## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | . MAGISTRATE JUDGE NO. 16-4117-MBB |
| | . |
| V. | . BOSTON, MASSACHUSETTS |
| | . APRIL 27, 2016 |
| MARTIN GOTTESFELD | . |
|     Defendant | . |
| . . . . . . . . . . . . . . . . | |

### TRANSCRIPT OF DETENTION HEARING
#### BEFORE THE HONORABLE MARIANNE B. BOWLER
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Adam J. Bookbinder, Esq.
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3112
adam.bookbinder@usdoj.gov

TOR EKELAND, P.C.
Tor Ekeland, Esq.
195 Plymouth Street, Fifth Floor
Brooklyn, NY 11201
(718) 737-7264
tor@torekeland.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                      I N D E X

2    WITNESS          DIRECT        CROSS      REDIRECT    RECROSS

3    Jeffrey Williams     4          35

4    EXHIBITS      DESCRIPTION                          PAGE

5    Government's:

6        1         Screenshot of YouTube video          11

7        2         CD of You Tube video                 12

8        3,4,5     Pictures of Boat                     25

9        6         List of Items from Secondary Screen  28

10   Defendant's:                                     IDENT.

11       A1        Complaint/Affidavit                  40

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   (Court called into session)

2   (2:06:20 PM)

3           THE COURT:  United States Court, District of

4   Massachusetts is now in session.  The Honorable Marianne

5   B. Bowler residing.  Today is Wednesday, April 27, 2016.

6   U.S. v. Gottesfeld Magistrate Judge No. 1604117 will now

7   be heard.

8           Could counsel please identify themselves for the

9   record?

10          MR. BOOKBINDER:  Good afternoon, Your Honor,

11  Adam Bookbinder and Dave D'Addio for the United States.

12          MR. D'ADDIO:  Good afternoon, Your Honor.

13          THE COURT:  Thank you.  Good afternoon.

14          MR. EKELAND:  Tor Ekeland of Tor Ekeland, P.C.

15  for defendant Martin Gottesfeld.

16          THE COURT:  Thank you very much.

17          Well we're here for the purposes of detention

18  and probable cause.  Are we ready to proceed?

19          MR. BOOKBINDER:  Your Honor, I believe PC was

20  waived.  We're here for the purpose of detention only.

21          THE COURT:  Was it at the first hearing?

22          MR. BOOKBINDER:  Yes, Your Honor.

23          THE COURT:  All right, so just the matter of

24  detention.  Is the government ready to proceed?

25          MR. BOOKBINDER:  We are, Your Honor.  We have

4

1  one witness we'd like to call, Special Agent Jeffrey

2  Williams.

3              THE COURT:  Would you please come forward and be

4  sworn.

5                  WITNESS, JEFFREY WILLIAMS, SWORN

6              THE COURT:  And I'll just ask you to keep your

7  voice up and speak into the microphone please.

8              THE WITNESS:  Yes, Your Honor.

9                      DIRECT EXAMINATION

10  BY MR. BOOKBINDER:

11  Q    Could you introduce yourself and spelling your name

12  for the record?

13  A    Yes, my name is Jeffrey, J-E-F-F-R-E-Y, M as in Mark,

14  middle name, Williams, W-I-L-L-I-A-M-S, and I'm a special

15  agent with the FBI here in Boston.

16  Q    Good afternoon, Agent Williams.  You said you're a

17  special agent with the FBI.  How long have you been with

18  the bureau?

19  A    I've been employed with the FBI for approximately six

20  years.

21  Q    So you joined in 2010?

22  A    Yes.

23  Q    And where are you stationed?

24  A    I'm stationed here in Boston currently.

25  Q    Are you associated with a particular unit?

5

1  A    I am associated with the Cyber Crime Squad here in

2  Boston.

3  Q    Okay, and how long have you been with Cyber Crime

4  Squad in Boston?

5  A    Approximately two and half years.

6  Q    Okay.  Prior to that where were you?

7  A    I was in our Las Vegas division of the FBI.

8  Q    And what was your area of focus in Las Vegas?

9  A    Also Cyber Crimes.

10 Q    Can you briefly summarize some of your training and

11 experience with respect to cyber investigations?

12 A    Yes, so for the FBI I've investigated a number of

13 different cybercrimes to include computer intrusions, both

14 criminal in nature and as also, also ones originating from

15 nation state threats.

16 Q    Okay, ever received any specialized training in

17 addition to all the on the job training and case work?

18 A    Yes, I've attended FBI sponsored computer

19 certification trainings.

20 Q    And can you briefly summarize your educational

21 background?

22 A    I hold a Bachelor of Science in Information Systems

23 from Drexel University as well as a Master of Science in

24 Computer, Computer Information Systems from Boston

25 University.

6

1  Q    Agent Williams, are you familiar with the defendant

2  in this case, Martin Gottesfeld?

3  A    Yes, I am.

4  Q    Okay, how are you familiar with him?

5  A    I'm familiar with him by knowing he's, he's the

6  target of a current FBI investigation involving the denial

7  of service attacks against a Boston hospital.

8  Q    Okay, do you see him in the courtroom today?

9  A    I do.

10 Q    Could you point him out and identify an article of

11 clothing he's wearing?

12 A    He's sitting here at the defense table wearing a tan

13 and brown shirt.

14        MR. BOOKBINDER:  Your Honor, for the record,

15 we'd ask that the court records--

16        THE COURT:  Let the record reflect that the

17 witness has identified the defendant.

18 BY MR. BOOKBINDER:

19 Q    Okay.  Agent Williams, you spoke about a denial of

20 service attack, can you explain who the target of that was

21 and in general what that attack was?

22 A    Yes, the target of the attack was Boston Children's

23 Hospital here in Boston, Massachusetts and in, in general

24 a denial service attack is when someone directs a number

25 of computers to transmit traffic to a single computer for

7

1   purposes of bringing that computer down and not being

2   able to communicate with other network computers.

3           THE COURT:  Brendon, can I have a copy of the

4   complaint?

5   BY MR. BOOKBINDER:

6   Q    Essentially overwhelming the traffic.  Is that fair

7   to say?

8   A    Yes.

9   Q    Network traffic?

10  A    Yes.

11  Q    Is that what happened in this case?

12  A    It is.

13  Q    Are you familiar with how long the denial of service,

14  distributed denial of service attack lasted in this case?

15  A    I'm not certain of, of the duration.  At least, at

16  least a day from what I understand.

17  Q    Were there other aspects of the attack beyond the

18  DDOS on Children's Hospital that you're aware of?

19          THE COURT:  Beyond the what?

20          MR. BOOKBINDER:  Beyond, Your Honor.  I'll back

21  up.

22          THE COURT:  For the record.

23  BY MR. BOOKBINDER:

24  Q    For the record, is there an acronym that's often used

25  to refer to distributed denial of service attacks?

1  A    Yes, people often refer to it in short as a DDOS.

2  D-D-O-S.

3  Q    Okay, and so the DDOS attack was one aspect of the

4  attack on Boston Children's Hospital computers?  Is that

5  fair to say?

6  A    That's correct.

7  Q    Were there other aspects of network attack as well?

8  A    Yes.

9  Q    Okay, can you briefly describe?

10 A    Yes, from what was reported to us Boston, Boston

11 Children's Hospital also received emails that contained

12 malicious code that if opened would allow the attackers

13 another avenue into their network.

14 Q    Okay, during the attack, did Children's Hospital take

15 steps to prevent the destruction, prevent the penetration

16 of its networks?

17 A    Yes.

18 Q    And are you familiar with what it did?

19 A    Yes, they ended up shutting off their hospital

20 network essentially from the outside network not allowing

21 physicians and patients to communicate with each other,

22 among many ways and to include email.  Due to this being

23 shut down, they also were not able to fund raise for

24 certain projects.

25 Q    Was the website, the publically facing website for

9

1    Boston's Children's Hospital taken offline?

2    A    Yes.

3    Q    And was the publically facing fundraising site for

4    Boston Children's Hospital taken offline?

5    A    Yes.

6    Q    And you testified that email communication within the

7    hospital was effected?

8    A    Yes.

9    Q    Okay.

10            THE COURT:  And what about access to medical

11   records?

12            THE WITNESS:  Patients were also not able to

13   access their medical records which include the ability to

14   understand medication refills and in some instances,

15   physicians could not communicate with each other to

16   discuss those medical records.  I'm not certain about

17   specific medical record information systems.

18            MR. BOOKBINDER:  Okay.

19            THE COURT:  Well, was a physician able to access

20   a medical record if he needed it?

21            THE WITNESS:  Potentially, but they weren't

22   able, again to refer back to other physicians through

23   email.

24   BY MR. BOOKBINDER:

25   Q    Do you know when this attack began?

1    A    April 19th--

2    Q    Okay.

3    A    --of 2014.  Excuse me.

4    Q    When, when did the FBI learn about it approximately?

5    A    That same day.

6    Q    And did the FBI begin its investigation around that

7    time?

8    A    Yes, we did.

9    Q    Was there public information that the FBI became

10   aware of relating to the attack and the, the purported

11   reasons for the attack?

12   A    Yes, there were two specific pieces of information

13   that came to our attention.  One was a You Tube video and

14   a second was a posting on a website, Pastebin.

15                MR. BOOKBINDER:  Okay.

16                THE COURT:  On, what was the name of the

17   website?

18                THE WITNESS:  Pastebin, P-A-S-T-E-B-I-N.com.

19   BY MR. BOOKBINDER:

20   Q    Agent Williams, we'll talk about each of those in

21   turn.

22                MR. BOOKBINDER:  Your Honor, may I approach the

23   witness?

24                THE COURT:  You may and you need not ask again.

25                MR. BOOKBINDER:  Thank you, Your Honor.

1  BY MR. BOOKBINDER:

2  Q    Agent Williams, I put two exhibits in front of you

3  that have been marked for identification as Exhibits 1 and

4  2.  One is the paper exhibit and two is the CD.  Can you,

5  starting with one, can you take a look at that and tell me

6  if you recognize what that is?

7  A    I do, I do recognize it.  It is for Exhibit 1.  It is

8  a screenshot of a YouTube video posted by the user shut

9  down Logan River Academy calling, or basically calling for

10 the attack of the particular hospital.

11 Q    And was there a date that that was published on the

12 document?

13 A    It was published, the documents date's is published

14 March 23, 2014.

15 Q    Does that, is that screen captured, does that relate

16 to the YouTube video you were referring to earlier?

17 A    Yes.

18       MR. BOOKBINDER:  Your Honor, with the Court's

19 permission we move into evidence Exhibit 1?

20       THE COURT:  Hearing no objection, Exhibit,

21 Government Exhibit 1 is made part of the record for the

22 purpose of this hearing.

23       MR. BOOKBINDER:  Okay.

24        GOVERNMENT'S EXHIBIT NO. 1, ADMITTED

25 BY MR. BOOKBINDER:

12

1   Q     Now turning to Exhibit 2, can you take a look at

2   that CD and tell me if you recognize it?

3   A     I do recognize it.

4   Q     How do you recognize it?

5   A     It's one that we, we reviewed in your office earlier

6   today.

7   Q     How do you recognize the actual physical object?

8   A     I dated and initialed, the CD.

9   Q     And what is, what's on the CD?

10  A     The CD contains the full content of the video that we

11  described in Exhibit 1.

12          MR. BOOKBINDER:  The government offers Exhibit 2

13  into evidence and requests permission to publish the

14  exhibit?

15          THE COURT:  Hearing no objection, Government

16  Exhibit 2 is made part of the record.

17            GOVERNMENT'S EXHIBIT NO. 2, ADMITTED

18  TAPE PLAYED FOR COURT

19  (2:16:47 PM-2:22:00 PM)

20  BY MR. BOOKBINDER:

21  Q     Agent Williams, you testified earlier about the

22  website Pastebin, was that referred to on the You Tube

23  posting?

24  A     Yes, it was.

25  Q     Did that website contain information that the link

13

1    described on the You Tube posting regarding the DDOS

2    attack on Boston Children's Hospital?

3    A    Yes, it did.

4    Q    Did it identify a particular server?

5    A    Yes.

6    Q    Was that the server that was the subject of the DDOS

7    attack on April 19, 2014?

8    A    It was.

9    Q    And the video was posted by an account that went by

10   the name of Shut Down Logan River Academy.  Is that right?

11   A    Yes.

12   Q    Did FBI obtain records regarding that account from

13   Google?

14   A    Yes.

15   Q    And what did those records show with regard to that

16   account?

17   A    Those records indicated that it was registered by

18   Martin Gottesfeld.

19   Q    Okay.

20   A    And it also included a number of IP address records.

21   Q    Did it include information regarding the IP address

22   that was used to post the video?

23   A    Yes.

24   Q    And were you able to obtain additional information,

25   you being the FBI, additional information regarding that

14

1    IP address?

2    A    Yes.

3    Q    And what were you able to find?

4    A    That the IP address belonged to the provider RCN and

5    then upon gathering further information from RCN, it led

6    us back to Martin Gottesfeld's apartment in Somerville,

7    Massachusetts.

8    Q    Was that at 12 Albion Street, Apartment No. 1 in

9    Somerville?

10   A    Yes.

11   Q    Did the FBI take any investigative steps relating to

12   that address?

13   A    Yes, the FBI executed a search warrant on that

14   address in approximately October 2014.

15   Q    Okay.  Did Mr. Gottesfeld, Gottesfeld speak to FBI

16   agents during the course of executing that search warrant?

17   A    Yes, he agreed to be interviewed.

18   Q    Okay, can you describe what he said regarding, can

19   you describe what he said?

20   A    He stated that he was the individual who operated the

21   Shut Down Logan River Twitter account.

22   Q    Okay, did he talk about--

23   A    Oh sorry, yup, Twitter.

24   Q    YouTube account?

25   A    Yes.

15

1   Q     Did he discuss posting the video?

2   A     Yes.  He said that he was the one who posted the

3   video but did not put his faith in DDOS.

4   Q     Okay, did FBI seize evidence from the apartment, from

5   Mr. Gottesfeld's apartment?

6   A     Yes, we seized a number of computers that he

7   identified as his own.

8   Q     Okay, did FBI examine those computers?

9   A     We did.

10  Q     And was there information on there relating to DDOS

11  attacks?

12  A     There were.  Through a review of those computers we

13  found messages where these DDOS attacks were discussed for

14  other treatment facilities, resid, youth residential

15  treatment facilities.

16  Q     And were some of those messages from Gottesfeld?

17  A     Yes.

18  Q     Okay.  So, fair to say that at the point of executing

19  the search warrant this was no longer a covert

20  investigation of the DDOS attack on Children's?

21  A     No, it was, it was not covert.

22  Q     You spoke to him.

23  A     He was aware that the FBI was there investigating

24  this.

25  Q     Was there any additional formal communication

1  notifying him regarding his status in this

2  investigation?

3  A    Yes.  Martin was also, provided a target letter to

4  notify him that he was in fact a target of the

5  investigation.

6  Q    Did FBI later meet with Martin Gottesfeld?

7  A    Yes.

8  Q    And do you recall roughly when that happened?

9  A    That was in May of 2015.

10 Q    Okay, and where did that meeting take place?

11 A    It took place at the U.S. Attorney's Office here in

12 Boston, Massachusetts.

13 Q    Was Mr. Gottesfeld represented by an attorney at that

14 time?

15 A    Yes.

16 Q    And who was present at the meeting?

17 A    Mr. Gottesfeld, Mr. Gottesfeld's attorney, who, who

18 are present here today, members of the FBI and members of

19 the United States Attorney's office.

20 Q    Without getting into specifics, what in general was

21 discussed at that meeting?

22 A    The, the evidence in the case and, and next steps—

23 Q    Okay.

24 A    --because of to come, to attempt to come to a

25 resolution.

1   Q    All right, so fair to say that the government

2   shared some of its evidence gathered in the investigation

3   of Mr. Gottesfeld?

4   A    Yes.

5   Q    Was there a later meeting that took place with Mr.

6   Gottesfeld?

7   A    Yes, there was.

8   Q    And when did that take place, approximately?

9   A    December of 2015.

10  Q    And was that also at the U.S. Attorney's Office?

11  A    It was.

12  Q    Was Mr. Gottesfeld represented by an attorney?

13  A    He was.

14  Q    Mr. Ekeland?

15  A    Yes.

16  Q    Without getting into the specifics of that meeting,

17  was the DDOS attack on Children's hospital discussed?

18  A    Yes, it was.

19  Q    Were you aware of discussions between the U.S.

20  Attorney's Office and Mr. Gottesfeld's attorney regarding

21  potentially resolving this matter?

22  A    Yes.

23  Q    And fair to say those discussions had progressed over

24  months?

25  A    Yes.

18

1  Q    And are you aware of whether any proposed

2  resolutions were discussed?

3  A    They were.

4  Q    Okay, and roughly what time frame was that occurring?

5  A    Towards the end of December into January 2016.

6  Q    And focusing on January of 2016, was FBI contacted by

7  local law enforcement regarding Mr. Gottesfeld's

8  whereabouts?

9  A    Yes, we were.

10 Q    Can you describe that communication?

11 A    So, towards the end of Jan, January 2016, the FBI was

12 contacted by Somerville police department because Mr.

13 Gottesfeld's employer had contacted them saying that he

14 had not shown up to work and they requested that a

15 wellness check be done on his, on him at his residence.

16 Q    Did Somerville P.D. conduct that check?

17 A    They did conduct that check and did not find any

18 what, anyone at home at the time the check was conducted.

19 Q    Anything unusual?

20 A    Nothing unusual.

21 Q    And that's the same apartment that FBI had searched

22 earlier, is that right?

23 A    Yes.

24 Q    Okay.  Did Sergeant Whelan talk about any attempts

25 that the employers had made to communicate with Mr.

1   Gottesfeld?

2   A    Just, they attempted to contact him.  There was no,

3   no answer.

4   Q    Okay.  Was there further communication with local law

5   enforcement about Mr. Gottesfeld's whereabouts?

6   A    Yes, so, now moving into the beginning of February,

7   another police department, Andover police department had

8   contacted Somerville police department, one, asking,

9   asking them the whereabouts of Mr. Gottesfeld because they

10  had a family medical emergency and they were trying to get

11  in contact with, with him.

12  Q    Were they able to reach him?

13  A    No, they were not.

14  Q    Was Somerville PD ever able to reach Mr. Gottesfeld?

15  A    No.

16  Q    So moving forward, were you, was FBI still in

17  communication with Somerville PD regarding the defendant's

18  whereabouts?

19  A    Yes, and it turns out, again another person was

20  looking for Mr. Gottesfeld and his wife.

21  Q    Who was that?

22  A    Martin's wife's mother was attempting to get ahold of

23  her daughter.

24  Q    Had she contacted Somerville PD?

25  A    She did.

20

1          THE COURT:  The defendant's mother?

2          THE WITNESS:  The defendant's wife's mother.

3          THE COURT:  Defendant's mother-in-law.

4          THE WITNESS:  Mother-in-law.  Yup.  Sorry, Your

5   Honor.

6          THE COURT:  That's all right.

7   BY MR. BOOKBINDER:

8   Q    And is the defendant's wife's name Dana Gottesfeld?

9   A    Yes.

10  Q    And the mother's name, Terri Barrack?

11  A    Yes.

12         THE COURT:  Terri Barrett?

13         THE WITNESS:  Barach.

14         MR. BOOKBINDER:  Barach?

15         THE COURT:  Can we have a spelling please?

16  BY MR. BOOKBINDER:

17  Q    B-A-R-A-C-H.  Is that correct agent?

18         THE WITNESS:  Yes.

19  BY MR. BOOKBINDER:

20  Q    What did Mrs. Barach report to Somerville P.D?

21  A    She reported that she had not been able to contact

22  her daughter for over a month.  That she pays or she paid

23  her daughter's cellphone bill and saw activity on the

24  cellphone drop basically no communications happened on

25  that phone after January the 15th, and that she was

21

1    considering filing a missing person's report because she

2    was not able to contact her daughter.

3    Q    Did Somerville PD conduct any follow up

4    investigation?

5    A    They did.  They contacted both of the employers of

6    Martin and Dana.

7    Q    And what did they find?

8    A    They found out that both individuals last returned,

9    last worked at their respective employers January 15th and

10   both requested off on the subsequent Monday and Tuesday so

11   they, 18th and 19th and they were both due back to work on

12   the 20th of January.

13   Q    Was that a holiday weekend do you recall?

14   A    Yes, I believe it was Martin Luther King, Jr.

15   weekend.

16   Q    Okay, and you said they didn't show up on the 20th, is

17   that right?

18   A    That's correct.

19   Q    Did they show up at any point after that?

20   A    No.

21   Q    Any contact with the employers after that?

22   A    No.

23   Q    Did FBI contact the defendant's mother-in-law, Ms.

24   Barach?

25   A    Yes.

1   Q    And roughly when did that happen?

2   A    Approximately the middle of, of February.

3   Q    Okay, and what in substance did Ms. Barach tell the

4   FBI about the whereabouts of her daughter?

5   A    She was not certain where her daughter was.  She had

6   not heard from her for this point about a month and a

7   half.  Again, that the cell phone activity had, there was

8   no activity after the 15th, and additionally she was able

9   to find the landlord's phone number for the apartment they

10  were renting in Somerville, Massachusetts, ultimately

11  meeting up with the landlord in person.  They live in the

12  same geographical area in California and the landlord had

13  informed Mrs. Barach that the rent had not, the rent was

14  paid for in January 2016 but not for February of 2016.

15  Q    And you testified earlier that she told Somerville PD

16  she was considering filing a missing person's report.  By

17  the time of FBI's contact with her had she filed a

18  missing's person report?

19  A    Yes, she, she told FBI she had filed a report at that

20  time.

21  Q    Had she reached out to the defendant's family to find

22  out his whereabouts and the whereabouts of her daughter?

23  A    She had.  She did.

24  Q    And what were the results of that?

25  A    Negative results.  It was uncertain where they were

23

1    still.

2    Q    Did you ask her or did FBI, excuse me, ask her to

3    call them if she heard anything?

4    A    We did.

5    Q    Did she ever?

6    A    She, at that point it was just left at if, if you do

7    hear from him, please let us know and kind of likewise--

8    Q    Okay.

9    A    --if you do learn about their whereabouts we, you

10   know, distinguish we'll definitely speak with some

11   Somerville PD as well, police department.

12   Q    Did she ever communicate the whereabouts of her

13   daughter to FBI?

14   A    No.

15   Q    Did FBI eventually learn where Dana and Martin

16   Gottesfeld were?

17   A    We did.

18   Q    And when did that happen?

19   A    Approximately February 16th--

20   Q    Okay.

21   A    --of 2016.

22   Q    Where were they?

23   A    Turns out they were rescued at sea off the coast of

24   Cuba after placing a mayday call because their, the vessel

25   they were on had lost propulsion.

24

1   Q    How'd you learn about that?

2   A    Two separate ways.  We learned that they were a

3   passenger on a cruise ship through customer, Customs and

4   Boarder Protection and then later learned through our

5   legal attaché office in the Bahama's that they actually

6   had been rescued at sea.

7   Q    Okay, did you contact anybody at, you said it was a

8   Disney Cruise ship.  Is that right?

9   A    Yes.

10  Q    Did you contact anybody at that, at the Disney Cruise

11  ship to find out what the story was?

12  A    Yes, we spoke with the director of security for that

13  cruise, specific cruise ship.

14  Q    What, and do you remember what that person's name is?

15  A    Phil Halshall.

16  Q    Okay, what is--

17          THE COURT:  Spelling of the last name?

18          THE WITNESS:   believe H-A-L-S, H-A-L-S-H-A-L-L.

19          THE COURT:  Thank you.

20  BY MR. BOOKBINDER:

21  Q    What did Mr. Halshall tell the FBI?

22  A    He, he informed the FBI that the, the ship had to,

23  had responded to a mayday call for a boat that had lost

24  propulsion.  They had rescued these two individuals and

25  that they had given different statements to different

1  members of the crew on the ship.  In addition, they were

2  able to grab some but not all of the belongings from the

3  boat that Martin and Dana were rescued from.

4  Q    Agent Williams, we'll, we'll talk about that in a

5  little more detail.  I'm going to assist with that

6  discussion and give you a few exhibits here--

7  A    Sure.

8  Q    --three, four and five for identification.  Can you

9  take a look at this and tell me if you recognize them?

10 A    I do.

11 Q    What are they?

12 A    They are pictures of, of the boat Martin and Dana

13 were on that were provided from that Disney Cruise line to

14 Customs and Boarder Detection who then in turn gave them

15 to the FBI.

16        MR. BOOKBINDER:  Your Honor, the government

17 moves in 3, 4 and 5 into evidence.

18        THE COURT:  Hearing no objection, Government

19 Exhibits 3, 4 and 5 will be admitted and made part of the

20 record for the purpose of this hearing.

21        GOVERNMENT'S EXHIBIT NOS. 3, 4 AND 5, ADMITTED

22 BY MR. BOOKBINDER:

23 Q    Let's start with three, Agent Williams.  What's in

24 that picture?

25 A    It's the overall shot of the, of the boat.  You can

26

1  see Mr. Gottesfeld in the middle of, of the boat, kind

2  of near steering area there, steering wheel, with a life

3  preserver on.

4  Q    And then four and five?

5  A    Four and five are close ups of the front and rear of

6  the boat.

7  Q    Which one's the front?

8  A    Number five is the front, four is the rear.

9  Q    Okay, were Dana and Martin Gottesfeld the only people

10  on that boat?

11  A    Yes.

12  Q    About how big is that boat?

13  A    It was estimated to be approximately 23 feet.

14  Q    Was there any identifying information on the boat

15  that you're aware of?

16  A    No, in fact the director of security for the cruise

17  line had informed the FBI that it was unregistered,

18  uninsured and unnamed.

19  Q    Okay.  You said that they were rescued.  How does it

20  work?  A cruise ship's a big thing and that's a 23 foot

21  boat.  How does that happen?

22  A    Sure.  So the way it was explained to me, it could

23  happen a number of ways.  Sometimes the cruise ships have

24  the ability to deploy a separate vessel to go perform

25  these types of rescue, rescues.  In this case, the cruise

27

1  ship actually pulled up next to this particular boat and

2  for lack of a better term, hoisted them and some of their

3  belongings up off of the boat.

4  Q    You said some of their belongings.  Were there things

5  left behind on the boat?

6  A    Yes, the director of security indicated that only a

7  subset of items that were on that boat were brought on to,

8  on board to the Disney Cruise line.

9  Q    Did the defendant and his wife seek to go back to the

10  boat to obtain the rest of their belongings?

11  A    Yes, from what was described to us they did.

12  Q    Were they able to do that?

13  A    They were not allowed to do that.

14  Q    Okay.  Were those items inventoried at some point?

15  A    They--

16  Q    The items that were brought onto the boat, not the

17  ones that were left behind?

18  A    Oh, when, when the cruise ship reached port in Miami

19  they were searched, secondary searched by officers of

20  Customer, Customs and Border Patrol for protection.

21  Q    I'm showing you what's been marked for identification

22  as Exhibit 6.  Can you take a look at that and tell me if

23  you recognize it?

24  A    Yes, I do recognize it.

25  Q    And what is it?

1  A    It's a, a list of some of the items that were

2  observed during the secondary screening.

3         MR. BOOKBINDER:  Your Honor, the government

4  offers Exhibit 6 into evidence.

5         THE COURT:  Hearing no objection, Government

6  Ex--

7         MR. EKELAND:  Your Honor, may I just get some

8  clarification here.  It's my understanding that the

9  Federal Rules of Evidence don't apply in a detention

10  hearing--

11         THE COURT:  That's correct.

12         MR. EKELAND:  --to the extent that I, it's

13  unnecessary that we move things into evidence.  We're not,

14  we can't object.

15         THE COURT:  Well it is necessary to move it into

16  evidence to make it part of the record, and there may be

17  other objections that you could make but--

18         MR. EKELAND:  Very well, Your Honor.  No

19  objection.

20         THE COURT:  All right, Government Exhibit 6 is

21  made part of the record for the purpose of this hearing.

22          GOVERNMENT'S EXHIBIT NO. 6, ADMITTED

23  BY MR. BOOKBINDER:

24  Q    So let's talk about a few of these items here.  There

25  are laptop computers, is that correct?

1    A    Yes.

2    Q    Cell phones?

3    A    Yes.

4    Q    And it says GPS device, what is that referring to?

5    A    For, for what we observed, it appeared to be a

6    standalone type GPS device as opposed to one that you

7    would use on your cell phone.

8    Q    Okay and there were calling cards and data cards.

9    What were those for?

10   A    Based off of my training and experience, I believe

11   those were used for, for monthly calling plans.  For

12   phones that were potentially purchased.

13   Q    Okay, and data capable phones?

14   A    Yes, for both talk, text and data or all three.

15   Q    And there are a number of, I guess you describe them

16   as personal items.  Is that fair to say?

17   A    Yes.

18   Q    Can you describe some of those?

19   A    Sure.  There was a photo album from Martin and Dana's

20   wedding, their marriage license, a number of identifying

21   documents to include Dana's social security card and

22   passport.

23   Q    Were there any stamps on Dana's passport?

24   A    There were not.  Then Dana and Martin's Massachusetts

25   driver's license as well as Martin's birth certificate.

30

1    We did not observe a passport for Martin.

2    Q    Okay.  Where about's were they rescued?

3    A    It was explained to us that they were rescued off the

4    coast of, of Cuba and on the boat in fact we found a Cuban

5    wind chart as well as some Cuban stamped cigarettes.

6              THE COURT:  On the boat you found?

7              THE WITNESS:  Oh, I'm sorry, within their

8    belongings that were recovered from the boat.

9              THE COURT:  Okay.

10   MR. BOOKBINDER:

11   Q    Were there, was there money and financial documents?

12   A    Yes, some checks and checkbooks, credit or debit

13   cards and there were at least $500 in cash.  We, we did

14   inventory of the money fully.

15   Q    Okay, and listed down at the bottom are receipts for

16   bank withdrawals and recent purchases.  Were you able at

17   some point to take a look at some of those items?

18   A    Yes, not only did we review as we took photographs of

19   them as well and essentially there was a number of, of

20   cash withdrawals or ATM withdrawals that appeared ranging

21   from amounts from $500 to $4,900 and then there, the

22   receipts that we observed were from Walmart to purchase

23   electronics.  These calling cards that we described

24   earlier and theirs were also paid in cash.

25   Q    Okay, did you talk to folks at Disney, you again,

1   when I say you I'm referring to FBI generally, not you

2   in particular, but did the FBI talk to Disney about any

3   communications they had with Martin and Dana Gottesfeld on

4   the ship?

5   A    Yes.

6   Q    Can you describe some of those?

7   A    One of, one of the, one of the, initially there was,

8   appeared to be some type of screaming or hysteria in terms

9   of what was going on and then when asked about what, where

10  they were, what they were doing, where they were, one crew

11  member, it was described by one crew member as they were,

12  they had just left Key West that day, but based off of

13  that crew member's experience, they looked and smelled

14  like they had been at sea for some time.

15  Q    Just to be clear, who told the crew member that they

16  had just left that day from--

17  A    Martin and Dana.

18  Q    Okay.

19           THE COURT:  Both?

20           THE WITNESS:  Just, I would go with just Martin

21  from what I recall.

22  BY MR. BOOKBINDER:

23  Q    That's your recollection from your--

24  A    Yes.

25  Q    --conversation with the security officer at Disney.

1   Is that right?

2   A    Yes.

3   Q    Okay.  Did Martin make any statements regarding where

4   the boat came from?

5   A    No, only that it was purchased for $4,000

6   approximately four weeks ago.

7   Q    So getting back to our timeline, I think you

8   testified earlier that they were, that you learned that

9   they were on this boat on or about February 16, 2016.  Is

10  that correct?

11  A    Yes.

12  Q    And at that point, where was the boat, where was the

13  Disney Cruise ship heading?

14  A    They were, they were still obviously at sea but they

15  were making their way back to the port of Miami, to--

16  Q    When were they due to dock in Miami?

17  A    February 17th.

18  Q    So at that point, FBI has communicated with customs

19  with its attaché and with Disney.  Is that right?

20  A    Yes.

21  Q    What steps did FBI take next?

22  A    So we contacted the U.S. Attorney's Office and

23  prepared a complaint for Martin's arrest.

24  Q    Okay.  Was that complaint issued?

25  A    It, it was issued on February the 16th.

1    Q    Was an arrest warrant issued?

2    A    Yes.

3    Q    Was that arrest warrant executed?

4    A    Yes, that was es, executed the very next day on the

5    17th.

6    Q    And where did that take place?

7    A    At the port of Miami.

8    Q    Were you there?

9    A    I was present.

10   Q    So you flew down to Miami?

11   A    Yes.

12   Q    Were you able to see some of the items that were

13   inventoried in Exhibit 6?

14   A    Yes.

15         THE COURT:  So it's unclear to me Special Agent

16   Williams, the ship came in a day early or did it come in

17   on the 16th or the 17th?

18         THE WITNESS:  The 17th.

19         THE COURT:  It was due the 17th and it arrived on

20   the 17th?

21         THE WITNESS:  Yes.

22   BY MR. BOOKBINDER:

23   Q    And the arrest warrant was issued on the 16th.  Is

24   that right?

25   A    Yes.

34

1  Q    And when did you fly down?

2  A    The night of the 16th.  We, we landed just after

3  midnight on the 17th.

4  Q    And approximately when was the defendant arrested on

5  the 17th?

6  A    Approximately 6:45 in the morning.

7  Q    Okay.  Did you make any attempts to speak with the

8  defendant?

9  A    No, other than general booking questions.

10  Q    Okay.  What about Dana?

11  A    We did attempt to interview Dana and she indicated

12  that she did have an attorney.

13  Q    Did she say who that attorney was?

14  A    Mr. Ekeland.

15  Q    Okay.  Did you tell Dana any other information?

16  A    We told her that she should consider calling her

17  mother due to the circumstances that we learned about

18  earlier in the month.

19  Q    Was Dana arrested?

20  A    No, she was not.

21  Q    Were any of the items that they had aboard the Disney

22  Cruise ship seized?

23  A    No.

24  Q    Did they have access to these items while they were

25  on the cruise ship?

35

1    A    It was my understanding that they did not.

2    Q    Okay.  So Dana was free to go.  Is that right?

3    A    Yes.

4    Q    And did she leave?

5    A    She did.

6    Q    Okay.  Did she take anything with her?

7    A    She took all of the belongings.

8    Q    Okay.

9         THE COURT:  Your Honor, if I could just have a

10   brief moment?

11        THE COURT:  Um-hmmm.

12   PAUSE

13        MR. BOOKBINDER:  Nothing further from the

14   government.

15        THE COURT:  Cross examination?

16        MR. EKELAND:  Yes, Your Honor.

17                    CROSS EXAMINATION

18   BY MR. EKELAND:

19   Q    Mr. Williams, thank you for coming in and testifying

20   today.  I want to just ask you a couple questions about

21   Mr. Gottesfeld being picked up as you said off the coast

22   of Cuba.

23        Now when Mr. Gottesfeld was picked up by the Disney

24   Cruise ship, he hadn't been formally charged with any

25   crime, correct?

36

1   A    That's correct.

2   Q    And you actually have no idea which direction Mr.

3   Gottesfeld was heading, correct?

4   A    I, I am not aware of the exact direction, no.

5   Q    As a matter of fact you can't tell me exactly where

6   he was picked up, correct?

7   A    That's correct.

8   Q    Okay.  So he might have been heading back the United

9   States for all you know, correct?

10  A    Correct, all we, all we know is what was told to us

11  from the cruise line.

12  Q    And, and at the time that Mr. Gottesfeld was picked

13  up, he wasn't under any kind of travel restrictions,

14  correct?

15  A    Correct.

16  Q    He was free to go wherever he wanted, correct?

17  A    Yes.

18  Q    And now, you mention that you've been working on this

19  investigation for a while now, correct?

20  A    I'm not the case agent of the investigation.  I've

21  assisted with various steps of it but--

22  Q    Well you're, you're famil, you, it's fair to say--

23  A    Right.

24  Q    --that you're familiar with it, correct?

25          THE COURT:  Let the witness finish.

37

1       MR. EKELAND:  Oh, I'm sorry, Your Honor.

2   A    No, yeah, so I, I, I've assisted with the execution

3   of the search warrant as well as execution of the arrest

4   warrant and you know, bits and pieces here and there but

5   I, I can answer your questions the best I can.

6   BY MR. EKELAND:

7   Q    Okay, and you testified about the execution of the

8   search warrant I believe, correct?

9   A    Yes.

10  Q    And you testified about, I believe what Mr.

11  Gottesfeld said when the search warrant was executed,

12  correct?

13  A    Yes.

14  Q    But you actually weren't there when the search

15  warrant was executed, correct?

16  A    No, I, I was in the residence.  I was not one of the

17  agents speaking directly with Mr. Gottesfeld.  I only know

18  what was told to me from, from other agents.

19  Q    From other agents.  So you weren't, you weren't

20  present when Mr. Gottesfeld made his statements to the

21  other agents, correct?

22  A    No.  I--

23  Q    And, sorry--

24  A    I, I was just going to say, I, I'm sure Mr.

25  Gottesfeld remembers but I did use his restroom.  I walked

38

1  through with him, but I wasn't adamantly involved in, in

2  the discussion.  I was, I was, there was a separate

3  roommate also living there that was also, you know, free

4  to leave but you know, in the meantime he decided he

5  wanted to stay in his residence so I was actually in that

6  other room with him.

7  Q    And you also testified to some conversations that Mr.

8  Gottesfeld had when he got picked up I guess in, in the

9  Caribbean, correct?  But you weren't present for those

10 conversations, correct?

11 A    No, I was not.

12 Q    You're just repeating what other people told you?

13 A    Yes, what, what the cruise line has reported to us.

14 Q    Uh-huh, and you also testified that you, that you

15 worked on the drafting of the criminal complaint in this

16 matter?

17 A    I didn't, no, there was another special agent, but I

18 did read the complaint.

19 Q    You, you're familiar with the complaint and you're

20 familiar with the affidavit in this case?

21 A    Yes.

22        MR. EKELAND:  Your Honor, may I approach?  I'd

23 just like--

24        THE COURT:  Yes, and you need not ask again.

25        MR. EKELAND:  Thank you, Your Honor.

39

1  BY MR. EKELAND:

2  Q    Mr. Williams, I'm just handing you what's been marked

3  for identificat--

4            THE COURT:  You've showed it to your brother?

5            MR. EKELAND:  What?

6            THE COURT:  You've showed it to your brother?

7            MR. EKELAND:  I am about to, Your Honor.

8            THE COURT:  We usually exchange exhibits.

9            MR. EKELAND:  And this, this is the criminal

10 complaint and the affidavit in this matter because your

11 copier--

12           THE COURT:  I think they're familiar with it.

13           MR. EKELAND:  I, I hope so.

14 BY MR. EKELAND:

15 Q    So, Mr. Williams, I'm just handing to you the

16 criminal complaint and the affidavit.  Would the Court

17 like a copy, Your Honor?

18           THE COURT:  No.

19           MR. EKELAND:  All right.

20 BY MR. EKELAND:

21 Q    So, Mr. Williams, I'm showing you what's been marked

22 for identification as Exhibit 1A which is the criminal

23 complaint.

24           THE COURT:  I think we already have Exhibit 1.

25 You would be Defendant's Exhibit A.

1      MR. EKELAND:  Defense Exhibits A.  Your, Your

2  Honor, I've pre-marked these.  If you'd like, I can, I'll

3  change the--

4      THE COURT: Well, it's always best to check with

5  the clerk when you're not familiar with the practice in

6  the district.

7      MR. EKELAND:  Very well.  So should I just

8  remark these right now as I go along?

9      THE COURT:  And refer to Exhibit A, Defendant's

10  Exhibit A.

11     DEFENDANT'S EXHIBIT 1A, MARKED FOR IDENTIFICATION

12     MR. EKELAND:  Yes, yes, Your Honor.

13  BY MR. EKELAND:

14  Q    So I'm showing you what's now being marked as

15  Defendant's Exhibit A1.  That is the criminal complaint--

16  A    Yes.

17  Q    --in this matter.  Is that correct?

18  A    Yes.

19  Q    And that essentially charges Mr. Gottesfeld with the

20  violation of 18 U.S., United States Code 371, correct?

21  A    That's correct.

22  Q    And that's just the general conspiracy statute,

23  correct?

24  A    Yes.

25  Q    And the conspiracy that's being alleged in this

41

1  complaint is a violation of 18 U.S.C. 1030(a)(5)(A),

2  correct?

3  A    Yes.

4  Q    And that is essentially knowing transmission of a

5  code with the intent to cause damage to a computer,

6  correct?

7  A    Yes.

8  Q    And, and those allegations are based on the alleged

9  DDOS attacks against Boston Children's Hospital and

10 Wayside Youth Center, correct?

11 A    Yes.

12 Q    I just want to, and in this complaint it mentions

13 that, a, it doesn't actually mention the hospital or the

14 youth treatment center by name, but the hospital is Boston

15 Children's Hospital, correct?

16 A    Yes.

17 Q    And the treatment center in question is Wayside Youth

18 and Family Center in Framingham, Massachusetts.  Is that

19 correct?

20 A    Yes.

21 Q    And the one thing that these two places had in common

22 is that they both essentially detained Justina Pelletier,

23 correct?

24 A    They had some involvement in, in the care of her.

25 They were custody was granted to them.  I'm not sure if I

42

1   want to use the word detained myself, but, they were

2   involved in, in the custody issue and, and, and it was

3   very public so.

4   Q    So, but, so, it's correct to say that the patient A

5   referred to in the affidavit is Justina Pelletier,

6   correct?

7   A    Correct, yup.

8   Q    And it is correct to say that Boston Children's

9   Hospital gained custody of Justina Pelletier from her

10  parents by going to Massachusetts State Court?

11  A    Yes.

12  Q    And they, are you aware that they call that a

13  parentectomy at Boston Children's Hospital?

14  A    I'm not aware of that term.

15       MR. BOOKBINDER:  Objection, Your Honor.

16       THE COURT:  Sustained.

17  BY MR. EKELAND:

18  Q    Are you aware that Justina Pelletier spent roughly 16

19  months in the custody of BCH--

20       MR. BOOKBINDER:  Objection, Your Honor.

21  Relevance grounds?  We're here on risk of flight.

22       THE COURT:  If he knows?

23  A    I'm not, I'm not aware of, of the exact conditions of

24  the case or anything for that matter in regards to her

25  care or treatment or--

1    BY MR. EKELAND:

2    Q    But you would agree that as stated in the criminal

3    complaint affidavit at paragraph six that both religious

4    and political organizations and others asserted that this

5    case was an example of governmental interference with

6    parental rights?

7    A    That, that's the way that it was explained on the

8    news, yes.

9    Q    And it's fair to say that this case attracted a fair

10   amount of media attention both locally in Boston and

11   nationally, correct?

12   A    It did.

13   Q    Now I just want to turn your attention to the March

14   23, 2014, YouTube video.

15   A    Yes.

16   Q    Now at the point of this, that this YouTube video

17   that's posted on March 23rd, Ms. Pelletier had been in the

18   custody of Boston Children's Hospital a little bit over a

19   year, correct?

20   A    Yeah.

21   Q    And as we'd mentioned, this was a very controversial

22   thing, her being held by a, being in the custody of Boston

23   Children's Hospital, correct?

24   A    Yes.

25   Q    And in that video, you recall watching that video.

44

1   Do you recall it asking for a letter writing campaign to

2   the judge who gave custody of Peltier to Boston Children's

3   Hospital?

4   A    Yes.

5   Q    And that it called for the firing of Dr. Alice Newton

6   who's the, allegedly the doctor at Boston Children's

7   Hospital who asked that the hospital gain custody of her?

8   A    Yes.

9   Q    And you're aware that that video says, asks for

10  Justina to be set free, correct?

11  A    Yes.

12  Q    And you mentioned, you testified about the

13  Pastebin.com listing as, I believe the affidavit says it

14  provided information about BCH's server necessary to

15  initiate a DDOS attack, correct?  That's a--

16  A    Yes.

17  Q    But you've looked at that Pastebin post?

18  A    I didn't re-verify it, no.

19  Q    Oh, so you wouldn't be able to tell me that, whether

20  or not it actually explicitly calls for a DDOS attack,

21  would you?

22  A    It did list an IP address as well as some additional

23  address information of the hospital.  I don't believe it,

24  from my recollection did not specifically call for it.  It

25  was just referenced to from the video.

45

1   Q    Right, and an IP address that's public information,

2   correct?

3   A    It is.

4   Q    And the Boston Children's Hospital's website was a

5   publically facing website, correct?

6   A    Yes, it, it was publically facing.

7   Q    And the type of server running the website, that's

8   public information as well, correct?

9   A    I'm not sure, I'm not certain how they have their

10  system set up to make it public or I'm not sure if they

11  make that information public.  I do know that you,

12  publically you can figure out who that network, who, who

13  owns that IP address, but I'm not sure if they publically

14  say what type of, what, what server it is.

15  Q    Are you aware of a service called Netcraft that will

16  tell you what sort of servers websites are running?

17  A    Yes.

18          THE COURT:  Netcraft?

19          MR. EKELAND:  Netcraft, Your Honor.  That's

20  N-E-T-C-R-A-F-T.

21          THE COURT:  Thank you.

22  BY MR. EKELAND:

23  Q    And the affidavit states that the YouTube video

24  traced directly back to Mr. Gottesfeld, correct?

25  A    Yes.

46

1   Q    And that's because the YouTube account was in his

2   name, correct?

3   A    Yes.

4   Q    And the IP address resolved to Mr. Gottesfeld's

5   address?

6   A    Yes, to his apartment.

7   Q    So it would be fair to say that Mr. Gottesfeld made

8   no effort to hide the fact that he uploaded this video,

9   correct?

10  A    Yeah, I guess that's a fair assessment.  Sometimes

11  people assume that they're using an anon, anonymizing

12  service, and they believe they're using that service and

13  then for one reason or another their true information

14  comes through so while they're, while they believe they're

15  hiding their IP address or their true identify, they do

16  often make mistakes.

17  Q    But when Mr. Gottesfeld was interviewed by the FBI he

18  didn't deny that this--

19  A    No.

20  Q    --was, was his at all?

21  A    Right.

22  Q    He admitted it freely?  Okay, so now I just want to

23  turn just briefly to the March 25, 2014 alleged DDOS of

24  Wayside Youth?

25  A    Sure.

47

1  Q    Are you familiar that in January 2014, Justina

2  Pelletier was transferred to Wayside Youth?

3  A    I'm not certain of the dates but, but I do know that

4  Wayside was involved in, in the issue or in the matter.

5  Q    You have no reason to think that that she wasn't

6  transferred there at some point, correct?

7  A    Right.

8  Q    And you're aware that people were protesting outside

9  Wayside Youth's Framingham campus in, in March?

10 A    Yes.

11 Q    And are you aware that they've been protesting there

12 for weeks?

13 A    I'm not certain of the time period, but I wouldn't, I

14 wouldn't dispute that.  I know it was very public so.

15 Q    Um-hmmm, and did you say, how long did the, you say

16 that the Wayside DDOS lasted?

17 A    I don't have the specific time period.  I do know it

18 did occur, but I'm not certain of a specific time period.

19 Q    And you're not, you're not, you're not certain how

20 long, and, and those Wayside services--

21         THE COURT:  And the date that it occurred?

22         THE WITNESS:  That was the, the March, the March

23 25th date.

24         THE COURT:  Thank you.

25 BY MR. EKELAND:

48

1   Q    And those Wayside services were publically facing

2   as well, correct?

3   A    Yes.

4   Q    And, and your, are you aware of the allegations of

5   abuse against Justina Pelletier at the Wayside?

6   A    Yes.

7   Q    And, but the FBI never investigated Wayside, did

8   they?

9   A    Not that I'm aware of.

10  Q    And are you aware that both BCH and Wayside received

11  about a half a million dollars and various types of--

12          MR. BOOKBINDER:  Objection.

13  BY MR. EKELAND:

14  Q    --government funding including Medicaid for their

15  treatment of Justina Pelletier?

16          MR. BOOKBINDER:  Objection, Your Honor.

17          THE COURT:  If he knows.

18  A    I'm not aware of the, the funding that they receive.

19  BY MR. EKELAND:

20  Q    And are you aware that Massachusetts Health and Human

21  Services Secretary John Palanowicz wrote a letter to the

22  media at the end of April 2014 stating that Justina should

23  be released to her parents?

24  A    No, I did not.  I'm not aware of that.

25  Q    All right. I'd like to turn your attention to the

49

1  April 19, 2014 alleged DDOS of Boston's Children's

2  Hospital.  At this point in time, on April 19, 2014, is it

3  your understanding that Boston Children's Hospital still

4  has custody of Justina Pelletier?

5  A    I believe so.

6  Q    Now you mentioned that I believe BCH, I'm using the

7  abbreviation for Boston Children's Hospital--

8  A    Sure.

9  Q    --received emails where essentially people were, were

10  fishing, correct?

11  A    That's correct.

12  Q    They were with malice, but you don't have any

13  evidence that Mr. Gottesfeld ever sent one of those

14  emails, do you?

15  A    No.

16  Q    As a matter of fact, you don't know who sent those

17  emails, do you?

18  A    No.

19  Q    And you don't have any evidence that any medical

20  records were ever accessed, correct?

21  A    No, only that, only what was described to us by the,

22  by the hospital, that they had to shut down some of their

23  systems.  It caused issues with doctors communicating with

24  each other as well as patients communicating with those

25  systems.

50

1  Q    Well, the, the phone systems were never shut down

2  at BCH, correct?

3  A    I don't believe so.

4  Q    So the doctors could call their patients, correct?

5  A    That's correct.

6  Q    And the patients could call their doctors, correct?

7  A    That's correct, but I'm also not certain of the

8  number of patients that they have on, on a daily basis

9  that would need to be contacted so in terms of the effort

10  or, or whatnot, you know, I'm not sure.  It involves

11  feasible, feasible option, I'm not certain that, you know,

12  that would be the best--

13  Q    I'm sorry.  Is it your testimony that you have no

14  idea the number of patients at Boston Children's Hospital

15  handles?

16  A    Well, in, in terms of communicating on a daily basis

17  with all their patients, while it could be an option, it

18  could be an option for them to do that, yes.

19  Q    I'm sorry, I didn't, I just didn't hear you.

20  A    I'm not aware of the number of patients that they

21  communicate with on a daily basis so while I do agree that

22  it is a good option for them, or one option is for them to

23  call their patients on the phone to communicate with each

24  other, you know, in terms of types of communications and

25  what needs to happen, I'm not certain of, if in

51

1  practicality that would, that would work.

2  Q    But you'd agree with me that the DDOS attack the

3  alleged DDOS attack did not target the phone system,

4  correct?

5  A    That's correct.

6  Q    And it did not target the personal emails of the

7  doctors at BCH?

8  A    No.

9  Q    And you're not aware of any medical records that were

10  destroyed, correct?

11  A    No.

12  Q    And you're not aware of any medical records that were

13  accessed for that matter, correct?

14  A    No.

15  Q    And the, I believe the affidavit says that some

16  research was allegedly interrupted, but you can't

17  specifically tell me what research was interrupted, can

18  you?

19  A    No, we'd have to ask the hospital for that.

20  Q    And this entire time, this period during this DDOS in

21  April 19, 2014, this case is still in the national media,

22  correct?

23  A    It is.

24  Q    It's very controversial, correct?

25  A    Yes.

52

1  Q    The governor of Massachusetts is getting involved

2  in it, correct?

3  A    Yes.

4  Q    It's on Fox News.  Mike Huckabee's doing pieces about

5  it, correct?

6  A    Um-hmmm.  Yes.

7  Q    It's fair to say it's a very politically

8  controversial case, correct?

9  A    Yes.

10  Q    Which brings me to June 2014.  Are you aware that in

11  June 2014, mainly because of all the controversy

12  surrounding this case and the governor of Massachusetts

13  getting involved, the judge, the state judge, who had--

14         MR. BOOKBINDER:  Objection, Your Honor.

15  Objection.

16         THE COURT:  Let him finish the question.

17  BY MR. BOOKBINDER:

18  Q    --the state judge who had granted custody to Justina,

19  to Boston Children's Hospital, returned custody of Justina

20  to her parents.  Are you aware of that?

21  A    Yes.

22  Q    And to the best of your knowledge, you, you testified

23  that the FBI never investigated Wayside Youth for any

24  alleged abuse of Justina Pelletier, correct?

25  A    That's right.

53

1   Q    And as far as you're aware, the FBI never

2   investigated Boston Children's Hospital for any alleged

3   abuse of Justina Pelletier, correct?

4   A    Yes.

5           MR. EKELAND:  One moment, Your Honor.

6   PAUSE

7           MR. EKELAND:  I have no further questions, Your

8   Honor.

9           THE COURT:  All right.  We'll take a short

10  break.  I'll handle a couple civil matters in the interim.

11  (Court in recess)

12  (3:04:40 PM)

13  (Court back in session)

14  (3:36:22 PM)

15          THE COURT:  Okay.  All right, Mr. Garvin.

16          THE CLERK:  Resuming on the record.  U.S. v.

17  Gottesfeld, Magistrate Judge No. 16-4117.

18          THE COURT:  Further cross examination?

19          MR. EKELAND:  None, Your Honor.

20          THE COURT:  All right.  Redirect?

21          MR. BOOKBINDER:  No, Your Honor.

22          THE COURT:  All right.  Then you may step down.

23          THE WITNESS:  Thank you, Your Honor.

24      WITNESS, excused

25          THE COURT:  Further witnesses for the

1  government?

2          MR. BOOKBINDER:  No, Your Honor.

3          THE COURT:  All right, witnesses for the

4  defendant?

5          MR. EKELAND:  No, Your Honor.

6          THE COURT:  All right, then I'll hear argument.

7  Division of Labor here.

8          MR. BOOKBINDER:  Division of Labor, absolutely,

9  Your Honor.  It appears from what we heard from, from Mr.

10  Ekeland that one of the things he's attempting to do is to

11  explain or excuse his client's conduct because the matter,

12  the medical matter, child custody matter was controversial

13  and people were concerned about it and people were

14  interested in it and it changed over time.  I don't want

15  to spend much time on that because I'd suggest that that's

16  not either a moral defense and certainly not a legal one

17  to the crimes that Mr. Gottesfeld is charged with.  You

18  can't join a conspiracy to damage computer systems because

19  you don't like something that the institution whose

20  computer systems those are is doing.  I don't, as I said

21  want to spend a lot more time on that except to point out

22  one more thing which is he also seems to be suggesting

23  that some aspects of that conspiracy were unsuccessful and

24  he's right to a point.  It appears that the defendant and

25  his co-conspirators were unable to actually intrude into

1  the system to get anything out of it, to, to destroy

2  data, to steal data.  They certainly tried through those

3  emails with the, the malicious code in them, but they were

4  unsuccessful and part of the reason they were unsuccessful

5  is because Children's Hospital took such significant

6  defensive measures to prevent them from doing that.  They

7  were worried, the hospital was worried, this was exactly

8  what they were trying to do and that's part of the reason

9  why they had to shut down so many parts of the network.

10  So they were successful there.  But of course other parts

11  of the attack were very successful.  The, the denial of

12  service attack took down the website and caused the

13  hospital to have to shut off essentially all external

14  communications and that meant, as Special Agent Williams

15  testified that, you know, that those doctors and there are

16  many of them that are at the Harvard hospitals that are

17  outside the hospital physically, could not access patient

18  records of their patients in the hospital, that they

19  couldn't place orders with pharmacies for medications,

20  they couldn't communicate through the hospital portal with

21  their patients.

22       Now, I mean obviously, Mr. Ekeland is right,

23  this was not a, you know, a cyber 911 that took out all

24  communications.  It was possible to use phones, but in

25  this day and age to say anybody who needed to know

1  anything or needed to know anything could have just made

2  a phone call to try to get the information to communicate,

3  I'd suggest that's not how any major institutions work now

4  and certainly not this one.  So it was tremendously

5  disruptive and all of the measures that the hospital had

6  to take to respond to this attack as the complaint sets

7  out cost more than $300,000.  So, and that doesn't even

8  include the fundraising that was disruptive.  So not only

9  was it operationally disruptive, it was expensive and

10 tremendously concerning for everyone at the hospital

11 because they were worried that patient records could be

12 stolen, damaged, altered and that could be catastrophic so

13 this was a significant, very significant disruption for

14 the hospital and can't be excused because Mr. Gottesfeld

15 didn't happened to like and maybe some other people didn't

16 happen to like how they were, how, how the courts dealt

17 with this matter and that the Massachusetts court awarded

18 custody to the state which then put the def, the, the

19 juvenile into Children's Hospital.  So, there's no excuse.

20 It's not a moral one.  It's not a legal one but that's

21 really not why we're here.  We're not here to litigate

22 this case.  We're confident that we will prevail on that

23 at trial and that is a factor the Court can consider, but

24 we're here because the question is, is Mr. Gottesfeld a

25 flight risk and can, are there conditions of release that

1   will assure his appearance, and I would suggest that one

2   of the things that's unusual about this situation is

3   there's no question about whether he's a flight risk, he's

4   already fled.  He's fled once and he fled in this case

5   before he was even charged.  He was aware of what was

6   happening.  He knew about what the government's evidence

7   was and how strong it was because we presented it to him

8   in a, in a, what's essentially a reverse proffer as

9   Special Agent Williams testified.  We were in the process

10   of negotiating whether we could come up with a plea

11   agreement and close to a resolution, close to the day when

12   he was going to have to sign a plea agreement and come in

13   and pled guilty and all of a sudden he disappeared, and

14   this wasn't just a, you know, stressed out on a Friday

15   night and decided to go hiking in the White Mountains and

16   no one knew where he was for a couple of days kind of

17   thing.  This was planned, thought out, they took cash,

18   they took computers, they took, you know, a wedding album

19   and their marriage certificate.  They, they took

20   everything they needed to permanently disappear, the

21   defendant and his wife.  They cut off all, they just

22   disappeared from their jobs for a month and they cut off

23   all ties with their family without any notice.  I mean

24   this is a tremendously draconian effort to disappear and

25   avoid prosecution.

1       There were, Mr. Gottesfeld was only arrested

2   frankly because of bad luck.  If the engine on the boat

3   that he was in off the coast of Cuba hadn't died, he

4   wouldn't be here today.  It did, he put out a distress

5   call, had he been picked up by the Cuban Coast Guard he

6   probably wouldn't be here today.  The place that he was

7   near and he had wind charts for, Cuba's a place where he'd

8   probably still be.  A country that's trying to modernize,

9   where his computer skills would probably be valuable and

10  we certainly would never had gotten him back from there,

11  but he had bad luck.  His boat died.  He ended up on a

12  Disney Cruise ship and here he is.  He did all of this

13  before he had been charged with any crime.  Now his

14  situation and his motivation to flee are greater.  His

15  situation is worse.  His motivation is greater.  He's now

16  been charged.  He knows that he will be indicted or

17  charged by information if he at some point works out a

18  plea agreement, but he's been charged and he is likely

19  facing a higher sentencing recommendation at least from

20  the government and likely a higher sentence from a judge

21  based on his flight and what he's already done.

22          THE COURT:  What's the guideline range?

23          MR. BOOKBINDER:  The guideline range, Your

24  Honor, that we were looking at before his flight was, I

25  believe with acceptance of responsibility, was 30 to 37

1  months.  Without acceptance of responsibility obviously

2  would have been greater and now it likely will be at least

3  somewhat greater.  It is unlikely he would get three

4  points for acceptance of responsibility if any in light of

5  his flight.  He may get some.  So that's sort of the

6  range.  We're talking three, four years, would be the

7  guideline range.  So he's looking at meaningful amount of

8  prison.  Like I said, somewhat more than he was before,

9  and so the remaining question is just are there conditions

10  of release that would assure his appearance here and I'd

11  suggest there's, there absolutely not.  I know that he has

12  prepared, he's got friends and family who are prepared to

13  put up money, some amount of cash for him, I think

14  totaling somewhere around 50 or $60,000.  I'm sure you'll

15  hear about that from Mr. Ekeland, but I'd suggest that,

16  you know, only a couple of months ago he was willing to

17  flee without money.  This isn't his money for the most

18  part and he was willing to flee without even telling these

19  people where he was.  His family were, were putting in

20  missing persons or at least his wife's family were filing

21  missing persons reports with the police.  They thought

22  maybe she was missing, dead, who knows and he and his

23  wife, they didn't care.  They just wanted to get away.  So

24  the idea that now these people have put up some cash and

25  all of a sudden he won't flee because, because he's so

60

1  concerned about that, I'd suggest he's proven that's not

2  a concern for him, and, and, you know, I understand I'm

3  sure he would be willing to wear a bracelet, monitoring

4  bracelet, but as the Court knows, all that does is just

5  limit the amount of a head start he would get, but he can

6  cut that off and be in the wind and, you know, if he gets

7  a boat this time with a better engine or makes his way

8  into Canada or somewhere else, you know, he's not going to

9  be here.

10         I'd suggest, Your Honor, that Mr. Gottesfeld had

11 a chance to stay out of jail and was on a path to stay out

12 of jail if he had a negotiated plea agreement.  A plea to

13 an information as the Court knows, in those cases

14 defendants are not detained pending trial and pending plea

15 and sentencing.  He had a chance to work that out and to

16 stay out pending a sentencing.  Instead he chose to flee

17 and at this point there is no way to secure his presence

18 in this Court except through detention, Your Honor.

19         THE COURT:  All right, thank you.  Mr. Ekeland?

20         MR. EKELAND:  Thank you, Your Honor.  Your

21 Honor, in the *United States v. Salerno*, 481 U.S. 739 755

22 1987, the United States Supreme Court recognized that in

23 our society liberty is the norm and detention prior to

24 trial or without trial is the carefully limited exception.

25         THE COURT:  I know the law well.  I've been

61

1   doing this for 26 years.  What are you offering?

2         MR. EKELAND:  What am I offering, Your Honor?

3   $55,000 cash bail put up by his sisters and his nephew,

4   electronic monitoring which this district, this circuit is

5   recognized has been effective since *United States v.*

6   *O'Brien* in 1990 over a quarter of a century ago.  Greg

7   Brown who is present in court, who is also willing to put

8   up some bail money will act as the custodian.  He's, lives

9   roughly 10 blocks away.

10         THE COURT:  Where will the defendant reside?

11         MR. EKELAND:  He'll reside at his current place

12   with his wife.

13         THE COURT:  The current place being?

14         MR. EKELAND:  28 Albion in Somerville.  Do I

15   have that address correct?  Yeah, 28 Albion in Somerville,

16   Massachusetts, Your Honor.  And regular check ins with

17   pretrial services, obviously he would actively seek

18   employment.  We're actually looking for a job for him

19   right now and obviously, standard conditions like

20   refraining from any contact with the alleged victims.

21         THE COURT:  All right.  I'll take it under

22   advisement.  In the meantime the defendant's wife can be

23   interviewed by pretrial services.

24         Now what about, did the defendant ever have a

25   passport?  Do we know?

62

1          MR. EKELAND:  No, he didn't, Your Honor.

2          THE COURT:  All right.  So we'll take it under

3   advisement.

4          Ms. Brown, you will give it a look?

5          MS. BROWN:  Yes, Your Honor.

6          THE COURT:  All right, so we'll look at the

7   conditions.

8          MR. EKELAND:  Your Honor, may I just add one

9   more thing?  Pretrial services in Miami actually

10  recommended that Mr. Gottesfeld be released on, on

11  pretrial, release--

12         THE COURT:  Well, you're in Boston now.  And

13  also you might introduce Ms. Brown the proposed custodian.

14         MR. EKELAND:  It's Mr. Brown and--

15         THE COURT:  Yes, you can introduce him to Ms.

16  Brown.

17         MR. EKELAND:  Oh, yes, yes, Your Honor.

18         THE COURT:  All right.

19         MS. BROWN:  Obviously he doesn't need a

20  probation officer as well.

21         THE COURT:  Yes, he will soon enough.  He will

22  soon enough.

23         MS. BROWN:  I'm wondering, Your Honor, if by

24  check it out, do you want me to have someone go to the

25  residence--

63

1          THE COURT:  Well let's start with the initial

2    interview and then we'll go from there.

3          MS. BROWN:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. EKELAND:  Thank you, Your Honor.

6    (Court adjourned)

7    (3:49:35 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1        CERTIFICATION

2       I, Maryann V. Young, court approved transcriber,

3   certify that the foregoing is a correct transcript from

4   the official digital sound recording of the proceedings in

5   the above-entitled matter.

6

7   /s/ Maryann V. Young                    May 23, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22