UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAGISTRATE JUDGE NO. 16-4117-MBB

**UNITED STATES OF AMERICA**

**v.**

**MARTIN GOTTESFELD**

**MEMORANDUM AND ORDER ON GOVERNMENT'S
MOTION FOR DETENTION**

**July 27, 2016**

**BOWLER, U.S.M.J.**

On or about February 17, 2016 defendant Martin Gottesfeld
(the "defendant"), was arrested in the Southern District of
Florida pursuant to a Criminal Complaint issued in this district
on February 16, 2016.  The Criminal Complaint charges the
defendant with conspiracy in violation of Title 18, United States
Code, Section 371.

1

The defendant had his initial appearance in the Southern District of Florida (Miami) on February 17, 2016.  The government moved to detain the defendant on the grounds that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant.  18 U.S.C. § 3142(f)(2)(A).  It would appear that the defendant was represented by court appointed counsel.[1]

According to the docket from the Southern District of Florida, the defendant stipulated to pretrial detention and waived the issue of removal.  The defendant was transferred in custody to the District of Massachusetts and had his initial appearance before this court on April 6, 2016.

At the April 6, 2016 hearing, the defendant was represented by retained counsel.  The defendant waived probable cause and counsel requested a detention hearing.  By agreement of counsel the hearing was scheduled for April 27, 2016.

At the detention hearing on April 27, 2016, the defendant was represented by retained counsel.  The government called one witness speaking to the issue of detention.  The defendant did not call any witnesses.  At the conclusion of the evidence, this court took the matter of detention under advisement.

---

[1]  Docket Entry # 2 on February 17, 2016 in MJ No. 16-02190-AOR from the Southern District of Florida states, "AFPD acted as amicus curiae."  This court assumes that AFPD means assistant federal public defender.

<u>DISCUSSION</u>

I.   A.   Under the provisions of 18 U.S.C. § 3142(c), "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person."  Thus, a defendant must be released under the provisions of 18 U.S.C. § 3142(b) or (c), or be detained pending trial under the provisions of 18 U.S.C. § 3142(e) and after a hearing pursuant to 18 U.S.C. § 3142(f).  <u>See</u> 18 U.S.C. § 3142(a).

Under 18 U.S.C. § 3142(e), a defendant may be ordered detained pending trial if the judicial officer finds one of the following three conditions to be true that: (1) by <u>clear and convincing</u> evidence, after a detention hearing under the provisions of § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or (c) will reasonably assure the safety of any other person or the community . . .;" (2) by <u>a preponderance of</u> the evidence, after a detention hearing under the provisions of 18 U.S.C. § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or (c) will reasonably assure the appearance of the person as required . . .;" or (3) there is a serious risk the defendant will flee.[2]  This determination is made by the court at

---

[2]  The distinction between the former and the latter are made clear by the very language of 18 U.S.C. § 3142(f).  In the last paragraph of that section, Congress has stated there must be <u>clear and convincing</u> evidence to authorize pretrial detention when the question is whether any condition or combination of conditions "will reasonably assure the <u>safety of any other person and the community</u> . . .."  (Latter emphasis added.)  By not requiring that same standard <u>vis a vis</u> an

the conclusion of a detention hearing.

     B.  The government is entitled to move for detention in a case that:

    (1)  involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4);[3]

    (2)  involves an offense punishable by death or life imprisonment;

    (3)  involves an offense prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the maximum authorized punishment is imprisonment for ten years or more;[4] or

---

assessment of risk of flight, it is clear that a lesser standard--i.e., preponderance of the evidence-- applied.  That is precisely the holding in the Second Circuit.  See e.g., United States v. Jackson, 823 F.2d, 5 (D.C.Cir. 1987); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986); see also United States v. Patriarca, 948 F.2d 789, 792 (1st Cir. 1991).

[3]  Section 3156 of Title 18 of the United States Code defines a crime of violence as:

       (A)  an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another, or

       (B)  any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 3156(a)(4).

[4]  The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense--not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines.  See United States v. Moss, 887 F.2d 333, 336-7 (1st Cir. 1989).

(4)   involves any felony alleged to have been committed
after the defendant has been convicted of two or more crimes of
violence, or of a crime, the punishment for which is death or
life imprisonment, or a ten year [or more] offense under the
Controlled Substances Act or the Controlled Substances Import and
Export Act.

Additionally, the government or the court sua sponte may
move for, or set, a detention hearing where there is a serious
risk of flight, or a serious risk of obstruction of justice or
threats to potential witnesses.  See 18 U.S.C. § 3142(f).


C.  In determining whether there are conditions of release
which will reasonably assure the appearance of the person and the
safety of any other person and the community, this court must
take into account:

>  (1) the nature and circumstances of the offense
>  charged, including whether the offense is a crime
>  of violence or involves a narcotic drug;
>
>  (2) the weight of the evidence against the
>  accused;
>
>  (3) the history and characteristics of the person,
>  including--
>
>>  (A) his character, physical and mental
>>  condition, family ties, employment, financial
>>  resources, length of residence in the
>>  community, community ties, past conduct,
>>  history relating to drug or alcohol abuse,
>>  criminal history, and record concerning
>>  appearance at court proceedings; and

>           (B) whether, at the time of the current
>           offense or arrest, he was on probation, on
>           parole, or other release pending trial,
>           sentencing, appeal, or completion of sentence
>           for an offense under Federal, State or local
>           law; and
>
>           (4) the nature and seriousness of the danger to
>           any other person or the community that would be
>           posed by the person's release.

18 U.S.C. § 3142(g).


        D.   The burden of persuasion remains with the government to

establish "that no condition or combination of conditions will

reasonably assure the appearance of the person as required and

the safety of any other person and the community."  The burden

then rests on the defendant to come forward with evidence

indicating that these general findings are not applicable to him

for whatever reason advanced.  The government must satisfy its

position with respect to risk of flight by a preponderance of the

evidence and with respect to dangerousness by clear and

convincing evidence.  See supra footnote 3.  This court must then

weigh all relevant factors [set forth under § 3142(g)] and

determine whether "any condition or combination of conditions

will reasonably assure the appearance of the [defendant] as

required and the safety of any other person and the community."

The decision is an individualized one based on all relevant

factors.  United States v. Patriarca, 948 F.2d 789, 794 (1st

Cir. 1991); see United States v. Jessup, 757 F.2d 378, 387-88

(1st Cir. 1985).

Moreover, one may be considered a danger to the community even in the absence of a finding by clear and convincing evidence that the accused will engage in <u>physical violence</u>.  Conversely, as noted by the Committee on the Judiciary (Report of the Committee on the Judiciary, United States Senate), on S. 215. 98th Congress, Report No. 98-147 (May 25, 1983):

> The concept of defendant's dangerousness is described throughout this chapter by the term "safety of any other person or the community." The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger <u>that the defendant might engage in criminal activity to the detriment of the community</u>.  The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence....  The Committee also <u>emphasizes</u> that the risk that a defendant will <u>continue to engage</u> in drug trafficking constitutes a danger to the "safety of any other person or the community."

<u>Id.</u> (Emphasis added; footnotes omitted); <u>see</u> <u>United States v. Patriarca</u>, 948 F.2d 789, 792 n.2 (1st Cir. 1991) (danger to community does not refer only to risk of physical violence); <u>see also</u> <u>United States v. Tortora</u>, 922 F.2d 880, 884 (1st Cir. 1990) (stating danger in context of 18 U.S.C. § 3142(g) not meant to

refer only to physical violence); <u>United States v. Hawkins</u>, 617 F.2d 59 (5th Cir. 1980), (trafficking in controlled substances).[5]

The issue critical to determining whether to detain a defendant is therefore, whether, with respect to the defendant, based on the guidelines set forth <u>supra</u> in part C of this Order, any condition or combination of conditions of release exist that will reasonably assure the safety of any person and the community and the presence of the defendant.  18 U.S.C. § 3142(e).

II.[6]  The defendant, Martin Gottesfeld, is 32 years of age.  He was born in Lawrence, Massachusetts.  He graduated from Andover High School and attended Drexel University for a semester.  The defendant considers himself a lifelong resident of Massachusetts. He reports residing for short periods of time in Connecticut, New Hampshire and Pennsylvania.  His 86 year old parents reside in Pompano Beach, FL.[7]  He has a sister in her fifties residing in

---

[5] A defendant may be ordered detained as a danger to the safety of another or to the community, however, only if the judicial officer determines that a detention hearing is appropriate under the provisions of 18 U.S.C. § 3142(f)(l), and the judicial officer has determined that a hearing is appropriate under that latter section.  <u>See</u> <u>United States v. Ploof</u>, 851 F.2d 7 (1st Cir. 1988).

[6] The information in this section is drawn from a Pretrial Services report compiled in the Southern District of Florida on February 17, 2016 and a supplementary report prepared in this district on May 4, 2016.  The supplementary report is based on a telephonic interview with the defendant's wife conducted by Pretrial Services.

[7] A letter filed in support of the defendant's release on April 26, 2016 from Gloria and Jay Gottesfeld states, "We are Martin Gottesfeld's adoptive parents and also his biological grandparents."

New York.  She is employed in the computer industry.

In December of 2014 the defendant married Dana Gottesfeld (hereinafter "Ms. Gottesfeld"), whose maiden name does not appear in the Pretrial Services report.  No children have been born of this union.  Ms. Gottesfeld is 26 years of age and was born in Los Angeles, where she grew up prior to attending Brandeis University in Waltham for three years.  Prior to attending college she spent a "gap year" in Israel.  Ms. Gottesfeld reported a history of being treated for depression for seven years and taking medication to treat her condition for the same period of time.

The defendant was unemployed for approximately one month prior to his arrest.  Prior to this period of unemployment, he worked for Edgewater Technology in Massachusetts, where he earned approximately $110,000 annually plus bonuses.  The defendant's wife was a project coordinator for Dell Services in Boston until January of 2016 when she "stopped" going to work without informing her employer that she did not intend to return.

The defendant and his wife have resided in an apartment in Somerville, Massachusetts since 2013.  The defendant does not have a prior criminal record.

III.  The relevant evidence at the detention hearing showed the following.

9

The government called Special Agent Jeffrey Williams ("Williams") of the Federal Bureau of Investigation ("FBI").  He testified that he has been so employed for the past six years and is currently assigned to the Cyber Crime Squad.  He added that he holds a bachelor's degree in information systems from Drexel University, a master's degree in computer information systems from Boston University and has had special training in investigating cyber crimes.

Williams identified the defendant in open court.  He stated that the defendant is the target of a current FBI investigation involving a distributed denial of service (hereinafter "DDOS") attack which targeted Boston Children's Hospital (hereinafter "Children's").  Williams explained that a DDOS occurs when "someone directs a number of computers to transmit traffic to a single computer for purposes of bringing that computer down and not being able to communicate with other networks" essentially overwhelming network traffic.  Williams noted that the duration of the Children's incident was "at least a day."

In further testimony, Williams noted that Children's had to shutdown its computer network resulting in the inability of physicians and patients being able to communicate with each other.  Nor was to hospital able to carry out fundraising activities.  Patients were unable to access medical records making it difficult to renew prescriptions.

Williams testified that the DDOS attack commenced on April 19, 2014 and the FBI became aware of it on the same day and initiated an investigation.  According to Williams, two specific pieces of information relating to the attack came to the attention of the FBI.  One was a YouTube video and the second was a posting on a website identified as "Pastebin.com."

Williams was shown a document which he described as a "screenshot of a YouTube video posted by the user Shut Down Logan River Academy calling, or basically calling for the attack on the particular hospital."  According to Williams, the document, which was admitted as Government Exhibit #1, was published on March 23, 2014.  In further testimony Williams identified a CD, which was admitted as Government Exhibit # 2, and stated that it contained the full content of the video.

The video, which lasted approximately six minutes, was played in open court.  The video featured masked characters stating, "We are anonymous...we are fighting for free speech...we are fighting for the truth...join us."  The tape makes reference to Justina Pelletier, a patient at the Children's as well as a doctor and a judge involved in the matter of her medical care.  A website is also featured on the video.

In further testimony Williams stated that the video was posted by an account in the name of "Shut Down Logan River Academy."  He added that the FBI obtained records indicating that

11

the account was registered to Martin Gottesfeld.  Further
investigation revealed that the IP address belonged to the
provider RCN and led back to the apartment of Martin Gottesfeld
at 12 Albion Street in Somerville.

Williams testified that the FBI executed a search warrant at
Gottesfeld's Somerville apartment in October of 2014 at which
time the defendant agreed to be interviewed and admitted that he
posted the video referenced above but denied his participation in
the DDOS attack at Children's.  A number of computers were seized
from the defendant's apartment during the execution of the search
warrant.  Williams noted that defendant was provided with a
target letter notifying him that he was the target of a federal
criminal investigation.

According to Williams, in May of 2015 the defendant, who was
represented by an attorney, met with members of the FBI and the
United States Attorney's Office to discuss the evidence in the
case and to "attempt to come to a resolution."  The government
shared its evidence with defendant and his counsel.  There were
ongoing discussions and another meeting occurred in December of
2015.  The DDOS attack at Children's was discussed, Williams
testified, and proposed resolutions were discussed in late
December and early January of 2016.

Williams testified that toward the end of January 2016 the
FBI was contacted by the Somerville Police Department because

Gottesfeld's employer requested a "wellness check" because Gottesfeld failed to appear for work and had not contacted his employed regarding his absence.  A check of his apartment was conducted and the police did not find anyone at home.  In early February 2016 the Andover Massachusetts Police Department contacted the Somerville Police Department in an attempt to locate Gottesfeld because of a family medical emergency.  Again, the Somerville police were unable to locate Gottesfeld.  Shortly thereafter, Terri Barach ("Barach"), the mother of the defendant's wife contacted the Somerville Police Department in an effort to locate her daughter, Ms. Gottesfeld.  Barach stated that she had been unable to contact her daughter for over a month.  She added that she pays her daughter's cell phone bill and there had been no activity on the phone after January 15, 2016.

Somerville police contacted the employers of both the defendant and his wife and discovered that both individuals had last worked on January 15, 2016 and had not returned to work after a planned long weekend over the Martin Luther King holiday. The employers did not receive any communication explaining the absences from work.

In mid-February 2016 Barach contacted the Somerville Police Department again stating she still had not heard from her daughter.  She told the police that the landlord for the Albion

Street apartment informed her that the February rent for the unit had not been paid.  Barach then filed a missing person's report regarding her daughter.

Williams testified that around February 16, 2016 the FBI learned that the defendant and his wife "were rescued at sea off the coast of Cuba after placing a mayday call" because their boat had lost propulsion.  They were rescued by a "Disney" cruise ship.  Williams noted that the information was provided to the FBI by the United States Customs and Border Protection (hereinafter "Customs") and consular officials in the Bahamas. Williams noted that the FBI conferred with Phil Halshall (hereinafter "Halshall"), the director of security on the cruise ship which effectuated the rescue.  Halshall stated the two rescued individuals gave differing statements to the ship's staff.

Government counsel showed Williams a series of color photographs which were admitted as Government Exhibits ## 3 through 5.  Williams described the photographs as showing the boat in which Gottesfeld and his wife were found.  The photographs were taken by the Disney cruise staff at the time of the rescue.  Williams noted that Exhibit # 3 showed the overall boat which he described as being about 23 feet in length.  It appears to be a small open cockpit motorboat with an inboard engine.  It lacks any type of closed compartment other than a

14

possible storage area under the forward section.  The boat
appears to have had minimal equipment on board.

Government Exhibit ## 4 and 5 show the aft and forward
portions of the boat.  Williams noted that the Disney cruise
staff informed the FBI that the boat was unregistered, uninsured
and had no identifying information on it.

According to Williams, the rescue was effectuated off the
coast of Cuba by the cruise ship coming alongside the Gottesfeld
boat and hoisting Gottesfeld and his wife up onto the cruise
ship.  They were able to take some of their belongings with them
but had to leave other items aboard the boat.  The Gottesfelds
asked to return to retrieve the things they left on the boat.
They were not permitted to return to the boat by cruise ship
staff.  Williams identified a list of items, which were brought
aboard the cruise ship and inventoried by Customs during a
secondary search when the Gottesfelds arrived in Miami, Florida
aboard the Disney cruise ship.  The list was admitted as
Government Exhibit # 6.

Among the inventoried items were three laptop computers, a
stand alone GPS device, telephone calling cards, data cards,
multiple cell phones, Cuban stamped cigarettes, Cuban wind chart
printouts, and personal identifying documents including a Social
Security card, a United States passport, and a Massachusetts
driver's license all in the name of Dana Gottesfeld as well as a

birth certificate and Massachusetts driver's license in the name
of Martin Gottesfeld.  A marriage license in the names of Dana
and Martin Gottesfeld was also found along with at least $500 in
cash, bank checkbooks, debit cards, multiple receipts for bank
withdrawals, ranging from $500 to $4,900, and receipts for recent
purchases of electronics at Walmart.  Williams noted that Dana
Gottesfeld's passport did not have any stamps in it.

According to Williams, the Gottesfelds both told a member of
the cruise ship staff that they left Key West, Florida the day
they were rescued.  However, based on the crew's experience they
told authorities that it appeared as if the couple had been at
sea for some time.  Gottesfeld stated that he had purchased the
boat for $4,000, although he did not specify where or when it was
purchased.

Williams testified that upon learning about the Gottesfeld
rescue at sea the FBI contacted the Office of the United States
Attorney and a Criminal Complaint issued charging Gottesfeld, who
was arrested upon the arrival of the cruise ship at the port of
Miami on February 17, 2016 at approximately 6:45 a.m..  Williams,
who was present at the arrest, stated that the defendant was not
asked anything beyond the general booking questions.  Agents
attempted to interview Ms. Gottesfeld but she declined and stated
she was represented by Attorney Tor Ekeland ("Attorney

Ekeland".)[8]

On cross examination defense counsel established that at the time the defendant was picked up by the cruise ship he was not under any kind of travel restrictions.  Defense counsel showed Williams a copy of the Criminal Complaint charging the defendant, which was marked for identification as Defendant's Exhibit A.

In further cross examination Williams agreed that Children's gained custody of Justina Pelletier from her parents by going to the state court in Massachusetts.  He noted the case attracted both local and national media attention as well as the concern of various religious and political organizations, which characterized the incident as an example of governmental interference with parental rights.  Williams acknowledged that at the time the video was posted on March 23, 2014, Justina Pelletier had been in Children's custody for over a year.  The video called for the firing Dr. Alice Newton, a physician at Children's involved in the care of Justina Pelletier.

On April 27, 2016 defense counsel submitted seven letters including two from the defendant's parents and one from the defendant's wife in support of the defendant's release from custody.  The remaining four letters are from longtime friends and individuals who worked with the defendant at various places

---

[8] Attorney Ekeland of Brooklyn, NY is the retained attorney of record for the defendant in the above-captioned case.

of employment in the computer industry.  None of the letters make reference to the specific charge against the defendant.

IV.  The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(f)(2)(A).  The government must demonstrate only by a preponderance of evidence that the defendant, if released, constitutes a serious risk of flight or failure to appear.  The two different standards are used because of the clear language expressed in the last paragraph of 18 U.S.C. § 3142(f) which states "that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." Congress, by not attaching that language to the risk of flight clause, infers that a lower standard of proof is all that is necessary to establish the government's case.

   A.  <u>Risk of Flight</u>

   The defendant is a 32 year old man who was aware that he was the subject of a federal criminal investigation when he and his wife disappeared without explanation in January of 2016.  They left Massachusetts in mid-January over a long weekend without advising their families, employers or landlord regarding their whereabouts and without paying the rent for their apartment for the month of February.  The Gottesfelds, both highly conversant

18

in computer technology, ceased using Ms. Gottesfeld's cellular telephone, which suggests they wanted to eliminate one possible means of tracing their movements.

When rescued at sea off the coast of Cuba after a mayday call the Gottesfelds were in a small boat, which was unregistered, uninsured and lacked any identifying markings. Their varied explanations to cruise ship staff about their situation and the length of time they had been at sea was inconsistent with their appearance.  The boat contained a stand alone GPS device, multiple cell phones, data cards, three laptop computers, various personal identifying documents, $500 in cash, multiple receipts for recent bank withdrawals in excess of $5,000 and perhaps most significantly Cuban wind chart printouts.

The location of the boat and the items in the boat along with the defendant's unexplained disappearance a month earlier highly suggest that the defendant, accompanied by his wife, was heading for Cuba, a place from which it would be difficult, if not impossible, to seek repatriation to the United States.  Had the propulsion on the boat not failed, he might have succeeded in reaching Cuban shores.

The facts support a finding that the defendant carefully arranged and attempted to execute an elaborate plan to leave Massachusetts surreptitiously without leaving any trace of his destination.  The failure to pay the February rent for the

Somerville apartment suggests that the defendant had no intention of returning.

In a recent filing (Docket Entry # 23 filed on July 8, 2016), defense counsel offers the defendant's nephew, Greg Brown, as a third party custodian in the event the court decides to release the defendant.  In addition, family members have offered to post $55,000 to secure the defendant's release.

While the defendant's family members appear to be well intentioned, this court is not convinced that there are any conditions of release that will assure the appearance of the defendant, given what appears to have been an elaborate effort to avoid prosecution by leaving the country without detection.

The defendant did not proffer any credible evidence to detract from the government's argument that the defendant poses a serious risk of flight or failure to appear.  Based on the totality of the evidence this court finds by a preponderance of the evidence that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

V. <u>Conclusion</u>

This court has found, at least by a preponderance of the evidence, that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

Having evaluated the factors set forth in 18 U.S.C. §
3142(g), this court orders the defendant detained subject to the
following conditions:

     (1)  The defendant be, and hereby is, committed to
the custody of the Attorney General for
confinement in a corrections facility, separate,
to the extent practicable, from persons awaiting
or serving sentences or being held in custody
pending appeal;

     (2)  The defendant be afforded reasonable opportunity
for private consultation with his counsel; and

     (3)  On Order of a court of the United States or on
request of an attorney for the Government, the person
in charge of the corrections facility in which the
defendant is confined deliver the defendant to an
authorized Deputy U.S. Marshal for the purpose of any
appearance in connection with a court proceeding.

     /S/ Marianne B. Bowler
     **MARIANNE B. BOWLER**
     United States Magistrate Judge