United States District Court
District of Massachusetts

FILED
OCT 23 [...] 2:10
U.S. [...]
DISTRICT OF [...]

| Martin Gottesfeld | Criminal Docket No: |
| Defendant | 16-10305-NMG |
| v. | |
| United States of America | |

## MOTION TO ALLOW THE FEDERAL DEFENDER'S OFFICE TO WITHDRAW AND FOR THE APPOINTMENT OF NEW COUNSEL

Defendant, Martin Gottesfeld, having been advised by his counsel (see Exhibits P and X), respectfully moves the Court to allow the Federal Defender's Office (herein the "FDO") to withdraw from the case and to appoint new defense counsel. This motion and its accompanying exhibits are intentionally filed not under seal. The defendant, through a series of events, has lost faith and trust in the FDO to effectively and zealously represent his best interests. This lack of confidence has led to an irretrievable breakdown in communication.

The defendant does wish to thank The Honorable Magistrate Judge Marianne Bowler for appointing the FDO and wishes to note for the record his longstanding efforts to work with the FDO.

The defendant's relationship with the FDO began seriously deteriorating in March 2017, when his father's

- Page 1 -

terminal illness took a turn for the worse and the defendant asked his then-FDO attorney to file an emergency motion for temporary release to visit him in his dying hours. The FDO attorney refused and the defendant's father died the next day, Saturday, March 25th, 2017.

The following Monday, March 27th, 2017, the defendant instructed his then-FDO attorney to file an emergency motion for temporary release so he could deliver the eulogy at his father's funeral. The defendant also communicated, in no uncertain terms, that he wanted his then-FDO attorney to resign from his representation in this matter as soon as the emergency motion was decided.

The next day, Tuesday, March 28th, the defendant's then-FDO attorney indeed filed an emergency motion for temporary release (see Exhibit E). However, unbeknownst to the defendant and contrary to his very explicit instructions, his then-FDO counsel neither cited any case law whatsoever to support the argument for release nor addressed in any way The Honorable Magistrate Judge Marianne Bowler's previously enumerated concerns that the defendant posed too serious a risk of flight for any set of pre-trial release conditions to reasonably assure his appearance.

The motion was subsequently denied and the defendant's mother was so upset that her only surviving son would not be able to attend the funeral, after he had already been held in pre-trial detention for over a year, charged with in effect trying to save the life of a child who at the time of the alleged events was being tortured and had already

- Page 2 -

been maimed by close affiliates of The Honorable Magistrate Judge Marianne Bowler (see Exhibits A, B, G, I, L, and T) who also happen to be somewhat less close, but still significantly affiliated, with former U.S. attorney Carmen Ortiz, acting U.S. attorney William Weinreb, assistant U.S. attorney Adam Bookbinder and assistant U.S. attorney David D'Addio, that she cancelled the memorial service.

The defendant never withdrew his instruction for his then-FDO attorney to resign from the case and continued his search, with renewed vigor, for private counsel willing to accept the case pro bono or on contingency of donations to his Legal Defense Fund. Additionally, the defendant's then-FDO counsel advised him that a daughter of an employee of an alleged victim in this case, Boston Children's Hospital, and specifically its "psychiatrist-in-chief," David DeMaso, works as an appellate attorney in the FDO, and that her presence there could be considered to represent a conflict of interest. However, as the defendant's FDO attorney at the time typically wrote his own appellate briefs, that FDO attorney did not feel a significant conflict existed at that point.

At a later date, while the defendant was still searching for different representation and with his instruction still standing for his then-FDO attorney to withdraw, the defendant's then-FDO attorney accepted a seemingly more desirable and lucrative position on the U.S. Federal Sentencing Commission in Washington D.C. The defendant

- Page 3 -

was told that the FDO had chosen a new attorney for this matter based on numerous relevant factors, including the circumstances of the case and compatibility between the defendant and the new and now-current FDO attorney.

However, despite these assurances from the FDO, the initial meeting between the defendant and his new attorney left him concerned about the zealousness of the new FDO attorney's representation and incredulous as to the honesty of the FDO's assurances regarding the care taken in the selection of his new counsel. Ongoing events and correspondence between the defendant's current FDO counsel and himself have not improved the situation.

For example, the defendant wrote a 3-page letter to his FDO attorney dated July 25th, 2017 and marked received by the FDO on July 31st, 2017 (see Exhibits M, N, and O). The FDO attorney's response, dated August 2nd, 2017 demonstrates a multitude of issues (see Exhibit P).

First, the defendant believes the FDO may be pushing him to represent himself, which is not his wish at this time (see Exhibit P item i). Second, the FDO seems to accept as a foregone conclusion that the result of the case will be a conviction, sentencing, and possible appeal (see Exhibit P items vii-viii). Third, while the FDO makes it quite clear that it will, at its sole discretion, refuse to make any filing requested by the defendant (and therefor to even preserve such issues for potential appeal), the FDO has decided to go above its

required duties when asked by the government to relay threats to the defendant's wife, who is neither a party to this matter nor represented by the FDO at this time (see Exhibits R, S, Q, and U).

If there was any remaining doubt that the defendant needs new counsel because the FDO's assistance is ineffective, and that there has further and independently of the efficacy issue been an irretrievable breakdown in communication between the defendant and the FDO, then any such doubt was put to rest by recent filings (or the lack thereof) as well as other events.

As the Court is no doubt aware, the FDO asked for time on multiple occasions in order to prepare a motion to dismiss on grounds of selective and vindictive prosecution. The FDO and the defendant had a longstanding agreement to file such a motion and yet no such filing was made. While this is perhaps the FDO's most glaring deviation from what it promised the Court as well as its client, it is not the only one.

As the government and the Court may have also noticed, discovery documents purported to have been subject to a protective order (see D.E. 43, Nov. 21st, 2016) have been published by the media (see Exhibit Z). For the record, the defendant never agreed to said order, would clearly never have agreed to such an order, did not in fact execute said order, and was only notified of its existence after a previous non-FDO attorney executed it without his knowledge.

- Page 5 -

Regardless, as per the defendant's understanding of the agreement (which he has never read or been provided a copy), the defendant was not to be provided such documents, except under the supervision of counsel. Yet, such documents were in fact mailed to him by multiple FDO attorneys in violation of the order. At one point, the defendant's current FDO attorney told the defendant there was no such order when in reality there was. The defendant believes the FDO's ignorance as to the existence of the order is indictive of the inefficacy of its assistance, i.e. if the FDO had taken the proper time to familiarize itself with the case history so that it could provide effective assistance then the FDO would have noticed and noted the order. In fact it is difficult to imagine how the FDO could be providing effective assistance while simultaneously unaware of the order.

Further, the FDO has failed in numerous other obligations to the defendant, including but not limited to its obligation to zealously protect his attorney-client privilege (see Exhibit X), without which no client can be expected to effectively communicate with counsel. On Thursday, September 21st, 2017, under the pretense of a prison "shakedown" or search, officers at the Plymouth County Correctional Facility (herein "PCCF") read the privileged legal papers of the defendant. The defendant believes their goal was to ascertain his sources for an upcoming exposé about an alleged "pay-to-play" racketeering scheme run by Plymouth County Sheriff Joseph McDonald Jr., who

- Page 6 -

not unlike Boston Children's Hospital, appears to the defendant to be above federal law. As the defendant has come to understand, PCCF staff commonly know that donations to Sheriff McDonald's election campaign buy them undue consideration for career advancement and vendors are made to know that such campaign donations will buy them undue consideration for lucrative contracts (see Exhibit W).

After the improper violation of attorney-client priviledge by PCCF staff, the defendant asked his FDO counsel to notify the Court of the breach and to move for an injunction barring PCCF staff from similarly violating the defendant's attorney-client priviledge in the future. The defendant made clear his wish for his counsel to resign from her representation in this matter if they were unwilling to make such a filing.

The FDO responded in a letter dated Friday, September 22nd, 2017 (see Exhibit X), but neither raised the issue to the Court nor resigned. Further, in regards to an internal investigation into the breach by PCCF, the FDO attorney promised the defendant, "I will keep you posted," but in fact has not done so.

The defendant's faith and trust in the FDO is additionally FUBAR (for lack of a more apt term) by his personal witness to the myriad ongoing constitutional violations faced by FDO clients at PCCF which the FDO allows to continue without significant challenge. The indelible impression under which the defendant is left is that the FDO

- Page 7 -

will go to far greater lengths to avoid making public filings against PCCF than it will on behalf of its clients who are suffering inexcusable violations of their 1st, 6th, and 8th Amendment rights as well as their patient rights at the facility (See Exhibits S, U, F, H, J, K, and W).

Indeed, the defendant is now convinced by the FDO's actions and inactions that it shares the government's goal of keeping the government's inexcusable behavior in this and other cases quiet and away from the public.

The proverbial straw that broke the defendant's back came with the latest round of filings and responses, the last of which he just received immediately prior to his drafting of this motion, with neither a typewriter nor sufficient access to legal and technical reference materials. The defendant wishes to note that his prior written requests for legal resources at PCCF have gone totally unanswered and unacknowledged. Instead of returning carbon copies of such requests to the defendant as is customary at the institution, the legal department at PCCF has left the defendant with no record of his previous fruitless requests to furnish here. Nonetheless, the defendant affirms that such requests have been made. The defendant apologizes to the Court for any deficiencies that may be present in this filing as he would have preferred to utilize legal resources to check for such problems prior to filing.

Additionally, if the government is correct in its assertion in its opposition (see Exhibit Y, page 10, III(B)(ii)) to the FDO's recent suppression motion (see Exhibit V), that an

— Page 8 —

affidavit is necessary to support the motion to suppress, then it is also worth noting that the FDO never advised the defendant of such need. The defendant would have, if asked, indeed executed such an affidavit. If the government is correct in said assertion then this further speaks to the efficacy (or lack thereof) of the FDO's counsel.

Reflecting further on the health (or lack thereof) of the communication between the FDO and the defendant, the defendant further notes that his use of so-called "anonymizing technologies" was intended for a myriad of reasons, not one of which was the covering of criminal activity (defending children like Justina Pelletier from grievous bodily harm as she indeed suffered at the hands of Boston Children's Hospital, and death is neither illegal nor immoral). The FDO in fact, in the defendant's recollection, never asked him his reasons for using these methods prior to purporting to know and only some of the defendant's true purposes have been touched upon by either the FDO or the government.

Finally, to the crux of the issues: that the FDO's counsel is at best ineffective, that there has been an irretrievable breakdown in communication between the defendant and the FDO, that the government's surveillance of the defendant indeed exceeded its statutory authority under the Pen Register/Tap and Trace Statute and therefor violated the 4th Amendment, that the good faith exception ought not apply in this instance, and that effective counsel properly communicating with the defendant would have made a sufficient

- Page 9 -

showing thereto, which the defendant believes the FDO did not...

Prior to the filing of the FDO's motion to suppress, the defendant notified the FDO that the government received information from RCN in excess of relevant statutory authorization, an example of which the government has now provided in the table found in its opposition (see Exhibit Y, page 5, §II[B]). The defendant explicitly told the FDO and explained that port numbers, as requested and received by the government, could not be represented nor believed by technical experts acting in good faith to constitute non-content dialing, routing, addressing or signaling information.

Further, the defendant and FDO agreed that the FDO would provide a time, prior to its filing of the suppression motion, for the defendant to speak to the FDO paralegal assigned to provide technical backing for that same motion. However, the FDO did not, and when the defendant inquired again for such an appointment, the time proposed by the FDO was after the filing deadline. When the defendant expressed this simple fact, the FDO informed him that it had all that it needed for the motion.

However, the FDO's motion and the government's belated opposition clearly indicate otherwise. Indeed, both the FDO's motion and the government's opposition as well as the case law they both quote are replete with misnomers, broken analogies, oversimplifications, contradictions and other problems that would make the Scott Adams character Dilbert cringe. The defendant respectfully asks the Court to grant him the

means, including new and effective counsel, to call in neutral technical experts to provide testimony on the relevant technical matters and/or for The Court to seek out such expertise on its own.

In the meantime, the defendant notes that if the FBI had listened to his expertise from 2 decades of professional industry experience and prior industry expert certifications by Cisco Systems, the world leader in enterprise computer networking equipment as well as the certification of computer networking personnel, and Sonicwall (now Dell), then the FBI would have known and mentioned that port numbers tell a great deal about the substance, purport and meaning of Internet communications which contain them.

For example, any reasonably qualified computer networking professional looking at the government's table in §II(B) of its opposition (see Exhibit 4 page 5) would see the destination port number of 161 and know with a high degree of certainty that the content of the traffic detailed in the 3 lines of sample data falls under the Simple Network Management Protocol (SNMP). SNMP traffic on port 161 is used to poll devices for statuses and statistics, as opposed to, say, viewing web pages, transferring files or playing online video games.

If the defendant sees traffic heading to port 21 then he could reasonably infer it was used by the File Transfer Protocol (FTP) to move files, port 3389 would be for Microsoft's Remote Desktop Protocol, port 22 for a secure shell session, etc. Each a different purport or meaning.

- Page 11 -

Further, port numbers (as opposed to IP addresses) shall not be considered routing and addressing information as the government states. Any qualified professional knows that Internet routing tables do not contain port numbers, nor do Internet routing decisions typically involve examining port numbers. Indeed, not all Internet traffic contains port numbers. For example, the well known and widely used Internet Control Message Protocol (ICMP) does not have port numbers, yet its traffic is addressed and routed across the Internet.

Further still, port numbers do not aid in identifying the source of Internet communications. The government is correct that the defendant knows that the registration of IP addresses is, to a point, a matter of public record and that TOR network nodes are also listed publicly. The government knows that IP registration information, known as WHOIS, does not register port numbers on individual IP addresses and that IP addresses used by TOR network nodes can also simultaneously be used for other, non-TOR related traffic.

Without the port numbers contained in the data returned from RCN as part of the PRTT, the government would not know that the content of any communication to those addresses was indeed TOR-related traffic as opposed to say, traffic to a website or other non-TOR application that happened to use the same IP address as a TOR node. Similarly, without the port numbers, the government would not know that the defendant's traffic to riseup.net indeed contained VPN session data, as opposed to other

- Page 12 -

applications used by Rise Up. For all the government knew at the time of the PRTT, the defendant could have been performing network maintenance as part of his profession on the equipment used by Rise Up, but again, the content of the port numbers indicated VPN traffic.

The defendant anticipates an argument that port numbers constitute dialing or signalling information to which the government was entitled, but such arguments must fail. First, as stated above, port numbers clearly constitute content within the definition of the statute 18 U.S.C. § 2510(8) and therefore the government was not entitled to receive them no matter what else they may constitute. Indeed, even some of the citations used by the government seem to belie its notion that the PRTT statute authorizes the collection of port numbers. For example, on page 8 of its opposition (see Exhibit Y) the government quotes from 396 F. Supp 2d 45, 48 (D. Mass. 2005) (Collings, J.) (ruling with regard to an internet PRTT application that [emphasis added by the defendant]: "If, indeed, the government is seeking only IP addresses of the web sites visited and nothing more, there is no problem"). Port numbers are distinct from IP addresses, and indeed are stored in a seperate, deeper part of Internet communication packets typically not involved in routing decisions on the Internet.

Secondly, the only way for port numbers to constitute dialing or signalling information would be in a metaphorical sense. There is no dialing on the Internet in the literal sense and signalling on computer networks, in the literal sense,

- Page 13 -

takes place below the level at which it is commonly accepted that port numbers reside, OSI layer 4. The best analogy for port numbers in such a metaphorical interpretation would be as the post-cut through digits the government acknowledges it would not be entitled to receive. The defendant believes that any honest, neutral computer networking expert would testify to such effect.

As for the good faith exception, the only way to believe that the government was unaware that port numbers, as it requested and received, were non-content dialing, routing, addressing or signalling information to which it was entitled would be to believe that its personnel lacked the knowledge imparted to network technicians at or below the Associate's Degree level, a nauseating concept for the Boston FBI Field Office's Cyber Crime Squad and U.S. Attorney's office. It instead seems certain they knew or should have known that such port numbers constituted content within the definition of the relevant statute.

Based on that, especially when considered in tandem with their apparent selection of the Honorable Magistrate Judge Marianne Bowler for the search warrant affidavit (see Exhibits A, B, G, I, L, T and U), it seems that the government knew it was up to something not on the level. The defendant respectfully asks the Court for effective counsel to assist him in establishing this further.

Additionally, there is a reasonable deterrent against future constitutional violations by the government to be anticipated from suppressing the PRTT and later search

- Page 14 -

warrant. Since such applications are heard ex parte, the government is the only voice in the technical conversation and judges are likely to rely on the technical assertions made by government staff. The government must be deterred from making such technically incorrect statements, as it did here about port numbers, in such ex parte situations or constitutional violations will increase in frequency. This is true even if such mistakes are made out of negligence or incompetence as opposed to bad faith, as in no circumstance should the government be allowed to make technical assertions ex parte that cannot be relied on by the Courts. To hold otherwise would be to incentivize and invite the government to send staff who know (or have been told) just enough to secure approvals for such warrants and orders using such statements, but not enough to realize their inaccuracies.

The defendant further wishes to assure the Court that there is nothing which anyone could say that would make him wish to continue being represented by the FDO. Even assurance from the Court that it holds his current counsel in the highest esteem would not give the defendant pause to reconsider. To be sure, the defendant does not want to proceed pro se, but would rather do so than continue with the FDO. The defendant further understands he will not be provided with an unlimited number of attorneys by the Court, however as the government has multiple attorneys specializing in cases such as this working on this case, he does respectfully

- Page 15 -

request an attorney with the necessary specialized experience to handle this case.

Further, the defendant humbly asks the Court not to throw out this motion permanently if it is found deficient in way(s) that could be remedied with the effective assistance of council.

The defendant also wishes to note that he believes there are additional deficiencies in the government's PRTT and search warrant applications as well as its recent opposition that he wants to address with the help of effective counsel as well.

Respectfully Submitted,

*[signature]*

Martin S. Gottesfeld
ID #71225
PCCF
26 Long Pond Road
Plymouth, MA 02360