UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 16-CR-10305 (NMG) |
| | ) | |
| MARTIN GOTTESFELD, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S MOTION IN LIMINE
TO PRECLUDE DEFENDANT'S "TORTURE DEFENSE"
BASED ON NECESSITY AND DEFENSE OF ANOTHER

The United States of America, by Assistant United States Attorneys Seth B. Kosto and

David J. D'Addio, hereby submits this motion in limine to preclude defendant Martin

Gottesfeld from presenting defenses and evidence based on the doctrines of defense of another

and necessity, each of which would be premised on the wholly unsupported notion that a world-

renowned children's hospital was torturing a minor patient placed in its care by court order.

## I.      **INTRODUCTION**

Since his arrest in February 2016, Gottesfeld has publicly taken responsibility for his

cyber attack targeting Boston Children's Hospital ("BCH").  *See, e.g.*, "Why I Knocked Boston

Children's Hospital Off the Internet – A Statement By Martin Gottesfeld," *Huffington Post*,

Sept. 18, 2016 (Exhibit A hereto).  Gottesfeld's explanation—repeated over social media, on

websites, in online news articles, and in a telephone interview he gave from jail—is that he

attacked BCH's computer network "to save [Patient A] from grievous bodily harm and possible

death" and to "dissuade" BCH from a supposedly "well-established pattern" of moving to have

the state obtain legal custody of patients in its care.  *Id.*

Although these claims suggest the affirmative defenses of necessity and defense of another, Gottesfeld cannot proffer any competent evidence that meets the legal standards required to present them to a jury.  He cannot show (1) that he acted in Patient A's presence to prevent imminent harm to Patient A; (2) that Patient A was subjected to the use of unlawful force; (3) that he reasonably anticipated his cyber attacks would address the supposed harm to her; and (4) that he had no legal alternative but to attack BCH in violation of the law.

Instead, Gottesfeld's own statements demonstrate that he determined for himself— without any firsthand knowledge—that he could better evaluate Patient A's medical condition than the clinicians at BCH; that he knew better than the Massachusetts Department of Children and Families ("MDCF") what was in Patient A's best interest; and that he—not the Massachusetts courts—should make the final determination regarding the custody and care of Patient A.  Gottesfeld not only claimed that BCH was torturing Patient A, he acted on this uninformed belief, threatening BCH and then directing an attack that put the care of the hospital's most vulnerable patients at risk.

Because Gottesfeld cannot satisfy the minimal burden necessary to put his so-called "torture defense" before the jury, the Court should preclude him in limine from presenting it, and from presenting evidence that is otherwise irrelevant to the elements of the offenses charged in the Indictment.

## II.     **BACKGROUND**

Count 1 of the Indictment charges Gottesfeld with conspiring with others to commit disruptive cyber attacks on the computer networks of BCH and the Wayside Youth and Family Support Network ("Wayside"), in violation of 18 U.S.C. § 371.  (Docket No. 28, ¶¶ 31-32). Count 2 charges Gottesfeld with causing damage without authorization to BCH's computer

networks, and with causing loss to BCH and the potential modification and impairment of the medical examination, diagnosis, treatment, and care of one or more individuals, in violation of 18 U.S.C. §§ 1030(a)(5)(A) & (c)(4)(B) and 18 U.S.C. § 2.  (Ind. ¶ 37).  The government's evidence at trial is expected to show that:

Prior to 2014, Gottesfeld was concerned about what he believed were abuses at facilities that treat children and teens with serious emotional, psychological, and medical problems— what Gottesfeld termed "the troubled teen industry."  (Ind. ¶ 2).  In 2013, Gottesfeld had created a website and social media accounts over which he advocated the shutdown of one such facility where an extended family member had been treated ("the Utah Treatment Center").  (Ind. ¶ 3).

*Patient A*

In early 2014, Gottesfeld began to focus on the highly publicized case of a teenager ("Patient A") who had been receiving medical treatment at BCH.[1]  The press had reported that a Massachusetts juvenile court judge had ordered Patient A into MDCF custody based on concerns that her parents were interfering with her treatment.  (Ind. ¶ 10).  The issue of Patient A's custody and medical care went viral, with religious and political organizations asserting that the case was an example of government interference with parental rights.  (Ind. ¶ 11).  Patient A attracted Gottesfeld's interest because he believed her case was emblematic of the concerns he had expressed about the Utah Treatment Center and the "troubled teen industry."  (Ind. ¶ 12).

A January 18, 2014 story in the *Boston Globe* reported that Patient A had been transferred from BCH to Wayside, a Framingham, Massachusetts residential treatment facility.

---

[1]BCH is a not-for-profit, comprehensive center for pediatric health care and is one of the largest pediatric medical centers in the United States.  BCH provides clinical care, conducts interdisciplinary research into childhood illnesses and disease, and maintains the largest training program for pediatricians and pediatric subspecialists in the United States.  (Ind. ¶ 14).

(Ind. ¶ 13).  The story reported that while Patient A was physically at Wayside, BCH would continue to oversee her care temporarily until MDCF could find new providers.  (Ind. ¶ 16).

In an effort to punish Wayside and BCH for their treatment of Patient A, and to pressure these institutions to discharge her, Gottesfeld and co-conspirators launched attacks on the computer networks of Wayside and BCH.  The attacks compromised both institutions' networks and were particularly disruptive to BCH.  (Ind. ¶¶ 17-18).

*Wayside*

On March 23, 2014, Gottesfeld and an unindicted co-conspirator ("UC-1") exchanged a series of Twitter direct messages that discussed attacking the computer networks of institutions involved in Patent A's treatment.  Gottesfeld suggested that the first target be Wayside.  (Ind. ¶ 19).  UC-1 remotely surveyed Wayside's website and reported to Gottesfeld that it would be easy to attack.  (Ind. ¶ 20).  On March 25, 2014, the press reported that the state court judge had granted permanent custody over Patient A to MDCF.  (Ind. ¶ 21).  That day, Gottesfeld issued a series of public Twitter messages (using the hashtag #Anonymous) calling for attacks on Wayside's computer network, and co-conspirators launched a Dedicated Denial of Service ("DDOS") attack[2] against Wayside.  The attack lasted for more than a week, crippled Wayside's website, and cost the facility more than $18,000 in response and mitigation efforts.  (Ind. ¶ 22).

*BCH*

On March 23, 2014, Gottesfeld posted a YouTube video calling for action against BCH,

---

[2]DDOS attacks direct an enormous amount of network traffic at a target computer server, with the intent to overwhelm that server and disrupt online services.  Successful DDOS attacks can take a website offline for the duration of the attack, which can range from an hour to days or even weeks.  (Ind. ¶ 5).

again in the name of the Anonymous, for its treatment of Patient A.  The video, narrated by a computer-generated voice, stated that Anonymous "will punish all those held accountable and will not relent until [Patient A] is free."  (Ind. ¶ 23).  The narrator also stated: "To The Boston Children's Hospital—why do you employ people that clearly do not put patients first?  We demand that you terminate [Patient A's physician] from her employment or you too shall feel the full unbridled wrath of Anonymous.  Test us and you shall fail."  (Ind. ¶ 24).

Gottesfeld's YouTube video directed viewers to a posting on the website pastebin.com that contained information about the BCH server necessary to conduct a DDOS attack against it. (Ind. ¶ 25).  On April 19, 2014, Gottesfeld and his co-conspirators initiated their DDOS attack against the BCH server.  The attack lasted for seven days, disrupted BCH's network, and took its website out of service.  The attack also disrupted both BCH's day-to-day operations and the research being done there.  (Ind. ¶ 26).  In an effort to ensure the attack did not compromise patient information, BCH shut down the portions of its network that communicated with the internet and its e-mail servers.  This shut down successfully prevented the attackers from accessing any patient records or other internal BCH information, but it impacted the entire BCH community, particularly the ability of physicians outside of BCH to obtain patient medical records and to communicate with BCH physicians.  (Ind. ¶ 27).  It also disrupted an important fundraising period for BCH by disabling the hospital's fundraising portal.  (Ind. ¶ 28).  Responding to and mitigating the damage from this DDOS attack cost BCH more than $300,000.  (Ind. ¶ 29).

*Gottesfeld's Public Statements Taking Responsibility for the Attack on BCH*

Gottesfeld has repeatedly claimed responsibility for the attack on BCH.  In a letter that the *Huffington Post* published, Gottesfeld succinctly described his method as taking the "whole

hospital off the Internet."

> I knew that BCH's big donation day was coming up, and that most donors give online.  I felt that to have sufficient influence to save [Patient A] from grievous bodily harm and possible death, as well as dissuade BCH from continuing its well established pattern of such harmful "parentectomies," I'd have to hit BCH where they appear to care the most, the pocket book and reputation.  All other efforts to protect [Patient A] weren't succeeding and time was of the essence.  Almost unbelievably, they kept their donation page on the same public network as the rest of their stuff.  Rookie mistake.  To take it down, I'd have to knock the whole hospital off the Internet.
> …
> The network was strong, well funded, but especially vulnerable to a specific attack.  Apparently BCH was unwilling to architect around the problem.  I see such laziness often in my work, and it leaves our nation vulnerable.
> I had spent my career building cyber-defenses.  For the first time, I was on the offensive.  I coded around the clock for two weeks to perfect the attack.  Small test runs were made.  BCH bragged to the media that they were withstanding the onslaught and hadn't been taken down.  They had no idea what was to come.
> I finished the code just in time.  It ran.  BCH's donation page went down.  As they were down, I was nervous.  I left it running for a few hours.

(Attachment A).

In a September 2016 telephone interview with a reporter, Gottesfeld invoked the imminent defense of Patient A as his reason for attacking BCH:  "It's kind of like if you see someone getting stabbed in an alley, or about to be stabbed in an alley, you could post that to Facebook and ask the person nicely to, you know, not stab the person, but is that an appropriate action in that case?"  He added that "everything I did was done to defend [Patient A] … to protect her from imminent grievous serious bodily harm and possible death."  When the reporter asked Gottesfeld what outcome he wanted, Gottesfeld stated, "I would like an acquittal, an acquittal based on defense of another.  That'd kind of be my end goal here."  (Audio Recording, Exhibit B hereto).[3]

Gottesfeld conceded to the same reporter, however, that he had no firsthand knowledge

---

[3]Gottesfeld also predicted to the news reporter that the government would move to preclude his affirmative defense, and that case law made it likely that the Court would do so.

of Patient A's condition or care.  He had never spoken to Patient A or to Patient A's family.

Despite having called the FBI about the Utah Treatment Facility in October 2013, Gottesfeld

did not contact the FBI regarding Patient A before his attacks.  He did not call his local police

department or the Boston Police Department.  The government is aware of no evidence that he

took the simple step of calling or writing to his representative in Congress.  Nor is the

government aware of Gottesfeld contacting BCH or Wayside to protest Patient A's treatment.

Although Patient A's parents sought to re-obtain custody over her through the juvenile court

system, Gottesfeld was not a party to any legal action against MDCF, BCH, or Wayside.

## III.   <u>APPLICABLE LAW</u>

A defendant's traditional right to present defenses and to have the jury instructed on

those defenses is not absolute.  *See United States v. Bailey*, 444 U.S. 394, 416 (1980); *United

States v. Maxwell*, 254 F.3d 21, 26 (1ˢᵗ Cir. 2001).  Rather, a jury may only be instructed on

affirmative defenses that are supported by law.  *Bailey*, 444 U.S. at 416.  "[W]hen a proffer in

support of an anticipated affirmative defense is insufficient as a matter of law to create a triable

issue, a district court may preclude the presentation of that defense entirely."  *Maxwell*, 254

F.3d at 26 (citing *Bailey*, 444 U.S. at 414-15).  The Court can also bar evidence on any of the

elements of the precluded affirmative defense that are not otherwise admissible for an

appropriate purpose.  *Bailey*, 444 U.S. at 416; *see also United States v. Silva-Rosa*, 275 F.3d 18,

23 (1st Cir. 2001) (affirming district court's decision to bar defendant's testimony about motive

and state of mind because such testimony was relevant "only insofar as it pertains to the

necessity defense," a justification that defendants could not establish as a matter of law).  This

requirement — that a defendant satisfy an "entry-level" burden of producing enough

"competent" evidence to plausibly support an affirmative defense — applies to Gottesfeld's

stated intent to assert these defenses.  *See Maxwell*, 254 F.3d at 26.

> *Defense of Another*

Defense of another permits "the use of force … when a person reasonably believes that it is necessary for the defense of oneself or another *against the immediate use of unlawful force*.  A person must use no more force than appears reasonably necessary in the circumstances."  First Circuit Pattern Jury Instr., § 5.04 (2017) (emphasis added); *see United States v. Bello*, 194 F.3d 18, 26 (1st Cir. 1999).

> *Necessity*

While duress-based defenses (like defense of self and others) cover "the situation where … coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils."  *Bailey*, 444 U.S. at 409.  The necessity defense requires proof that a defendant "(1) was faced with a choice of evils and chose the lesser evil; (2) acted to prevent imminent harm; (3) reasonably anticipated a direct causal relationship between his acts and the harm to be averted; and (4) had no legal alternative but to violate the law."  *United States v. Lebreault-Feliz*, 807 F.3d 1, 4 (1st Cir. 2015) (affirming preclusion of duress and necessity defenses to passport fraud charges); *Maxwell*, 254 F.3d at 27.

> *Imminent Harm*

To invoke either necessity or defense of another, Gottesfeld carries the burden of showing through competent evidence immediate or imminent harm to Patient A.  *See Maxwell*, 254 F.3d at 27.  "The term 'imminent harm' connotes a real emergency, a crisis involving immediate danger to oneself or to a third party."  *Id.*

8

*Reasonable Anticipation of Averting Harm*

Gottesfeld also carries the burden of demonstrating by competent evidence a "cause and effect between an act of protest and the achievement of the goal of the protest." *Id.* at 28.  A reasonable anticipation of averting harm, however, "requires more than seeing ghosts under every bed." *Id.*  A defendant may not engage in "pure conjecture." *Id.*  As the First Circuit explained in *Maxwell*: a defendant "cannot will a causal relationship into being simply by the fervor of his convictions (no matter how sincerely held)." *Id.*

*Legal Alternatives*

To succeed on a necessity defense, a defendant must also show through competent evidence that he had no legal alternative to violating the law.  *Id.* at 28.  "[T]he necessity defense does not arise from a defendant's choice of a preferred course of actions from among a universe of possible courses of action (some legal, some not), but from an emergent crisis that, as a practical matter, precludes all principled options but one." *Id.*  "In other words, the defendant's act must be necessary, not merely desirable." *Id.*

The fact that a defendant is unlikely to effect the changes he desires through legal alternatives does not mean that those alternatives are non-existent. *Id.* at 29.  "Accepting such an argument would be tantamount to giving an individual carte blanche to interpose a necessity defense whenever he becomes disaffected by the workings of the political process." *Id.*  The First Circuit has in fact held that a "defendant's legal alternatives will rarely, if ever, be deemed exhausted when the harm of which he complains can be palliated by political action." *Id.*

## IV.    ARGUMENT

Gottesfeld's far-fetched claims that BCH and Wayside were torturing Patient A, and that he had no choice but to attack BCH and Wayside's networks in her defense, must be measured against the First Circuit's requirement that Gottesfeld proffer, through competent evidence, each of the elements of defense of another and necessity.  Because Gottesfeld cannot meet this "entry-level" burden as to either defense, the Court should preclude them.  It should also bar Gottesfeld from introducing evidence related to these defenses where it is otherwise irrelevant to the elements of the offenses charged in the Indictment.

### A.    Gottesfeld Cannot Show He Acted in Defense of Patient A

#### 1.    *Gottesfeld Was Never In Patient A's Presence*

Gottesfeld cannot claim "defense of another" after engineering DDOS attacks from the comfort of his Somerville apartment.  Justification defenses, including defense of another, "obviously and inevitably require[] that the criminal act to be counteracted occur *in the presence of the actor*."  *Hawaii v. Marley*, 509 P.2d 1095, 1108 (Haw. 1973) (emphasis added). *Marley* sets out the sensible rationale for this rule and warns against the dangers that would flow from Gottesfeld's brand of remote justice:

> A presence requirement is the concomitant of the "immediate harm" requirement. The inevitable requirement of presence stands, even where the criminal acts done to prevent harm to self, others, or property do not involve force. Failure of the courts to require presence would license persons to violate the criminal statutes far more frequently.  Such license is to be given only in exceptional cases, and even when given is to be severely limited to matters of intimate personal concern. Where the limiting factor of intimate personal concern is absent from the surrounding circumstances, as here, we see no reason to expand the scope of the justification defense.  To rule that a full justification defense to the prosecution for commission of crime is established even absent a presence requirement would be to create a very dangerous precedent, for it would make each citizen a judge of the criminality of all the acts of every other citizen, with power to mete out sentence.

*Marley*, 509 P.2d at 1108; *see also United States v. Brodhead*, 714 F. Supp. 593, 598 (D. Mass. 1989) (Woodlock, J.) (affirming a magistrate judge's preclusion of a "crime-prevention defense" based on *Marley*'s presence requirement).  The very example of defense of another that Gottesfeld offers—a bystander stumbling upon a violent assault in progress—demonstrates how his own conduct misses the justification mark.

> ## 2.    *Gottesfeld Cannot Show That He Acted To Prevent Imminent Harm*

Even if Gottesfeld had been present, he has still not proffered competent evidence that he acted to prevent an *imminent* harm, which is another requirement of both defense of another and necessity.  *See* First Circuit Pattern Jury Instr. § 5.04 (defense of another); *Maxwell* 254, F.3d at 27 (necessity).  He should accordingly be precluded from advancing either defense.

On April 20, 2014, there was no "real emergency [or] crisis involving immediate danger" to Patient A, at either Wayside or BCH.  *Maxwell*, 254 F.3d at 27.  Gottesfeld knew that Patient A had been discharged from BCH to Wayside months earlier.  (Ind. ¶ 32m).  He has stated publicly that he planned the DDOS attack on BCH for two weeks.  (Exhibit A).  He made "test runs" at the hospital's network.  (Exhibit A).  These are the actions of a hacker perfecting his craft, not a defender of Patient A's life.  *See United States v. Kabat*, 797 F.2d 580, 591 (8th Cir. 1986) ("[T]he harm must be so imminent that, absent the defendant's criminal acts, the harm is *certain to occur*.") (emphasis added).  Plainly, Gottesfeld cannot prove that he was acting to prevent an imminent harm when he spent weeks planning his cyber attack.  *Cf. Bello*, 194 F.3d at 26–27 (rejecting a defendant's request for an instruction on self-defense where there was an eighteen hour "cooling off" period).

Gottesfeld never saw Patient A at Wayside or BCH and thus lacked the kind of first-hand knowledge of imminent harm that makes for a classic and credible claim of necessity.  *See*

*Marley*, 509 P.2d at 1108.  He never spoke with her or with her family, which left him without even secondhand information about her condition.  Although Patient A's father was quoted in the media in February 2014 as saying Patient A's life was at risk, this is hardly competent evidence that BCH was causing her serious bodily harm, then or more than two months later. *See Bello*, 194 F.3d at 26–27.  Indeed, the news reports describing Patient A's condition on which Gottesfeld relies "at most support[] a lingering threat of future harm."  *See United States v. Arthurs*, 73 F.3d 444, 448-49 (1ˢᵗ Cir. 1996) (rejecting duress defense where defendant could have discarded drugs or sought help in the minutes between being threatened in a cruise ship bathroom and then exiting that ship with contraband).

Moreover, Gottesfeld cannot produce competent evidence that Patient A was actually being harmed at *any* point.  He has simply spliced together undated, unauthenticated, hearsay documents purporting to establish that she was being tortured.  *See, e.g.*, Docket Nos. 90-1 and 90-2 (attaching news media).[4]  But the Court need not accept these "bald assertions" and "unsupportable conclusions" of imminent harm, *Maxwell*, 254 F.3d at 28, particularly those that describe Patient A's condition months before Gottesfeld's attack.  Gottesfeld's assessment of Patient A's condition at the time of his attacks on Wayside and BCH was little better than a

---

[4] Where facts do not fit Gottesfeld's "torture/life in danger" narrative, he essentially ignores them.  In a November 2017 filing, Docket No. 90-2 (Exhibit U), Gottesfeld points to an online article under his byline featuring purported "before" and "after" pictures of Patient A.  The first shows a smiling child on figure skates, and the second shows a child in a wheelchair, with Gottesfeld writing that the wheelchair was "thanks to [BCH] and social services in the Commonwealth of Massachusetts."  In fact, it was reported that Patient A *arrived* at BCH by ambulance in serious distress.  Nor does Gottesfeld's narrative acknowledge that even Patient A's family does not allege in its lawsuit that BCH and its personnel tortured her.  The family filed suit claiming simple negligence, gross negligence, civil rights violations, and loss of consortium.  *See Pelletier v. Peters et al.*, Civil Action No. 2016-0474D, (Suffolk Super. Ct.). For its part, patient privacy rules prevent BCH from publicly rebutting Gottesfeld' s absurd claims.

guess. *See Marley*, 509 P.2d at 1108; *see also Purifoy v. Tucker,* 2012 WL 1933769, *18 (N.D. Fla. May 3, 2012) (upholding on habeas review a trial court's rejection of a challenge to counsel's failure to call "duress" witnesses where "none of these witnesses was an eyewitness to the offenses or had any firsthand knowledge of whether [the defendant] was in imminent danger during the commission of the crimes, or whether [the defendant] reasonably believed that [a third party]'s threat was imminent during commission of the crimes"). Because Gottesfeld cannot show harm to Patient A, let alone imminent harm, his defense of another claims fail as a matter of law.

### 3.    *Gottesfeld Could Not Have Used Force against BCH or Wayside*

Gottesfeld's digital attacks on BCH and Wayside do not fit under the banner of meeting unlawful force with comparable force in defense of another. First, there is no evidence of "unlawful force" by either BCH or Wayside. Both entities were acting at MDCF's direction pursuant to a court order. In the absence of any unlawful force against Patient A, Gottesfeld was not entitled to use physical or legal force in her defense. First Circuit Pattern Jury Instr., § 5.04 (permitting the use of force only "when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force").

To allow Gottesfeld to offer "defense of another" as justification would require this Court to conclude that Gottesfeld was entitled to use whatever physical force was reasonably necessary to remove Patient A from the care of Wayside or BCH. No sensible reading of this doctrine would arm a total stranger with no firsthand knowledge of a patient's medical care with immunity to storm a children's hospital and remove her by whatever means necessary. The contrary result is genuinely terrifying to contemplate. Because Gottesfeld's actions do not "conform to the normal understanding of defense of another," the Court should bar the defense.

**B.**     **Gottesfeld Cannot Establish the Elements of Necessity**

Gottesfeld cannot meet his entry-level burden of proffering competent proof of necessity as to any of the defense's elements.  As explained above in Section II.A., Gottesfeld cannot show that he acted to prevent an imminent harm, which alone is fatal to his necessity defense.  But Gottesfeld also cannot show that he reasonably anticipated a direct causal relationship between his acts and the harm to be averted, or that he had no legal alternative but to violate the law.  Because no useful purpose would be served by allowing the assertion of this defense at trial, the Court should exclude any evidence supporting a necessity defense that is otherwise irrelevant, including Gottesfeld's motive for committing the cyber attack.  *See Silva-Rosa*, 275 F.3d at 23.

*1.     Gottesfeld Could Not Reasonably Believe a DDOS Attack Would Prevent the Harm He Alleged*

In traditional necessity cases, the nexus between an illegal act and the result obtained is a clear one:  a prisoner flees a burning cell and averts death, or someone demolishes a home to create a firebreak that saves an entire community.  "It is the volitional illegal act alone which, once taken, abates the evil."  *United States v. Schoon*, 971 F.2d 193, 198 (9th Cir. 1991).  In *United States v. Ayala*, for example, the First Circuit rejected a necessity defense where the defendants claimed that their presence on a military base would cause the Navy to suspend live fire exercises that the defendants claimed were harming the environment.  289 F.3d 16, 26 (1st Cir. 2002).  The Court reasoned that the defendants had presented no evidence that their trespassory protests would result in a change of U.S. Naval policy, rather than a simple temporary cessation.  *See id.*

Like the protestors in *Ayala*, Gottesfeld could not reasonably anticipate a causal relationship between his acts and the harm he purportedly averted.  No evidence supports

14

Gottesfeld's argument that knocking BCH "off the Internet" or interfering with its fundraising would cause licensed physicians charged with Patient A's care to change their diagnoses and treatment of her or other patients.  Rather than affect any change in BCH and Wayside's care of Patient A, Gottesfeld's DDOS attack on BCH's network left the hospital scrambling to prevent damage to its networks and harm to all of its patients.

Likewise, Gottesfeld's suggestion that because of his attack "[t]here have been no such egregious parentectomies published at BCH since" is nothing more than wishful thinking that is, in any event, irrelevant to a necessity defense.  First, his claim that BCH involves MDCF in custody matters less frequently since his attack is unsupported by any evidence.  Even if true, it amounts to nothing more than a *post hoc* fallacy, as well as a self-serving attempt to claim that his attack accomplished something more than disrupting the critical care of sick children. Finally, Gottesfeld's claim that he sought and caused changes in how BCH handles child custody questions undermines the core claim on which his necessity and defense of another arguments rest — that he was acting to prevent imminent harm to Patient A.

Gottesfeld's expectations are even less reasonable because BCH and Wayside were caring for Patient A at the direction of MDCF under the terms of a juvenile court's order.  Even assuming Gottesfeld's attacks caused Patient A's caregivers to abandon both their medical judgment and obligation to act in Patient A's best interests, it is the state agency and the state court that controlled the terms of Patient A's custody.  Gottesfeld could not reasonably anticipate that his conduct targeting BCH and Wayside would affect MDCF and the court's respective judgments.  *See Schoon*, 971 F.2d at 198 ("the act alone is unlikely to abate the evil" where "it takes another volitional actor not controlled by the protestor to take a further

15

step ….").  Gottesfeld's stated beliefs are accordingly insufficient to meet his burden on the necessity defense's causation element.

2.      *Gottesfeld Had Legal Alternatives to Violating the Law*

Finally, necessity requires a crisis that precludes "all principled options but one." *Maxwell*, 254 F.3d at 28.  Gottesfeld cannot meet his burden of showing such a crisis because he had a universe of legal options available to him.  He did not call the FBI to report Patient A's case, despite having called months earlier about the Utah Treatment Center.  He failed to speak to Patient A or to her family.  He did not go to Wayside or BCH to try to meet Patient A, to protest, or to speak with her caregivers or the facilities' administrators.  He did not file suit against BCH, Wayside, or MDCF, or write letters on Patient A's behalf to his congressperson or state officials.  And even though Gottesfeld claims he believed that hurting BCH's "pocket book" would allow him "to have sufficient influence to save [Patient A]," he made no appeal to donors asking them not to give money to BCH.  Instead, on the basis of media reports, he substituted his judgment for that of Patient A's doctors; for the MDCF professionals charged with acting in Patient A's best interests; and for the juvenile court judge who heard substantial evidence in a contentious case before ordering Patient A into MDCF custody.

Despite having failed to exhaust his options as to the purported harm to Patient A, Gottesfeld has, since his arrest and in service of his own cause, shown the "panoramic range" of legal activity that was available to him.  *See Maxwell*, 254 F.3d at 29 (defendant's "own activities in support of the cause of nuclear disarmament" belie suggestion that political avenues were closed to him).  To draw attention to his own case, Gottesfeld has, among other actions, given television and newspaper interviews; established, posted on, and fundraised over Twitter and Facebook accounts created to support his views; championed a website promoting his

16

cause; claimed to have gone on a "hunger strike"; and announced his candidacy for the United

States Senate.  All of these legal actions were available to Gottesfeld before he attacked

Wayside and BCH, but he skipped them in favor of a criminal attack.

Accepting Gottesfeld's suggestion that he could not effect change at BCH and Wayside

over Facebook, *see* Exhibit A, would be "tantamount to giving an individual carte blanche to

interpose a necessity defense whenever he becomes disaffected by the political process."

*Maxwell*, 254 F.3d at 29.  For this reason, the Ninth Circuit and at least one district court in this

Circuit have categorically rejected necessity as a defense to crimes, like the ones Gottesfeld is

charged with, that are committed as acts of indirect civil disobedience.  *Schoon*, 971 F.2d at

195-200 (explaining that defendants may not "distort to their purpose an age-old common law

doctrine meant for a very different purpose"); *United States v. Montanes-Sanes*, 135 F. Supp. 2d

281, 283 (D.P.R. 2001).[5]  These courts have reasoned that indirect civil disobedience cases are

about "gaining notoriety for a cause — the [necessity] defense allows protestors to get their

political grievances discussed in a courtroom," which is not a legitimate purpose for the

application of the defense.  *Schoon*, 971 F.2d at 199.  "The law could not function were people

allowed to rely on their *subjective* beliefs and value judgments in determining which harms

justified the taking of criminal action."  *Id.* (*citing United States v. Moylan,* 417 F.2d 1002,

1008-09 (4th Cir.1969) ("[E]xercise of a moral judgment based upon individual standards does

not carry with it legal justification or immunity from punishment for breach of the law ....

Toleration of such conduct would [be] inevitably anarchic.")); *United States v. Jacobs*, 704 F.

---

[5] Indirect civil disobedience is "violating a law or interfering with a government policy that is
not, itself, the object of protest." *Schoon*, 971 F.2d at 196.  Here, Gottesfeld is charged with
violating the conspiracy statute (18 U.S.C. § 371) and the Computer Fraud and Abuse Act (18
U.S.C. § 1030 *et seq.*), not in protest of those laws, but to bring attention to Patient A's cause.

Supp. 629, 630 (E.D.N.C. 1988) (excluding necessity evidence in case charging armed kidnapping, purportedly intended to call attention to generic drug trafficking and official corruption).  *Cf.* Maxwell, 254 F.3d at 26 n.2 (assuming without deciding that necessity, if proven, might constitute a defense in a civil disobedience case).  Gottesfeld accordingly cannot prove exhaustion element of the necessity defense as a matter of law.[6]

As he wrote to the Huffington Post, Gottesfeld intended his attack on BCH to bring notoriety to his cause.  *See* Exhibit A.  This is not a legitimate purpose for the application of justification defenses, *see Schoon*, 971 F.2d at 199, and the Court should not permit Gottesfeld to use an otherwise straightforward trial of computer intrusion charges — as to BCH, a crime that Gottesfeld *has admitted publicly* that he committed — as a platform for his views on the role of BCH, Wayside, MDCF, and the Massachusetts juvenile court in the care of minor patients.

---

[6] Gottesfeld's inability to show the absence of legal alternatives is equally fatal to his defense of another claim because "absence of legal alternatives is an element of all lesser-evil defenses." *United States v. Haynes*, 143 F.3d 1089, 1090–91 (1st Cir. 1998). The *Haynes* court explained that self-defense is such a defense, *id.*, and it follows that defense of another is as well.  *See* First Circuit Pattern Jury Instr. § 5.04 (grouping self-defense and defense of another together).

V.        <u>**CONCLUSION**</u>

For all of these reasons, unless Gottesfeld's March 15, 2018 opposition proffers competent evidence of each of the elements of necessity and defense of another, the Court should preclude him from presenting these justifications, and from presenting motive evidence that is not otherwise relevant to the elements of the charges in Counts 1 and 2 of the Indictment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By: */s/ Seth B. Kosto*
Seth B. Kosto
David J. D'Addio
Assistant U.S. Attorneys

February 28, 2018

CERTIFICATE OF SERVICE

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Seth B. Kosto*

Dated: February 28, 2018