UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.: 16-cr-10305-NMG |
| | ) | |
| MARTIN GOTTESFELD | ) | |

SECOND SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE

The defendant Martin Gottesfeld ("Mr. Gottesfeld") hereby files this second

supplemental motion to suppress evidence.  Mr. Gottesfeld filed his first motion to

suppress evidence on August 31, 2017.[1]  Dkt. No. 78.  The government filed an

opposition on October 6, 2017.  Dkt. No. 84.  Mr. Gottesfeld filed a reply to the

government's opposition on October 20, 2017.  Dkt. No. 89.  Represented by successor

counsel, Mr. Gottesfeld filed a supplemental motion to suppress on March 20, 2018.[2]

Dkt. No. 128.  Mr. Gottesfeld, now represented by undersigned counsel, files this second

supplemental motion to suppress evidence.  All facts and arguments made in Mr.

Gottesfeld's previous suppression filings are hereby incorporated by reference.  This

motion expands on several of those arguments, makes new arguments, and seeks

exclusion of all evidence seized pursuant to Pen Register/Trap and Trace order, the

search warrant, and all fruits derived therefrom.

---

[1] The motion to suppress was accompanied by three (3) exhibits: Ex. A consisted of the search warrant and application for search warrant (including special agent Michael Tunick's affidavit) as provided in discovery (Dkt. No. 78-1); Ex. B was the application for the pen register/trap and trace order (Dkt. No. 78-2); and Ex. C was the pen register/trap and trace order (D-78-3).  These Exhibits were filed under seal.  (See Dkt. Nos. 79 and 80)

[2] The supplemental motion to suppress was accompanied by seven (7) exhibits: Ex. A was a Port Numbers Profile (Dkt. No. 128-1); Ex. B was a List of Dedicated Port Numbers (Dkt. No. 128-2); Ex. C was entitled "greatschools.org email" (Dkt. No. 128-3); Ex. D was entitled "Bowler, M.J. C.V. and TBF (Dkt. No. 128-4); Ex. E was entitled "Wayside – givingcommon.org and TBF" (Dkt. No. 128-5); Ex. F. was entitled "Press Release – Bowler, M.J." (Dkt. No. 128-6); and Ex. G. was entitled "Cabi, et al v. Boston Children's Hospital" (Dkt. No. 128-7)

1.  Magistrate Judge Marianne Bowler failed to disqualify herself from considering the search warrant despite being required to recuse.  The magistrate judge was not neutral and detached when she considered and issued the search warrant.

    a.   The Affidavit of Michael W. Tunick.

The affidavit of special agent Michael W. Tunick in support of the search warrant application in 14-mj-2234-MBB clearly identified facts and circumstances requiring Magistrate Judge Bowler to disqualify herself from considering the search warrant.  Dkt. No. 78-1.

Paragraph two (2) of the affidavit states "I am currently investigating violations of 18.U.S.C. § 1030(a)(5)(A) (intentionally causing damage to a protected computer) and 18 U.S.C. § 371 (conspiracy) relating to attacks against the Boston Children's Hospital computer network *and other related network attacks*."  Id. at ¶ 2.  (emphasis supplied) The affidavit later describes a Distributed Denial of Service ("DDOS") attack against Boston Children's Hospital ("BCH") on or about April 20, 2014 through at least April 24, 2014.  Id. at ¶ 6.  According to Tunick, "The intent of these [DDOS] attacks is to overwhelm the target's networking equipment to render it useless and consequently disrupt online services."  Id. at ¶ 7.

Paragraph eight (8) of the affidavit states: "The incoming traffic [from the DDOS attack] resulted in significant disruptions to the BCH website *and additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate.*  To prevent greater damage, BCH decided to temporarily shut down several online service portals used by patients, providers and physicians.  The loss of these services and the impact on the network impacted the ability of BCH to care for its patients."  Id. at ¶ 8. (emphasis supplied)

In paragraph nine (9) of the affidavit, Tunick states his belief that "the attack against BCH is related to an activist effort concerning the custody battle over teenage medical patient [J.P.].[3]  This custody battle involved the Commonwealth of Massachusetts's taking custody of [J.P.] from her parents due to her serious medical condition.  She was in Massachusetts custody for 16 months, much of which she spent at BCH, until her release in June 2014."  Id. at ¶ 9.

Paragraph twenty-seven (27) of the affidavit states "Since the attack against BCH in April 2014, the FBI has learned of other DDOS attacks against entities associated with BCH, the [J.P.] custody battle, and the troubled teen industry.  Additional victims include… Wayside Youth and Family Support Network…  These victims all experienced similar disruptions."  Id. at ¶ 27. (footnote excluded)

    b.  <u>Magistrate Judge Bowler's spousal relationship with Marc A. Pheffer of Harvard Medical School and Brigham and Women's Hospital required recusal.</u>

Magistrate Judge Bowler is married to Marc A. Pheffer, M.D., Ph.D., the Dzau Professor of Medicine at Harvard Medical School ("HMS") and a senior cardiologist at the Brigham and Women's Hospital ("BWH").  Dkt. No.128-6.  BCH is an affiliate of HMS.  See https://hms.harvard.edu/about-hms/hms-affiliates/boston-childrens-hospital (last accessed April 28, 2018).  BWH is also an affiliate of HMS.  See https://hms.harvard.edu/about-hms/hms-affiliates/brigham-and-womens-hospital (last accessed on April 28, 2018).  Thus, both of Dr. Pheffer's employers, HMS and BWH, are affiliates of alleged "organizational victim" BCH.  Dkt. Nos. 37 and 78-1 at ¶ 8.

---

[3] The affidavit uses J.P.'s full name; at the time, J.P. was a teenager.  Local and national media regularly used J.P.'s full name when reporting on her family's custody battle with BCH and the alleged mistreatment and/or abuse of J.P. and her family by BCH and others.  Further, J.P. is now an adult.  However, in an abundance of caution, this motion will utilize her initials in its narrative text.

As noted *supra*, special agent Tunick's affidavit clearly stated "The incoming traffic [from the DDOS attack] resulted in significant disruptions to the BCH website and *additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate.*  Dkt. No.78-1 at ¶ 8.  (emphasis supplied)  Tunick's use of the phrase "the network" as opposed to "a network" indicates that the DDOS attack disrupted the network on which Dr. Pfeffer's Harvard-affiliated BWH communicates. This alone required Magistrate Judge Bowler's recusal.

Even more, Dr. Pfeffer's work at HMS and BWH includes interests and responsibilities regarding "medical communications."  Dr. Pfeffer is on the faculty of BWH's Division of Medical Communications.  See http://medicalcommunications.bwh.harvard.edu/our-faculty/ (last accessed April 28, 2018).  According to the Division's website, "The mission of the Division of Medical Communications is to enhance accurate, succinct, and clear communication in four different areas: 1. Physician to patient and patient to physician; 2. Peer-to-peer (physician-to-physician); 3. Physician to-lay-public; and 4. Physician-to-media."  See http://medicalcommunications.bwh.harvard.edu/  (last accessed April 28, 2018).  The Division's biography of Dr. Pfeffer states "Dr. Pfeffer… is known for his fairness in data sharing and assisting others in developing meaningful scholarly works from study databases."  See http://medicalcommunications.bwh.harvard.edu/personnel/marc-alan-pfeffer/ (last accessed April 28, 2018).  The Division biography also reports that Dr. Pfeffer "serves on the Data Safety Monitoring Boards of major international trials."  Id.

When Magistrate Judge Bowler reviewed Tunick's affidavit, she would have seen that her spouse's employment at HMS and Harvard-affiliated BWH, including but not

limited to his work in medical communications, was negatively impacted by the "disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate." Dkt. No.78-1 at ¶ 8. Nonetheless, she failed to disqualify herself.

Further, while the extent of Magistrate Judge Bowler's knowledge of the DDOS attack and its implications for her spouse's work *prior* to her review of the affidavit is unknown, it must be acknowledged that the cyber attack was widely reported when it occurred and intensely discussed in both the medical community. See e.g. "Hacker Group Anonymous targets Children's Hospital," The Boston Globe, April 24, 2014 (https://www.bostonglobe.com/business/2014/04/24/hacker-group-anonymous-targets-children-hospital-over-justina-pelletier-case/jSd3EE5VVHbSGTJdS5YrfM/story.html) (last accessed April 29, 2018); "Anonymous Reportedly Behind Cyber Attacks Against Children's Hospital Website In Response to Justina Pelletier Custody Case," Boston.com, April 24, 2014, (https://www.boston.com/news/technology/2014/04/24/anonymous-reportedly-behind-cyber-attacks-against-childrens-hospital-website-in-response-to-justina-pelletier-custody-case) (last accessed April 29, 2018); "Lessons From Boston Children's: When Hackers Attack Your Hospital," WBUR.org, July 31, 2014 (http://www.wbur.org/commonhealth/2014/07/31/cyberattack-boston-childrens) (last accessed April 29, 2018); "When 'Hacktivists' Target Your Hospital," New England Journal of Medicine, July 31, 2014 (N Engl J Med 2014; 371:393-395).

Indeed, Magistrate Judge Bowler and Dr. Pfeffer have worked together on medical communication matters. In 2011, Magistrate Judge Bowler and Dr. Pfeffer jointly authored an article published in the New England Journal of Medicine entitled

"Access to Safety Data – Stockholders versus Prescribers."  (A true copy of the article is attached as Exhibit A)  The article concerns, *inter alia*, the responsibility of the medical industry to disclose certain safety data to shareholders; the article also makes recommendations concerning access to information.  Id.  While the article focuses on a particular niche of medical communications, it directly implicates the "mission" of Dr. Pfeffer's Division of Medical Communications; most important for this motion, the article reveals Magistrate Judge Bowler awareness of, and indeed collaboration with, Dr. Pfeffer in his work at HMS and Harvard-affiliated BWH in the field of medical communications.  Thus, Magistrate Judge Bowler would have recognized her knowledge of, and personal participation in, her spouse's work when she read that the DDOS attack caused "disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate."  Dkt. No.78-1 at ¶ 8.  Nonetheless, she failed to disqualify herself.

28 U.S.C. §455(a) states "Any justice, judge, or Magistrate Judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

The First Circuit has ruled "that the district court should exercise [its] discretion with the understanding that, 'if the question whether §455(a) requires disqualification is a close one, the balance tips in favor of recusal.'"  In re Boston's Children First, et al, Petitioners, 244 F.3d 164, 168 (1st Cir. 2001), citing Nichols v. Avery, 71 F.3d 347, 352 (10th Cir. 1995); see also Susan B. Hoekema, Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a), 60 Temp. L.Q. 697, 708 (1987) ("[S]ection 455(a) suggests that it requires disqualification for the

appearance of bias."); accord <u>In Re Chantal</u>, 902 F.2d 1018, 1023 (1st Cir. 1990).  "The point under §455(a) is not [the judge's] actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries."  <u>In re James J. Bulger, Petitioner</u>, No 12-2488 (1st Cir. 2013)

28 U.S.C. §455(b) states, in pertinent part, that a judge "shall also disqualify himself in the following circumstances…

(4) He knows that he, individually or as a fiduciary, or his spouse… has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person… (iii) Is known by the judge to have an interest that could be substantially affected by the by the outcome of the proceeding..."

28 U.S.C. §455(c) provides that "A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."

Magistrate Judge Bowler's spousal relationship with Dr. Pfeffer required her disqualification from considering the search warrant.  She violated 28 U.S.C. §455(b)(4) and 5(iii) because she knew that her spouse "ha[d] a financial interest in the subject

matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

First, Dr. Pfeffer clearly had a "financial interest" because he was employed by impacted institutions HMS and BWH.  Second, Dr. Pfeffer possessed "interest[s] that could be substantially affected by the outcome of the proceeding."  Dr. Pfeffer's employment at HMS and BWH, including but not limited to his faculty membership in the Division of Medical Communications, reveals interests that could be affected by the outcome of the proceeding.  For example, if Magistrate Judge Bowler refused to issue the search warrant, information related to the alleged cyber attack may never have been learned, impairing the ability of HMS and BWH to learn about the attack and better prepare against future attacks.  Granting the search warrant, however, increased the likelihood of acquiring such information.[4]  Similarly, if Magistrate Judge Bowler refused to issue the search warrant, the government may never have acquired evidence leading to Mr. Gottesfeld being charged (or convicted) with the DDOS attack; indeed, nobody had been charged in the approximately five (5) months between the April 2014 DDOS attack and the September 2014 application for the search warrant.  Without criminal charges, HMS-affiliated hospitals would be deprived of the deterrent effect Mr. Gottesfeld's prosecution would have against future would-be hackers, creating more work for HMS-affiliated hospitals in various respects, including but not limited to the field of medical communications.

Magistrate Judge Bowler also violated 28 U.S.C. §455(a)'s requirement that she "disqualify [herself] in any proceeding in which [her] impartiality might reasonably be

---

[4] This is not a comment upon the purported probable cause for the search warrant; probable cause did not exist.  Rather, this is merely an obvious statement of fact that, legality aside, the issuance of a search warrant would render the seizure of evidence more likely than without such issuance of a warrant.

questioned" because of her spouse's employment and interests.   The circumstances of

Dr. Pfeffer's work clearly presented the "existence of facts that would prompt a

reasonable question in the mind of a well-informed person about the judge's capacity for

impartiality in the course of the trial and its preliminaries."   In re James J. Bulger,

Petitioner, supra.

Indeed, Magistrate Judge Bowler's refusal to recuse herself in the present case

sharply contrasts with her March 20, 2017 Order of Recusal in another matter involving

BCH and HMS, Cabi, et al v. Boston Children's Hospital et al, 15-cv-12306-DJC, where

she explicitly cited her spouse's positions at HMS and BWH as the reason for her

disqualification.  Dkt. No. 128-7.  Cabi, et al is a civil action where plaintiffs allege, *inter*

*alia*, hostile work environment, retaliation, conspiracy, and breach of contract against

BCH and/or certain of its employees.  See 15-cv-12306-DJC, Dkt. No. 79 at ¶¶ 251-312.

In her Order of Recusal, Magistrate Judge Bowler acknowledged her spouse Dr. Pfeffer's

positions at HMS and BCH and wrote: "As discovery has progressed, it has become

apparent that the connection to Harvard Medical is more direct than originally

anticipated.  For example, plaintiffs are seeking documents from Harvard Medical School

which defendant's move to quash.  Mindful that 'doubts ordinarily ought to be resolved

in favor of recusal,' In re U.S., 441 F.3d at 56, accord In re Boston's Children's First, 244

F.3d 164, 167 (1st Cir. 2001), I recuse myself from presiding over this case."  Dkt. No.

128-7.

In Cabi, et al, BCH and other defendants were moving to quash a subpoena *duces*

*tecum* issued by Plaintiffs directed at HMS seeking documents regarding a "confidential

HMS investigation" into research misconduct.  See "Memorandum of Law in Support of

Motion for Protective Order and to Quash Subpoena," 15-cv-12306-DJC, March 9, 2017 (D-197). (A true copy is attached as Exhibit B).  Neither the documents subpoenaed, nor the motion to quash them, concerned Magistrate Judge Bowler's spouse or his work in any way.  Nonetheless, when the subpoena dispute arose, Magistrate Judge Bowler acknowledged that despite almost two years on the case, "doubts ordinarily ought to be resolved in favor of recusal" and disqualified herself. Dkt. No. 128-7.  (citations omitted)

      The instant case presented a far more obvious, significant, and immediate need for recusal than Cabi et al.   Unlike that case, the disqualifying connection between the DDOS attack and Harvard-affiliated hospitals in the instant case was clear the day Magistrate Judge Bowler reviewed the search warrant affidavit; further, it was far more substantial and consequential a connection.  Dkt. No. 78-1 at ¶ 8.  Special agent Tunick unambiguously stated the DDOS attack disrupted "*the network on which other Harvard University-affiliated hospitals communicate.*"  Dkt. No.78-1 at ¶ 8. (emphasis supplied) Dr. Pfeffer works at HMS and BWH, including in areas directly affected by the DDOS attack.  His many colleagues, peers, and patients would also be affected by the disruption in communication.  Further, the extent of the DDOS attack, the damages sustained by the HMS-affiliated hospitals, and the remedial actions taken by the affected institutions were of obvious significance to the government's investigation and any future criminal case. The explicit connection between the search warrant application and her spouse's work "would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries."  In re James J. Bulger, Petitioner, supra.

Magistrate Judge Bowler was not neutral and detached when she issued the search warrant.  Mr. Gottesfeld argues this Court should allow his motions to suppress and exclude the evidence, and their fruits, without a hearing.  Should a hearing be necessary, however, it would be appropriate to call Dr. Pfeffer and others to testify concerning his work at HMS and BWH, including his work in medical communications, as well as Magistrate Judge Bowler's knowledge of that work as of September 2014.  It would also be appropriate for Dr. Pfeffer and others to testify concerning the effect of the DDOS attack on his work and professional engagements, as well as any communications he had with Magistrate Judge Bowler concerning the DDOS attack and its impacts on HMS, BWH, and his professional life as of September 2014.

> c.  Magistrate Judge Bowler's role in The Boston Foundation with its connections to BCH and Wayside required recusal.

From 1995 to 2005 Magistrate Judge Bowler was on the Board of Directors of The Boston Foundation ("TBF"), a charitable organization. https://www.scribd.com/document/138058835/Judge-Marianne-Bowler (last accessed April 16, 2018).  The TBF website currently lists Magistrate Judge Bowler as an Emeriti Director.  See https://www.tbf.org/who-we-are/people/board-of-directors (last accessed April 16, 2018).

TBF's 2014 IRS Form 990, which is "Open to Public Inspection" per a notice on its first page, reveals a considerable financial connection between TBF and BCH. https://www.tbf.org/-/media/tbf/files/financial-information/tax-forms/2014tbf990.pdf?la=en&hash=A00556FAD36B521D9A6B239F83BB7EBD3A081

FD9 (last accessed April 29, 2018). (A true excerpt of TBF's Form 990 and Schedule I is attached at Exhibit C)[5]

  Schedule I of TBF's Form 990 concerns "Grants and Other Assistance to Organizations, Governments, and Individuals in the United States."  Id. at 46.  In its Schedule I, TBF declared grants and other assistance to "Childrens Hospital Corporation" of Boston (aka BCH) in four (4) different respects: (1) $167,450 in "Operating Support;" (2) $5,000 in "Family Support;" (3) $500 in "Health Care;" and (4)  $10,000 in "Medical Research."  Exhibit C at 94-95 (last two pages of exhibit).

  TBF also had financial ties to Wayside at the time of the search warrant application.  In a document entitled "2014 Agency Highlights," Wayside listed TBF on their financial "Donor List" for "Foundations, Corporations, and Organizations."  See http://www.waysideyouth.org/Portals/0/Uploads/Documents/2014%20Wayside%20Highlights.pdf (last accessed April 16, 2018).

  As a prior member of the TBF's Board of Directors from 1995 to 2005, and as a present-day Emeriti Director, Magistrate Judge Bowler was in a position to know about TBF's financial relationships with "organizational victims" BCH and Wayside as well as its duties and responsibilities owed to them; indeed, if Magistrate Judge Bowler did not know about TBF's financial relationship with BCH and Wayside, she may have had a duty under 28 U.S.C. §455(c) and Massachusetts law to discover them.

  "If you are a trustee or a member of the board of directors of a charitable organization, you and your fellow board members are responsible for governing the

---

[5] TBF's complete 2014 Form 990, with all its schedules and attachments, is two hundred ninety-two (292) pages.  It is available in full through the hyperlink provided.  Exhibit C is an excerpt of TBF's 2014 Form 990 consisting of fifteen (15) total pages: the complete Form 990 over thirteen (13) pages; and the relevant two (2) pages of the Schedule I showing "grants and other assistance" to "Childrens Hospital Corporation." These last two (2) pages are denoted within the original document as pages 94 and 95, respectively.

organization. The law imposes upon you two primary duties: the duty of care, and the duty of loyalty." The Attorney General's Guide for Board Members of a Charitable Organization, Office of Attorney General Maura Healey, Commonwealth of Massachusetts, March 2015, at 3 (A true copy is attached at Exhibit D)  Conflict of interest rules apply to board members of charitable organizations. Id. at 7.

Members of boards of directors at nonprofit charities are "fiduciaries" with corresponding duties and obligations.  See Thomas Lee Hazen & Lisa Love Hazen, Punctilios and Nonprofit Corporate Governance – A Comprehensive Look at Nonprofit Directors' Fiduciary Duties, U. of Pennsylvania Journal of Business Law, Vol. 14:2 2012.  (available at https://www.law.upenn.edu/journals/jbl/articles/volume14/issue2/Hazen14U.Pa.J.Bus.L.3 47(2012).pdf (last accessed May 4, 2018) "Nonprofit organizations generally have a governing board. Members of those governing boards are regarded as fiduciaries." Id. at 349.  "The law thus recognizes that a fiduciary relationship entails a strong duty of the utmost loyalty.  This loyalty obligation means that the fiduciary must act solely in the beneficiary's best interests rather than acting in the fiduciary's own interests." Id.  "The duties of nonprofit directors to a large extent parallel the obligations of for-profit directors," including the duties of care, loyalty, good faith, and obedience.  Id. at 356. "The duty of obedience is especially significant in the case of nonprofit corporations." Id. at 386.  "Charitable organizations that disburse donor funds have special obligations. For example, failure to follow the donors' intent can be problematic and form the basis for challenging the charity's operations. The charitable trust doctrine holds that, with

restricted gifts, a donor's intent creates trust obligations in managing the trust." Id. at 390-391.

In this case, a member of the Board of Directors would be in violation of 28 U.S.C. §455(b)(4)'s provision that a judge "shall also disqualify himself [when]... [H]e knows that he, individually or *as a fiduciary*, or his spouse... has a financial interest in the subject matter in controversy or in a party to the proceeding..." (emphasis supplied). The same year as the DDOS attack, TBF managed funds that were either distributed to BCH and Wayside or destined to be so distributed while TBF acted as fiduciary and trustee. That alone would require judicial recusal for a board member. Further, while the precise amounts may be disputed, it is obvious that the affected institutions would claim financial losses both from the cyber attack and the attempts to remedy it; some of the TBF managed funds, including $167,450 of funds identified in TBF's 2014 Form 990 Schedule I for "Operational Support," may have been used to cover those losses pending restitution or other recompense. Even special agent Tunick's affidavit states "To prevent greater damage, BCH decided to temporarily shut down several online service portals used by patients, providers and physicians. The loss of these services and the impact on the network impacted the ability of BCH to care for its patients." Dkt. No. 78-1 at ¶ 8. In this respect, the losses to BCH and its HMS-affiliates are the losses of its donors at TBF.

Magistrate Judge Bowler, of course, was an Emeriti Director in 2014. Her role, duties, and obligations as an Emeriti Director are not precisely known. However, it should be noted that Magistrate Judge Bowler's *curriculum vitae* suggests that she held her position on the TBF Board of Directors while a magistrate judge; thus, it was not her

appointment to the bench that led to her change in status from Member of the Board to Emeriti Director.  See https://www.scribd.com/document/138058835/Judge-Marianne-Bowler

Moreover, it is not uncommon for Emeriti Directors in nonprofit organizations to remain as advisors to fiduciary colleagues who remain on the board.  See

https://boardsource.org/resources/nonprofit-board-dynamics-processes-faqs/ (last accessed May 1, 2018) ("An 'emeritus' director is usually a former board member who is invited to stay on board as a nonvoting member in an advisory capacity.")  Indeed, one would certainly not expect an Emeriti Director to have *contrary* interests to the Board of Directors.   Further fact-finding at a hearing may be necessary to determine Magistrate Judge Bowler's role, duties, and obligations as Emeriti Director.

Even if this Court found that Magistrate Judge Bowler did not remain a fiduciary at TBF in 2014 when she considered the search warrant regarding a DDOS attack on BCH and Wayside, a hospital to which her fiduciary colleagues at TBF had duties to deliver donor funds, the circumstances still violated 28 U.S.C. §455(b)(4)'s provision that a judge "shall also disqualify himself [when]… He knows that he… has… any other interest that could be substantially affected by the outcome of the proceeding."  Further, the circumstances also violate 28 U.S.C. §455(a)'s provision that "Any justice, judge, or Magistrate Judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Indeed, there can be no doubt that Magistrate Judge recused herself for less in Cabi, et al.  Dkt. No. 128-7.

For these reasons, Magistrate Judge Bowler was not neutral and detached when she issued the search warrant.  Mr. Gottesfield argues this Court should allow his motions

to suppress and order the exclusion of the evidence and their fruits without a hearing.

However, should a hearing be necessary, it would be appropriate to call witnesses and

subpoena documents concerning the circumstances surrounding TBF's financial

connections to BCH and Wayside and Magistrate Judge Bowler's knowledge of, and role

in, those connections.

> d.   In combination, Magistrate Judge Bowler's spousal relationship with Dr.
> Marc Pfeffer and her professional role at TBF required recusal from the
> search warrant application.

Individually, both Magistrate Judge Bowler's spousal relationship with Dr.

Pfeffer and her role at TBF required recusal from the search warrant application.  In

combination, however, the need for disqualification is even clearer.  The Magistrate

Judge's spouse's work, including but not limited to his special interest in "medical

communications," was negatively impacted by the DDOS attack's "disruption to the

network on which BCH and *other Harvard University-affiliated hospitals communicate*."

Dkt. No. 78-1 at ¶ 8.  (emphasis supplied). Magistrate Judge Bowler knew about, and

even collaborated with, Dr. Pfeffer with his work in medical communications.  On top of

this, Magistrate Judge Bowler's decade-long membership on the TBF Board of Directors

and present-day position as Emeriti Director reveals - if not a fiduciary duty – a

commitment to those board members who do owe a fiduciary duty to donors to BCH and

Wayside.  The 2014 TBF grants, and the purposes for which they were made, were likely

to be negatively affected by the DDOS attack at issue in the search warrant application.

Exhibit C at 94-95 (the last two pages of the exhibit); Dkt. No. 78-1 at ¶ 8.

While Magistrate Judge Bowler's relationships with her spouse and TBF required

recusal individually, in combination there can be no doubt that her "impartiality might

reasonably be questioned." 28 U.S.C. §455(a). If the routine subpoena dispute in Cabi, et al raised grounds for recusal, then these personal, financial, and professional circumstances certainly did. Dkt. No. 128-7. The Court must rule that Magistrate Judge Bowler was not neutral and detached when she issued the search warrant.

2. The "good faith" exception does not apply and the evidence must be suppressed and excluded.

   a. The "good faith" exception does not apply in the absence of a neutral and detached magistrate.

The "good faith" exception for searches conducted pursuant to warrants is inapplicable where the reviewing magistrate was not neutral and detached. United States v. Leon, 468 U.S. 897, 914 (1984). In Leon, the Supreme Court announced several limitations to the "good faith" exception and held: "Deference to the magistrate, however, is not boundless. It is clear… the courts must also insist that the magistrate purport to 'perform his neutral and detached' function and not serve merely as a rubber stamp for the police.' Id. at 914 (citations omitted).

The Court reaffirmed its holding in Illinois v. Krull, acknowledging: "The Court noted in Leon that the 'good faith' exception to the exclusionary rule would not apply 'where the issuing magistrate wholly abandoned his judicial role...' 480 U.S. 340, 355 (1987); see also United States v. Decker, 956 F.2d 773, 778 (8th Cir. 1992) (holding good-faith exception did not apply when the issuing judge failed to act in neutral and detached manner).

Since Magistrate Judge Bowler was not neutral and detached when she considered the search warrant, the "good faith" exception does not apply. Id. The Court must suppress and exclude the evidence seized pursuant to the warrant and their fruits.

     b.  <u>The "good faith" exception does not apply in the absence of "a substantial basis for determining the existence of probable cause" or where "the form of the warrant was improper in some respect."</u>

The "good faith" exception is also inapplicable because the affidavit failed to establish "a substantial basis for determining the existence of probable cause." <u>Leon</u>, 468 U.S. at 915.   In <u>Leon</u>, the Supreme Court held:

> "[R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause (citation omitted).… Even if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable cause determination reflected an improper analysis of the totality of the circumstances (citation omitted), or because the form of the warrant was improper in some respect."

 <u>Id</u>. (citations omitted).   For reasons stated in Mr. Gottesfeld's previous filings, the search warrant affidavit failed to establish probable cause to issue the warrant; certainly a "substantial basis" for probable cause does not exist.   Dkt. Nos. 78, 89, and 128.

Further, "the form of the warrant was improper in some respect." <u>Leon</u>, 468 U.S. at 915.   For almost four (4) years, the government and its agents labored under the impression that the search warrant materials attached in Docket No. 78-1 reflected the same warrant papers presumably filed in 14-mj-2234-MBB.   Indeed, based on discovery provided by the government, for over (2) years the defense labored under the same impression.   According to those warrant papers, Magistrate Judge Bowler signed and dated the actual "Search and Seizure Warrant" in 14-mj-2234-MBB on "September 29, 2014 @ 3:43 p.m."   Dkt. No. 78-1.   However, the "Application for a Search Warrant" and accompanying affidavit of special agent Tunick was not submitted until *the day after* on "09/30/2014." <u>Id</u>.   Complicating matters still, Magistrate Judge Bowler signed the

affidavit as having been "Subscribed and sworn to before me on September 29, 2014."
Id.

However, yesterday, May 3, 2018, the Court granted counsel for both parties
access to the sealed docket, filings, and orders in 14-mj-2234-MBB.  Dkt. No 162.   (True
copies of these materials are filed under seal at Exhibit E)  These materials reveal the
government and its agents executed a warrant whose application materially differed from
the sealed docketed copy.  According to the search warrant application docketed in 14-
mj-2234-MBB, at some time unknown to the parties, Magistrate Judge Bowler drew a
line through the typewritten date "09/30/2014" on the application and handwrote
"09/29/2014," initialing the change.  The Court-generated "legend" at the top of the
document indicates the application was docketed in 14-mj-2234-MBB on 09/29/14.
From this, the government may argue that Magistrate Judge Bowler made the change to
the sealed document *after* providing the government or an agent with the copy depicted in
Dkt. No. 78-1 which was later produced in discovery.

Assuming *arguendo* that scenario is correct, "the form of the warrant," or more
precisely the form of the warrant vis-à-vis its application, "was improper in some
respect."  Leon, 468 U.S. supra at 915.  Just as counsel for the government and defense
were unaware of any *post hoc* amendments to the warrant application, special agent
Tunick and other officers would be equally ignorant of such changes.  Thus, when the
warrant was executed on October 1, 2014, the warrant papers clearly suggested that the
application was granted on September 29, 2014 but only applied for on September 30,
2014.  That Magistrate Judge Bowler signed the affidavit as having been "Subscribed and
sworn to before me on September 29, 2014" does not resolve this conflict since there still

existed a discrepancy concerning the date the warrant was applied for and the date it was issued.  The Supreme Court's holding in <u>Leon</u> that the "good faith" exception must not apply where "the form of the warrant was improper in some respect" is true here.  <u>Leon</u>, 468 U.S. supra at 915; see also <u>United States</u> v. <u>Ricciardelli</u>, 998 F.2d 8, 16 (1st Cir. 1993) (holding good-faith exception did not apply because warrant was facially deficient and investigators would have to know it did not comport with Fourth Amendment)

As the Court reaffirmed in <u>Krull</u>, "The standard of reasonableness we adopt is an objective one; the standard does not turn on the subjective good faith of individual officers." 480 U.S. at 355, citing <u>Leon</u>, 468 U.S. 919, n. 20.  Thus, an assumption concerning special Agent Tunick's subjective good faith, or that of other officers, is irrelevant.  It is not objectively reasonable to rely on a search warrant where, on the face of the papers in possession of law enforcement, the warrant was issued before it was applied for; indeed, it is objectively *unreasonable* to execute such a warrant.  The "good faith" exception does not apply.

      c.  The "good faith" exception does not apply because, in combination, the lack of a neutral and detached magistrate, the absence of a substantial basis for probable cause, and the objective unreasonableness of relying on a warrant that predates the application require suppression and exclusion of the evidence.

The "good faith" exception does not apply for the individual and separate grounds raised *supra*, and the Court must suppress and exclude the evidence seized pursuant to the warrant and any fruits derived therefrom.  Further, the combination of these separate grounds - the lack of a neutral and detached magistrate, the absence of a substantial basis for probable cause, and  the objectively unreasonable act of relying on a warrant where -

on the face of the papers in possession of law enforcement - the warrant was issued

before the date it was applied for, require suppression and exclusion of the evidence.

<u>CONCLUSION</u>

For the above-stated reasons, and for the reasons previously argued in Dkt. Nos.

78, 89, and 128, Mr. Gottesfeld request this Court suppress and exclude the identified

evidence and their fruits.  Further, this Court should order suppression and exclusion

without a hearing; if a hearing is to be held, however, the defense requests a preliminary

hearing with the Court regarding the scope of the suppression hearing, the witnesses to be

called, and the evidence to be produced.

Respectfully submitted,
MARTIN GOTTESFELD
By his attorney:

/s/ David J. Grimaldi
_____

David J. Grimaldi
David J. Grimaldi, P.C.
BBO No. 669343
675 Massachusetts Avenue, 9th Floor
Cambridge, MA 02139
617-661-1529 (tel)
857-362-7889 (fax)
david@attorneygrimaldi.com

DATE: May 4, 2018

<u>CERTIFICATE OF SERVICE</u>

I, David J. Grimaldi, hereby certify that true copies of this motion were served on
all registered participants in this matter via ECF this 4th day of May 2018.

/s/ David J. Grimaldi
_____

David J. Grimaldi