UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No.: 16-cr-10305-NMG |
| | ) | |
| MARTIN GOTTESFELD | ) | |

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT GOTTESFELD'S
SUPPLEMENTAL MOTIONS TO SUPPRESS EVIDENCE

The defendant Martin Gottesfeld ("Mr. Gottesfeld") hereby files this Reply to the government's opposition to his supplemental motions to suppress evidence ("opposition"). Dkt. No. 179.

1. Magistrate Judge Bowler was required to recuse herself from consideration of the search warrant application.

The opposition reverses the order of concerns by first addressing Magistrate Bowler's relationship with The Boston Foundation ("TBF") and only later responding to Mr. Gottesfeld's leading argument regarding Magistrate Judge Bowler's spousal relationship with Dr. Marc Pfeffer. This Reply restores the original order of the arguments.

   a. Magistrate Judge Bowler's spousal relationship with Dr. Marc Pheffer required her disqualification from consideration of the search warrant.

The government agrees that Magistrate Judge Bowler is married to Dr. Marc Pfeffer of Harvard Medical School ("HMS") and Brigham and Women's Hospital ("BWH"). Opposition at 8. The government also concedes that both BCH and BWH are affiliates of HMS. Id. at 8-9.

The government nonetheless quarrels with Mr. Gottesfeld's use of the term "affiliates" in his recent filing; in part, they do so by portraying Mr. Gottesfeld's

1

argument as a "lumping together HMS and each of its 'affiliated' entities." Opposition at 9.

The government complains of the use of the word "affiliate" as if it was not sourced to the government's own search warrant application under review. As quoted multiple times in Mr. Gottesfeld's recent filing, paragraph eight (8) of Agent Tunick's affidavit before Magistrate Judge Bowler explicitly stated: "The incoming traffic [from the DDOS attack] resulted in significant disruptions to the BCH website *and additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate*." Dkt. No. 78-1 at ¶ 8. (emphasis supplied), cited in Dkt. No. 166 at 2, 4, 5, 6, 10, 16.

Indeed, the opposition fails even to cite or quote this pivotal paragraph from agent Tunick's affidavit precisely because it so obviously implicates the network on which Dr. Pfeffer's Harvard-affiliated hospital used to communicate. Dkt. No. 78-1 at ¶ 8.

The government seeks to skirt this obvious problem - a magistrate reviewing a search warrant concerning a cyber attack that reportedly disrupted the communications systems of her spouse's employer – by any means necessary.

For example, the government conveniently ignores a 2011 article in the New England Journal of Medicine jointly authored by Magistrate Judge Bowler and Dr. Pfeffer on the subject of medical communications. See "Access to Safety Data – Stockholders versus Prescribers," Dkt. No. 166-1. The government ignores the article because it reveals Magistrate Bowler's knowledge of, and indeed participation in, her spouse's work in the area agent Tunick swore was affected by the DDOS attack: communications by and among medical personnel.

Further, the government ignores the BWH Division of Medical Communications biography of Dr. Pfeffer in which they recognize he "serves on the Data Safety Monitoring Boards of international trials." Dkt. No. 166 at 4. Clearly, disruptions to network communications raise concerns about data safety, as again evidenced by agent Tunick's affidavit submitted to Magistrate Judge Bowler: "To prevent greater damage, BCH decided to temporarily shut down several online service portals used by patients, providers and physicians. The loss of these services and the impact on the network impacted the ability of BCH to care for its patients." Dkt. No. 78-1 at ¶ 8.

Instead of confronting these issues head-on, the government pejoratively claims that Mr. Gottesfeld's argument concerning Dr. Pfeffer's role in medical communications "is playing games with words, not mounting a serious argument." Opposition at 11. That claim is itself diversionary and meritless. The subject matter of medical communications in a large research hospital varies greatly: sometimes it will be about a treatment of a particular patient, other times it will be about data safety, other times it will be about disclosure of information to stockholders, and so on. As with a law firm, the possible types of subject matter discussed through its network servers are practically limitless. The point here is Magistrate Judge Bowler knew that the DDOS attack disrupted the servers on which Harvard-affiliated hospitals communicate, and that her spouse's work as a BWH physician and faculty member of the Division of Medical Communications would thereby be affected, yet she still considered the search warrant.

Contrary to the government's insinuations, Mr. Gottesfeld's recent filing specifically quoted the stated "mission" of BWH's Division of Medical Communications, of which Dr. Pfeffer is a faculty member. Dkt. No. 166 at 4. Again, "The mission of the

Division of Medical Communications is to enhance accurate, succinct, and clear communication in four different areas: 1. Physician to patient and patient to physician; 2. Peer-to-peer (physician-to-physician); 3. Physician to-lay-public; and 4. Physician-to-media." See http://medicalcommunications.bwh.harvard.edu/ (last accessed April 28, 2018); cited Dkt. No. 166 at 4. Of course this "mission" would be impacted by "the additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate." Dkt. No. 78-1 at ¶ 8. (emphasis supplied). The government is simply unwilling to confront how Dr. Pfeffer's unique involvement in medical communications at Harvard-affiliated BWH bears on Magistrate Judge Bowler's consideration of the search warrant.

The government again averts its eyes by focusing on the impact of the DDOS attack on the network of "a separate hospital," as if BCH was the only hospital affected. Opposition at 11. Again, the principal point here is that Agent Tunick swore to Magistrate Judge Bowler that the alleged DDOS attack resulted in disruption of to the network on which "*other Harvard-affiliated hospitals* communicate," not just BCH.

Counterproductive to its own arguments, the government calls "speculative" Mr. Mr. Gottesfeld's argument that "if Magistrate Judge Bowler refused to issue the search warrant, information related to the alleged cyber attack may never have been learned, impairing the ability of HMS and BWH to learn about the attack and better prepare against future attacks. Granting the search warrant, however, increased the likelihood of acquiring such information." See Opposition at 11-12, quoting Dkt. No. 166 at 8. If Mr. Gottesfeld's argument here is speculative, then so is the government's argument for probable cause. They certainly cannot have it both ways.

The government's claim that while "there is a general deterrent value in prosecuting individuals who attack hospital networks… the affidavit did not address the impact of the DDOS attack on any specific hospital other than Children's Hospital" is their greatest effort to scrub clean the specific language of Agent Tunick's affidavit. Opposition at 12.  Notice was surely provided to Magistrate Judge Bowler that her spouse's work at HMS and BWH was implicated when Agent Tunick's swore that the DDOS disrupted the network on which "other Harvard University-affiliated hospitals communicate." Dkt. No. 78-1 at ¶ 8.  Such language was more than sufficient in Magistrate Judge Bowler's decision to recuse herself in Cabi et al. v. Boston Children's Hospital, et. al, 15-cv-12306-DJC, and it is certainly sufficient here.

In a single paragraph, the opposition seeks to dismiss Cabi, et al as it relates to suppression; they do so despite the fact that at the cited May 3, 2018 hearing, the Court agreed to consider the matter fresh after the suppression issues were fully briefed. Opposition at 12-13.  As the government knows, Mr. Gottesfeld's most recent filing was timely submitted on May 4, 2018.

Summing up its take on Cabi et al, the government writes "Judge Bowler presided over the matter for approximately two years before an issue arose that *directly* implicated her husband's employer – a dispute over discovery of *HMS* documents regarding an internal investigation concerning allegations of misconduct." Opposition at 13. (emphasis in original).  This is exactly the point: agent Tunick's affidavit clearly stated the DDOS attack caused "additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate." Dkt. No. 78-1 at ¶ 8.  This sworn statement is surely specific enough to alert Magistrate Judge Bowler of the disqualifying

conflict.  The government's apparent suggestion, that the warrant is saved because agent Tunick did not list each and every affected Harvard-affiliated hospital is meritless, certainly in this context.  When a known collection of related-institutions are aptly described by a common moniker, such as Harvard-affiliated hospitals, further specification is unnecessary.

        b.    <u>Magistrate Judge Bowler's relationship with The Boston Foundation</u>

The government's production of an affidavit from Timothy Gassert, corporate secretary at TBF, does appear to affect the landscape of Mr. Gottesfeld's argument as it relates to that organization's relationship with BCH and Wayside.  Dkt. 179-1.  Mr. Gottesfeld always acknowledged that Magistrate Judge Bowler's "role, duties, and obligations as an Emeriti Director are not precisely known."  Dkt. No. 166 at 14.  Based on the customary definition of "emeritus," Mr. Gottesfeld reasonably believed that Magistrate Judge Bowler was in fact an Emerita Director at the time she considered the warrant.  See e.g. https://www.merriam-webster.com/dictionary/emeritus (emeritus: "a person retired from professional life but permitted to retain as an honorary title the rank of the last office held"); http://www.dictionary.com/browse/emeritus (emeritus: "retired or honorably discharged from active professional duty, but retaining the title of one's office or position").  Further research concerning Emeritus Directors of non-profit organizations cited in Mr. Gottesfeld's filing confirmed a possible advisory role.  See Dkt. No 166 at 15.

Indeed, even according to Mr. Gassert's affidavit, Magistrate Judge Bowler *was* an Emerita Director in 2014; however, she only acquired the membership on or about October 16, 2014 – a little over two weeks after agent Tunick submitted his search

6

warrant affidavit for her review. To the extent this approximately two-week delay between her consideration of the search warrant and her designation as an Emerita Director affects the claims in Mr. Gottesfeld's suppression arguments, he acknowledges the same. Should further research on topics raised in the recently submitted affidavit of Mr. Gassert turn out to bear on the case, Mr. Gottesfeld respectfully reserves the right to raise those issues at a later date.

2. Port Data and Suppression

The government claims that no port data appears on agent Tunick's affidavit appears factually incorrect. Without the underlying port data obtained in exceeding the scope of the Pen Register/Trap and Trace statute, the government would not have been able to say with any certainty that Mr. Gottesfeld was using VPN Technology or Tor. For example, without knowing that Gottesfeld was communicating using UDP (User Data Protocol) Port 1194, the government would not be able to say with any certainty that Gottesfeld was using VPN as opposed to another service provided by RISEUP using the same IP address but a different port. Similarly, without TCP (Transmission Control Protocol) port data, the government would not be able to say with any certainty that Gottesfeld was using Tor as opposed to another service being offered on an IP address which also happened to simultaneously be a part of the Tor Network. In other words, one IP address may simultaneously host a non-Tor related website on, for instance, TCP port number 80 while also providing access to the Tor Network on, for instance, TCP port number 30,353. The government is right that the list of Tor nodes is publicly available at any given time, but each entry on that list includes not just an IP address, but also a TCP port number with the corresponding address.

Further, internet service providers do not routinely track either the IP addresses or port numbers with which all their customers communicate as business records or any other kind of record, as due to the huge volume of traffic doing such would be impracticable. If anything, an internet service provider might temporarily collect a small sample of such data when ordered by a Court, or for troubleshooting purposes, usually with the consent of the affected customers, and dispose of it at the conclusion of such work.

As a remedy here, the Court must strike all information concerning Mr. Gottesfeld's alleged use of VPN and Tor from the search warrant affidavit, rendering an already deficient search warrant further lacking in cause.

Citing authorities, the government claims that "Port cannot be trusted" and are "largely unreliable." Opposition at 22. Clearly, the industry finds value in ports or else they would find themselves in disuse. Further, the government would not have been able to confirm that Mr. Gottesfeld was using VPN or Tor without reference to Port data.

The government repeatedly cites to United States v. Ulbricht, 858 F.3d 71, (2d Cir. 2017) as support for their position. Counsel for Ulbricht, however, has filed a petition for writ of certiorari with the Supreme Court, No 17-950. See Ex. A, attached. Mr. Gottesfeld hereby incorporates that petition for certiorari and related filings supporting his position on that docket, including *amici*, to this Reply.

3. Conclusion

Given time constraints identified in Mr. Gottesfeld's recent Motion to Continue, Dkt. No. 180, and discussed in the Court's order from today, Dkt No. 186, counsel has

been unable to address every issue he intended to respond to. He requests leave to address additional issues, if not in writing, than at the scheduled hearing on the matter.

For the reasons stated in Mr. Gottesfeld's suppression motions, this Reply, and for the reasons to be argued at the scheduled hearing on this matter, this Court must ALLOW his motions to suppress evidence.

Respectfully submitted,<br>
MARTIN GOTTESFELD<br>
By his attorney:<br><br>
/s/ David J. Grimaldi<br>
_____<br>
David J. Grimaldi<br>
David J. Grimaldi, P.C.<br>
BBO No. 669343<br>
675 Massachusetts Avenue, 9th Floor<br>
Cambridge, MA 02139<br>
617-661-1529 (tel)<br>
857-362-7889 (fax)<br>
david@attorneygrimaldi.com

DATE: May 25, 2018

### CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this motion were served on all registered participants in this matter via ECF this 25th day of May 2018.

/s/ David J. Grimaldi<br>
_____<br>
David J. Grimaldi