UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.: 16-cr-10305-NMG |
| | ) | |
| MARTIN GOTTESFELD | ) | |

DEFENDANT'S OPPOSITION TO
"GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE DEFENDANT'S 'TORTURE
DEFENSE' BASED ON NECESSITY AND DEFENSE OF ANOTHER"

INTRODUCTION

The government seeks to deprive defendant Martin Gottesfeld ("Mr. Gottesfeld") of his
constitutional rights to present a full and complete defense, compulsory process, confrontation of
witnesses, due process of law, freedom of speech, right to testify, and right to a jury trial through
an alarming motion *in limine* ("motion") that aims to preclude his defenses to the charges before
he has even raised them.  Further, the motion shifts the burden of proof to the defense and
compels self-incrimination by forcing Mr. Gottesfeld, who is presumed to be innocent, to state
with detail his anticipated evidence and trial strategy, while the government, the party with the
burden of proof, has yet to present any evidence whatsoever.   Moreover, the motion's claims
about Mr. Gottesfeld's defenses of necessity and defense of others are by turn mistaken,
overstated, antiquated, or inapposite.

The government's sweeping effort to control the content of the evidence, the manner in
which it is presented, counsel's arguments to the jury, and the issues the jury may consider must
not be condoned.

On May 23, 2018, Mr. Gottesfeld filed a motion for leave to submit his opposition to the
motion in two parts over separate dates.  Dkt. No. 182.  The government filed an opposition to
that request.  Dkt No. 184.  On May 25, 2018, the Court issued a Memorandum and Order

1

which, *inter alia*, denied Mr. Gotteseld's request.  Dkt. No. 186.  Accordingly, without

withdrawing his objection to the same, both parts of Mr. Gottesfeld's opposition are found in this

single filing.

PART I: THE COURT SHOULD DENY THE MOTION *IN LIMINE*
WITHOUT REQUIRING FURTHER RESPONSE FROM THE DEFENSE

1. **The Court should reject the government's use of the motion *in limine* as a vehicle to preclude Mr. Gottesfeld's defenses of necessity and defense of others prior to trial. The motion shifts the burden of proof to the defendant and requires him to divulge significant and constitutionally-protected areas of his defense.  Instead, the Court should rule on the admissibility of evidence as it is offered in context at trial.**

For decades, legal scholars, judges, and lawyers have condemned the use of motions *in*

*limine* as a method of precluding entire defenses, particularly in politically-charged cases.  See

generally Luke Shulman-Ryan, *Evidence – The Motion In Limine and the Marketplace of Ideas:*

*Advocating for the Availability of the Necessity Defense for Some of The Bay State's Civilly*

*Disobedient*, 27 W. New L. Rev. 299 (2005); Douglas L. Colbert, *The Motion in Limine in*

*Politically Sensitive Cases: Silencing the Defendant at Trial*, 39 Stan. L. Rev. 1271 (1987);

Douglas L. Colbert, *The Motion in Limine: Trial Without Jury – A Government's Weapon*

*Against the Sanctuary Movement,* Hofstra Law Review, Vol. 15: Iss. 1, Article 2; see also

Washington v. Texas, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and

to compel their attendance, if necessary, is in plain terms the right to present a defense, the right

to present the defendant's version of the facts… he has the right to present his own witnesses to

establish a defense. This right is a fundamental element of due process of law."); Commonwealth

v. O'Malley, 14 Mass. App. Ct. 314, 323 (1982) ("The notion of using a pretrial motion to test

the adequacy of the entire defense case as matter of law appears to be inimical to these

principles… In the usual case, therefore, it is far more prudent for the judge to follow the

traditional, and constitutionally sounder, course of waiting until all the evidence has been

introduced at trial before ruling on its sufficiency to raise a proffered defense."); People v. Brumfield, 72 Ill.App.3d 107 (1979) (motion *in limine* should be used with caution, especially in criminal cases); State v. Quick, 226 Kan. 308, 312 (1979) (motion *in limine* must be narrow, pinpointing prejudicial material or evidence, as well as specific basis for exclusion or admission); Lewis v. Buena Vista, 183 N.W.2d 198,  200-01 (civil case) (motion *in limine* not ordinarily to be used to choke off entire defense; parties should not be prevented from trying to prove their contentions).

The Fifth and Sixth Amendments guarantee the right to a fair trial before an impartial jury.  In accordance with due process, this right guarantees "a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  Juries not judges, are arbiters of the facts. Morissette v. United States, 342 U.S. 246, 274 (1952). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973).  In order to secure defendants' constitutional rights at trial, courts must allow defendants "to present [their] version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967).

In this case, the government exemplifies virtually every problematic aspect of using a motion *in limine* to silence the defendant from advancing his defenses at trial.

"[B]y requiring the defense to respond, the court compels a pretrial preview of defense theories…. Inevitably, the accused is compelled to divulge her trial strategy, allowing the prosecution to shore up weaknesses in its direct case and to prepare rebuttal of defense contentions.  Thus, the prosecution's motion in limine requires defense counsel to disclose her 'ideas, thoughts and strategies' – information that the Supreme Court considers privileged and

whose confidentiality is recognized as vital to the proper functioning of the criminal justice system."  Colbert at 1316-1317; citing Hickman v. Taylor, 329 U.S. 495, 511 (1947).

The motion also infringes on Mr. Gottesfeld's rights to remain silent and to avoid self-incrimination.  "[S]uch motions compel the accused to speak on her own behalf – or else risk waiving an entire defense… In attempting to satisfy this initial test, the accused foregoes these fundamental rights without any proof of guilt by the prosecution."  Colbert, at 1317.

Preclusion of a recognized defense in advance of trial "jeopardizes the accused's 'inherent and invaluable right' to be tried by a jury that has had the opportunity to hear and consider a complete defense to the charge."  Id., quoting Duncan  v. Louisiana, 391 U.S. 145, 152 (1968).  In Duncan v. Louisiana, the Supreme Court acknowledged "Fear of unchecked power… found expression in the criminal law in this insistence upon community [i.e., jury] participation in the determination of guilt or innocence."  Duncan at 156.  In Williams v. Florida, the Court elaborated: "[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from the group's determination of guilt or innocence."  399 U.S. 78, 100 (1970).  "The government's motion in limine to preclude an entire defense directly challenges the jury's role, as envisioned by the Framers of the Constitution, as a democratic body."  Colbert at 1318 (citations omitted).

Further, "[t]his role is all the more important in politically sensitive cases, where the defendant's only opportunity to be judged fairly depends on a jury gaining sufficient understanding of the circumstances leading to the accused's arrest."  Id.

Indeed, the government recognizes that the motive for the alleged cyber attack, Boston Children's Hospital ("BCH") and Wayside Youth and Family Support Network's ("Wayside")

alleged kidnapping and abuse of J.P., was widely-reported reported in the press with serious political implications.[1]   For example, in Agent Tunick's Affidavit filed on February 16, 2016, he acknowledged "The issue of Patient A's custody and medical care became a national media story, with religious and political organizations and others asserting the case was an example of interference with parental rights."  Dkt. No. 3-2 at ¶ 6.

Even more than interference with parental rights, however, the national controversy surrounding BCH and Wayside raised questions concerning medical child abuse.  National politicians, including, for example, former Arkansas governor and U.S. Presidential candidate Mike Huckabee, condemned the alleged kidnapping and abuse of J.P.  See "'There is Something Wrong When the Government Kidnaps Children from Their Own Family': Huckabee References Justina Pelletier in CPAC Speech," The Blaze, March 7, 2014,

https://www.theblaze.com/news/2014/03/07/there-is-something-wrong-when-the-government-kidnaps-children-from-their-own-family-huckabee-references-justina-pelletier-in-cpac-speech

(last accessed May 24, 2018).  Indeed, in the months and weeks before the alleged offenses, many news outlets reported mistreatment and/or abuse of J.P. and her family.  See e.g. "A Medical Collision with a Child in the Middle," The Boston Globe, December 15, 2013,

(https://www.bostonglobe.com/metro/2013/12/15/justina/vnwzbbNdiodSD7WDTh6xZI/story.html) (last accessed April 8, 2018); "Frustrations on All Fronts in Struggle Over Child's Future," The Boston Globe, December 16, 2013 (https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-conclusion-still-uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html) (last accessed April 17, 2018); "Protest Planned to Fight Hospital's 'Kidnapping' of West Hartford

---

[1] Local and national media regularly used the true name of J.P. who, at the time of BCH and Wayside's reported kidnapping and abuse of her, was a teenager.  Further, J.P. is now an adult.  Nonetheless, in an abundance of caution, this opposition will use J.P.'s initials in its narrative text.

[2] Despite the large number of successful necessity defenses, there are few reported decisions upholding the right to present the defense to the jury for the simple reason that courts are usually not called upon to issue an opinion in

Girl," West Hartford Patch, December 2, 2013

(https://patch.com/connecticut/westhartford/protest-planned-to-fight-hospitals-kidnapping-of-west-hartford-girl) (last accessed April 17, 2018); "Advocates Fight for Justina Pelletier, Teen Held by State in Psych Ward," ABC News, February 10, 2014

(http://abcnews.go.com/Health/advocates-fight-teen-justin-pelletier-held-state-pysch/story?id=22312907) (last accessed April 8, 2018); "Father Breaks Judge's Gag Order as Daughter Remains in State Custody," Fox News, February 20, 2014,

http://insider.foxnews.com/2014/02/20/father-teen-justina-pelletier-speaks-out-about-custody-battle-hospital (last accessed May 23, 2018); "Justina Pelletier's Parents Fighting to Get Her Back," WGBH News, March 6, 2014  (https://news.wgbh.org/post/justina-pelletiers-parents-fighting-get-her-back)

The widespread concern and public furor over the alleged abuse of J.P. persisted for months before the alleged offenses occurred.

The indictment alleges that Mr. Gottesfeld and a co-conspirator "launched a DDOS attack against Wayside" on March 25, 2014.  Dkt. No. 28, ¶¶ 21, 22.  The indictment further alleges that "On April 19, 2014, Gottesfeld and the conspirators initiated a DDOS attack against the Children's Hospital server."  Id. at ¶ 26.

Media continued to report on the alleged kidnapping and abuse of J.P. and her family amidst the period of the separate alleged DDOS attacks.  See e.g. "The Sad, Scary Saga of Justina Pelletier," Slate.com, March 27, 2014

(http://www.slate.com/blogs/xx_factor/2014/03/27/justina_pelletier_ruling_boston_children_s_hospital_and_judge_perform_parent.html) (last accessed April 17, 2018); "Mitochondrial Disease or Medical Child Abuse?," Slate.com, April 1, 2014

(http://www.slate.com/articles/health_and_science/medical_examiner/2014/04/justina_pelletier_

s_mitochondrial_disease_boston_children_s_hospital_suspects.html) (last accessed April 8,

2014); "'Shocking Note' Apparently Penned by Justina Pelletier to Her Parents," The Blaze,

April 15, 2014, (https://www.theblaze.com/news/2014/04/15/shocking-note-apparently-penned-

by-justina-pelletier-to-her-parents) (last accessed May 30, 2018); "Justina Pelletier tells parents

in secret letter she is being 'tortured'," Life News, April 16, 2014,

(http://www.lifenews.com/2014/04/16/justina-pelletier-tells-parents-in-secret-letter-she-is-being-

tortured/) (last accessed April 8, 2018); "The Faces of 'Free Justina'," The Boston Globe, May 2,

2014(http://www.bostonglobe.com/2014/05/01/justina/1iVWxZZSSejnbcQhrRLELN/story.html)

(last accessed April 8, 2018).  It was in this extremely serious, highly-charged context that the

alleged offenses occurred.

        The crucial observation that the jury's role "is all the more important in politically

sensitive cases, where the defendant's only opportunity to be judged fairly depends on a jury

gaining sufficient understanding of the circumstances leading to the accused's arrest" is amply

illustrated in Mr. Gottesfeld's case.  Colbert at 1318.

        Further, the government's motion seeks to undermine the Court's own role in making

proper rulings on the admissibility of evidence in the context of an ongoing, dynamic trial;

indeed the motion requests the Court to make a crucial ruling in a vacuum before the trial has

even begun.  See Colbert at 1321 ("The government's use of the broad motion in limine also

demonstrates a lack of confidence in the ability of trial judges to make appropriate rulings during

trial and to control court proceedings…. The motion reduces the presiding judge to an enforcer

of a pretrial order which restricts evidence from being heard, rather than a neutral magistrate who

makes evidentiary rulings as the relevance of evidence becomes clearer"); see also O'Malley, 14 Mass. App. Ct. at 323-325.

The motion undermines the historical purpose of trial by jury.   In Duncan, the Supreme Court recognized: "A right to a jury trial is granted to criminal defendants in order to prevent oppression by the government…. Providing an accused with the right to be tried by a jury of his peers have him an inestimable safeguard against the corrupt or overzealous prosecutor and against compliant, biased, or eccentric judge." 391 U.S. at 155-156.  As stated *infra*, Mr. Gottesfeld will meet the requisite elements of the defenses of necessity and defense of others; nonetheless "[t]he motion… demonstrates a lack of trust and confidence in the people who serve as jurors… Public confidence in the fairness of a criminal trial is diminished, and, most seriously, the democratic process is thwarted."   Colbert, at 1326.

The extraordinary demand of the government – to silence a defendant and his counsel at a jury trial concerning the reasons why he allegedly committed the charged offenses, when those reasons flowed directly from politically-charged, widely-reported, and broadly-shared concerns about an alleged kidnapping and abuse of a teenage girl -  is unconstitutional.

The Court should deny the government's motion without further response from Mr. Gottesfeld.  Instead, the parties should be allowed to present evidence while the Court makes appropriate rulings on the admissibility of individual pieces of evidence as they are offered within the context of the trial.  At the conclusion of the evidence, the Court may, as appropriate, rule on whether certain instructions should be provided to the jury based on the facts presented at trial.

**2.   The government's repeated reliance on *United States v. Maxwell* is misplaced.**

The motion cites United States v. Maxwell, 254 F.3d. 21, 26 (1st Cir. 2001), to argue a "requirement – that a defendant satisfy an 'entry-level' burden of producing enough 'competent' evidence to plausibly support an affirmative defense," quoting from United States v. Maxwell. Opposition at 7-8.

Maxwell is materially different than the present case.  Unlike here, Maxwell was not a felony jury trial in which the government sought to preclude the defendant's defense in advance of trial by a preemptive motion *in limine*; rather, Maxwell was a *misdemeanor bench trial* where the District Court was ruling on a pretrial motion *of the defendant.*

All of the many arguments concerning the government's misuse of motions *in limine* to preclude a defendant's defense, summarized *supra,* were not raised in Maxwell or considered by that Court.  Consideration of those issues here requires denial of the government's motion.

Further, all of the many arguments pertaining to a defendant's constitutional rights to present his defense *to a jury* as opposed to a judge, summarized *supra*, were not raised in Maxwell or considered by that Court.  Consideration of those issues here requires denial of the government's motion.

In another context, the government's motion cites to United States v. Brodhead, 714 F. Supp. 593 (D. Mass. 1989) (Woodlock, J.). That case, like Maxwell also a bench trial for a fairly minor crime, cited Colbert's work and noted the following:

> Many of the concerns voiced about the breadth of the motion *in limine* touch upon the role of the jury in our judicial system. An accused is to be judged by her peers and the lens through which members of the jury view the actions of the defendant should be neither overly focused nor distorted by a trial judge. Those considerations are not present in this case, which was not tried to a jury, and the propriety of the Magistrate's orders are thus not to be judged by those concerns.

Id. at 596.  Of course, unlike the bench trials in <u>Maxwell</u> and <u>Brodhead</u>, the present *jury* trial must "be judged by those concerns" and the jury's view of "the actions of the defendant should be neither overly focused nor distorted by the trial judge."  Id.

Moreover, it is worth noting that the citation in <u>Maxwell</u> to <u>United States</u> v. <u>Amparo</u>, 961 F.2d. 288, 291 (1st Cir. 1992) concerning the "entry-level" burden fails to assist the government as well.  <u>Maxwell</u> at 26.  <u>Amparo</u> involved a review of the sufficiency of the evidence at trial concerning an entrapment case; it did *not* involve a government motion *in limine* to exclude that defense in advance of a jury trial.

The government's effort to turn <u>Maxwell</u> into a panacea for its extraordinary and unconstitutional demands is inapt and misdirected.  That case is materially and consequentially different than the present case.  The Court must deny the motion without further response from Mr. Gottesfeld.

3. **Even under the inapposite *Maxwell* decision, the Court is not required to exclude a defendant's proffered defense.**

The language of even the inapposite <u>Maxwell</u> decision makes the discretionary nature of the issue presented in that case abundantly clear.  254 F.3d. 21, 26 (1st Cir. 2001) ("[W]hen the proffer in support of an anticipated affirmative defense is insufficient as a matter of law to create a triable issue, a district court *may* preclude the presentation of that defense entirely.") (emphasis supplied).  Motion at 7.

Thus, contrary to the suggestions of the motion, there is no requirement that the Court strike a proffered defense based on an anticipatory finding in a motion *in limine* that the defense proffer is insufficient at that point in time.

In combination with the many reasons justifying denial of the motion without further response from Mr. Gottesfeld, the discretionary nature of the ultimate issue further supports denial of the government's extraordinary request without a hearing.

**4. The government claims Mr. Gottesfeld fails to meet duress-based defenses, but ignores Supreme Court precedent indicating "[t]here is no federal statute defining the elements of the duress defense," and that "[w]e have not specified the elements of the defense." Dixon v. United States, 548 U.S. 1, 5 n.2 (2006).**

The government describes defense of another and necessity as "duress-based defenses." Motion at 8.  Though it acknowledges the viability of such defenses, the United States Supreme Court has stated that "[t]here is no federal statute defining the elements of the duress defense," and that "[w]e have not specified the elements of the defense."  Dixon v. United States, 548 U.S. 1, 5 n.2 (2006).

Although neither Congress nor the Supreme Court have articulated the elements of duress defenses, the government – prior to trial or a charge conference - claims to know the precise law that will govern this case.  Motion at 8-9.  The government presumes as much despite the Court having set a separate date of July 3, 2018 for submission of proposed jury instructions. Dkt. No. 169.

The Court should reject this presumption by the government as an usurpation of its own role in providing the jury with the law in the case at the end of the trial.  Instead, the parties should be allowed to present their evidence in the context of trial with the Court ruling on evidentiary objections in the normal course.  The Court should only rule on the jury instructions only after the parties have been heard on both their written requests and submissions based on the trial evidence.

**5. Conclusion of Part I.**

For the above-stated reasons, and for the reasons argued at the hearing on the motion, this Court must deny the motion without requiring any further response from Mr. Gottesfeld.


PART II: A REASONABLE JURY COULD FIND THAT MR. GOTTESFELD'S ALLEGED RESPONSE TO THE WIDELY-REPORTED ALLEGED KIDNAPPING AND ABUSE OF A TEENAGE GIRL SATISFIES BOTH A "DEFENSE OF ANOTHER" AND "NECESSITY"

Without withdrawing his objection to being required to respond to the claims in the government's motion, Mr. Gottesfeld now addresses how a reasonable jury could find that Mr. Gottesfeld's alleged response to the widely-reported alleged kidnapping and abuse of a teenage girl satisfies both a "defense of another" and "necessity."

While specific citations to news reports and other items in Part I of this opposition may again be cited in Part II, in order to avoid needless repetition Mr. Gottesfeld hereby incorporates by reference the citations from Part I into Part II.

1. **Necessity and Defense of Another Generally.**

The necessity defense has a long pedigree in Anglo-American jurisprudence. As early as 1550, an English merchant was acquitted by reason of necessity for dumping passengers' cargo to prevent a ship from capsizing, Reniger v. Fogossa, 75 Eng. Rep. 1 (K.B. 1550). In Hale v. Lawrence, 21 N.J.L. 714, 729 (N.J. E. & A.1848), the New Jersey Court of Errors and Appeals described the broad scope of the defense:

> The right to take or destroy private property, by an individual in self defence, or for the protection of life, liberty, or property, (if it can be esteemed a legal right at all) is one of a different character; it does not appertain to sovereignty, but to individuals considered as individuals; it is a natural right, of which government cannot deprive the citizen, and founded upon necessity and not expediency. It may be exercised by a single individual for their own personal safety or security, or for the preservation of their own property, or by a community of individuals, in defence of their common safety, or in the protection of their common rights.

The defense is prudential and reflects courts' understanding that strict enforcement of the law must sometimes give way to practical and moral considerations, as happens elsewhere in the criminal justice process, such as in prosecutorial charging decisions.

The necessity defense has been widely employed in prosecutions for acts of civil disobedience in the United States. Since the 1970s, hundreds of individuals representing a variety of causes have been acquitted by reason of necessity for civil disobedience actions across the country.[2]

---

[2] Despite the large number of successful necessity defenses, there are few reported decisions upholding the right to present the defense to the jury for the simple reason that courts are usually not called upon to issue an opinion in such cases, and acquittals are not appealable. The following is only a selection of successful political necessity defenses: Massachusetts v. Schaeffer-Duffy (Worcester Dist. Ct. 1989) (protesters acquitted of trespass at a nuclear facility after necessity instruction); *Massachusetts v. Carter*, No. 86-45 CR 7475 (Hampshire Dist. Ct. 1987) (defendants, including President Carter's daughter, acquitted of trespass and disorderly conduct in protest against CIA recruitment after necessity instruction); *State v. Mouer* (Columbia Co. Dist. Ct., Dec. 12-16, 1977) (protesters acquitted of trespass at nuclear site after instruction on necessity); *People v. Block* (Galt Judicial Dist., Sacramento Co. Mun. Ct., Aug. 14, 1979) (one defendant acquitted of charges from protest at nuclear plant after necessity instruction, other defendants received split verdict and charges dropped); *California v. Lemnitzer*, No. 27106E (Pleasanton-Livermore Mun. Ct. Feb. 1, 1982) (hung jury for protester at nuclear research facility after instruction on necessity, at retrial no necessity instruction but instruction on malice); *Vermont v. Keller*, No. 1372-4-84-CNCR (Vt. Dist. Ct. Nov. 17, 1984) (defendants acquitted of trespass in congressman's office to protest policy in Central America after extensive testimony and necessity instruction); *Michigan v. Jones et al.*, Nos. 83-101194-101228 (Oakland County Dist. Ct. 1984) (defendants acquitted of charges related to blockade of cruise missile site after necessity instruction); *People v. Jarka*, Nos. 002170, 002196-002212, 00214, 00236, 00238 (Ill. Cir. Ct. Apr. 15, 1985) (protesters acquitted after sit-in at naval training center to protest Central American policy when court gave necessity instruction that noted illegality of nuclear war); *Chicago v. Streeter*, Nos. 85-108644, 48, 49, 51, 52, 120323, 26, 27 (Cir. Ct., Cook County 11, May 1985); (defendants acquitted of trespass at office of South African consul after necessity instruction); *Colorado v. Bock* (Denver County Ct. June 12, 1985) (protesters acquitted of trespass at senator's office to protest policy in Central America after necessity instruction); *Michigan v. Lagrou*, Nos. 85-000098, 99, 100, 102 (Oakland County Dist. Ct. 1985) (defendants acquitted of charges related to blockade of cruise missile site, court noting absence of malice and absence of alternative methods); *Massachusetts v. Heller* (Seattle Mun. Ct. 1985) (protesters acquitted of trespassing at the home of South African consul after necessity on instruction); *Massachusetts v. Bass*, Nos. 4750-038, -395 to -400 (Thurston County Dist. Ct. April 8, 1987) (protesters acquitted of charges from occupation of state capitol in anti-apartheid protest after necessity instruction); *Illinois v. Fish* (Skokie Cir. Ct. Aug. 1987) (protesters acquitted of trespass at an army recruiting center after necessity instruction); *State v. McMillan*, No. D 00518 (San Luis Obispo Jud. Dist. Mun. Ct., Cal. Oct. 13, 1987) (bench trial acquitted protesters at nuclear plant on theory of necessity); *West Valley City v. Hirshi*, No. 891003031-3 MC (Salt Lake County, Ut. Cir. Ct., W. Valley Dept. 1990) (protesters at nuclear missile plant acquitted after necessity instruction); *California v. Halem*, No. 135842 (Berkeley Mun. Ct. 1991) (defendant acquitted of distributing clean needles in response to AIDS crisis after necessity instruction); *People v. Bordowitz*, 155 Misc.2d 128 (N.Y.C. Crim. Ct. 1991) (defendants acquitted of distributing clean needles in response to AIDS crisis on necessity defense); *People v. Gray*, 150 Misc.2d 852 (N.Y.C. Crim. Ct. 1991) (defendants acquitted on necessity defense in bench trial after protest against pollution and safety effects of new vehicular lanes).

The use of "political necessity" defenses reflects not only the fact that such actions often satisfy the elements of the general necessity defense and its emphasis on the prevention of serious harm through less harmful law-breaking, but also the important role that civil disobedience plays in shaping the nation's political progress. Judge Bright of the Eighth Circuit, dissenting in a case where anti-nuclear war protesters were convicted on several charges for damaging missile equipment, wrote:

> We must recognize that civil disobedience in various forms, used without violent acts against others, is engrained in our society and the moral correctness of political protestors' views has on occasion served to change and better our society. Civil disobedience has been prevalent throughout this nation's history extending from the Boston Tea Party and the signing of the Declaration of Independence, to the freeing of the slaves by operation of the underground railroad in the mid-1800's . . . In these circumstances, the courts in assessing punishment for violation of laws have ordinarily acted with a degree of restraint as to the severity of the punishment, recognizing that, although legally wrong, the offender may carry some moral justification for the disobedient acts.

*Kabat*, 797 F.2d at 601 (Bright, J., dissenting).[3]

As noted in Part I *supra*, a defendant's right to present a full and complete defenses of necessity and defense of another are inextricably linked with his rights to due process of law, compulsory process, trial by jury, confrontation of witnesses, freedom of speech, and right to testify.  The Court must allow Mr. Gottesfeld to present his defenses.

## 2. <u>The alleged burden on Mr. Gottesfeld to present his defenses is low.</u>

Even assuming that Mr. Gottesfeld has a burden to produce "some evidence" of his defenses at this stage of the proceedings, the burden is low:

---

[3] For evidence that the necessity defense has been permitted in cases of political protest involving facts similar to those of *Kabat*, see the unreported case *United States v. LaForge & Katt*, CR 4-84-66 (D. Minn. 1986), in which the judge allowed anti-nuclear weapons protesters to present a necessity defense at trial. The jury convicted the defendants and the judge delivered a speech at sentencing praising the protesters' motives. *See* William P. Quigley, *The Necessity Defense in Civil Disobedience Cases: Bring it to the Jury*, 38 New England L. Rev 3, 18, n. 136. (2003).

Some evidence is evidence that, viewed in the light most favorable to the defendant, would allow a reasonable juror to find in the defendant's favor on each element of the defense. The 'some evidence' burden is not a heavy one — as long as the defendant produces some evidence to support each element of the defense, any weakness or implausibility in that evidence is irrelevant and a matter for the jury, not for the court.

State v. Greenwood, 237 P.3d 1018, 1022-23 (Ak. 2010) (citations omitted).

Many authorities affirm the minimal nature of any burden.  See, e.g., Commonwealth v. Magadini, 474 Mass. 593, 600 (Mass. 2016) ("In determining whether there has been sufficient evidence of the foundational conditions to the necessity defense, all reasonable inferences should be resolved in favor of the defendant, and, no matter how incredible their testimony, that testimony must be treated as true") (citation omitted); Commonwealth v. Kendall, 451 Mass. 10, 15 (2008) ("if some evidence has been presented on each condition of a defense of necessity, then a defendant is entitled to an appropriate jury instruction"); Wilson v. State, 777 S.W.2d 823, 825 (Tex. App. 1989) ("If the defendant produces evidence, from whatever source and of whatever strength, raising every element of the defense, then he is entitled to an instruction on the defense, and the State must disprove the defense beyond a reasonable doubt"); People v. Kucavik, 854 N.E.2d 255, 259-60 (Ill. App. 2006) ("The State is free to argue to the jury what it believes a reasonable person would have done under the circumstances defendant faced. That it may have a different view of reasonable behavior does not negate defendant's right to the instruction, or defendant's right to have the jury make the final determination"); Hoagland v. State, 240 P.3d 1043, 1047 (Nev. 2010)  ("It is well established that a defendant is entitled to a jury instruction on their theory of the case, so long as there is evidence to support it, regardless of whether the evidence is weak, inconsistent, believable, or incredible.") (citations omitted); Bozeman v. State, 714 So. 2d 570, 572 (Fla. D. Ct. App. 1998) ("[A] defendant is entitled to have their jury instructed on the law applicable to their theory of defense if there is any evidence

15

presented supporting such a theory, even if the only evidence supporting the defense theory comes from the defendant's own testimony").

Thus, the government's portrayal of Mr. Gottesfeld's beliefs about J.P.'s widely-reported kidnapping and torture as "far-fetched" (Motion at 10) and "absurd" (Motion at 12 fn. 4) is not only contrary to significant news reporting, but legally irrelevant.  Any burden on Mr. Gottesfeld is low, must be weighed in the light most favorable to him, and remains unaffected by anyone's credibility determination, including that of the government.

### 3.  A short history of the J.P controversy

The history of the J.P. controversy have been outlined and chronicled on many occasions. See e.g. "A Medical Collision with a Child in the Middle," The Boston Globe, December 15, 2013, (https://www.bostonglobe.com/metro/2013/12/15/justina/vnwzbbNdiodSD7WDTh6xZI/story.html) (last accessed April 8, 2018); "Frustrations on All Fronts in Struggle Over Child's Future," The Boston Globe, December 16, 2013 (https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-conclusion-still-uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html) (last accessed April 17, 2018); "Timeline of the Justina Pelletier case," The Boston Globe, June 17, 2014, http://www.bostonglobe.com/2014/06/17/timeline-justina-pelletier-case/ckBrf2BtESvVOdZVzt74TM/story.html (last accessed May, 31, 2018).   Many of the articles cited in this filing contain relevant portions of this history, and are incorporated by reference here.  The following is intended only as a short summary of the controversy, with additional facts developed as appropriate in later sections of the opposition.

J.P. had been undergoing regular treatment for mitochondrial disease by doctors at Tufts Medical Center in Boston, where she was diagnosed in 2011. When she began having

gastrointestinal problems in February 2013, J.P.'s physician, Dr. Mark Korson, advised the family to visit Dr. Alejandro Flores at Boston Children's Hospital, who she had seen before.

On February 10, 2013, Linda Pelletier brought her 14-year-old daughter, J.P., to Boston Children's Hospital.  Because she was in a wheelchair and a heavy snow was falling at the time, J.P. was taken to the hospital by ambulance. The ambulance took J.P. to the emergency room, where another resident, not Dr. Flores, examined her.  Linda Pelletier informed BCH that her daughter was not eating, her speech was slurred, and she had trouble walking. She told doctors that her daughter has been treated at Tufts for a rare metabolic disorder, mitochondrial disease, which likely explains her symptoms.

On February 14, 2013, BCH reports suspicion that, rather than mitochondrial disease, the child's illness is primarily psychiatric in nature.  BCH then refused to allow the Pelletiers to take their child from the hospital or seek treatment with other providers; instead, they file an emergency complaint of medical child abuse with the Massachusetts Department of Children and Families. The agency prohibits J.P.'s parents from removing the girl from the hospital. A state court judge approves giving temporary custody of J.P. to DCF.

In April 2013, Children's Hospital staff maintain she needs psychiatric treatment for a psycho-somatic type of disorder. They transfer J.P., over her explicit objections, to the hospital's Bader 5 unit, which oversees psychiatric patients.

Ostensibly to protect J.P.. from psychosomatic effects, J.P. and her family were forbidden from discussing her condition and treatment.  Her parents were also forbidden from taking photographs of J.P.  Desperate for help, J.P. took to smuggling notes to her family hidden in art projects, and despite the prohibitions, her loved ones were able to take and publish some pictures

of her, visually depicting her marked deterioration at BCH. Her hair started to fall out, her legs swelled, and her gums receded.

In December 2013, a judge completes a hearing to decide if Justina's parents are so "unfit" that they should lose permanent custody of their child, but does not make an immediate decision.  J.P.'s deterioration at BCH continued.

In the meantime, J.P.'s parents took to the media to spread the story of their child's alleged kidnapping and abuse.  Politicians, political commentators, and interested people of all kinds took on the cause of the reportedly kidnapped and abused teenager.

On December 20, 2013, as the case attracts widespread media attention, the judge delays a final decision on the parents' fitness and appoints a special investigator to give him additional input.

On January 17, 2014, J.P. leaves BCH and enters a residential treatment center in Framingham, Wayside Youth and Family Support Network. The case draws intense national interest from a wide variety of groups.

On March 25, 2014, the state court judge grants custody of Justina to DCF.

On May 12, 2014, the case having attracted attention in the highest levels of the governor's office. A top state health official announces that J.P. is being moved to the JRI Susan Wayne Center for Excellence in Thompson, Conn., and a plan to expedite J.P.'s reunification with her parents. They announce that Tufts Medical Center will oversee her care.

On June 6, 2014, DCF drops its opposition to returning custody to the parents. The judge asks for all parties to submit written briefs by June 13th.

On June 17, 2014, the judge in the case issues opinion giving full custody of Justina, now 16, back to the parents, saying there is "credible evidence" that circumstances have changed. She returns home on June 18, 2014.

**4. A reasonable jury could find that Mr. Gottesfeld's alleged actions meet the elements of the defense of another.**

    a.  The state of the law.

The government claims "defense of another permits 'the use of force… when a person reasonably believes that it is necessary for the defense of oneself or another *against the immediate use of unlawful force*.  A person must use no more force than appears reasonably necessary in the circumstances."  Motion at 8, citing First Circuit Pattern Jury Instr., § 5.04 (2017) (emphasis added by government), and United States v. Bello, 194 F.3d 18, 26 (1st Cir.).

As noted *supra*, the United States Supreme Court has stated that "[t]here is no federal statute defining the elements of the duress defense," and that "[w]e have not specified the elements of the defense."  Dixon v. United States, 548 U.S. 1, 5 n.2 (2006).

Assuming without conceding that the government's claim regarding the elements are true, ample evidence allows a reasonable jury to find Mr. Gottesfeld acted in the defense of another against the immediate use of unlawful force.

    b.  The government's claims of deficiency in Mr. Gottesfeld's defense of another.

The government limits its complaints regarding Mr. Gottesfeld's defense of another to three (3) claims: (1) that Mr. Gottesfeld was never in J.P's presence, (2) that Mr. Gottesfeld cannot show he acted to prevent imminent harm, and (3) that Mr. Gottesfeld could not use force against BCH or Wayside.  As discussed below, the government fails on all three claims.

    c.  In a 21st century case alleging cybercrimes, the government erroneously relies on antiquated reasoning in arguing that Mr. Gottesfeld could not act to assist J.P. against her alleged kidnappers and torturers because he was not in her presence.

The government charged Mr. Gottesfeld with committing  21st century cyber crimes, but now complains that "Gottesfeld was Never in [J.P's] Presence."  Motion at 10-11.  In support of its outmoded reasoning, the motion cites a 45 year-old state case, Hawaii v. Marley, 509 P.2d. 1095, 1108 (Haw. 1973), and a 29 year-old appeal heard by a District Court judge after a bench trial before a magistrate, United States v. Brodhead, 714 F. Supp. 593, 598 (D. Mass. 1989) (Woodlock, J.).  Both of these non-precedential cases, decided over a generation ago, concerned relatively minor physical trespasses on property.  Id.

The government's reliance on these non-precedential decisions in the modern digital age is misplaced, particularly where the mistreatment of J.P was so widely-reported that, for instance, even former Presidential candidates were decrying J.P.'s kidnapping.  See "'There is Something Wrong When the Government Kidnaps Children from Their Own Family': Huckabee References Justina Pelletier in CPAC Speech," The Blaze, March 7, 2014, https://www.theblaze.com/news/2014/03/07/there-is-something-wrong-when-the-government-kidnaps-children-from-their-own-family-huckabee-references-justina-pelletier-in-cpac-speech (last accessed May 24, 2018); see also https://www.youtube.com/watch?v=wd-IOtW3fvk&t=5s (an interview of J.P. by Huckabee published on June 28, 2014 where Huckabee said "You were 15 when you went into their custody, and I say kidnapped you, because that's what I think they did") (last accessed June 1, 2014).  Indeed, the government's position here is shocking.  By their logic, a modern person suffering abuse who could be aided by a concerned person through a laptop computer should nonetheless be forced to suffer that abuse because the person willing to render aid is not personally present.  Indeed, the government's position is so worrying that one wonders if they realize the import of what they claim.  It does not take much to see the circumstances in which a computer-literate person might aid a victim by use of a laptop or other

capable device: preventing an abuser's dissemination of child pornography, preventing identity theft; stopping financial crimes; preventing election fraud; ending cyber bulling or calls to suicide, etc.[4]  By the government's lights, however, child pornographers, thieves, fraudsters, and abusers should be allowed to carry on with their crimes while others who *could* help the victims are instead forced to wait for government bureaucracies to do something about it.  That, it must be said, is a risk many reasonable people – indeed, reasonable jurors - would not be willing to take.

The government's insistence that the law requires actual presence to defend another is not based on binding precedent, antiquated, and poses serious societal dangers.  The Court should reject it and allow the jury to decide whether Mr. Gottesfeld acted in defense of others and out of necessity.

        d.   <u>A reasonable jury could find that Mr. Gottesfeld acted to prevent imminent harm.</u>

A reasonable jury could find Mr. Gottesfeld acted to prevent imminent harm.  The motion repeatedly cites to Mr. Gottesfeld's alleged September 2016 statement in the Huffington Post about why he committed the cyber attack.  See "Why I Knocked Boston Children's Hospital Off The Internet: A Statement from Martin Gottesfeld," Dkt. No. 116, Ex. A.  The government ignores, however, Mr. Gottesfeld's alleged statement in that article regarding the *factual predicate* for the motive:

> The answer is simpler than you might think: The defense of an innocent, learning disabled, 15-year-old girl. In the criminal complaint, she's called "Patient A," but to me, she has a name, [J.P.]. Boston Children's Hospital disagreed with her diagnosis. They said her symptoms were psychological. They made misleading

---

[4] The last reference to cyber bulling or calls to suicide is amply illustrated in the highly-publicized Massachusetts case of Michelle Carter who was convicted of manslaughter after bullying a teenager into committing suicide via text messages.  See e.g. https://www.nbcnews.com/news/us-news/michelle-carter-convicted-texting-suicide-case-sentenced-15-months-jail-n789276 (last accessed May 24, 2018).  By the government's logic, a concerned adult who took away Michelle Carter's phone or interfered with her phone service would be guilty of criminal offenses rather than credited with saving the victim's life, merely because he was not in the presence of the victim.

statements on an affidavit, went to court, and had [J.P's] parents stripped of
custody.

They stopped her painkillers, leaving her in agony. They stopped her heart
medication, leaving her tachycardic. They said she was a danger to herself, and
locked her in a psych ward. They said her family was part of the problem, so they
limited, monitored, and censored her contact with them.

[J.P.] resorted to sneaking notes, hidden in origami, to tell her family what she
wasn't allowed to say around eavesdroppers. Hospital staff pushed her to do
things she was physically incapable of, due to the physical condition they refused
to acknowledge she has. They laughed at her as she struggled futilely. They left
her on a toilet for hours when she couldn't void her bowels. They left her
secluded in a bare room, or alone in the hallway, sometimes for days when she
couldn't wheel herself elsewhere.

When they did move her, they ripped her toe nails, dragging her feet on the floor.
They bruised her. Her legs swelled, her gums receded, and her hair fell out. This
went on for 11 months at BCH.

Her parents went to the media, and a gag order was issued specifically prohibiting
them from speaking to journalists. When she finally left the hospital (in large part
thanks to the negative publicity,) she still wasn't allowed home and her ordeal
wasn't over. BCH was still in charge and her suffering continued, though the most
culpable had successfully manipulated the spotlight onto others.

At her new treatment center, aptly named "Wayside," Justina was verbally
assaulted while nude in the shower. She continued to be denied her medications
and treated according to the BCH plan.

Her father broke the gag order, publicly stating her life was in danger. The story
made big news, but there was no indication when Justina would be returned to her
family and receive the long delayed treatment she desperately needed. A former
BCH nurse called what Justina was enduring its proper term: torture. According
to international humanitarian law, she was right.

Of course, Mr. Gottesfeld's alleged statement in the Huffington Post concerning BCH

and Wayside's mistreatment and/or abuse of J.P. corresponds with many of the local and national

media reports cited throughout this filing.

In one salient example, on February 20, 2014, J.P's father Lou Pelletier appeared on Fox

News cable network with reporter Megyn Kelly.   Mr. Pelletier reported: "Bottom line is, my

daughter's life is now at stake.  This has been one year since she has been at Boston Children's

Hospital.  She has been tortured physically and mentally… she is at her breaking point… she is

just rotting."  See "Father Breaks Judge's Gag Order as Daughter Remains in State Custody,"

http://insider.foxnews.com/2014/02/20/father-teen-justina-pelletier-speaks-out-about-custody-

battle-hospital (last accessed May 23, 2018).

In another example, on March 6, 2014 – just weeks before the alleged offenses – Mr.

Pelletier interviewed with journalist Emily Rooney on WGBH's Greater Boston.  See

https://www.youtube.com/watch?v=l-JEJZIIMmg (last accessed May 23, 2018).  Speaking about

BCH's alleged abuse of his daughter, Mr. Pelletier stated the following:

> She went from a healthy as could be young lady, to a person now in a wheelchair,
> pretty much paralyzed below the hips, almost no physical strength above the hips.
> She has been totally medically abused.  She had tachycardia, medically
> diagnosed, was on Metoprolol for that.  Since she's been at Boston Children's
> through DCF Custody, she's been off that.  So, she's had a heart rate of anywhere
> from 100 to 152, medically verified.  Number two, she had a cecostomy tube
> placed into her colon so she can go to the bathroom, for neuropathy of the colon,
> and when you're a mitochondrial [disease] patient, you're more sensitive to your
> nerves, kind of like somebody with fibromyalgia.  So, she was taking Lyrica to
> deaden the nerve pain.  She, she been in severe pain, non-stop, twenty-four hours
> a day for thirteen months.

Id. [5]

Further, on March 27, 2014, the Citizens Commission on Human Rights (CCHR) wrote:

> "[U]nder the United Nation's 2013 Report by the Special Rapporteur on Torture
> and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Pelletiers
> certainly could claim [J.P's] human rights have been violated: 'Medical care that
> causes severe suffering for no justifiable reason can be considered cruel, inhuman
> or degrading treatment or punishment, and if there is State involvement and
> specific intent, it is torture.'"

---

[5] National political commentator Glenn Beck published a similar interview with Mr. Pelletier detailing the alleged abuse of his daughter on February 19, 2014.  See https://www.youtube.com/watch?v=ztqsLdM2rIk (last accessed June 1, 2014).

"Modern Day Salem – Boston Psychiatric Unit's Imprisonment of Teenager Justina

Pelletier Needs State Investigation into Reckless Endangerment of Psychiatric

Diagnosing," Citizen's Commission on Human Rights, March 27, 2014

(https://www.cchrint.org/2014/03/27/modern-day-salem-boston-psychiatric-units-

imprisonment-of-teenager-justina-pelletier/) (last accessed May 23, 2018), citing the

February 1, 2013 "Report of the Special Rapporteur on torture and other cruel, inhuman

or degrading treatment or punishment" by the Human Rights Counsel of the United

Nations

(http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession/Session22/A.H

RC.22.53_English.pdf) (last accessed May 24, 2018).  Indeed, the UN's 2013 report

explicitly discusses torture and related unlawful activities by medical providers.  Id.

Mr. Gottesfeld's alleged statement in the Huffington Post clearly demonstrates a

thorough knowledge of these media reports and the widespread urgent concerns for J.P.'s safety.

With these reports so pervasive and widespread, a reasonable jury could find that Mr. Gottesfeld

acted to prevent imminent harm.

The government erroneously analogizes United States v. Kabat, 797 F.2d 580, 591 (8th

Cir. 1986), a case concerning predominantly political protests of nuclear sites, with Mr.

Gottesfeld's alleged actions to assist an ongoing, intractable, pervasive reported kidnapping and

abuse of a teenage girl.  The harm against J.P. was more than "imminent" and "certain to occur;"

it was *already happening* and had not been stopped by any other means.  Again, one wonders if

the government realizes the import of its legal arguments: an imminent harm can be prevented,

but an *ongoing* harm cannot be stopped.  This argument is wholly illogical and the Court must

reject it.

While the alleged abuse of J.P. was continuing and significant, it should be noted that imminent harm includes even ongoing but more distributed harm. See e.g. <u>Massachusetts</u> v. <u>E.P.A.</u>, 549 U.S. 497, 521-23 (2007) (where the Supreme Court noted "[t]he harms associated with climate change are serious and well recognized" and held that the widely distributed nature of these harms did not minimize their significance at an individual or statewide level.  The EPA's refusal to regulate greenhouse gas emissions was found to be an "imminent" harm to Massachusetts.); see also <u>Juliana</u> v. <u>U.S.</u>, 217 F. Supp. 3d 1224, 1244 (D. Or. 2016) (where the District of Oregon found that plaintiffs bringing claims against the federal government for failure to ameliorate climate change had sufficiently demonstrated imminence because climate change harms are "ongoing and likely to continue in the future.").  In this legal context, there can be no doubt that "imminent harm" includes the ongoing alleged kidnapping, abuse, and torture of a teenage girl.

In another version of its "non-presence" argument, the motion complains that Mr. Gottesfeld had no first-hand knowledge of J.P.'s reported kidnapping and abuse, but is only relying on hearsay of "spliced together, undated, unauthenticated, hearsay documents."  Motion at 12.  First, without having heard from Mr. Gottesfeld at trial should he choose to testify (and without even having received this opposition), it is hard to see how the government knows precisely what Mr. Gottesfeld relied on to determine that J.P. was being harmed. [6]

Second, the government's claim is specious.  As noted *supra,* Lou Pelletier and others repeatedly reported on personal observations of J.P., calling it torture.  In April 2014, media reported that J.P. personally authored a note describing her abuse.  See e.g. "'Shocking Note'

---

[6] This issue illustrates one of the fundamental problems with forcing Mr. Gottesfeld to respond to a motion *in limine* to preclude his defenses: the government accuses Mr. Gottesfeld of lacking foundation for his motive, thereby requiring Mr. Gottesfeld to reveal and commit to the bases for his knowledge.  This sleight of hand is nothing less than a shift in the burden of proof and compelled self-incrimination.

Apparently Penned by Justina Pelletier to Her Parents," The Blaze, April 15, 2014,

(https://www.theblaze.com/news/2014/04/15/shocking-note-apparently-penned-by-justina-pelletier-to-her-parents) (last accessed May 30, 2018).  The handwritten note stated, *inter alia*:

"They hurt me all the time push me all the time and more."  Id.  The note was reportedly

authored by J.P. just weeks before its release to the media, in part due to her mistreatment by

Wayside.  Id.  As noted, on March 27, 2014 the Citizens Commission on Human Rights

(CCHR) agreed J.P.'s family could a violation of human rights at the United Nations.  Media

from across the country was reporting on the terrible harms allegedly suffered by J.P.

In the face of the persistent reporting on J.P.'s alleged kidnapping and abuse, neither Mr.

Gottesfeld nor the many politicians, commentators, protestors, and concerned citizens who

rendered judgments about J.P's alleged kidnapping and abuse relied on "little better than a

guess" about her condition.  Motion at 11-12.  Instead, they were reacting to persistent, credible

reports from numerous news media sources from around the country.  Mr. Gottesfeld's alleged

statements in the Huffington Post, and elsewhere in the Court's docket, reflect an intimate

familiarity with, and reaction to, these reports.  His alleged assertions regarding J.P.'s

mistreatment were not "bald assertions" or "unsupportable conclusions" (motion at 12); they

were easily sourced, credible conclusions shared by discerning people of various backgrounds

from across the country.

A reasonable juror could find that Mr. Gottesfeld acted to prevent imminent harm.  The

Court must allow him to present his full and complete defenses.

    e.  <u>Mr. Gottesfeld was not precluded from using a cyber attack against BCH and Wayside.</u>

The government claims that "Gottesfeld's digital attacks on BCH and Wayside do not fit under the banner of meeting unlawful force with comparable force in defense of another." Motion at 13.  This argument fails in various respects.

First, the government offers no case law or other authority to support their argument that a defendant may engage in only a certain type of reaction (such as direct physical force) to the widely-reported torture and abuse of a teenager.  In fact, it would be commonsensical that a reaction short of direct physical force – such as a DDOS disruption that failed to harm a single person, which is the case here – might be preferred to reasonable juror than direct physical force that actually causes some physical harm.  Indeed, the government position seems to invite exaggerated reactions rather than discourage them.

Second, the motion wrongly claims that "there is no evidence of 'unlawful force' by either BCH or Wayside."  Motion at 13.   To begin, the government's apparent suggestion that it would be impossible for a state probate judge to issue an unlawful order requires no serious rebuttal.  A state court order concerning custody of a child may indeed turn out to be unlawful. See e.g. Smith, Jr. v. McDonald, 458 Mass. 540, 547-550 (2010) (probate judge exceeded her statutory authority in "unlawful order" regarding custody).  Indeed, after the court deprived J.P's parents of custody over their daughter, media reported that the family's attorneys "have filed a writ of habeus corpus against Massachusetts for wrongful imprisonment."  See "Family of Justina Pelletier devastated after Mass. judge's ruling," Fox News, March 26, 2014, (http://www.foxnews.com/health/2014/03/26/justina-pelletier-to-remain-in-custody-massachusetts-judge-rules.html) (last accessed May 23, 2018).  Wrongful imprisonment is surely unlawful.

Further, several aspects of the custody battle over J.P. led many to believe that the state

court proceedings *themselves* were compromised.  For example, on December 16, 2013 in an

article entitled "Frustration on all fronts in struggle over child's future," the Boston Globe

reported:

> One of the key pieces of evidence presented to Juvenile Court Judge Joseph
> Johnston had been an affidavit filed by a state social worker, following her
> interviews with all the major parties.
>
> The affidavit showed considerable deference to Children's. It quoted liberally
> from hospital records and interviews with staff members there, including
> accusations that [J.P.'s] parents were obstructing her care. It said the Children's
> doctors "do not know where the parents picked up the current diagnosis and they
> are hard to disprove." It included negative comments from [J.P.'s] Connecticut
> pediatrician about how Linda and Lou had "fired" multiple doctors and
> "encouraged" the diagnosis of multiple medical problems.
>
> However, the affidavit failed to mention that the social worker had interviewed
> Korson, and that Korson had explained the origins of the working diagnosis of
> mitochondrial disease that he had given [J.P.]. Internal state records show that
> Korson had explained that the disorder sometimes runs in families and that he had
> also been treating [J.P's] older sister for it.
>
> When the judge decided to maintain temporary custody of [J.P.] with the state, the
> Pelletiers were furious. They took their complaints to every authority they could
> think of: the district attorney, the attorney general, the governor's office, even the
> FBI. They alleged that Children's was using its considerable muscle to box them
> out at every turn. When the parents received an e-mail from the person the judge
> had appointed as an independent investigator to advise him in the case, they were
> outraged to see her list an affiliation with Children's in the e-mail.

https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-conclusion-still-

uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html (last accessed May 23, 2018).

Locally, elected representatives across the political spectrum decried the custody battle

between BCH and J.P.'s parents, calling actions by state authorities "absolute overreach" and an

infringement on a "medical decision that should be allowed to be made by parents.  Parents have

those rights."  See "DCF's handling of girl's medical case called 'gigantic overreach' by Greater

Lowell reps," Lowell Sun, February 28, 2014

(http://www.lowellsun.com/todaysheadlines/ci_25246254/dcfs-handling-girls-medical-case-called-gigantic-overreach) (last accessed May 23, 2018).  Massachusetts State Representative

Jim Lyons (R-Andover) and Rep. Marc Lombardo (R-Billerica) challenged the legality of

Juvenile Court Judge Joseph Johnston's order depriving J.P.'s parents custody of their daughter

through legislative action.  See e.g. "Mass. Reps Create New Resolution to Release Justina

Pelletier," Fox 61, March 26, 2014  http://fox61.com/2014/03/26/mass-reps-create-new-resolution-to-release-justina-pelletier/

More than just concerns about legal process and orders, of course, were the persistent

reports of unlawful kidnapping, abuse, and torture of J.P. at BCH and Wayside.  The

government's opinion as to whether BCH's and Wayside's treatment of J.P. was "unlawful

force" has absolutely no bearing on whether a reasonable juror, on the facts presented, will

determine that J.P. was subjected to unlawful force.

Mr. Gottesfeld must be allowed to present his full and complete defenses to the charges at

his jury trial.

5. **A reasonable jury could find that Mr. Gottesfeld's alleged actions meet the elements of necessity.**

   a.  The state of the law.

The government asserts that "[t]he necessity defense requires proof that a defendant "(1)

was faced with a choice of evils and chose the lesser evil; (2) acted to prevent imminent harm;

(3) reasonably anticipated a direct causal relationship between his acts and the harm to be

averted; and (4) had no legal alternative but to violate the law," citing United States v. Lebreault-

Feliz, 802 F.3d 1, 4 (1st Cir 2015); Maxwell 254 F.3d at 27.  (Motion at 8).

As noted *supra*, the United States Supreme Court has stated that "[t]here is no federal statute defining the elements of the duress defense," and that "[w]e have not specified the elements of the defense."  Dixon v. United States, 548 U.S. 1, 5 n.2 (2006).

Assuming without conceding that the government's claim regarding the elements are true, ample evidence allows a reasonable jury to find Mr. Gottesfeld acted in necessity.

b.  A reasonable jury could find that Mr. Gottesfeld faced a choice of evils and chose the lesser evil.

Beyond mere assertion, the government fails to argue against the first element of the necessity defense, *viz.* that Mr. Gottesfeld faced a choice of evils and chose the lesser evil. Motion at 14-18.  Instead, the motion turns straight to the subsequent claimed elements of necessity.

The Court should find that the government concedes that Mr. Gottesfeld satisfies the first element of proving necessity in that he faced a choice of evils and chose the lesser of those evils.

Further, as noted throughout this filing, the local and national media widely-reported on the alleged kidnapping and abuse of J.P. by BCH and Wayside.   From Mr. Pelletier's interviews with Megyn Kelly and Emily Rooney to the statements of Mike Huckabee and so many others, reasonable people clearly believed that that BCH and Wayside perpetrated and posed an "evil" to the reportedly kidnapped and tortured teenage girl.  Faced with this evil, and aware of how ineffective the valiant efforts of J.P.'s family and other supporters had been (protests, court petitions, media interviews, etc.), a jury could reasonably find Mr. Gottesfeld chose the lesser evil.  As reflected in the alleged statement from the Huffington Post: "I felt that to have sufficient influence to save [J.P.] from grievous bodily harm and possible death… All other efforts to protect [J.P.] weren't succeeding and time was of the essence."  Dkt. No. 116-1.

Regardless of the government's failure to substantively argue against this element, a reasonable jury could find that Mr. Gottesfeld meets this element.

      c.   <u>A reasonable jury could find that Mr. Gottesfeld acted to prevent imminent harm.</u>

As argued in section 4(d) above, a reasonable juror could find that Mr. Gottesfeld acted to prevent imminent harm.  Those arguments are incorporated by reference here.

      d.   <u>A reasonable jury could find that Mr. Gottesfeld reasonably anticipated a direct causal relationship between his alleged acts and the harm to be averted.</u>

As noted throughout this filing, prior to the alleged offense concerned people from across all walks of life campaigned, lobbied, petitioned, and struggled to remedy the widely-reported kidnapping, abuse, and torture of J.P.  Despite these intrepid efforts, all such methods failed to aid the alleged suffering of J.P.

Particularly (though not exclusively) in these circumstances, a juror could find that Mr. Gottesfeld reasonably anticipated a direct causal relationship between the alleged DDOS attacks and the harm to be averted.  In order to rescue J.P. from the alleged abuse, or at least attempt to alleviate the harm inflicted, a juror could find that a different, non-traditional tactic was necessary.  While the cyber disruption would never harm a single patient, it would certainly get the attention of the alleged abusers, the public, and other stakeholders in the process, improving J.P.'s chances for relief.

Indeed, the alleged cyber attacks were reported in the media when they occurred.   See e.g. "Hacker Group Anonymous targets Children's Hospital," The Boston Globe, April 24, 2014 (https://www.bostonglobe.com/business/2014/04/24/hacker-group-anonymous-targets-children-hospital-over-justina-pelletier-case/jSd3EE5VVHbSGTJdS5YrfM/story.html) (last accessed April 29, 2018); "Anonymous Reportedly Behind Cyber Attacks Against Children's Hospital Website In Response to Justina Pelletier Custody Case," Boston.com, April 24, 2014,

(https://www.boston.com/news/technology/2014/04/24/anonymous-reportedly-behind-cyber-attacks-against-childrens-hospital-website-in-response-to-justina-pelletier-custody-case) (last accessed April 29, 2018); "Did Anonymous Target Boston Hospital in Cyberattacks over Justina Pelletier Case?", The Blaze, April 25, 2014, https://www.theblaze.com/news/2014/04/25/did-anonymous-target-boston-hospital-in-cyberattacks-over-justina-pelletier-case (last accessed May 31, 2018).

Further, according to Rolling Stone magazine's article on J.P. and the cyber attack, "the attack largely achieved Gottesfeld's intended effect: It put the institution overseeing her care on the defense and raised awareness of Justina's story." See "The Hacker Who Cared Too Much," Rolling Stone, June 29, 2017, https://www.rollingstone.com/culture/features/how-a-crusade-to-save-children-landed-a-hacker-in-prison-w489735 (last accessed June 1, 2018).

In fact, J.P. personally recognizes the connection between Mr. Gottesfeld's alleged actions and the relief she required. As Rolling Stone reported:

> Though the two have never talked or met, she and Gottesfeld share a unique bond, and she, more than anyone, knows what it's like to be trapped inside the system. It's as if they've traded places, and now, for the first time, she can take a stand to help him get out – just as he had done for her. "He shouldn't be in jail…. He didn't hurt any kids. He was just trying to help." When I ask her what she would like to tell Gottesfeld if she could, she gathers herself for a moment, and then replies. "Just, 'thank you,'" she says.

Id.

In June 2014, the same judge who deprived J.P.'s parents of custody dismissed the case and returned J.P. to her family. See e.g. "Justina Pelletier heads home after judge ends state custody," The Boston Globe, June 17, 2014

https://www.bostonglobe.com/metro/2014/06/17/judge-orders-custody-justina-pelletier-returned-parents/mDWtuGURNawSuObO0pDX4J/story.html (last accessed June 1, 2018). The Globe

article notes that the court's decision "was a remarkable change in tone from the judge's ruling just three months earlier, when he determined the parents were unfit and awarded permanent custody to the state."   Id.  Of course, whether the judge actually considered the cyber attack when ruling is not the question today; indeed, the judge's written orders did not mention the cyber attack.  Id.  Instead, the question is whether a juror could find that Mr. Gottesfeld reasonably anticipated a causal relationship between his alleged actions and the anticipated relief.  With all other efforts to assist J.P. leading to widely-reported dead-ends, a juror could find that Mr. Gottesfeld reasonably anticipated that the alleged cyber attack would provide relief for the teenager where other efforts had failed.

The Court must allow Mr. Gottesfeld to present his full and complete defenses to the charges.

        e.   Legal alternatives

The government wrongly contends that Mr. Gottesfeld had legal alternatives to the alleged cyber attack and suggests that if he had used those options he might have achieved the desired ends of aiding J.P.  Motion at 16-18.

J.P.'s parents had already called the FBI and many other law enforcement agencies about the alleged kidnapping and abuse of their daughter, to no avail.  See e.g. https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-conclusion-still-uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html (last accessed May 23, 2018).  Legal battles concerning J.P.'s custody and treatment were already ongoing, and – as the government is surely aware - Mr. Gottesfeld would likely have no standing to sue for relief for J.P.  Protesters had already rallied for J.P.'s cause outside courthouses and other high profile forums.  See e.g. "Protest Planned to Fight Hospital's 'Kidnapping' of West Hartford Girl," West Hartford Patch,

December 2, 2013 (https://patch.com/connecticut/westhartford/protest-planned-to-fight-hospitals-kidnapping-of-west-hartford-girl) (last accessed April 17, 2018); "Feb 24 2014 Free [J.P.] ," https://www.youtube.com/watch?v=6q7w-LAeA9E (last accessed June 1, 2018); "March 17 2014 [J.P] Rally Suffolk Courthouse Boston," https://www.youtube.com/watch?v=T1x1Sw0cHDA (last accessed June 1, 2014).  Politicians and political commentators were already supportive of J.P. without any discernible impact on J.P.'s status or condition.  The government's claim that Mr. Gottesfeld failed to pursue these different alternatives ignores the commendable but ineffective prior efforts by others to save J.P. from her widely-reported kidnapping and abuse.

Further, writing one's congressperson, engaging in public protest, and sending private messages to those affected may be laudable ways to support those in need; however, they cannot always be counted on to address a serious, ongoing harm.  Despite mountains of attention and good will shown to J.P. and her family from across the country, it was widely-reported that J.P. remained imperiled.  A reasonable jury could find that something different had to be done.

The government misses the mark again in arguing that the actions allegedly taken by Mr. Gottesfeld since his pretrial incarceration, including television and newspaper interviews; fundraising on social media; website promotion; engaging in a hunger strike; and political campaigning, were also available to him before the alleged offenses. Motion at 16-17.  This argument confuses causes with effects: without the alleged offenses and/or the government's charges against Mr. Gottesfeld, none of his alleged efforts would be likely or possible.

While it should go without saying, the defense is surely not suggesting that any action would be justified in attempting to assist J.P against her alleged kidnappers and abusers.  Rather, the defense merely argues that at his jury trial, a reasonable jury could find that Mr. Gottesfeld's

alleged actions, which did not injure a single person, were born out of necessity and in defense of J.P.   This is a matter for the jury to decide, not the government or the Court.

The Court must allowed Mr. Gottesfeld to present his full and complete defenses to the jury.

**6.   <u>Conclusion of Part II.</u>**

For the above-stated reasons, and for the reasons stated at the hearing on this motion, the Court must deny the government's motion *in limine*.   Further, if this Court should – over Mr. Gottesfeld's objection - allow the government's motion, Mr. Gottesfeld reserves the right to present additional facts, arguments, and information to the Court at later points in connection with subsequent requests for reconsideration.

Respectfully submitted,
MARTIN GOTTESFELD
By his attorney:

/s/ David J. Grimaldi
_____
David J. Grimaldi
David J. Grimaldi, P.C.
BBO No. 669343
675 Massachusetts Avenue, 9th Floor
Cambridge, MA 02139
617-661-1529 (tel)
857-362-7889 (fax)
david@attorneygrimaldi.com

DATE: June 4, 2018

<u>CERTIFICATE OF SERVICE</u>

I, David J. Grimaldi, hereby certify that true copies of this motion were served on all registered participants in this matter via ECF this 4th day of June 2018.

/s/ David J. Grimaldi
_____
David J. Grimaldi