UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.          )  16-CR-10305-NMG<br>)<br>MARTIN GOTTESFELD,       )<br>)<br>Defendant.       ) | |

REPLY IN SUPPORT OF MOTION IN LIMINE

The Court has ruled that Gottesfeld must "carry [an] entry-level burden of adducing competent proof of the affirmative defense." *United States v. Gottesfeld*, 2018 WL 2392002, *2 (D. Mass. May 25, 2018) (*citing United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001)). For the reasons stated below, Gottesfeld has not met his entry-level burden.

I.   *Gottesfeld Offers No Competent Proof of Torture, Kidnapping and Abuse*

Gottesfeld wants to argue to the jury that he attacked the networks of Boston Children's Hospital and the Wayside Youth and Family Support Network ("Wayside") in "response to the widely reported alleged kidnapping and abuse of a teenage girl." (Opp., Docket No. 198, at 12). He wants the jury to hear the emotional claims that Patient A's father made to a cable news host: that his daughter was being "tortured physically and mentally" and that her life was "at stake." (Opp. at 22-23).

To introduce evidence of an affirmative defense, and to argue that defense to the jury, it is not enough for him to show that there was a controversy over Patient A's diagnosis, or that Patient A and her family were parties to a bitter custody battle. As set forth below, Gottesfeld must prove, among other elements, that he acted to prevent "imminent harm" or "the immediate

use of unlawful force," respectively. *See Maxwell*, 254 F.3d at 27 (necessity); First Cir. Model Crim. Jury Instr. 5.04 (defense of another). If he cannot meet this threshold, evidence of his good motive for the attacks is irrelevant (and inadmissible) where it does nothing to negate the elements of the charged offenses. *See United States v. White*, 766 F.2d 22, 24 (1st Cir. 1985) (rejecting an offer of proof that defendant "knowingly chose to break the law ... [but that] her motive for knowingly breaking the law was to help her mother").

In response to the Court's order for competent proof, Gottesfeld proffers approximately twenty online news articles and videos regarding Patient A. Widely reported or not, these materials are not "competent proof of the affirmative defense" — they are inadmissible hearsay. *See Queen v. Hepburn*, 11 U.S. 290, 295 (1813) ("That hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge."). Second-hand reports of statements by Patient A's father, or by Patient A herself, are double hearsay, and offer even less of an evidentiary foundation for these affirmative defenses. *See United States v. Brown*, 669 F.3d 10, 20 (1st Cir. 2012) ("An accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *United States v. Dorrell*, 758 F.2d 427, 434 (9th Cir. 1985) (hearsay rules govern admissibility of necessity evidence). Gottesfeld has proffered no admissible evidence of torture, kidnapping, and child abuse, and he has therefore failed to meet his entry level burden.

Gottesfeld appears likely to argue instead that he relied on one, several, or all of these sources in deciding to attack his victims' networks. (Opp. at 24) (Gottesfeld's statement to the *Huffington Post* "demonstrates a thorough knowledge of these media reports and the widespread urgent concern for [Patient A's] safety"); (Opp. at 26) (referencing Gottesfeld's "intimate

familiarity" with media reports).[1]  Because having read or seen media reports is not an objectively reasonable basis on which to violate criminal statutes, he fails to meet his entry level burden.  *See United States v. Perdomo-Espana*, 522 F.3d 983, 988 (9th Cir. 2008) (courts test proof of necessity under an objectively reasonable standard, not by examining a defendant's subjective beliefs).

II.     *Gottesfeld Offers No Evidence of Imminent Harm*

The term "imminent harm" connotes a real emergency, a crisis involving immediate danger to oneself or to a third party.  *Maxwell*, 254 F.3d at 27.  The media accounts he relies on establish the existence of a controversy, but they do not resolve it, particularly when only one of two parties to the dispute could speak publicly about it.  A full two-thirds of the articles and videos Gottesfeld cites contain no statement from either Wayside or Boston Children's Hospital.  Several others report that for reasons of patient confidentiality, these institutions could not respond publicly to any of the allegations about Patient A's care, as at least one of the articles that Gottesfeld cites acknowledges:

> First, we're essentially hearing only one side of [Patient A's] story. [Reporter] and [Reporter], the reporters covering the story for the *Boston Globe*, have done an admirable reporting job, but hospitals can't say much about their patients.  [Patient A's parents] appear to have provided much of [Reporter] and [Reporter]'s information.  Second, the science is complicated. Mitochondrial disease ([Patient A]'s original diagnosis) and medical child abuse (the Boston Children's diagnosis) can look extremely similar. Both can be deadly if not treated properly.

---

[1] Many of the articles were published after Gottesfeld's attack on Wayside and offer no foundation at all for his actions.

3

Palmer, Brian, *Mitochondrial Disease or Medical Child Abuse, [Patient A's] Case is a Study in Diagnostic Challenges*, SLATE, Apr. 1, 2014. (Cited in Opp. at 6). To be clear, this article is as much inadmissible hearsay as the one claiming that the hospital's diagnosis had "about as much science to support it as Dr. William Griggs' 'witch' diagnosis in the late 1600s" in Salem, Massachusetts. (Cited in Opp. at 24). It is not the Court's task to decide which article got it right, but the starkly different viewpoints they express show the lack of any reasonable basis, on the evidence Gottesfeld offers, to except his conduct from the scope of federal criminal law.[2]

*Hawaii v. Marley's* presence requirement, 509 P.2d 1095, 1108 (Haw. 1973), which severely limits justification defenses to matters of "intimate personal concern," is hardly antiquated, as Gottesfeld suggests. (Opp. at 21). The presence requirement is a bulwark against the development of "a vigilante society." *See Marley*, 509 P.2d at 1108. It makes sure that harm and bodily injury are imminent, making it appropriate, for example, for a defendant-felon to violate the law by taking a gun and ammunition from his girlfriend's son, after the son has run from the house screaming he was going to kill someone. *See United States v. Newcomb*, 6 F.3d 1129, 1136 (6th Cir. 1993).

It is precisely the breadth of the Internet — where anyone with a social media account can claim to be disseminating news — that makes the presence requirement so relevant today. Gottesfeld posits an Internet full of "concerned persons," stripped of any intimate and personal connection to an issue, policing "societal dangers" with their laptop computers. (Opp. at 20). On any matter of public concern, any one (or all) of these "concerned persons" could act, in

---

[2] If the Court admits hearsay statements of Patient A, her father, or other advocates with no firsthand knowledge regarding her care, the government will be forced to meet this testimony with the actual health records relating to her care and the testimony of the health care professionals who treated her.

whatever way they thought best, based on something they read. So expanded, the necessity defense, an exception to the legislative branch's role to define crimes, would swallow any criminal statute placed in its way. *See United States v. Schoon*, 971 F.2d 193, 196–97 (9th Cir. 1991) ("the necessity defense allows us to act as individual legislatures, amending a particular criminal provision or crafting a one-time exception to it, subject to court review, when a real legislature would formally do the same under those circumstances.")

Imminent harm is also absent in this case because a Massachusetts court authorized DCF to take custody of Patient A and to direct her treatment. Gottesfeld may wish to characterize this as kidnapping and child abuse, but the court cannot recognize imminent harm "from a practice when that practice is specifically condoned by the law." *See Minnesota v. Klapstein*, 2018 WL 1902473, *4 (Minn. Ct. App. Apr. 23, 2018); *see Dorrell,* 758 F.2d at 432 ("[T]he law should [not] excuse criminal activity intended to express the protestor's disagreement with positions reached by the law-making branches of the government."); *Illinois v. Stiso,* 416 N.E.2d 1209, 1211 (Ill. App. Ct. 1981) ("Necessity, as a matter of law, does not justify barring of access to rooms where abortions performed because "the alleged injury sought to be avoided, the abortions, was not a legally recognized injury.").

The Court should similarly reject Gottesfeld's invitation to expand the necessity doctrine to encompass "ongoing but more distributed harm," such as climate change. (Opp. at 25). *Maxwell* rejected these more abstract harms, contrasting the "mere presence" of a nuclear submarine (where harm is not imminent) with the "realistic threat of detonation." *See* 254 F.3d at 27. Again, Gottesfeld's burden is to produce competent evidence that he acted to prevent torture and kidnapping, not to address the ongoing controversy over Patient A's care. *See id.*

5

III.     *Gottesfeld Shows No Reasonable Connection Between His Attacks and Patient A*

"A defendant must demonstrate cause and effect between an act of protest and the achievement of the goal of the protest by competent evidence." *See Maxwell*, 254 F.3d at 28. When Gottesfeld knocked Boston Children's Hospital off the internet in April 2014, he knew that Patient A had been discharged to Wayside months earlier. (Opp. at 18). He knew that the question of Patient A's custody and care was squarely in the hands of a state court judge and DCF, not the institutions he attacked. He cannot have reasonably believed that retaliating against a 400-bed pediatric hospital would sway state officials or the doctors who treated Patient A, months after she had already been discharged. *See Maxwell*, 254 F.3d at 28 (holding that defendant failed to establish link between temporary disruption of exercises at one military site and the Navy's deployment of nuclear submarines generally).

The fact that Patient A was ultimately discharged from Wayside and reunited with her family, or even that she thanked Gottesfeld for what he did,[3] establishes no reasonable connection between Gottesfeld's conduct and Patient A. Based on the record Gottesfeld has submitted, what appears to have led the court to award custody of Patient A to her family was changed circumstances, including her family's cooperation and engagement with services that DCF was overseeing. (Cited in Opp. at 32).

---

[3] In fact, in the immediate wake of the Children's Hospital attacks, Patient A's mother stated that she did not know about the cyberattacks on her daughter's behalf and did not condone them. Michael B. Farrell and Patrician Wen, *Hacker Group Anonymous Targets Boston Children's Hospital*, BOSTON GLOBE, Apr. 24, 2014. (Cited in Opp. at 31).

IV.     *Gottesfeld Ignored Legal Alternatives to Violating the Law*

The articles on which Gottesfeld would rely made clear that Patient A's care was the subject of ongoing litigation between Patient A's family and DCF before a Massachusetts juvenile court judge.  Gottesfeld acknowledges that the judge had "appoint[ed] a special investigator to give him additional input." (Opp. at 18).  It is hardly surprising that the FBI and other law enforcement agencies, who are bound to abide by court decisions, would defer to an ongoing judicial process concerning Patient A.  If, as Gottesfeld suggests, the state court's custody order was incorrect, "unlawful," or the process had been "compromised" in some way, (Opp. at 28), the order would be subject to reconsideration or reversal by an appellate court.

Gottesfeld's sources make clear in the same way that elected representatives spoke about Patient A and drafted resolutions concerning her care.  (Opp. at 29).  Where courts, legislators, and the executive were already acting, it was objectively unreasonable for Gottesfeld to substitute his judgment for all three branches of government.  *See United States v. Cullen*, 454 F.2d 386, 391 (7th Cir. 1991) ("One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making") (Stevens, J.); *see also Maxwell*, 254 F.3d at 29 ("The fact that [defendant] was unlikely to effect the changes he desires through legal alternatives does not mean, ipso facto, that those alternatives are nonexistent."); *United States v. Katzberg*, 201 F.R.D. 50, 53 (D.R.I. 2001) (protestor "cannot create 'necessity' through their own impatience with the less visible and more time consuming alternatives").

V.   *Conclusion*

If the reporting and advocacy on which Gottesfeld proposes to rely can establish the defenses of necessity and defense of another, these doctrines have no discernable limit. The computer networks of any public or private actor, in any matter of public concern, would be the proper subject of dangerous and costly digital attacks, whether or not the reporting turned out to be accurate. And if a DDOS attack had failed to achieve the results Gottesfeld wanted, his brand of necessity would permit him to erase the hospital's patient records, target the networks of companies providing power to the hospital, or worse. "History has not been short of evidence of the risks, the evils, that can attend subordinating the requirements of law to one's personal view of morality." *United States v. Platte*, 401 F.3d 1176, 1181 (10th Cir. 2005).

Gottesfeld's goal is to argue his good motive to the jury. This is an improper invitation to nullification. "An innocent or even noble motivation for committing a crime, as distinct from lack of intent to commit it, is not a defense." *United States v. Cephus*, 684 F.3d 703, 706–07 (7th Cir. 2012).

Clearly, the jury will learn of the controversy surrounding Patient A, and of Gottesfeld's motives for the attack. His statements to the *Huffington Post* and in a YouTube video he posted, non-hearsay when offered by the government under Fed. R. Evid. 801(d)(2), refer clearly to his motives. What the Court must guard and instruct against is Gottesfeld's use of incompetent allegations of torture, kidnapping, and child abuse as a path to acquittal under a cloak of necessity. *See* Fed. R. Evid. 403.

For all of the reasons stated above and in its motion, (Docket No. 116), the Court should allow the government's motion in limine.

> Respectfully submitted,
>
> Andrew E. Lelling
> United States Attorney
>
> By:   */s/ Seth B. Kosto*
> David J. D'Addio
> Seth B. Kosto
> Assistant U.S. Attorneys

June 8, 2017
Boston, Massachusetts

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

> */s/ Seth B. Kosto*

Dated: June 8, 2018