United States District Court
District of Massachusetts

```
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          v.                      )
                                  )
MARTIN GOTTESFELD                 )      Criminal Action No.
                                  )      16-10305-NMG
          Defendant.              )
                                  )
```

## MEMORANDUM & ORDER

**GORTON, J.**

This case arises from alleged cyber-attacks against Wayside Youth and Family Support Network ("Wayside") and Boston Children's Hospital ("BCH"). The Grand Jury returned a two count indictment of Martin Gottesfeld ("defendant" or "Gottesfeld") for his alleged involvement in these attacks.

Pending before the Court are (1) defendant's motion to suppress and its supplements (Docket Nos. 78, 128 and 166) and (2) the government's motion in limine to preclude defendant's so-called "torture defense" (Docket No. 116). For the following reasons, the motion to suppress and their supplements will be denied and the motion in limine will be allowed. By order of the Court entered on June 14, 2018 (Docket No. 205), the defendant's motions to dismiss (Docket No. 164) and for release from custody (Docket Nos. 147 and 177) were denied, with the

notation that an explanatory memorandum would follow.  This memorandum includes that explanation.

## I.   **Factual Background**

The indictment charges (1) conspiracy under 18 U.S.C. § 371 (Count I) and (2) intentionally causing damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A) (Count II). The indictment also includes forfeiture allegations pursuant to (1) 18 U.S.C. § 981(a)(C)(1) and 18 U.S.C. § 2461 (conspiracy forfeiture allegation) and (2) 18 U.S.C. § 982(a)(2)(B) and 18 U.S.C. § 1030(i) (intentional damage to a protected computer forfeiture allegation).

The government submits that beginning no later than 2013, Gottesfeld became concerned with what he called "the troubled teen industry" and used websites and social media tools to bring attention to his cause.  That year, he advocated for the shutdown of an adolescent treatment center in Utah ("the Utah Treatment Center") through various social media accounts.  In November 2013, the Utah Treatment Center was the target of intermittent distributed denial of service ("DDOS") attacks for several months.

DDOS attacks flood computer servers with traffic in an attempt to overload the capacity of the server system.  This generally involves directing traffic from remotely hijacked, web-enabled devices or access to high capacity internet

connections through which thousands of traffic sources are simulated.  The cyber attacks are difficult to defend against because they come from so many sources.  In addition to exceeding the capacities of the servers, attacks often force victims to shut down important parts of their websites or to refuse otherwise legitimate and productive traffic.

In March 2014, the company that managed patient records for the Utah Treatment Center ("the Record Management Company") was also targeted with DDOS attacks.  Gottesfeld allegedly used his Twitter account while the attacks were occurring to send a message to the Record Management Company: "Website troubles? Drop [the Utah Treatment Center] or we NEVER stop".  For more than one month, the attacks disrupted the ability of the Records Management Company to communicate with clients and cost the company approximately $24,000.

In early 2014, the media began reporting on a teenager, Justina Pelletier ("Ms. Pelletier") who had been placed in the custody of the Massachusetts Department of Children and Families ("DCF") because of concerns that her parents were interfering with her treatment for a psycho-somatic disorder by instead insisting on treatment for mitochondrial disease.  Ms. Pelletier was reportedly treated at BCH before being transferred to Wayside.

On March 23, 2014, Gottesfeld purportedly sent Twitter messages to an unindicted co-conspirator suggesting targeting Wayside with cyber-attacks.  Two days later, Gottesfeld allegedly issued a series of public Twitter messages calling for attacks on the Wayside network.  The attacks lasted more than a week, crippled Wayside's website and caused Wayside to spend in excess of $18,000 on response and mitigation efforts.

Also March 23, 2014, Gottesfeld allegedly posted a YouTube video in the name of the hacking organization Anonymous calling for action against BCH.  The video stated Anonymous' intent to punish BCH until Ms. Pelletier was released and demanded the termination of a physician involved in Ms. Pelletier's case "or [BCH] too shall feel the full unbridled wrath of Anonymous".  The video directed viewers to a website that contained information necessary to initiate a DDOS attack against BCH's computer server.

On April 19, 2014, Gottesfeld and the alleged conspirators purportedly initiated a DDOS attack against BCH's Massachusetts server for at least seven days, taking BCH's website out of service.  The attacks disrupted the entire BCH community by impeding the ability of physicians to communicate and access patient records.  The cyber attack also occurred during a period of important fundraising which was severely impacted.  Responding to and mitigating the damage from the attack

purportedly cost BCH more than $300,000 in addition to lost
fundraising estimated at $300,000.

## II. Government's Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another (Docket No. 116)

The government moves to preclude evidence on the
affirmative defenses of necessity and defense of another that is
not otherwise admissible for an appropriate purpose.  The
government contends that defendant cannot produce competent
evidence to show that he acted in defense of Ms. Pelletier
because (1) defendant was never in Ms. Pelletier's presence, (2)
he cannot show that he acted to prevent imminent harm and (3)
there is no evidence of unlawful force by BCH or Wayside.  With
respect to defendant's purported necessity defense, the
government maintains that the defendant has proffered no
competent evidence showing that (1) defendant's actions were in
reasonable anticipation of averting the alleged harm or (2)
defendant lacked legal alternatives to violating the law.

Defendant first renews his objection to the motion in
limine procedure to exclude an affirmative defense.  He
maintains that requiring a proffer of evidence at this juncture
shifts the burden of proof to him and compels self-incrimination
by defendant.  In support of the imminence-of-harm requirement,
defendant proffers his statement to the Huffington Post
describing the harm Ms. Pelletier faced in the care of BCH and

-5-

Wayside.  Defendant relies on interviews of Ms. Pelletier's father on television news programs describing Ms. Pelletier's condition.  Defendant contends that he has demonstrated the imminent harm element by tendering evidence of Ms. Pelletier's ongoing medical suffering.

Defendant rejects the government's suggestion that the "force" used by BCH and Wayside was not unlawful because it was exerted pursuant to an order by the DCF.  He objects to the premise that legally-sanctioned force cannot be unlawful because a state court order with respect to custody can later be overturned.  Defendant relies again on news articles, suggesting that the court proceedings themselves may have been compromised.

Gottesfeld argues that it was reasonable to anticipate a direct, causal relationship between his action and the harm to be averted, proffering evidence that the cyber attack largely achieved the intended effect of raising awareness of Ms. Pelletier's story.  He submits that after the attack, the state court judge dismissed the case and returned custody of Ms. Pelletier to her parents.  Defendant contends that a juror could find that the non-traditional attack was necessary.

To demonstrate that defendant had no legal alternatives to the alleged cyber attack, he proffers evidence that Ms. Pelletier's parents had already notified the FBI and other law enforcement agencies.  He contends that he had no standing to

seek other legal relief on behalf of Ms. Pelletier and that writing Congress, engaging in public protest or sending private messages to those affected would not have been effective in redressing the ongoing harm.

While a defendant has a "wide-ranging" right to present a defense, that right is not absolute and does not include the right to present irrelevant evidence. United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001) (citing In re Oliver, 333 U.S. 257, 273-74 n.31 (1948)).  Before submitting an affirmative defense to the jury,

> it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense.

United States v. Bailey, 444 U.S. 394, 415 (1980).  A district court can assess the sufficiency of a defendant's affirmative defense before it is presented to a jury as part of its gate-keeping responsibilities. See United States v. Portillo-Vega, 478 F.3d 1194, 1197 (10th Cir. 2007).  It can review the sufficiency of defendant's proffered evidence before trial, during trial or after the close of evidence before an instruction on the defense is given to the jury. See, e.g., United States v. Graham, 663 Fed. App'x 622, 625-26 (10th Cir. 2016) (citing Portillo-Vega, 478 F.3d at 1202) (precluding duress defense after pretrial hearing)); United States v.

<u>Lebreault-Feliz</u>, 807 F.3d 1, 5 (1st Cir. 2015) (affirming district court's decision to exclude duress and necessity defenses during trial).

To establish the affirmative defense of another a defendant must show that he reasonably believed that the use of force was necessary "for the defense of oneself or another against the immediate use of unlawful force". <u>United States</u> v. <u>Bello</u>, 194 F.3d 18, 26 (1st Cir. 1999) (citing First Circuit Pattern Jury Instr. § 5.04 (2017)).  The affirmative defense of necessity requires proof that the defendant

> (1) was faced with a choice of evils and chose the lesser evil, (2) acted to prevent imminent harm, (3) reasonably anticipated a direct causal relationship between his acts and the harm to be averted, and (4) had no legal alternative but to violate the law.

<u>Lebreault-Feliz</u>, 807 F.3d at 4.

As to the defendant's proposed affirmative defense based upon defense of another, his proffer of evidence does not demonstrate that Ms. Pelletier was threatened by the immediate use of unlawful force.  The alleged force being used against Ms. Pelletier was exerted pursuant to an order of a Massachusetts Juvenile Court judge to the DCF.  Defendant contends that a state court order concerning child custody could, at some later point, be determined to be unlawful.

The <u>de minimis</u> possibility that a court order, at some uncertain future point, could be reversed by an appellate court,

-8-

does not mean that someone acting in accordance with that court order while it is in effect is somehow acting unlawfully.  See, e.g., United States v. Branch, 91 F.3d 699, 714 (5th Cir. 1996) (holding that district court was not obligated to give proposed self-defense instruction and making clear that general availability of affirmative defenses "must accommodate a citizen's duty to accede to lawful government power"); cf. United States v. Dorrell, 758 F.2d 427, 434 (9th Cir. 1985) ("[I]t does not follow that the law should excuse criminal activity intended to express the protestor's disagreement with positions reached by the lawmaking branches of the government."); United States v. Kopp, 562 F.3d 141 (2d Cir. 2009) (affirming district court's exclusion of affirmative defense proposing justification based on contention that defendant was acting to save lives of "innocent third party children by preventing [legal] abortions").  Defendant's subjective opinion that the force was unlawful does not make it so.

With respect to the necessity defense, defendant has not offered competent evidence that it was objectively reasonable to anticipate a causal relationship between the alleged cyber attack and the purported harm to be averted.  Defendant has offered no competent evidence to demonstrate that he reasonably expected a DDOS interruption to lead to the release of Ms.

Pelletier.  In his opposition memorandum, he asserts that the disruption would "certainly get the attention of the alleged abusers", thereby improving Ms. Pelletier's chances for release. Gottesfeld acknowledges that he did not expect the attack would cause the desired effect, as is required, but rather that the attack would lead to publicity which could potentially improve the chances that Ms. Pelletier would get relief at some uncertain time in the future. See, e.g., Dorrell, 758 F.2d at 434 (holding that defendant could not establish as a matter of law that his spray-painting of government property could be reasonably anticipated to lead to the termination of a missile program and the aversion of nuclear war and world starvation). That causal connection is too attenuated to meet the requirement of a necessity defense.  See Maxwell, 254 F.3d at 28 ("He cannot will a causal relationship into being simply by the fervor of his convictions (no matter how sincerely held).") (citing United States v. Montgomery, 772 F.2d 733, 736 (11th Cir. 1985)).

Defendant also fails to elucidate that there were no legal alternatives to the alleged cyber attack.  The necessity defense requires that the defendant show that the emergent crisis precluded all options but the one taken. Maxwell, 254 F.3d at 28.  The fact that a defendant is "unlikely to effect the changes he desires through legal alternatives does not mean, ipso facto, that those alternatives are nonexistent". Id. at 29

(citing Dorrell, 758 F.2d at 432).  When considering whether
there were viable legal alternatives, a court must assess a
defendant's proffered evidence about the availability of those
alternatives objectively. See United States v. Schoon, 971 F.2d
193, 198 (9th Cir. 1991).

Gottesfeld does not, and presumably cannot, demonstrate
that there were no legal alternatives to the alleged cyber
attack under the circumstances.  In his opposition memorandum,
he acknowledges some of those alternatives but complains of
their ineffectiveness.  For example, he maintains that Ms.
Pelletier's parents had already called law enforcement and that
public protest and writing a member of Congress "cannot always
be counted on to address a serious, ongoing harm".  Although
such actions may not always be effective, defendant apparently
concedes that legal alternatives did, in fact, exist.  The
ineffectiveness of available alternatives does not negate their
existence. Maxwell, 254 F.3d at 29; see also United States v.
Posada-Rios, 158 F.3d 832, 874 (5th Cir. 1998) ("As long as
defendant's crises permitted a selection from among several
solutions, some of which did not involve criminal acts, . . .
the necessity defense must fail." (internal citation omitted).

Defendant maintains that other parties had pursued legal
alternatives and had failed.  Even if the ineffectiveness of
such alternatives was sufficient to justify the illegal action,

which it was not, Gottesfeld has not proffered evidence that he pursued any legal alternative or communicated with any person who had explored those alternatives. See e.g., United States v. Dicks, 338 F.3d 1256, 1258 (11th Cir. 2003) (affirming district court's exclusion of necessity defense where appellant had not "avail[ed] himself of [a] viable legal alternative").

In his opposition memorandum and throughout oral argument, defendant suggested that his proffered evidence was admissible and sufficient to maintain the proposed affirmative defenses because it would demonstrate defendant's state of mind at the time of the alleged cyber attacks.  Defendant's proffered evidence does not, however, show that it was objectively reasonable to believe that (1) Ms. Pelletier had been subjected to unlawful force, (2) there were no viable legal alternatives or (3) that defendant's actions would cause the desired outcome. See, e.g., United States v. Perdomo-Espana, 522 F.3d 983, 987 (9th Cir. 2008) (assessing defendant's proffered necessity defense through an objective framework); United States v. Acosta-Sierra, 690 F.3d 1111, 1126-27 (9th Cir. 2012) (affirming exclusion of mental health evidence that would have explained defendant's subjective belief that self defense was necessary, but "would not have supported the proposition that his actions were objectively reasonable").

At oral argument, counsel for defendant repeatedly suggested that he "would be willing to find" additional admissible evidence in support of the proposed affirmative defenses.  In his opposition memorandum, he similarly states that

> he reserves the right to present additional facts, arguments, and information to the Court at later points in connection with subsequent requests for reconsideration.

Defendant has not proffered any competent evidence that would support his proposed affirmative defenses.  The Court will not engage in unlimited dialogue on the subject.  If defendant has competent evidence that would support reconsideration of this preclusion of his affirmative defenses, he is directed to submit it forthwith.

Accordingly, the motion in limine will be allowed and defendant will be precluded from introducing evidence of the affirmative defenses of necessity or defense of another.  The Court will not, however, preclude the defendant from testifying, if he chooses to do so, as to his version of events.  Nor will the Court preclude the introduction of otherwise relevant, non-hearsay testimony in support of Gottesfeld's defense.

### III. Defendant's Motion to Dismiss (Docket No. 164)

Defendant moves to dismiss the indictment for alleged violations of the Speedy Trial Act, 18 U.S.C. § 3161 and the speedy trial provisions of Fed. R. Crim. P. 48(b)(1).  He

-13-

contends that more than 30 non-excludable days elapsed between his arrest on February 17, 2016 in the Southern District of Florida and his indictment on October 19, 2016 in the District of Massachusetts.  If he is correct, that would be a violation of 18 U.S.C. § 3161(b).  First, defendant suggests that the orders entered by another session of this Court in Case No. 16-mc-91064-ADB are insufficient to exclude the purported days because (1) the orders were not made in the record of this case but rather in a sealed civil docket, (2) the Court did not set forth its reasons for finding that the ends of justice would be served by the continuance, (3) the orders were improperly backdated and (4) Attorney Tor Ekeland had no authority to assent to the motions because he had not entered an appearance on the sealed civil docket.

The government responds that all but 26 days were properly excluded between the time of defendant's arrest and his indictment and that, accordingly, there has been no violation of § 3161(b).  The government also maintains that (1) pre-indictment motions to exclude are properly made on the Miscellaneous Business Docket, (2) it properly obtained effective consent from defendant's counsel, (3) there was no improper backdating and (4) the orders on the motions to exclude adopted the content of the assented-to motions thereby

satisfying the reason-giving requirements of the Speedy Trial Act.

The Speedy Trial Act provides, in relevant part, that

> [a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested.

18 U.S.C. § 3161(a).  The purpose of the thirty day requirement is to ensure "that the defendant is not held under an arrest warrant for an excessive period without receiving formal notice" of the charge made against him. United States v. Spagnuolo, 469 F.3d 39, 42 (1st Cir. 2006) (quoting United States v. Meade, 110 F.3d 190, 200 (1st Cir. 1997) (internal quotation marks omitted)).

The Speedy Trial Act provides a detailed list of periods of delay that may be properly excluded including, for example, "delay resulting from other proceedings concerning the defendant". 18 U.S.C. § 3161(h); see also Zedner v. United States, 547 U.S. 489, 497 (2006).  The statutory scheme also permits a district court to grant a continuance and exclude a delay where the judge finds that

> the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).

In defendant's case, if more than 30 non-excludable days elapsed between the date of defendant's arrest in the Southern

-15-

District of Florida on February 17, 2016, and the date of
defendant's indictment on October 19, 2016, the case "shall be
dismissed". 18 U.S.C. § 3162(a)(1).  The parties agree that ten
days within the relevant statutory period are properly excluded
under § 3161(h)(1)(F), which provides for an exclusion of no
more than ten days as a result of delay from transportation of
defendant from another district.  That provision applies to
defendant by virtue of his transport from the Southern District
of Florida to this District and the time between February 17,
2016 and February 27, 2016 is therefore properly excluded.  The
first motion for excludable delay was filed on March 1, 2016,
properly excluding the day of March 1, 2016, pursuant to 18
U.S.C. § 3161(h)(1)(D).

Orders were entered in another session of this Court, Case
No. 16-mc-91064, excluding time between:

  - March 18, 2016 and April 22, 2016 (Docket No. 2),
  - April 22, 2016 and May 27, 2016 (Docket No. 5),
  - May 26, 2016 and July 1, 2016 (Docket No. 7),
  - July 1, 2016 and August 1, 2016 (Docket No. 9),
  - August 1, 2016 to September 9, 2016 (Docket No. 11, 12),
  - September 9, 2016 and October 10, 2016 (Docket No. 14).

Non-excluded time elapsed during three periods: (1) February 28,
2016 through February 29, 2016; (2) March 2, 2016 through March
17, 2016 and (3) October 11, 2016 through October 18, 2016, for
a total of 26 non-excludable days.  The challenges made by

defendant to the exclusions entered on the docket are
unpersuasive.

### A. Use of the Miscellaneous Business Docket

Pursuant to 18 U.S.C. § 3165, each district is required to
prepare a plan for the disposition of criminal cases consistent
with the time standards of the Speedy Trial Act.  Under the plan
for the District of Massachusetts, pre-indictment motions for a
continuance are properly filed with the judge assigned to "the
miscellaneous business docket". Plan for the Prompt Disposition
of Criminal Cases, District of Massachusetts, ¶ 5(c)(1)(A).

Defendant contends that the District Plan violates the
provision of the Speedy Trial Act that any ends-of-justice
continuance include oral or written findings "in the record of
the case". 18 U.S.C. § 3161(h)(7(A).  The cases relied upon by
defendant concern challenges to the Speedy Trial Act's post-
indictment provision, 18 U.S.C. § 3161(c)(1), requiring that the
trial of a defendant shall commence within 70 days from the
filing of the information or indictment. See Zedner, 547 U.S. at
492 ("In this case, petitioner's trial did not begin within 70
days of indictment."); Bloate v. United States, 559 U.S. 196,
199 (2010).  This Court declines to second guess the District
Plan and its recognition of the importance of the secrecy of
grand jury proceedings.  Accordingly, the Court finds that pre-

indictment continuances were made properly here on the
miscellaneous business docket.

### B. Validity of Consent from Predecessor Counsel

In addition to challenging the docket under which the
motions to exclude time were filed, defendant contends that the
motions were essentially made _ex parte_ because defendant's
attorney, Tor Ekeland, was not authorized to assent thereto.
Defendant avers that, because Attorney Ekeland was not a member
of the Massachusetts Bar nor admitted to practice in the
District in Case No. 16-mc-91064, he was not qualified to act as
counsel and assent to any motion to exclude time.

In response, the government contends that defendant
improperly conflates an attorney's authority to communicate (or
enter into an agreement) with the government on behalf of a
client with an attorney's obligation to file a motion to be
admitted to practice before this Court.  Attached to the
government's opposition memorandum are communications between
the government and Attorney Ekeland purporting to assent, on
behalf of defendant, to the government filing of motions for
excludable delay.

A review of those communications indicate that Attorney
Ekeland's assent was valid.  Under the local rules of this
District, an attorney who is a member of the bar of another
United States District Court or the highest court of any state

-18-

"may appear and practice in this court in a particular case by leave granted in the discretion of the Court". <u>Local Rules of the United States District Court for the District of Massachusetts</u>, Rule 83.5.3.  Attorney Ekeland informed the government of his intent to file a motion for admission <u>pro hac vice</u> in this District and was admitted by motion in Case No. 16-mj-4117 by Magistrate Judge Bowler in April, 2015.

The fact that Attorney Ekeland did not file an appearance on the miscellaneous business docket does not negate his assent to excludable delays on behalf of his client or somehow transform such motions into <u>ex parte</u> requests by the government. The assent given to the government to file a motion for excludable delay did not amount to "practice before the Court" under Massachusetts Local Rule 85.5.3.

**C. Alleged Backdating**

Defendant further challenges the exclusions on the grounds that the orders purported to exclude time through improper backdating on two occasions: (1) the second motion to exclude time, filed on April 11, 2016, purported to exclude time from April 22, 2016 through May 27, 2016, but was not granted until May 5, 2016 and (2) the fifth motion to exclude time, filed on July 26, 2016, purported to exclude time from August 1, 2016 through September 9, 2016 but was not granted until August 2, 2016.  Defendant contends that 14 days were improperly backdated

which, when added to the additional unexcluded days, puts the total at over 30 days.

The Speedy Trial Act provides that any delay resulting from the filing of a pretrial motion "through the conclusion of the hearing on, or other prompt disposition of, such motion" shall be excluded. 18 U.S.C. § 3161(h)(1)(D). The time between the filing of the motions and the resolution of those motions is properly excluded under that subsection and the orders of the district judge did not therefore improperly allow retroactive exclusions of time. The cases relied on by defendant are inapposite. In United States v. Janik, 723 F.2d 537, 545-46 (7th Cir. 1983), for example, the Seventh Circuit Court of Appeals reversed a district court's order denying a defendant's motion to dismiss where the district judge had retroactively declared an ends-of-justice continuance to exclude time that had elapsed during a period of time in excess of 60 days that the court had a motion to suppress under advisement. In denying a motion to dismiss, the district judge retroactively declared that the time should have been excluded even though there had been no motion to exclude filed during the pendency of the suppression motion. Id. Here, the government had properly filed motions, with defendant's assent, to exclude time and those motions were allowed after the period the parties sought to exclude had begun to run.

**D. Adoption of Content of Motions**

Defendant objects that the orders excluding time are also invalid because they fail to set forth the reasons for finding that the ends of justice would be served by the granting of the requested continuances.  The electronic endorsements of the assented-to motions, defendant avers, do not adequately explain their reasoning as is required by statute.  The government responds that the electronic endorsements adopted the reasoning set forth in the motions.

Under 18 U.S.C. § 3161(h)(7)(A), a Court may grant a motion for a continuance based on findings that "the ends of justice served by taking such action outweigh the best interest" of the defendant and public in a speedy trial.  Pursuant to that subsection, a judge is required to set forth "its reasons for finding that the ends of justice" would be served by such a continuance. Id.  The statute lists four factors that a judge can consider in determining whether a continuance would be in the interests of justice but makes clear that the list is non-exhaustive. § 3161(h)(7)(B).

Each of the assented-to motions explains that defendant, through his attorney, was engaged in plea negotiations with the government.  With respect to the first motion, defendant was being transported from Florida to this District, necessitating

additional time to allow parties to discuss a plea.  The third, fourth and fifth motions make clear that the parties agreed to wait for the detention decision of the magistrate judge before resuming plea negotiations.  The sixth assented-to motion made the timeline clear, noting that because the detention order was entered the motion was likely the final one

Defendant's contention that the orders do not properly exclude time because they do not state the reasons for exclusion is unavailing.  The First Circuit has made clear that a court need not "articulate the basic facts when they are obvious and set forth in a motion for a continuance". United States v. Pakala, 568 F.3d 47, 60 (1st Cir. 2009) (quoting United States v. Rush, 738 F.2d 497, 507 (1st Cir. 1984)).  As in Pakala, it is clear here that the district judge presiding over the miscellaneous business docket "necessarily adopted" the grounds presented in the assented-to motions. Id. (citing United States v. Bruckman, 874 F.2d 57, 62 (1st Cir. 1989)).

Defendant is judicially estopped from adopting a position that is clearly inconsistent with his earlier assent to the motions for exclusion of time. Id. (citing Zedner, 547 U.S. at 504) (finding that defendant was judicially estopped from seeking the advantages of the continuances at one stage and then challenging those continuances at a later stage of the case). When determining whether a party is judicially estopped, a court

-22-

must consider whether the party "seeking to assert an inconsistent position would derive an unfair advantage" if not estopped. Zedner, 547 U.S. at 504.

The plea negotiations here that served to justify the interest of justice exclusions of time inured to the defendant's potential benefit.  The First Circuit has left open the question of whether plea negotiations are appropriate grounds for an exclusion under 18 U.S.C. § 3161(h)(7)(A). United States v. Souza, 749 F.3d 74, 80 (1st Cir. 2014) ("[W]e have expressly left open the issue whether periods of plea negotiations can properly be excluded."). Other courts have accepted plea negotiations as a valid rationale for an ends-of-justice continuance. See e.g., United States v. Fields, 39 F.3d 439, 445 (3d Cir. 1994) ("We therefore see no reason why an 'ends of justice' continuance may not be granted in appropriate circumstances to permit plea negotiations to continue."); cf. United States v. Mathurin, 690 F.3d 1236, 1242 (11th Cir. 2012) (noting that while a delay resulting from plea negotiations is not automatically excludable under § 3161(h)(1)(G), an ends-of-justice continuance may be appropriate under § 3161(h)(7)(A)).

Defendant here, through counsel, indicated that he was "seriously considering" a plea agreement.  The parties had reached an advanced stage of plea negotiations where an agreement was drafted and defendant was considering that

-23-

agreement.  Under the circumstances, the Court finds that the
orders excluding time were appropriate under the ends-of-justice
provision of the Speedy Trial Act and that defendant is
judicially estopped from advancing a position contrary to his
earlier assent.

For the foregoing reasons, defendant's motion to dismiss
was previously denied.

## IV. Defendant's Motion to Suppress, Supplemental Motion to Suppress and Second Supplemental Motion to Suppress (Docket Nos. 78, 128 and 166)

Defendant moves to suppress evidence obtained as a result
of the execution of a search warrant for defendant's apartment
and as a result of a Pen Register/Trap and Trace order.
Defendant, through counsel, filed his first motion to suppress
in August, 2017.  Successor counsel filed a supplemental motion
to suppress in March, 2018 and defendant's fourth attorney, who
currently represents Gottesfeld, filed a second supplemental
motion to suppress in May, 2018.  The government opposes the
motion and both its supplements.

### A. Recusal of Magistrate Judge

In defendant's first and second supplemental motions to
suppress, he suggests that evidence seized pursuant to the Pen
Register/Trap and Trace order and the search warrant must be
excluded because Magistrate Judge Bowler was required to recuse
herself from this case by virtue of her spousal relationship and

-24-

her role in The Boston Foundation ("TBF").[1]  Defendant submits that the "good faith" exception does not apply in the absence of a neutral and detached magistrate.

The government responds with an affidavit of TBF Corporate Secretary, Timothy Gassert, confirming that Magistrate Judge Bowler had no role in TBF when the warrant was issued and that the Director Emeritus title conferred weeks later was merely honorific.  With respect to Magistrate Judge Bowler's spousal relationship, the government maintains that the fact that her husband has a relationship with Harvard Medical School ("HMS") provided no ground for recusal in this case.

A magistrate judge issuing a search warrant must be a "neutral, detached officer capable of determining whether probable cause existed".  United States v. Soule, 908 F.2d 1032 (1st Cir. 1990) (internal citation omitted).  Where a magistrate judge does not have the requisite neutrality and detachment she "cannot provide valid authorization for an otherwise

---

[1] In his reply memorandum in support of his second supplemental motion to suppress, defendant requests leave "to address additional issues, if not in writing, than [sic] at the scheduled hearing on the matter".  At the June 13, 2018 motion hearing, this Court granted leave to Attorney Grimaldi to address additional issues orally at the hearing provided that he did so within the time restrictions imposed for oral argument. In at least one post-hearing pleading, Attorney Grimaldi implies that the Court granted him leave to file a "supplemental brief concerning suppression".  That is incorrect.  Defendant has, to date, submitted in excess of 70 pages in support of his motion to suppress which is deemed sufficient.

unconstitutional search". United States v. Leon, 468 U.S. 897, 914 (1984).  Courts have found that a magistrate's involvement violated those requirements where (1) the magistrate had a pecuniary interest in issuing the warrant, Connally v. Georgia, 429 U.S. 245, 251 (1977) or (2) the magistrate had active involvement in the investigation underlying the warrant, Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327-28 (2009).

Pursuant to 28 U.S.C. § 455(a), any justice, judge or magistrate judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned".  A separate section of that statute sets out specific situations where recusal is required including where the magistrate judge "has personal bias or prejudice", § 455(b)(1) or where the magistrate judge or his/her spouse or minor child "has a financial interest in the subject in controversy", § 455(b)(4). Where the question is a close one, the First Circuit has noted that "the balance tips in favor of recusal". In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001).

Defendant's assertions that Magistrate Judge Bowler was required to recuse herself are unavailing.  With respect to her purported involvement in TBF, the affidavit of Mr. Gassert submitted by the government makes clear that Magistrate Judge Bowler had no involvement in the organization at the time the

warrant was issued.  Accordingly, that ground for recusal is without merit.

Defendant also contests Magistrate Judge Bowler's neutrality because of her spousal relationship with Dr. Marc A. Pfeffer, a professor of medicine at HMS and a senior cardiologist at Brigham and Women's Hospital ("the Brigham"). Defendant suggests that recusal was required because the affidavit in support of the search warrant referred to

> disruptions to the BCH website and additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate.

(emphasis added).  He concludes that the reference to "Harvard University-affiliated hospitals" gave Dr. Pfeffer a financial interest in the subject of the warrant.  Defendant's attempt to amalgamate distinct legal entities does not create a financial interest where that interest does not exist.  The government convincingly demonstrates that HMS is not an affiliate of area hospitals in the sense that there is a business relationship with the hallmarks of legal control, but rather that the affiliation relates to the training of medical students and residents.

Furthermore, under 28 U.S.C. § 455(b)(4), an organizational victim of a crime is not a "party to the proceeding" such that a financial interest in that victim would require recusal. United States v. Rogers, 119 F.3d 1377, 1384 (9th Cir. 1997); United

-27-

States v. Lauersen, 348 F.3d 329, 336 (2d Cir. 2003) (declining
to adopt per se rule requiring recusal in every case where judge
has interest in victim of a crime).  Accordingly, even if Dr.
Pfeffer had a financial interest in one of alleged victims of
this case, BCH or Wayside, by virtue of his relationship to HMS
and the Brigham (which it is clear he does not), that interest
would not require disqualification here.

Defendant grasps at other potential interests in an attempt
to manufacture a rationale requiring recusal.  For instance, he
notes that Dr. Pfeffer is on the faculty of the Brigham's
"Division of Medical Communications", and infers from that title
that his work would suffer from a disruption to the network on
which BCH and Harvard-affiliated hospitals communicate.  The
government responds that the Division of Medical Communications
focuses on physician communication skills and that defendant has
offered no evidence that a cyber attack on a computer network
seriously implicates Dr. Pfeffer's work in any way.  This Court
agrees.

As noted at a May 3, 2018 hearing on an unrelated motion,
Magistrate Judge Bowler's recusal in Cabi v. Boston Children's
Hospital, Case No. 15-cv-12306, is inapposite.  In that case,
Magistrate Judge Bowler was assigned to the case for nearly two
years during which time she considered and decided a number of
pending discovery motions and held seven hearings on those

pending motions.  Only after HMS became directly involved in the case did Magistrate Judge Bowler recuse herself from the case with the following comment:

> As discovery has progressed, it has become apparent that the connection of this action to the Harvard Medical School is more direct than originally anticipated.  For example, plaintiffs are seeking documents directly from Harvard Medical School which defendants move to quash.

Case No. 15-cv-12306 (Docket No. 221).  The relationship to HMS here is tenuous, at best, and recusal was not required here. See In re Boston's Children First, 244 F.3d at 167 (finding "disqualification appropriate only when the charge is supported by a factual basis, and when the facts asserted provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality") (quoting In re United States, 666 F.2d 690, 694 (1st Cir. 1981) (internal quotation marks omitted)).

**B. Pen Register/Trap and Trace Order**

On July 17, 2014, the government obtained a Pen Register/Trap and Trace order ("the PRTT order") allowing it to collect IP addresses used to send communications to, and receive communications from, defendant's IP address for a period of 60 days.  That order also permitted the collection of subscriber information associated with each communicating IP address.  In its search warrant application, the government noted that defendant was using a VPN through the website www.riseup.net and

a TOR network, information that it had gathered from the PRTT order.  In September, 2014, the government obtained a search warrant to search defendant's apartment.

Defendant seeks to suppress all evidence gathered during execution of the search warrant and any information obtained as a result of the seizure of those items.  In his original and first supplemental motions to suppress, he contends that, notwithstanding authority to the contrary, the PRTT order exceeded statutory authority and constituted a search and seizure within the meaning of the Fourth Amendment to the United States Constitution.

The Pen Register/Trap and Trace statute ("the PRTT statute") permits installation of a "pen register", or a device that "records or decodes dialing, routing, addressing, or signaling information" transmitted by an instrument from which a wire or electronic communication is transmitted. 18 U.S.C. § 3127(3).  The statutory scheme precludes collection of the "contents of any communication".  Id.  A "trap and trace" device is a device or process that

> captures the incoming electronic or other impulses which
> identify the originating number or other dialing, routing,
> addressing, and signaling information reasonably likely to
> identify the source of a wire or electronic communication.

Id. § 3127(4).  A trap and trace device is also precluded from capturing the "contents of any communication".  Id.  To apply for

an order authorizing either device, the government must certify that the information "likely to be obtained is relevant to an ongoing criminal investigation". 18 U.S.C. § 3122(b)(2).

The PRTT order here permitted the installation of a pen register and trap and trace device to trace the source of electronic communications directed to or originating from the account providing internet service to defendant's apartment. The order authorizing the installation of the pen register/trap and trace device was entered on July 17, 2014 by Magistrate Judge Jennifer C. Boal.  Defendant claims that the PRTT order violated the Fourth Amendment because he had a reasonable expectation of privacy in the IP address routing information.

The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court has held that a person does not have a legitimate expectation of privacy in information voluntarily turned over to third parties, including phone numbers dialed in placing a telephone call which can be captured by a pen register. Smith v. Maryland, 442 U.S. 735, 743-44 (1979). Courts have extended the third party doctrine to the collection

of information by internet service providers such as IP addresses because internet users are similarly relying on third-party equipment. See United States v. Forrester, 512 F.3d 500, 510 (9th Cir. 2008); United States v. Ulbricht, 858 F.3d 71, 97 (2d Cir. 2017) ("The recording of IP address information and similar routing data, which reveal the existence of connections between communications devices without disclosing the content of the communications, are precisely analogous to the capture of telephone numbers at issue in Smith.").

The collection of IP address information here was similarly "devoid of content", Ulbricht, 858 F.3d at 97, and is therefore "constitutionally indistinguishable from the use of a pen register", Forrester, 512 F.3d at 510.  This Court declines to accept defendant's invitation to depart from the growing consensus that the collection of IP address information similar to the information collected here does not violate a defendant's Fourth Amendment rights.

Defendant also contends that the IP addresses themselves constitute the content of his communications and that, therefore, the seizure of the information violated his Fourth Amendment rights.

The United States Supreme Court has set out a two-part test to determine whether a person has a legitimate expectation of privacy in the place searched or the item seized: (1) whether

the movant has exhibited an actual, subjective expectation of privacy and (2) whether that subjective expectation is "one that society is prepared to recognize as objectively reasonable". Smith v. Maryland, 442 U.S. 735, 740 (1979) (citing Katz v. United States, 389 U.S. 347 (1967)).

Defendant contends that he had a reasonable expectation of privacy and that he demonstrated his subjective expectation by using encryption services. Even if defendant demonstrates that he has a subjective expectation of privacy in the IP addresses, however, he cannot meet his burden with respect to the second part of the test. The recording of IP address information and similar routing data "are precisely analogous to the capture of telephone numbers at issue in Smith" and, therefore, defendant cannot show that "a reasonable person could maintain a privacy interest in that sort of information". Ulbricht, 858 F.3d 71, 97.

Defendant's statutory claim that the collection of IP addresses and port numbers constitutes "content" also falls short. See Forrester, 512 F.3d at 510 (holding that collection of IP address, constituting address information, "do not necessarily reveal any more about the underlying contents of communication than do phone numbers"); Ulbricht, 858 F.3d at 98 n.29 (making clear that holding is limited to capture of IP addresses and Transmission Control Protocol ("TCP") connection

data and does not include "more invasive surveillance techniques that capture more information (such as content)"). Defendant's claims under the Stored Communications Act, 18 U.S.C. § 2703(d) and the Wiretap Act, 18 U.S.C. § 2510 are similarly futile. The PRTT order here provides for the collection of a PRTT device where information obtained will likely be relevant "to an ongoing criminal investigation", 18 U.S.C. § 3122(b)(2) and, as discussed above, the collection did not include any collection of "content".

Because the Court finds that the collection of IP address and port number information does not violate the Fourth Amendment or the statutory scheme, it need not consider whether the good-faith exception applies. Accordingly, all three motions to suppress will be denied.

## V. Defendant's Motions for Release from Custody (Docket Nos. 147 and 177)

In conjunction with his motion to dismiss, defendant filed two motions for release from custody seeking review, pursuant to 18 U.S.C. § 3145(b) of the order of detention entered by the magistrate judge assigned to this case on July 27, 2016. Defendant moves for revocation of that detention order because of the likelihood that he will prevail on his motions to suppress and to dismiss. As explained above, the Court will deny those motions and therefore finds no grounds to revoke the

detention order here.  After review of the record, the Court finds that the government has demonstrated, by a preponderance of evidence, that defendant constitutes a serious risk of flight under 18 U.S.C. 3142(f)(2)(A).  As stated in the order of the Court entered June 14, 2018 (Docket No. 205), the motions for release from custody are denied.

## ORDER

For the foregoing reasons, defendant's motions to suppress (Docket Nos. 78, 128 and 166) are **DENIED** and the government's motion in limine (Docket No. 116) is **ALLOWED.**

As noted in the foregoing memorandum, defendant's motions to dismiss (Docket No. 164) and for release from custody (Docket Nos. 147 and 177) were previously denied by order of the Court entered June 14, 2018 (Docket No. 205).


**So ordered.**


/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated June 19, 2018