UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No.: 16-cr-10305-NMG |
| | ) |
| MARTIN GOTTESFELD | ) |

MOTION FOR RECONSIDERATION

The defendant Martin Gottesfeld ("Mr. Gottesfeld") moves this Honorable Court for reconsideration of the Court's June 19, 2018 Memorandum and Order (Dkt. No. 209) ("Memorandum") and related orders from June 14, 2018 (Dkt. Nos. 205, 208). These decisions, *inter alia*, denied Mr. Gottesfeld's motion to dismiss, motions to suppress, and motion for release from custody. Mr. Gottesfeld requests reconsideration of these decisions. In support, the defendant incorporates by reference all of his previous arguments on these issues, and further states the following.

1. Reconsideration of these Issues is Proper

Reconsideration of these issues is proper. Although no rule of criminal procedure explicitly authorizes motions for reconsideration in criminal cases, our courts recognize the legitimacy of "a timely motion for rehearing or reconsideration of a judgment in a criminal case..." United States v. Morillo, 8 F.3d 864, 868 (1st Cir.1993); see also United States v. Healy, 376 U.S. 75, 78-79 (1964) ("We have recently recognized the appropriateness of petitions for rehearing . . . in criminal cases. . . The practice of the Court has been to treat such petitions as having the same effect . . . as do similar petitions in civil cases. . . ."); also United States v. Gorski, 36 F. Supp.3d 256, 263-264 (2014 D.) (Saylor, J.).

In United States v. Sampson,148 F.Supp. 3d 127 (2015) (Wolf, J.) the standard for reconsideration was provided as follows:

---

*Handwritten annotation:*

Motion denied (with respect to the motion to suppress, the recent decision ~~was~~ of the United States Supreme Court in Carpenter v. United States, 2018 WL 3073916, at *28-29 (June 22, 2018)(Kennedy, J., dissenting) does not extend Fourth Amendment protection to IP addresses)

/s/ NMGorton, USDJ 6/29/18

Case 1:16-cr-10305-NMG   Document 222   Filed 06/29/18   Page 2 of 20
Case 1:16-cr-10305-NMG   Document 213   Filed 06/27/18   Page 2 of 20

"[D]istrict courts have the inherent authority to reconsider their interlocutory orders outside the sentencing context." United States v. Bravo-Fernandez, 790 F.3d 41, 61 n. 14 (1st Cir. 2015). The First Circuit has articulated a three-part test to be employed by district courts in deciding motions to reconsider. A district court may grant a motion for reconsideration "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." United States v. Cintron, 724 F.3d 32, 36 n. 5 (1st Cir. 2013) (quoting United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009).

148 F. Supp. 3d 127 (2015). (Wolf. J.)

For the reasons stated *infra*, the Court's decisions on dismissal and bail were based on a manifest error of law and clearly unjust. United States v. Cintron, 724 F.3d 32, 36 n. 5 (1st Cir. 2013). Further, the Court's decision on suppression must be reconsidered in light of an intervening change in the law, *viz.* the Supreme Court's June 22, 2018 decision in Carpenter v. United States, 585 U.S. ___ (2018) (2018 U.S. Lexis 3844).

2. Motion to Dismiss

   a. Use of the Miscellaneous Business Docket

In its Memorandum, the Court recognized that the Speedy Trial Act ("the Act") requires that "any ends-of-justice continuance include oral or written findings 'in the record of the case'". Memorandum at 17 (citing 18 U.S.C. §3161 (h)(7)(A)); see also Zedner v. United States, 547 U.S. 489 (2006). In this case, no pre-indictment ends-of-justice continuances were made "in the record of the case" in the two-hundred forty six (246) days between Mr. Gottesfeld's arrest on February 17, 2016 and his indictment on October 19, 2016. Importantly, Congress made no distinction between pre-indictment and post-indictment ends-of-justice continuances when enacting §3161(h)(7(A)'s

2

mandate of oral or written judicial findings "in the record of the case"; under the Act, *all* ends-of-justice continuances require oral or written findings "in the record of the case."

This Court, however, erroneously inserts into §3161(h)(7)(A) a distinction between pre- and post-indictment ends-of-justice exclusions by reference to the 2008 Plan for the Prompt Disposition of Criminal Cases, District of Massachusetts, §5(c)(1)(A). Memorandum at 17-18; see also District Plan at http://www.mad.uscourts.gov/caseinfo/pdf/122008GenOrd08-5.pdf (last accessed June 23, 2018). This distinction is a manifest error of law, clearly unjust, and requires reconsideration. Cintron, 724 F.3d at 36 n. 5. The Act's plain requirement that all ends-of-justice findings must be made "in the record of the case," here criminal case 16-mj-4117-MBB, clearly supersedes any claimed authority in a local District Plan to allow exclusion in a separate sealed civil miscellaneous business docket before a different judge, here 16-mc-91064-ADB. See also Zedner v. United States, 547 U.S. 489 (2006).

The Supreme Court decided Zedner ten (10) years before the relevant procedural history in this matter. Id. In Zedner the Court held that ends-of-justice exclusions (at that time governed by §3161(h)(8) of the Act) may only be made "within limits and subject to specific procedures." Id. at 499.

In light of the "limits and specific procedures" recognized by Zedner, the Memorandum commits a manifest error of law by privileging a local District Plan over the §3161(h)(7)(A)'s requirement of findings "in the record of the case." In fact, the present case is remarkably similar to the issue in Zedner. In Zedner the Court found it "significant that §3161(a)(2) makes no mention of prospective waivers, and there is no reason to think that Congress wanted to treat prospective and retrospective waivers

3

similarly. Allowing prospective waivers would seriously undermine the Act... to the detriment of the public interest." Id. at 502. Similarly, it is significant in the present case that neither §3161(h)(7)(A) nor any other provision of the Act allows a party to seek, or a Court to grant, ends-of-justice exclusions (or any other continuance) in a sealed civil miscellaneous business docket before a different judge than the criminal case. Instead, the Act requires all ends-of-justice findings to be made by the judge presiding in the ongoing criminal case. The interests of litigants, the Court, and the public are served by the regularity and transparency provided in Congress's unambiguous requirement of findings "in the record of the case." The District Plan cannot undermine the plain and clear meaning and intention of the Act.

Further, the District Plan was adopted before the Supreme Court's precedential decision in Bloate v. United States where the Court strictly interpreted the language of the Act, recognizing that the "statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." 559 U.S. 196, 209 (2010). This Court attempts to distinguish both Zedner and Bloate by noting that those Supreme Court decisions concerned post-indictment ends-of-justice exclusions. Memorandum at 17. But Congress recognized no distinction between pre- and post-indictment exclusions of time in § 3161(h)(7(A). Indeed, since Congress clearly made such distinctions in the Act in other contexts (e.g., § 3161(b)'s thirty day pre-indictment requirements versus §3161(c)(1)'s seventy day post-indictment requirements), the absence of any distinctions in §3161(h)(7(A) concerning pre- and post-indictment periods demonstrates Congress's intent that §3161(h)(7)(A) apply to *all* ends-of-justice continuances, both pre- and post-indictment.

4

As the defense has previously acknowledged, the only circumstances in which the District Plan might lawfully authorize orders to exclude time in the ends-of-justice on a docket other than the criminal docket is when in fact *there is in fact no criminal docket*, but instead the government is proceeding by direct indictment. See Dkt. No. 170 at 4 n.2. However, where as in this case there was a criminal docket, §3161(h)(7)(A) precluded any ends-of-justice findings on a sealed civil miscellaneous business docket. The "importance of the secrecy of grand jury proceedings" cited by the Court in the Memorandum, if present at all in this case, could just as easily have been addressed, as so often occurs, by filings under seal in the criminal case. Memorandum at 17; see also Dkt. No. 170 at 4 (acknowledging same).

Respectfully, this Court's decisions are a manifest error of law and a clearly unjust ruling. United States v. Cintron, 724 F.3d at n. 5. Mr. Gottesfeld requests the Court reconsider its previous decisions and allow his motion to dismiss.

### b. Tor Ekeland's Unlicensed and Unadmitted Status

In its Memorandum, the Court wrote:

> The fact that Attorney Ekeland did not file an appearance on the miscellaneous business docket does not negate his assent to excludable delays on behalf of his client or somehow transform such motions into ex parte requests by the government. The assent given to the government to file a motion for excludable delay did not amount to "practice before the Court" under Massachusetts Local Rule 85.5.3.

Memorandum at 19.

The Court decides, without citation to case law, that an unlicensed, unadmitted lawyer may assent to written motions by the government to exclude time under the Speedy Trial Act *and* that a Court may rely on that assent in deciding such filed motions.

The Court's decision is clear error, manifestly unjust, and must be reconsidered. United States v. Cintron, 724 F.3d at n. 5.

First, Mr. Ekeland had no authority to "assent" to the government's motions, and any purported "assent" was surely "practice before the Court." Undoubtedly, Mr. Ekeland would be barred from *filing* motions to exclude time on behalf of Mr. Gottesfeld (or on any other topic) before admission to the District, since filing motions is "practice before the Court." Since he was barred from filing motions before the Court, unlicensed and unadmitted counsel could not provide legal *assent* to the government's motions before the Court.

Second, the Memorandum begs the question of whether an unlicensed, unadmitted lawyer may take a contrary view, i.e. *object*, to the government's ends-of-justice request for exclusion under § 3161(h)(7(A) in a filing with the Court. The answer, of course, is no: an objection to a government motion for an ends-of-justice exclusion by an unadmitted lawyer would surely be "practice before the Court" just as clearly as an "assent" to such a motion. An unlicensed and unadmitted lawyer is in no position to either object or assent to ends-of-justice continuances, or any other continuances under the Act.

One of the significant problems presented by the Memorandum is that, on the one hand, the Court rules that Mr. Ekeland did not "practice before the Court" when he "assented" to the government's motions (Memorandum at 19) to exclude time, but then cites the quintessentially homegrown District Plan as justification for its ruling on the contested propriety of the miscellaneous business docket as a means for excluding that same time (Memorandum at 17). If counsel from out-of-District did not "practice before

6

the Court" as found in the Memorandum, then it is fundamentally unfair and a due process violation to then use a local District Plan – which Mr. Ekeland has no reason to be familiar with, particularly where it conflicts with the Supreme Court's prior decisions in Zedner and Bloate - to judicially estop Mr. Gottesfeld from arguing violations of §3161(h)(7(A)'s requirement of findings "in the record of the case."

Indeed, Mr. Ekeland's unlicensed and unadmitted status relates to the question of judicial estoppel discussed *infra*. In Zedner, the Supreme Court noted that in examining claims of estoppel, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position." Zedner, 547 U.S. at 504, (quoting New Hampshire v. Maine, 532 U.S. 742, 750-51, (2001)). Clearly, however, Mr. Ekeland did not and could not "persuade" the Court to do anything: he did not file an appearance; he did not appear before Judge Burroughs; he did not even have access to the sealed civil docket in which the government filed its "assented-to" motions, and thus could not review the Electronic Orders and other entries in contention. Clearly, Mr. Ekeland did not persuade the Court of anything. And, perhaps above all else, Mr. Ekeland clearly could not "persuade" the Court of any position without engaging in "practice before the Court", which the Memorandum finds he did not do.

Unlicensed and unadmitted counsel could not "assent" to the government's motions, and the Memorandum pits a finding that Mr. Ekeland did not practice before the Court with findings it otherwise uses to justify its conclusions. The Court must reconsider its decision.

    c. <u>The Unavailability of Judicial Estoppel</u>

        i. <u>Reconsideration is proper where the government did not argue judicial estoppel and the matter has not been briefed or argued.</u>

Both in its opposition to the motion to dismiss (Dkt. No. 167) and at oral argument, the government failed to argue that Mr. Gottesfeld was judicial estopped from moving to dismiss under the Act. While the government did cite United States v. Pakala, 568 F.3d 47 (1st Cir. 2009) for other propositions (See Dkt. No. 167 at 12-13), the government never argued for judicial estoppel. In his Reply to the government's opposition (Dkt. No. 176), Mr. Gottesfeld noted that the government "did not claim judicial estoppel... because there is no claim to be made." Dkt. No. 176 at 6-7. At the later oral argument, the government did not dispute this contention and never argued for judicial estoppel.

The Memorandum is manifestly incorrect and clearly unjust to estop the defendant where the government waived the issue. Further, reconsideration of judicial estoppel is appropriate where the matter has never been raised by the government or substantially briefed and argued.

> ii. In *United States v. Scott*, 180 F.Supp. 3d. 88, 93 (2015), a case concerning the Speedy Trial Act, this Court (Gorton, J.) ruled that "judicial estoppel cannot override a statutory requirement." Supreme Court precedent requires the same holding here.

In United States v. Scott, a case concerning the Act, this Court (Gorton, J.) rejected the government's claim that the defendant "should be estopped from disputing the validity of the exclusion of periods of time when he had explicitly consented to and benefited from the exclusion and resulting continuance." 180 F.Supp. 3d. 88, 93 (2015). Instead, in Scott this Court ruled that "Judicial estoppel cannot, however, override a statutory requirement." Id. In support of this ruling, the Court even cited Pakala, 568

F.3d at 59-60 as "conditioning the availability of judicial estoppel on the district court's articulation of findings to support an 'ends of justice' continuance." Id.

This Court's prior ruling in Scott that "Judicial estoppel cannot... override a statutory requirement" is equally applicable to the present case. Id. Indeed, judicial estoppel cannot override §3161(h)(7)(A)'s requirement of oral or written findings "in the record of the case" as opposed to a separate sealed civil miscellaneous business docket before a different judge. Just as the defendant in Zedner could not prospectively waive the Act, Mr. Gottesfeld (or the government or the Court) cannot waive or otherwise dispel with the Act's requirement of findings "in the record of the case."

In Zedner the Supreme Court held "petitioner's (mistaken) agreement that Speedy Trial Act waivers are valid also does not provide a ground for estoppel. Petitioner did not 'succee[d] in persuading' the District Court to accept the proposition that prospective waivers of Speedy Trial Act rights are valid. On the contrary, it was the District Court that requested the waiver and produced the form for petitioner to sign." 547 U.S. at 505. The situation in Zedner is remarkably similar to the present case. Even if Mr. Gottesfeld allegedly "assented" (through unlicensed and unadmitted counsel) for ends-of-justice exclusions under the Act, any purported agreement that a filing in a sealed civil docket before a different judge might amount to valid exclusions was surely mistaken.

Further, just as in Zedner, Mr. Gottesfeld did not "succee[d] in persuading" that ends-of-justice exclusions could properly be made on a sealed civil docket. No lawyer ever argued the propriety of that issue before either District Judge Burroughs in 16-mc-91064-ADB or before Magistrate Judge Bowler in 16-mj-4117-MBB. Nor did Tor Ekeland ever discuss with the government in their email correspondence (Dkt. No. 167-1)

9

the obvious conflict between §3161(h)(7)(A)'s requirement for findings "in the record of the case" and the subsequent filings in a sealed civil case before a different judge. Indeed, Mr. Gottesfeld clearly did not persuade the Court or even *know about* the conflict between requirements of §3161(h)(7)(A) and the contrary practice here, as evidenced even by the government's motion to unseal the civil case. Dkt No. 164-3 at 29; see also Dkt. No. 122. Just as the District Court in Zedner erroneously provided the defendant with the prospective waiver form, here the District Plan erroneously provided a scheme for excluding time that directly conflicts with §3161(h)(7)(A) clear requirement for findings "in the record of the case." But Mr. Gottesfeld is an even even better position than the defendant in Zedner: here it was the government, *not Mr. Gottesfeld*, that filed the motions based on the erroneous provisions in the District Plan. If the defendant in Zedner could not be judicially estopped from arguing against the statutory violations of the District Court's waiver form *where he actually filed it*, Mr. Gottesfeld cannot be judicially estopped from arguing against the statutory violations District Plan *where he (allegedly) merely assented, and only then with unlicensed and unadmitted counsel.*

Just as in Zedner, consideration of other factors associated with judicial estoppel is unavailing: "And while the other relevant factors (clear inconsistency and unfair advantage or detriment) might in isolation support the Government, we think they do not predominate where, as here, the Government itself accepted the District Court's interpretation without objection." 547 U.S. at 505.

In Zedner, the Supreme Court noted that "this estoppel doctrine is equitable and thus cannot be reduced to a precise formula or test," but articulated several factors to consider in applying judicial estoppel:

10

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

547 U.S. at 504, (quoting New Hampshire v. Maine, 532 U.S. 742, 750-51, (2001)).

Even assuming valid consent to the motion, the defense's position is not "clearly inconsistent with its earlier position" within the meaning of precedent. For example, in Heckler v. Community Health Servs., 467 U.S. 51, 59 (1984), the Supreme Court conditioned judicial estoppel to situations where "one person makes a definite misrepresentation of fact to another person having reason to believe the other will rely upon it and the other in reasonable reliance upon it does an act" and is detrimentally affected by the definite misrepresentation. Here, of course, Mr. Gottesfeld was the non-moving party and unrepresented by licensed or admitted counsel; further, the defense never convinced the government (or anyone else) that the §3161(h)(7)(A)'s requirement for findings "in the record of the case" could or should be abandoned in favor of a local District Plan; it was *the government* who ignored the clear requirements of the Act. See also id at n.10.

This Court was correct in Scott to hold that "Judicial estoppel cannot… override a statutory requirement." 180 F.Supp. 3d. 88, 93 (2015). Supreme Court precedent requires the same conclusion here. The Court must, as in Scott, reject judicial estoppel. The indictment must be dismissed.

3. Motions to Suppress

    a. Reconsideration is proper in light of the Supreme Court's recent decision in *Carpenter v. United States*

11

In its Memorandum, the Court extended the third-party doctrine found in Smith v. Maryland, 442 U.S. 735 (1979) to decide that Mr. Gottesfeld had no reasonable expectation of privacy in the recording of IP addresses, port numbers, and other computer information. Memorandum at 31-34.

On June 22, 108, however, the Supreme Court decided Carpenter v. United States, 585 U.S. ___ (2018) (2018 U.S. Lexis 3844), rejecting the government's request to extend the third-party doctrine to cellular site location information ("CSLI"). Id. The Court wrote "Whether the Government employs its own surveillance technology… or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id. at 20-21.

Both the majority decision and Justice Gorsuch's dissent hold significant import for the present case. The Court held "A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'" Id. at 21, citing Katz v. United States, 389 U.S. 347, 351-352 (1967). "These location records 'hold for many Americans the 'privacies of life.'" Id. at 22 (citations omitted). "Accordingly, when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." Id. at 25-26. In Carpenter, the Court "declined to extend Smith and Miller to the collection of CSLI. Given the unique nature of cell phone location information, the fact that the Government obtained the information from a third party does not overcome Carpenter's claim to Fourth Amendment. The Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment. Id. at 29-30 (citations omitted). "Having found that the acquisition of Carpenter's CSLI was a

search, we also conclude that the Government must generally obtain a warrant supported by probable cause before acquiring such records." Id. at 30.

Like the defendant in Carpenter, Mr. Gottesfeld had a reasonable expectation of privacy in his online computer movements and contents. Mr. Gottesfeld had previously cited the pending Carpenter decision (Dkt. No. 78 at 4, 8) and argued the reasonable expectation of privacy in his "internet communications – his cyber-location" (Dkt. No. 89 at 3-4). Now that Carpenter is decided, the Court must reconsider and reverse its decision in the Memorandum.

Further, Justice Gorsuch's dissent raised serious questions about the future of the third-party doctrine as a whole, most notably in the context of computers:

> What's left of the Fourth Amendment? Today we use the Internet to do most everything. Smartphones make it easy to keep a calendar, correspond with friends, make calls, conduct banking, and even watch the game. Countless Internet companies maintain records about us and, increasingly, *for* us. Even our most private documents—those that, in other eras, we would have locked safely in a desk drawer or destroyed—now reside on third party servers.
> Smith and Miller teach that the police can review all of this material, on the theory that no one reasonably expects any of it will be kept private. But no one believes that, if they ever did.

Id. at 129-130 (Gorsuch, J., dissenting). Justice Gorsuch surveys the law of third-party doctrine and reasonable expectation of privacy, particularly in the modern age, and finds the jurisprudence extremely wanting. He asks "What, then, is the explanation for our third party doctrine? The truth is, the Court has never offered a persuasive justification." Id. at 132-133. "In the end, what do Smith and Miller add up to? A doubtful application of Katz that lets the government search almost whatever it wants whenever it wants." Id. at 135 (citations omitted). Justice Gorsuch's articulation of the property theory of the 4th Amendment, in addition reasonable expectation of privacy, provides additional basis for suppression here.

13

Both the opinion of the majority and Justice Gorsuch require this Court to revisit and reverse its decision concerning the warrantlessly seized IP addresses and port numbers. Indeed, in this case Mr. Gottesfeld is particularly justified in applying Carpenter since the government alleges he attempted to keep his internet actions secret through use of VPN and TOR, thus revealing his own desire to keep his internet location and content from the government. Both society and Mr. Gottesfeld recognize his expectation of privacy in his computer content and movements to be reasonable. In light of Carpenter, this Court must do so also.

    b. **The port numbers acquired pursuant to the Pen Register/Trap and Trace include "content" as defined by 18 U.S.C. § 2510(8) as "the substance, purport, or meaning" of the seized communication.**

The government searched and seized without a warrant the "content" of Mr. Gottesfeld's electronic communications when they requested and received port numbers through a pen register/trap and trace ("pen/trap") without probable cause. That illegally seized content would later be used in the affidavit in support for the search warrant. See Search Warrant Affidavit at Dkt No. 78-1, ¶¶ 22-24; 26. While the warrant is already infirm and lacking in probable cause for the reasons stated in Mr. Gottesfeld's previous motions, excising the illegally seized content from the affidavit reveals further consequential deficiencies in the warrant. All evidence seized pursuant to the search warrant, and their fruits, must be suppressed.

As noted in Mr. Gottesfeld's original Motion to Suppress Evidence (Dkt. No. 78 at 10-11), a pen/trap may record, decode, or capture various types of electronic communication information; however, according to federal law, "such information shall not include the contents of any communication." 18 U.S.C. § 3127(3)&(4); *see also In re Application of U.S. for an Order Authorizing use of A Pen Register & Trap On (XXX) Internet Serv. Account/User Name,*

14

*(xxxxxxxx@xxx.com)*, 396 F. Supp. 2d 45, 47 (D. Mass. 2005) ("[T]he government is not entitled to receive '...dialing, routing, addressing, or signaling information ... reasonably likely to identify the source of a wire or electronic communication" ... if [that information]... reveals the 'contents' of a communication"); *United States v. Willard*, No. 3:10-CR- 154, 2010 WL 3784944, at *2 (E.D. Va. Sept. 20, 2010) ("When using a pen register or trap and trace device on a computer, the government is not entitled to receive information from the device if that information reveals the contents of a communication").

"'[C]ontents', when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport or meaning of that communication." 18 U.S.C. § 2510(8).

The port number information acquired in this case contains "content" as defined in federal law, both individually and in the aggregate. "Port numbers... reside in the header of the packet being transmitted and <u>thus identify the purpose of the packet.</u>" See PC Magazine, *Definition of TCP/IP Port* <tinyurl.com/portdefinition> (last accessed June 19, 2018) (emphasis supplied). Clearly, a statute designed to limit surveillance in the telephone age does not neatly map onto the very different technology of the digital age. However, if port numbers can be analogized to anything, they are more akin (though not completely, as noted *infra*) to the "post-cut-through-dialed-digits" ("PCD") of the telephone era which, as explained in Dkt. No. 128 at 11, courts in certain instances have found to be "content" under the pen/trap statute; *see also* https://portforward.com/networking/whatisport.htm (last accessed June 19, 2018) ("If we think of an IP address as a telephone number, (an identifying number that allows communication between two locations), then we can think of ports as telephone number extensions... Ports are like telephone number extensions as they allow multiple pieces of data to flow back and forth on

15

a single IP address. In fact, port numbers are appended to the end of IP addresses just as extensions are appended to telephone numbers").

Port numbers may perform specific services relating to content. For example, the government's table in its Opposition (Dkt. No. 84 at 5) displaying a Destination Port of 161 reveals a high likelihood that the content of the relevant traffic falls under the Simple Network Management Protocol (SNMP). See Cisco Unified Serviceability Administration Guide, Release 9.0(1), available at https://www.cisco.com/c/en/us/td/docs/voice_ip_comm/cucm/service/9_0/admin/CUCM_BK_C136FE37_00_cisco-unified-serviceability-administration-90/CUCM_BK_C136FE37_00_cisco-unified-serviceability-administration-guide_chapter_01100.pdf (last accessed June 18, 2018) ("The SNMP master agent listens on port 161 and forwards SNMP packets for Vendor MIBs"). SNMP traffic on port 161 is used to poll devices for statuses and statistics, as opposed to, for instance, viewing web pages, transferring files, or playing online video games.

By contrast, if traffic was headed to port 21 then it was likely used by the File Transfer Protocol (FTP) to move files. See e.g. "FTP for Beginners," February 15, 2010, Wired, https://www.wired.com/2010/02/ftp_for_beginners/ (last accessed June 18, 2018). By contrast yet again, traffic to port 3389 would be for Microsoft's Remote Desktop Protocol. https://www.grc.com/port_3389.htm (last accessed June 18, 2018). Port 22 would be for a secure "shell session" to provide secure access to a remote computer. See https://searchsecurity.techtarget.com/definition/Secure-Shell (last accessed June 18, 2018).

Just as with PCD, the government's warrantless seizure of the numerous port numbers provided just as various "information concerning the substance, purport or meaning of that communication."

Indeed, without the port numbers contained in the data returned from RCN in this case, the government would not know that Mr. Gottesfeld was allegedly engaged in TOR-related traffic as opposed to, for instance, traffic to a website or other non-TOR application that happened to use the same IP address as a TOR node. Similarly, without the port numbers, the government would not know that Mr. Gottesfeld alleged traffic to riseup.net contained VPN session data, as opposed to other applications used by Rise Up. This is important because the government would later rely on Mr. Gottesfeld's alleged use of TOR and VPN in its request for the search warrant subject to his motion to suppress. See Search Warrant Affidavit at Dkt. No. 78-1, ¶¶ 22-24; 26.

Further, the affidavit attempts to derive further benefit from the illegally seized content by tying the "criminal" TOR and VPN information to certain Twitter accounts. Dkt No. 78-1, ¶ 25. According to agent Tunick, "the Twitter accounts, @AnonMercurial and @PacketSignal, both of which tweeted at or about DDOS victims, including BCH [Boston Children's Hospital], during and after attacks. These records show the account subscribers using both TOR IP addresses as well as IP addresses run by riseup.net to log in to these accounts." Id. Thus, this paragraph must also be excised from the affidavit, further diminishing the claimed rationalization for the warrant.

Far from showing merely the party to whom Mr. Gottesfeld might be communicating, as perhaps with a phone call, agent Tunick's affidavit demonstrates how the illegally seized port numbers reveal an allegedly criminal "substance, purport or meaning" barred by federal and constitutional law. It was indeed the "substance, purport, and meaning" of Mr. Gottesfeld's alleged use of TOR and VPN that the agent Tunick found important enough to include it his affidavit.

17

The government wrongly contends that port numbers are always analogous to a mere and innocuous phone extension as opposed to a content-imbued PCD such as an account number, password, or similar entry. Dkt. No. 179 at 22-23. If port numbers were not imbued with "substance, purport or meaning" then agent Tunick wrongly averred in his affidavit that "criminals routinely use these services [TOR and Riseup.Net] to hide their true IP addresses while committing, discussing or planning crimes in an effort to evade law enforcement. They will attempt to maintain 'operational security' by using these services while doing anything related to the crime but may not use them while doing things related to their non-criminal social or personal life." See Search Warrant Affidavit at Dkt No. 78-1, ¶ 26. While there are indeed many legitimate, even laudatory reasons to use TOR and Riseup.net (including professional, journalistic, and human rights-oriented work), agent Tunick stressed to Magistrate Bowler "criminal" uses, which surely relates to substance, purport, and meaning under federal law.

Scholars on this topic agree. See e.g. David McPhie, *Almost Private: Pen Registers, Packet Sniffers, and Privacy at the Margin*, 2005 Stan. Tech. L. Rev. 1., available at http://egov.ufsc.br/portal/sites/default/files/anexos/5530-5522-1-PB.pdf (last accessed June 18, 2018). In his article, McPhie writes:

> As has been noted, TCP headers contain TCP port numbers, which often correspond to particular applications. In other words, if pen registers see a packet sent to a particular IP address on TCP port 80, it is highly likely that it represents a request for a web page. At that point, of course, the IP address may be entered into the "location" field of a web browser, and it is possible to get an idea of what page or set of pages the monitored subject might have been looking at (unless, as is sometimes the case with smaller hosting services, the IP address is associated with a variety of unaffiliated web sites).
>
> Sometimes, knowledge that a particular application is being used is suggestive in and of itself. For example, some universities and employers purposely block ports that are usually associated with file-sharing and instant-messaging programs, for a variety of reasons (desire to conserve bandwidth or increase productivity, fear of liability, etc.)...

18

> Of course, in general, the further down the header stack one travels, the more likely one is to encounter data that meets the statutory criteria of "content," thus directly earning the precise privacy protection denied in the examples given above. And it is perfectly fitting that this content-rich data (e.g., the actual text of an email) should be granted such protection, as is generally conceded by those on all sides of the privacy debate. But this takes nothing away from the privacy value of the other kinds of data that are less clearly "content." Drawing the comparison is misleading; simply calling a bit of data non-content may sometimes mean very little in terms of privacy, measured by the level of intrusion into personal information that one might rationally want to keep secret.... [I]t is vital to engage in the sort of analysis attempted here: at the end of the day, what is the government able to figure out about people for whom they do not even have probable cause to suspect as guilty of a crime?

Id. at ¶¶ 40-43.

Reconsideration of the Memorandum is proper here in light of the warrantless seizure of port number content later used in support of a search warrant. The evidence must be suppressed.

4. Release on Bail

In light of the necessary reconsideration of the Memorandum on dismissal and suppression, this Court must reconsider its order on detention and release Mr. Gottesfeld on bail with conditions.

5. Conclusions

For the reasons stated in this Motion, and the original filings on these matters, the defense respectfully requests the Court reconsider the Memorandum and ALLOW the motion to dismiss and motions to suppress.

19

                          Respectfully submitted,
                          MARTIN GOTTESFELD
                          By his attorney:

                          /s/ David J. Grimaldi
                          _____
                          David J. Grimaldi
                          David J. Grimaldi, P.C.
                          BBO No. 669343
                          675 Massachusetts Avenue, 9th Floor
                          Cambridge, MA 02139
                          617-661-1529 (tel)
                          857-362-7889 (fax)
DATE: June 27, 2018          david@attorneygrimaldi.com


## CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this filing were served on all registered participants in this matter via ECF this 27th day of June, 2018.

                          /s/ David J. Grimaldi
                          _____
                          David J. Grimaldi