UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. 16-CR-10305-NMG |
| MARTIN GOTTESFELD, | |
| Defendant. | |

**TRIAL BRIEF OF THE UNITED STATES**

The United States respectfully submits this trial brief to describe the evidence it expects
to introduce and to address legal issues that are likely to arise during the course of the trial in the
above matter.  Jury selection is scheduled for Thursday, July 19, 2018 at 9:00 a.m., and the Court
has ordered that the trial will begin on Monday, July 23, 2018 at 9:00 a.m.

I.      Evidence

In late 2013, Martin Gottesfeld was a systems engineer living in Somerville,
Massachusetts with his girlfriend, Dana Barach ("Barach").  Barach had a brother who attended
Logan River Academy, a residential facility in Utah for teenagers.  Because of the brother's
experience there, Gottesfeld began to advocate for the shutdown of Logan River Academy,
including by establishing a website, www.shutdownloganriver.com, and through social media
accounts using similar names on Twitter, Facebook, and YouTube.

Late in 2013, through his interest in Logan River Academy, Gottesfeld learned about a
child custody dispute involving Justina Pelletier, a Connecticut teenager in the custody of the
Massachusetts Department of Children & Families ("DCF").  Pelletier had been admitted to

Boston Children's Hospital in early 2013.  After a dispute arose over her diagnosis, DCF sought and obtained temporary custody of Pelletier through the Massachusetts Juvenile Court. Gottesfeld read about Pelletier's story, disagreed with the hospital's diagnosis and DCF's position before the juvenile court, and began to advocate for Pelletier's release through social media.

In March 2014, shortly before the juvenile court was to resolve the issue of Pelletier's custody permanently (*i.e.*, whether she would stay in the state's custody or be returned to her family), Pelletier had been discharged from Boston Children's Hospital and was a resident at Wayside Youth & Family Support Network, a residential program for teenagers in Framingham, Massachusetts.  Gottesfeld was aware of this fact.

On March 20, 2014, the hacking collective Anonymous posted a statement on the internet calling for Pelletier's release from DCF's care and custody.  The statement posted the name, address, and telephone number of both the state court judge handling Pelletier's case and of a Boston Children's Hospital doctor reportedly involved in Pelletier's care.  The post also contained information about the IP address of the public-facing website of Boston Children's Hospital and threatened to retaliate against the hospital unless the hospital fired the doctor and Pelletier was returned to her family.

On March 23, 2014, from his Somerville apartment, Gottesfeld posted a five-minute video (Exh. 122) to his Shut Down Logan River YouTube page (Exh. 121) under the hashtag #opjustina.  The video's narration was largely the text of the Anonymous post threatening the state court judge, the hospital, and its doctors, and the video contained the URL (web address) for the Anonymous post itself.

On March 22 and March 23, 2014, over Twitter, Gottesfeld exchanged direct messages with a coconspirator, DigitaGhost, about the creation of the Anonymous video and about Pelletier's case.  Gottesfeld and DigitaGhost discussed the pending juvenile court decision, which the court was to issue on March 25.  When DigitaGhost suggested attacking computer networks in furtherance of Pelletier's cause, either by defacing or denying service to the networks, Gottesfeld proposed that the target be Wayside.  DigitaGhost checked the security of Wayside's network and reported back that Wayside was vulnerable.

In anticipation of the attack, Gottesfeld established a Twitter account, "AnonMercurial," using the e-mail address digitgaldruid@riseup.net. (Exh. 106).  In the early morning hours of March 25, 2014, Gottesfeld also posted a message on a Shut Down Logan River message board under the user name "digitaldruid" that "basic checks [had been] run against wayside," and that he was "Standing by for DDos on wayside tomorrow."  (Exh. 44A).

On March 25, 2014, the juvenile court judge issued an order (Exh. 84) agreeing with the hospital's diagnosis of Pelletier and awarding continued custody of Pelletier to DCF.  That day, Gottesfeld accessed media reports about the order.  He also used his AnonMercurial Twitter account to call for attacks on the IP address of Wayside's public-facing website.  (Exh. 96).

Wayside experienced DDOS (distributed denial of service) attacks on its computer networks that disabled its website and its e-mail network.  The attack impaired Wayside's ability to communicate with providers, staff, families, and DCF over e-mail; the staff's ability to access Wayside's internal network, where it kept residents' records; and the public's ability to obtain information from Wayside's public-facing internet page, www.waysideyouth.org.  Gottesfeld used the AnonMercurial Twitter account to ask Wayside whether it was experiencing "website

problems" and to account that Wayside's website was "tango down." (Exh. 96A). Wayside spent approximately $18,000 defending itself against the attack.

*The Attack on Boston Children's Hospital*

On Sunday, April 13, 2014, in the middle of the night, Boston Children's Hospital began to experience increased traffic to the IP address of one of its public facing websites – the same IP address referenced in the Anonymous internet post and in the video that Gottesfeld posted on YouTube on March 23. The traffic more than doubled typical weekday visits to the hospital's website, even though it was late at night on a Sunday.

The hospital made changes to defend its network, but Gottesfeld and his coconspirators ramped up the amount of traffic to the point where it had overwhelmed the hospital's ability to process Internet traffic through its firewall. All of the hospital's Internet-connected services were affected. The attack continued to increase in intensity.

On April 19, 2014, Gottesfeld used a second "AnonMercurial" Twitter account to threaten Boston Children's Hospital with the "doxing" of its staff and HIPAA attacks, references to the public distribution of its staff's personally identifiable information and to attacks targeting patients' medical records, which the hospital was required to protect by federal statute. The hospital's network was then in fact subject to attacks attempting to penetrate its network, and to "phishing" attacks sent by e-mail to the hospital's mail servers. In response to these threats and attacks, the hospital took its public-facing website down, disabled websites that patients and providers used to access hospital records and services, and disabled its e-mail network (so as to be able to scan for emails containing viruses). The attack stretched the resources of the hosptial's IT staff, requiring it to retain consultants and other service providers, both to mitigate

the increased network traffic caused by the DDOS attack and to defend against the efforts to penetrate its network.  These resources cost the hospital hundreds of thousands of dollars.

The attacks substantially disrupted the hospital's normal operations, requiring its staff to use manual procedures and other workarounds, both to communicate and to access resources related to patient care.

*The Search of Gottesfeld's Somerville Residence*

On October 1, 2014, in connection with the investigation of the attacks on Wayside and Boston Children's Hospital, FBI agents searched Gottesfeld's Sommervile residence and seized computers, including an Alienware laptop and a Gateway desktop computer.  Forensic evidence obtained from these computers linking Gottesfeld to the attacks on Wayside and Children's will be offered through agents who seized, processed, and examined the contents of Gottesfeld's computers.  During the search, Gottesfeld admitted to FBI agents that he had posted the Anonymous YouTube video, but he falsely told the agents that he had no role in the network attacks on the hospital related to the Pelletier matter.

In April 2015, several months after the search, Gottesfeld and lawyers representing him met with representatives of the U.S. Attorney's Office and the FBI regarding the evidence that the FBI collected in its investigation.  On December 17, 2015, while the investigation was still pending, Gottesfeld and lawyers representing him met again with representatives of the U.S. Attorney's Office and the FBI.  The subject matter of the meeting concerned, among other things, the April 2014 network attacks on Boston Children's Hospital.

Approximately a month later, Gottesfeld and Barach, to whom he was now married, left the Boston area.  On the evening of February 15, 2017, the Disney Cruise Line vessel *Wonder* rescued Gottesfeld and Barach from a disabled powerboat in the choppy waters between Cuba

and Florida.  The two had with them, among other things, their wedding album and marriage

license, an original birth certificate, and Cuban wind charts.  Gottesfeld was arrested upon the

*Wonder*'s return to Miami, Florida.

In a September 2016 statement he published in the *Huffington Post*, Gottesfeld described

his attack on the computer networks of Boston Children's Hospital and the reasons for it.

(Exh. 35).

II.     Witnesses

Witnesses from Wayside and Boston Children's Hospital will describe the attacks on

their networks, the facilities' responses to those attacks, the costs associated with those

responses, and the effects of the attacks on their normal operations, including the impact on the

care of patients and residents.  A retired Framingham Police Officer will testify regarding his

role in the investigation of the attack on Wayside.  FBI personnel will testify to the seizure,

imaging and processing of computers from Gottesfeld's residence and what evidence was found

on those computers; statements that Gottesfeld made during the search; social media posts

obtained and preserved during the course of the investigation, and the circumstances surrounding

Gottesfeld's flight from Massachusetts.  A friend of Gottesfeld's, John Santos, is expected to

testify that in late April or early May 2014, Gottesfeld admitted to him that Gottesfeld had

committed the DDOS attacks against Boston Children's Hospital.  Santos is also expected to

testify regarding Gottesfeld's efforts to shut down Logan River Academy.  A representative of

the Disney Cruise Line who was aboard the *Wonder* on February 15, 2016 is expected to testify

concerning Gottesfeld and Barach's rescue at sea.  Custodians of records from the two facilities

where Gottesfeld has been held since his arrest, the Plymouth County Correctional Facility and

the Wyatt Detention Facility, are expected to authenticate recorded calls that Gottesfeld made to

his wife and to reporters.

III.     The Use of Summary Exhibits Pursuant to Fed. R. Evid. 1006

Two of the government's exhibits summarize direct messages seized from Gottesfeld's Alienware laptop.  The computer writings that contain these messages are both voluminous and complex.  They cannot be conveniently examined in court.  The .html file containing Gottesfeld's Twitter messages with DigitaGhost (Exh. 43), for example, contains more than 5,547 pages of computer coded text.  The government's summary Exhibit 42, by contrast, is a table of eight pages, organizing the messages by date, time, sender, recipient, and message. Exhibit 45, a series of SQL databases seized from the laptop, is comprised of 219 separate electronic files that together constitute the messages and other data contained in Exhibit 44, which is a four-page document reflecting the transmission and content of Gottesfeld's messages. The government also proposes to introduce a summary chart (Exh. 13) depicting more than 100,000 individual page visits to a Children's Hospital web portal in April and May 2014.

In each of these circumstances, Fed. R. Evid. 1006 permits the presentation of the voluminous content of the underlying files in summary fashion.  As required by Fed. R. Evid. 1006, the government has produced copies of the summary exhibits and the underlying electronic files to the defendant.  The summary Exhibits 13, 42 and 44 are accordingly admissible.

The government also expects that an FBI witness will read to the jury some of the Twitter and direct messages in Exhibits 42 and 44.  Assuming the Court's agreement with one or more of the bases for admissibility of these messages (discussed above and in the government's motion in limine under Fed. R. Evid. 801(d)(2)(E)), the government will present most of this evidence to the jury through the FBI agent who retrieved them from Gottesfeld's devices.  After identifying the participants in a given message, the government proposes to publish the messages to the jury

and have the agent – essentially a "reader" – read the messages verbatim.  *See United States v. Safavian*, 435 F.Supp.2d 36, 41-42 (D.D.C. 2006) (anticipating government presenting email exhibits through non-percipient FBI agent); *see also United States v. Quattrone*, 441 F.3d 143, 168 (2d Cir. 2006) (noting defense use of summary witness to present emails and phone records).

This is a common method of admitting the contents of prior conversations that were transcribed or recorded but for which no percipient witness is being called, such as transcripts of a defendant's earlier testimony, or transcriptions of calls originally intercepted in a foreign language.  *See, e.g.*, *United States v. Font-Ramirez*, 944 F.2d 42, 49 (1st Cir. 1991) (trial court has discretion to allow readers to read transcripts into the record) (citing *United States v. Rengifo*, 789 F.2d 975, 983 (1st Cir. 1986)).  As with transcripts, the summary agent presenting the emails to the jury would read the text of the messages without additional commentary unless he has some personal or otherwise admissible knowledge about the contents.  *See, e.g., Safavian*, 435 F.Supp.2d at 42 (setting these limitations on anticipated testimony of summary agent).

IV.     Admission Of The March 25, 2014 Juvenile Court Decision

The government intends to offer in evidence Exhibit 94, a certified copy of the March 25, 2014 order awarding permanent custody of Pelletier to DCF.  The exhibit bears the seal of the Massachusetts Juvenile Court clerk who certified its authenticity.  *See* Fed. R. Evid. 902(1) (authentication of domestic public documents under seal).

Judge Johnston's opinion (at just over three pages) is not offered for its truth.  Rather, it establishes the fact that a judicial proceeding occurred in juvenile court and that court made findings of fact concerning a dispute.  Those findings — correct or otherwise — resulted in the award of custody of Pelletier to DCF.  *See United States v. Dupree*, 706 F.3d 131, 136-37 (2d Cir. 2013) (reversing district court's exclusion of restraining order as hearsay); *see also* Fed. R.

Evid. 801(c), Advisory Committee Note (explaining that verbal acts, meaning statements affecting the legal rights of parties, are excluded from the definition of hearsay); *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004) ("A prior judgment is not hearsay ... to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties"); *Johnson v. Clark*, 2006 WL 289107 (M.D. Fla. Feb. 7. 2006) (state court orders are not hearsay if considered for the limited purpose of proving that judicial proceedings took place).

Judge Johnston's opinion is also offered to prove the nexus between his order, which Gottesfeld learned of on March 25, 2014, and the DDOS Gottesfeld conducted that day. *See Dupree*, 706 F.3d at 136 (statement offered to show its effect on the listener is not hearsay); *United States v. Twitty*, 689 Fed. Appx. 890 (10th Cir. 2017) (judicial orders adverse to defendant were not hearsay when offered to show their effect on him, and to show his intent to threaten the judge who issued them). Two days before the Tuesday, March 25 release of the opinion, DigitaGhost messaged Gottesfeld that s/he had "a crew coming together for some online hijinks should they piss us off." Gottesfeld similarly expressed hope to DigitaGhost that Judge Johnston would "release her" (*i.e.*, Justina), thereby obviating the need for an attack. The juvenile court's judicial act awarding custody is thus closely linked to its effect on Gottesfeld and his coconspirators and their retaliatory intent in attacking Wayside.

V.     Introduction Of Recorded Jail Calls

Gottesfeld has been in custody since his February 2016 arrest. As noted above, in September 2016, Gottesfeld released a statement to the Huffington Post, a news and opinion website, claiming responsibility for knocking Children's Hospital "off the internet" under the banner of Anonymous and explaining why he did it. Gottesfeld has to date refused the government's offer of a stipulation regarding the authenticity and admissibility of this statement,

and the government has accordingly moved in limine to admit it as an adoptive admission under

Fed. R. Evid. 801(d)(2)(B).  (Docket No. 218).

In support of that motion, and to rebut any argument at trial that the statement is not

Gottesfeld's, the government intends to introduce portions of six September 2016 jail calls in

which Gottesfeld and Barach discuss the *Huffington Post* statement as Gottesfeld's own, (Exhs.

66 through 71), and portions of a September 30, 2016 phone interview with Fox News (Exh. 72)

in which Gottesfeld directs the reporter to the *Huffington Post* article in response to the reporter's

questions about the attack.

The admission of the recorded calls through the jail's records custodian are likely to

disclose the fact that Gottesfeld was in custody, at least for several days in September 2016.

While compelling a defendant to wear prison or jail clothing can violate a right to a fair trial,

*Estelle v. Williams*, 425 U.S. 501 (1976), passing references during trial to a defendant's prior

incarceration do not.  *See United States v. Trinidad-Acosta*, 773 F.3d 298, 307 (1st Cir. 2014) (no

prejudice in "isolated" reference to defendant's custodial status); *United States v. Steele*, 2018

WL 2068356, *3 (11th Cir. May 3, 2018) (passing remark made in the context of the

government's attempt to establish a foundation for jail phone calls it wished to admit was not a

"continuing reminder" that defendant was in custody); *United States v. Villabona-Garnica,* 63

F.3d 1051, 1058 (11th Cir. 1995) ("the mere utterance of the word [jail, prison, or arrest] does

not, without regard to context or circumstances, constitute reversible error per se.").  The jury

could also be instructed that it should disregard the fact that defendant was at one time in

custody, that such custody is not unusual, and has no bearing on Gottesfeld's guilt or innocence. *United States v. Larkin*, 417 F.2d 617 (1st Cir. 1969).[1]

VI.     Introduction of Business Records

The government intends to introduce business records from RCN, Twitter, and YouTube under Fed. R. Evid. 803(6) and 902(11) and (13).  These include records of the IP address servicing Gottesfeld's Somerville residence (RCN, Exh. 64); subscriber information and IP logs regarding the creation and use of the Twitter accounts, AnonMercurial and AnonMercurial2 (Twitter, Exhs. 106-11); and subscriber information and IP logs for Gottesfeld's Shut Down Logan River Academy YouTube account (YouTube, Exhs. 122-25).

As is required by Fed. R. Evid. 902(11), the government provided counsel for the defendant with copies of these records in December 2016.  Copies of certifications obtained pursuant to Fed. R. Evid. 902(11) and/or 902(13) were provided on June 13 (RCN and YouTube) and July 6, 2018 (Twitter), alongside notice of the government's intent to introduce the exhibits without the need for the testimony of a records custodian.  (The certifications for these records, marked for identification as Exhibits 130 through 133, are attached for the court's review as Exhibit A hereto).  The government also requested the defendant's stipulation to the records' admissibility.  The defendant declined to stipulate and has not suggested that the source of the information or the method or circumstance of the preparation of these records indicate a lack of trustworthiness.  *See* Fed. R. Evid. 803(6).

---

[1] The government also intends to introduce short excerpts of lengthy recorded jail calls between Gottesfeld and a journalist.  Gottesfeld's own recorded statements, admissible under Fed. R. Evid. 801(d)(2)(A), such as one explaining his goals in launching the network against Children's Hospital, are admissions that are relevant to the charges in the indictment.

Business records may be admissible as self-authenticating, non-hearsay evidence "if certified according to Fed. R. Evid. 902(11)" or (13).  *See Federal Trade Comm. v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 16 (1st Cir. 2010); *see also* Fed. R. Evid. 902 advisory committee's note to 2017 amendment (explaining that subsection 13 was amended in 2017 to "set[ ] forth a procedure by which parties can authenticate certain electronic evidence other than through the testimony of a foundation witness").  Rule 902(11) provides for the admissibility of "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."  Fed. R. Evid. 902(11).

 Similarly, Fed. R. Evid. 902(13) provides for the admissibility of "[a] record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11)...." *Id.* R. 902(13).

The declaration under rule 902(11) must establish that:

(A) the record was made at or near the time by—or from information transmitted by— someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]

(C) making the record was a regular practice of that activity ....

*Id.* R. 803(6); *see also Direct Marketing Concepts*, 624 F.3d at 16 (citing former Federal Rule of Evidence 902(11) as containing virtually identical text).

Fed. R. Evid. 902(13) similarly provides that "a record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."

The court should admit the offered records as business records under rule 803(6) that are properly certified as authentic copies of domestic records under 902(11) or as copies of accurate search results from an electronic database under 902(13).

Because the Internet Service Providers' records were created automatically in the ordinary course of their business operations, and not created for the purpose of this prosecution, their admission without a live witness does not present Confrontation Clause issues of the type underlying the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). *See Tran v. Roden*, 847 F.3d 44, 51 (1st Cir. 2017); *United States v. Cameron*, 699 F.3d 621, 641-42 (1st Cir. 2012) (Yahoo! and Google subscriber records not created for the purpose of the prosecution are non-testimonial). The underlying records (but not the certifications) are accordingly admissible pursuant to Fed. R. Evid. 803(6) and 902(11) and 902(13). *See also Crawford*, 541 U.S. at 56 (noting that business records are non-testimonial "by their nature"). Although the certifications attesting to the authenticity of the records themselves were "prepared for use at trial," the certificates do not pose a Confrontation Clause problem, especially where they will not be offered in evidence. *See Melendez-Díaz v. Massachusetts*, 557 U.S. 305, 322–23 (2009) (recognizing that a records "clerk could by affidavit authenticate or provide a copy of an otherwise admissible record, but could not ... create a record for the sole purpose of providing evidence against a defendant").

VII.    Conclusion

The United States respectfully reserves the right to address legal and evidentiary issues that may arise during the course of trial.

*Respectfully submitted*,

ANDREW E. LELLING
United States Attorney

By:    */s/ Seth B. Kosto*
DAVID J. D'ADDIO
SETH B. KOSTO
Assistant U.S. Attorneys

Date:  July 17, 2018

**Certificate of Service**

I hereby certify that, on this date, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ *Seth B. Kosto*
Seth B. Kosto
David J. D'Addio
Assistant U.S. Attorneys

Date:  July 17, 2018