# Affidavit

I, Martin S. Gottesfeld, do hereby affirm the
following is true and accurate to the best of my
knowledge, information, and belief on this _____ day
of December _____, 2018   and I hereby offer this
affidavit pursuant to 28 U.S.C. §144 in the case of
1:16-cr-10305 (herein simply "the case"):

1. I am the sole defendant in the case, which is
currently pending in U.S. District Court in Boston,
Massachusetts and currently assigned to The Honorable
Judge Nathaniel M. Gorton.

2. The principal alleged "victim" in the case is
Boston Children's Hospital (herein "BCH") and the
other alleged "victim" named in the indictment is The
Wayside Youth and Family Support Network (herein
"Wayside").

3. However, the only real and true victims in the
case at the time of the events in controversy in the
indictment were Justina Pelletier (herein "Justina")
and her family (herein, collectively, "the Pelletiers").
This is because over the course of 16 months from
February 2013 until June 2014, starting when Justina
was 14 years of age and ending when she was 16, Justina
was tortured, crippled, and nearly killed by BCH and

— Page 1 of 86 —

Wayside with either the silent consent, acquiescence, or, in some instances, with the overt cooperation of other alleged "victims" not named in the indictment.

4. A detailed report of these human rights violations, which compiles reputable primary and secondary sources, has been docketted in the case (please see Docket Entry (D.E.) 190 from May 29th, 2018) and it is hereby incorporated and sworn into this affidavit by reference, under penalty of perjury, as being true and accurate to the best of my knowledge, information, and belief on this date. These primary and secondary sources include firsthand accounts by Justina, her family, her doctor, and other victims of similar cases at BCH as well as by a board member of The Massachusetts Society For The Prevention Of Cruelty To Children and former federal prosecutor named Barry Pollack and a registered nurse (R.N.) who had previously worked in the BCH psych ward named Kathleen Higgins. One of the journalists whose work is contained therein won back-to-back Edward R. Murrow Awards for his coverage of Justina's case. Other publications cited in D.E. 190 include WGBH, The Boston Globe, ABC News, Fox News, The Huffington Post, The Blaze, The Hartford Courant, The Lowell Sun, Fox Connecticut, Fox 25, and WCVB Channel 5.

5. State and federal lawmakers also got involved in Justina's case and 32 U.S. Congressional Representatives

ultimately co-sponsored a bill known as "Justine's Law," including now—Secretary-of-State Mike Pompeo.

6. In contrast to BCH and Wayside, I am not accused of harming a soul in the case.

7. The jury in the case refused to find that anything I did impacted or even potentially impacted the care of any patients at BCH or elsewhere and one member of that jury was an R.N. who works at an area hospital and who is familiar with both day-to-day hospital operations as well as with what BCH did to Justine (please see D.E. 323 page 131 line 15 and page 31 lines 3 and 10 as well as D.E. 331 page 11 line 21).

8. During Justine's interview with Rolling Stone, she thanked me for my efforts to help her and said that I did not hurt any kids and that I do not belong in jail. Rolling Stone titled its feature about the case, "The Hacker Who Cared Too Much" and captioned it "How A Crusade To Save Children Landed A Hacker Behind Bars."

9. Mine is the only Internet activism case indicted by former U.S. Attorney Carmen Ortiz after the suicide of Internet innovator and Freedom of information activist Aaron Swartz.

10. The Honorable Judge Nathaniel M. Gorton also presided over the case against Aaron Swartz.

11. While the events in controversy in the indictment of the case occurred in early 2014, the full timeline of

all the events in controversy in the case upon which The Honorable Judge Nathaniel M. Gorton and The Honorable U.S. Magistrate Judge Marianne B. Bowler (amongst others) have passed judgement is far longer and both preceeds and continues after the allegations in the indictment. This full timeline includes, but is not limited to, the full involvement of BCH and Wayside with Justina (February 2013 through June 2014), the government's investigation of my activism (April 2014 or thereabouts through the present), and my actions following the FBI's execution of a search warrant at my home on October 1st, 2014.

12. Despite both the facts contained herein and those herein referenced and incorporated from elsewhere, such as D.E. 190, The Honorable Judge Nathaniel M. Gorton has intentionally failed to maintain the purity of the judicial "temple" (please see Sorrells v. United States, 287 U.S. 435; 53 S.Ct. 210; 77 L.Ed. 413 (1932). Instead, The Honorable Judge Nathaniel M. Gorton has been using The Court vindictively in order to consummate a wrong. This is antithetical to the finest treditions of American jurisprudence which at one point distinguished The United States from the tyranny that is all too common elsewhere in the world (please see Id.). In addition to the other evidence of bias cited below, it is axiomatic that for a judge to do such a thing, he or she must harbor a bias and it is seperately and

severly just as obvious that for a judge to appear to do such a thing is also for he or she to appear biased.

13. While The Honorable Judge Nathaniel M. Gorton was on the Federal bench in 2003 he was also listed as a member of The Board of Advisors of a non-profit called The New England Home for Little Wanderers (herein the "NEHLW") and that same year, his brother, Michael C. Gorton Sr., was listed as a member of the NEHLW's Board of Directors.

14. The Honorable Judge Nathaniel M. Gorton listed himself as a "Member of the Corporation" of the NEHLW on his financial disclosures from 2003 through 2012.

15. Customarily, the NEHLW publicly thanks its donors on an annual basis, usually in January. Different levels of patronage from the previous fiscal year receive membership and public recognition at different levels from the NEHLW which have changed over time. The NEHLW begins its fiscal giving year on July 1st. So, for example, the NEHLW's 2003 fiscal giving year began on July 1st, 2002 and ran through June 30th, 2003.

16. The Honorable Judge Nathaniel M. Gorton and his spouse jointly and publicly donated the following sums of money to the NEHLW. An * denotes a date or date range which coincides or overlaps with events in controversy in the case and a † denotes a date or date range which

coincides or overlaps with the time in which The Honorable Judge Nathaniel M. Gorton has been assigned as the trial judge to the case, as these symbols will continue to signify in all subsequent such tables and charts.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/02 - 6/30/03 | $1,000-$2,499 | Unknown | "Friends Circle" |
| 7/1/10 - 6/30/11 | $1,000-$2,499 | 1/23/12 | "Presidents Circle" |
| 7/1/11 - 6/30/12 | $1,000-$2,499 | 1/7/13 | "Presidents Circle" |
| 7/1/12 - 6/30/13* | $1,000-$2,499 | 1/13/14* | "Presidents Circle" |
| 7/1/15 - 6/30/16+ | $250-$499 | 1/5/17*† | "Advocate" |

17. The spouse of The Honorable Judge Nathaniel M. Gorton individually and publicly donated between $250 and $499 to the NEHLW between July 1st, 2013 and June 30th, 2014 and the NEHLW publicly thanked her and named her one of its "Advocates" on January 20th, 2015, all during the events in controversy.

18. Michael C. Gorton Sr. and his spouse Karen (nee Swift), who are respectively the brother and sister-in-law of The Honorable Judge Nathaniel M. Gorton, publicly donated the following sums of money to the NEHLW. Again, Michael C. Gorton Sr. was on the Board of Directors of the NEHLW in 2003 as well.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/02 - 6/30/03 | $10,000-$24,999 | Unknown | "Frederick H. Knight Circle" |
| 7/1/10 - 6/30/11 | $2,800-$4,999 | 1/23/12 | "President's Council" |
| 7/1/11 - 6/30/12 | $2,500-$4,999 | 1/7/13 | "President's Council" |
| 7/1/12 - 6/30/13* | $1,000-$2,499 | 1/13/14* | "President's Circle" |
| 7/1/13 - 6/30/14* | $2,800-$4,999 | 1/20/15* | "President's Council" |
| 7/1/14 - 6/30/15* | $2,800 - $4,999 | 2/10/16* | "President's Council" |
| 7/1/15 - 6/30/16* | $5,000-$9,999 | 1/5/17*† | "President's Cabinet" |
| 7/1/16 - 6/30/17*† | $5,000-$9,999 | 1/30/18*† | "President's Circle" |

19. The NBHLW announced a new partnership with BCH in its 2003 fiscal year (while the NBHLW also listed the Honorable Judge Nathaniel M. Gorton as a member of its Board of Advisors and his brother as a member of its Board of Directors). Specifically, BCH joined a program which the NBHLW calls "Safe-at-Home," and given the NBHLW's description of the joint cooperative effort in its annual report for fiscal year 2003, it appears that BCH would have considered Justina and her family as candidates for the program: "Safe-at-Home added [Boston] Children's Hospital to its roster of hospital partners that include Boston Medical Center, Carney Hospital, and Cambridge City Hospital. Over the past year the Safe-at-Home program has helped to 'divert' a total of 67 children from psychiatric inpatient

stay by working intensively with families in their homes. The goal is to help families stabilize and work more effectively with each other and their community."

20. The NEHLW also offers adoption services for such juvenile patients and one of the most controversial and bitterly disputed parts of Justine's saga was when BCH and The Massachusetts Department of Children and Families put her on a path towards adoption against her and her family's wishes.

21. The company Slade Gorton & Co., Inc. publicly donated the following sums of money to the NEHLW during its fiscal years of 2003 and then every year from 2011 through 2017.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/02 – 6/30/03 | $10,000 – $24,999 | Unknown | "Frederick H. Knight Circle" |
| 7/1/10 – 6/30/11 | $2,500 – $4,999 | 1/23/12 | "President's Council" |
| 7/1/11 – 6/30/12 | $2,500 – $4,999 | 1/7/13 | "President's Council" |
| 7/1/12 – 6/30/13* | $1,000 – $2,499 | 1/13/14* | "President's Circle" |
| 7/1/13 – 6/30/14* | $1,000 – $2,499 | 1/20/15* | "President's Circle" |
| 7/1/14 – 6/30/15* | $1,000 – $2,499 | 2/10/16* | "President's Circle" |
| 7/1/15 – 6/30/16* | $2,500 – $4,999 | 1/5/17*† | "President's Council" |
| 7/1/16 – 6/30/17*† | $1,000 – $4,999 | 1/30/18*† | "Eshe Society" |

22. Slade Gorton & Co., Inc. publicly donated between

$1,000 and $2,499 to BCH in each of BCH's 2013 and 2015 fiscal years. The FY 2013 gift took place close to or during events in controversy in the case as well as close to or while the time BCH was taking down lists of its philanthropic supporters, presumably to protect them from economic harm during the protests over Justina Pelletier. Further, BCH publicly thanked Slade Gorton & Co., Inc. for its FY 2013 gift on or about May 11th, 2014 — less than a month after the main event in controversy in the case — and the FY 2015 gift and resulting thank you also occurred during events in controversy.

23. Slade Gorton & Co., Inc. is named for the father of the Honorable Judge Nathaniel M. Gorton. The company's chairman is his brother, Michael C. Gorton Sr., its president and CEO is his neice, Kimberly Gorton, and its vice president of food service sales is his nephew, Michael Gorton Jr. In his financial disclosure reports for the calendar years 2003 through 2008, the Honorable Judge Nathaniel M. Gorton lists himself as a "Shareholder, Clerk/Secretary and Director" of Rocky Bay Trust, "a MA Business Trust, which owns all of the stock of Slade Gorton & Co., Inc." In his financial disclosure reports for the calendar years 2009 and 2010, the Honorable Judge Nathaniel M. Gorton lists himself as a "Stockholder, Clerk/Secretary and Director" of Slade Gorton & Co., Inc.; "a MA corporation and successor of Rocky

Bay Trust, a MA Business Trust, which formerly owned all of the stock of the Corporation." In his financial disclosure reports for the calendar years 2011 through 2016, The Honorable Judge Nathaniel M. Gorton lists himself as a "Stockholder, Clerk/Secretary and Director" of SG Seafood Holdings, Inc. According to Bloomberg, Slade Gorton & Co., Inc. is now a subsidiary of SG Seafood Holdings, Inc.

24. On or about February 4th, 2008, BCH gave its partner, the NEHLW, $30,000.

25. On or about September 2nd, 2015, the NEHLW issued a press release stating that it was "incredibly grateful to Boston Children's [Hospital]" for a $50,000 grant that BCH had awarded the NEHLW on August 27th, 2015. This grant and the resulting press release took place during events in controversy in the case upon which The Honorable Judge Nathaniel M. Gorton has passed judgement and within 6 months of my arrest.

26. There may be further assets about which I am yet to learn which have changed hands between the NEHLW or BCH and Slade Gorton & Co., Inc., The Honorable Judge Nathaniel M. Gorton and his spouse, people within three degrees of relationship to either of them, and/or the spouses of such people. However I have not been able to conduct an exhaustive search because The Honorable Judge Nathaniel M. Gorton and The Honorable Magistrate Judge

Marianne B. Bowler here denied me bail for nearly 3 years based on an alleged offense which the overwhelming majority of fully-informed objectively reasonable members of the public consider to be a non-crime and/or a courageous and selfless act of compassion.

27. When inquired upon for comment on March 1st, 2018 regarding these and other apparent conflicts of interest on the part of the Honorable Judge Nathaniel M. Gorton due to his roles at the NEHLW and its connections to BCH and elsewhere, Brian Condron, the NEHLW's vice president of external affairs, responded within minutes to say that The Honorable Judge Nathaniel M. Gorton had not "been affiliated with The Home for at least a decade." However when pressed again with The Honorable Judge Nathaniel M. Gorton's 2012 financial disclosure report the following morning, listing him as a "Member of the Corporation" as well as with questions regarding the NEHLW's Board of Advisors and whether it had taken on a new title, Mr. Condron never replied. This experience is representative of the difficulties which my team and I have encountered trying to ascertain details which The Honorable Judge Nathaniel M. Gorton should have — at the least — disclosed voluntarily at the outset of his assignment to the case.

28. Thus, there may also be other organizational, personal, and/or financial relationships between individuals covered by 28 U.S.C. §§ 455(a), 455(b), and 144 and the NEHLW, BCH,

Waysick, and other alleged "victims" in the case chart which I am yet to learn.

29. However, what my team and I have been able to uncover so far is more than sufficient to demonstrate conclusively that The Honorable Judge Nathaniel M. Gorton and other relevant entities maintain long-term and substantial financial and personal interests in the NEHLW, BCH, and the partnership between the two which may be affected by the outcome of the case, as contemplated by 28 U.S.C. §§ 144, 455(a), 455(b)(4), and/or 455(b)(5)(iii).

30. For instance, any restitution which The Honorable Judge Nathaniel M. Gorton may order me to pay to BCH or to others may substantially affect the NEHLW either directly through donations and/or grants by BCH and others, or indirectly — yet still in a substantial way — through the NEHLW's partnerships with BCH and others.

31. The outcome of the case may also have other effects that are or will be ephemeral, intangible, and/or indirect, but which nonetheless are or would be substantial and/or otherwise cognizable under 28 U.S.C. §§ 144 and/or 455. Some of these plausible effects are enumerated below, however it would be impossible for anyone to know and list them all, and some further background information is necessary to illuminate what is known.

32. First, The Honorable Judge Nathaniel M. Gorton is currently assigned to another case, 1:18-cv-11237 Charm

the "NEHLW discrimination case"), which is an employment discrimination suit filed against the NEHLW in Boston U.S. District Court on or about June 13th, 2018. The Honorable Judge Nathaniel M. Gorton and the Honorable Magistrate Judge Marianne B. Bowler have neither disqualified themselves nor made on-the-record disclosures pursuant to either the relevant Canon of Ethics or 28 U.S.C. §455(e) in the NEHLW discrimination case. However, they each have docketed orders in that other case.

33. Second, during the trial of my case, a juror recognized the employer of the very first government witness, Mr. Patrick Keeton, who testified about his experiences working for a company called KDSA, which was an IT vendor for Wayside. At Wayside, Justine was, amongst other things, verbally assaulted, as defined by Massachusetts law, by a Wayside staff member who wasn't authorized to be in Justine's bathroom but who nonetheless ripped open her shower curtain while she was trying to bathe and screamed at her, putting her in fear.

34. The juror – who is an accountant (please see D.B. 323 page 197 line 22) and who worked for the NEHLW from 2006 through 2014 (please see D.B. 325 page 95 line 14) – recognized KDSA as the IT vendor for both the NEHLW and her subsequent, then-current employer as well.

35. Thus, this juror was presumably arranging payments to

KDSA over a 12-year period across 2 employers and was currently still doing so while seated on my case.

36. Although the defense asked to dismiss this juror for cause after the juror herself mentioned sua sponte the NEHLW and the prospect of a mistrial, The Honorable Judge Nathaniel M. Gorton neither dismissed the juror, disqualified himself, nor made any on-the-record disclosure regarding the NEHLW, the juror, nor KDSA.

37. Now, by way of illustration and by no means limitation, the financial interests of individuals enumerated in 28 U.S.C. § 455 will likely be affected and other-interests of such individuals will likely be substantially affected by the outcome of my case, especially by whether The Honorable Judge Nathaniel M. Gorton is allowed to continue presiding, whether the findings made as to both law and fact by him and the jury are allowed to stand, as well as by whether or not financial restitution is ordered, and if so, to whom and in what amounts. For example, there could and likely would be a chilling and/or deterrent effect on plaintiffs in cases like the aforementioned NEHLW discrimination case and upon defendants in criminal cases like this one and U.S. v. Swartz, causing them to accept negotiated settlements which are either directly or indirectly unduly favorable to the NEHLW and/or the government; to enter arbitration or plea negotiations when they otherwise might not have, and/or to be less assertive in their briefings. Indeed, these

Financial and other substantial effects seem even more likely given the procedural history of this case and U.S. v. Swartz as well as the difficulties I have had just getting these issues onto the docket (please see D.E. 192, 214, 241-242, 254, 268, 307-308, and 334-335).

38. In some instances, potential plaintiffs may be deterred from filing against the NBH&W, BCH, or related parties in the first place. Indeed, it's not hard to imagine that the plaintiff in the NBH&W discrimination case would be disheartened to learn that her lawsuit — her demand for justice — was assigned to a judge who is so well-connected to her opponent and who neither disclosed those connections nor disqualified himself in her case or in this one, given their respective circumstances. If such plaintiffs were to decide simply not to file against the NBH&W and/or BCH in the future, this would affect the financial affairs of these entities, including their insurance rates, and also their perceived prestige as well as that of those with whom they publicly associate, including Steele Gorton & Co., Inc. and others revealed later below.

39. For instance, as mentioned above in paragraph 22, as public outrage against BCH was growing during the controversy regarding Justine's care (or lack thereof), BCH took down its list of philanthropic donors from its website, ostensibly to prevent reputational and/or economic harm to these donors from protests and boycotts. This list likely

(or should have) included Slade Gorton & Co., Inc. at a time when The Honorable Judge Nathaniel M. Gorton was a "Stockholder, Clerk/Secretary and Director" of its holding company.

40. Similarly, the public ties between the Gorton family, its companies, BCH, and the NBHLW mean that the former two have an interest in the reputations of the latter two, which have been and would continue to be substantially affected by my case. For instance, the evidentiary decisions made by The Honorable Judge Nathaniel M. Gorton not to admit testimony about what BCH and its partners did to Justina and to preclude me from asserting that I acted in the defense of others, spared BCH and its donors — including Slade Gorton & Co., Inc — as well as its partners — like Wayside and the NBHLW — from the public display of scathing evidence, including: testimony from Justina regarding the abuse and torture she endured at the hands of BCH and Wayside, the admission of Justina's handwritten notes accusing BCH and Wayside of torturing her (please see D.E. 100), and open letters from a former federal prosecutor (please see D.E. 127, Attachment 1) and a former BCH nurse (please see Id., Attachment 2) condemning BCH.

41. In Tumey v. Ohio, 273 U.S. 510; 47 S.Ct. 437; 71 L.Ed. 749 (1927), the U.S. Supreme Court found that any situation "which would offer a possible temptation to the

average men as a judge... not to hold the balance nice, clear, and true between the state and the accused" denies the accused Due Process. Some 45 years later, The U.S. Supreme Court reaffirmed this finding in Ward v. Village of Monroeville, Ohio, 409 U.S. 57; 93 S.Ct. 80; 34 L.Ed.2d 267 (1972), and specifically held that the "Petitioner is entitled to a neutral and detached judge in the first instance." Yet, that is impossible in my case and the NBHW discrimination case so long as they are assigned to the Honorable Judge Nathaniel M. Gorton.

42. Additionally, activists mindful of the tragic outcome of the case U.S. v. Swartz and of its procedural history and that of my case as well as of the wanton and repeated violations of defendants' rights therein (and detailed herein and further below) have probably already been deterred from exercising their 1st Amendment rights and from engaging in civil disobedience, to the benefit of The Honorable Judge Nathaniel M. Gorton and his family, for instance by limiting their participation or that of others in the annual Aaron Swartz Day celebrations when such participation might criticize and therefore provoke the ire of The Honorable Judge Nathaniel M. Gorton.

43. In fact, even if eventual appellate review were to lead to the amelioration of the personal damage inflicted upon me with impunity by The Honorable Judge Nathaniel M. Gorton for a non-crime, nonetheless his abilities to deny me

my rights in the first instance and to hold me without bail for years on end, while vindictively making me wait for such appellate review, while incarcerated, would not undo and in fact would likely only intensify such chilling and deterrent effects. One would expect more people than already do so today to begin voicing a defeatist sentiment, so dangerous to liberty, along the lines of, "The defendant may have eventually 'won' after a 100-day hunger strike, significant media coverage, and years of tireless effort, but The Honorable Judge Nathaniel M. Gorton still dragged his name through the mud, violated his rights with impunity, made him represent himself in federal court, held him without bail, away from his wife and family, for years on end for a non-crime which presented the judge with serious financial and other conflicts of interest which he never disclosed on-the-record, and in the end there is nothing to stop The Honorable Judge Nathaniel M. Gorton from doing it again — absolutely nothing. The judicial system is broken. 'Winning' wasn't worth it, and we're better off not exercising our 'rights' in the first place lest The Honorable Judge Nathaniel M. Gorton or another judge like him do the same to us."

44.   Indeed, this is one of if not the most compelling reasons why post-verdict appellate relief is insufficient and why the purity of the judicial "temple" must be preserved in the first instance — so that nobody whose alleged "crime"

— Page 18 of 86 —

boils down to caring too much for others ever feels the way
that Aaron Swartz did and so that the tragic end of his
case never repeats itself. However, to instead allow The
Honorable Judge Nathaniel M. Gorton to operate as he has in
my case with impunity is to deliberately invite rather than
to preclude such tragedies in the future.

45. On a previous occasion, Timothy Watkins, Esq.,
who at the time was one of the senior federal criminal
defense attorneys in Boston, truthfully told me that once
The Honorable Judge Nathaniel M. Gorton had been assigned
to the case of U.S. v. Aaron Swartz, the United States
Attorney's Office told Aaron through his attorneys that
the government could effectively set his sentence as high
as they liked since The Honorable Judge Gorton would not
deviate from the recommendation of the prosecutors. In concert
with the well-deserved reputation of The Honorable Judge
Nathaniel M. Gorton, Aaron thus came to believe —
accurately — that he would be denied a neutral and
detached arbiter of justice in the initial instance.

46. Mr. Watkins also asserted to me that he wasn't
aware of one single case wherein The Honorable Judge
Nathaniel M. Gorton reversed a magistrate's detention order
and that he was only aware of him doing the opposite.

47. Records indicate that when The Honorable Judge
Nathaniel M. Gorton was assigned to the case of Aaron
Swartz and Assistant U.S. Attorney Steve Heymann was

informed by Acron's defense team prior to his death that his office had made Acron suicidal, Mr. Heymann responded by saying, "Fine, we'll lock him up."

48. Neither The Honorable Judge Nathaniel M. Gorton nor The United States Attorney's Office have ever apologized for their roles in the death of Acron Swartz.

49. On May 13th, 2013, after Acron's death, The Honorable Judge Nathaniel M. Gorton cited incidents of retaliation and harassment as well as "threatening communication" received by a relative of an AUSA when he ordered the redaction of the names of government agents and employees from case documents in U.S. v. Acron Swartz prior to their release to the waiting public. The government was concerned that revealing the names of such individuals; even to Congress; might lead to some form of retaliation.

50. The Honorable Judge Nathaniel M. Gorton is emotionally compromised from the fallout of U.S. v. Acron Swartz and this is obvious from his behavior presiding over my case.

51. The Honorable Nathaniel M. Gorton has created unconstitutional prior restraints, without holding hearings and inviting objections beforehand, in order to silence me from speaking critically to the prosecution and to curtail my petitions for the redress of grievances.

52. I previously filed many non-motion letters on the docket of my case. However, after I docketed a picture

of Aaron Swartz smiling, The Honorable Judge Nathaniel M. Gorton very promptly ordered me to cease making such filings (please see D.E. 192).

53. On or about June 13th, 2018, my wife — who is a journalist — called the mothers of the two federal prosecutors assigned to my case in order to inquire for comment for an upcoming article regarding whether they were ashamed of their sons for persecuting a Rolling-Stone—featured human rights activist for saving a crippled girl in a wheelchair. Despite the subsequent false and misleading claims of the U.S. attorney's office indicating otherwise, each time my wife identified herself as a journalist using her married name (though her caller ID on her cell phone may still be registered in her maiden name) and all of these calls took place before 10PM.

54. The next day, the government filed a motion seeking to have The Honorable Judge Nathaniel M. Gorton summarily impose sentence on my wife — who is a non-party who never appeared on any witness list — for her Constitutionally—protected conduct as a journalist which took place outside of the presence of his Court and which allegedly violated one of his aforementioned unconstitutional prior restraints aimed at unlawfully protecting the government. The government's motion falsely stated that my wife identified herself using her maiden name (which she did not) and it misrepresented the time of the calls so as to make them seem like they

— Page 21 of 86 —

were much later than they were.

55. This was only the government's most recent in a long line of misrepresentations of the journalism which my wife and I produce. In reality, we are credited with hundreds of articles at national political outlets reporting on a wide array of topics, sometimes satirically and often critically.

56. Earlier, the prosecution misquoted my work on the record in an obvious and deliberate attempt to anger The Honorable Judge Nathaniel M. Gorton, intimidate me, and bias the judge further against me. There was no other likely nor apparent reason for prosecutors to misrepresent a critical yet obviously satirical and qualified section of one of my headlines about The Honorable Judge Nathaniel M. Gorton as a serious and unequivocal accusation that he is a "wiretapping kidnapper," nor for them to mention that particular article to the judge in the first place. However, it does appear that they achieved their desired results.

57. On June 19th, 2018 or thereabouts, The Honorable Judge Nathaniel M. Gorton denied the government's ridiculous motion to summarily impose sentence on my wife without prejudice, but he enacted a new, though still unconstitutional, prior restraint, this time barring non-party non-witnesses from communicating with unnamed other non-party non-witnesses. Once again, there were no hearings and no opportunities to bring objections beforehand (please see D.E. 210). And once more,

the effect of the prior restraint, and likely a significant part of its purpose, is to protect the prosecution from public accountability and criticism.

58. It is not the role of a neutral and detached judiciary to protect the prosecution from public accountability and criticism. Nor should the judiciary strive to do so, nor allow circumstances to appear as if it is striving to do so.

59. If such becomes the case — as it has here — then it is reasonable to question the impartiality of the judge(s) responsible. Further, in my case:

60. The day after The Honorable Judge Gorton's then-latest prior restraint, there was a conspicuously loud knock on my wife's door which seemed aimed at intimidating her while her husband was away.

61. My wife video recorded what followed.

62. Two men were outside displaying badges.

63. They kept their distance when they noticed that my wife was recording them.

64. One of them hid his face behind a notepad or notebook which appeared to have writing on it, possibly preparatory notes for the encounter.

65. Eventually, the men identified themselves as being with The U.S. Marshals Service.

66. They attempted to interrogate my wife regarding her state of mind when she made the calls to the mothers of the prosecutors days before.

— Page 23 of 86 —

67. When my wife refused to stop recording and declined to answer questions, or cease "being difficult," as the men put it, they sought to confirm that she had seen The Honorable Judge Nathaniel M. Gorton's latest order.

68. It appears that the Honorable Judge Nathaniel M. Gorton had dispatched deputy U.S. marshals to serve process on my wife and to question her ex parte, off the record, with no attorneys present. At least that is what an objectively reasonable and fully informed member of the public would likely infer given the circumstances and the typical duties of deputy U.S. marshals as well as their close affiliation with the U.S. courts.

69. On October 19th, 2018, my team issued a Federal Freedom of Information Act (FOIA) request to The U.S. Marshals Service seeking to obtain the identities of the deputy U.S. Marshals who questioned my wife, the contact info for their direct supervisor, ~~and~~ any discoverable information regarding their trip to my wife's residence (such as their preparatory notes, if any), their primary and secondary assigned duties for that week, and if applicable, the identity of the federal judge to whom they were ~~assigned~~ assigned as security detail at that time.

70. An answer to that FOIA request is now long overdue and we have been following up diligently for over a month.

71. If there is another reason why a pair of

— Page 24 of 86 —

deputy U.S. marshals tried to interrogate (and intimidate) my wife for Constitutionally-protected work she carried out as a journalist to hold federal prosecutors accountable for their morally reprehensible behavior in this case, then The U.S. Marshals Service has not provided it.

72. The fallout from The United States v. Aaron Swartz and the facts both above and below clearly demonstrate that The Honorable Judge Nathaniel M. Gorton is emotionally compromised in regards to my case and would lead objective, fully-informed observers to question his impartiality therein.

73. My wife attended a trial over which The Honorable Judge Nathaniel M. Gorton presided just prior to mine and which ran smoothly while she was seated in the gallery wearing a shirt with a picture of Aaron Swartz on it. Shortly thereafter, without explaining his reasoning for doing so, The Honorable Judge Nathaniel M. Gorton ordered sue sponte that nobody wearing clothing with pictures on it — as people routinely do while attending trials — would be allowed into the courtroom during my trial. The Honorable Judge Nathaniel M. Gorton said that he would have court security officers stationed outside to enforce compliance.

74. Then, mispronouncing Aaron's surname before switching to what I can best describe as a caustic tone of voice and body language, The Honorable Judge Nathaniel M. Gorton specifically and explicitly noted that his clothing ban included items depicting "Mr. Swartz in his full glory."

— Page 25 of 86 —

75. These and other similar orders enacted by The Honorable Judge Nathaniel M. Gorton as well as the manner in which most of them were handed down without the opportunity to bring objections before they were to take effect and the apparent reasons behind them have serious ramifications for free speech, freedom of the press, the ability to petition the government for the redress of grievances, Due Process, public trials, the right of confrontation, as well as under 28 U.S.C. §§ 144, 455(a), 455(b)(4), and 455(b)(5)(iii).

76. Indeed, when The Honorable Judge Nathaniel M. Gorton was confronted with a choice between, on one side, my rights to a public trial and Due Process, including my right to a neutral and detached arbitor of justice, the right of those peacefully assembled in a public courtroom to freedom of expression and to petition the government for the redress of grievances, and his own appearance of impartiality versus, on the other side, his own concerns, The Honorable Judge Nathaniel M. Gorton chose the latter over the former.

77. Furthermore, despite the fact that my wife, myself, and the public had been barred by The Honorable Judge Nathaniel M. Gorton from wearing clothing bearing the image of Aaron Swartz, a juror referred sua sponte to him anyway on the final day of trial (please see D.E. 331 page 51 line 21) and the defense moved for the recusal

— Page 26 of 86 —

of The Honorable Judge Nathaniel M. Gorton (please see Id. page 19 line 1).

78. It is reasonable to assume that avoiding such a scenario was one of the motives behind The Honorable Judge Nathaniel M. Gorton's order banning shirts depicting Aaron's image.

79. However, part of the reason for the 6th Amendment right to a public trial is that government officials — including federal judges and prosecutors — are supposed to be accountable to the public — including for their behavior and exercise of prosecutorial and judicial discretion in controversial and politically-charged cases such as The United States v. Aaron Swartz and my case.

80. Additionally, if my wife, myself, and the public had been allowed to wear our already-made shirts bearing images of Aaron Swartz and Justina, more jurors may have recognized one or both of them.

81. The juror who referenced Aaron Swartz (and who was also familiar with what BCH had done to Justina and her family (please see D.E. 323 page 31 lines 3 and 10)) was visibly upset and teary-eyed as the verdict was read aloud. As she exited the courtroom before I was remanded into custody, she mouthed the words, "I'm sorry" to me.

82. Had this juror known about her Constitutional right (and some might say duty) to vote her conscience, then the trial likely would have resulted in a hung jury,

or, if she had informed other jurors more about what she knew, possibly an outright acquittal.

83. This juror also appeared to have been pressured by her peers during deliberations (please see D.E. 331 page 20 line 11, page 22 line 19, and page 26 line 20). Thus, if other jurors had recognized Aaron, or if I hadn't been precluded from discussing how what happened to him had influenced the decision of my wife and I to seek political asylum in Cuba (please see D.E. 329 page 58 line 7 through page 60 line 22), then perhaps more jurors would have had such reservations, the apparently lone voice of dissent in the jury room wouldn't have been as alone, and the outcome would have been different.

84. When the defense asked The Honorable Judge Nathaniel M. Gorton to disqualify himself following the juror's reference to Aaron Swartz, the judge displayed a visceral reaction. Indeed, the transcript reveals that he didn't allow the government to finish the first sentence of its opposing argument in the matter before he interrupted and said, "I'm not going to do that, okay?" (Please see D.E. 331 page 19 line 23.)

85. The Honorable Judge Nathaniel M. Gorton never put an analysis of his aforementioned decision and 28 U.S.C. §455 on the record.

86. When The Honorable Judge Nathaniel M. Gorton allowed my motion for the withdrawal of the Federal

Defender's Office, he took a conspicuously long time to appoint Ray Gillespie, Esq. as successor counsel. This pro se motion of mine specifically asserted conflicts of interest on the part of the formerly-presiding U.S. Magistrate Judge, The Honorable Marianne B. Bowler, which I did not know at the time are similarly problematic for The Honorable Judge Nathaniel M. Gorton (please see D.E. 90).

87. I do not know if The Honorable Judge Nathaniel M. Gorton was initially aware that Ray Gillespie carried no malpractice insurance while he was representing me, and Ray Gillespie never disclosed this information to me himself.

88. I do not know if The Honorable Judge Nathaniel M. Gorton was initially aware that records reflect that Ray Gillespie owed the federal government hundreds of thousands of dollars in back taxes which had accrued over a period of many years, and that he was in the process of negotiating a payment plan with the IRS. This debt, owed directly to the opposing party in my case and in other federal criminal cases, represents a serious conflict of interest. Further, should this conflict of interest lead to malpractice, there would be no insurance carrier with whom to file a claim.

89. Likewise, I do not know if The Honorable Judge Nathaniel M. Gorton was initially aware that Ray Gillespie spent/spends approximately 75% of his professional time on personal injury cases.

90. However, I do know that when I expressed

— Page 29 of 86 —

wonder as to how/why Mr. Gillespie had been chosen to represent me in a relatively high-profile criminal case given the above. The Honorable Judge Nathaniel M. Gorton disclosed the method by which he would appoint Mr. Gillespie's successor, i.e., that he would appoint whoever was the CJA duty attorney ~~that day~~ on the day of the hearing of Mr. Gillespie's motion to withdraw as opposed to however Mr. Gillespie had been selected.

91. To the best of my knowledge, both The Honorable Judge Nathaniel M. Gorton and the CJA panel allow Mr. Gillespie to continue to be appointed to represent committing federal criminal defendants who are not then made aware of the information above.

92. Prior to our discovery of the above issues with the representation of Mr. Gillespie, when my wife and I inquired with J.W. Carney Jr., Esq. as to both whether The Honorable Judge Nathaniel M. Gorton used the significant choice in appointing Mr. Gillespie to game the CJA appointment system and as to the skills and experience of Mr. Gillespie, particularly regarding the specifics of the case, Mr. Carney answered 13 days later on November 20th, 2017 by describing Mr. Gillespie as "outstanding," "very experienced," and an "ideal choice." However, this so obviously wasn't the case that it instead seems that Mr. Carney may have been speaking in code. In the same message, Mr. Carney also

wrote, "I don't know how [The Honorable Judge Nathaniel M. Gorton's] delay in appointing [Mr. Gillespie] could have been intentionally playing the system."

93. At every hearing where The Honorable Judge Nathaniel M. Gorton has closed the courtroom to the public and the government in order to hear my various attorneys and I ex parte, I have tried to object and assert my right to a public trial. My objections shall be preserved on the record of all of these hearings except the one for D.E. 90, for which there appears to have been a miscommunication between my attorney and I as to who was going to raise the issue.

94. I filed a written letter ahead of one such hearing, raising these objections (please see D.E. 140) which I know that The Honorable Judge Nathaniel M. Gorton saw beforehand because he mentioned this letter orally on the record and distributed it to the attorneys for both parties.

95. Every single one of these objections and assertions of my public trial right heard by The Honorable Judge was created Nathaniel M. Gorton was overruled to the detriment of myself, the public, and transparency and to the apparent benefit of the judge. Usually, exhibits highlighting conflicts of interest had been docketed under seal ahead of time.

96. In the most recent instance, on Thursday, December 13th, 2018, I asked The Honorable Judge

— Page 31 of 86 —

Nathaniel M. Gorton to assure my last attorney that it would be alright for him to raise disqualification issues and that The Honorable Judge Nathaniel M. Gorton wouldn't take it personally if he were to do so. I also asked for a stay of the rapidly approaching sentencing hearing when The Honorable Judge Nathaniel M. Gorton ordered me to represent myself so that I would have time to prepare and file this affidavit. These requests were denied.

97. When I previously requested to allow a journalist to stay in the courtroom during an ex parte hearing regarding my difficulties getting my last attorney to present these issues, that request was denied.

98. My requests to my last two attorneys to furnish me transcripts of these ex parte hearings have been fruitless.

99. Nor did my last two attorneys honor my requests to litigate the protective order prohibiting me from publishing or possessing any of my discovery. This order was enacted at the request of the government by The Honorable Magistrate Judge Marianne B. Bowler. Though my attorney at the time assented to this protective order, ~~but~~ I did not and never would have. I have never executed an agreement to this protective order and I only found out about it after it had been ~~enacted~~ put in place.

100. Moreover, from the government's very early

— Page 32 of 86 —

communications with my first attorney, it was clear that the government knew that I would want to publish and to make public as much as possible.

101. When The Honorable Judge Nathaniel M. Gorton ordered me to represent myself on Thursday, December 18th, 2018, one of my first motions, presented orally at that hearing, was to lift the protective order and for the government to produce the discovery from my case for my review prior to sentencing. This motion too was denied.

102. However there is a benefit for The Honorable Judge Nathaniel M. Gorton in upholding the protective order which presents a serious conflict of interest.

103. The warrant which "authorized" the FBI to search my home was issued by The Honorable U.S. Magistrate Judge Marianne B. Bowler (please see D.E. 8-1).

104. In the second paragraph of the affidavit in support of the search warrant (please see Id.), the affirming agent stated that he was, "investigating violations of 18 U.S.C. §1030(a)(5)(A) (intentionally causing damage to a protected computer) and 18 U.S.C. §371 (conspiracy) relating to attacks against the Boston Children's Hospital computer network and other related network attacks. (Emphasis added.)

105. Justine Pelletier is a person.

— Page 33 of 86 —

106. You will rarely, ~~ever~~ if ever, find anyone who cares more about computers than ~~the~~ I do.

107. No matter what though, people ~~are more~~ ~~important~~ — like Justine Pelletier — are more important than computers.

108. The eighth paragraph of the affidavit offered in support of the application for the search warrant for my home states, "The incoming traffic [from the DDoS attack] resulted in significant disruptions to the BCH website and additional disruptions to the network on which BCH and other Harvard University-affiliated hospitals communicate." (Emphasis added.)

109. Paragraph 27 of the affidavit says, "Since the attack against BCH in April 2014, the FBI has learned of other DDoS attacks against entities associated with BCH, the Justine Pelletier custody battle, and the troubled teen industry. Additional victims include... Wayside... These victims all experienced similar disruptions." (Emphasis added.)

110. According to her official court biography, The Honorable Magistrate Judge Marianne B. Bowler worked as a research assistant at Harvard Medical School. This information is mirrored in her CV, where she lists her time at Harvard Medical starting in 1967 and ending in 1969 in the section "Professional Experience."

111. According to her CV, The Honorable Magistrate

— Page 34 of 86 —

Judge Marianne B. Bowler is also a member of the visiting committee on Neuroscience at Massachusetts General Hospital and has been since 1999. Massachusetts General Hospital is Harvard Medical School's largest teaching hospital. (Please see D.E. 128-4).

112. The Honorable Magistrate Judge Marianne B. Bowler was at all relevant times married to Marc A. Pfeffer, who is and was at all relevant times a professor of medicine at Harvard Medical School and a cardiologist at Brigham and Women's Hospital ("BWH") (Please see D.E. 128-6).

113. Mr. Pfeffer's email address is: ~~mpfeffer@~~ mpfeffer@rics.bwh.harvard.edu.

114. "rics" stands for "research information computing systems."

115. The overwhelming majority of other BWH employees also have email addresses which contain "harvard.edu".

116. The email domain name for BCH staff is "childrens.harvard.edu".

117. Again, please see paragraphs 2 and 27 of the affidavit in support of the search warrant contained in D.E. 78-1 and especially paragraph 8 thereof i.e. mentioning "disruption to the network on which BCH and other Harvard University - affiliated hospitals communicate." (Emphasis added.)

118. Further, the affidavit filed in support of the criminal complaint specifically alleged disruptions to email systems and to medical research being conducted (please see D.E. 3 paragraphs 13 and 14).

119. Neither email systems nor medical research are more important than people such as Justine Pelletier and neither take precedence over the non-derogable human right of Justine to be free from torture.

120. In my second supplimental suppression motion, which cited, amongst other reasons, the readily obvious conflicts held by The Honorable Magistrate Judge Marianne B. Bowler due to the interests of her husband, the defense stated on page 11, "Should a [joint evidentiary] hearing be necessary, however, it would be ~~necessary~~ appropriate to call for Pfeffer and others to testify concerning his work at [Harvard Medical School] and BWH, including his work in medical communications, as well as [The Honorable] Magistrate Judge Bowler's knowledge of that work as of [when the search warrant was issued in] September 2014. It would also be appropriate for Dr. Pfeffer and others to testify concerning the DDOS attack and its impacts on [Harvard Medical School], BWH, and his professional life as of September 2014."

121. The Honorable Judge Nathaniel M. Gorton

later passed judgement on the aforementioned second supplemental suppression motion.

122. On page 3 of its opposition to the aforementioned second supplimental suppression motion, the government claimed the following assertion of supposed fact (please see D.E. 179 at 3): "The fact that [The Honorable Magistrate] Judge Bowler's husband is employed by a medical school and a hospital that were not the target of attack being investigation [sic] similar to provides no grounds for recusal." (Emphasis added.)

123. The government then claims on page 13 of D.E. 179, "Because Dr. Pfeffer's connections to the [Harvard Medical School] and BWH were so divorced from the attack on Boston Children's hospital, no actual conflict existed that required [The Honorable Magistrate] Judge [Marianne B.] Bowler's recusal."

124. The Honorable Judge Nathaniel M. Gorton made credibility determinations as to these claims by the government when he denied my suppression motions without granting the evidentiary hearing which I had repeatedly requested. However, he had inappropriate and undisclosed reasons for doing so, many of an extrajudicial nature, as will soon be demonstrated.

125. On page 27 of his order denying my suppression motions without a hearing, The Honorable Judge Nathaniel M. Gorton determined, "The government

convincingly demonstrates that [Harvard Medical School] is not an affiliate of area hospitals in the sense that there is a business relationship with the hallmarks of legal control, but rather that the affiliation relates to the training of medical students and residents." (Please see D.E. 209 at 27, emphasis added.)

126. Then, regarding another case which will be discussed later herein and over which The Honorable Magistrate Judge Marianne B. Bowler [Recusified] herself sua sponte, The Honorable Judge Nathaniel M. Gorton found that she did so, "[O]nly after [Harvard Medical School] became directly involved in the case." The Honorable Judge Nathaniel M. Gorton also determined that, "The relationship to [Harvard Medical School] [in the instant case] is tenuous, at best and recusal was not required here." (Please see D.E. 209 at 29, emphasis added.)

127. However, the government knew better at the time of its opposition to the suppression motions. With access to the 302s in my discovery, to which I have been denied by The Honorable Judge Nathaniel M. Gorton, I could demonstrate this further. However, for now, please see D.E. 216 at 1 and 2, seeking to preclude me from testifying to the contrary that I "expanded the DDoS attack against BCH beyond what was necessary to take down the hospital's public-facing website, to include a

subnet of 65,000 IP addresses that was shared with other hospitals in the Boston area." (Emphasis added.)

128. Indeed, Assistant U.S. Attorney David J. D'Addio, who personally filed the opposition to my suppression motions (please see D.E. 179 at 26) was physically present in the room at the time of the statements referenced in D.E. 216. The 302s to which I am currently denied access in the discovery materials of my case would show that he knew all too well prior to filing the opposition to my suppression motions that BWH was one of the "other hospitals" referenced in D.E. 216, that Harvard Medical School was "directly involved" and that the relationship between BWH and Harvard is and was in fact critical and anything but "tenuous, at best," as Mr. D'Addio intentionally led The Honorable Judge Nathaniel M. Gorton to conclude while all the time likely aware that the Judge had personal reasons to want to reach such conclusions and not to want to scrutinize the credibility of the government's assertions.

129. Furthermore, AUSA D'Addio would later illicit directly contradictory witness testimony (please see D.E. 327 page 194 line 24 through page 199 line 13) and explicitly mention ~~B..H~~ the alleged impact on BWH in his closing arguments, along with Harvard Medical School as well (please see D.E. 329 page 6 lines 11-13).

130. In fact, all of the government's vaunted

ideals permeating D.E. 216 about "good faith," "truthfullness," and "creibility" rang absolutely hollow at trial when it became the government which repeatedly and deliberately violated D.E. 216-1. That should reflect on the credibility of AUSAs D'Addio and Kosto now.

131. It is important to note that the charge conference in my case took place before the closing arguments in my case.

132. Bearing the above in mind, the government proposed a jury instruction regarding "Impeachment By Prior Inconsistant Statement" (please see D.E. 238 at 22).

133. However, at the charge conference, The Honorable Judge Nathaniel M. Gorton said, "I'm not going to give that [instruction] because I don't think there was any reference to prior inconsistant statements during the course of the trial." (please see D.E. 328 page 8 lines 22 thragh 25.)

134. Thus any information which the government obtained through D.E. 216-1 was inadmissable.

135. However once again, the 302s in the discovery material of this case would show that AUSAs knew all of the following through D.E. 216-1: that it was a 40,000-node botnet used against BCH (please see D.E. 313 page 70 lines 21-24), that I had created it (please see Id. at 71 lines 3-6), that I caused the

— Page 40 of 86 —

software to be loaded onto those nodes and issued a command (an essential element of the offense which the government was required to prove.) (please see T.J. at 71 line 13 through page 73 lines 11), that I used a variant of the moon worm (please see T.J. at 71 line 24 through page 72 line 4) and that I controlled the botnet through a virtual private server (please see T.J. at 72 lines 16 through 21).

136. The government then incorporated this inadmissible information into a powerpoint presentation which it never entered into evidence before playing it before the jury in closing arguments (please see D.E. 329 at 15 lines 24 through page 15 line 10 and page 92 line 18 through page 93 line 13).

137. Now, to be clear, I do not believe that the Honorable Judge Gorton knew about these violations of D.E. 216-1. To my great dismay it seems that even though I told my lawyer about this issue, he did not raise it at sidebar as he had led me to believe. Nevertheless, the Honorable Judge Nathaniel M. Gorton did make credibility determinations in favor of the government and particularly, AUSA David J. D'Addio and AUSA Seth Kosto inappropriately and their behavior above should be noted to prevent such errors in the future. Credibility is and ought to remain a non-renewable resource.

138. Returning to the issue of The Honorable U.S.

Magistrate Judge Marianne B. Bowler's failure to disqualify herself despite the "significant" disruption to the two organizations from which her spouse, with whom she is entitled to file joint tax returns, ~~draws pay checks,~~ presumably draws pay checks, there were other conflicts of interest which required her to recuse and which dovetail with similar conflicts of interest on the part of The Honorable Judge Nathaniel M. Gorton.

139. From 1995 through 2005, The Honorable Magistrate Judge Marianne B. Bowler was a director of The Boston Foundation Church "TBF") (please see D.E. 128-4). She is now an emerita director of TBF (please see D.E. 179-1).

140. During the NEHLW's 2003 fiscal year, while The Honorable Judge Nathaniel M. Gorton listed himself as a "Member of the Corporation," and while the NEHLW listed him as a member of its Board of Advisors and his brother Michael as one of its directors, as well as when the judge and his spouse, and Michael Gorton and his spouse donated significant sums of money, The Boston Foundation (of which The Honorable Magistrate Judge Marianne B. Bowler was then a director) donated between $1,000 and $2,499 to the NEHLW as well, which the NEHLW publicly acknowledged by placing TBF in its "Friends Crofx," two columns over from The Honorable Judge Nathaniel M. Gorton in its FY 2003 report.

— Page 42 of 86 —

141. In Fact, TBF has a long history of donating to the NEHLW, BCH, and Wayside. It maintains entire fundraising webpages for each at its charity portal givingcommon.org. So far my team has found the following donations from TBF to the NEHLW. In some instances, multiple funds or parts of TBF each made donations in the same giving period.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/02 – 6/30/03 | $1,000 – $2,499 | Unknown | "Friend's Circle" |
| 7/1/05 – 6/30/06 | $10,000 – $24,999 | Unknown | "Chairman's Circle" |
| 7/1/06 – 6/30/07 | $50,000 – $99,999 | Unknown | "Chairman's Cabinet" |
| 7/1/07 – 6/30/08 | $50,000 – $99,999 | Unknown | "Chairman's Cabinet" |
| 7/1/08 – 6/30/09 | $10,000 – $24,999 | Unknown | "Chairman's Circle" |
| 7/1/08 – 6/30/09 (2) | $1,000 – $2,499 | Unknown | "President's Circle" |
| 7/1/09 – 6/30/10 | $1,000 – $24,999 | Unknown | "President's Circle" |
| 7/1/10 – 6/30/11 | $5,000 – $9,999 | 1/23/12 | "President's Cabinet" |
| 7/1/13 – 6/30/14 * | $10,000 – $24,999 | 1/20/15 * | "Chairman's Circle" |
| 7/1/14 – 6/30/15 * | $10,000 – $24,999 | 2/18/16 * | "Chairman's Circle" |
| 7/1/14 – 6/30/15 (2) * | $5,000 – $9,999 | 2/18/16 * | "President's Cabinet" |
| 7/1/15 – 6/30/16 * | $5,000 – $9,999 | 1/15/17 *† | "President's Cabinet" |
| 7/1/15 – 6/30/16 (2) * | $5,000 – $9,999 | 1/15/17 *† | "President's Cabinet" |
| 7/1/16 – 6/30/17 *† | $5,000 – $9,999 | 1/30/18 *† | "President's Circle" |

142. In calendar year 2014, during the events in controversy, TBF gave $182,950 to BCH ($167,450 in

operational support, $5,000 in Family support $10,000 for medical research like that which BCH claims was interrupted, and $500 in health care).

143. In calendar year 2015, also during events in controversy, The Swichnberg/Novotny Donor Advised Fund at The Boston Foundation gave BCH between $2,500,000 and $4,999,999, and was listed along with Slade Gorton & Co., Inc.

144. In December 2017, TBF simultaneously granted the NBHLW $20,000 and Wayside $7,000 as part of its "Massachusetts United For Puerto Rico" campaign.

145. On or about February 21st, 2008, while The Honorable Judge Nathaniel M. Gorton disclosed that he was a "Member of the Corporation" of the NBHLW, TBF gave the NBHLW a $30,000 grant to "support the Task Force on Youth Aging Out of [Department of Social Services] Care." The Department of Social Services was the forerunner of the current Massachusetts Department of Children and Families (DCF).

146. On its "2014 Agency Highlights" report, Wayside listed TBF on its "Donor List," presumably at/for the time of the principal events in controversy, if not during other events in controversy for my case (please see D.E. 166 at 12).

147. Up through at least December 2, 2015, TBF was publicly listing The Honorable Magistrate Judge Marianne B. Bowler among the Emeritus Members of its Board of

Directors (please see D.E. 128-4 at 3-4).

148. There may be (and indeed there almost certainly are) other assets which changed hands to/from TBF and the NBHLW, BCH, Wayside, and other relevant entities which have never been disclosed on the record and about which I am yet to learn.

149. For example, while drafting this affidavit my team found that during the winter of 2014, while the public outcry around Justina was reaching its height and during the principal events in controversy, the Boston Foundation was in the selection process for its "Health Starts at Home" initiative and that by April of that year, a coalition which included BCH would be one of four grant recipients to receive $40,000. Both BCH and TBF publicly acknowledged each other as part of this initiative, with BCH crediting TBF for "funding and technical support."

150. It has further come to light that the NBHLW listed BCH among its "Top Corporate and Foundation Supporters" for its FY 2016 (July 1st, 2015 through June 30th, 2016), during which time important events in controversy in my case transpired. The Honorable Judge Nathaniel M. Gorton has passed judgement on those events.

151. Similarly, it has come to my attention since I began writing this document that the corporate profile of The Honorable Judge Nathaniel M. Gorton's brother,

Michael Gorton Sr., on the Slade Gorton & Co., Inc. commercial website currently, specifically, and explicitly mentions that "[H]is personal affiliations range from The Home for Little Wanderers, a Boston-based children's organization, to the Dedham Tennis Club." When this page is printed as it is currently laid out, this mention of the NEHLW appears directly adjacent to "Download Our Catalog" and "Email: sales@sladegorton.com (please see D.E. 341 Exhibit B6). The Honorable Judge Nathaniel M. Gorton's niece and nephew also appear on this page as company executives, as do links labelled "Retail," "Brands," "Food Services" and "Contact Us."

152. Once again, in his financial disclosures from calendar years 2003 up through 2016, The Honorable Judge Nathaniel M. Gorton has consistantly and without exception listed himself as either a "Shareholder, Clerk/Secretary and Director" or a "Stockholder, Clerk/Secretary and Director" of Slade Gorton & Co., Inc. or its wholly-owning trust or holding company ascribed by whichever the case may be in a given year. This likely continues in his 2017 financial disclosure report (which I am yet to obtain) and will likely continue in his 2018 report when it is filed. Further, regardless of subsequent years, my case was assigned to The Honorable Judge Nathaniel M. Gorton in calendar/disclosure year 2016.

153. Additionally, my team and I recently found the following donations to the NBHLW from KOSA, the IT vendor and employer of the first government witness mentioned above in paragraphs 33-36 which was recognized by the juror and accountant who formerly worked for the NBHLW.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/05 - 6/30/06 | $5,000-$9,999 | Unknown | "President's Cabinet" |
| 7/1/06 - 6/30/07 | $5,000-$9,999 | Unknown | "President's Cabinet" |
| 7/1/07 - 6/30/08 | $5,000-$9,999 | Unknown | "President's Cabinet" |
| 7/1/08 - 6/30/09 | $5,000-$9,999 | Unknown | "President's Cabinet" |
| 7/1/09 - 6/30/10 | $5,000-$9,999 | 1/9/11 | "President's Cabinet" |
| 7/1/10 - 6/30/11 | $10,000-$24,999 | 1/23/12 | "Chairmen's Circle" |
| 7/1/11 - 6/30/12 | $10,000-$24,999 | 1/7/13 | "Chairmen's Circle" |
| 7/1/12 - 6/30/13* | $10,000-$24,999 | 1/13/14* | "Chairmen's Circle" |
| 7/1/13 - 6/30/14* | $5,000-$9,999 | 1/20/15* | "President's Cabinet" |

154. Thus, it is reasonable to infer that this juror wasn't just processing payments from the NBHLW to KOSA, but also to the NBHLW from KOSA. The Honorable Judge Nathaniel M. Gorton and his spouse, his brother Michael Gorton and his spouse Karen (nee Swift), Slade Gorton & Co., Inc., BCH, and others who will be detailed below. Thus, given that the juror's time at the NBHLW

(2006 through 2014) overlapped with the tenure of The Honorable Judge Nathaniel M. Gorton there as a "Member of the Corporation" (at least 2003 through 2012), it is also reasonable to infer that The Honorable Judge Nathaniel M. Gorton knew that this juror was (or likely was) processing these transactions and yet he neither disclosed this information nor dismissed the juror when moved to do so by the defense.

155. Furthermore, the following donations to the NEHLW from the current employer of this juror at the time of the trial here just come to my attention. Many occurred during the tenure of The Honorable Judge Nathaniel M. Gorton at the NEHLW.

| Giving Period | Amount | Thank You Date | Membership |
|---|---|---|---|
| 7/1/06 – 6/30/07 | $1,000 – $2,499 | Unknown | "President's Circle" |
| 7/1/07 – 6/30/08 | $250 – $499 | Unknown | "Advocate" |
| 7/1/08 – 6/30/09 | $250 – $499 | Unknown | "Advocate" |
| 7/1/09 – 6/30/10 | $500 – $999 | 1/9/11 | "Mentor" |

156. My team also found that BCH named both the NEHLW and the Massachusetts Department of Children and Families (DCF) as "Community Partners" in its Community Health and Benefits Strategic Implementation Plan (FY17 - FY19).

157. Finally, returning to The Boston Foundation, TBF is listed alongside The Massachusetts Department of Children and Families (DCF) and the NEHLW in a February 2018 "Funding Strategy Report" released by BCH's Office of Community Health.

158. Now, these intimate bonds between TBF and/or the NEHLW on the one hand and DCF, BCH, Wayside, and the rest of the so-called "Massachusetts child welfare bureaucracy" on the other are not new. In fact, they date back to the tenures of The Honorable Magistrate Judge Marianne B. Bowler as a director of TBF from 1995 through 2005 and The Honorable Judge Nathaniel M. Gorton at the NEHLW from 2003 or earlier through 2012.

159. For instance, in TBF's FY2003 report, the Foundation disclosed that it had dispensed some $6,940,983 in grants for "social services," presumably $1,000 to $2,499 or so of which went to the NEHLW.

160. Similarly, in the NEHLW's FY2003 report for the period in which The Honorable Judge Nathaniel M. Gorton was one of its ~~directors~~ advisors and his

brother was one of its Directors, the agency detailed that it had received $100,000 or more in donations from each of The Massachusetts Department of Education, The Massachusetts Department of Mental Health (DMH), and The Massachusetts Department of Public Health (DPH) and more than $50,000 each from The Massachusetts Office of Child Care Services and The Massachusetts Department of Social Services (DSS), which was the predecessor of the modern Massachusetts Department of Children and Families (DCF). As will be shown later many of these public-private partnerships continued for many years during the tenure of The Honorable Judge Nathaniel M. Gorton at the NEHLW and many of these state agencies would become centers of controversy during the Justina Pelletier scandal and my case (please see D.E. 127 Attachments 1-2 and D.E. 329 page 28 lines 23-24, amongst many others).

161. For example, the NEHLW's FY2012 report (which would be the last or penultimate for which The Honorable Judge Nathaniel M. Gorton would list himself as a "Member of the Corporation"), highlighted that, "We [, the NEHLW,] exceeded our target of 28% of total business generated by third-party payers (public and private insurance companies vs. state-funded allocations, primarily from the Department of Children & Families and the Department of Mental Health)."

- Page 50 of 86 -

However, what this quote also reveals is that somewhere around 72% or so of the NBHLW's "total business" came "primarily from the Department of Children & Families and the Department of Mental Health."

162. It is also worth noting that the NBHLW wasn't just influenced by state agencies and their funding, but that the NBHLW (and TBF as well) helped to shape the "Massachusetts child welfare bureaucracy" (please see D.E. 341 Exhibits D1-D14).

163. For instance, in its FY 2003 report alone, the NBHLW boasted that it was helping to provide the state "more than 70 caring and committed Foster-Families," that "Over the course of a year, 1,837 Boston school staff and students benefitted from mental health and substance abuse consultations and psychoeducational groups provided by the [NBHLW's] Child and Family Counseling Center," and that one of its programs "joined forces with the Department of Social Services Boston Regional Office and the Bendeli Team to prevent child prostitution... Trainings are also offered to staff at the programs and to social workers at DSS."

164. The implications of these very public associations are three-fold: 1) they give rise to an objective appearance of bias when The Honorable Magistrate Judge Marianne B. Bowler or The Honorable Judge Nathaniel M. Gorton are asked to make unflattering

rulings regarding and/or affecting these entities, with which they, their families, and their professional associates are or were publicly affiliated; 2) recusal is mandated under 28 U.S.C. §455(a)(1) when the aforementioned Honorable jurists would be "forced to make factual findings about events in which [they were] active participants]" (please see United States v. Alabama 828 F.2d 1532 (11th Cir. 1987); and 3) recusal is separately and independently mandated when the aforementioned Honorable jurists possess "personal knowledge of disputed evidentiary facts" gained outside the courtroom (please see 28 U.S.C. §455(b)(1)). All three are disqualifying of both The Honorable Magistrate Judge Marianne B. Bowler and The Honorable Judge Nathaniel M. Gorton in my case.

165. Even before the trial testimony regarding the significant, direct, and unprecedented impact of the alleged events directly on the two employers of the spouse of The Honorable Magistrate Judge Marianne B. Bowler (again, please see D.E. 327 pages 194 through 199), fully-informed objective observers could have and did reasonably question her impartiality in hearing the application for a search warrant for my home based on paragraphs 103–117 above.

166. Additionally, the affidavit in support of the search warrant application explicitly advised the former Director of TBF, an organization which had and still has

— Page 52 of 86 —

significant financial, political, operational, and other ties to the Massachusetts child welfare bureaucracy, that "Based on the evidence discussed below, I believe that the attack against BCH is related to an activist effort concerning the custody battle over teenage medical patient Justine Pelletier. This custody battle involved the Commonwealth of Massachusetts's [sic] taking custody of Justine Pelletier from her parents due to her serious medical condition. She was in Massachusetts['] custody for 16 months, much of which she spent at BCH, until her release in June 2014." (Emphasis added. Please see D.E. 78 Exhibit A paragraph 9.)"

167. The above section of the search warrant application's supporting affidavit implicated the personal knowledge of and the alignment with the Massachusetts child welfare bureaucracy resulting from The Honorable Magistrate Judge Marianne B. Bowler's tenure as a Director at TBF.

168. Furthermore, The Honorable Magistrate Judge Marianne B. Bowler was an "active participant" in the molding of the Massachusetts child welfare bureaucracy such that presiding over my case required her to make factual findings about events in which she participated.

169. For example, on February 2nd, 2014, before the events in controversy in the search warrant application occurred, The Boston Globe published a detailed report

finding that more than 95 children had died while in
state custody between 2001 and 2010, a period which
overlaps significantly with the tenure of The Honorable
Magistrate Judge Marianne B. Bowler as a director at
TBF as well as that of The Honorable Judge Nathaniel
M. Gorton as an advisor/"Member of the Corporation" of
the NEHLW. This report was widely circulated and caused
great alarm in the activist community prior to my efforts
to save Justina. For instance, Rolling Stone later noted
this report in its feature about my case, "The [Boston]
Globe, in a wider investigation into the DCF, found more
disturbing data. More than 95 children were found to
have died in state custody between 2001 and 2010."
(Please see D.E. 341 Exhibit G2.)

170. A search of the messages shared on the social
media platform Twitter during the Justina Pelletier scandal
for the terms "#Free Justina DCF" returns a copious
number of results clearly indicating that DCF's policies,
procedures, and history were the subject of widespread
and significant public scrutiny, controversy, and outcry.

171. The Twitter accounts for which the government
was searching (please see Attachment B § (I)(A)(11)
of the warrant application, i.e. D.E. 78 Exhibit A) had
tweeted about these topics (please also see paragraph 25
of the warrant application affidavit).

172. Additionally, it has recently come to my

— Page 54 of 86 —

attention that the cardiology department at BWH, for which the spouse of The Honorable Magistrate Judge Marianne B. Bowler works, touts its close collaboration with colleagues at BCH on its website.

173. The approval of the government's application for a search warrant for my home by The Honorable Magistrate Judge Marianne B. Bowler was a vital and necessary step for the recovery of financial restitution by her husband's employer(s), the discovery of information about the alleged acts which had "crippled" and "humiliated" those employers, the deterrence of similar acts against them in the future, and the silencing of their critics and those of the Massachusetts child welfare bureaucracy. It is reasonably viewed by objective and well-informed observers as an act of retribution by The Honorable Magistrate Judge Marianne B. Bowler.

174. Thus, all three of the principles enumerated above in paragraph 164 precluded The Honorable Magistrate Judge Marianne B. Bowler from hearing the government's application for a search warrant for my home.

175. Moreover, The Honorable Magistrate Judge Marianne B. Bowler continued to preside over my case even after the issuance of the initial criminal complaint, the affidavit in support of the application for which explicitly mentioned "the custody of the Massachusetts Department of Children and Families," that Justine's

"custody and medical care became a national media story, with religious and political organizations, and others asserting that the case was an example of government interference with parental rights," that the alleged DDoS "disrupted the Hospital's day-to-day operations as well as research being done," that "the Hospital decided to shutdown the portions of its network that communicated with the internet and its email servers," and that "This shutdown of the Hospital's website, external internet portal, and e-mail servers, however, impacted the entire Hospital community." (Emphasis added. Please see D.E. 3, affidavit paragraphs 5, 6, 13, 15, and 16.)

176. Although The Honorable Magistrate Judge Marianne B. Bowler did not issue the criminal complaint herself, there can be no doubt that she read it as she obtained a copy of it from her clerk during my detention hearing (please see D.E. 19 page 7 lines 3-4) prior to waiting 92 days to issue her order of detention in my case. And though the identities of BCH and Justine were omitted from the complaint affidavit, they were named early and often throughout the hearing, as was the surrounding controversy regarding the Massachusetts child welfare bureaucracy.

177. Further, in her eventual detention order, after which The Honorable Magistrate Judge Marianne B. Bowler would continue to preside over my case, she

- Page 56 of 86 -

explicitly noted the national and local controversy over
governmental interference which accompanied Justine's case
(please see D.E. 25 at 17).

178. Tellingly, The Honorable Magistrate Judge
Marianne B. Bowler also spontaneously began referring
to BCH using the familiar moniker "Children's" (please
see ID. at 10).

179. The Honorable Magistrate Judge Marianne B.
Bowler never disclosed any information onto the record
relevant to the question of disqualification nor inquired
on the record to ascertain whether the alleged "disruption
to the network on which BCH and other Harvard University-
affiliated hospitals communicate" (D.E. 78 Exhibit A
paragraph 8) (emphasis added) affected her spouse, BWH,
or Harvard Medical School even after the government
mentioned "many [doctors] that are at the Harvard
hospitals that are outside the hospital physically" (please
see D.E. 19 page 55 lines 15-17, emphasis added).
Although, she did spontaneously ask about access to
medical records and physicians' access to them (please
see ID. page 9 lines 10-20).

180. It may also be worth noting that The Honorable
Magistrate Judge Marianne B. Bowler never let my attorney
finish his legal argument before taking the matter of my
detention "under advisement" for 92 days (please see ID.
page 60 line 19 through page 61 line 21).

181. In addition to all of the above facts about The Honorable Judge Nathaniel M. Gorton, The Honorable Magistrate Judge Marianne B. Bowler, her spouse Marc Pfeffer, BCH, BWH, Harvard Medical School, RRCS, TBF, DCF, the NEHLW, the Massachusetts child welfare bureaucracy as well as the relevant trial testimony and argument thereto, The Honorable Magistrate Judge Marianne B. Bowler very clearly dated and timestamped the search warrant that she issued for my home "September 29, 2014 @ 3:43PM" when she signed, sealed, and returned it to the government (please see D.E. 78 Exhibit A).

182. However, the application for that same search warrant was dated the following day, "09/30/14" on its front page when The Honorable Magistrate Judge Marianne B. Bowler signed, sealed, and returned it to the government and when the government provided it to the defense in discovery (please see D.E.).

183. Therefore — at best — The Honorable Magistrate Judge Marianne B. Bowler did not review the application for the search warrant she issued for my home carefully enough to notice this mismatch before signing, sealing, and returning both the warrant application and the warrant itself.

184. The United States Supreme Court has wisely remarked and has since reaffirmed that "justice must satisfy the appearance of justice." (Please see Offutt

v. U.S., 348 U.S. 11, 14; 75 S.Ct. 11, 13; 99 L.Ed. (1954).)

185. Further, the version of the warrant application which The Honorable Magistrate Judge Marianne B. Bowler filed under seal (and which The Honorable Judge Nathaniel M. Gorton refused to unseal for the world to see) does not match the version returned to the government (please compare 1:14-mj-2233-MBB to 1:16-cr-10305 D.E. 78 Exhibit A).

186. There is little, if anything, about my case which "satisfies] the appearance of justice" (please see D.E. 77, 100-102, and 90 Exhibits F-I and J).

187. For another instance, TBF changed its bylaws less than 3 weeks after The Honorable Magistrate Judge Marianne B. Bowler issued the search warrant for my home, resulting in her being awarded the status of director emerita (please see D.E. 179-1 paragraph 3). Again, that year TBF donated heavily to BCH and was listed as a sponsor of Wayside. Yet despite the appearance of impropriety resulting from her acceptance of this title so very shortly after issuing the search warrant for my residence, The Honorable Magistrate Judge Marianne B. Bowler neither declined nor delayed her acceptance of this honorific in accordance with 28 U.S.C. §455(a) (please see In Re Continental Airlines, 901 F.2d 1289 (5th Cir. 1990)).

188. Indeed, during the pendency of my case before The Honorable Magistrate Judge Marianne B. Bowler, she spontaneously disqualified herself from another case involving BCH (herein "Cabi et. al."), citing both 28 U.S.C. §455(a) and 28 U.S.C. §455(b)(4) (please see Dr.E. 128-7) and the likely and apparent effect on her husband's interests in that case were far less significant than they are in mine. Ironically, the combination of The Honorable Magistrate Judge Marianne B. Bowler's recusal in Cabi et al. and her failure to inquire and/or make an on-the-record disclosure in my case regarding her spouse's interests, ~~there~~ together themselves give rise to reasonable questions requiring her recusal from my case under 28 U.S.C. §455(a).

189. Further, the magistrate judge assigned to my case, the NEHLW discrimination case, and to Cabi et al. was in each instance The Honorable Magistrate Judge Marianne B. Bowler.

190. I do not have direct access to PACER (nor to RECAP), but I can do some math. If there are 5 magistrate judges in U.S. District Court in Boston and no other cases pending there wherein BCH and/or the NEHLW figure so prominently, then the odds of all 3 cases where these entities are so critical being assigned to ~~them~~ The Honorable Magistrate Judge Marianne B. Bowler ~~are~~ initially are 1:125. If there are 6 magistrate judges,

then the odds become 1:216, and if 7, then 1:343.

191.  If there is/was 1 other case featuring either BCH or the NEHLW (of which I am not aware despite my discoveries of Cebi et al. and the NEHLW discrimination case) and 5 magistrate judges in U.S. District Court in Boston, then the odds of The Honorable Magistrate Judge Marianne B. Bowler being initially assigned to 3 of them are roughly 1:39 (less than 3%). If there are 6 magistrate judges then the odds of The Honorable Magistrate Judge Marianne B. Bowler being initially assigned to 3 out of 4 such cases are about 1:65 (about 1.5%), and if there are 7 magistrates then the chances are about 1:100 or 1%.

192.  If there was/were 2 other cases featuring either BCH or the NEHLW, the the odds and 5 magistrate judges, then the odds of The Honorable Magistrate Judge Marianne B. Bowler being assigned to exactly 3 of 5 such cases would be about 1:8.13 or about 12.5%. If 6 magistrates, then the odds become exactly 1:12.95 or roughly 7.69%, and if 7 magistrates then the chances are roughly 1:19.4 or about 5.2%.

193.  In order for there to be an even (or roughly even) distribution pattern of such cases across 5 magistrate judges wherein The Honorable Magistrate Judge Marianne B. Bowler is assigned initially to 3 of them, there would have to be roughly 15 such cases. To make a roughly even

distribution pattern with 6 magistrate judges and 3 such cases initially assigned to The Honorable Magistrate Judge Marianne B. Bowler, there would have to be roughly 18 such cases, and for 7 magistrate judges 21 such cases would be required.

194. In the absence of such a high number of such cases, it is objectively reasonable to question the process by which my case, the NBHLW discrimination case, and Cebi et al. were all initially assigned to The Honorable Magistrate Judge Marianne B. Bowler. In fact, it would be irrational not to question it.

195. When my former "attorney" Ray Gillespie emailed a listserv of area lawyers to inquire as to the normal assignment process of U.S. magistrate judges to federal cases and he described the procedural history relevant to my case (PRTT order issued by one magistrate judge, search warrant issued by another, criminal complaint issued by a third, but then the pre-indictment docket reassigned back to the magistrate who had issued the search warrant), he received a single response.

196. The Honorable Nancy Gertner replied to Ray, telling him that the emergency magistrate at the time of the application for the criminal complaint would likely hear that matter and that thereafter it would be normal for the docket to be reassigned back to the magistrate who had issued the search warrant. However,

- Page 62 of 86 -

She also told him that it would be scandalous if the
assignment process was being manipulated and to get to the
bottom of it.

197. Nobody ever got to the bottom of it though.
However, Reg did a limited analysis which indicated
that The Honorable Magistrate Judge Marianne B. Bowler
was not the emergency magistrate judge for September
2014 when the search warrant for my home was issued.
Instead, his numbers reflected that she had handled the
second-most of such requests that month, perhaps
meaning that she was the backup emergency magistrate
judge at that time.

198. Obviously — at the least — the U.S.
attorney's office is aware of the identities of the emergency
and backup emergency U.S. magistrate judges at any
given time and the practice of usually referring a criminal
case back to a previous emergency or backup emergency
magistrate judge who had handled a search warrant
application would allow the government to "magistrate
shop" so long as they were willing to wait to apply
for a search warrant until their preferred U.S. magistrate
judge for a given case were the emergency or backup
emergency magistrate.

199. This too can (and in my case does) give
rise to reasonable questions regarding the impartiality
of The Honorable U.S. Magistrate Judge Marianne B.

— Page 63 of 86 —

Bowler in my case.

200. It is also reasonable to question the odds of drawing the jury which was selected for my case. Neither the NEHLW nor Wayside are particularly large organizations in the scope of the jury duty rolls. Yet, my jury included both a former patient from Wayside and a former accountant from the NEHLW.

201. I would explore this issue further, but I am precluded from contacting the jurors without the prior approval of The Honorable Judge Nathaniel M. Gorton.

202. In the time since I began drafting this affidavit, my team located the FY 2004 annual report of the NEHLW. It continues to list The Honorable Judge Nathaniel M. Gorton as a member of its Board of Advisors and his brother Michael Gorton as one of its Directors. Additionally, it thanks Michael Gorton and his spouse Karen as well as Slade Gorton & Company, Inc. for total giving between $10,000 and $24,999 ("Frederick H. Knight # Circle") and The Honorable Nathaniel M. Gorton and his spouse for between $1,000 and $2,499 ("Friends Circle").

203. I also wish to note an oversight in paragraph 23 above. The Honorable Nathaniel M. Gorton's Financial Disclosure report for the calendar year 2016 reflects that SG Seafood Holdings, Inc. became Slade Gorton Seafood Holdings, Inc, though his position there remains

the same

204. My team and I have discovered additional donations to the NEHLW from various state child welfare agencies, some potentially in excess of $100,000 per fiscal year (particularly from the Department of Early Education and Care), as well as from various departments of various Harvard hospitals which The Honorable Judge Nathaniel M. Gorton knows to have been substantially affected by the alleged DDoS central to my case, including BCH, BWH, MGH, Beth Israel, Dana-Farber, and parent Partners HealthCare — all of which The Honorable Judge Nathaniel M. Gorton stands poised to order me to repay for claimed "damages" incurred while they silently consented/acquiesced to the continued torture of an innocent child, Justina Pelletier.

205. Some of these donations are from The Brigham and Women's Hospital Cardiovascular Division, for which the spouse of The Honorable Magistrate Judge Marianne B. Bowler works/worked throughout this controversy.

206. We have also found publicly available information indicating that BWH cardiologists such as Mr. Pfeffer work in close collaboration with their BCH counterparts. As such, one would expect, reasonably, Mr. Pfeffer to have been both aware and impacted by

— Page 65 of 86 —

the alleged DDoS.

207. Other donations to the NEHLW ~~are~~ are attributed to Harvard, its employees, or various divisions thereof; including one from Harvard Medical Faculty Physicians (which presumably includes Dr. Pfeffer).

208. Still other donations came from NSTAR, its Charitable Foundation, and its successor, Eversource Energy. NSTAR was featured prominently on page 43 of BCH's 2013 philanthropy report - the page before the one on which Steele Gorton & Co., Inc. appears. (Please see D.E. 341 Exhibit A1, and paragraph 22 starting on page 8 above.) The government is seeking restitution from me for alleged damage to NSTAR.

209. This affidavit will conclude with a chronological list of donations to the NEHLW made by relevant or potentially relevant entities.

210. The "Deval Patrick Committee" made one such donation. During the campaign to free Justine, Mr. Patrick faced considerable public scrutiny. He was referred to during my detention hearing (please see D.E. 19 page 52 line 1 through page 53 line 4). He was also mentioned by name in the Rolling Stone feature about my case. (Please see D.E. 341 Exhibit G2.) Ultimately, he was forced to replace the commissioner of DCF.

211. My team and I are still working to find more. We will not stop. We have requested audited financial data

- Page 66 of 86 -

directly from the NEHLW and are awaiting a response.

212. The Honorable Judge Nathaniel M. Gorton would not keep the courtroom open to the public and to journalists when I objected to its closure and waived my attorney-client privilidge after exhibits relevant to disqualification had been filed ex parte and under seal. But he did order me to represent myself when I insisted that my attorney should raise these issues and asked him to tell my lead attorney that it would be alright for him to do so and that he wouldn't get offended if he did.

213. The three factors enumerated in paragraph 164 above all require the disqualification of The Honorable Judge Nathaniel M. Gorton from my case.

214. The Honorable Judge Nathaniel M. Gorton is so closely associated with the Massachusetts child welfare bureaucracy through his own voluntary associations, those of his family, and those of Sherk Gorton & Co., Inc. - including directly to BCH - that 28 U.S.C. §455(a) requires his disqualification.

215. The Honorable Judge Nathaniel M. Gorton was "an active participant" in shaping the Massachusetts child welfare bureaucracy as it stands today and as it came into widespread local and national controversy during #FreeJustina. Reports from the NEHLW show State child welfare staff being trained by the NEHLW, remark on a joint venture between the NEHLW and the state as

the first of its kind, and even a partnership with BCH aimed at helping the hospital "divert" juvenile psychiatric inpatients, as BCH would later fail to do with Justina, giving rise to my very case itself.

216. It is glaringly obvious that it was inappropriate for The Honorable Judge Nathaniel M. Gorton to rule as to whether The Honorable Magistrate Judge Marianne B. Bowler was neutral and detached in my case given the many striking similarities and the wide overlap between their conflicts of interest. They both are/were directors of organizations which receive public recognition on the very same BCH website which I allegedly forced offline, and they both possess personal knowledge gained in the boardroom or the conference room rather than the courtroom regarding important entities in controversy in my case, including BCH and DCF.

217. If The Honorable Magistrate Judge Marianne B. Bowler or The Honorable Judge Nathaniel M. Gorton had been selected as potential jurors, then they should have (and likely would have) been disqualified based on any or all of the above.

218. At numerous junctures things were docketed which should have led to on-the-record disclosure and/or disqualification but instead they led to unconstitutional prior restraints and/or threats of sanctions (please see D.E. 77, 100-102, 290-292, 268).

— Page 68 of 86 —

219. The Honorable Judge Nathaniel M. Gorton was well aware that he possessed undisclosed information which I considered relevant to the question of disqualification (please see D.E. 340). He was required to disclose this information by the Canon of Ethics. Yet he never has.

220. The Honorable Judge Nathaniel M. Gorton has a substantial interest in the legislative legacy of his brother Slade and that legacy includes America's highly controversial cyber-crime laws. This represents unique and idiosyncratic disqualification issues for him in my case, especially since the tragic suicide of Aaron Swartz (please see D.E. 341 Exhibit G2).

221. I have never docketed an affidavit pursuant to 28 U.S.C. § 144 in this case prior to this one. D.E. 268 was not ~~acted by me~~ filed by me nor with my knowledge or consent. I only filed the previous affidavit with the U.S. Court of Appeals for the First Circuit and not with the District Court.

222. The Honorable Judge Gorton has publicly indicated that he plans to ignore the jury's refusal to find that I impacted or potentially impacted the care of any patients.

223. The only patient who was hurt as a result of any of the events in controversy in my case was Justina Pelletier and she wasn't hurt by me.

224. The Honorable Judge Gorton's rulings in my

case and others are tainted with a pervasive bias in favor of the DOJ. This is a significant part of the reason why Aaron Swartz killed himself. And yet nothing has changed since then, in that regard.

225. This affidavit is filed with the intention that 28 U.S.C. § 144 should be applied to the Honorable Judge Nathaniel M. Gorton in this ~~case~~ case. This affidavit only mentions the Honorable Magistrate Judge Marianne B. Bowler so far as such is relevant. I do not seek to apply 28 U.S.C. § 144 to disqualify the Honorable Magistrate Marianne B. Bowler.

226. A fair, impartial, and just arbiter would have long ago convened a hearing to get to the moral ~~core~~ core (or perhaps more aptly put the immoral one) of what's been going on in my case. Such an arbiter would have cited a case like Sorrells above and demanded to hear directly from Justine because hers is the voice that most needs to be heard, and not the self-serving chorus of her tormentors and their abetters. Such a worthy arbiter would do this before the federal criminal statute of limitations for healthcare fraud lapses on what was done to Justine by people who the Honorable Judge Nathaniel M. Gorton and the Honorable Magistrate Judge Marianne B. Bowler consider to be their affiliates and my supposed "victims."

227. Jane F. Peachy, Esq. once truthfully told me

that The Honorable Judge Nathaniel M. Gorton makes racist decisions, especially at sentencing.

228. On June 4th, 2018, my team inquired upon The Circuit Executive for sentencing statistics for Judge The Honorable Judge Gorton broken down by racial and religious background, as would be necessary to analyze for trends across cultural and ethnic lines.

229. Such data has not been forthcoming.

230. What follows is the aforementioned list of sanctions to the NEHLW by relevant or potentially relevant entities.

Relevent or Potenticlly Relevent Donations to The NEHLW
By Year (Fiscal)

2003

Children's Circle — $100,000+
Massachusetts Depatment of Education
Massachusetts Depatment of Mental Health (DMH)
Massachusetts Depatment of Public Health (DPH)

Dr. Orren S. Sanders Circle — $50,000 — $99,999
Massachusetts Depatment of Social Services (DCF Forerunner)
Massachusetts Office of Child Care Services

Frederick H. Knight Circle — $10,000 — $24,999
Michael & Karen Gorton
Slade Gorton & Co., Inc.

Friends Circle — $1,000 — $2,499
Nathanicl & Jean Gorton
The Boston Fandation

2004

Frederick H. Knight Circle — $10,000 — $24,999
Michael and Karen Gorton
Slade Gorton & Company, Inc.

Friends Circle — $1,000 — $2,499
Nathaniel and Jodi Gorton

2006

Chairmen's Circle — $10,000 - $24,999
   The Boston Familation

President's Cabinet — $5,000 - $9,999
   Michael and Karen Gorton
   KDSA Consulting, LLC
   Slade Gorton & Company, Inc.

President's Council — $2,500 - $4,999
   Harvard University

President's Circle — $1,000 - $2,499
   Dana Farber/Brigham and Women's Dept. of Radiation
   Nathaniel and Jodi Gorton
   Harvard University


2007

Visionary Circle — $100,000 or more
   Office of Juvenile Justice and Delinquency Prevention

Chairmen's Cabinet — $50,000 - $99,999
   The Boston Familation
   Department of Early Education & Care

President's Cabinet — $5,000 - $9,999
   KDSA Consulting, LLC.

President's Council — $2,500 - $4,999
   Michael and Karen Gorton
   Slade Gorton & Company, Inc.

2007 Continued

President's Circle — $1,000 - $2,499

   Boston Symphony Orchestra

   Brigham & Women's Hospital Radiation Oncology

   Nathaniel and Jodi Gorton

   Harvard Business School Press

Mentor — $500 - $999

   Drs. Steven and Angela Becker

Advocate — $250 - $499

   Harvard University

   Massachusetts General Hospital Renal Associates

2008

Visionary Circle — $100,000 or more

   Department of Early Education and Care

Chairmen's Cabinet — $50,000 - $99,999

   The Boston Foundation

Chairmen's Circle — $10,000 - $24,999

   Beth Israel Deaconess Medical Center — Cardiovascular Institute

President's Cabinet — $5,000 - $9,999

   KDSA Consulting, LLC.

President's Council — $2,500 - $4,999

   Michael and Karen Gorton

   Harvard Business School

   Slade Gorton & Company, Inc.

2008 Continued

President's Circle — $1,000 - $2,499

   Dana-Farber Cancer Institute — Radiation Oncology Dept.

   Joan Gorton

   Massachusetts Municipal Association

Mentor — $500 - $999

   Drs. Steven and Angela Bader

   Mr. and Mrs. Michael J. Bowler

   Harvard University

Advocate — $250 - $499

   Boston Symphony Orchestra

   Brigham and Women's Hospital: The Endoscopy Institute

   Harvard University Government, Community and Public Affairs

   MGH Senior HealthWISE

2009

Visionary Circle — $100,000 or more

   Department of Early Education and Care

Chairman's Circle — $10,000 - $24,999

   The Boston Foundation

   Executive Office of Public Safety & Security

President's Cabinet — $5,000 - $9,999

   Boston Center For Youth and Families

   KDSA Consulting, LLC.

2009 Continued

President's Council — $2,500 — $4,999

   Commonwealth of Massachusetts Employee's Charitable Campaign

   Michael and Karen Gorton

   Slade Gorton & Company, Inc.

President's Circle — $1,000 — $2,499

   Anonymous Fund at The Boston Foundation

   Beth Israel Deaconess Medical Center — Cardiovascular

     Institute

   [Boston] Children's Hospital — Department of Plastics

     and Oral Surgery

   Dana—Farber Cancer Institute — Radiation Oncology Dept.

   Nathaniel and Jodi Gorton

   Harvard Business School Press

   Harvard Medical Faculty Physicians

   Harvard University Government, Community, & Public Affairs

   Insurance Fraud Bureau of Massachusetts

Mentor — $500 — $999

   Drs. Steven and Angela Bader

   Massachusetts General Hospital

   Massachusetts Port Authority

   Partners HealthCare, Materials Management

   Partners HealthCare, Development Office

   Registry of Vital Records DPH

2009 Continued

Advocate - $250 - $499

   Boston Symphony Orchestra

   The Commonwealth of Massachusetts

   Harvard University Employees

   New England Baptist Hospital

   Northeast Power Alliance

   NSTAR


2010 - "Thank You" Published January 9th, 2011

Chairmen's Cabinet - $50,000 - $99,999

   Department of Early Education and Care

President's Cabinet - $5,000 - $9,999

   Massachusetts Department of Elementary & Secondary Education

   KDSA Consulting, LLC

President's Council - $2,500 - $4,999

   Commonwealth of Massachusetts

   NSTAR

President's Circle - $1,000 - $2,499

   The Boston Foundation

   City of Boston Employees Charitable Campaign

   Dana-Farber Cancer Institute - Radiation Oncology Dept.

   The Insurance Fraud Bureau of Massachusetts

Mentor - $500 - $999

   Boston Symphony Orchestra

   Deval Patrick Committee

2010 Continued

Mentor Continued — $500 — $999
   Harvard University Government, Community & Public Affairs
   Massachusetts Municipal Association
Advocate — $250 — $499
   Agassiz School
   MGH Planning and Construction
   NSTAR Foundation


2011 — "Thank You" Published January 23rd, 2012
Visionary Council — $200,000 — $499,999
   Department of Early Education and Care
Chairman's Circle — $10,000 — $24,999
   KDSA Consulting, LLC
President's Cabinet — $5,000 — $9,999
   The Boston Foundation
President's Council — $2,500 — $4,999
   Children's Hospital Boston Opthmology Foundation
   Michael and Karen Gorton
   Public Welfare Foundation
   Slade Gorton & Company, Inc.
President's Circle — $1,000 — $2,499
   Brigham and Women's Hospital Oncology
   City of Boston Employees Charitable Campaign
   Nathaniel and Joan Gorton
   Harvard University Employees


— Page 78 of 86 —

2011 Continued

President's Circle Continued — $1,000 — $2,499

   Insurance Fraud Bureau of Massachusetts

   Mass General Hospital Planning and Construction

Mentor — $500 — $999

   Brigham and Women's Hospital Cardiovascular Division

   Commonwealth of Mass / Information Technology Division

   NSTAR Foundation

   NSTAR

   Massachusetts General Hospital


2012 — "Thank You" Published January 7th, 2013

Visionary Cabinet — $500,000 or more

   Boston Department of Neighborhood Development

Chairman's Circle — $10,000 — $24,999

   KDSA Consulting, LLC

   NSTAR

President's Council — $2,500 — $4,999

   Michael and Karen Gorton

   Slade Gorton & Company, Inc.

President's Circle — $1,000 — $2,499

   Brigham and Women's Hospital Cardiovascular Division

   Brigham and Women's Hospital Radiation Oncology

   Nathaniel and Joan Gorton

   Massachusetts General Hospital

2012 Continued
Mentor — $500 — $999
    NSTAR Foundation
Advocate — $250 — $499
    Brigham and Women's Hospital Clinical Services

2013* — "Thank You" Published January 13th, 2014*
Chairmen's Circle — $10,000 — $24,999
    KDSA Consulting, LLC
President's Council — $2,500 — $4,999
    Harvard University Employees
President's Circle — $1,000 — $2,499
    Brigham and Women's Hospital — Oncology
    The Giving Common (TBF)
    Michael and Karen Gorton
    Nathaniel and Joan Gorton
    Slade Gorton & Company, Inc.
Mentor — $500 — $999
    Drs. Steven and Angela Beder
    NSTAR Foundation
Advocate — $250 — $499
    Brigham and Women's Hospital — Clinical Sciences

2014* — "Thank You" Published January 20th, 2015*

Chairman's Council — $25,000 — $49,999

   The Trust of Robert B. Brigham

Chairman's Circle — $10,000 — $24,999

   The Boston Foundation

President's Cabinet — $5,000 — $9,999

   Harvard Management Company, Inc.

KDSA Consulting, LLC

President's Council — $2,500 — $4,999

   Brigham and Women's Dept. of Radiation Oncology

Combined Federal Campaign

   The Commonwealth of Massachusetts Employees'

     Charitable Campaign

   Michael and Karen Gorton

   Harvard University Employees

President's Circle — $1,000 — $2,499

   City of Boston Employees' Charitable Campaign

   Slade Gorton & Company, Inc.

2015* - "Thank You" Published February 10th, 2016*

Chairman's Council - $25,000 - $49,999

   Trust of Robert B. Brigham

Chairman's Circle - $10,000 - $24,999

   The Equality Fund at the Boston Foundation

   Eversource Energy

President's Cabinet - $5,000 - $9,999

   The Boston Foundation

   Combined Federal Campaign

   Harvard University Employees

President's Council - $2,500 - $4,999

   Fitchburg State University

   Michael and Karen Gorton

This page intentionally left blank.

This page intentionally left blank.

— Page 84 of 86 —

This page intentionally left blank.

— Page 85 of 86 —

Signed under penalties of perjury on 27th of
December, 2018

Martin S. Gottesfeld
Pro Se
PCCF, ID # 71225, Unit H1, Cell 235
26 Long Pond Road
Plymouth, MA 02360

**The Commonwealth of Massachusetts**

On this 27 day of DECEMBER 2018
before me, the undersigned notary public, personally appeared
MARTIN GOTTESFELD
proved to me through satisfactory evidence of identification, which were JAI LTM
to be the person whose name is signed on the preceding or attached document who swore
or affirmed to me that the contents of the document are truthful and accurate to the best of
his/her knowledge and belief.

ROBERT J. LALIBERTE, Notary Public
My Commission Expires May 2, 2019

— Page 86 of 86 —

Certificate of Good Faith

I, Martin S. Gottesfeld, hereby certify under oath that the accompanying affidavit filed pursuant to 28 U.S.C. § 144 in the case 1:16-cr-10305 is made and offered in good faith.

I further certify that I am acting pro se and am therefore the "counsel of record" corresponding to the accompanying affidavit within the relevant meaning of 28 U.S.C. § 144.

Signed under penalty of perjury on this day, 27th Day of December, 2018

Martin S. Gottesfeld, Pro Se
PCCF, ID # 71225, Unit H1, Cell 235
26 Long Pond Road
Plymouth, MA 02360

The Commonwealth of Massachusetts
On this 27 day of DECEMBER 20 18
before me, the undersigned notary public, personally appeared
MARTIN GOTTESFELD
proved to me through satisfactory evidence of identification, which were JAIL ID
to be the person whose name is signed on the preceding or attached document and who swore
or affirmed to me that the contents of the document are truthful and accurate to the best of
his/her knowledge and belief.

ROBERT J. LALIBERTE, Notary Public
My Commission Expires May 2, 2019

- Page 1 of 1 -

# CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld _____, pro se, hereby certify that on December 27th _____ the foregoing document(s) will be mailed _____ to Assistent U.S. Attorney David D'Addio.

_____

M.G.

Martin S. Gottesfeld

Pro Se