UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>MARTIN S. GOTTESFELD<br>Defendant, pro se | Case No.: 16-cr-10305 |

DEFENDANT'S INCOMPLETE PRELIMINARY
MEMORANDUM PENDING RECEIPT OF DISCOVERY,
SENTENCING MEMORANDUM, AND JUDICIAL
REQUIRED BY CANON OF ETHICS 3E1 AS WELL AS AN
OBJECTIVELY REASONABLE PERIOD OF TIME IN WHICH TO
FULLY RESPOND

Having received the final PSR 48 hours ago and having sighted key differences, Defendant Martin S. Gottesfeld (herein "Defendant"), acting pro se over his continuing objection, hereby submits this incomplete and preliminary sentencing memorandum pending his receipt of his discovery, the government's sentencing memorandum, and judicial disclosure of information relevant under 28 U.S.C. §§ 455(a), 455(b)(1), 455(b)(4), and 455(b)(5)(iii), as required by the Canon of Ethics 3E1, as well as of an objectively reasonable period of time in which for a pro se litigant who is denied access to a typewriter to respond. (Please see American Bar Association Model Canon of

- Page 1 of 6 -

Ethics for Judges Canon 3E1 and Commentary thereto, Code of Conduct for U.S. Judges Canon 3D, Canon 3C1a, and Canon 3C1c, as well as *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999), quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995), "Further, judges have an ethical duty to 'disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification.' [B]oth litigants and counsel should be able to rely upon judges to comply with their own Canon of Ethics." (Internal citation omitted.)

The defendant reserves the right to amend and/or to supplement this memorandum if/when he should receive any of the above-mentioned information and/or an objectively reasonable period of time in which for him to respond without a typewriter.

The defendant also requests the application of the prison mailbox rule to this filing.

Further, the defendant objects to the use by the government of any and all documents, recordings, or other information contained in the discovery material of this case, access to which the defendant requested orally but was denied by the Honorable Court on Thursday, December 13th, 2018. (Please see The Due Process Clause and *Offutt v. U.S.*, 348 U.S. 11, 14; 75 S.Ct. 11, 13; 99 L.Ed. 11 (1954), "Therefore, justice must satisfy the appearance of justice.")

The defendant hereby incorporates herein - and explicitly requests that The Honorable Court individually and thoroughly review - each of the following docket entries in the instant case: 77, 100, 101, 138, 139, 140, 142, 143, 145, 189, 190, 191, 194, 198, 199, 341 Exhibits G-1 and G-2, and 346, as well as Exhibit A hereto, which is a non-motion letter which the defendant was prohibited from sending by order of The Honorable Court after it was first written, said order no longer being applicable.

Penultimately, the defendant will arrange for both a witness list as well as a computer storage device such as a Compact Disc (CD), Digital Versatile Disc (DVD), or Universal Serial Bus Mass Storage Device (USB Thumbdrive) containing video evidence which he intends to introduce and to play to be hand-delivered to the clerk's office on Tuesday, January 8th, 2019. The defendant humbly requests that The Honorable Court make the necessary arrangements for him to be able to do so, after having ordered the defendant to represent himself pro se over his preserved objections.

These videos will include those referenced in the Exhibit to D.E. 190 at 4, 6, 8, and 10, those referenced in the government's own statement of offense conduct (please see PSR paragraph 73), and sworn U.S. Congressional testimony by the Managing Director of Forensic Audits and Special Investigations for the U.S. Government Accountability Office (GAO) and others introduced during hearings before The U.S. House of Representatives Committee on Education

and Labor on October 10th, 2007 and on April 24th, 2008.

Also included will be a video of Justina Pelletier published by The Christian Defense Coalition on or about June 8th, 2014, entitled, "Justina's Plea," a video of Justina Pelletier's older sister Jennifer Pelletier outside The Wayside Youth and Family Support Network (available here: https://www.youtube.com/watch?v=hBads6xVMBc), and video recounts by survivors of Logan River Academy and Sorenson's Ranch.

In accordance with Sorrells v. U.S., 287 U.S. 435; 53 S.Ct. 210; 77 L.Ed. 413 (1932), the defendant recommends that The Honorable Court close its processes to the continuing consummation of the wrong which is the prosecution of the instant case, being carried out by many of the same people responsible for the death of Aaron Swartz, as well as, through their continued inaction, the torture and maiming of Justina Pelletier and others like her. Instead, the Honorable Court should dismiss the instant case with prejudice and order the United States attorney to show cause as to why there has been no meaningful investigation into what BCH and Wayside each did to Justina Pelletier and her family (please see D.E. 19 at 48 lines 4-9 and at 52 line 22 through page 53 line 4).

Respectfully mailed the night of January 6th, 2019,

/s/ MSG
Martin S. Gottesfeld, pro se
RCCF, ID 71225, Unit H1, Cell 235
26 Long Pond Road
Plymouth, MA 02360

- Page 5 of 6 -

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, pro se, hereby certify that on the night of Jan. 6th, 2019, the foregoing document(s) will be mailed to Assistant U.S. Attorney David D'Addio at some point next week.

Martin S. Gottesfeld
Pro Se

— Page 6 of 6 —

Exhibit A:

Dear Honorable Judge Gorton,

Once again, I hope that this letter finds Your Honor well, and I thank Your Honor for taking the time to read it.

I am writing to still further impeach the government's reckless denial of the crime against humanity perpetrated by Boston Children's Hospital against then-14-year-old, learning-challenged, physically-disabled Justina Pelletier and her family. Indeed, the attempted cover up of this atrocity which stems back to 2014 and is currently being carried out by 2 federal prosecutors whom research reflects to be potentially interested parties, David J. D'Addio and Seth Kosto, is the type of corrupt behavior that one would expect to find under a tin-pot dictatorship, and certainly not in The United States of America.

Once again, I am including documents. Attachment A is the August 7th, 2014 Boston Globe article, "Nanny's lawyer challenges diagnosed cause of child's death." At the time of that article, Justina had just gone home less than 2 months prior and 2 child homicide cases which both pre-dated her admission to Boston Children's Hospital were falling apart and they were both brought based on the findings of the same so-called "expert" who had filed the similarly-bogus accusation of "medical child abuse" against Justina's parents, Dr. Alice Newton.

One was the high-profile "Irish nanny" case.

As reflected in the article, the so-called "science" proffered by Newton was dubious and she was noticeably no longer the head of the Boston Children's Hospital child protection team. History records that Newton once held a special dual-appointment as the simultaneous head of

- Page 1 of 3 -

the child protection teams at both of Harvard's 2 most important pediatric affiliates, Boston Children's Hospital and Massachusetts General Hospital. So her remaining position as team leader at Mass. General was not the result of a lateral move either.

Moving to Attachment B, the August 31st, 2015 WCVB report, "5 Investigates: Same expert behind two dropped shaken baby cases," both other child homicide charges brought due to Newton's findings would be dropped by a year or so later.

It turns out that in one of them, a chorus of 5 independent medical experts challenged Newton and in the other a cacophony of 9 rebuked her. The pseudoscience espoused by Newton had been exposed and had been shot down by the scientific community. And the troubles for Newton and for those who had backed her didn't end with the dismissals.

Attachment C is the October 18th, 2015 Boston Globe article, "Middlesex DA's office shows troubling attitude about evidence," by Yvonne Abraham. Then, a couple of days later, on October 20th, 2015, The Washington Post picked up the story and published Attachment D, "Middlesex County, Mass., prosecutors withheld exculpatory evidence in two 'shaken baby' cases," by Radley Balko. These articles speak for themselves as to the untrustworthiness of the "world-renowned" reputation of Boston Children's Hospital given that the debunked "Irish Nanny case," Geoffrey Wilson case, and Pelletier case were all instigated by the same former BCH employee and all three were dropped after her findings were vetted and found thoroughly wanting.

However, I do wish to highlight parts of each of Attachments C and D. As Balko ended The Washington Post article:
But these prosecutors didn't just rely on bad science; they

...ctively suppressed evidence that not only should have informed that their theories about these cases were flawed, but was ultimately the evidence that led to the accused getting freed. A just system would sanction them. If they aren't punished, there's little disincentive to do it again, or for other prosecutors who might be tempted to shortchange a suspect's rights.

And, as Abraham wrote for the Globe:

"McCarthy's attorneys are convinced she would not have sat in prison for more than two years if prosecutors had done the right thing... But maybe they need a reminder: Sometimes, justice and winning aren't the same thing."

Maybe if more people at Boston Children's Hospital had remembered that last part then Justina wouldn't have been confined against her will in a vain attempt to save face for 16 months of her childhood and maybe she would be ice skating again today.

Perhaps if more people at Moakley had taken that last part to heart then Aaron Swartz would still be alive and innovating.

Respectfully signed and mailed on Thursday, May 31st, 2018,

Martin S. Gottesfeld

**#39 Boston Globe:** Nanny's lawyer challenges diagnosed cause of child's death   2014-08-07

The defense team for an Irish nanny accused of killing a baby girl in her care last year has filed a motion challenging testimony from a specialist who diagnosed 1-year-old Rehma Sabir as a victim of abusive head trauma.

In court documents filed Wednesday, Aisling Brady McCarthy's lawyers asserted that "an avalanche of science" has raised doubts about diagnoses of shaken baby syndrome, particularly in cases where there are no outward signs of abuse. "At best, SBS is a highly controversial, unproven hypothesis unfit to serve as the basis for a murder prosecution," they wrote. "At worst, SBS is junk science, a tragic hoax caused by overzealousness within the child protection community."

McCarthy's lawyers, Melinda Thompson and David Meier, sought a hearing on the evidence "given the present debate within the relevant scientific community as to the reliability and acceptance of shaken baby syndrome or abusive head trauma in general."

A spokeswoman for the Middlesex district attorney's office, which is prosecuting the case, declined to comment Thursday. The trial is scheduled to start in October.

Nanny loses bid to lower bail

- **1/24/13 | Abraham: A parent's child-care nightmare**

McCarthy is accused of fatally assaulting Rehma in January 2013 while baby-sitting her in the child's Cambridge home. Investigators found blood stains on a pillow and blanket in her crib, and prosecutors say the child suffered acute head injuries that led directly to her death.

Sabir, who authorities say was in McCarthy's exclusive care when she was injured, was diagnosed at the hospital by Alice Newton, then the medical director of the child protection program at Boston Children's Hospital. Prosecutors plan to call Newton as an expert witness in the case.

Newton declined to comment.

Prosecutors say Rehma Sabir suffered massive bleeding in her brain and the back of her eyes, injuries specialists say strongly indicate abusive head trauma.

"Bleeding in the back of the eye rarely happens absent abuse," said Robert Sege, medical director of the Child Protection Team at Boston Medical Center.

Sege said abusive head trauma is a leading cause of death of infants, and its existence is a "settled scientific fact," according to the American Academy of Pediatrics. [handwritten: Leading? 80 seems kind of low to be leading cause]

At least 80 infants die each year from abusive head trauma, according to government figures.

Initially, doctors told the child's parents and McCarthy that Rehma was having a series of strokes. Child protection specialists soon suspected abuse. Newton diagnosed the child as a victim of abusive head trauma the day after she was hospitalized. She was declared brain dead the following day; life support was removed two days later.

McCarthy's lawyers said there is no evidence that Newton or other specialists "spent any meaningful time" looking at alternative diagnoses.

"She diagnosed SBS so quickly . . . that it is difficult even to pretend for argument's sake she engaged in any serious differential diagnosis," they wrote. Newton declined to comment because the case is ongoing. [handwritten: Wouldn't comment afterwards either]

The defense's motion also asserts that the child "was sick much of her life," and was seen by specialists for gastrointestinal problems, failure to gain weight, and a bleeding disorder. According to medical records, the child was diagnosed with malnutrition five weeks before her death, and "by all accounts bruised very easily," the lawyers wrote.

"When [Rehma] died, her body had no bruises, grip marks, crush injuries, or acute broken bones," the lawyers wrote. "Yet, the Commonwealth alleges that medical science proves that she died because the last person with the child, Ms. McCarthy, violently shook her or caused her abusive head trauma. Not so."

Nanny's lawyer challenges diagnosed cause of child's death

Her lawyers also noted that prosecutors initially charged McCarthy with inflicting vertebral fractures, but later determined the injuries were mostly likely three to four weeks old. At that time, the child was traveling with her mother in Pakistan.

In a separate motion, McCarthy's lawyers asked for evidence in a pending murder case against Geoffrey Wilson in the 2010 death of his 6-month-old son. They asserted that Wilson was indicted based on Newton's determination that the infant died from abusive head trauma, but said the state's medical examiner's office recently has changed the cause of death from homicide to undetermined.

"The opinions expressed by Dr. Newton in the Wilson case are strikingly similar to those expressed by her in this case," her lawyers wrote.

The spokeswoman for the Middlesex district attorney said she could not comment on the Wilson case.

**5 Investigates: Same expert behind two dropped shaken baby cases**

*Charges dropped against Irish nanny Aisling Brady McCarthy Monday*

**UPDATED** 7:36 PM EDT Aug 31, 2015

SHOW TRANSCRIPT

**BOSTON** —Aisling Brady McCarthy spent more than two years behind bars while charged with murder in the death of 1-year-old Rehma Sabir, but 5 Investigates has found it's not the first shaken baby allegation by the Middlesex District Attorney's Office that was dropped in the past year.

The state medical examiner has changed its determination of the manner of death of the Cambridge 1-year-old at the center of a shaken baby case that landed the child's Irish nanny in jail.

Geoffrey Wilson of Malden was accused in 2010 of shaking his 6-month-old son, Nathan, to death. But defense experts found Wilson's son had a rare genetic defect that may have played a role in his death.

Last year the Medical Examiner's Office changed the manner of death from "homicide" to "cannot be determined" and -- more than four years after being charged -- the case against him was dropped.

The prosecution's medical expert at the center of both cases was Dr. Alice Newton.

Wilson's attorney, J.W. Carney, said the case against his client was a "rush to judgment."

"Geoff Wilson was arrested at the hospital two hours after his child was taken off life support," Carney said.

In McCarthy's case, her lawyers say Newton told prosecutors the nanny shook the baby with the force equal to that experienced in motor vehicle accident.

Calls to Newton and to Massachusetts General Hospital, where she currently works, were not returned.

In an April 2013 letter obtained by 5 Investigates, McCarthy's lawyers asked the DA to provide all of the medical records for the little girl and raised questions about prior injuries and possible causes of her death.

They tell us the DA's office didn't hand over that information before it went to the grand jury, no medical experts from the defense were allowed to testify before the grand jury, which indicted McCarthy for murder.

A representative for Middlesex District Attorney Marian Ryan said the office released what it legally could at the time.

The science behind shaken baby diagnoses are being questioned and in some cases thrown out across the country.

"So many questions are being raised about shaken baby syndrome that there are more dismissals of pending cases than there are of new indictments," Carney said.

responsibility. Most should be tarred and feathered before being ran from town. At the very least, most should be brought before the board and dis-barred on ethical grounds for total disregard and subversion of our Civil Rights as well as incompetent irresponsibility. The Boards who are supposed to censer or control these villains need to be removed for inaction
LikeShare
1
KEVCON
10/20/2015 4:59 PM EDT
"other prosecutors who might be tempted to shortchange a suspect's rights."?

This is done all of the time! How else do our Prison population become so massive, the biggest on the planet. More than China?

Whenever Prosecutors deal with indigent, mostly minority, 'suspects' they 'Force A Plea' and get credit for a Win. They say 'If you do not take this Plea Deal for 5 Years, we will put you away for 20 years!'.

It happens all of the time! It's routine - just see the many Statistics, especially compared to years and decades ago. 'Forced Plea' deals account for 85% of ALL convictions - what would you do if faced with that choice and you had Zero Resources!?!
LikeShare
1
Jeremy Praay
10/20/2015 2:07 PM EDT
At the heart of all of these SBS cases is bad science. Those who support the SBS diagnosis continue to ask for proof from their opposition that the diagnosis is wrong. This is a scientific impossibility. It is akin to proving that ghosts do not exist.

Instead, reams of data have been produced rarely challenging the assumption that shaking produces the classic triad of findings. In the end, the logic becomes circular. When subdural and retinal hemorrhage are found, shaking is presumed to be the cause, and that case goes into the SBS category. To then look at that data, and try to determine that retinal hemorrhages are a result of shaking, is similar to saying, "Red cars are most often red" or, perhaps as a better simile, "Those diagnosed with stiff man syndrome often have stiff joints." It does nothing to ascertain the cause, but presumes the cause. What causes stiff man syndrome? What causes shaken baby syndrome? You see, with the latter, we've already presumed to know the cause.

I have read through much of the literature supporting SBS, and the vast majority seems to suffer, repeatedly, from this flaw in reasoning. Someone canned the phrase "Tooth Fairy Science" for this type of phenomenon. You can obtain mountains of data by studying the money left under children's pillows, but none of it, no matter how detailed, no matter how many patterns, and no matter how well we believe we can distinguish "real" Tooth Fairy events from hoaxes, proves the existence of the Tooth Fairy. And if you ask any scientist to prove there is no Tooth Fairy, they can't. All they can reasonably do is point out the flaws in the methods used, and perhaps show that some children lose teeth and get no money under their pillows.

How, then, can anyone disprove SBS in any way other than to cast doubt on the diagnosis itself, and to offer up alternative, proven explanations to explain the "triad" of findings?
LikeShare
2
Austrolib
10/20/2015 10:07 AM EDT
Wow...if anyone but a prosecutor or a cop had done this they would be in some serious trouble!
LikeShare
6

(#173) YVONNE ABRAHAM
Middlesex DA's office shows troubling attitude about evidence — After D. Green
LINKEDIN
94COMMENTSPRINT
KEITH BEDFORD/GLOBE STAFF
Aisling Brady McCarthy.
By Yvonne Abraham GLOBE COLUMNIST OCTOBER 18, 2015
Middlesex County prosecutors had information that could have helped Aisling Brady McCarthy, the nanny accused of killing the 1-year-old she was caring for. But instead of sharing it, as they should have, they kept it to themselves for more than a year while she remained in jail.
In April, a Superior Court judge found that the information — that the baby's injuries could have had another cause — was potentially helpful to the defendant, and that prosecutors should have turned it over sooner. That remarkable finding, that the Commonwealth withheld exculpatory evidence in a murder case, went unnoticed at the time.

But given <u>allegations of questionable conduct</u> by Middlesex prosecutors in the case of Nathan Wilson — the strikingly similar case of a Malden baby whose father was charged with violently shaking him to death — it bears a hard look now. Like McCarthy, Geoffrey Wilson eventually <u>had the charges against him dropped</u> after a medical examiner reversed a homicide finding.

McCarthy was accused of killing Rehma Sabir in January 2013. She was charged after Alice Newton, a prosecution medical expert, concluded (as she did in the Wilson case) that the 1-year-old had suffered injuries, including severe bleeding in the back of the eyes, which indicated abusive head trauma, also known as shaken baby syndrome.

After McCarthy was jailed without bail, prosecutors sought the opinion of Dr. Alex Levin, an eye specialist, on whether the injuries to the baby's eyes indicated abuse. In a series of phone calls starting in August 2013, Levin expressed hesitation about coming to that conclusion. He told prosecutors he had found less severe retinal hemorrhaging, and repeatedly raised the possibility that the baby's injuries might have been caused by something other than abuse — an immune disorder called Job Syndrome — according to a court document.

View Story

*Nanny's murder case dropped*
The medical examiner's office said it could no longer stand by its ruling that a Cambridge infant's death in 2013 was a homicide.

### Abraham: Medical examiner wrote that DA 'bullied' him

Ethics rules require that prosecutors share information like that with the defense in a timely manner. District attorneys hold many more cards than defense attorneys in criminal cases, and they're held to very high standards. They're supposed to make their cases on the merits, and not by sitting on evidence that could benefit the accused.

"Their job is not just to win," said David Rossman, a professor of law at Boston University who was briefly a prosecutor in Middlesex County. "Their job is to do justice, and that means even if they are morally certain a person did it, and there is a piece of evidence in their hands that in the eyes of a reasonable, objective person would make it seem less certain the defendant is guilty, they've got to turn it over."

That obligation was there, even if prosecutors disagreed with the doctor. Even if Levin had been an unhinged quack, and not, as he is, a nationally known expert who has regularly delivered findings of abuse in shaken baby cases.

Not only must exculpatory evidence be shared, it must be shared promptly.

"Immediacy is not required, but the law demands some level of promptness," said Daniel Medwed, professor of law at Northeastern University. "More to the point . . . we should expect and demand immediate compliance."

The best prosecutors would have shared that information right after the first phone call. But, prosecutors on the McCarthy case kept it to themselves: not only after that first phone call with Levin, but through several more over the course of a year. This even after defense attorneys, who learned of Levin's work by happenstance, asked for it repeatedly.

It's hard to imagine prosecutors could have been unaware of the information's significance. Those same assistant district attorneys were working on the Wilson case. A few weeks after their first call with Levin, Geoffrey Wilson's attorney presented them with evidence suggesting that Nathan Wilson's death could have been caused by a genetic defect that made his blood vessels prone to rupture.

In a September 2013 e-mail, the medical examiner told prosecutor Katharine Folger that he wanted to change his homicide finding about the Wilson baby. (He did not do so officially until Aug. 1, 2014, and complained to Folger that the Middlesex District Attorney's office had attempted to pressure him into sticking with his original homicide finding, according to the examiner's case notes, obtained by the Globe.)

Folger had been in on some of the calls with Levin, too. Yet, even as the Wilson case was unraveling, Folger and other prosecutors didn't share Levin's speculation about the immune disorder with McCarthy's defense attorneys.

Nor did they share the information after a large crack appeared in their case against the nanny: In December 2013, a judge threw out an assault and battery charge against McCarthy, finding insufficient evidence to support the charge that she caused the bone fractures central to prosecution claims that she had abused the baby.

Instead, after finding a reference to him in files from the medical examiner, McCarthy's attorneys learned Levin had been consulted in January 2014. They repeatedly requested Levin's report, notes, and any exculpatory evidence. District Attorney Marian Ryan said prosecutors revealed in August that Levin had considered an alternative cause of death. But they did not turn over the more extensive — and more clearly exculpatory — notes from his conversations with prosecutors until January 2015, after Judge Maureen Hogan ordered them to do so. It had been 16 months since the first phone call with Levin.

They should have done it sooner, the judge said.

"Prosecutors had an obligation to turn over to the defendant information provided to them by Dr. Levin which was exculpatory, or . . . arguably exculpatory, prior to the time that they did," Hogan said in an April 22 hearing.

The judge is right, District Attorney Marian Ryan concedes.

"We take our responsibility to produce all exculpatory evidence very seriously," Ryan said in a written statement. "While there were several extenuating circumstances which delayed the production of Dr. Levin's final written report, we acknowledge and agree that the information should have been provided to the defendant sooner."

McCarthy had her bail reduced and was released this past May, after her defense team presented the medical examiner with reports from nine outside specialists challenging the homicide finding, prompting a complete review of the post-mortem. The Levin information almost certainly would have sped up that process, Thompson said.

Charges against McCarthy were dropped Aug. 31, after the medical examiner changed the baby's cause of death from homicide to "undetermined." McCarthy, who was in the country illegally, was immediately deported back to Ireland.

It's impossible to say for sure what would have happened if McCarthy's attorneys had had the Levin information sooner. Judge Hogan found that, while prosecutors failed to fulfil their obligations, their actions did not constitute grounds for the case to be dismissed, or harm McCarthy's chances of a fair trial.

But McCarthy's attorneys are convinced she would not have sat in prison for more than two years if prosecutors had done the right thing.

"Their own expert was questioning the diagnosis of abuse," said attorney Melinda Thompson. "Had the medical examiner been aware of this, her analysis could have been different early on."

Even for those convinced McCarthy murdered Rehma Sabir, there is plenty here to be concerned about when it comes to Marian Ryan's office. This is not how prosecutors should be bringing anybody to justice. The integrity of the entire system depends on fairness towards all defendants, regardless of guilt of innocence.

"Rules like those related to discovery are designed to make the playing field more even," said Medwed, the Northeastern University professor. "Flouting those rules leaves defendants playing with one hand tied behind their backs."

Ryan and her prosecutors know this. But maybe they need a reminder: Sometimes, justice and winning aren't the same thing.

Columnist Yvonne Abraham can be reached at yvonne.abraham@globe.com.

#174)

The Boston Globe

**Shaken baby cases on the increase**
**Specialists link rise to economic stress**
By Carey Goldberg
Globe Staff / March 19, 2009

Cases of the potentially devastating brain injury known as shaken baby syndrome have at least doubled in the last few months, a jump that Massachusetts child abuse specialists say is apparently influenced by families' economic stress.

Child protection teams at Children's Hospital Boston and Massachusetts General Hospital, which consult on many of the state's cases of maltreatment, have seen nine infants with shaken baby syndrome in the last three months, compared with four in the same period last year.

The number of cases of brain trauma has increased statewide, officials say, amid an overall rise in child abuse and neglect reports of 8 percent in the 2008 fiscal year, compared with the previous year.

Research has linked increased family stress, economic crunches in particular, to increased child abuse. Among recent shaken baby cases at Children's, several involved parents who had recently been laid off or faced other stresses such as the utilities being turned off, said Dr. Alice Newton, medical director of the hospital's Child Protection Team.

"This is a tragedy that we need to pay attention to, especially during these really difficult, stressful economic times," said Suzin Bartley, executive director of the Massachusetts Children's Trust Fund, which was created by the Legislature in 2006 to run programs to prevent shaken baby syndrome.

The organization plans to brief legislators today on the latest figures and on its prevention efforts. There is some concern, Bartley said, that the program might not continue to receive its annual $350,000 allocation because the money is no longer listed separately in the state budget.

Broader public education about how to avoid shaken baby syndrome is still badly needed, said Alison Goodwin, spokeswoman for the Department of Children and Families, because it can be very hard to predict which infants are most at risk. She said the majority of cases do not involve clients of the agency, which works with families that have been the subject of previous abuse or neglect reports.

The syndrome occurs when an adult - usually driven to distraction by crying - violently shakes a baby, whose neck muscles are too weak to hold his or her head steady, exposing the fragile brain to potentially overwhelming injury. There are no reliable national figures on how common the syndrome is, but about one in four victims die, and the rest are usually left with severe neurological problems.

The syndrome gained particular attention locally in 1997, when a British au pair, Louise Woodward, was convicted in the shaken baby syndrome death of an 8-month-old Newton boy in her charge, Matthew Eappen.

The state does not have complete data on shaken baby syndrome statewide, but reports of head trauma have increased in recent months, consistent with the increase in shaken baby cases seen at the Boston hospitals, Goodwin said.

Bartley said it seems clear that economic stress is piling on to the usual stress of parenting in dangerous ways.

"You never know what the level of frustration is in an individual family that may be contributing to them feeling totally overwhelmed," she said. "And an inconsolable, incessantly crying baby can send you right over the edge. And if you've got other young children, and you're working odd hours trying to keep a family together, and you don't understand that sometimes babies just cry, then you can be more vulnerable to shaking as a reaction."

The Children's Hospital team has seen an increase of late in the number of abuse cases and in their severity, and also in the number involving very young babies, said Newton. In the last three months, there have been 16 cases of serious physical abuse, predominantly of babies under 3 months old, compared with a dozen cases last winter, Newton said.

Though she has no proof, Newton said, "I think it's a combination of the current economic situation and the deteriorating social infrastructure," such as services for poor families.

Allison Scobie, the program director for child protection at Children's, said the recent cases do coincide with "the collective stress and hopelessness that I think pervades everything."

I just sat through a complete trial where I witnessed Dr. (Quack) Alice Newton commit perjury during her testimony!!! And right after the prosecution rested it's case the defense Attorney asked for a direct verdict and the judge denied it, What should have happened was a mistrial should have been called right then and there. But it wasn't. I had passed a not to the defense attorney some medical information that Alice Newton had lied about and he left it on his table the ADA in the case walked by took a look at that note realized the gig was up that her witness had lied. And suddenly had a family emergency where the trial was stalled for over a week. When the trail resumed a lot of things has changed. . I know that during that week the ADA and DR. Newton went through the Medical records and pulled all reference to the family history of the baby's illness they also pulled the second full scans done at the hospital that show there was no damage to the spleen and that the baby did not show any signs of abuse. As the rebuttal witness for our expert witness Dr. Newton lied so much stating the baby had bruises all over his left side of his body and that he was so injured that he must have been shaken and thrown. that he had lost 60 percent of his brain capacity!!! Yet my sister produced videos of her grandson that showed a two year old who is very smart have perfect vision has no problem walking talking running sharing his toys identifying objects. in fact the last independent evaluation done on this child showed him to be a child that was advanced in his skills as a 2.5 year old child. Hmmm with having lost 60 percent of his brain capacity????? REALLY DR. NEWTON!!!! Then the ADA had the ex foster monster get up and testify that the child was blind and that they tool him to the Zoo and all he could see was the trees!!!! Really well who the hell takes a blind kid to the zoo to see animals? But Brandon is not blind his vision is 20/30 which is consider perfect for a child his age. SO said the optometrist at his last check up and my sister was there and talk to that doctor. He even said Brandon didn't have to wear those goofy glasses you people make him wear when ever he is out in public!!! The Judge had just got done watching the videos my sister had presented which showed Brandon opening his birthday presents for his 2nd birthday and he got a zoo train and he took the elephant out and look at it and said "Look Grammy and elephant" And then he gave it to her. He then proceeded to identify every animal and their color too!!! Well I think that's pretty good for a child that is supposedly BLIND!!!! And the judge let this go on. No one said any thing. The trial wrapped up and we knew something has happened. The judge came back with a verdict of guilty for my nephew!!!! He would NEVER hurt his son or any child. He took care of his first child McKenna when she was colicky and was also taking care of Brandon. He did the right thing with taking Brandon to the emergency room that night because something was wrong. Brandon was suffering from a Hydrocephalic condition which does run in our family. The hospital did not identify this right away and made it a lot worse. Once it was identify Brandon began to recover quickly. But Brandon also had problems from birth because he was a Face Chin presentation delivered by an over confident Midwife. And he was only 33-34 weeks gestation. That is where all his medical problems began. But Alice Newton was called in to save Boston Children's Hospital's Ass for being sued over all the mistakes they made in the care of BRANDON GREEN. Who DCF is now going to try and STEAL from my farm by adopting him out to the daughter of the Foster Monster that testify and committed perjury in my Nephews trial!!! Well we will get it declared a MISTRIAL and JUSTICE WILL BE SERVERED IF IT IS THE LAST THING I DO ON THIS PLANET!!!!
September 15, 2015 at 12:02 pmG
David

Admin said: > Dr. Alice Newton, the Medical Director of the Massachusetts General Hospital Child Protection Program, is back in the news. Dr. Newton gained attention in the media in 2014 during the Justina Pelletier medical kidnapping case when she used the designation of "medical child abuse" to take Justina away from her parents. Justina's parents were not happy with the treatment of Justina, and had sought a second opinion, more consistent with their regular doctor. > > In this report from WCVB in Boston, two people who were accused of "Shaken Baby Syndrome" by Dr. Alice Newton have allegedly had their charges dropped after being wrongly convicted on false evidence. Dr. Newton is part of a recently created pediatric specialty that looks for medical child abuse. Some would say that these specialists must find medical abuse to justify their positions, and that they often are quick to make judgments without considering other evidence. As in the kidnapping of my grandchildren, you will see the same Judges, Case workers, Supervisors, Phys, therapists, ALL on CPS's pay roll, doing the same thing over and over again, With their immunity and the judges CPS owns, they go ruff shot over everybody, because there is NO ACCOUNTABILITY, no watch dog in place and until this is stopped, you will continue to see more and more kidnapping for the sake of state and fed funding.
September 14, 2015 at 5:12 pm
InalienableWrights
Reply
Science as a God only ranks a little behind Government as a God.
September 14, 2015 at 12:59 pm
Links from M.L. #27
"was in a psychiatric ward at the hospital" → M.L. 101 "Hundreds may be missing in child welfare system"
" ruled that Justina be transferred" → Judge Rules to Put Justina Pelletier in Foster Care, Father Says (now M.L. 176)

(#172) Middlesex County, Mass., prosecutors withheld exculpatory evidence in two 'shaken baby' cases
By Radley Balko October 20, 2015
In the Boston Globe, columnist Yvonne Abraham writes about how prosecutors in the Middlesex County, Mass., district attorney's office withheld exculpatory evidence in the Shaken Baby Syndrome case against Irish nanny Aisling Brady McCarthy.
McCarthy was accused of killing Rehma Sabir in January 2013. She was charged after Alice Newton, a prosecution medical expert, concluded (as she did in the Wilson case) that the 1-year-old had suffered injuries, including severe bleeding in the back of the eyes, which indicated abusive head trauma, also known as shaken baby syndrome.

After McCarthy was jailed without bail, prosecutors sought the opinion of Dr. Alex Levin, an eye specialist, on whether the injuries to the baby's eyes indicated abuse. In a series of phone calls starting in August 2013, Levin expressed hesitation about coming to that conclusion. He told prosecutors he had found less severe retinal hemorrhaging, and repeatedly raised the possibility that the baby's injuries might have been caused by something other than abuse — an immune disorder called Job Syndrome — according to a court document...

Not only must exculpatory evidence be shared, it must be shared promptly.

"Immediacy is not required, but the law demands some level of promptness," said Daniel Medwed, professor of law at Northeastern University. "More to the point... we should expect and demand immediate compliance."

The best prosecutors would have shared that information right after the first phone call. But, prosecutors on the McCarthy case kept it to themselves: not only after that first phone call with Levin, but through several more over the course of a year. This even after defense attorneys, who learned of Levin's work by happenstance, asked for it repeatedly...

In a September 2013 e-mail, the medical examiner told prosecutor Katharine Folger that he wanted to change his homicide finding about the Wilson baby. (He did not do so officially until Aug. 1, 2014, and complained to Folger that the Middlesex District Attorney's office had attempted to pressure him into sticking with his original homicide finding, according to the examiner's case notes, obtained by the Globe.)

Folger had been in on some of the calls with Levin, too. Yet, even as the Wilson case was unraveling, Folger and other prosecutors didn't share Levin's speculation about the immune disorder with McCarthy's defense attorneys.

A judge has since found that they should have turned all of that information over much, much sooner. McCarthy spent more than a year in jail before she was released earlier this year.

As Abraham points out, this is the second botched "shaken baby" case in Middlesex County. Geoffrey Wilson was accused of killing his son Nathan by shaking him to death. He was cleared only after his attorneys produced evidence that the child had a genetic condition that causes veins and arteries to rupture, one of the alleged symptoms of Shaken Baby Syndrome. Here's Abraham writing on that case last week:

Initially, forensic pathologist Peter Cummings ruled that the 2010 death of the baby, Nathan Wilson, was a homicide, the result of abusive head trauma, or shaken baby syndrome. His father, Geoffrey Wilson, was charged by Ryan's office with the baby's murder...

Cummings decided to file an amended death certificate changing the cause of death from "homicide" to "could not be determined." In supplemental case notes, handwritten by Cummings and placed in the baby's closed case file the day before the murder charges were dropped, Cummings said that the DA and her staff had not wanted him to change his finding. He called the way they dealt with his office on the case "unethical and unprofessional." He accused them of "M.E. shopping" in the hopes of getting a different opinion. "I told them I felt bullied and at times as though I was being forced to sign the case out in a way I did not think was honest," Cummings wrote in the case notes, obtained by the Globe.

Let's also not forget that it was Middlesex County that put the now much disputed Shaken Baby Syndrome on the map in the 1997 prosecution of Louise Woodward, a British au pair accused of killing 8-month-old Matthew Eappen. The state's expert witness in that case has since said that he would not give today the testimony that he gave then, explaining that we now know that a number of medical conditions can produce the symptoms that experts once claimed could only have come from shaking. It's just another example of the problems with asking judges to be the gatekeepers of what science does and doesn't get into the courtroom. Dozens, perhaps hundreds, of people were convicted based on expert testimony that we now know was at best grossly overstated, and at worst was simply false.

But these prosecutors didn't just rely on bad science; they actively suppressed evidence that not only should have informed that their theories about these cases were flawed, but was ultimately the evidence that led to the accused getting freed. A just system would sanction them. If they aren't punished, there's little disincentive to do it again, or for other prosecutors who might be tempted to shortchange a suspect's rights.

dew
10/28/2015 8:58 PM EDT
"Let's also not forget that it was Middlesex County that put the now much disputed Shaken Baby Syndrome on the map in the 1997 prosecution of Louise Woodward"

Also don't forget that the Middlesex MA DA's office was ground zero for the recovered memories / ritual child abuse hysteria of the 1980s.
LikeShare
TOPDOG
10/20/2015 11:49 PM EDT
Overreach and over prosecution by prosecutors,(both state and federal) Mostly on drug laws is the number one problem within our justice system. Their methods have become so underhanded and unscrupulous that no justice or civil system nor person can long tolerate or withstand them. Their ability to compel and manipulate jury's and to extort confessions and testimony has completely removed justice from within the justice system.they should all be required and held to a much higher standard.The same as judges or higher.At present, they are held, only, to very low standards,no more than any ambulance chaser yet are allowed to make decisions of national import.This allows villains and tyrants to flourish, all hiding behind legal status. Many use their office only to play politics. The protection of our Civil and Human Rights are supposed to be protected by these louts.Instead they completely ignore their