UNITED STATES DISTRICT COURT FILED
DISTRICT OF MASSACHUSETTS CLERKS OFFICE

UNITED STATES OF AMERICA,
v.
MARTIN GOTTESFELD, *pro se*,
Defendant.

2021 AUG 13 PM 12: 56

No. 16-cr-10305-NMG
U.S. DISTRICT COURT
DISTRICT OF MASS.

## EXPEDITED MOTION FOR RELEASE PENDING APPEAL

MARTIN GOTTESFELD, Defendant, *pro se*, hereby moves The Honorable Court for release pending

appeal: *United States v. Gottesfeld*, 18-1669, 19-1042, 19-1043, 19-1107 (1st Cir.).

Defendant's imprisonment is plainly unjust; he is entitled to release under, *inter alia*, the

Due Process and Excessive Bail clauses (U.S. Const. amends. V, VIII) and 18 U.S.C. § 3143(b). *See*

accompanying Memorandum in Support of Expedited Release Pending Appeal ("Supp. Memo.").

Pursuant to The Due Process Clause and 28 U.S.C. § 455(a), (b)(1), (b)(4), (b)(5)(iii),

Defendant hereby renews his motion to disqualify The Honorable Judge Nathaniel M. Gorton.[1],[2] *See*

Supp. Memo.

Also pursuant to The Due Process Clause and 28 U.S.C. § 455(a), (b)(1), (b)(4), (b)(5)(iii),

(b)(5)(iv), Defendant hereby renews his motion to disqualify The Honorable Magistrate Judge

Marianne B. Bowler.[3] *See* Supp. Memo.

Third, Defendant moves to vacate Det. Ord., dkt. 25 (July 27, 2016) and for a detention

hearing before a neutral and detached judicial officer. *See* Supp. Memo.

Respectfully filed under the prison-mailbox rule, *Fallen v. United States*, 378 U.S. 139

---

[1] Raised in sealed exhs. to Withd. Mot., *presumably* dkt. 214-1 *et seq.* (June 28, 2018); Hrg. Tr. 7:21, 9:24, July 6, 2018, dkt. 435 (docket report misdated "July 9, 2013"); Trial Tr. VIII at 19, Aug. 1, 2018, dkt. 331; disq. mots., dkts. 344-47 incl. dkts. 346-1 *et seq.* (Dec. 31, 2018).

[2] Defendant declines any construal hereof that divests The First Circuit of jurisdiction. *Cf. Castro v. United States*, 540 U.S. 375, 382 (2003) (court must warn and allow *pro se* party to amend filing before recharacterization that may make it much harder to obtain relief); *United States v. Berkan*, 502 F. Supp. 25 (D.P.R. 1980) (recusal heard as appeal pended). Defendant limits this renewal to the bail issue at bar, consistent with his request for limited remand for disq. findings; *see* Red. Appel. Br. at MS-Word pg. nos. 60-62, *filed as* Supp. Memo., Exh. M.

[3] Raised in Withd. Mot. at 3, dkt. 90 (Oct. 23, 2017); Hrg. Tr. at 19, May 3, 2018, dkt. 434; suppl. suppr. mots., dkts. 128 (Mar. 20, 2018); 166 (May 4, 2018); DQ. Aff. ¶¶ 103-29, dkt. 346.

(1964); *Houston v. Lack*, 487 U.S. 266 (1988), in an envelope bearing sufficient affixed pre-paid U.S. Priority Mail postage and track. no. 9114 9022 0078 9497 2467 94, handed to Ms. Jamie Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of The United States and of its counsel Friday, August 6 , 2021, or the first opportunity thereafter,

by: _____

Martin S. Gottesfeld, Defendant, *pro se*
Reg. no. 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, *pro se*, certify that I mailed a copy of the foregoing document to David J. D'Addio, counsel for The United States in the above-captioned case, in an envelope bearing sufficient affixed pre-paid First Class U.S. postage and track. no. 9114 9023 0722 4792 9869 35, handed to Ms. Jamie Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of The United States and of its counsel Friday, August 6 , 2021, or the first opportunity thereafter, and that separately I affected service in-hand via 28 C.F.R. § 540.203(a), (c)(1), (c)(3),

by: _____

Martin S. Gottesfeld, Defendant

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  )
               v.            )
                     )     No. 16-cr-10305-NMG
MARTIN GOTTESFELD, *pro se*,  )
     Defendant.       )

## MEMORANDUM IN SUPPORT OF EXPEDITED RELEASE PENDING APPEAL

### I. THE RENEWED DISQUALIFICATION MOTIONS ARE RELEVANT AND TIMELY.

Defendant "is entitled to a neutral and detached judge in the first instance." *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972). *See also* DQ. Aff. ¶ 41, dkt. 346 (Dec. 31, 2018) (quoting same). This constitutional guarantee applies to the instant bail proceeding:

> *Every* procedure which would offer a *possible* temptation to the average man as a judge to forget the burden of proof required to convict the defendant, *or which might* lead him not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.

*Tumey v. Ohio*.[1] A judge hearing bail must "hold the balance nice, clear and true" between "the burden of proof required to convict the defendant," *id.*, and "the weight of the evidence against the person," 18 U.S.C. § 3142(g)(2). Bail requires a neutral and detached judge in the first instance because review is "tempered by deference to the district court's firsthand judgment." *United States v. Bayko*, 774 F.2d 516, 520 (1st Cir. 1985). But not even where review is *de novo* "may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication." *Ward* at 61. With bail still before the district court the renewed disqualification motions cannot be moot.

And Defendant's filings show he promptly raised disqualification issues when he found them; when lawyers refused he fired them and sued.[2] Defendant even moved for judicial disclosure, dkt. 340 (Dec. 21, 2018), albeit unsuccessfully, Ord. Denying Discl., dkt. 342 (Dec. 27, 2018).

---

[1] 273 U.S. 510, 532 (1927) (emphasis added); *see also* DQ. Aff. ¶ 41 (quoting same).

[2] Withd. Mot., dkt. 90 (Oct. 23, 2017); Hrg. Tr. at 15, Mar. 22, 2018, dkt. 419; Hrg. Tr. at 19, May 23, 2018, dkt. 434; exhs. to Withd. Mot., *presumably* dkts. 214-1 *et seq.* (June 28, 2018); exhs. to Emerg. Withd. Mot., dkt. 242 (July 12, 2018); Trial Tr. VIII at 19, Aug. 1, 2018, dkt. 331; sealed exhs. to Emerg. Withd. Mot., dkts. 335-1 *et seq.* (Dec. 7, 2018); Hrg. Tr. 8:22, Dec.

We write to clarify that a litigant's duty to investigate the facts of his case does not include a mandate for investigations into a judge's impartiality. Judge Beckwith erred by suggesting otherwise. After proclaiming that "the strategy employed by Relator [filing the recusal motion two weeks after receiving an unfavorable dispositive ruling] is questionable at best, and the Court refuses to reward Relator or encourage this trend," she concluded that subsection of her opinion by stating that "litigants have a duty to investigate and inform the court of any perceived biases before the court and the parties invest time and expense in a case. Relator has posited no reason for the failure to make a timely inquiry into Judge Holschuh's background." *United States ex rel. American Textile Mfrs. Inst. Inc. v. The Limited, Inc.*, 179 F.R.D. 541, 546 (S.D. Ohio 1997).

We believe instead that litigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters. Further, judges have an ethical duty to "disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification." *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995). "Both litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics." *Ibid.* In ATMI's case, Judge Holschuh possibly did not consider the matter sufficiently relevant to merit disclosure, but his nondisclosure did not vest in ATMI a duty to investigate him.

*American Textile Mfrs. Inst., Inc. v. Limited, Inc.*[3] Defendant posits the § 455(e) no-waiver rule expressly forbids finding waiver from untimeliness. Implied waiver subverts Congress's goal for § 455: "to foster public confidence in the judicial system."[4] After Judge Gorton denied disclosure, ruling implied waiver would harm public confidence, not foster it.

> In contrast, § 455(a) is automatic, mandatory and self-executing. The adoption of ABA Canon 3 C was a response to criticism of the inadequacy of the [28 U.S.C.] § 144 approach. It did away with the "duty to sit" doctrine. It attacks the appearance of bias, not just bias in fact. The waiver of § 455(b) grounds is forbidden, and it is allowed for § 455(a) only with a statement on the record of the basis of disqualification. 28 U.S.C. § 455(e).

*Chantal* at 1023 (some citations omitted). The renewed disqualification motions are timely.

## II. DISCLOSURE & FINDINGS ARE REQUIRED IN RE DISQUALIFICATION.

"When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). "Judicial bias should be treated as a mixed question of law and fact..." *Nakell v. Attorney Gen.*, 15 F.3d 319, 324 (4th Cir. 1994).

> The proper approach under subsection 455(a) *requires* the trial judge to place on the record *all* the facts relating to any *alleged* appearance of lack of impartiality and then leave entirely to the parties whether to waive disqualification under section 455(a).

13, 2018, dkt. 423; DQ. Aff. ¶¶ 202, 211.

[3] 190 F.3d 729, 742 (6th Cir. 1999) (alteration in original); *see also* 28 U.S.C. § 455(c) (a judge should learn his personal fiduciary interests and make reasonable efforts to know his spouse's personal financial interests), (e) (no waiver of disq. absent full, on-the-record disclosure).

[4] *United States v. Chantal*, 902 F.2d 1018, 1022 (1st Cir. 1990) (internal quotation marks and citations omitted).

*El Fenix de P.R. v. The M/V Johanny*, 36 F.3d 136, 141 (1st Cir. 1994) (emphasis added).

### III. DISQUALIFICATION STANDARDS

Bracing *Ward, Tumey, etc.*, a judge must recuse when his "impartiality might reasonably be questioned." § 455(a). A judge's or his spouse's "financial interest in the subject matter" also begets recusal. § 455(b)(4). As do other interests of the judge, his spouse, or anyone within three degrees of relationship to them "that could be substantially affected by the outcome of the proceeding." *Id.*; § 455(b)(5)(iii). A judge aware 1) that such a person is likely a material witness or 2) of disputed evidentiary facts must recuse too. § 455(b)(5)(iv), (b)(1).

Though overall Congress intended § 455 "to foster public confidence in the judicial system," *Chantal* at 1022; it specifically grounded subsection 455(b) in due process:

A fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end[] no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships *must* be considered. This Court has said, however, that every procedure which would offer a possible temptation to the average man as a judge not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law. Such a stringent system may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way justice must satisfy the appearance of justice.

*In re Murchison*, 349 U.S. 133, 136 (1955) (alteration and emphasis added) (internal quotation marks, ellipsis, and citations omitted). Subsection 455(b)(1), for example, forbids "personal knowledge of disputed evidentiary facts." Such *ex curia* knowledge leaves no official record, thus frustrating appellate review, and the disadvantaged party cannot rebut the "silent facts" to which he can never be privy. *In re Kensington Int'l Ltd.*, 368 F.3d 289, 309–12 (3d Cir. 2004).

### IV. MAGISTRATE JUDGE BOWLER MUST BE DISQUALIFIED.

Magistrate Judge ("M.J.") Bowler had and has personal knowledge of disputed evidentiary facts in re the bail issue at bar, as shown by, *e.g.*, "My spouse, Marc A. Pfeffer, M.D., Ph.D., is the Dzau Professor of Medicine at Harvard Medical School and a senior cardiologist at the Brigham and Women's Hospital in Boston, which is a Harvard Medical School affiliated hospital." *Cabi, et al. v. Boston Children's Hospital*, 15-cv-12306, dkt. 211 at 2 (D. Mass. Mar. 20, 2017) (Bowler, M.J.,

recusing). "We work closely with physicians at Boston Children's Hospital." Brigham and Women's

Hospital ("BWH") Cardiovascular Genetic Diseases page, dkt. 346-3 at 86 (Dec. 31, 2018). AUSAs

gamed Her Honor's personal knowledge early and often, e.g., directly beseeching M.J. Bowler:

> ..., you know, that these doctors and there are many of them that are at the Harvard hospitals
> that are outside the hospital physically, could not access patient records of their patients
> in the hospital, that they couldn't place orders with pharmacies for medications, they
> couldn't communicate through the hospital portal with their patients.

Det. Hrg. Tr. at 55, Apr. 27, 2016, dkt. 19 (emphasis added).[5] "Harvard hospitals" besides Boston

Children's Hospital ("BCH") had gone unsung at bar, as had how "many" doctors "are at the *Harvard*

*hospitals*" who "could not access patient records" from "outside the hospital." *See* Det. Hrg. Tr.;

docket report. But BCH doctors' access to such records was a hotly contested factual matter.[6]

Defendant and his lawyer were new to This Court.[7] The AUSAs, in contrast, knew Her Honor's

background well.[8] They judge-shopped for M.J. Bowler in a system already rigged to put Her Honor

on Harvard-hospital cases. Decl. of Martin S. Gottesfeld (Aug. 6, 2021); Exh. A..  ⸱⸱ ⸱⸱⸱ ⸱ ⸱⸱⸱⸱⸴.

And M.J. Bowler must have been cognizant of the relevant events because, e.g., "It wasn't

just [BCH] that was down in this [DDoS] attack, it was... Mass. General, Brigham and Women's...

and Harvard Medical School," Trial Tr. IV at 196, July 25, 2018, dkt. 327.

> To put it into perspective, that [DDoS] was 2.8 times larger[*sic*] than the amount of
> bandwidth[*sic*] that Harvard had. Harvard had 10 gigabits[/second] of bandwidth and were
> getting 28 gigabits[/second] worth of traffic. [] And that's why all of Longwood[ Medical
> Area, including BWH,] was no longer functioning.

*Id.* at 199.[9] M.J. Bowler also personally knew the DDoS's aforesaid toll on Mass. General Hospital

("MGH"). Her Honor sits on MGH's Visiting Committee on Neuroscience. *See* Marianne B. Bowler,

---

[5] Notwithstanding such inflammatory rhetoric and M.J. Bowler's crediting thereof, the government
ultimately failed to prove that Defendant's actions, i.e. saving Justina Pelletier, caused "the
potential modification or impairment of the medical examination, diagnosis, treatment, or care of
[one] or more individuals." Verdict Form, dkt. 301 (Aug. 1, 2018).

[6] Det. Hrg. Tr. 9:19—23, 51:9—14, 55:24—56:4.

[7] E.g., Ord. Grant. Leave to Appear *Pro Hac Vice*, dkt. 12 (Apr. 5, 2016); Det. Hrg. Tr. at 40;
Det. Ord. at 9, dkt. 25 (July 27, 2016) (Defendant "does not have a prior criminal record").

[8] E.g, U.S. District Court Press Release Apr. 16, 2014, at 2, dkt. 128-6 ("Judge Bowler lives in
Brookline with husband, Marc A. Pfeffer, M.D., Ph.D., who is the Dzau Professor of Medicine at
Harvard Medical School and a senior cardiologist at the Brigham and Women's hospital in Boston").

[9] Defendant reserves his right against self-incrimination; but Fed. R. Civ. P. 11(b)(3) obliges he
herein clarify that the throughput directed at Harvard likely exceeded 250 gigabits/second (gbits/
sec); the DDoS saturated upstream connections, so Radware's 28-gbits/sec figure likely reflects

*Curricullum Vitae* ("Bowler CV") at 6, Exh. B (retrieved 2021). AUSAs, aware Her Honor was an MGH bureaucrat wedded to one of "those doctors" "at the Harvard hospitals," fretted to Her Honor that the DDoS was "expensive," "tremendously disruptive," "operationally disruptive," and "tremendously concerning for everyone at the hospital because they were worried that patient records could be stolen, damaged, altered and that would be catastrophic." Det. Hrg. Tr. at 56.[10] M.J. Bowler's *ex curia* knowledge of this "expensive," "disruptive" DDoS mandated Her Honor's recusal.[11]

And once AUSAs invoked "those doctors" "at the Harvard hospitals," *supra*, M.J. Bowler knew Pfeffer was a possible material witness, *e.g.*, in re restitution and U.S.S.G. § 2B1.1(b)(2)(A)(i). Indeed, AUSAs *ab initio* sought restitution to Pfeffer's employers and balked only when Defendant filed a draft-PSR page proving such before The First Circuit. *See* Dft. PSR Pg., sealed exh. to Mand. Pet., No. 19-1011. Her Honor's recusal was thus also mandated by § 455(b)(5)(iv).

The DDoS also hit home for M.J. Bowler by trashing her spouse's medical-communications work and research.[12] "[P]rofessional prestige and the opportunity to associate with and train students under training grants in a significant area of medical research [] lend more than an abstract interest to [a doctor]'s personal stake in" a case. *Apter v. Richardson*, 510 F.2d 351, 354 (7th Cir. 1974). *Compare* Trial Tr. IV 52:3-6. "Preparation time devoted to a project in expectation of economic benefits has been held a sufficient 'personal stake'" for standing.[13] Pfeffer's economic and other interests are cognizable in research grants awarded to an institutional victim and not directly to himself: "The fact that the alleged wrong may also have injured third parties does not deprive [the doctor] of standing so long as []he as well is injured."[14] M.J. Bowler

only the trickle-through near Harvard itself.

[10] *See, again,* n.5, *supra.*

[11] *El Fenix, supra,* at 140 n.4, citing *United States v. Alabama,* 828 F.2d 1532, 1543-46 (11th Cir. 1987) (recusal mandated when trial judge's pursuits involved him in "disputed evidentiary facts").

[12] *See, e.g.,* for Pfeffer's research: 2d Suppl. Suppr. Mot. at 4, dkt. 166 (May 4, 2018); *Marc Alan Pfeffer, M.D., Ph.D.,* Harvard Catalyst Profiles, Exh. C (retrieved 2021); Research Info. Comput. Systs., dkt. 346-2 at 84, 86; and for impact on HMS research, Compl. ¶ 13, dkt. 3-2 (Feb. 16, 2016); Det. Hrg. Tr. 51:15, Trial Tr. IV 97:20-21,24-25; Trial Tr. VII 20:5-6, July 31, 2018, dkt. 329; Sent. Tr. at 48-50, Jan. 10, 2019, dkt. 399.

[13] *Apter,* citing *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208 (8th Cir. 1972).

[14] *Apter,* citing *Sierra Club v. Morton,* 405 U.S. 727, 736-38 (1972); *Cotovsky-Kaplan Physical Therapy Ass'n, Ltd. v. United States,* 507 F.2d 1353 (7th Cir. 1975).

rightly recused *sua sponte* upon softer impact on Pfeffer. *Cabi, supra,* at 1, citing § 455(b)(4). Her Honor surely knew his vital interest at bar and had to recuse. § 455(c), (b)(4), (b)(5)(iii).

Sans disclosure known facts tie M.J. Bowler to this case: Her Honor was a Harvard Medical School ("HMS") research assistant. Bowler CV at 4. Her Honor is, since 1983, a "Member of the Corporation" of New England Baptist Hospital, *id.* at 7, and was its chair from 1990—96, *id.* at 6. NEBH runs "teaching programs in collaboration with Harvard Medical School." New England Baptist Hospital, *About,* available at https://www.nebh.org/who-we-are (viewed July 26, 2021). Her Honor also personally molded the same child-welfare system witheringly rebuked over Justina's case.[15]

A judge cannot accept $5 a warrant. *Connally v. Georgia,* 429 U.S. 245 (1977). Mayors cannot try cases affecting city budgets. *Tumey; Ward.* No one may judge her own case. *Murchison.* "In defining these standards the Court has asked whether, under a realistic appraisal of psychological tendencies and human weakness, the [judge's personal] interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."[16] This is such a case. M.J. Bowler herself worked for HMS; Pfeffer still does. Her Honor sits on a board at Harvard's primary teaching hospital (MGH) and chaired one of HMS's teaching collaborators, where she remains a member of the corporation. The alleged effects on HMS and its partners were widespread and severe. In the AUSAs' own words to M.J. Bowler:

> [I]t was tremendously disruptive [] and that doesn't even include the fundraising that was disrupt[ed]. So not only was it operationally disruptive, it was expensive and *tremendously* concerning for *everyone* at the hospital because they were worried that patient records could be stolen, damaged, altered and that could be *catastrophic* so this was a significant, *very significant* disruption for the hospital.

Det. Hrg. Tr. 56:4—14 (emphasis added).[17] Judges might impartially hear cases that so alarm their

---

[15] E.g., David Kushner, *The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison,* Rolling Stone (June 28, 2017), excerpt at dkt. 346-3 at 72; Jennifer McKim, *Savage toll of abuse for children in DCF care: More than 95 have died since '01, state report says,* Boston Globe (Feb. 2, 2014), *id.* at 73; Tweets with #FreeJustina & DCF (Nov. 1, 2013—June 20, 2014), *id.* at 79; Tweets with #FreeJustina & foster (same period), dkt. 346-1 at 109—13; MyFoxBoston, *Protesters gather outside state facility housing Justina Pelletier* (May 4, 2014), *id.* at 125; Lifting The Veil, *Thousands Rally for Pelletier Family at Massachusetts Statehouse* (May 28, 2014), *id.* at 127; Mass Resistance, *Justina Pelletier is finally released...* (June 18, 2014), *id.* at 133; see also DQ. Aff. *in toto* incl. dkts. 346-1 et seq., *in toto.*

[16] *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 883—84 (2009) (internal quotation marks and citations omitted).

[17] See, again, n.5, supra.

spouses, but "the requirement of due process [] is not satisfied by the argument that men of the highest honor and greatest self-sacrifice could carry it on without danger of injustice." *Tumey* at 532. "[J]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). M.J. Bowler's passing on Defendant who allegedly "tremendously disrupt[ed]" Her Honor's spouse's tenure employers, thus "tremendously concerning" "everyone" there with "catastrophic" damage, utterly fails to satisfy the appearance of justice; The Due Process Clause required M.J. Bowler to recuse.[18] Instead Her Honor preempted Defendant's lawyer. Det. Hrg. Tr. 60:19—61:22. As feared in *Caperton*, M.J. Bowler had prejudged Defendant guilty without trial:

```
19 MS. BROWN: Obviously he[, i.e. Defendant,] doesn't need a
20           probation officer as well.
21 THE COURT: Yes, he will soon enough. He will
22           soon enough.
```

Det. Hrg. Tr. at 62. M.J. Bowler could only be sure Defendant "will" need a probation officer if Her Honor 1) was granting bail or 2) had judged him guilty before trial. The record proves which: *see* Det. Ord. Once denied bail Defendant would need a probation officer only if convicted. "A sentence of a court pronounced against a party without hearing him or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other" court.[19] "[A]n extrajudicial source is not the exclusive basis for establishing disqualifying bias."[20] "By [due process] is most clearly intended the general law, a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial."[21] Once M.J. Bowler prejudged Defendant without hearing his bail argument recusal was required. *Id.*

Also M.J. Bowler rubber-stamped the warrant to search Defendant's home "September 29, 2014 @ 3:43 PM." Search warrant and application, dkt. 78-1. But only after affirming probable cause did Her Honor actually read the paperwork and note that page one of the application was postdated the

---

[18] "Our commitment to these values [of government under law] requires fidelity to them even when there is temptation to ignore them. Such temptation is especially apt to arise in criminal matters, for those granted constitutional protection in this context are those whom society finds most menacing and opprobrious." *McKlesky v. Kemp*, 481 U.S. 279, 342—43 (1987) (Brennan, Marshall, Blackmun, Stevens, JJ., dissenting), citing *The Least Dangerous Branch* 24 (1962).

[19] *Windsor v. McVeigh*, 93 U.S. 274, 277 (1876); *Hovey v. Elliott*, 167 U.S. 409, 414 (1897) (same).

[20] *In re United States*, 441 F.3d 44, 67 n.20 (1st Cir. 2006) (internal quotation marks and citations omitted).

[21] *United States v. New York, N.H. & H.R. Co.*, 165 F. 742, 746 (C.C. Mass. 1908).

next day: "09/30/2014," *id.* Unknown to the government Her Honor filed a sealed *post facto*-altered version, Hrg. Tr. 20:2–16, May 3, 2018, dkt. 434; No. 14-mj-2234-MBB, dkt. 3.[22]

Each item *supra* severally required recusal. Together they're indisputable. If nothing more, M.J. Bowler's impartiality "could reasonably be questioned." § 455(a). *E.g.*, testimony of BWH doctors left Judge Stearns, a trustee of Vincent Memorial Hospital, "no alternative but" recusal despite "three levels" of removal.[23] Elsewhere, affirming vacatur under § 455(a), SCOTUS noted:

> A finding by another judge—faced with the difficult task of passing upon the integrity of a fellow member of the bench—that his or her colleague merely possessed constructive knowledge, and not actual knowledge [of disputed evidentiary facts], is unlikely to significantly quell the concerns of the skeptic.

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 n.12 (1988). That prospect is shakier here after M.J. Bowler referred *sua sponte* to BCH by the intimate moniker most familiar to Her Honor's husband and other Harvard doctors: "Children's," Det. Ord. at 10. If This Court is unconvinced, Defendant moves to examine M.J. Bowler and Pfeffer as to their knowledge and talks.

## V. JUDGE GORTON MUST BE DISQUALIFIED.

Defendant promptly sought Judge Gorton's recusal upon following the money between His Honor's family, family business Slade Gorton & Co., Inc. ("SG&C"), favored charity The Home for Little Wanderers ("HLW"), and BCH.[24] Then His Honor *sua sponte* banned shirts "showing Mr. [Aaron] Swartz in all his glory." Hrg. Tr. at 46, July 17, 2018, dkt. 265. Nonetheless, a juror *sua sponte* alluded to Swartz and counsel expressly moved to disqualify, Trial Tr. VIII at 19. Judge Gorton denied the motion without findings or disclosure. *Id.*[25]

---

[22] Her Honor also *sua sponte* delayed Defendant's initial appearance a week, dkt. 8; continued his bail hearing 3 weeks, dkt. 13, i.e. triple the limit: 18 U.S.C. § 3142(f); then held his detention under advisement 92 days, dkts. 15, 25. *Cf.* 18 U.S.C. § 3145(b), (c) (bail "shall be determined promptly); 18 U.S.C. § 3161(h)(1)(H), (h)(7)(C) (STA limits "under advisement" to 30 days, bans court-congestion continuances); *United States v. Jones*, 1999 U.S. Dist. LEXIS 8080, 98-cr-10169 (D. Mass. May 26, 1999) (M.J. Bowler and prior bail delay); and Code of Conduct for United States Judges ("CCUSJ") Canon 3A(5) ("A judge should dispose promptly of business of the court").

[23] *Bradley v. Sugarbaker*, 2013 U.S. Dist. LEXIS 172872, 07-cv-12319 (D. Mass. Dec. 4, 2013).

[24] *Inter alia*, sealed exhs. to Withd. Mot., *presumably* dkt. 214-1 *et seq.* (June 28, 2018); Hrg. Tr. 7:21, 9:24, July 6, 2018, dkt. 435 (docket report misdated "July 9, 2018").

[25] *See also* Joana Kao, *Swartz judge sides with MIT on release of case evidence*, MIT Tech (May 14, 2013), dkt. 346-4 at 7; Katie Rogers, *Internet pays tribute to Aaron Swartz: commentary from around the web*, The Guardian (Jan. 14, 2013), dkt. 346-1 at 193; Kevin Cullen, *On humanity, a big failure in Aaron Swartz case*, Boston Globe (Jan. 15, 2013), dkt. 346-1 at 199; DQ. Aff. ¶¶ 45–50, 72–78.

When asked, Judge Gorton outright denied on-the-record disclosure: dkts. 340, 342. *Contrast,*
§§ I—II, *supra*: This error "did not vest in" Defendant "a duty to investigate him" or else waive
disqualification. *American Textile Mfrs. Inst., Inc.* Instead: "§ 455(a) is automatic, mandatory
and self-executing.... [W]aiver of § 455(b) grounds is forbidden, and it is allowed for § 455(a)
only with a statement on the record of the basis for disqualification." *Chantal, supra.*

Defendant filed motions to disqualify *eo die* Judge Gorton refused disclosure: dkts. 344—46,
"mailed 12/27/18" asserting the prison-mailbox rule. Exhibited were 500-plus pages of financial
and other data undisclosed by Judge Gorton, dkts. 346-1 *et seq.* Defendant had just obtained them,
*e.g.*, DQ. Aff. ¶¶ 202, 211: "My team and I are still working to find more." Further proving
alacrity, the next day Defendant filed Suppl. Disq. Mot., dkt. 347. His Honor also denied these
disqualification motions without explanation or disclosure: dkts. 350—52. *Contrast* § II, *supra.*

But much is known. *Ab initio* Judge Gorton has held stock in and been a "Clerk/Secretary and
Director" of Slade Gorton & Co., Inc. ("SG&C"), "a closely held family seafood business."[26] Slade
Gorton fathered Judge Gorton. His Honor's brother Michael Sr., niece Kim (a Harvard alumna), and
nephew Michael Jr. respectively chair and preside over SG&C's board and direct its sales.[27] SG&C
joined The Seafood Nutrition Partnership ("SNP"), a trade body hawking "the benefits of a seafood-
rich diet," Suppl. Disq. Mot. at 6, 8—9. HMS faculty cofounded SNP in 2013, *id.*, i.e. amid the
Pelletier case. The month M.J. Bowler rubber-stamped the search of Defendant's home, September
2014, Pfeffer's BWH cardiology department joined SG&C's marketing, pledging to run four "eating
heart healthy" programs for SNP, *id.* at 7. The programs started in 2015, *id.*, before Defendant
moved to examine Pfeffer *et al.* about Pfeffer's work for HMS and BWH and M.J. Bowler's knowledge
thereof "as of September 2014," 2d Suppl. Suppr. Mot. at 4. His Honor disclosed nothing when BWH
Cardiology arose, but passed on BWH Cardiology's ties to HMS while HMS and BWH Cardiology promoted
His Honor's products as "heart healthy." Ord., dkt. 209 at 28; Suppl. Disq. Mot. at 7. His Honor
needed to heed § 455(a), (b)(1), (b)(4), (b)(5)(iii) and recuse. *Cf. Bradley*, n.23, *supra.*

---

[26] Gorton, Nathaniel M., financial disclosure reports, 2003—16 ("Gorton Discls."), Exh. D; *see
also* dkt. 346-1 at 11—33 (redacted, marked versions of same); DQ. Aff. ¶¶ 23, 203.
[27] John C. Hughes, *Slade Gorton: A Half Century in Politics, excerpt at* dkt. 346-1 at 141—44;
SG&C Website, marked print-outs, Dec. 23, 2018, http://www.sladegorton.com/about-us/our-team/
executive-team, *id.* at 147—48; DQ. Aff. ¶ 23; *cf. also* CCUSJ Canon 3C(3)(a), § 455(b)(5).

Also undisclosed, Harvard's chief pediatrics professor cofounded SNP, Suppl. Disq. Mot. at 6. As BCH boasted, "We're the primary pediatric teaching facility for Harvard," Trial Tr. IV at 52. All BCH faculty are HMS faculty, *id.* Their email addresses are @childrens.harvard.edu.[28] During the Pelletier scandal SG&C gave to BCH; BCH thanked SG&C on its website, further promoting SG&C.[29] Defendant is chiefly accused of a modern civil-rights-era-style sit-in of BCH's same website amid a major online fundraiser. Indictm. ¶¶ 28–29, dkt. 28. Back then BCH took offline lists of its patrons, like SG&C, to protect them from reputational and economic harm.[30] SG&C was thus subject to harm from Justina's case and Defendant's actions, and remains interested in this case.

Besides patronizing BCH for online promotion, Judge Gorton *et al.* have long-term interests in HLW.[31] His Honor, Michael Sr. and his wife, and SG&C are frequent donors; Michael Sr. was on its board of directors; both His Honor and Michael Sr. sat on its board of advisors; and from 2003–12 Judge Gorton listed himself as a "Member of the Corporation." *Id.*; Gorton Discls.; *cf. also* CCUSJ Canon 3C(3)(c). SG&C leverages Michael Sr.'s patronage of HLW on its website near links to "Email: sales" and "Download our catalogue." SG&C website, marked print-outs, dkt. 346-1 at 147–48.

HLW, in turn, has long partnered with BCH "to 'divert'[] children from psychiatric inpatient stay by working intensively with families in their homes"; HLW FY 2003 Report excerpt, dkt. 346-1 at 35. This "Safe-at-Home" program could have had Justina's face on it. HLW also places such kids for adoption[32] "and one of the most controversial and bitterly disputed parts of Justina's saga was when BCH and The Massachusetts Department of Children and Families put her on a path towards adoption against her and her family's wishes," DQ. Aff. ¶ 20. In support of this partnership BCH frequently donates to HLW.[33]

---

[28] DQ. Aff. ¶ 116; *People: Boston Children's Hospital,* https://hsci.harvard.edu/people/people-terms/boston-childrens-hospital (retrieved Dec. 30, 2018), dkt. 346- at .

[29] Boston Children's Hospital Philanthropy Supporters 2013, *excerpt at* dkt. 343-3 at 145–47.

[30] *E.g.,* Failure To Listen, *Mat Staver Joins Megyn Kelly to Discuss State Ordered Detaining of Justina Pelletier* (May 5, 2014) at 2, dkt. 346-1 at 120.

[31] DQ. Aff. ¶¶ 13–18, 21, 27; HLW Annual Reports FYs 2003–15, *excerpts at* dkt. 346-1 at 10–11, 34–102.

[32] HLW "Waiting Children" Adoption (retrieved Dec. 29, 2018), dkt. 346-1 at 106; Patricia Wen, *Parents of Justina Pelletier upset after learning teenager will now be sent to DCF foster care, advocates say,* Boston Globe (Feb. 24, 2014), dkt. 346-1 at 108.

[33] DQ. Aff. ¶¶ 24–25, 150, 156; The Home for Little Wanderers awarded $50,000 [from BCH] (Sept.

More broadly, for decades Judge Gorton molded the same public-private Massachusetts child-welfare system that during Justina's saga was a lightning rod for criticism: *see* n.15, *supra*; *in toto* DQ. Aff., dkts. 346-1 *et seq.* His Honor's pursuits *ex curia* thus involved him in disputed evidentiary facts upon which His Honor passed, *e.g.*, 1) the total fundraising BCH lost from the DDoS, i.e. an estimate based upon years past and donors disinclined to give due to scandal—using His Honor's personal experiences fundraising for child-welfare NGOs;[34] 2) whether Defendant's activism against said child-welfare system posed danger if he were released, Hrg. Tr. 13:7, Sept. 24, 2018, dkt. 422; and 3) whether Defendant was entitled to a defense-of-others instruction due to His Honor's associates endangering Justina's life while in their custody, Chg. Conf. Tr. 17:12, July 30, 2018, dkt. 328. Judge Gorton thus had to recuse under § 455(b)(1). *El Fenix*, *supra*.

Given the longstanding ties between SG&C and BCH—particularly those in re HLW and BWH—His Honor could not have missed his need to disclose and recuse. *Cf. Liljeberg* at 851–52 (despite no actual knowledge, "a reasonable observer would expect" the judge "would remember" his organization "had some dealings with" litigating party and third party "and seek to ascertain the nature of those dealings"). Relationships flowed from Judge Gorton through SG&C and HLW to SNP, BCH, BWH, a juror, and a trial witness.[35] *Cf. Bradley*, n.23, *supra*.

As with M.J. Bowler, The Constitution required Judge Gorton to disqualify, *e.g.*, Defendant sought to admit evidence His Honor's Massachusetts child-welfare associates tortured a child and unlawfully endangered her life: Opp. to Mot. *in Lim.*, dkt. 198. No judge can satisfy due process while passing on whether his lifelong comrades—let alone those promoting his products—were hit by lawful defense of others. To hold otherwise allows judges to pass on the character, judgment, and credibility of their associates as if they were witnesses in a bench trial, especially where, as here, Judge Gorton cut off the jury's factfinding, Ord. Allow. Mot. *in Lim.*, dkt. 209.

Given BWH runs programs for Judge Gorton's family business, the issue at bar of restitution

2, 2015) (retrieved Dec. 23, 2018), dkt. 346-1 at 150.

[34] HLW annual reports FYs 2003–15, n.31, *supra*; Sent. Tr. at 11, HLW FY 2012 Report excerpt in re third-party payers, dkt. 345-2 at 203.

[35] After the citations *supra*, *see*, *e.g.*, Trial Tr. II at 95–99, July 23, 2018, dkt. 325; Boston Business Journal, *KDSA gets inspired by the tales* (Nov. 20, 2008), dkt. 346-1 at 166, HLW annual reports, KDSA-donation excerpts, dkt. 346-2 at 181–91; HLW 2012 Form 990, dkt. 346-1 at 174; HLW annual reports, BWH-donation excerpts, dkt. 346-3 at 24.

to BWH was sharper than mayors in *Ward* and *Tumey* fining drivers to pad city budgets. BWH suddenly was cut *sub silencio* after the draft PSR—right after Defendant raised restitution to BWH as a disqualification issue. Compare Dft. PSR Pg., *supra*, *to* Final PSR. A person would reasonably question this timing and coordination. And due process no more abides Judge Gorton's ever having presided over likely restitution to those promoting His Honor's wares than it lets mayors in black robes fill city coffers. Broader, as "[c]ircumstances and relationships must be considered," *Murchison*, the sum of facts paints "a possible temptation to the average man" in Judge Gorton's place "not to hold the balance nice, clear and true between the State" and Defendant.

Plus, Judge Gorton's refusal to disclose under the canons—or to enter findings—indicates more than a "possible temptation." It is now its own recusal basis: An unafraid judge would disclose. *Compare* § 455(a), (b)(4), (c), (e), Discl. Mot., dkts. 341, 341-1 *to* Ord. Den. Discl., dkt. 342. An objective, fully informed citizen would question what *else* Judge Gorton keeps hidden and ergo question His Honor's impartiality. § 455(a). Disclosure under the honor system at this late stage could never assuage such concerns. *Cf. Liljeberg* at 866, 868.

VI. THE PREVIOUS DETENTION ORDER AND FINDINGS REQUIRE VACATUR.

Defendant hereby moves to vacate Det. Ord., dkt. 25, and all findings in re detention.

SCOTUS considers three risks when deciding if § 455(a) requires vacatur: 1) the risk of injustice to the parties; 2) the risk that denying relief will produce injustice in other cases, and 3) the risk of undermining public confidence in the judicial process. *Liljeberg* at 864.

First, the injustice to Defendant is manifest: His now-65-month detention is as-yet unheard *de novo* by an uninterested judge—an unending injustice sans vacatur. Judges interested in his conviction denied him due process, *supra*, and a speedy-and-public trial, as detailed *infra*. Upon reversal he will have endured 5½ years of pre-retrial incarceration; and here The Due Process Clause itself requires vacatur, *e.g.*, "This separate violation of § 455[(b)] further compels the conclusion that vacatur was an appropriate remedy; by his silence, [the judge] deprived respondent of a basis for making a timely motion for a new trial." *Liljeberg* at 867; *cf.* Ord. Den. Discl.

Also manifest are the risks of upholding the procedural posture at bar:

[P]roviding relief in cases such as this will not produce injustice in other cases; to the

contrary, the [Court]'s willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.

*Liljeberg* at 868. And the instant denial of prompt relief has already undermined public trust in the judiciary, *e.g.*, Aaron Bandler, *EXCLUSIVE: Jailed Hacktavist Who Fought To Save Girl's Life Blocked By Biased Judge From Attending His Father's Funeral*, DailyWire (Apr. 9, 2017), dkt. 346-1 at 151. Further delay further harms public trust. And the public is less trusting now than ever. "Judicial discipline at the federal level is almost non-existent." Peter S. Green & John Mazor, *Corrupt Justice: What happens when judges' bias taints a case?*, The Guardian (Oct. 18, 2015). From 2010—14, 2,561 federal judicial-misconduct complaints alleged bias or conflicts of interest, "But only three judges were disciplined during those years and each got the mildest rebuke on the books." *Id.*[36] For decades public trust in federal judges has consistently deteriorated. Gallup, Inc., *Trust in Government*, *available at* https://news.gallup.com/poll/5392/trust-government.aspx (visited Feb. 8, 2021). The latest data, taken five months before Defendant's arrest, is the worst yet: asked "how much trust and confidence" they had in the federal judicial branch, 47 percent said "Not very much" or "None at all." *Id.* The thin majority who answered a "Fair amount" or a "Great deal" approximates Americans' approval of King George III on July 3, 1776.[37] Respectfully, events after these latest 2015 data—including those *supra*—lowered public trust still further.[38]

## VII. COMMUNITY SAFETY CAN BE REASONABLY ASSURED.

"[I]nterpreting the 'reasonably assure' standard set forth in [18 U.S.C. § 3142(c)] as a requirement that release conditions 'guarantee' community safety and the defendant's appearance" is erroneous. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). "[W]e agree with the Eighth Circuit that the courts cannot demand more than an 'objectively reasonable assurance of community safety.'" *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (quoting *Orta* at 892). Defendant proposes conditions ("prop. condts.") exceeding reasonable assurance,

---

[36] Defendant declines any construal hereof as a complaint of judicial misconduct. *Castro, supra.*

[37] Independence Hall Association, *Loyalists, Fence-sitters, and Patriots*, *available at* https://www.ushistory.org/us/11b.asp (visited July 22, 2021).

[38] *E.g.*, Martin Gottesfeld, *Think Russia Is Bad? Listen To This Imprisoned Human Rights Activist*, The Huffington Post (Mar. 28, 2017), dkt. 346-3 at 118; Jim Jimitis, *Fate of Accused Hospital Hacker In The Hands of Judge With Personal Ties To Hospital*, Red State (Mar. 29, 2017), *id.* at 121.

[Proposed ]Order of Release, Exh. E. Defendant has no prior conviction, n.7, *supra.* He acted only upon credible claims BCH tortured then-15-year-old Justina Pelletier, Tort. Memo, dkt. 190-1. No like incidents since occurred at BCH. None are expected. AUSAs produce no basis to find Defendant dangerous. An unmasked *Anonymous* hacker cannot act anonymously or *Anonymously.* Defendant's days of hacktivism are over; just begun are his protected pursuits: journalism and politics.[39]

Defendant's lawful conduct is further enforced by the prop. condts. In another case, *e.g.,*

> [D]efendant has also agreed to maintain his current residence, and to go on electronic monitoring 24/7 if ordered by the court. This would eliminate any risk of flight and would, in this court's view, reasonably eliminate any concerns [D]efendant would continue to engage in illegal activities.

*United States v. D'Amore,* 2008 U.S. Dist. LEXIS 119275, 00-cr-10094, at *19 (D. Mass. May 20, 2008). This Court found, for example, that the particular conditions D'Amore posited reasonably assured community safety because the "types of crimes with which [D]efendant has been engaged in the past required his personal involvement and could not be conducted from his home." *Id.* Likewise prop. condts. 5-8, 12-13 (computer monitoring, house arrest) assure such here.

## VIII. DEFENDANT'S APPEARANCE CAN BE REASONABLY ASSURED.

"[O]nly reasonable assurances, rather than a guarantee, are required with regard to risk of flight." *United States v. Simone,* 317 F. Supp. 2d 38, 42 (D. Mass. 2004). For 31 years The First Circuit has held that electronic monitoring, prop. condt. 12, effectively deters flight.[40]

> [A]lso of note is the degree to which electronic monitoring technology has progressed since [cases from 1985 and '93]. As defense counsel argued, pretrial monitoring now enables a pretrial officer to track a defendant in real time, on a computer or a cell phone, so that the officer can be assured that, for example, when [Defendant] says he is going to the hospital, that he is in fact doing so.

*United States v. Paulino,* 335 F. Supp. 3d 600, 617-18 (S.D.N.Y. 2018). If GPS bracelets were ineffective pretrial services would shun the technology, not rely upon it at risk to the public.

The fugitive-disentitlement doctrine further deters Defendant from flight.[41] The government has already done its worst to Defendant; now he dreams of his day before a fair tribunal. *Id.*

[39] Decl. of Martin S. Gottesfeld (Aug. 4, 2021) ("Bail Decl."), Exh. F; U.S. Const. amend. I.

[40] *United States v. O'Brien,* 895 F.2d 810, 816 (1st Cir. 1990) (finding electronic-monitoring bracelet and surety rebutted presumption of flight). *See also* exhs. G-L; *D'Amore, supra.*

[41] Bail Decl. ¶ 49 (quoting *Ortega-Rodriguez v. United States,* 507 U.S. 234, 239 (1993) ("... an appellate court may dismiss the appeal of a defendant who is a fugitive...")).

## A. DEFENDANT'S LAWFUL 2016 ASYLUM CLAIM IS UNINDICATIVE OF FLIGHT.

"'[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'"[42] The Bail Reform Act is an act of Congress, e.g., § 3142(e)(1). The law of nations, i.e. customary international law, jealously guards the right to seek asylum.[43] In the instant case The Bail Reform Act ought not be construed against Defendant's asylum claim.

And Defendant sought asylum[44] uncharged, when his travel was unrestricted. Det. Hrg. Tr. 36:12. AUSAs imply but do not testify charges were imminent; their posture belies their innuendo. Defendant is the only activist indicted under The Computer Fraud and Abuse Act since *United States v. Aaron Swartz*, 11–cr–10260–NMG (D. Mass.), fallout from which included House and Senate hearings and over 61,000 signatures to fire then–U.S. Attorney Carmen Ortiz.[45] Supposed-victim BCH was accused of torture and 32 Congressmen cosponsored Justina's Law.[46] From target letter to asylum claim—some nine months—AUSAs sought not to indict. Det. Hrg. Tr. 16:3. Defendant sought asylum when charges absent a plea agreement were at most uncertain.

## IX. DEFENDANT'S APPEAL FULFILLS 18 U.S.C. § 3143(b)(1)(B).

Defendant's appeal is briefed; oral argument was June 8, 2021. Docket report, *United States v. Gottesfeld*, 18–1669 (1st Cir.). Defendant filed for victory, not delay; he cannot now slow the court's ruling. Defendant raises eight substantial questions of law or fact.[47] Any of the first three would require dimissal. *Id.* ¶¶ 1–3. Four others would require retrial. *Id.* ¶¶ 4–6, 8. The last will likely also result in retrial. *Id.* ¶ 7. To wit, the eight issues *infra* merit release pending appeal, which requires only a "substantial question" that if decided favorably would likely lead to reversal. *Bayko, supra*, 522–23.

---

[42] F. Hoffmann-La Roche Ltd. v. Empagran S. A., 542 U.S. 155, 164 (2004) (quoting Murray v. Schooner Charming Betsy, 2 CRANCH 64, 118, 2 L. Ed. 208 (1804)) (alteration in original).

[43] Roman Boed, *The State of the Right of Asylum in International Law*; "Everyone shall be free to leave any country, including his own," International Covenant on Civil and Political Rights, art. 12(2) (ratified June 8, 1992); "Everyone has the right to seek and enjoy in other countries asylum from persecution," United Nations Universal Declaration of Human Rights, art. 14(1).

[44] Trial Tr. VI at 49, July 27, 2018, dkt. 313.

[45] WhiteHouse.gov petition, *Remove United States District[sic] Attorney Carmen Ortiz from office for overrreach in the case of Aaron Swartz*, dkt. 346-1 at 6.

[46] Tort. Memo; Congress.gov, *H.R. 4989—Justina's Law* 113 Congress (2013—14), dkt. 346-1 at 2.

[47] Red. Appel. Br. ("Appel. Br.") at 3–4 (all pg. nos. to MS Word, not CM/ECF), Exh. M.

1. This Court erroneously excluded 13 unexcludable days under 18 U.S.C. § 3161(h)(1)(D) for non-pretrial motions filed in a separate, sealed, civil case, which, when added to the 26 days already counted, trigger dismissal under 18 U.S.C. § 3161(b). Appel. Br. at 29; Red. Appel. Rep. ("Appel. Rep.") at 14 (all pg. nos. to MS Word, not CM/ECF), Exh. N.

2. This Court violated § 3161(h)(1)(H), (h)(7)(C) by excluding 92 days while Defendant's bail was "under advisement," triggering dismissal under § 3161(b). Appel. Br. at 31; Appel. Rep. at 4.

3. This Court erroneously excluded months of unexcludable time in violation of § 3161(h)(7)(A), which required specific on-the-record findings that were never made. Added to the 26 days already counted, these months trigger dismissal under § 3161(b). Appel. Br. at 36.

4. This Court wrongly denied suppression, forcing retrial. Appel. Br. at 42; Appel. Rep. at 26.

5. This Court erroneously denied David Grimaldi's withdrawal, forcing Defendant to stand trial with conflicted counsel, which now requires remedial retrial. Appel. Br. at 49.

6. This Court violated Defendant's public-trial right, closing the courtroom five times over his objections without considering alternatives or making findings. These structural errors require retrial. Appel. Br. at 54; Appel. Rep. at 21.

7. This Court made no findings when refusing disqualification. Appel. Br. at 60; Appel. Rep. at 27. Disqualification ultimately will require retrial. *See Liljeberg, supra,* at 850, 863–70.

8. This Court erroneously precluded Defendant's defense-of-others argument. The only remedy is retrial. Appel. Br. at 57; Appel. Rep. at 16.

Under § 3143(b)(1)(B) a "substantial question" is "a 'close' question or one that very well could be decided the other way." *Bayko* at 523. Whether an appeal presents a "close" question is decided on a case-by-case basis. *Id.* "[L]ikely to result in reversal or an order for a new trial" requires "the claimed error[s] not be harmless or unprejudicial." *Id.* The "likely to result" standard is applied "flexibly." *United States v. Colon-Munoz,* 292 F.3d 18, 20 (1st Cir. 2002). In deciding the standard's second part, The Court "must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction." *United States v. Powell,* 761 F.2d 1227, 1233 (8th Cir. 1985).

The First Circuit stresses bail pending appeal is not "contingent on a finding by the district court that it is likely to be reversed." *Bayko* at 523.[48]

> Thus, in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.

*United States v. Hicks,* 611 F. Supp. 497, 499 (S.D. Fla. 1985). Each of Defendant's appellate

[48] *See, e.g., United States v. Grenberg,* 772 F.2d 340, 341 (7th Cir. 1985) (district court does not have to find that it is more likely to be reversed than affirmed); *Powell, supra,* at 1232 ("a judge considering the question of bail pending appeal need not hold" "that he or she has probably made a mistake"); *United States v. Miller,* 753 F.2d 19, 23 (3d Cir. 1985) ("The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome"); *United States v. DeSimone,* 424 F. Supp. 2d 344, 345 (D.R.I. 2006) (district court is not required to conclude that it is likely to be reversed to grant bail pending appeal).

issues exceeds this standard, meriting immediate release.

X. THE DUE PROCESS CLAUSE MANDATES DEFENDANT'S EXPEDITED RELEASE.

Defendant was robbed of due process. The government judge-shopped, Exh. A, then searched and seized his property with a warrant rubber-stamped before the date printed on the first page of its application, § IV, *supra*. M.J. Bowler disclosed nothing while wrongly dragging out basic rulings, n.22, *supra*. Judge Gorton denied Defendant relief from M.J. Bowler without disclosing that M.J. Bowler's husband—the primary nexus of Her Honor's biases—also promoted Judge Gorton's products, § V, *supra*. Based upon loyalty and personal knowledge of disputed evidentiary facts, Judge Gorton also forbid the jury's factfinding on Defendant's defense of others, crediting His Honor's child-welfare chums and product endorsers over Defendant, *id*. Thus Defendant's conviction "is not entitled to respect in any other" court. *Windsor* at 277. Defendant has effectively been held 65 months without trial. More time shall lapse before any fair retrial commences.

"Put bluntly, 'prolonged pretrial detention may become excessive and consequently punitive so as to violate the person's right to due process.'" *United States v. Daniels*.[49]

> As the First Circuit has explained, the constitutional limit to the length of pretrial detention requires an assessment on a case by case basis. In support of this approach, the First Circuit has identified two types of criteria which would guide the determination of whether due process requires release. First, due process judgments should reflect the factors relevant to the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or danger to the community, and the strength of the government's case on the merits. Second, these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity.

*Id.* (internal quotation marks, ellipsis, and citations omitted). "[W]e shall assume that in many, perhaps most, cases, sixteen months would be found to exceed [] due process limitations [] of pretrial confinement." *Id.* at *10 (internal quotation marks and citations omitted).

AUSAs lost on possible impact to patient care, 18 U.S.C. § 1030(c)(4)(B)(i), (A)(i)(II), i.e. the moral core of the case, n.5, *supra*. Even *contra bonos mores* gagging Defendant's defense of others and admonishing the jury against his "good motive" in re *mens rea*, Trial Tr. VII 74:6, VIII 31:4-7, AUSAs barely eked out a verdict; *see, e.g., id.* at 19; Jury Notes, dkt. 301-1 (Aug. 1,

[49] 2000 U.S. Dist. LEXIS 15810, 98-cr-30040-MAP (D. Mass. Oct. 5, 2000) at *48 (quoting *United States v. Shareef*, 907 F. Supp. 1481, 1484 (D. Kan. 1995) (collecting cases)).

2018). At fair retrial, however, Defendant's defense of others will be heard and:

> Double jeopardy bars retrial on a particular charge when the jury was dismissed without returning an express verdict on that charge and without defendant's consent despite having a full opportunity to return a verdict and in the absence of extraordinary circumstances which prevented it from doing so.

*United States v. Candelario-Santana.*[50] No mistrial was declared and The Court *sua sponte* accepted an incomplete verdict. Defense counsel faced a statutory construction already decided—apparently off the record—but never consented, Trial Tr. VIII at 31. In Defendant's recollection, no *Allen* charge was given. *Cf. Allen v. United States*, 164 U.S. 492 (1896). For these reasons, retrial is barred on § 1030(c)(4)(B)(i), (A)(i)(II), precluding at retrial the AUSAs' days-long prejudicial dog-and-pony show about BCH's "most vulnerable patients"—not one of whom was in fact hurt. Fed. R. Evid. 403. Weighed on justice's scales the gravity and rigor of the retriable charge, § 1030(c)(4)(B)(i), (A)(i)(I), based solely on institutional loss under $400,000, fails to budge Defendant's 65 months of pretrial incarceration.

Moreover retrial is unlikely. Upon any reversal Defendant forthwith shall seek dismissal via U.S. Const. amends. V, VI.[51] Under, *e.g., Barker*, 1) the delay before retrial—5½ years so far—is quintuple that for presumptive prejudice; 2) AUSAs and The Court caused it;[52] 3) Defendant ardently claimed his right;[53] and 4) although Defendant's stark showing under the other factors moots his need to show prejudice, Defendant easily does so, *e.g.*, courts look away as AUSAs deny Defendant mail, phone calls, contact visits, etc. in a terrorist unit thousands of miles from home that The U.S. Court of Appeals openly compares to Chinese water torture.[54]

---

[50] 977 F.3d 146, 159 (1st Cir. 2020) (internal quotation and alteration marks, ellipses, and citation omitted).

[51] *E.g., Barker v. Wingo*, 407 U.S. 514 (1972); *Doggett v. United States*, 505 U.S. 647, 655 n.2 (1992) ("[D]efendant may invoke due process to challenge delay both before and after official accusation"); *United States v. MacDonald*, 456 U.S. 1, 7 (1982).

[52] *E.g.*, n.22, *supra*; Opp. to STA Mot., dkt. 167 (May 4, 2018); Ord. Den. STA Mot., dkt. 209 (June 19, 2018); Ord. Den. Recon., dkt. 222 (June 29, 2018).

[53] *E.g.*, 1st Speedy Tr. Mot., dkt. 122 (Mar. 8, 2018); *see also* dkts. 131, 146, 151, 164, 170, 172, 176 (STA mot.), Recon. Mot., dkt. 213 (June 27, 2018); Appel. Br.; Appel. Rep.

[54] Decl. of Martin S. Gottesfeld (Aug. 5, 2021), Exh. O; *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016) (citing *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 684 (M.D. La. 2007) ("With each passing day its effects are exponentially increased, just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones")); 18 U.S.C. § 3621(b) (500 mile rule); Hrg. Tr. 15:23, July 17, 2018; 1st Am. Compl. ("FAC"), *Brown v. Federal Bureau of Prisons*, 19-cv-02795 (RBW) (D.D.C.).

By, *e.g.*, judge-shopping then withholding known disqualification grounds, frivolously opposing Defendant's STA and suppression motions, and moving meritlessly *in limine* to deny Defendant a fair trial, the government needlessly complicated this case.

Put simply, slow-and-private foreclosed speedy-and-public. Justina survives; this case shall not. Only by now releasing Defendant can justice begin to "satisfy the appearance of justice."

Towards this long-overdue imperative, Defendant moves for a detention hearing before a neutral and detached judicial officer; it would be Defendant's first such opportunity.

Respectfully filed under the prison-mailbox rule, *Fallen v. United States*, 378 U.S. 139 (1964); *Houston v. Lack*, 487 U.S. 266 (1988), in an envelope bearing sufficient affixed pre-paid U.S. Priority Mail postage and track. no. 9114 9022 0078 9497 2467 94, handed to Ms. Jamie Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of The United States and of its counsel Friday, August 6                , 2021, or the first opportunity thereafter,

·by:

Martin S. Gottesfeld, *pro se*, Defendant
Reg. no. 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, *pro se*, certify that I mailed a copy of the foregoing document to David J. D'Addio, counsel for The United States in the above-captioned case, in an envelope bearing sufficient affixed pre-paid First Class U.S. postage and track. no. 9114 9023 0722 4792 9869 35, handed to Ms. Jamie Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of The United States and of its counsel Friday, August 6        , 2021, or the first opportunity thereafter, and that separately I affected service in-hand via 28 C.F.R. § 540.203(a), (c)(1), (c)(3),

by:

Martin S. Gottesfeld, Defendant