6.      Whether the district court violated Gottesfeld's right to a public trial by closing the courtroom, over Gottesfeld's objection, during five hearings.

7.      Whether the district court's orders denying Gottesfeld's *pro se* motions for recusal under 28 U.S.C. §§ 144 and 455(a) are sufficiently detailed to permit appellate review.

8.      Whether the district court erred in allowing the Government's motion *in limine* precluding Gottesfeld's "torture defense" based on defense of others.

## STATEMENT OF THE CASE

**(a)    <u>Justina Pelletier's Treatment Raises Public Concern</u>**

Justina Pelletier ("Justina") was fourteen years old in February 2013 when her parents took her to Boston Children's Hospital ("BCH") for care. Tufts Medical Center ("Tufts") had previously diagnosed Justina with mitochondrial disease, but a BCH psychologist disagreed concluding instead that Justin was suffering from a psychological disorder. Justina's parents sought Justina's return to Tufts for treatment, but BCH asked a juvenile court to place Justina in the care of the Massachusetts Department of Children and Families ("DCF"). DCF, with BCH's support, then placed Justina in a BCH psychiatric ward. [Gov't Ex. 35, JA4 1569–70; Search Warrant & Appl. ¶ 9, SJA 23–24].

Justina's treatment by BCH and DCF received local and national media attention. [Det. Hr'g Tr. 43, JA1 86]. Many in the public, including Justina's family ("the Pelletiers"), felt BCH and DCF unlawfully interfered with their parental rights. Concern was also raised that Justina was being tortured. [Trial Tr. 3, 29, JA2 659].

In January 2014, BCH transferred Justina to Wayside Youth and
Family Support Network ("Wayside"). Wayside is a non-profit that
claims to provide services like clinical psychological support to at-risk
youth, and students who are unable to attend public school. [Trial Tr. 2,
45–46, 191, JA2 434–35, 580]. Protests erupted following Justina's
placement at Wayside and endured throughout February, March, and
April 2014 regarding Justina's treatment and interference with the
Pelletiers' parental rights. [Trial Tr. 2, 119–20, 124, 131, 150, 223, 228,
JA2 508–09, 513, 520, 539, 612, 617; Detention Order 17, JA1 124].
These protests intensified after DCF was granted permanent custody of
Justina on March 25, 2014, which prompted both the governor of
Massachusetts and former presidential candidate and Fox News
commentator Mike Huckabee to get involved. [Trial Tr. 2, 123–24, 192–
93, JA2 512–13, 581–82; Det. Hr'g Tr. 52, JA1 95].

**(b)** **The DDoS Attacks And Their Impact**

After permanent custody of Justina was assigned to DCF,
problems plagued Wayside's email and computer networks. [Trial Tr. 2,
193, JA2 582]. Wayside consulted with Patrick Keaton of KDSA
Consulting ("KDSA"), who concluded that Wayside was the target of a

6

Distributed Denial of Service ("DDoS") attack. Keaton testified at trial about DDoS attacks:

> A denial-of-service attack is a cyber attack that targets a device such as a firewall or a server that's directly connected to the internet, and what that attack does is it sends a high amount of traffic to that particular device in attempts to disable its capabilities in terms of allowing it to function as it's designed to do.

[Trial Tr. 2, 69, JA2 458].

A March 25, 2014, tweet from Twitter user AnonMercurial2 to Wayside also confirmed the DDoS:

> We need more people attacking 184.154.224.18. Fire up your VPN and Torshammer! #opjustina, #anonymous, #target.

[Trial Tr. 2, 72, JA2 461; Ex. 96, JA4 1583]. The attack on Wayside lasted three to four weeks, until mid to late April 2014. *Id.* Justina was released from Wayside in early May 2014. [Trial Tr. 2, 190, JA2 579].

A DDoS also ultimately disconnected BCH from the internet. [Trial Tr. 4, 67, 70–71, 108, JA3 942, 945–46, 983]. On April 19, 2014, BCH received a tweet from AnonMercurial:

> Website Troubles? We are #Anonymous. #FreeJustinaNOW or d0xes of your staff are next. HIPAA breach thereafter. Test us.

[Govt. Ex. 97E, JA4 1584].

7

In 2014, Harvard University provided internet access to BCH.
Indeed, Harvard provided internet connectivity to all of the hospitals in
the Longwood Medical Area network, each of which was affected by the
DDoS.  [Trial Tr. 4, 199, JA3 1074; Trial Tr. 5, 50–67, JA3 1136–53].
The Chief Information Security Officer at Beth Israel testified about the
severity and the scope of the attack; "So, it wasn't just Children's that
was down in this attack; it was Children's, it was Joslin, it was Dana-
Farber, Mass. General, Brigham and Women's, Beth Israel, and
Harvard Med School." [Trial Tr. 4, 195–96, JA3 1070–71].

### (c)    The Government Obtains A PRTT And Search Warrant

In the summer of 2014, the Government obtained authorization to
install a pen register and trap and trace ("PRTT") device on Gottesfeld's
internet account. [PRTT Order, DE 3, SJA 9–11]. The purpose of the
PRTT was to capture address and routing information relevant to the
DDoS attack against BCH. The Government noted in its application
that the DDoS disrupted the communications network used by BCH
and other "Harvard University affiliated hospitals." [PRTT Appl., SJA
4–5]. As part of the PRTT Application, the Government applied for

8

authority to record the "source and destination IP address and port of all electronic communications" of Gottesfeld's internet traffic. [PRTT Appl., SJA 5]. The lower court authorized the PRTT for 60 days. [PRTT Order, SJA 9–11].

The Government later sought a search warrant for Gottesfeld's residence. [Appl. Search Warrant, SJA 42; Search & Seizure Warrant, SJA 61]. The affidavit of Special Agent Tunick filed in support of the application for a search warrant reiterated the bases for the PRTT, including that the DDoS had affected the network used by "BCH and other Harvard University-affiliated hospitals." [Tunick Aff. ¶ 8, SJA 23]. Magistrate Judge Marianne B. Bowler authorized the warrant. Judge Bowler's husband is a cardiologist at Brigham and Women's Hospital and a professor at Harvard Medical School. *See* [Order DE 209 at 27, Addendum].

### (d)    The Speedy Trial Act Continuances

The Government filed a criminal complaint against Gottesfeld on February 16, 2016. [Compl., DE 3]. Gottesfeld was arrested in Florida the next day. [Det. Hr'g Tr. 6–34, JA1 49–77]. Over the next several months, the Government filed a total of six "assented to" continuance

9

motions in a miscellaneous case on the district court's "miscellaneous business docket" ("MBD"). Each sought to extend time for the Government to obtain an indictment. [DE 164-3 at 5, 11, 14, 17, 20, 25; JA1 177, 183, 186, 189, 192, 197]. Absent a continuance, the Government was required to indict Gottesfeld within 30 days of his arrest. 18 U.S.C. § 3161(b).

The continuance motions were filed in the district court's MBD, rather than Gottesfeld's criminal case, consistent with the district court's Plan for the Prompt Disposition of Criminal Cases ("District Plan").[1] According to the District Plan, pre-indictment continuance motions may only be filed by the United States Attorney in the MBD. *See* The Plan § 5(c), Addendum.

In contrast, every other district in this Circuit permits the filing of non-public continuance motions in the criminal docket. *See* Maine Dist.

---

[1]     The District Plan is accessible at
http://www.mad.uscourts.gov/caseinfo/pdf/122008GenOrd08-5.pdf

10

Ct. Speedy Trial Plan at 2-3[2]; USDC-PR LR Cr. 106 at 105[3]; USDC-RI

LR Cr. 6(c)[4]; D.N.H. Supp. R. for Electronic Case Filing 3.1(d).[5]

The Government filed the first continuance motion on March 1,

2016, seeking to exclude time under 18 U.S.C. §§ 3161(h)(1)(E),

(h)(1)(F), and (h)(7)(A). [DE 164-3 at 5, JA1 177]. Therein, it asserted

the desires of the parties to explore further plea negotiations as the

basis to exclude time under § (h)(7)(A). [DE 164-3 at 5, JA1 177]. The

court granted the motion the same day, March 1, 2016, excluding time

from March 18, 2016 to April 22, 2016. [DE 164-3 at 8, JA1 180]. The

court provided no detailed findings for its order. *Id.*

The Government filed the second continuance motion on April 11,

2016. [DE 164-3 at 11, JA1 183]. It again sought to exclude time under §

3161(h)(7)(A) so the parties could continue plea discussions. The court

granted the second continuance motion on May 5, 2016, by electronic

---

[2] https://www.med.uscourts.gov/pdf/SpeedyTrialPlan.pdf

[3]

https://www.prd.uscourts.gov/sites/default/files/documents/94/Local_Rul
es_amended_as_of_Sept_2_2010_with_TOC%2015_0.pdf

[4] https://www.rid.uscourts.gov/sites/rid/files/documents/12-01-2018-
Rules.pdf

[5] http://www.nhd.uscourts.gov/pdf/Combined%20Local%20Rules%20-
%202019.pdf

order, without explanation. [DE 164-3 at 3, JA1 175]. The motion sought to exclude time from April 22, 2016, through May 27, 2016.

The Government filed the third, fourth, and fifth continuance motions respectively on May 20, 2016, June 30, 2016, and July 22, 2016. [DE 164-3 at 3, 13–21, JA1 175, 185–93]. Each time the Government sought to exclude time under § 3161(h)(7)(A) for the same reason: the parties were waiting on Magistrate Judge Bowler's detention decision before continuing plea negotiations, and when Judge Bowler, "issues her decision, the parties will resume their [plea agreement] discussions." [DE 164-3 at 14, 17, 20, JA1 186, 189, 192]. Judge Bowler conducted Gottesfeld's detention hearing on April 27, 2016. The district court granted the third and fourth continuance motions by electronic order respectively on May 25 and June 30, 2016, without explanation. [DE 164-3 at 3, JA1 175]. The Government sought to exclude time from May 27, 2016, until July 1, 2016, and from July 1, 2016, until August 1, 2016. The fifth continuance motion was granted by electronic order, and a separate form order was entered August 2, 2016, excluding time from August 1 through September 9, 2016. [DE 164-3 at 22, JA1 194].

12

The Government filed the sixth and final continuance motion on

August 26, 2016, and again sought to exclude time under

§ 3161(h)(7)(A) for plea negotiations. [DE 164-3 at 23–25, JA1 195–97].

The court granted this motion on August 29, 2016, by electronic order

with no explanation. [DE 164-3 at 3, JA1 175]. The Government sought

to exclude time from September 9, 2016, until October 10, 2016.

    Gottesfeld was indicted on October 19, 2016. [Indictment, DE 28,

JA1 130–43].

    **(e)**    **The District Court Denies Gottesfeld's Speedy Trial
Act Dismissal Motion, Motion To Suppress, And
Precludes Gottesfeld From Introducing Evidence Of
Affirmative Defense Of Defense Of Others.**

The district court denied Gottesfeld's motion to dismiss the

indictment on STA grounds in a published order. *United States v.*

*Gottesfeld*, 319 F. Supp. 3d 548 (D. Mass. 2018). The district court

rejected Gottesfeld's challenge to the court's use of the miscellaneous

business docket, finding:

> Pursuant to 18 U.S.C. § 3165, each district is required to
> prepare a plan for the disposition of criminal cases
> consistent with the time standards of the Speedy Trial Act.
> Under the plan for the District of Massachusetts, pre-
> indictment motions for a continuance are properly filed with
> the judge assigned to "the miscellaneous business docket".

13

Plan for the Prompt Disposition of Criminal Cases, District of Massachusetts, ¶ 5(c)(1)(A).

Defendant contends that the District Plan violates the provision of the Speedy Trial Act that any ends-of-justice continuance include oral or written findings "in the record of the case". 18 U.S.C. § 3161(h)(7(A). The cases relied upon by defendant concern challenges to the Speedy Trial Act's post-indictment provision, 18 U.S.C. § 3161(c)(1), requiring that the trial of a defendant shall commence within 70 days from the filing of the information or indictment. *See Zedner*, 547 U.S. at 492 ("In this case, petitioner's trial did not begin within 70 days of indictment."); *Bloate v. United States*, 559 U.S. 196, 199, 130 S. Ct. 1345, 176 L. Ed. 2d 54 (2010). This Court declines to second guess the District Plan and its recognition of the importance of the secrecy of grand jury proceedings. Accordingly, the Court finds that pre-indictment continuances were made properly here on the miscellaneous business docket.

*Gottesfeld*, 319 F. Supp. 3d at 557–58. The district court also found that the court's continuance orders necessarily adopted the party's proffered rationale for the continuance motions as the court's STA findings. *Id.* at 559. The district court further concluded that Gottesfeld was judicially estopped from challenging the court's STA rulings. *Id.* at 559–60.

In that same order, the district court also denied Gottesfeld's motion to suppress, finding that there was no basis to disqualify Magistrate Judge Bowler from deciding whether to issue the search warrant. *Id.* at 561–62.

14

Finally, the district court allowed the Government's motion *in
limine* preventing Gottesfeld from introducing evidence on the
affirmative defenses of necessity and defense of another. *Id.* at 552–53.

**(f)    The District Court Denies Grimaldi's Motions To
Withdraw, Threatens Gottesfeld With Obstruction
Charges, And Closes The Courtroom**

Grimaldi first moved to withdraw as Gottesfeld's counsel on June
1, 2018, citing Gottesfeld's instruction to Grimaldi not to file anything
further in the case except for a motion to withdraw. [DE 195, Supp.
App. 105–08]. The district court denied this motion for lack of good
cause. [DE 197 at 4, Addendum 53]. Grimaldi filed his second motion to
withdraw on June 28, 2018. [DE 214, Supp. App. 109]. On July 6, 2018,
during a hearing on the motion to withdraw, the district court closed
the courtroom—over Gottesfeld's objection—to only Gottesfeld, his wife,
and his counsel. [July 6, 2018 Hr'g Tr., DE 435 at 4–5, Supp. App. 121–
22]. This resulted in the removal of a journalist from the proceeding
who was present with Gottesfeld's wife. *Id.*

With the proceeding closed, Grimaldi explained to the district
court that Gottesfeld had posted negative online attorney reviews about
him and was "attempting to smear" him. [DE 435 at 11, Supp. App.

15

128]. This led Grimaldi to advise the district court that he could not

continue:

> But I do not believe I can effectively represent him anymore.
> It's not something I want to do. I've represented clients
> where we haven't always agreed. I've represented clients
> who were of their own opinions. I've represented clients who
> – where there's been challenges, but this is too much. This is
> too much. I can't tell you that, after what's happened, not
> before, but now, that I can adequately represent him.

[DE 435 at 12:6–14, Supp. App. 129]. Gottesfeld told the district court

that he did not want a new attorney and characterized the negative

online reviews about Grimaldi as "all protected speech." [DE 435 at

13:16, Supp. App. 130]. Gottesfeld further explained to the district court

that he did not want to represent himself and that he was not waiving

his "right to effective assistance of counsel." [DE 435 at 13:19–20, Supp.

App. 130].

The district court denied Grimaldi's second withdrawal motion,

*ore tenus*, finding that "an irreparable breakdown" between Gottesfeld

and Grimaldi did not exist. [DE 435 at 14, Supp. App. 131]. The district

court then reopened the proceedings to the public and told Gottesfeld

and his wife:

16

Case 1:16-cr-10305-NMG    Document 442-7    Filed 08/03/17    Page 14 of 46

the Court warns Mr. Gottesfeld that, if you and/or those
acting on your behalf -- and I refer specifically to your wife,
Dana Gottesfeld -- persist in the internet or telephonic
conduct recently displayed, you and/or she may find
yourselves subject to an independent prosecution for
obstruction of justice under Title 18 of the United States
Code, Section 1503, and if you don't know what that says, I
commend it to your reading. This case is going to be resolved
one way or the other within the next month, so I would urge
you to avoid any similar activities in the meantime.

[DE 435 at 15:5–16, Supp. App. 132].

On July 12, 2018, Grimaldi filed an emergency motion to

withdraw as Gottesfeld's counsel arguing, "an actual conflict of interest

exists between counsel and the defendant; further, the attorney-client

relationship is irretrievably broken." [DE 241, Supp. App. 110–11]. The

motion was heard by U.S. District Judge Richard G. Stearns on July 16,

2018. [DE 248, Addendum 71–72]. At the hearing on the motion,

Grimaldi reiterated he could not continue:

> *I know that the actual conflict of interest that persists, exists
> and persists, in this case will prevent me from zealously
> representing him* now in light of recent events in the last
> days and weeks.
>
> I can't say that for another lawyer. I know many, as I'm sure
> the Court does, defense lawyers who will defend anybody,
> and I consider myself among those people, except when
> presented in circumstances like these.

17

I think that this case is deserving, and Mr. Gottesfeld is deserving, of zealous representation by a lawyer without an actual conflict of interest.

I'm not that lawyer. I was. I was. But in light of events in the last days and weeks, I'm not anymore.

*I no longer wish for his success in this case. I no longer wish for it. I can no longer represent him, consistent with my duties under the Rules of Professional Conduct.* I'm asking the Court for leave to withdraw because I have an actual conflict of interest.

...

Again, I wish to be very careful here. The Rules of Professional Conduct, in particular 1.16(a)(1), stating, "A lawyer shall withdraw from representation of a client if the representation will result in a violation of the Rules of Professional Conduct or other law" requires my withdrawal in this case.

Rule of Professional Conduct 1.7(a)(2), which states in pertinent part, "A lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if there is a significant risk that the representation of one or more clients will be materially limited by a personal interest of the lawyer."

Rule 1.3 states, "The lawyer should represent a client zealously."

*I cannot abide by these rules. I cannot represent Mr. Gottesfeld in light of what's happened in the last days and weeks. I cannot represent Mr. Gottesfeld zealously. There is a significant risk that the representation of Mr. Gottesfeld will be materially limited by a personal interest of me.*

18

There's cases, of course, that discuss these ethical obligations of counsel. One of many is Commonwealth v. *Croken*, C-R-O-K-E-N, 432 Mass. 266, a 2000 case, which at page 272 says that "An actual or genuine conflict of interest arises when the, quote, independent professional judgment of trial counsel is impaired either by its own interests or the interest of another client."

*Commonwealth v. Shraiar*, I'll spell the last name, S-H-R-A-I-A-R, 397 Mass. 16, a 1986 case, at page 20, speaks to "The defendant's right to the full and undivided loyalty of his client."

*Mr. Gottesfeld does not have my full and undivided loyalty* based on events of the last days and weeks.

I'm in a very difficult position here. I understand that. Mr. Gottesfeld's in a very difficult position here.

I am circumscribing my comments here in this courtroom and in my filings in a very significant way to reduce – to hopefully absolute *de minimis* what I must say in order to have the Court be assured of the genuine and actual conflict of interest. And, on top of that, of course, are the more discretionary factors, including my belief -- well, let me go right to the rule, your Honor.

Rule of Professional Conduct 1.16(b)(2), (4), (6), and (7), all of which justify my withdrawal in this case.

In that rule the rule writers allow the Court some discretion, saying that a lawyer may withdraw in those circumstances. But in no uncertain terms do the rules say that a lawyer shall not represent, in Rule 1.7(a)(2), and a lawyer shall withdraw under 1.16(a)(1).

19

> You've read the submissions. I ask you to allow me to
> withdraw. What you do with the case thereafter, sending it
> back to Judge Gorton or whatever happens to this case, I
> wish that Mr. Gottesfeld gets counsel, zealous counsel, and
> he litigates his case. *But I cannot, and I can't imagine that
> I'll be able to, represent him at this trial and move him
> forward, as required under the ethical rules.*

[Case No. 1:18-mc-91297-RGS, July 16, 2018 Hr'g Tr., DE 10 at 7–8,

14–16, Supp. App. 141–42, 148–50] (emphasis added). Judge Stearns

asked Gottesfeld if he still wanted to proceed with Grimaldi as his

counsel despite Grimaldi's complaints. In response, Gottesfeld told

Judge Stearns that he, "wouldn't put -- wouldn't use the word 'want,'

but I would rather do that than any of my alternatives. I think it is the

least undesirable of the alternatives that are before me at the moment."

[DE 10 at 20–21, Supp. App. 154–55]. Further, when told by Judge

Stearns that denial of Grimaldi's motion to withdraw would be

construed as "waiving whatever conflict that has arisen between"

Gottesfeld and Grimaldi, Gottesfeld took exception to any such waiver.

[DE 10 at 18, Supp. App. 152 According to Gottesfeld, he was unable to

waive any conflict based on the attachments to Grimaldi's motion

because he had not seen the attachments and was therefore, "not in a

20

position to make a knowing waiver of their contents." [DE 10 at 18, Supp. App. 152].

Judge Stearns denied Grimaldi's motion to withdraw on July 16, 2018. [DE 248, Addendum 71–72].

Following the trial in the case, Grimaldi again moved to withdraw as Gottesfeld's counsel. [DE 307, Supp. App. 114–15]. Gottesfeld assented to this motion provided the court appoint new counsel and his sentencing hearing remained as scheduled. [DE 307 at 2, Supp. App. 115]. Grimaldi asserted the same basis for this motion: the continuing actual conflict of interest that existed between himself and Gottesfeld.

The district court conducted a hearing on Grimaldi's motion on September 24, 2018. [DE 319]. ███████████████████████

████████████████████████████████████████████

██████████████████████.[6] [Sept. 24, 2018 Hr'g Tr., DE 422 at 14, Sealed Supp. App. 66]. The Court denied Grimaldi's motion. [DE 319].

On December 7, 2018, Grimaldi filed another emergency motion to withdraw as Gottesfeld's counsel ████████████████████████████

---

[6] Redactions concern information and materials filed under seal and referenced in the Sealed Supplemental Appendix ("SSA").

. [DE 335, Supp. App. 116–17; Dec. 13, 2018 Hr'g Tr., DE 423 at 3–14, SSA 90–101]. The district court conducted a hearing on the motion and granted Grimaldi leave to withdraw over Gottesfeld's objection, ████████████████████████████████████████. [Order, DE 338; DE 339; DE 423 at 11–12, SSA 98–99].

[DE 423 at 11, SSA 98]. ██████████████████████████ [DE 423 at 11, SSA 98].

**(g)**   **The Jury Found Gottesfeld Guilty**

The jury found Gottesfeld guilty of conspiracy and intentionally damaging a protected computer causing a loss over $5,000. [Verdict, DE 301, JA4 1661–62].

**(h)**   **Gottesfeld Seeks Recusal Of Judge Gorton Pro Se**

Gottesfeld, as promised, moved for Judge Gorton's recusal under 28 U.S.C. §§ 144 and 455 after Grimaldi was allowed to withdraw,

22

accompanying the motions with a detailed affidavit. [DE 344, 345, 346, 347]. Similarly, as promised, the district court denied Gottesfeld's motions without explanation. [DE 350, 351, 352, Addendum 122–124].

**(i)    <u>Sentencing</u>**

The district court sentenced Gottesfeld to 121 months' imprisonment, three years of supervised release, and ordered him to pay $442,930 in restitution in addition to a $200 special assessment.

This timely appeal follows.

## SUMMARY OF ARGUMENT

It took 246 days from the date of Gottesfeld's arrest for Gottesfeld to be indicted. It took 50 days to bring Gottesfeld from the Southern District of Florida to the District of Massachusetts and 71 days from the time of his arrest for Gottesfeld to receive a detention hearing. By the time the detention order was issued on July 27, 2016, Gottesfeld had been in custody for 162 days.

After properly accounting for excludable days, the delay Gottesfeld endured was well outside the 30-day limit permitted under the STA. He moved to dismiss the indictment based on violations of the STA, but the district court denied Gottesfeld's motion concluding it would not second-

23

guess the District Plan and that judicial estoppel precluded Gottesfeld from arguing against previously sought continuances. The district court erred in denying the motion.

First, the continuance motions filed on the MBD are not "pretrial motions" under the STA. Second, the STA was violated when Magistrate Judge Bowler held Gottesfeld's detention "under advisement" for 92 days, far exceeding the 30-day limit permitted by the STA. Furthermore, the additional 60 days were not excludable because plea negotiations were not ongoing. Third, the District Plan's requirement to adjudicate pre-indictment continuance motions on the MBD conflicts with the STA's requirement that the court set forth its findings "in the record of the case." Finally, the district court was wrong to employ judicial estoppel because Gottesfeld filed a timely motion to dismiss for violations of the STA. Courts cannot abrogate the unambiguous requirements of statutes, Gottesfeld had no ability to object to the process required by the District Plan other than by a motion to dismiss, and he had no ability prospectively to object to the lack of findings by the district judge.

24

Gottesfeld moved to suppress the evidence obtained from the PRTT order, arguing, in part, that the magistrate judge who issued the warrant was not a neutral judicial officer as her husband was a victim of the offense and she should have withdrawn. The district court determined that Dr. Pfeffer's work was not seriously implicated; however, there is sufficient evidence to conclude the DDoS attacks had a significant impact on Dr. Pfeffer and his colleagues such that Magistrate Judge Bowler's impartiality might reasonably be called into question and she should have disqualified herself.

Gottesfeld's trial attorney filed five motions for leave to withdraw between June and August 2018 before the court granted Grimaldi's request to withdraw in December 2018. Gottesfeld and Grimaldi repeatedly demonstrated a significant conflict of interest that resulted in a total lack of communication and the court erred in denying Grimaldi's earlier motions to withdraw.

The district court closed the courtroom during five separate hearings over the objection of Gottesfeld. When closing the courtroom during the hearings on motions to withdraw by Attorneys Gillespie and Grimaldi, the court failed to make any findings that an overriding

25

interest made closure essential or that there were no other suitable alternatives to closure. These closures violated Gottesfeld's right to a public trial.

The district court erred in denying Gottesfeld the opportunity to present the affirmative defense of others because evidence establishes that Gottesfeld acted in the defense of Justina Pelletier against the immediate use of unlawful force.

Finally, Gottesfeld filed motions *pro se* seeking the disqualification and recusal of Judge Gorton pursuant to 28 U.S.C. §§ 144 and 455. Prior to the actual filing of the motions, Judge Gorton informed Gottesfeld that his motions would be denied. Ultimately, the motions were denied by endorsed order and the record is insufficient to permit appellate review of the district court's denials.

## STANDARDS OF REVIEW

**(a)    Speedy Trial Act**

This Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error when deciding whether the Speedy Trial Act was violated. *United States v. Irizarry-Colón*, 848 F.3d 61, 65 (1st Cir. 2017).

26

**(b)    Suppression Motion**

This Court, when considering whether a motion to suppress should have been granted, reviews a district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Rasberry*, 882 F.3d 241, 246 (1st Cir. 2018). Further, this Court considers the entirety of the record when reviewing the denial of a motion to suppress. *United States v. Brown*, 510 F.3d 57, 64 n.6 (1st Cir. 2007).

**(c)    Denial of Attorney Withdrawal Motions**

This Court reviews the denial of an attorney withdrawal motion for abuse of discretion. *United States v. Reyes*, 352 F.3d 511, 515 (1st Cir. 2003). This Court considers, "the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." *Id.*

**(d)    Violation of Public Trial Right**

This Court reviews *de novo* whether a district court's partial or total closure of a courtroom violated a defendant's Sixth Amendment

27

right to a public trial. *United States v. Laureano-Pérez*, 797 F.3d 45, 76 (1st Cir. 2015).

**(e)  Affirmative Defense of Another**

This Court reviews *de novo* the denial of the right to present an affirmative defense. *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001).

**(f)  Recusal For Judicial Bias**

The denial of a motion for recusal is reviewed for abuse of discretion. *United States v. Torres-Estrada*, 817 F.3d 376, 380 (1st Cir. 2016).

**(g)  Reassignment to a Different Judge on Remand**

Reassignment to a different district judge on remand is appropriate if doing so is for the "judge's sake, and the appearance of justice." *Mawson v. United States*, 463 F.2d 29, 31 (1st Cir. 1972). District of Massachusetts's Local Rule 40.1(k)(2) requires that further proceedings conducted by the district court, "shall not be conducted before the district judge before whom the prior proceedings were conducted," except under circumstances further prescribed by D. Mass. LR 40.1(k)(2).

28

## ARGUMENT

### (a) The District Court Erred By Refusing To Dismiss Gottesfeld's Indictment on Speedy Trial Act Grounds

#### (1) The Motions To Exclude Time Were Not "Pretrial Motions" Under 18 U.S.C. § 3161(h)(1)(D)

The STA automatically excludes time tied to "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). The STA does not define "pretrial motion." Gottesfeld now argues that the six continuance motions filed in the MBD were not "pretrial motions" under 18 U.S.C. § 3161(h)(1)(D); therefore, the 13 days spent considering those motions are non-excludable and the indictment was untimely filed.

This Court has "read the term 'pretrial motion' broadly to encompass all manner of motions, ranging from informal requests for laboratory reports to 'implied' requests for a new trial date." *United States v. Barnes*, 159 F.3d 4, 11 (1st Cir. 1998); *see also United States v. Santiago-Becerril*, 130 F.3d 11, 17 (1st Cir. 1997) (notification by counsel of availability after a continuance treated as an implied motion for a new trial date); *United States v. Jorge*, 865 F.2d 6, 11 (1st Cir.

29

1989) ("request for discovery" close enough to a motion to be considered at least an "other proceeding" subject to exclusion); *United States v. Richardson*, 421 F.3d 17, 27–29 (1st Cir. 2005).

But not everything is a "pretrial motion." For example, in *United States v. Rush*, 738 F.2d 497, 505 (1st Cir. 1984), this Court held that an offer of proof is not a "pretrial motion." *Id.* Similarly, this Court has refused to treat a motion *in limine* as a "pretrial motion" from the point after a district court states its intention not to rule on the motion until trial. *United States v. Rojo-Alvarez*, 944 F.2d 959 (1st Cir. 1991).

This Court should similarly conclude that the six continuance motions were not "pretrial motions" because they were never filed in the actual criminal case, but instead in the MBD. Only the Government may move for a "pre-indictment" continuance in the MBD. *See* District Plan § 5(c)(1)(A). A one-sided proceeding in a non-criminal, sealed case where only one party may participate is not "pretrial" in any sense of the word. Moreover, allowing motions filed on other sealed dockets to automatically exclude time in a separate criminal case undermines the purpose of the STA, as it did in the instant case. Never before has this Court treated a motion filed outside the criminal case in a sealed, one-

30

sided proceeding as a "pretrial motion." The Court should decline to do so now.

The court's misclassification of the continuance motions as pre-trial motions is material because the court originally (and improperly) excluded the 13 pre-indictment days it spent considering the continuance motions. *United States v. Gottesfeld*, 319 F. Supp. 3d 548, 558–59 (D. Mass. 2018). There is no dispute that 26 pre-indictment days are non-excludable. *Id.* at 557. Thus, when the 13 days are added to the 26 non-excludable days, the 30-day limitation is exceeded and the indictment is untimely filed. Accordingly, the district court erroneously denied Gottesfeld's STA motion and the judgment must be reversed.

(2)    The District Court Did An End Run Around The 30-Day Limitation For Proceedings "Under Advisement"

Pursuant to the STA, up to 30 days may be excluded during a period when a proceeding is "under advisement by the court." 18 U.S.C. § 3161(h)(1)(H). In this case, Gottesfeld's detention hearing was held on April 27, 2016, and it took 92 days for Magistrate Judge Bowler to issue her detention decision on July 27, 2016. [Detention Hr'g Tr. DE 19, JA1

31

44–107; DE 25]. Due to the 30-day arrest to indictment requirement, the time after May 27, 2016, was not excludable under § 3161(h)(1)(H).

Between May and July 2016, the Government filed the third, fourth, and fifth continuance motions seeking to exclude time under § 3161(h)(7)(A) because the parties were waiting on Magistrate Judge Bowler to issue her detention decision so plea negotiations could "resume." [DE 164-3 at 13–21, JA1 185–93]. The third, fourth, and fifth continuance motions collectively sought to exclude time from May 27, 2016, until September 9, 2016; however, the maximum period of time that could be excluded for Judge Bowler to consider Gottesfeld's detention was 30 days, or until May 27, 2016.

The district court cannot circumvent the 30-day limitation for proceedings "under advisement" by treating the continuances as arising under § 3161(h)(7)(A) because even if the particular circumstances of the plea negotiations during that time are within *"the ends of justice"* exclusion, the court failed to set forth its findings "in the record of the case." 18 U.S.C. § 3161(h)(7)(A).

The "third, fourth and fifth motions make clear that the parties agreed to wait for the detention decision of the magistrate judge *before*

· 32

*resuming plea negotiations.*" [DE 209 Order at 22, Addendum 33 (emphasis added)]. The language of those three motions suggests that plea negotiations were not active while the magistrate judge considered the detention order, calling into question the legitimate bases to exclude time under the STA. Conversely, if plea negotiations were active and ongoing while the parties waited for a detention decision, the court failed to make findings in the record of the case that support further continuance and exclusion of time under § 3161(h)(7)(A).

First, the motions to exclude time and related orders granting continuances were filed in the MBD, not "the record of the case." All motions and orders were in a sealed civil docket, while the case at issue is an unsealed criminal docket—they are not the same case. *See Bloate v. United States*, 559 U.S 196, 209 (2010); *Zedner v. United States*, 547 U.S. 489, 506–07 (2006) (discussion requirement to set forth reasons in record of case).

Second, the orders to exclude time lacked the requisite oral or written statement of reasons supporting the court's findings. In the docket for 16-mc-91064-ADB, there were five "Electronic Order" notations in response to motions filed April 11, May 20, June 30, July

22, and August 26, 2016. [DE 164-3 at 3, JA1 175]. Yet, the Electronic

Order was not accompanied by an oral or written statement of reasons

on the record. The July 22, 2016, motion was the only motion

accompanied by a written "Order of Excludable Delay," which also

failed to state why the ends of justice were served by the requested

continuance. [DE 164-3 at 22, JA1 194].

This Court has acknowledged that "a court need not 'articulate the

basic facts when they are obvious and set forth in a motion for a

continuance." *Gottesfeld*, 319 F. Supp. 3d at 559 (citing *United States v.*

*Pakala,* 568 F.3d 47, 60 (1st Cir. 2009) (quoting *United States v. Rush,*

738 F.2d 497, 507 (1st Cir. 1984)). However, a court cannot adopt the

contents of motions where the facts and law in the motion do not

correspond to operative facts and law—30 days after the detention

hearing, exclusion based on Magistrate Judge Bowler's continued

consideration was no longer a legal basis to exclude days. Since the

third, fourth, and fifth motions to exclude time expressly acknowledge

that plea negotiations will not resume until a detention decision is

issued, a continuance under § 3161(h)(7)(A) is also not supported by the

law or facts and the court cannot rely on its "stock electronic order" in

34

lieu of making findings on the record justifying a continuance. *Pakala*, 568 F.3d at 60.

Finally, "general congestion of the court's calendar" cannot serve as a basis for a § 3161(h)(7)(A) continuance. 18 U.S.C. § 3161(h)(7)(C). Yet, the Court's order effectively rested on this basis since the third, fourth, and fifth motions expressly acknowledge, "the parties agreed to wait for the detention decision of the magistrate judge." Indeed, the additional 60 days past May 27, 2016, it took for the court to enter the detention order violated the STA.

As this Court has held, "neither counsel nor district courts may employ measures for excluding time from the speedy trial clock that impermissibly frustrate the STA's purpose of protecting the shared interest of criminal defendants and the public in bringing criminal charges to the bar of justice as promptly as practicable." *United States v. Souza*, 749 F.3d 74, 80 (1st Cir. 2014) (internal quotations omitted).

Prompt adjudication of detention as required explicitly by Fed. R. Crim. P. 59(a) is a core part of "bringing criminal charges to the bar of justice as promptly as practicable." Instead, through no fault of his own, Gottesfeld languished for 50 days in custody before his initial

35

appearance and 162 days without a detention order. The court and the Government illegitimately and prejudicially forced Gottesfeld to choose between his right to a speedy trial and his right to make decisions informed by the court's prompt detention decision. By the time of Gottesfeld's eventual indictment 246 days after his arrest, he had run out of money to pay his attorney of choice and was forced to accept appointed counsel. [Letter Regarding Counsel, DE 44].

With time after May 27, 2016, deemed non-excludable, the Government far exceeded the 30-day limit for bringing an indictment against Gottesfeld. The district court erred in denying Gottesfeld's motion to dismiss the indictment on STA grounds and its judgment must now be reversed.

### (3)    The District Plan Conflicts With The STA

The STA provides as follows:

No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, *in the record of the case*, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

36

18 U.S.C. § 3161(h)(7)(A) (emphasis added). In this matter, "the case" refers to Gottesfeld's criminal case, and if his case were pending in any other district in this Circuit (other than Massachusetts), consideration of continuance motions would be reflected in the criminal docket. *See supra*, Statement of the Case. The District Plan, however, requires the adjudication of pre-indictment continuance motions in the MBD and directly conflicts with the STA's mandate to make findings, "in the record of the case." *Compare* District Plan § 5(c)(1)(A), *with* 18 U.S.C. § 3161(h)(7)(A).

While the district is entitled to create its own plan, its operating procedures cannot violate the STA. *See Zedner v. United States*, 547 U.S. 489 (2006) (finding procedure of requiring defendant to sign pre-printed form created by district court to prospectively waive application of the Act violated the STA). Well-accepted principles of statutory construction require "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Bloate*, 559 U.S. at 209 (internal quotations omitted). Thus, the District Plan cannot render "superfluous, void or insignificant" the STA's explicit requirement that the court place

37

its findings "in the record of the case." Likewise, the STA requires the same judge that granted the continuance motion to make the findings: "[a]ny period of delay resulting from a continuance granted by a judge . . . if the judge granted such continuance on the basis of *his* findings." § 3161(h)(7)(A). The STA clearly envisions that continuance motions must be filed in the criminal case so that motions can be disposed of by the same judge that sets forth the reasons for their findings in the record of the criminal case.

The conflict between the MBD and criminal docket is not the only instance where the district court distinguished between Gottesfeld's criminal case and other motions brought by the Defendant in a collateral civil case:

> [T]he remedies sought by petitioner are more appropriately sought, if at all, from the judge handling the criminal case.
> . . .
> For almost one hundred years, courts have consistently held that a federal criminal defendant who seeks to challenge some aspect of an ongoing federal criminal prosecution must bring his claims in the criminal case itself.

*Gottesfeld v. McDonald*, No. 18-10376-NMG, 2018 U.S. Dist. LEXIS 40022, *2–3 (D. Mass. Mar. 12, 2018) (citations omitted).

The Government also advanced this view:

38



[Mar. 9, 2018 Hr'g Tr., DE 432 at 3:18–4:9, SSA 3–4]. The Government, having admitted that Case Numbers 16-cr-10305 and 18-cv-10376 are separate cases, should now be estopped from arguing that Case Numbers 16-cr-10305 and 16-mc-91064 are the same case.

The district court dismissed Gottesfeld's STA challenge on the basis that it would not "second guess the District Plan and its recognition of the importance of the secrecy of grand jury proceedings." *Gottesfeld*, 319 F. Supp. 3d at 557–58. But "the secrecy of grand jury proceedings" is easily protected "in the record of the case" by sealing pre-indictment continuance motions, as opposed to violating the STA by requiring pre-indictment continuances to be adjudicated in the MBD. Moreover, district courts cannot have the power to adopt STA plans, like the District Plan, that conflict with the STA. *See Zedner*, 547 U.S.

39

at 506–508 (noting that the "provisions of the Act are unequivocal" and discussing the requirement that findings be put on the record). The district court's order denying Gottesfeld's STA motion must be reversed.

(4)    Judicial Estoppel Is Inapplicable

The district court held, "the orders excluding time were appropriate under the ends-of-justice provision of the Speedy Trial Act and that defendant is judicially estopped from advancing a position contrary to his earlier assent." *Gottesfeld*, 319 F. Supp. 3d at 560. Gottesfeld cannot waive the application of the STA and the Court must reject the district court's application of judicial estoppel.

First, judicial estoppel is inapplicable, "when the court requires the party to adopt the position it later seeks to contradict." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 555–56 (5th Cir. 2014) (citing *Zedner*). That is what happened to Gottesfeld. Through its District Plan, the district court required the continuance motions to be litigated in the MBD. Gottesfeld filed a timely motion to dismiss for violations of the STA and he was unable make the type of prospective waiver rejected in *Zedner* because he could not object to the filings on the MBD as required by the District Plan, nor could he waive the STA violations

40

for failing to make findings on the record in his case. Thus, the Court cannot judicially estop Gottesfeld from arguing that the District Plan violates the STA or that pre-indictment continuance motions filed in the MBD do not qualify as "pretrial motions."

Second, judicial estoppel does not apply to Gottesfeld's argument that the third, fourth, and fifth continuance motions were granted in violation of § 3161(h)(7)(A). This Court in *Pakala* found that judicial estoppel precluded a defendant from asserting, "statutorily authorized exclusions of delay" and later arguing, "the district court failed to credit its grounds." 568 F.3d at 59. This case is easily distinguished because Magistrate Judge Bowler's failure to decide Gottesfeld's detention motion within 30 days is the opposite of a "statutorily authorized exclusion[] of delay." The court exceeded the 30-day limit permitted under the STA by at least 60 days and Gottesfeld cannot be judicially estopped from arguing such a delay was in violation of the STA. Accordingly, the Court must hold that judicial estoppel does not bar Gottesfeld's STA challenges.

**(b)** **The Search Warrant Should Have Been Suppressed Because Judge Bowler Was Neither Neutral Nor Detached And Subject To Recusal**

In his motion to suppress and its supplements, Gottesfeld argued that Magistrate Judge Bowler was neither neutral nor detached when she issued the search warrant because of her spousal relationship and her husband's ties to institutions affected by the DDoS. Her husband, Dr. Marc A. Pfeffer, is a professor at Harvard Medical School and a senior cardiologist at Brigham and Women's Hospital. The DDoS, as discussed in the Statement of the Case, affected the Harvard communications network used by Dr. Pfeffer and his colleagues at Harvard Medical School, Brigham and Women's, and other affiliated hospitals.

In ruling on the motion, the district court agreed that:

A magistrate judge issuing a search warrant must be a "neutral, detached officer capable of determining whether probable cause existed". *United States v. Soule*, 908 F.2d 1032 (1st Cir. 1990) (internal citation omitted). Where a magistrate judge does not have the requisite neutrality and detachment she "cannot provide valid authorization for an otherwise unconstitutional search". *United States v. Leon*, 468 U.S. 897, 914 (1984).

42

*Gottesfeld*, 319 F. Supp. 3d at 561. The district court nevertheless found that an organizational victim is not a party to a proceeding so as to require recusal and that Dr. Pfeffer lacked a financial interest that required the recusal of Judge Bower. *Id.* The district court concluded there was "no evidence that a cyber attack on a computer network seriously implicate[d] Dr. Pfeffer's work in any way." *Id.*

As set forth in the Statement of the Case, however, the Government elicited from its witnesses overwhelming testimonial evidence regarding the reference in the Warrant Affidavit that the DDoS affected the communications lines between Harvard Medical School and Brigham and Women's Hospital as much as it did BCH's. During the detention hearing in front of Magistrate Judge Bowler, the Government discussed the massive disruptions experienced by BCH and other hospitals affiliated with Harvard University: physicians could not access electronic patient records, place orders with pharmacies, or communicate with patients through the hospital portal, and fundraising was disrupted. [Detention Hr'g Tr. 55–56, JA1 98–99]. This disruption was severe and implicated all levels of the hospital's operations.

Testimony presented at sentencing further illuminated the personal
trauma the DDoS effected on doctors working in those institutions.

Dr. Nigren testified at Gottesfeld's sentencing. Although Nigren's
testimony pertained mostly to BCH, some of it clearly applied to other
Harvard hospitals affected by the DDoS:

> We had to shut down our email system to make sure none of
> that malware made it through. That's an incredibly
> disruptive set of steps. So from the prospective of our patient
> care providers, we weren't able to route prescriptions
> electronically, our pharmacists had to consult paper books to
> go look up formulary information to make sure that
> medications were being administered properly, we weren't
> able to have care-coordination conversations that normally
> happen electronically occurring between teams caring for
> real patients in the Hospital, and we weren't even able to do
> some mundane things like schedule patients for visits
> because they rely on email in many instances.
>
> ***
>
> It wasn't just confined to the four walls of our organization
> as well. As I mentioned before, we have referring physician
> portals, we have providers from all over the Commonwealth
> who refer patients to us for care, whether it's for a simple
> testing, radiological testing, lab testing or for some specialty
> evaluation. And all of those things are checked in on by
> those referring providers out in the community via our
> provider portals. Those things were all disrupted during this
>
> event. So that the impact was far more than just the
> patients and providers within our four walls; they extended
> much broader than that.

44

And then, finally the impact on our research is not
something I should forget. Research is a huge component of
what we do at Boston Children's, and we had many clinical
research studies that depend on internet access for data
acquisition, and those needed to be interrupted during this
time. And in some instances, it potentially jeopardized their
research studies because of that interruption in the data-
acquisition steps.

[Sentencing Tr., 48–50, JA4 1642–44]. Another witness confirmed the

extent of the attack, noting "it wasn't just Children's that was down in

this attack; it was Children's it was Joslin, it was Dana-Farber, Mass.

General, Brigham and Women's, Beth Israel, and Harvard Med School."

[Trial Tr. 4, at 196; JA3 1071].

The Government also acknowledged the wide-ranging effects in its

closing argument:

A DDoS attack that hit not only Children's Hospital but each
of the 65,000 IP addresses that institutions in the Longwood
Medical Area counted on for their internet connections, the
Brigham and Women's Hospital, the Beth Israel, the Dana-
Farber Cancer Institute, the Harvard Medical School.

This wasn't some inconvenience . . . .

[Trial Tr. 7, at 6, JA4 1455]. This was not a financial crime that affects

an institution but does not ruffle the feathers of those who work within

it. The personnel that experienced the DDoS first-hand were directly

45

and profoundly affected. Magistrate Judge Bowler's husband was one of those people.

Personal contact with victims of an attack by a particular perpetrator is a well-recognized basis for recusal. For example, in *United States v. Moody*, U.S. Circuit Court Judge Robert S. Vance and civil rights attorney Robert E. Robinson were killed by homemade package bombs sent by Walter Leroy Moody, Jr. *United States v. Moody*, 977 F.2d 1425, 1428 (11th Cir. 1992). Thereafter, the entire Northern District of Georgia as well as all judges then sitting in the Eleventh Circuit withdrew from this case. The appeal, although processed through the Eleventh Circuit, was heard by a panel of Fourth Circuit judges. *See id.* (as to district court); *United States v. Moody*, 977 F.2d 1420, 1423 (11th Cir. 1992) (as to appellate judges). No one questioned the propriety of recusal given the personal and professional connection between Judge Vance and the other judges of the courts in which he presided.

Conversely, when Timothy McVeigh and Terry Nichols were charged in a federal district court in Oklahoma City with blowing up the Murrah Federal Building, which was only a few blocks away from

the federal courthouse, the Tenth Circuit reversed a district court's

refusal to withdraw. *See Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995).

In doing so, it noted the following:

> 28 U.S.C. § 455(a) ... states that a judge "shall disqualify
> himself in any proceeding in which his impartiality might
> reasonably be questioned." In order to "promote public
> confidence in the integrity of the judicial process," the
> statute was broadened in 1974 by replacing the subjective
> standard with an objective test. *Liljeberg v. Health Sers.
> Acquisition Corp.*, 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194,
> 2202 n.7, 100 L.Ed.2d 855 (1988). "[W]hat matters is not the
> reality of bias or prejudice but its appearance." *Liteky v.
> United States*, __ U.S. __, __, 114 S.Ct. 1147, 1154, 127
> L.Ed.2d 474 (1994).

*Nichols,* 71 F.3d at 350. Judge Alley had staff, associates, and family

members of staff and associates impacted by the alleged crime and his

impartiality was drawn into question. *Id.*

Similarly, the facts presented by the Government at trial and

sentencing in this case irrefutably establish that the "disruption to the

network on which BCH and other Harvard University-affiliated

hospitals communicate" referenced in the Warrant Affidavit was

devastating to the individual doctors and other personnel who worked

in those hospitals, including Magistrate Judge Bowler's husband.

[Warrant Aff. ¶ 8, SJA 23]. The magnitude of the interruption could not

47

have been lost on either Dr. Pfeffer or his wife. Anyone who knew of the

effect of the DDoS on the workings of the hospitals involved would

reasonably question the impartiality of a judicial officer whose spouse

was directly impacted. Indeed, Chief District Judge Saris recused

herself *sua sponte* from the case when she became aware that

Anonymous was alleged to be involved in the crime; in 2013, the United

States Sentencing Commission was attacked by a group that called

itself Anonymous and she was the Chair of the Sentencing Commission.

On that basis alone, she rightly noted her impartiality could reasonably

be questioned. *See* [Order of Recusal DE 33, Addendum 49].

Where the question concerning recusal is a close one, "the balance

tips in favor of recusal." *In re Boston's Children First*, 244 F.3d 164, 167

(1st Cir. 2001). Magistrate Judge Bowler was neither neutral nor

detached and the law required she recuse herself consistent with 28

U.S.C. § 455. Accordingly, the district court's order denying Gottesfeld's

motion to suppress must be reversed.

### (c) **The District Court Abused Its Discretion In Denying Grimaldi's Withdrawal Motions**

The district court erred in denying attorney David Grimaldi's motions to withdraw as Gottesfeld's counsel. In deciding whether withdrawal must be granted, this Court considers "the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." *Reyes*, 352 F.3d at 515. Further, although Grimaldi filed the motions instead of Gottesfeld, the district court was still required to "thoroughly inquire into the factual basis of any conflicts asserted by counsel." *United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014).

Here the district court was confronted with multiple motions to withdraw wherein Grimaldi argued, *inter alia*, that he could not proceed:

> But I do not believe I can effectively represent him anymore.
> It's not something I want to do. I've represented clients
> where we haven't always agreed. I've represented clients
> who were of their own opinions. I've represented clients who
> — where there's been challenges, but this is too much. This is

49