too much. I can't tell you that, after what's happened, not before, but now, that I can adequately represent him.

[DE 435 at 12:6–14, Supp. App. 129]. The district court denied the motion finding there was not an "irreparable" breakdown in communication. [DE 435 at 14:1–5, Supp. App. 131].

Grimaldi then filed an emergency motion to withdraw on July 12, 2018. He argued, "an actual conflict of interest exists between counsel and the defendant; further, the attorney-client relationship is irretrievably broken." [DE 241 at 1, Supp. App. 111]. Judge Richard G. Stearns heard the motion. During the motion hearing, Grimaldi described the problem at length:

> *I know that the actual conflict of interest that persists, exists and persists, in this case will prevent me from zealously representing him* now in light of recent events in the last days and weeks.
>
> ...
>
> I think that this case is deserving, and Mr. Gottesfeld is deserving, of zealous representation by a lawyer without an actual conflict of interest.
>
> I'm not that lawyer. I was. I was. But in light of events in the last days and weeks, I'm not anymore.
>
> *I no longer wish for his success in this case. I no longer wish for it. I can no longer represent him, consistent with my*

50

*duties under the Rules of Professional Conduct.* I'm asking the Court for leave to withdraw because I have an actual conflict of interest.

...

*I cannot abide by these rules. I cannot represent Mr. Gottesfeld in light of what's happened in the last days and weeks. I cannot represent Mr. Gottesfeld zealously. There is a significant risk that the representation of Mr. Gottesfeld will be materially limited by a personal interest of me.*

...

*Mr. Gottesfeld does not have my full and undivided loyalty* based on events of the last days and weeks.

I'm in a very difficult position here. I understand that. Mr. Gottesfeld's in a very difficult position here.

I am circumscribing my comments here in this courtroom and in my filings in a very significant way to reduce — to hopefully absolute de minimis what I must say in order to have the Court be assured of the genuine and actual conflict of interest. And, on top of that, of course, are the more discretionary factors, including my belief -- well, let me go right to the rule, your Honor.

...

*But I cannot, and I can't imagine that I'll be able to, represent him at this trial and move him forward, as required under the ethical rules.*

[DE 10 at 7–8, 15–16, Supp. App. 141–42, 149–50] (emphasis added).
Judge Stearns denied Grimaldi's motion to withdraw on July 16, 2018.
[DE 248, Addendum 71–72].

Following the trial in the case, Grimaldi again moved to
withdraw. [DE 307, Supp. App. 114–15]. Gottesfeld assented to this
motion provided the Court appoint new counsel and Gottesfeld's
sentencing hearing remain as scheduled. [DE 307 at 2, Supp. App. 115].
Grimaldi asserted the same basis from his second and third motions to
withdraw: the continuing actual conflict of interest that existed between
himself and Gottesfeld.

On September 24, 2018, the district court held a hearing on
Grimaldi's motion and closed the courtroom over Gottesfeld's objection
to everyone except for Gottesfeld, his counsel, and Gottesfeld's wife, and
again denied Grimaldi's motion to withdraw. [DE 319; Sept. 24, 2018
Hr'g Tr., DE 422 at 14, SSA 66].

Turning to the *Reyes* factors, it is clear the district court abused
its discretion in denying Grimaldi's motions to withdraw. Grimaldi's
June 28 [DE 214, Supp. App. 109], July 12 [De 241, Supp. App. 110–11],
and July 17 [DE 254, Supp. App. 112–13] motions to withdraw may be

52

considered untimely because of their close proximity to the July 2018 trial date; however, the August 2018 motion to withdraw [DE 307, Supp. App. 114–15] was timely filed after trial and months before sentencing took place in January 2019.

The representations by Grimaldi about the nature of the conflict showed the "total breakdown in communication" between Grimaldi and Gottesfeld. *Reyes*, 352 F.3d at 515. In fact, Grimaldi and Gottesfeld admitted that they had no direct communication between the July 6, 2018, hearing and the emergency hearing on July 16, 2018, to discuss Gottesfeld's upcoming trial testimony—which was three days before trial began with jury selection on July 19, 2018. [DE 10 at 9–11, 18, Supp. App. 143–45, 152]. Their conflict was more than a mere disagreement. *Reyes*, 352 F.3d at 516. Accordingly, the Court should hold that the district court abused its discretion in denying Grimaldi's June 2018 and July 2018 motions to withdraw.

The Court should also find that the district court erred in denying Grimaldi's August 2018 motion to withdraw. Grimaldi's August 2018 withdrawal motion was months away from sentencing and therefore timely. There was a clear, actual conflict of interest between Grimaldi

53

and Gottesfeld, discussed repeatedly in the four motions and hearings

that preceded the August 2018 motion and at length during the

September 2018 hearing. [DE 422 at 14–31, SSA 66–83]. In addition,

the factual basis for Grimaldi's requested withdrawal remained

unchanged from his prior two motions. [DE 214, Supp. App. 104; DE

241, Supp. App. 110–11; DE 254, Supp. App. 112–13; DE 442 at 15:8–9,

15:25–16:3, SSA 67–68]. Finally, based on the nature of the conflict,

there was a complete breakdown in the attorney-client relationship.

Grimaldi and Gottesfeld had no direct communications between July 6

and 16, just days before trial began. [DE 10 at 9–11, 18, Supp. App.

143–45, 152]. The motion to withdraw was erroneously denied. The

judgment of the district court must be reversed.

**(d)** **The District Court Violated Gottesfeld's Public Trial Rights By Closing The Courtroom Five Times**

The district court closed the courtroom five times over Gottesfeld's

objection during hearings on withdrawal motions by Attorneys Gillespie

and Grimaldi: March 9, 2018 [DE 432 at 9, SSA 9]; March 22, 2018 [DE

419 at 5, SSA 37]; July 6, 2018 [DE 434 at 4, Supp. App. 121];

September 24, 2018 [DE 422 at 14, SSA 66]; December 13, 2018 [DE

54

423 at 3, SSA 90]. These courtroom closures violated Gottesfeld's right to a public trial, Gottesfeld objected to the closures, and the closures were therefore presumptively prejudicial. *See Weaver v. Massachusetts*, 582 U.S. __, 137 S.Ct. 1899, 1908–09 (2017) (noting that a violation of the right to a public trial is a structural error and can occur where the court fails to make proper findings before closing the courtroom).

A defendant has a right to a trial that is open to members of the public. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). The guarantee of a public trial is for the benefit of the defendant; a trial is far more likely to be fair when the watchful eye of the public is present. *In re Oliver*, 333 U.S. 257, 270 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."); *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). As such, it is clear that trial closures are to be "rare and only for cause shown that outweighs the value of openness." *See Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 509 (1984); *Waller*, 467 U.S. at 47 ("[U]nder the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its

55

predecessors."). A closure may be justified only by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise*, 464 U.S. at 510; *United States v. Antar*, 38 F.3d 1348, 1361 (3d Cir. 1994). In particular, a court must consider (and reject) alternatives to closure before barring public access. *Press-Enterprise*, 464 U.S. at 511.

Here, the district court violated Gottesfeld's right to a public trial by closing the courtroom during hearings on Gillespie and Grimaldi's withdrawal motions to everyone except for Gottesfeld, his wife, and his counsel. The district court's errors are especially clear when juxtaposed against Judge Stearns' decision to keep the courtroom open during a hearing on Grimaldi's emergency motion to withdraw. *See* [DE 10, Supp. App. 135–56]. Judge Stearns recognized that Gottesfeld owned the privilege and was therefore free to speak publicly about his counsel if he so wished.

"One of the reasons often advanced for closing a trial—avoiding tainting of the jury by pretrial publicity . . . is largely absent when a defendant makes an informed decision to object to the closing of the proceeding." *Waller*, 467 U.S. at 47 n.6. Gottesfeld has consistently

56

objected when the court closed the courtroom during five pre-trial proceedings. Yet, when faced with Gottesfeld's objections, the court never had significant discussions or made any findings justifying the need for closure, and it never made any attempts to consider alternatives to closure. In addition, Judge Gorton failed to make any of the necessary findings to support the closure of the courtroom. Accordingly, the case should be remanded for further proceedings consistent with the findings of this Court.

**(e)**     **The District Court Erred In Denying Gottesfeld's Defense Of Others.**

To establish the affirmative defense of another, Gottesfeld was required to show "he reasonably believed that the use of force was necessary 'for the defense of oneself or another against the immediate use of unlawful force.'" *Gottesfeld*, 319 F. Supp. 3d at 554 (quoting *United States v. Bello*, 194 F.3d 18, 26 (1st Cir. 1999)). Despite ample evidence to the contrary, the district court concluded that Gottesfeld's "proffer of evidence does not demonstrate that Ms. Pelletier was threatened by the immediate use of unlawful force" since the force

against Ms. Pelletier was done pursuant to an order by the Massachusetts Juvenile Court judge to the DCF and, therefore, lawful. *Id.* at 554. For the foregoing reasons, that decision was in error.

First, the personal presence requirement is antiquated and inapplicable in today's digital era. In its motion *in limine*, the Government argued that "Gottesfeld was never in [Ms. Pelletier's] presence. [DE 116 at 10–11]. In support, it cited decades old or non-precedential cases concerning minor physical trespasses on property. [DE 116 at 10–11]. *See Hawaii v. Marley*, 509 P.2d 1095 (Haw. 1973); *United States v. Brodhead*, 714 F. Supp. 593 (D. Mass. 1989). Given the remarkable changes in technology, it is foreseeable that someone outside the presence of a victim should be able to act in justification and in their defense without physically being in the presence of the victim. For instance, a computer-literate person could use a laptop to aid a victim by preventing identity theft, preventing an abuser's dissemination of child pornography, or stopping financial crimes. [DE 198 at 21]. Gottesfeld should not be forced to satisfy the presence requirement based on nonbinding, antiquated decisions.

58

Second, Gottesfeld acted to prevent imminent harm. In opposition to the Government's attempt to preclude the affirmative defense, Gottesfeld cited numerous statements demonstrating "imminent harm." [Opp. to Motion *In Limine*, DE 198 at 21–25]. His statement in the Huffington Post concerning BCH and Wayside's gross mistreatment and abuse of Ms. Pelletier corresponds with many local and national media reports and interviews by Justina's father where he details the suffering and pain his daughter was forced to endure. [DE 198 at 22–23]. The harm against Ms. Pelletier was beyond "imminent," it was already occurring, and it was significant—the ongoing alleged kidnapping, abuse, and torture of a teenage girl was imminent harm. [DE 198 at 24–26].

Finally, Gottesfeld established that the force against Justina was "unlawful." A state court order concerning the custody of a child may ultimately be deemed unlawful. *See, e.g., Smith, Jr. v. McDonald,* 458 Mass. 540, 547–50 (2010) (probate judge exceeded her statutory authority in "unlawful order"). Indeed, after a 16-month custody battle, Justina was finally (and rightfully) returned to the custody of her parents. *Justina Pelletier Heading Home After 16-Month Medical*

59

*Custody* Battle, ABCNews, June 18, 2014,

https://abcnews.go.com/Health/justina-pelletier-heading-home-16-

month-medical-custody/story?id=24191396. The unlawful nature of the

order to remove Justina from her parents' care, DCF's handling of Ms.

Pelletier's medical care, and the ensuing custody battle were the

ultimate acts of overreach. *See* [DE 198 at 28–29].

Ultimately, Gottesfeld was deprived of his right to present a full

and complete defense, which should have included the affirmative

defense of another. His alleged response to the widely-reported alleged

abuse of Justina Pelletier was necessary to prevent the immediate (and

ongoing) use of unlawful force against Justina.

**(f)    The Record Is Insufficient To Permit Appellate Review Of The District Court's Denial Of Gottesfeld's *Pro Se* Recusal Motions**

When Judge Gorton denied Gottesfeld's motions to disqualify, he

did not issue orders discussing his findings verbally or in writing.

Rather, Judge Gorton issued "endorsed orders," which provided no

discussion of facts underlying his decisions. [DE 350, Addendum 122;

DE 351, Addendum 123; DE 352, Addendum 124].

60

When deciding a motion for disqualification, "[t]he proper approach under subsection 455(e) requires the trial judge to place on the record all the facts relating to any alleged appearance of lack of impartiality and then leave entirely to the parties whether to waive disqualification under section 455(a)." *El Fenix de P.R. v. The M/Y Johanny,* 36 F.3d 136, 141 (1st Cir. 1994). On appeal, this Court may sustain the district court's ruling "unless we find that it cannot be defended as a rational conclusion supported by [a] reasonable reading of the record." *Torres-Estrada,* 817 F.3d at 380 (citations omitted).

In this case, the judge failed to place any facts on the record related to the alleged lack of impartiality discussed in Gottesfeld's motions and affidavit. The only discussion on these motions took place before Gottesfeld filed them; . [DE 423 at 11:12–18, SSA 98]. [DE 423 at 11:19–20, SSA 98].

Ultimately, Judge Gorton did not issue findings in support of the endorsed orders denying Gottesfeld's motions, leaving this Court with

61

no findings to conduct a meaningful examination of those motions on appeal. *See Torres-Estrada*, 817 F.3d at 380 ("an abuse of discretion will be found only if a reasonable reading of the record fails to support the conclusion that the judge's impartiality was not subject to question"). Thus, the Court should remand the disqualification issue to the district court for further explanation of its decision to deny the motions.

## CONCLUSION

Based on the foregoing, the judgment of the district court should be reversed.

Dated: July 31, 2020.

Respectfully submitted,

/s/ Brandon Sample
Brandon Sample
**Brandon Sample PLC**
P.O. Box 250
Rutland, Vermont 05702
Phone: (802) 444-4357
Fax:    (802) 779-9590
Vermont Bar: 5573
Email: brandon@brandonsample.com
https://brandonsample.com

*Attorney for Martin Gottesfeld*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,961 words, excluding exempted portions listed in Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Version 16.33 in Century Schoolbook 14-point font.

Dated: July 31, 2020.

/s/ Brandon Sample

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by filing same electronically via the Court's CM/ECF system this 31st day of July, 2020.

/s/ Brandon Sample

63

Exhibit N

**Nos. 18-1669, 19-1042, 19-1043, 19-1107**

# In the United States Court of Appeals for the First Circuit

---

### UNITED STATES OF AMERICA,
*Appellee,*

*v.*

### MARTIN GOTTESFELD,
*Defendant-Appellant.*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (CRIM. NO. 16-10305)
(THE HONORABLE NATHANIEL M. GORTON, J.)*

---

### REPLY BRIEF OF MARTIN GOTTESFELD

---

MICHAEL PABIAN
*pabianlaw38@gmail.com*
MICHAEL PABIAN LAW OFFICE, LLC
*20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700*

*Counsel for Martin Gottesfeld*

# TABLE OF CONTENTS

I.    Gottesfeld's Preserved Speedy Trial Arguments Require Dismissal......1

    A.    Gottesfeld Challenged the Relevant Exclusions in District Court and
         Provided That Court a Fair Opportunity to Address His Arguments...1

    B.    The Magistrate Judge's Failure to Timely Issue a Detention Ruling
         Was Not Grounds for an Ends of Justice Continuance...................4

    C.    The Supreme Court's Decision in *Bloate* Forecloses the Government's
         Argument that the Motions to Exclude Tolled the Speedy Trial Clock
         under the Act's General Prefatory Language...........................14

II.   The District Court Wrongly Precluded Gottesfeld from Introducing
    Evidence that He Reasonably Believed His Actions Were Taken in
    Defense of Justina Pelletier.................................................16

III.  The Preserved Violations of Gottesfeld's Public-Trial Right Require
    Reversal.......................................................................21

IV.   Gottesfeld's Recusal Arguments Were Properly Raised and
    Preserved.....................................................................26

V.    Conclusion...................................................................28

i

# TABLE OF AUTHORITIES

## Cases

*AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282 (1st Cir. 2019)..12

*Beltowski v. Brewer*, 766 F. App'x 218 (6th Cir. 2019) (unpublished)............. 17-18

*Bloate v. United States*, 559 U.S. 196 (2010) .................................................. 4, 9, 15

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ...........................................................23

*In re Oliver*, 333 U.S. 257 (1948)................................................................... 22, 26

*In re United States*, 441 F.3d 44 (1st Cir. 2006)......................................................27

*Knox v. Roper Pump Co.*, 957 F.3d 1237 (11th Cir. 2020) .....................................26

*United States v. Amparo*, 961 F.2d 288 (1st Cir. 1992)...........................................16

*United States v. Andrews*, 790 F.2d 803 (10th Cir. 1986) .......................................10

*United States v. Antar*, 38 F.3d 1348 (3d Cir. 1994)...............................................22

*United States v. Barnes*, 159 F.3d 4 (1st Cir. 1998) ..............................................4, 5

*United States v. Barnes*, 251 F.3d 251 (1st Cir. 2001) ...............................................5

*United States v. Bello*, 194 F.3d 18 (1st Cir. 1999) .................................................16

*United States v. Brodhead*, 714 F. Supp. 593 (D. Mass. 1989)...............................17

*United States v. Brown*, 669 F.3d 10 (1st Cir. 2012)...............................................25

*United States v. Bryant*, 523 F.3d 349 (D.C. Cir. 2008)............................................6

*United States v. Bucci*, 525 F.3d 116 (1st Cir. 2008) ..............................................25

*United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016)...........................21

*United States v. Castillo*, 981 F.3d 94 (1st Cir. 2020)................................3

*United States v. Crane*, 776 F.2d 600 (6th Cir. 1985)...............................10

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)...........................23

*United States v. Harris*, 642 F. App'x 713 (9th Cir. 2016) (unpublished)..........27

*United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011)...........................7

*United States v. Maxwell*, 254 F.3d 21 (1st Cir. 2001)...........................16

*United States v. Pakala*, 568 F.3d 47 (1st Cir. 2009) ...............................14

*United States v. Ramirez*, 788 F.3d 732 (7th Cir. 2015)...........................10

*United States v. Ramirez-Cortez*, 213 F.3d 1149 (9th Cir. 2000)...........................8

*United States v. Richardson*, 421 F.3d 17 (1st Cir. 2005) .......................15

*United States v. Rivera-Berrios*, 968 F.3d 130 (1st Cir. 2020) .................3

*United States v. Rodriguez*, 858 F.2d 809 (1st Cir. 1988) ................................ 16, 20

*United States v. Scott*, 180 F. Supp. 3d 88 (D. Mass. 2015)....................11

*United States v. Souza*, 749 F.3d 74 (1st Cir. 2014).................................8

*United States v. Stoudenmire*, 74 F.3d 60 (4th Cir. 1996).......................10

*United States v. Tigano*, 880 F.3d 602 (2d Cir. 2018)................................8

*United States v. Toledo*, 739 F.3d 562 (10th Cir. 2014)...........................20

*United States v. Tunley*, 664 F.3d 1260 (8th Cir. 2012) ...........................18

*United States v. Valdivia*, 680 F.3d 33 (1st Cir. 2012)................................3

*United States v. Vazquez-Botet*, 532 F.3d 37 (1st Cir. 2008) ...................25

*United States v. White*, 920 F.3d 1109 (6th Cir. 2019)..............................................9

*Waller v. Georgia*, 467 U.S. 39 (1984)....................................................22-23, 25-26

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) ........................................21

*Zedner v. United States*, 547 U.S. 489 (2006) ................................................. *passim*

**Statutes**

18 U.S.C. § 3161 .................................................................................... *passim*

18 U.S.C. § 3142(f)...........................................................................................12

18 U.S.C. § 3145(b)...........................................................................................13

28 U.S.C. § 455.................................................................................................27

## I.  Gottesfeld's Preserved Speedy Trial Arguments Require Dismissal

### A.  Gottesfeld Challenged the Relevant Exclusions in District Court and Provided That Court a Fair Opportunity to Address His Arguments

Gottesfeld's opening brief made clear that the district court violated the Speedy Trial Act by improperly excluding two categories of time.  Either category, added to the 26 days that the government agrees are unexcludable, brings the total elapsed time between Gottesfeld's arrest and his October 19, 2016 indictment beyond the 30-day statutory limit.  *See* 18 U.S.C. § 3161(b).  The two principal time periods are: (1) 62 days between Gottesfeld's detention hearing and the subsequent detention ruling, during which time the court purported to order three "ends of justice" exclusions, *see* § 3161(h)(7)(A);[1] and (2) 13 days during which

---

[1] While the government suggests that Gottesfeld has waived any argument based on the three additional ends of justice exclusions, the Court need not decide the issue.  The delay occasioned by the three challenged exclusions is easily sufficient to surpass the 30-day limit.  Additionally, Gottesfeld's argument that the exclusions were not supported by findings "in the record of the case," as required by statute, implicates all six ends of justice exclusions.  *See* Def. Br. 36-40.  The detention motion was pending for 92 days, reduced to 62 by the statute's 30-day exclusion for matters under advisement.  *See* § 3161(h)(1)(H).  Had the third, fourth, and fifth ends of justice exclusions not been improperly granted, the speedy trial clock would have expired on June 8, 2016 (counting the days agreed upon by the government, Govt. Br. 14, and resuming the count on May 28, 2016).  Gottesfeld's consent to "temporary pretrial detention," Govt. Br. 20 n.3, did not encompass consent to indictment more than four months later than required by the Speedy Trial Act.

1

the government's motions to exclude time were pending on the miscellaneous
business docket ("MBD").[2]

In district court, Gottesfeld challenged, *inter alia*, both of the foregoing time
periods. He expressly argued, citing several of the same authorities relied on in
this appeal, that the statutory prerequisites for an ends of justice continuance had
not been met. *See* Dkt. 164 at 11-14; Dkt. 176 at 6-8.[3] Gottesfeld's reply
specifically noted the excessiveness of the exclusions in comparison to the
statutory 30-day exclusion for matters under advisement. *See* Dkt. 176 at 7.
Gottesfeld similarly challenged exclusion of the days during which the
government's motions were pending. *See* Dkt. 164 at 14. He also argued that the
exclusion motions should not have been filed and granted in the MBD, as opposed
to the criminal docket. *See id.* at 12. In his reply, Gottesfeld expressly opposed
the government's suggestion that this period was excludable due to the pendency
of a "pretrial motion" under § 3161(h)(1)(D). *See* Dkt. 176 at 5-6; *see also* Dkt.

---

[2] Including these days (March 1 and April 23 through May 4, 2016) minus days
during which the detention issue was pending (April 27, 2016 on), the 30-day
clock expired on October 17, 2016.

[3] "Dkt." refers to docket entries in district court case no. 16-CR-10305, unless
otherwise noted. "Add." refers to the addendum to Gottesfeld's opening brief.
"JA" refers to the Joint Appendix. "SSA" refers to the Sealed Supplemental
Appendix.

2

167 (Govt. Opp'n) at 6, 11-12.  The district court considered and decided this specific issue.  *See* Add. 31 ("The time between the filing of the motions and the resolution of those motions is properly excluded under [the applicable] subsection . . .").  Gottesfeld also argued that the exclusions should not have been ordered by a different judge than the one presiding over his criminal case.  *See* Dkt. 164 at 12; Dkt. 176 at 1-4.

"[S]uccessful preservation of a claim of error for . . . consideration on appeal requires that a party object with sufficient specificity such that the district court is aware of the claimed error." *United States v. Castillo*, 981 F.3d 94, 101 (1st Cir. 2020).  "[E]xquisite precision" is not required. *United States v. Rivera-Berrios*, 968 F.3d 130, 134 (1st Cir. 2020).  Here, Gottesfeld's district court arguments provided both the government and the judge ample opportunity to address the very issues he now raises on appeal.  There was, accordingly, no forfeiture.  The situation is a far cry from *United States v. Valdivia*, the only case cited by the government on this issue, where the defendant utterly failed to "identify the periods of time" that he sought to challenge on appeal "as non-excludable" before the district court.  680 F.3d 33, 41 (1st Cir. 2012).  Counsel is aware of no decision by this Court finding forfeiture of a speedy trial argument in circumstances remotely analogous to those at issue here.

### B.   The Magistrate Judge's Failure to Timely Issue a Detention Ruling Was Not Grounds for an Ends of Justice Continuance

Turning to the merits of the Speedy Trial Act issues, the law is clear that "[t]he purposes of the Act . . . cut against exclusion on the grounds of mere consent or waiver." *Zedner v. United States*, 547 U.S. 489, 500 (2006). This is because the statute was designed not only for the protection of defendants' rights, but also "with the public interest firmly in mind." *Id.* at 501; *see also Bloate v. United States*, 559 U.S. 196, 211 (2010) (explaining that Act was intended "to vindicate the public interest in the swift administration of justice"). Thus, "[t]he fact that the defendant has requested the continuance or consents to it is not in itself sufficient to toll the operation of the time limits." *United States v. Barnes*, 159 F.3d 4, 13 (1st Cir. 1998) (citation omitted). Rather, "[w]hether time resulting from a continuance may toll the Act depends on whether the court abused its discretion by granting the continuance." *Id.*

The statute sets out a number of specified categories of time that are automatically excluded in calculating applicable deadlines. *See generally* § 3161(h)(1). Section 3161(h)(7)(A) contemplates potential unenumerated bases for exclusion, permitting courts to grant a continuance based on "findings that the ends of justice served by taking such action outweigh the best interest of the public

4

and the defendant in a speedy trial." *Id.* But that subsection thereafter dictates that "[n]o such period of delay . . . shall be excludable . . . unless the court sets forth, in the record of the case, . . . its reasons for finding that the ends of justice" support the continuance. *Id.* The statute sets out a specific list of factors that the court "shall consider" in reaching a decision. *See* § 3161(h)(7)(B). "[G]eneral congestion of the court's calendar" is specifically impermissible grounds for a continuance. § 3161(h)(7)(C).

The discretion to order an ends of justice continuance is "exceedingly narrow." *Barnes*, 159 F.3d at 13 (citation omitted). Such continuances, accordingly, "should not be granted cavalierly." *United States v. Barnes*, 251 F.3d 251, 256 (1st Cir. 2001). The Supreme Court has described the "strategy" of this subsection as "to counteract substantive openendedness with procedural strictness." *Zedner*, 547 U.S. at 509. Congress perceived "a danger that [ends of justice] continuances could get out of hand and subvert the Act's detailed scheme." *Id.* at 508-09. This concern explains the inclusion of a "demand[]" for "on-the-record findings," as well as the mandatory list of factors to consider. *Id.* at 509. "A straightforward reading of" the statute makes clear "that if a judge fails to make the requisite findings . . . , the delay resulting from the continuance must be counted, and if as a result the trial does not begin on time, the indictment or

information must be dismissed." *Id.* at 508. Implicit findings are insufficient. *See United States v. Bryant*, 523 F.3d 349, 360 (D.C. Cir. 2008).

In this case, while the district court purported to order ends of justice exclusions, the record fails to provide the support required under § 3161(h)(7)(A). All three motions relevant here were filed between Gottesfeld's detention hearing and the decision issued 92 days later on July 27, 2016. All three motions contained nearly identical language regarding the proffered "grounds" for exclusion: "while the defendant had his detention hearing in this district on April 27, 2016, Magistrate Judge Bowler has not yet issued a detention decision. While that decision is pending, the parties have not been able to conclude their discussions of a possible plea agreement and information." JA186; *see also* JA189, 192. As the government concedes, District Court Judge Burroughs made no "specific findings" with respect to these motions. Govt. Br. 17-18. The first two motions were granted with no explanation whatsoever. *See* JA175 (docket entries 7 and 9). The third order included the formulaic recitation that "the ends of justice outweigh the usual interest in a speedy trial." *Id.* (docket entry 11).

To the extent that, as the government argues, the district court's orders granting the motions incorporated the grounds set forth by the government, the exclusions were precipitated by the magistrate judge's delay in issuing a detention

6

ruling. This is precisely the type of consideration that the statute expressly provides is impermissible under § 3161(h)(7)(C). Based on the government motions and ensuing orders, nothing was especially "unusual" or "complex" about the detention motion or any other relevant aspect of the case. § 3161(h)(7)(B)(ii). Certainly, there was no indication that failure to grant an extension was "likely to make a continuation of [the] proceeding impossible, or result in a miscarriage of justice." § 3161(h)(7)(B)(i). In fact, neither the government motions nor the court's orders so much as mentioned the mandatory considerations listed in § 3161(h)(7)(B). The government's contention that the subsequent order (issued by a different district court judge) denying Gottesfeld's motion to dismiss provided the missing explanation is unavailing. That order simply repeated the insufficient justification that "the parties agreed to wait for the detention decision of the magistrate judge before resuming plea negotiations." Add. 33.[4]

---

[4] As argued in Gottesfeld's opening brief, the district court also failed to comply with the statutory requirement that the requisite findings be set forth "in the record of the case." § 3161(h)(7)(A). The MBD proceedings were not part of this criminal case. *See* Def. Br. 33, 37-39. And Judge Gorton's subsequent order could not cure the violation. *See* § 3161(h)(7)(A) (providing for exclusion "if the judge granted [a] continuance on the basis of *his findings* . . . ." (emphasis added)); *United States v. Huete-Sandoval*, 668 F.3d 1, 5 (1st Cir. 2011) ("[W]hether or not the district court's order drew support from § 3161(h)(7) is of no moment, as the ends-of-justice finding must be recorded 'by the time [the] district court rules' on the motion to dismiss." (quoting *Zedner*, 547 U.S. at 506-07)).

The motions to exclude did not say that additional time was necessary to pursue ongoing plea negotiations.  To the contrary, they expressly stated that the parties had "not been able to conclude" such negotiations during the pendency of the detention issue and intended to "resume their discussions" upon issuance of a decision.  JA186.  Thus, regardless of whether or not "periods of plea negotiation can be properly excluded" under the ends of justice provision, an issue which this Court has expressly left open, *see United States v. Souza*, 749 F.3d 74, 80 (1st Cir. 2014), that is not the situation that occurred here.  And at least one circuit has held that the parties' "desire to engage in . . . plea negotiations" cannot support an ends of justice continuance, even when such negotiations are ongoing.  *See United States v. Ramirez-Cortez*, 213 F.3d 1149, 1155 (9th Cir. 2000); *cf. United States v. Tigano*, 880 F.3d 602, 615 (2d Cir. 2018) ("We have held that the time spent in plea bargaining is a gamble taken by the government regarding the defendant's speedy trial rights and is properly counted against the government.").

Although the government is correct that an ends of justice continuance may cover types of delay not automatically excludable under § 3161(h)(1), it cites no authority whatsoever for the proposition that such a continuance may be used as an end-run around the statutory limit of 30 days for excludable delay when a matter is under advisement.  *See* § 3161(h)(1)(H).  Instead, the cases cited by the

8

government involved delay necessary to the preparation of pretrial motions and active plea negotiations. *See* Govt. Br. 18-19 (citing *Bloate*, 559 U.S. at 214 and *United States v. White*, 920 F.3d 1109, 1115 (6th Cir. 2019)). Neither situation implicates the statutory prohibition on continuances for general court congestion, which factors significantly in the present case.

Although it is possible that an ends of justice continuance could properly issue where a matter was taken under advisement for more than 30 days in light of the various factors set forth in § 3161(h)(7)(B) (*e.g.*, complexity), the court made no such findings here. Instead, it merely endorsed (without comment) the government's citation to the pendency of the detention motion and the parties' preference for that motion to be decided prior to progressing further in plea negotiations. This desire is not unique or even unusual. As the government itself acknowledges, "[t]hat a pending pretrial detention decision would be an important factor in [plea] negotiations is hardly surprising: it is highly relevant to a defendant's decision on a proposed plea whether he will remain in custody pending trial or could argue for immediate release in connection with a plea." Govt. Br. 19. Respectfully, the court's inability to decide a routine motion within the 30-day statutory exclusion does not constitute grounds for an ends of justice continuance. If it did, Congress's specific and express limitation on excludable time for matters

9

under advisement would be rendered essentially meaningless. The excessiveness of the exclusions in this case relative to the 30-day limit set by Congress only reinforces the need for specific findings, which again were not provided.

Federal courts of appeals have repeatedly found Speedy Trial Act violations where the proffered reasons for a purported ends of justice continuance, coupled with the absence of other permissible explanations in the record, implicated the statutory prohibition on exclusions for court congestion. *See United States v. Ramirez*, 788 F.3d 732, 736 (7th Cir. 2015) ("[T]he record only reveals that the district court repeatedly blamed its crowded calendar for its inability to schedule a sooner trial date, a factor relied upon in error."); *United States v. Stoudenmire*, 74 F.3d 60, 64 n.4 (4th Cir. 1996) ("Although purporting to exclude this period as an ends of justice continuance, the district court granted the continuance for reasons that amounted to docket congestion."); *United States v. Andrews*, 790 F.2d 803, 808 (10th Cir. 1986) ("Neither a congested court calendar nor the press of a judge's other business can excuse delay under the Act."); *United States v. Crane*, 776 F.2d 600, 605 (6th Cir. 1985) ("The trial judge's unavailability was caused at least partially by his presiding over another case and was therefore attributable to 'general congestion of the court's calendar.' Thus, the judge's absence is not a proper reason for an ends of justice continuance."). The present case fits within

10

that framework.  The government's motions made clear on their face that they were necessitated by the magistrate judge's delay in deciding the detention motion. The court's orders provided no additional explanation and failed to reflect any consideration of the § 3161(h)(7)(B) factors.  In these circumstances, there are no record findings sufficient to support the delay, *see* § 3161(h)(7)(A), which appears to have resulted from the impermissible factor of court congestion, *see* § 3161(h)(7)(C).  The district court, accordingly, abused its discretion by granting the exclusions.

The district court also erred in ruling that Gottesfeld was estopped from challenging the ends of justice exclusions.  Estoppel may be appropriate where a party takes a litigation position "clearly inconsistent with its earlier position." *Zedner*, 547 U.S. at 504 (citation omitted).  Courts should also consider "whether the party has succeeded in persuading a court to accept" its prior position and whether the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (citation omitted).  Estoppel should be narrowly construed in the Speedy Trial Act context given the public interest at stake.  *See id.* at 499; *cf. United States v. Scott*, 180 F. Supp. 3d 88, 93 (D. Mass. 2015) (Gorton, J.) ("Judicial estoppel cannot . . . override a statutory requirement.").

11

As an initial matter, though the motions to exclude were styled as "assented-to," they were all filed by the government, not Gottesfeld. In fact, Gottesfeld was not even represented by counsel in the MBD proceedings, *see* JA174-75, (belying the government's suggestion that the "same . . . attorneys" were involved in both cases, Govt. Br. 21), and his *pro se* filing cited by the government did not occur until 2018, well over a year after the last exclusion order. *See* Govt. Br. 16.[5] The government cites no support for a finding of judicial estoppel against a party that did not even make a filing or appear before the court regarding the issue at hand. *See, e.g., AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282, 291 n.8 (1st Cir. 2019).

Moreover, as in *Zedner*, it was the court rather than the defendant that was the driver of the delay. *See Zedner*, 547 U.S. at 505 (noting that the court "requested the waiver and produced the form for petitioner to sign"). The motions to exclude did not reflect consent to indefinite delay or an expectation that the magistrate judge would hold the detention issue under advisement for 92 days. To the contrary, the parties expected a prompt ruling. *See* 18 U.S.C. §§ 3142(f),

_____

[5] The *pro se* motion was denied as moot for that reason. *See United States v. Gottesfeld*, No. 16-MC-91064, Dkt. 20.

12

3145(b).[6] The magistrate judge's failure to act on the detention motion left Gottesfeld in the unenviable position of having to forge ahead in plea negotiations without knowing whether he would remain detained (a "highly relevant" consideration, *see* Govt. Br. 19), or instead endure illegal delay. Gottesfeld did not "succeed in persuading" the court of anything by reluctantly electing the latter. In these circumstances, any "unfair advantage" to the defendant that would result from dismissal does "not predominate." *Zedner*, 547 U.S. at 505.

There is no inconsistency, much less a clear one, between the representation that plea negotiations had stalled during the pendency of the detention motion and Gottesfeld's subsequent assertion of his Speedy Trial Act rights with respect to that period of delay. *See id.* at 505 (holding prior position "that granting the requested continuance would represent a sound exercise of the trial judge's discretion in managing its calendar" not to be clearly inconsistent with "later position that the continuance was not permissible under the terms of the Act").[7] In the sole case

---

[6] The government's estoppel argument is limited to the substantive merits of the ends of justice exclusions and inapplicable to Gottesfeld's claim regarding the lack of required findings in the record of the case. Indeed, the District Plan that called for the motions to be dealt with on the MBD is, much like the waiver form at issue in *Zedner*, a product of the court. Gottesfeld did not "succeed in persuading" the court to follow its own plan.

[7] Contrary to the government's suggestion, the motions to exclude did not

13

where this Court has found estoppel under *Zedner*, the defense moved for ends of justice continuances for its own reasons. *See United States v. Pakala*, 568 F.3d 47, 60 (1st Cir. 2009) (one motion filed due to defense counsel's "scheduling conflict" and a second to allow the defense to obtain a transcript). The defendant in *Pakala*, therefore, could be fairly said to have persuaded the court that the proffered bases supported continuances under the ends of justice provision. *Pakala* should not be extended to estop Gottesfeld based on motions filed by the government, in a proceeding in which no appearance was even made on his behalf, and necessitated by delay outside of Gottesfeld's control.

C.   The Supreme Court's Decision in *Bloate* Forecloses the Government's Argument that the Motions to Exclude Tolled the Speedy Trial Clock under the Act's General Prefatory Language

The government's contention that the motions to exclude filed in the MBD, even if they are not "pretrial motion[s]" within the meaning of § 3161(h)(1)(D), should nonetheless trigger an exclusion for "other proceedings concerning the defendant" is contrary to Supreme Court precedent. In *Bloate*, the Court made

---

"specifically state[] that the pending detention decision was a suitable ground for an ends-of-justice continuance." Govt. Br. 20. Rather, they merely noted the pendency of the motion and the corresponding stall in plea negotiations. The only reference to the ends of justice was the following formulaic recitation in the concluding paragraph: "[t]he ends of justice served by granting the requested exclusion outweigh the interest of the public and the defendant in a speedy trial,

14

clear that "the general language in subsection (h)(1)" regarding other proceedings should "not be held to apply to a matter specifically dealt with in another part" of the statute, namely the exclusions set forth in subsections (h)(1)(A)-(H). 559 U.S. at 207 (citations omitted). The cases cited by the government on this issue were all decided more than a decade before *Bloate*. *See* Govt. Br. 15. Congress considered the appropriateness of delay due to motion practice in enacting § 3161(h)(1)(D). If the Court finds that the motions at issue here fall outside the scope of that provision, it should not construe the statute's general prefatory language to render the limits of the specific subsection superfluous.

Accordingly, the dispositive question for this exclusion is whether the motions filed in the MBD were "pretrial motions." § 3161(h)(1)(D). As the government notes, this Court has defined that statutory phrase to require that the relevant filing concern "matters affecting the course of trial." Govt. Br. 15 (citation omitted). The motions at issue here do not meet that standard because they were filed before Gottesfeld was indicted and in an entirely separate docket from his criminal case. *United States v. Richardson* is distinguishable on this basis. *See* 421 F.3d 17, 27 (1st Cir. 2005) (involving motion filed in criminal case the day after a "second pre-trial status conference"). The government is wrong

---

under § 3161(h)(7)(A)." JA186.

15

that, prior to indictment, "there was no criminal docket" in which to file the

motions.  Govt. Br. 22 n.4.  The motions could and should have been filed in case

no. 16-MJ-04117, the magistrate case with a criminal complaint pending that was

subsequently merged into the proceedings before Judge Gorton.

## II.    The District Court Wrongly Precluded Gottesfeld from Introducing Evidence that He Reasonably Believed His Actions Were Taken in Defense of Justina Pelletier

The law is clear that "a criminal defendant has a wide-ranging right to

present a defense." *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001).

While the defendant bears an "entry-level burden" to proffer evidence from which

a reasonable juror could find an affirmative defense supported, this "burden of

production does not shift the historic burden of proof." *United States v. Amparo*,

961 F.2d 288, 291 (1st Cir. 1992) (citation omitted); *see also United States v.*

*Rodriguez*, 858 F.2d 809, 814 (1st Cir. 1988) ("[T]he accused's burden of

production is measured by the time-honored sufficiency-of-the-evidence

yardstick—no more, no less . . . .").

Gottesfeld sought to present an affirmative defense that he "reasonably

believe[d]" his alleged actions were "necessary for the defense" of Justina Pelletier

"against the immediate use of unlawful force." *United States v. Bello*, 194 F.3d 18,

26 (1st Cir. 1999) (quoting First Circuit Pattern Crim. Jury Instr. § 5.04)).  As an

initial matter, the sole authority cited by the government for the purported

requirement that Gottesfeld be physically present in the same location as Pelletier

is a 30-year-old, pre-Internet, district court decision involving a different

affirmative defense. *See United States v. Brodhead*, 714 F. Supp. 593, 598 (D.

Mass. 1989) ("A person who reasonably believes that a felony, or a misdemeanor

amounting to a breach of the peace, is being committed, or is about to be

committed, in her presence, may use reasonable force to prevent it."). The

government provides no rationale for transposing this requirement into the context

of defense of another, where, as noted in Gottesfeld's opening brief, it would serve

only as an antiquated and unprincipled limitation on the scope of the defense. *See*

Def. Br. 58. At the time *Brodhead* was decided, these concerns were much less

significant.

The district court erred in giving preclusive effect to a Massachusetts

Juvenile Court Order, in the face of substantial proffered evidence supporting

Gottesfeld's reasonable belief that the ongoing mistreatment of Pelletier was

unlawful. *See* Add. 19-20. At the outset, the government incorrectly frames the

issue as whether the force exerted against Pelletier was, in fact, unlawful. *See*

Govt. Br. 49. The proper inquiry focuses instead on Gottesfeld's reasonable belief.

*See, e.g., Beltowski v. Brewer*, 766 F. App'x 218, 221 (6th Cir. 2019)

17

(unpublished) ("[B]oth the statute and the instruction required the jury to assess the reasonableness of [the defendant's] belief, not the lawfulness of [victim's] actions."); *United States v. Tunley*, 664 F.3d 1260, 1262 n.3 (8th Cir. 2012) ("If a person reasonably believes that force is necessary to protect . . . another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in . . . defense of another person." (citation omitted)).

Shortly before Gottesfeld's alleged actions giving rise to the charges in this case, Pelletier's father appeared on Fox News saying that his daughter had been "tortured physically and mentally" and that her very "life [wa]s now at stake." Dkt. 198 at 22-23. The family was reported to have subsequently filed a petition for writ of habeas corpus alleging wrongful imprisonment. *See id.* at 27. A former nurse at Boston Children's Hospital ("BCH") agreed with the family's characterization, filing a public complaint referring to "abuse" and "torture" suffered by Pelletier. *See* Dkt. 190-1 at 14-16. Several local elected officials similarly questioned the lawfulness of Pelletier's treatment. *See* Dkt. 198 at 28-29. Then-Presidential candidate and former Arkansas Governor Mike Huckabee went so far as to publicly refer to the situation as a "kidnap[ping]." *Id.* at 5. Additional media reports reflected similar characterizations. *See id.* at 5-7. Some reports

specifically questioned the fairness of the Juvenile Court process. *See id.* at 28.  In

short, the record makes clear that Gottesfeld was far from alone in his serious

concern for Pelletier's safety and thoroughly supported a jury finding that he

reasonably believed her treatment was unlawful. *See also generally* Dkt. 190-1 at

3-10 (citing several contemporaneous media reports).

With regard to the anticipated effect of Gottesfeld's alleged actions, the

government cites Gottesfeld's own trial testimony that he knew at the time of the

events in question that Pelletier was no longer physically located at BCH. *See*

Govt. Br. 49.  The government, however, omits Gottesfeld's expressly articulated

"caveat" that the hospital's doctors "were still very much in control of her

situation." JA1414-15.

In a pretrial statement relied on by the government at trial, Gottesfeld

explicitly relayed his belief that his actions could indeed prevent further harm to

Pelletier:

> I knew that BCH's big donation day was coming up and
> that most donors gave online.  I felt that, to have
> sufficient influence to save Justina from grievous bodily
> harm and possible death . . . , I'd have to hit BCH where
> they appear to care the most, the pocketbook and the
> reputation.  All the efforts to save Justina weren't
> succeeding, and time was of the essence.

JA680.[8]  Indeed, Gottesfeld's alleged actions did make news, and Pelletier was subsequently returned to her family.  *See* Dkt. 198 at 31-33.  Pelletier herself has expressed gratitude towards Gottesfeld.  *See id.* at 32.

Although the jury could disagree that Gottesfeld reasonably believed his actions were necessary to prevent harm to Pelletier, he had the Constitutional right to present evidence in support of that defense and to a corresponding jury instruction on the subject.  *Cf. United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014) ("[T]hough a defendant's testimony may be contradicted to some degree by other evidence or even by his prior statements, a defendant is entitled to an instruction if the evidence viewed in his favor could support the defense.").  In short, while Gottesfeld's account "need not have been believed," "its creditworthiness was not for the district court to assess." *Rodriguez*, 858 F.2d at 815.  Instead, jurors "should have been given the opportunity to pass upon" the affirmative defense. *Id.* at 816.

---

[8] The government's claim that Gottesfeld "acknowledge[d] that he did not expect the attack would *cause* the desired effect," Govt. Br. 49, is a quotation from the district court's opinion with no cited support, *see* Add. 21.  It is also contrary to Gottesfeld's pretrial statement.

### III.   The Preserved Violations of Gottesfeld's Public-Trial Right Require Reversal

The Supreme Court has held that, in the case of a "structural error," such as violation of a defendant's right to a public trial, "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (citation omitted); *see also United States v. Candelario-Santana*, 834 F.3d 8, 22 (1st Cir. 2016) ("Denial of a public trial constitutes structural error, rendering the entire trial process fundamentally unfair" (citations omitted)). In the present case, Gottesfeld objected to each of the five courtroom closures, including one instance in which a journalist was specifically expelled from the courtroom. *See* SSA9, 37, 66, 90; Add. 57.[9]

Accordingly, if this Court agrees that the hearings on the withdrawal motions filed by Gottesfeld's counsel fall within the scope of the public-trial right, the appropriate remedy is reversal. Despite the foregoing, and Gottesfeld's citation to *Weaver* in his opening brief, the government faults Gottesfeld for purportedly

---

[9] While the government questions whether Gottesfeld preserved his challenge for two of these hearings, Govt. Br. 43, this Court need not decide the issue because, assuming the public-trial right applies, Gottesfeld's preserved objection to three closures requires reversal. Moreover, in one of the closures for which the government questions preservation, Gottesfeld described his "██████" as "██

failing to "identify the appropriate remedy" for a public-trial violation.  Govt. Br.

46.  The government's citations on this issue all predate *Weaver* by more than a

decade.  The defense respectfully submits that *Weaver* is the controlling precedent.

The government's suggestion that remand could be limited to the provision of

"supplemental findings" supporting closure, Govt. Br. 46, also contravenes the rule

that "closure may not be retroactively validated," *United States v. Antar*, 38 F.3d

1348, 1361 (3d Cir. 1994).

The Supreme Court has long acknowledged the importance of the

requirement that criminal trials be held in public.  "The knowledge that every

criminal trial is subject to contemporaneous review in the forum of public opinion

is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333

U.S. 257, 270 (1948).  Although the powerful considerations weighing in favor of

public trials "may give way in certain cases to other rights or interests, . . . [s]uch

circumstances will be rare, . . . . and the balance of interests must be struck with

special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).  Any closure must be

supported by findings that it "is essential to preserve higher values and is narrowly

tailored to serve that interest." *Id.* (citation omitted).

The public-trial right is not limited to the actual trial itself, but rather has

_____

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" SSA48.

been applied to jury selection and suppression hearings. *See id.* In determining

whether the right extends to a particular context, the Supreme Court has asked

whether the proceeding at issue implicates the interests that the right is intended to

serve, including ensuring "that the public may see [the defendant] is fairly dealt

with and not unjustly condemned" and "that judge and prosecutor carry out their

duties responsibly." *Id.* at 46.

There can be no doubt that the Constitutional right to counsel is fundamental

to the fairness of our criminal justice system. As the Supreme Court has

acknowledged, "[t]he right to be heard would be, in many cases, of little avail if it

did not comprehend the right to be heard by counsel. . . . Left without the aid of

counsel [a defendant] may be put on trial without a proper charge, and convicted

upon incompetent evidence . . . ." *Gideon v. Wainwright*, 372 U.S. 335, 344-45

(1963) (citation omitted). And attorneys are not interchangeable. "Different

attorneys will pursue different strategies with regard to investigation and

discovery, development of the theory of defense, selection of the jury, presentation

of the witnesses, and style of witness examination and jury argument." *United

States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

When an attorney moves to withdraw in a criminal case, the fundamental

interests underpinning the right to counsel are squarely implicated, particularly

23

where (as here) the defendant himself opposes the motion. There are three possible outcomes: (1) the attorney will be compelled to continue the representation; (2) the withdrawal will be granted forcing the defendant to start anew with substitute counsel; or (3) the withdrawal will be granted and the defendant will be forced to represent himself. It is of the utmost importance that the defendant be treated fairly in a proceeding with such stark consequences. Indeed, in one of the hearings at issue, Gottesfeld's attorney was permitted to withdraw and Gottesfeld was ordered, over his objection, to defend himself at sentencing. *See* SSA94-95, 99. In a prior closed hearing, the court gave a stern warning to Gottesfeld regarding his sentencing. *See* SSA83 ("▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒"). In this situation, the checks that the public-trial right is intended to provide were of paramount importance. Gottesfeld was ultimately sentenced to more than ten years in prison.

Although the government is correct that Gottesfeld has not cited any case squarely holding that the public-trial right applies to hearings on counsel's motions to withdraw, *see* Govt. Br. 43, neither has the government proffered any contrary authority. The cases that the government does rely upon are readily

24

distinguishable. *See United States v. Brown*, 669 F.3d 10, 33 (1st Cir. 2012)
(finding no violation of public-trial right in brief in-chambers questioning of jurors
regarding "the potential treatment of a contemptuous witness"); *United States v.
Vazquez-Botet*, 532 F.3d 37, 51-52 (1st Cir. 2008) (declining to extend right to
"question-and-answer offer of proof" regarding evidence that "had already . . .
been ruled irrelevant"); *United States v. Bucci*, 525 F.3d 116, 130 (1st Cir. 2008)
(finding no plain error in closing courtroom during civil contempt proceedings
against witness).  In short, this is an open question, which this Court should resolve
in Gottesfeld's favor.

The government's other arguments on this issue are unconvincing.
Concerns about pretrial publicity are "largely absent when a defendant makes an
informed decision to object to the closing of the proceeding." *Waller*, 467 U.S. at
47 n.6.  If, for some reason, the danger posed by publicity is so extreme that the
court believes closure is necessary notwithstanding the defendant's desire for
openness, it can order such closure so long as it provides "findings specific enough
that a reviewing court can determine whether the closure order was properly
entered." *Id.* at 45 (citation omitted).  The record in this case reflects no such
specific findings.  The cited concern regarding attorney-client privilege is a red
herring in light of the fact that the privilege belonged to Gottesfeld and was, of

25

course, his to waive. *See, e.g., Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) ("The attorney-client privilege belongs solely to the client, who may waive it either expressly or by implication." (citation omitted)). The availability of transcripts as a potential alternative check to ensure fairness is "insufficient" and "of small account" absent public proceedings. *Oliver*, 333 U.S. at 271 (quoting 1 Bentham, Rationale of Judicial Evidence 524 (1827)). Witness testimony is not a prerequisite to triggering the public-trial right, as evidenced by the Supreme Court's holding that the right applies in the context of jury selection. *See Waller*, 467 U.S. at 45 (citation omitted). Much like prospective jurors, attorneys in withdrawal hearings may be more truthful and forthcoming if required to face the public. Lastly, there was nothing "limited" or "brief" about the hearings on counsel's motions to withdraw in this case. Govt. Br. 45. The courtroom was closed for five such hearings, which involved extended colloquies.

## IV.  Gottesfeld's Recusal Arguments Were Properly Raised and Preserved

Gottesfeld filed a pretrial motion to suppress evidence collected pursuant to a warrant issued by Magistrate Judge Bowler based on her husband's affiliation with Harvard Medical School and Brigham and Women's Hospital. *See* Govt. Br. 24. After that motion was denied, when the government introduced the subject evidence at trial, Gottesfeld objected. *See id.* at 25. Nothing more was required to

26

preserve the issue. Moreover, Gottesfeld has preserved his argument under 28

U.S.C. § 455(b). His opening brief disputed the reasoning of the district court's

order, which addressed both subsections of the statute simultaneously. *See* Add.

37-40. Gottesfeld's brief demonstrated that the relevant entities and BCH were

closely connected, not "loosely affiliated," Govt. Br. 6. *See* Def. Br. 8, 43-48; *see*

*also* Dkt. 327 at 52 (testimony of BCH's Chief Information Officer that "all of our

faculty are faculty at Harvard Medical School").[10]

Gottesfeld's claim regarding recusal of the district court judge is similarly

preserved. Although Gottesfeld filed *pro se* recusal motions after trial, he had

previously moved for the district court judge to recuse himself during

deliberations. *See* Dkt. 331 at 19. Later, when Gottesfeld stated his intent to file

written recusal motions, Judge Gorton preemptively said, "~~░░░░░░░░░░░░░░░░░~~

~~░░░░░░~~." SSA98; *see also* SSA95-96. Recusal motions may properly arise

from "an accumulation of events." *In re United States*, 441 F.3d 44, 65 (1st Cir.

2006). Indeed, a "motion to recuse is a very serious matter and must have a factual

foundation; it may take some time to build the foundation." *Id.* Gottesfeld,

---

[10] If the Court agrees that the evidence should have been suppressed, remand would be required to address the attenuation issue, not previously considered in district court, implicated by the government's harmless error claim. *See, e.g.*, *United States v. Harris*, 642 F. App'x 713, 717 (9th Cir. 2016) (unpublished).

therefore, should not be faulted for moving for recusal based on circumstances that developed over time in the district court.

## V.    Conclusion

For the foregoing reasons, and for all the reasons set forth in his opening brief, Gottesfeld's convictions should be reversed or vacated.

Respectfully submitted,
Martin Gottesfeld
By his Attorney,

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
pabianlaw38@gmail.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.     This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 6,496 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

<u>**/s/ Michael Pabian**</u>
Michael Pabian

Dated:  February 26, 2021

## CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this 26th day of February 2021, this Reply Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

<u>**/s/ Michael Pabian**</u>
Michael Pabian

Dated:  February 26, 2021

Exhibit 6

## Declaration of Martin S. Gottesfeld

I declare as follows pursuant to 28 U.S.C. § 1746(1):

1.  I am Martin Stephen Gottesfeld, Defendant, *pro se*, in *United States v. Gottesfeld*, 16-cr-10305-NMG (D. Mass.) (hereinafter the "case").

2.  The government allows the vast majority of defendants at my custody level contact visits with their families, but not me; my wife and I were last allowed a contact visit in January 2017.

3.  For more than two years—since April 1, 2019—the government has held me in the Federal Correctional Institution (FCI) Terre Haute, Indiana *communications-management unit* (CMU) aka *Little Guantanamo* despite knowing 1) I am a minimum-security prisoner, i.e. a "camper"; 2) I and my wife are Jews and natural-born U.S. citizens and this unit is houses life-sentenced administrative-maximum-security anti-Israeli Jihadi terrorists who killed a non-Muslim non-violent prisoner in this unit in November 2018, i.e. less than six months before I arrived here; and 3) This Court ruled I am no terrorist.

4.  In this unit I am denied the phone calls and electronic messaging allowed to other prisoners of my custody level elsewhere. *Contrast*, e.g., 1) Bureau of Prisons Program Statement 5264.08 Inmate Telephone Regulations at ch. 8 (prisoners allowed 300 minutes monthly) *to* 28 C.F.R. § 540.204(a) (CMU prisoners guaranteed only three monthly calls no longer than 15 minutes each) and 2) Bureau of Prisons Program Statement 4500.12 Trust Fund/Deposit Fund Manual at ch. 14.10 TRULINCS SERVICES, Email Controls (prisoners allowed 60-minute sessions with 15-minute enforced breaks intervening, with no published limit on total sessions) *to* 28 C.F.R. § 540.203(d) (CMU prisoners' electronic messaging "may be limited to two messages, per calendar week, to and from a single recipient").

5.  I am simultaneously located more than 500 driving miles away from my family. C*f.* 18 U.S.C. § 3621(b) (prisoners to be housed "as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence").

6.  Despite The U.S. Court of Appeals ruling in *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016) (CMU "designation meets *Sandin's* requirements" for pre-deprivation hearing), I was provided no such hearing.

7.  The government here denies me legal calls with my attorneys, and my wife has evidence of these denials.

8.  The BOP regularly opens my incoming legal mail outside my presence and delays delivery of my inbound and outbound legal mail for weeks.

9.  BOP "Sr. Attorney" Katherine Siereveld violates the rules of The Kentucky Bar Association, of which she is a member, by interrogating me re the contents of my legal mail when she knows I am represented by counsel who have not consented to her discussing said matters with their client outside their presence.

10.  BOP Sr. Attorney Katherine Siereveld analyzes the contents of my outbound legal mail and restricts its contents illegitimately to cover waste, fraud, abuse, and criminality here.

11.  The BOP threatens me over the amount of time I spend on the typewriters here litigating this and other cases; the BOP has nearly never had the proper number (3) of working typewriters in this CMU while I've been here and this is by the BOP's design.

12.  My unit manager here, Mr. Todd Royer, is a voyeur who watches me and other CMU prisoners defecate. I have reported Mr. Royer but the BOP and DOJ Office of the Inspector General (OIG) never took any of the steps required under The Prison Rape Elimination Act (PREA). C*f.* 34 U.S.C. § 30307(b) (PREA standards "shall apply to the Federal Bureau of Prisons"), 28 C.F.R. §§ 115.64(a)(1) (BOP was required to separate Mr. Royer and me, but instead made Mr. Royer my new unit manager), 115.67(c) (BOP was required to monitor for retaliation against me for 90 days after my report, but instead through me in the SHU the next business day), and 115.73(a) (BOP was

required to inform me of the status of any investigation into my complaint but never did so).

13. This FCI's staffers destroyed PREA reports about this CMU's prior case manager, Mr. Clint Swift, and when word reached the OIG anyway through an attorney, the BOP moved Mr. Swift to the nearby federal prison camp (FPC). *Contrast* 28 C.F.R. § 115.76(b) ("Termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse").

14. I have endured extreme retaliation here from Mr. Royer for over a year—and from other staff starting even earlier—because I reported Mr. Royer.

15. S.I.S. Lieutenant J. Sherman here claims he lost my report against Mr. Royer, but this is specious. I mailed a copy to federal court, where it appears on the docket of *Gottesfeld v. Hurwitz, et al.*, 18-cv-10836-PGG-GWG (S.D.N.Y.). *See also* 28 C.F.R. § 540.203(a), (b), (c)(1), (c)(2) (collectively, the CMU reads outgoing court mail for contents).

16. The above, and more, are relevant to the 4th prong of analysis under *Barker v. Wingo*, 407 U.S. 514 (1972).

I declare that the foregoing is true and correct under the penalty of perjury under the laws of The United States of America. Executed Thursday, August 5, 2021.

by:
Martin S. Gottesfeld