that framework.  The government's motions made clear on their face that they

were necessitated by the magistrate judge's delay in deciding the detention motion.

The court's orders provided no additional explanation and failed to reflect any

consideration of the § 3161(h)(7)(B) factors.  In these circumstances, there are no

record findings sufficient to support the delay, *see* § 3161(h)(7)(A), which appears

to have resulted from the impermissible factor of court congestion, *see*

§ 3161(h)(7)(C).  The district court, accordingly, abused its discretion by granting

the exclusions.

The district court also erred in ruling that Gottesfeld was estopped from

challenging the ends of justice exclusions.  Estoppel may be appropriate where a

party takes a litigation position "clearly inconsistent with its earlier position."

*Zedner*, 547 U.S. at 504 (citation omitted).  Courts should also consider "whether

the party has succeeded in persuading a court to accept" its prior position and

whether the party "would derive an unfair advantage or impose an unfair detriment

on the opposing party if not estopped."  *Id.* (citation omitted).  Estoppel should be

narrowly construed in the Speedy Trial Act context given the public interest at

stake.  *See id.* at 499; *cf. United States v. Scott*, 180 F. Supp. 3d 88, 93 (D. Mass.

2015) (Gorton, J.) ("Judicial estoppel cannot . . . override a statutory

requirement.").

As an initial matter, though the motions to exclude were styled as "assented-to," they were all filed by the government, not Gottesfeld.  In fact, Gottesfeld was not even represented by counsel in the MBD proceedings, *see* JA174-75, (belying the government's suggestion that the "same . . . attorneys" were involved in both cases, Govt. Br. 21), and his *pro se* filing cited by the government did not occur until 2018, well over a year after the last exclusion order.  *See* Govt. Br. 16.[5]  The government cites no support for a finding of judicial estoppel against a party that did not even make a filing or appear before the court regarding the issue at hand.  *See, e.g., AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282, 291 n.8 (1st Cir. 2019).

Moreover, as in *Zedner*, it was the court rather than the defendant that was the driver of the delay.  *See Zedner*, 547 U.S. at 505 (noting that the court "requested the waiver and produced the form for petitioner to sign").  The motions to exclude did not reflect consent to indefinite delay or an expectation that the magistrate judge would hold the detention issue under advisement for 92 days.  To the contrary, the parties expected a prompt ruling.  *See* 18 U.S.C. §§ 3142(f),

---

[5] The *pro se* motion was denied as moot for that reason.  *See United States v. Gottesfeld*, No. 16-MC-91064, Dkt. 20.

12

3145(b).[6] The magistrate judge's failure to act on the detention motion left Gottesfeld in the unenviable position of having to forge ahead in plea negotiations without knowing whether he would remain detained (a "highly relevant" consideration, *see* Govt. Br. 19), or instead endure illegal delay. Gottesfeld did not "succeed in persuading" the court of anything by reluctantly electing the latter. In these circumstances, any "unfair advantage" to the defendant that would result from dismissal does "not predominate." *Zedner*, 547 U.S. at 505.

There is no inconsistency, much less a clear one, between the representation that plea negotiations had stalled during the pendency of the detention motion and Gottesfeld's subsequent assertion of his Speedy Trial Act rights with respect to that period of delay. *See id.* at 505 (holding prior position "that granting the requested continuance would represent a sound exercise of the trial judge's discretion in managing its calendar" not to be clearly inconsistent with "later position that the continuance was not permissible under the terms of the Act").[7] In the sole case

---

[6] The government's estoppel argument is limited to the substantive merits of the ends of justice exclusions and inapplicable to Gottesfeld's claim regarding the lack of required findings in the record of the case. Indeed, the District Plan that called for the motions to be dealt with on the MBD is, much like the waiver form at issue in *Zedner*, a product of the court. Gottesfeld did not "succeed in persuading" the court to follow its own plan.

[7] Contrary to the government's suggestion, the motions to exclude did not

13

where this Court has found estoppel under *Zedner*, the defense moved for ends of justice continuances for its own reasons. *See United States v. Pakala*, 568 F.3d 47, 60 (1st Cir. 2009) (one motion filed due to defense counsel's "scheduling conflict" and a second to allow the defense to obtain a transcript). The defendant in *Pakala*, therefore, could be fairly said to have persuaded the court that the proffered bases supported continuances under the ends of justice provision. *Pakala* should not be extended to estop Gottesfeld based on motions filed by the government, in a proceeding in which no appearance was even made on his behalf, and necessitated by delay outside of Gottesfeld's control.

C. The Supreme Court's Decision in *Bloate* Forecloses the Government's Argument that the Motions to Exclude Tolled the Speedy Trial Clock under the Act's General Prefatory Language

The government's contention that the motions to exclude filed in the MBD, even if they are not "pretrial motion[s]" within the meaning of § 3161(h)(1)(D), should nonetheless trigger an exclusion for "other proceedings concerning the defendant" is contrary to Supreme Court precedent. In *Bloate*, the Court made

"specifically state[] that the pending detention decision was a suitable ground for an ends-of-justice continuance." Govt. Br. 20. Rather, they merely noted the pendency of the motion and the corresponding stall in plea negotiations. The only reference to the ends of justice was the following formulaic recitation in the concluding paragraph: "[t]he ends of justice served by granting the requested exclusion outweigh the interest of the public and the defendant in a speedy trial,

clear that "the general language in subsection (h)(1)" regarding other proceedings should "not be held to apply to a matter specifically dealt with in another part" of the statute, namely the exclusions set forth in subsections (h)(1)(A)-(H). 559 U.S. at 207 (citations omitted). The cases cited by the government on this issue were all decided more than a decade before *Bloate*. *See* Govt. Br. 15. Congress considered the appropriateness of delay due to motion practice in enacting § 3161(h)(1)(D). If the Court finds that the motions at issue here fall outside the scope of that provision, it should not construe the statute's general prefatory language to render the limits of the specific subsection superfluous.

Accordingly, the dispositive question for this exclusion is whether the motions filed in the MBD were "pretrial motions." § 3161(h)(1)(D). As the government notes, this Court has defined that statutory phrase to require that the relevant filing concern "matters affecting the course of trial." Govt. Br. 15 (citation omitted). The motions at issue here do not meet that standard because they were filed before Gottesfeld was indicted and in an entirely separate docket from his criminal case. *United States v. Richardson* is distinguishable on this basis. *See* 421 F.3d 17, 27 (1st Cir. 2005) (involving motion filed in criminal case the day after a "second pre-trial status conference"). The government is wrong

under § 3161(h)(7)(A)." JA186

that, prior to indictment, "there was no criminal docket" in which to file the motions. Govt. Br. 22 n.4. The motions could and should have been filed in case no. 16-MJ-04117, the magistrate case with a criminal complaint pending that was subsequently merged into the proceedings before Judge Gorton.

## II. The District Court Wrongly Precluded Gottesfeld from Introducing Evidence that He Reasonably Believed His Actions Were Taken in Defense of Justina Pelletier

The law is clear that "a criminal defendant has a wide-ranging right to present a defense." *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001). While the defendant bears an "entry-level burden" to proffer evidence from which a reasonable juror could find an affirmative defense supported, this "burden of production does not shift the historic burden of proof." *United States v. Amparo*, 961 F.2d 288, 291 (1st Cir. 1992) (citation omitted); *see also United States v. Rodriguez*, 858 F.2d 809, 814 (1st Cir. 1988) ("[T]he accused's burden of production is measured by the time-honored sufficiency-of-the-evidence yardstick—no more, no less . . . .").

Gottesfeld sought to present an affirmative defense that he "reasonably believe[d]" his alleged actions were "necessary for the defense" of Justina Pelletier "against the immediate use of unlawful force." *United States v. Bello*, 194 F.3d 18, 26 (1st Cir. 1999) (quoting First Circuit Pattern Crim. Jury Instr. § 5.04)). As an

16

initial matter, the sole authority cited by the government for the purported

requirement that Gottesfeld be physically present in the same location as Pelletier

is a 30-year-old, pre-Internet, district court decision involving a different

affirmative defense. *See United States v. Brodhead*, 714 F. Supp. 593, 598 (D.

Mass. 1989) ("A person who reasonably believes that a felony, or a misdemeanor

amounting to a breach of the peace, is being committed, or is about to be

committed, in her presence, may use reasonable force to prevent it."). The

government provides no rationale for transposing this requirement into the context

of defense of another, where, as noted in Gottesfeld's opening brief, it would serve

only as an antiquated and unprincipled limitation on the scope of the defense. *See*

Def. Br. 58. At the time *Brodhead* was decided, these concerns were much less

significant.

The district court erred in giving preclusive effect to a Massachusetts

Juvenile Court Order, in the face of substantial proffered evidence supporting

Gottesfeld's reasonable belief that the ongoing mistreatment of Pelletier was

unlawful. *See* Add. 19-20. At the outset, the government incorrectly frames the

issue as whether the force exerted against Pelletier was, in fact, unlawful. *See*

Govt. Br. 49. The proper inquiry focuses instead on Gottesfeld's reasonable belief.

*See, e.g., Beltowski v. Brewer*, 766 F. App'x 218, 221 (6th Cir. 2019)

17

(unpublished) ("[B]oth the statute and the instruction required the jury to assess the reasonableness of [the defendant's] belief, not the lawfulness of [victim's] actions."); *United States v. Tunley*, 664 F.3d 1260, 1262 n.3 (8th Cir. 2012) ("If a person reasonably believes that force is necessary to protect . . . another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in . . . defense of another person." (citation omitted)).

Shortly before Gottesfeld's alleged actions giving rise to the charges in this case, Pelletier's father appeared on Fox News saying that his daughter had been "tortured physically and mentally" and that her very "life [wa]s now at stake." Dkt. 198 at 22-23. The family was reported to have subsequently filed a petition for writ of habeas corpus alleging wrongful imprisonment. *See id.* at 27. A former nurse at Boston Children's Hospital ("BCH") agreed with the family's characterization, filing a public complaint referring to "abuse" and "torture" suffered by Pelletier. *See* Dkt. 190-1 at 14-16. Several local elected officials similarly questioned the lawfulness of Pelletier's treatment. *See* Dkt. 198 at 28-29. Then-Presidential candidate and former Arkansas Governor Mike Huckabee went so far as to publicly refer to the situation as a "kidnap[ping]." *Id.* at 5. Additional media reports reflected similar characterizations. *See id.* at 5-7. Some reports

18

specifically questioned the fairness of the Juvenile Court process. *See id.* at 28.  In

short, the record makes clear that Gottesfeld was far from alone in his serious

concern for Pelletier's safety and thoroughly supported a jury finding that he

reasonably believed her treatment was unlawful. *See also generally* Dkt. 190-1 at

3-10 (citing several contemporaneous media reports).

With regard to the anticipated effect of Gottesfeld's alleged actions, the

government cites Gottesfeld's own trial testimony that he knew at the time of the

events in question that Pelletier was no longer physically located at BCH. *See*

Govt. Br. 49.  The government, however, omits Gottesfeld's expressly articulated

"caveat" that the hospital's doctors "were still very much in control of her

situation." JA1414-15.

In a pretrial statement relied on by the government at trial, Gottesfeld

explicitly relayed his belief that his actions could indeed prevent further harm to

Pelletier:

> I knew that BCH's big donation day was coming up and
> that most donors gave online.  I felt that, to have
> sufficient influence to save Justina from grievous bodily
> harm and possible death . . . , I'd have to hit BCH where
> they appear to care the most, the pocketbook and the
> reputation.  All the efforts to save Justina weren't
> succeeding, and time was of the essence.

JA680.[8]  Indeed, Gottesfeld's alleged actions did make news, and Pelletier was subsequently returned to her family.  *See* Dkt. 198 at 31-33.  Pelletier herself has expressed gratitude towards Gottesfeld.  *See id.* at 32.

Although the jury could disagree that Gottesfeld reasonably believed his actions were necessary to prevent harm to Pelletier, he had the Constitutional right to present evidence in support of that defense and to a corresponding jury instruction on the subject.  *Cf. United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014) ("[T]hough a defendant's testimony may be contradicted to some degree by other evidence or even by his prior statements, a defendant is entitled to an instruction if the evidence viewed in his favor could support the defense.").  In short, while Gottesfeld's account "need not have been believed," "its creditworthiness was not for the district court to assess." *Rodriguez*, 858 F.2d at 815.  Instead, jurors "should have been given the opportunity to pass upon" the affirmative defense.  *Id.* at 816.

---

[8] The government's claim that Gottesfeld "acknowledge[d] that he did not expect the attack would *cause* the desired effect," Govt. Br. 49, is a quotation from the district court's opinion with no cited support, *see* Add. 21.  It is also contrary to Gottesfeld's pretrial statement.

III.   **The Preserved Violations of Gottesfeld's Public-Trial Right Require Reversal**

The Supreme Court has held that, in the case of a "structural error," such as violation of a defendant's right to a public trial, "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (citation omitted); *see also United States v. Candelario-Santana*, 834 F.3d 8, 22 (1st Cir. 2016) ("Denial of a public trial constitutes structural error, rendering the entire trial process fundamentally unfair" (citations omitted)).  In the present case, Gottesfeld objected to each of the five courtroom closures, including one instance in which a journalist was specifically expelled from the courtroom. *See* SSA9, 37, 66, 90; Add. 57.[9] Accordingly, if this Court agrees that the hearings on the withdrawal motions filed by Gottesfeld's counsel fall within the scope of the public-trial right, the appropriate remedy is reversal.  Despite the foregoing, and Gottesfeld's citation to *Weaver* in his opening brief, the government faults Gottesfeld for purportedly

---

[9] While the government questions whether Gottesfeld preserved his challenge for two of these hearings, Govt. Br. 43, this Court need not decide the issue because, assuming the public-trial right applies, Gottesfeld's preserved objection to three closures requires reversal.  Moreover, in one of the closures for which the government questions preservation, ███████████████████████

21

failing to "identify the appropriate remedy" for a public-trial violation.  Govt. Br. 46.  The government's citations on this issue all predate *Weaver* by more than a decade.  The defense respectfully submits that *Weaver* is the controlling precedent. The government's suggestion that remand could be limited to the provision of "supplemental findings" supporting closure, Govt. Br. 46, also contravenes the rule that "closure may not be retroactively validated," *United States v. Antar*, 38 F.3d 1348, 1361 (3d Cir. 1994).

The Supreme Court has long acknowledged the importance of the requirement that criminal trials be held in public.  "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270 (1948).  Although the powerful considerations weighing in favor of public trials "may give way in certain cases to other rights or interests, . . . [s]uch circumstances will be rare, . . . . and the balance of interests must be struck with special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).  Any closure must be supported by findings that it "is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (citation omitted).

The public-trial right is not limited to the actual trial itself, but rather has

SSA48.

22

been applied to jury selection and suppression hearings. *See id.* In determining whether the right extends to a particular context, the Supreme Court has asked whether the proceeding at issue implicates the interests that the right is intended to serve, including ensuring "that the public may see [the defendant] is fairly dealt with and not unjustly condemned" and "that judge and prosecutor carry out their duties responsibly." *Id.* at 46.

There can be no doubt that the Constitutional right to counsel is fundamental to the fairness of our criminal justice system. As the Supreme Court has acknowledged, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. . . . Left without the aid of counsel [a defendant] may be put on trial without a proper charge, and convicted upon incompetent evidence . . . ." *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (citation omitted). And attorneys are not interchangeable. "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

When an attorney moves to withdraw in a criminal case, the fundamental interests underpinning the right to counsel are squarely implicated, particularly

23

where (as here) the defendant himself opposes the motion.  There are three

possible outcomes: (1) the attorney will be compelled to continue the

representation; (2) the withdrawal will be granted forcing the defendant to start

anew with substitute counsel; or (3) the withdrawal will be granted and the

defendant will be forced to represent himself.  It is of the utmost importance that

the defendant be treated fairly in a proceeding with such stark consequences.

Indeed, in one of the hearings at issue, Gottesfeld's attorney was permitted to

withdraw and Gottesfeld was ordered, over his objection, to defend himself at

sentencing.  *See* SSA94-95, 99.  In a prior closed hearing, ███████████████

████████████████████████████████████████  *See* SSA83 ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  In this situation, the checks that the

public-trial right is intended to provide were of paramount importance.  Gottesfeld

was ultimately sentenced to more than ten years in prison.

Although the government is correct that Gottesfeld has not cited any case

squarely holding that the public-trial right applies to hearings on counsel's motions

to withdraw, *see* Govt. Br. 43, neither has the government proffered any contrary

authority.  The cases that the government does rely upon are readily

24

distinguishable. *See United States v. Brown*, 669 F.3d 10, 33 (1st Cir. 2012)

(finding no violation of public-trial right in brief in-chambers questioning of jurors

regarding "the potential treatment of a contemptuous witness"); *United States v.*

*Vazquez-Botet*, 532 F.3d 37, 51-52 (1st Cir. 2008) (declining to extend right to

"question-and-answer offer of proof" regarding evidence that "had already . . .

been ruled irrelevant"); *United States v. Bucci*, 525 F.3d 116, 130 (1st Cir. 2008)

(finding no plain error in closing courtroom during civil contempt proceedings

against witness).  In short, this is an open question, which this Court should resolve

in Gottesfeld's favor.

The government's other arguments on this issue are unconvincing.

Concerns about pretrial publicity are "largely absent when a defendant makes an

informed decision to object to the closing of the proceeding." *Waller*, 467 U.S. at

47 n.6.  If, for some reason, the danger posed by publicity is so extreme that the

court believes closure is necessary notwithstanding the defendant's desire for

openness, it can order such closure so long as it provides "findings specific enough

that a reviewing court can determine whether the closure order was properly

entered." *Id.* at 45 (citation omitted).  The record in this case reflects no such

specific findings.  The cited concern regarding attorney-client privilege is a red

herring in light of the fact that the privilege belonged to Gottesfeld and was, of

25

course, his to waive. *See, e.g., Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) ("The attorney-client privilege belongs solely to the client, who may waive it either expressly or by implication." (citation omitted)). The availability of transcripts as a potential alternative check to ensure fairness is "insufficient" and "of small account" absent public proceedings. *Oliver*, 333 U.S. at 271 (quoting 1 Bentham, Rationale of Judicial Evidence 524 (1827)). Witness testimony is not a prerequisite to triggering the public-trial right, as evidenced by the Supreme Court's holding that the right applies in the context of jury selection. *See Waller*, 467 U.S. at 45 (citation omitted). Much like prospective jurors, attorneys in withdrawal hearings may be more truthful and forthcoming if required to face the public. Lastly, there was nothing "limited" or "brief" about the hearings on counsel's motions to withdraw in this case. Govt. Br. 45. The courtroom was closed for five such hearings, which involved extended colloquies.

## IV.    Gottesfeld's Recusal Arguments Were Properly Raised and Preserved

Gottesfeld filed a pretrial motion to suppress evidence collected pursuant to a warrant issued by Magistrate Judge Bowler based on her husband's affiliation with Harvard Medical School and Brigham and Women's Hospital. *See* Govt. Br. 24. After that motion was denied, when the government introduced the subject evidence at trial, Gottesfeld objected. *See id.* at 25. Nothing more was required to

26

preserve the issue. Moreover, Gottesfeld has preserved his argument under 28

U.S.C. § 455(b). His opening brief disputed the reasoning of the district court's

order, which addressed both subsections of the statute simultaneously. *See* Add.

37-40. Gottesfeld's brief demonstrated that the relevant entities and BCH were

closely connected, not "loosely affiliated," Govt. Br. 6. *See* Def. Br. 8, 43-48; *see*

*also* Dkt. 327 at 52 (testimony of BCH's Chief Information Officer that "all of our

faculty are faculty at Harvard Medical School").[10]

Gottesfeld's claim regarding recusal of the district court judge is similarly

preserved. Although Gottesfeld filed *pro se* recusal motions after trial, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮. *See* Dkt. 331 at 19. Later, when Gottesfeld stated his intent to file

written recusal motions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ SSA98; *see also* SSA95-96. Recusal motions may properly arise

from "an accumulation of events." *In re United States*, 441 F.3d 44, 65 (1st Cir.

2006). Indeed, a "motion to recuse is a very serious matter and must have a factual

foundation; it may take some time to build the foundation." *Id.* Gottesfeld,

---

[10] If the Court agrees that the evidence should have been suppressed, remand
would be required to address the attenuation issue, not previously considered in
district court, implicated by the government's harmless error claim. *See, e.g.*,
*United States v. Harris*, 642 F. App'x 713, 717 (9th Cir. 2016) (unpublished).

therefore, should not be faulted for moving for recusal based on circumstances that developed over time in the district court.

## V.   Conclusion

For the foregoing reasons, and for all the reasons set forth in his opening brief, Gottesfeld's convictions should be reversed or vacated.

Respectfully submitted,
Martin Gottesfeld
By his Attorney,

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
pabianlaw38@gmail.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.     This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 6,496 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

/s/ Michael Pabian
Michael Pabian

Dated:  February 26, 2021

**CERTIFICATE OF SERVICE**

I, Michael Pabian, hereby certify that on this 26th day of February 2021, this

Reply Brief was filed with the Court through its CM/ECF system, thus effectuating

service on all parties to this appeal.

<u>**/s/ Michael Pabian**</u>
Michael Pabian

Dated:  February 26, 2021

Exhibit C

# Declaration of Martin S. Gottesfeld

I declare as follows pursuant to 28 U.S.C. § 1746(1):

1. I am Martin Stephen Gottesfeld, Defendant, *pro se*, in *United States v. Gottesfeld*, 16-cr-10305-NMG (D. Mass.) (hereinafter the "case").

2. The government allows the vast majority of defendants at my custody level contact visits with their families, but not me; my wife and I were last allowed a contact visit in January 2017.

3. For more than two years—since April 1, 2019—the government has held me in the Federal Correctional Institution (FCI) Terre Haute, Indiana *communications-management unit* (CMU) aka *Little Guantanamo* despite knowing 1) I am a minimum-security prisoner, i.e. a "camper"; 2) I and my wife are Jews and natural-born U.S. citizens and this unit is houses life-sentenced administrative-maximum-security anti-Israeli Jihadi terrorists who killed a non-Muslim non-violent prisoner in this unit in November 2018, i.e. less than six months before I arrived here; and 3) This Court ruled I am no terrorist.

4. In this unit I am denied the phone calls and electronic messaging allowed to other prisoners of my custody level elsewhere. *Contrast, e.g.,* 1) Bureau of Prisons Program Statement 5264.08 Inmate Telephone Regulations at ch. 8 (prisoners allowed 300 minutes monthly) *to* 28 C.F.R. § 540.204(a) (CMU prisoners guaranteed only three monthly calls no longer than 15 minutes each) and 2) Bureau of Prisons Program Statement 4500.12 Trust Fund/Deposit Fund Manual at ch. 14.10 TRULINCS SERVICES, Email Controls (prisoners allowed 60-minute sessions with 15-minute enforced breaks intervening, with no published limit on total sessions) *to* 28 C.F.R. § 540.203(d) (CMU prisoners' electronic messaging "may be limited to two messages, per calendar week, to and from a single recipient").

5. I am simultaneously located more than 500 driving miles away from my family. *Cf.* 18 U.S.C. § 3621(b) (prisoners to be housed "as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence").

6. Despite The U.S. Court of Appeals ruling in *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016) (CMU "designation meets *Sandin*'s requirements" for pre-deprivation hearing), I was provided no such hearing.

7. The government here denies me legal calls with my attorneys, and my wife has evidence of these denials.

8. The BOP regularly opens my incoming legal mail outside my presence and delays delivery of my inbound and outbound legal mail for weeks.

9. BOP "Sr. Attorney" Katherine Siereveld violates the rules of The Kentucky Bar Association, of which she is a member, by interrogating me re the contents of my legal mail when she knows I am represented by counsel who have not consented to her discussing said matters with their client outside their presence.

10. BOP Sr. Attorney Katherine Siereveld analyzes the contents of my outbound legal mail and restricts its contents illegitimately to cover waste, fraud, abuse, and criminality here.

11. The BOP threatens me over the amount of time I spend on the typewriters here litigating this and other cases; the BOP has nearly never had the proper number (3) of working typewriters in this CMU while I've been here and this is by the BOP's design.

12. My unit manager here, Mr. Todd Royer, is a voyeur who watches me and other CMU prisoners defecate. I have reported Mr. Royer but the BOP and DOJ Office of the Inspector General (OIG) never took any of the steps required under The Prison Rape Elimination Act (PREA). *Cf.* 34 U.S.C. § 30307(b) (PREA standards "shall apply to the Federal Bureau of Prisons"), 28 C.F.R. §§ 115.64(a)(1) (BOP was required to separate Mr. Royer and me, but instead made Mr. Royer my new unit manager), 115.67(c) (BOP was required to monitor for retaliation against me for 90 days after my report, but instead through me in the SHU the next business day), and 115.73(a) (BOP was

- PAGE 1 OF 2 -

required to inform me of the status of any investigation into my complaint but never did so).

13.   This ECI's staffers destroyed PREA reports about this CMU's prior case manager, Mr. Clint Swift, and when word reached the OIG anyway through an attorney, the BOP moved Mr. Swift to the nearby federal prison camp (FPC). *Contrast* 28 C.F.R. § 115.76(b) ("Termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse").

14.   I have endured extreme retaliation here from Mr. Royer for over a year—and from other staff starting even earlier—because I reported Mr. Royer.

15.   S.I.S. Lieutenant J. Sherman here claims he lost my report against Mr. Royer, but this is specious.  I mailed a copy to federal court, where it appears on the docket of *Gottesfeld v. Hurwitz, et al.*, 18-cv-10836-PGG-GWG (S.D.N.Y.).  *See also* 28 C.F.R. § 540.203(a), (b), (c)(1), (c)(2) (collectively, the CMU reads outgoing court mail for contents).

16.   The above, and more, are relevant to the 4th prong of analysis under *Barker v. Wingo*, 407 U.S. 514 (1972).

I declare that the foregoing is true and correct under the penalty of perjury under the laws of The United States of America.  Executed Thursday, August 5, 2021.


by:

Martin S. Gottesfeld