UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Nos. 16-cr-10305-NMG |
| | ) | 23-cv-12267-NMG |
| MARTIN GOTTESFELD, | ) | |
| Defendant. | ) | |

**REDACTED AMENDED MOTION TO VACATE AND SET ASIDE SENTENCE (§ 2255)**

MARTIN GOTTESFELD, Defendant, *pro se*, moves under 28 U.S.C. § 2255 to vacate and set aside the sentence in the above-captioned case.

## I.   INTRODUCTION

Defendant acted to save a 15-year-old girl named Justina Pelletier from the state child-welfare system, Harvard's Boston Children's Hospital and the Wayside Youth and Family Support Network amid a controversial and partisanly charged human- and parents'-rights matter.  In the process, Defendant allegedly caused existential damage to all the Harvard hospitals and Wayside.  Thereafter a Harvard alumnus still affiliated with his Harvard Law School class[1] sought a search warrant for Defendant's home from a federal magistrate[2] who—

1)   had worked for years as a Harvard Medical School research assistant;[3]

_____

[1] *See, infra,* p. 80, ¶¶ 62–64 (Former chief federal cybercrimes prosecutor Mr. Adam J. Bookbinder graduated from Harvard Law School, sought the warrant in this case, appeared in this case and spoke on cybercrime at Harvard Law School three months before this case went to trial.) (citations omitted).

[2] *See, infra,* p. 79, ¶ 53 (The search warrant for Defendant's home was issued by U.S. Magistrate Judge Marianne B. Bowler.) (citations omitted).

[3] *See, infra,* p. 83, ¶ 73 (Magistrate Bowler was, from 1967–69, a Harvard Medical School research assistant.) (citations omitted).

2)    sat on a committee at the "largest" of the allegedly affected Harvard hospitals;[4]

3)    is chairwoman emerita of another hospital that runs teaching programs with Harvard;[5]

4)    is director emerita of a foundation that raised and raises millions for the Harvard hospitals and Wayside;[6]

5)    effectively declared Defendant guilty before trial;[7]

6)    used, *sua sponte*, Boston Children's Hospital's preferred marketing lingo in this Court's orders;[8] and

7)    was and is married to a tenured Harvard Medical School professor and senior cardiologist at one of the aggrieved Harvard hospitals,[9] where his department advertises its close operational ties

---

[4] *See, infra,* p. 85, ¶¶ 79–80 (From 1999 onward Magistrate Bowler sat on the Visiting Committee on Neuroscience at Massachusetts General Hospital.) (Massachusetts General Hospital advertises itself as both "the original" and "largest" of Harvard's teaching hospitals.) (citations omitted).

[5] *See, infra,* p. 86, ¶¶ 81–82 (From 1983 onward Magistrate Bowler has been a "Member of the Corporation" of New England Baptist Hospital and from 1990–96 Her Honor chaired its board of trustees.) (New England Baptist Hospital advertises that it conducts teaching programs "in collaboration with Harvard Medical School.") (citations omitted).

[6] *See, infra,* p. 83, ¶¶ 74–78 (Magistrate Bowler is director emerita of The Boston Foundation 1995–2005.) (The Boston Foundation raised money for Wayside and gave $182,950 to Boston Children's Hospital during the Justina Pelletier case and, from 2001–05, had given Boston Children's Hospital $297,501.) (citations omitted).

[7] *See, infra*, p. 87, ¶¶ 89–91 (Before trial, Magistrate Bowler unequivocally declared Defendant would need a U.S. probation officer "soon enough.") (Defendant would need a U.S. probation officer only upon conviction or release on bail.) (Magistrate Bowler never released Defendant on bail.) (citations omitted).

[8] *See, infra*, p. 88, ¶¶ 92–93 (though the parties had always said and written "Boston Children's Hospital" or "BCH," Magistrate Bowler adopted, *sua sponte*, the label "Children's.") ("One reporter" at boston.com "remembers when the hospital made a push, [circa 2004], to have 'Children's' come first in print, an effort to give the hospital more national appeal.") (citations omitted).

[9] *See, infra*, p. 81, ¶¶ 66–67 (Magistrate Bowler's spouse is Mr. Marc Alan Pfeffer, M.D., Ph.D., "the Dzau Professor of Medicine at Harvard Medical School" and a senior cardiologist at Brigham and Women's Hospital, "a major teaching hospital of Harvard Medical School.") (citations omitted); p. 86, ¶¶ 83–88 (Though the government failed to prove that Defendant impacted or potentially impacted the medical care, diagnosis or treatment of even one person, prosecutors assured Magistrate Bowler that, due to Defendant, the doctors "at the Harvard hospitals*"* could not access patient records, communicate with patients, place orders or perform research, and that Defendant's conduct "was expensive and *tremendously* concerning for *everyone* at the hospital because they were worried that patient records could be stolen, damaged, [or] altered and that could be *catastrophic."*) (emphasis added) (citations omitted).

to Boston Children's Hospital,[10] and where his and his colleagues'
research were severely impacted,[11] making them possible witnesses.

Before trial, the Harvard alumnus who obtained the search warrant
was replaced by another prosecutor whose spouse—

1)    completed her pediatric residency in the Harvard hospital
system,[12] most likely at Boston Children's Hospital,[13] and

2)    was at all relevant times "an Assistant Program Director for
the Harvard Medicine-Pediatric Residency Program at Brigham and
Women's Hospital and Boston Children's Hospital."[14]

Meanwhile, the magistrate disclosed nothing[15] and detained
Defendant for two and a half years pending trial before a district
judge who—

1)    is and was clerk, secretary, director and shareholder of His
Honor's for-profit family business, which relied on Harvard Medical
School, its pediatricians and hospitals to conduct industry research

---

[10] *See, infra*, p. 82, ¶¶ 70–72 (At various places on its website, Brigham and Women's Hospital advertises that its cardiology department works "closely with physicians at Boston Children's Hospital" and that the hospital is "a member of Mass General Brigham, *an integrated health care system*" that is "*fortunate to have immediate access to the expertise of subspecialists in every area of pediatrics at two of Boston's preeminent children's hospitals, Boston Children's Hospital* and Mass General for Children," and, "In collaboration with Boston Children's Hospital and the Boston Adult Congenital Heart (BACH) Program, our board-certified cardiovascular experts provide evaluation and diagnosis, with the aid of the latest in advanced imaging technologies, for patients aged 16 years and older who have congenital heart disease and related illnesses.") (emphasis added) (citations omitted).

[11] *See, infra*, p. 86, ¶¶ 85–86 (Magistrate Bowler requested and entered into evidence a copy of the Criminal Complaint, which accused Defendant of disrupting Harvard's medical research.) (citations omitted); p. 82, ¶¶ 68–69 (Brigham and Women's Hospital touts that Magistrate Bowler's spouse is "author of over 450 peer-reviewed publications" and "has received research funding from the American Heart Association and National Institutes of Health," and Harvard touts his involvement in 731 "selected publications," including dozens in 2013–2014, when Justina was held at Boston Children's Hospital and Wayside and during the charged conduct.) (citations omitted).

[12] *See, infra*, p. 102, ¶¶ 122–123 (Bookbinder was replaced before trial by Assistant United States Attorney Mr. Seth B. Kosto) (Kosto's spouse Ms. Staci Eisenberg "completed a residency at the Harvard combined internal medicine-pediatrics program in Boston.") (citations omitted).

[13] *See, infra*, p. 80, ¶ 60 (Boston Children's Hospital advertises it "is the *primary* pediatric teaching hospital for Harvard Medical School.") (emphasis added) (citation omitted).

[14] *See, infra*, p. 102, ¶ 124 (citation omitted).

[15] *See, infra*, p. 120, ¶ 182 (noting absences of disclosures).

and market the business's products to the public as "Heart Healthy," while the same Boston Children's Hospital website that Defendant allegedly trashed listed His Honor's family business as a donor;[16]

    2)   was a former board member and, through 2012, "Member of the Corporation" of a Boston Children's Hospital "partner" that handled the type of case in which Defendant interceded, and which received multiple grants of $50,000 directly from Boston Children's Hospital while the judge's family business advertised its connection to that same Boston Children's Hospital partner on its website;[17]

    3)   formerly chaired the board of trustees at a top-30 Harvard feeder school;[18]

    4)   advertises internships directly on the Harvard Law School website;[19]

---

[16] *See, infra,* p. 89, ¶¶ 97–108 (This case was assigned to the Honorable Judge Nathaniel Gorton for trial.) (Judge Gorton is and was a clerk, secretary, director and shareholder of Slade Gorton & Co., Inc.) (Slade Gorton & Co., Inc. is a family-owned, for-profit seafood business.) (Slade Gorton & Co., Inc. donated at least $1,000 to Boston Children's Hospital in 2014, during the Justina Pelletier controversy, and was listed, publicly, on Boston Children's Hospital's website as a valued donor.) (Slade Gorton & Co., Inc. is also part of the Seafood Nutrition Partnership.) (The Seafood Nutrition Partnership is a trade group evangelizing the health benefits of seafood to the public.) (Slade Gorton & Co., Inc. donated at least $10,000 to the Seafood Nutrition Partnership in 2015.) (Through the Seafood Nutrition Partnership,, Slade Gorton & Co., Inc. partnered with Harvard Medical School's top pediatricians and Brigham and Women's Hospital, specifically Pfeffer's cardiology department, to conduct industry research purporting to show the cardiac and other health benefits of seafood.) (citations omitted).

[17] *See, infra,* p. 98, ¶¶ 113–120 (Judge Gorton and His Honor's brother Michael Sr. were board members of the New England Home for Little Wanderers, which received multiple $50,000 grants from Boston Children's Hospital and partnered with Boston Children's Hospital to divert "children from psychiatric inpatient stay by working intensively with families in their homes.") (Slade Gorton & Co., Inc.'s website touted Michael Gorton Sr.'s association with the New England Home for Little Wanderers next to links to "DOWNLOAD OUR CATALOG" and "Contact: sales@sladegorton.com.") (citations omitted).

[18] *See, infra,* p. 96, ¶¶ 110–111 (Judge Gorton is "Former Chair, Board of Trustees, Buckingham Browne & Nichols School, Cambridge, MA," and "Buckingham Browne and Nichols School is a Harvard University feeder based on Top 30 Harvard University Feeder Schools.") (citations omitted).

[19] *See, infra,* p. 97, ¶¶ 112 (internship advertisement showing "The Honorable Nathaniel M. Gorton [] U.S. District Court [] John Joseph Moakley U.S. Courthouse" next to the text: "Harvard Law School provides unparalleled opportunities to study law with extraordinary colleagues") (citations omitted).

5)     knew or should have known the first organizational witness in the case;[20] and

6)     knew or should have known one of the jurors.[21]

That district judge disclosed nothing,[22] refused to disclose any information when asked,[23] and denied multiple disqualification motions without findings.[24]

After charging Defendant, the relevant United States attorney applied for a job a Harvard.[25]

The case was then heard on appeal by a judge who had worked for the state child-welfare system[26] before becoming a partner for over a decade at the quintessential Harvard firm.[27]  Statistical analysis and a billion computer simulations further reveal that, though the First Circuit assures the public that it randomly assigns cases,[28] this particular appellate judge heard nearly every case important to Harvard and the state child-welfare system at odds more than four

---

[20] *See, infra,* p. 103, ¶¶ 126–134 (The government's first witness was Mr. Patrick Keaton.) (Keaton self-identified as a former employee of K.D.S.A. Consulting through 2015.) (A juror then (a) self-identified as a former accountant "from 2006 to 2014" for the New England Home for Little Wanderers, (b) informed the Court that K.D.S.A. also consulted for the Home for Little Wanderers during that time and (c) expressed concern these connections would "make a mistrial.") (citations omitted).

[21] *Id.*

[22] *See, infra,* p. 120, ¶ 182 (noting absences of disclosures).

[23] *See, infra,* p. 121, ¶¶ 187–188 (Judge Gorton denied Defendant's disclosure motion without findings.) (citing Emergency Motions for Disclosure and Disqualification, E.C.F. nos. 340, 344–47; Orders Denying Emergency Motion for Disclosure and Motions for Disqualification, E.C.F. nos. 342, 350–52).

[24] *See, infra,* p. 121, ¶¶ 185–186 (citations omitted).

[25] *See, infra,* p. 106, ¶ 143 (U.S. Attorney Carmen M. Ortiz sought a job at Harvard's Kennedy School after leaving public office.) (citations omitted).

[26] *See, infra,* p. 106, ¶¶ 144–145 (Judge Sandra Lynch was an assistant Massachusetts attorney general and general counsel for the Massachusetts Department of Education.) (citations omitted).

[27] *See, infra,* p. 107, ¶¶ 146–147 (Judge Sandra Lynch was a longtime partner at Foley, Hoag & Elliot.) (Early Foley, Hoag & Elliot partner Mr. Bob Biernbaum recently recalled: "I think it was the year after I came here, the firm hired five Harvard Law Review editors.  I, I am not, was not, a Harvard Law Review editor, but the year after I came, they hired five.  Well, there's not another law firm in the United States *today* that could do that.") (emphasis is the speaker's) (citations omitted).

[28] *See, infra,* p. 136, ¶ 240 (quoting United States Court of Appeals for the First Circuit, Rulebook[*sic*] at 124, § D).

times lower than those of winning the Powerball jackpot.[29]  Meanwhile that judge wrote a disproportionately high number of the opinions and orders in those same cases,[30] binding the district courts.

Compounding matters, half or more of the public, unaffiliated with Harvard and fully informed of the facts, would have rather prosecuted Wayside and Harvard's hospital than Defendant.[31]  But the government never investigated Wayside or Boston Children's.[32]

In summary, Defendant brings this motion because the sentence must be vacated on eight grounds:

1.  This case cannot be construed as having achieved due process.  Alleged victim Boston Children's Hospital is Harvard's multi-billion-dollar "primary pediatric teaching and research facility."  Two prosecutors from this case or their spouses were from Harvard.  Three of this case's judges have personal, financial and public ties to Harvard.  Their decisions spanned every critical

---

[29] *See, infra,* p. 136, ¶¶ 241–251 (Defendant, a professional computer program, ran a billion simulations for each of multiple datasets and found anomalies in case assignments) (citations omitted).

[30] *See, infra,* p. 146, ¶¶ 264–269 (for cases involving particular parties, including Harvard, Judge Lynch wrote up to 75 percent of the panel opinions) (citations omitted).

[31] *See, e.g.,* Malkin, *#FreeMartyG: Exposing America's Secret Prisons* (Jan. 25, 2022) ("Marty Gottesfeld, 37, is an American political prisoner.  There's just no other way to describe the self-taught, nonviolent techie/medical freedom activist[...]"), *available at* https://www.creators.com/read/michelle-malkin/01/22/freemartyg-exposing-americas-secret-prisons (last accessed Jan. 26, 2024); Kushner, *The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison,* Rolling Stone (June 29, 2017) ("When a programmer shut down a hospital website to defend a sick girl, he raised a crucial question:  What are the bounds of protest in the digital age?"), *available at* https://www.rollingstone.com/culture/culture-features/the-hacker-who-cared-too-much-196425/ (last accessed Jan. 26, 2024); Newman, *Critics Slam Prosecution of Man Who Tried to Save Girl from Gov't,* The New American (Apr. 13, 2017) ("The U.S. Justice Department is facing growing criticism over an ongoing Obama-era prosecution—or persecution, as some critics have put it—of a political activist accused of shutting down a hospital's website.  His goal was to bring attention to what he and others across America viewed as a grave and potentially life-threatening injustice.  The alleged crime has been described by critics of the prosecution as 'civil disobedience' tantamount to 'digital vandalism'—all for what the critics viewed as a very worthy cause: saving a girl from potentially deadly abuse inflicted with the cooperation of local government."), *available at* https://thenewamerican.com/us/crime/critics-slam-prosecution-of-man-who-tried-to-save-girl-from-gov-t/ (last accessed Jan. 26, 2024).

[32] *See, e.g., infra,* p. 107, ¶¶ 148–151 (F.B.I. Special Agent Mr. Jeffrey Williams testified that, to his knowledge, the F.B.I. never investigated Boston Children's Hospital or Wayside for abusing Justina.) (quoting Det. Hrg. Tr., Apr. 27, 2016, at 52:22–53:4, E.C.F. no. 19).

juncture of this case, from search warrant[33] through direct appeal.
The U.S. attorney who oversaw Defendant's indictment soon applied for
a job at Harvard.  But the courts belong to the United States, not to
Harvard,[34] and this case offends the Founders' notion of "due process
of law."[35]

2.    Defendant's right to an impartial appellate panel was
violated.[36]  Judges are not supposed to seek particular cases.  To
foster public trust, cases are instead supposed to be assigned
randomly.  The data and mathematics, however, show that the appeal
from this case, and nearly every other significant appeal involving
Harvard and particular Massachusetts child-welfare agencies, went
before a particular appellate judge who wrote far more than Her
Honor's expected share of the resultant binding precedents.  This
cannot be said to have conformed with due process[37] in America.

3.    The denial of defendant's requested jury instruction as to
his defense of another violated due process.  Defendant had the right
to argue that he acted in the defense of another and to have the jury
instructed accordingly, especially where, as herein detailed,
competent evidence supported that theory, including evidence on this
docket.  Having been obtained by denying Defendant his right to

---

[33] *See* the Warrants Clause ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."), U.S. Const. amend. IV, cl. 2.

[34] *Cf.* the Emoluments Clause ("No Title of Nobility shall be granted by the United States[…]"), U.S. Const. art. I, § 9, cl. 8.

[35] *See* the Due Process Clause, U.S. Const. amend. V, cl. 4 ("No person shall be […] deprived of life, liberty, or property, without due process of law").

[36] *See* 28 U.S.C. §§ 1291 ("The courts of appeals […] shall have jurisdiction of appeals from all final decisions of the district courts of the United States[…]"), 46(b) ("In each circuit the court may authorize the hearing and determination of cases and controversies by separate panels, each consisting of three judges[…]").

[37] *See* U.S. Const. amend. V, cl. 4, *supra,* n. 35.

present his defense to a properly instructed jury, the sentence violates the Due Process Clause,[38] Jury-and-venue Clause[39] and Impartial Jury and District Clause.[40]

4. *Under the defense-of-another theory, Defendant is actually innocent.* Under relevant precedents and this Court's pattern instruction, as an ordinary person would have understood them before the charged conduct, Defendant committed no crime.[41] The sentence thus violates the Due Process Clause[42] and is a miscarriage of justice.

5. *Assistant United States Attorney Mark Kosto misrepresented the Court's instructions to the jury, violating due process and Defendant's right to trial by jury.* The government used this Court's instructions to confuse the jury. The government blended the line between the law as decided by the Court and its own mandatorily worded, but unbinding, directives and legal conclusions. Confused, the jurors likely believed that this Court, not the government, told them that they "must convict." The resultant sentence violates the Due Process Clause[43], Jury-and-venue Clause[44] and Impartial Jury and District Clause.[45]

6. *The government prejudicially violated the proffer agreement.* Defendant offered to help Boston Children's Hospital understand its cyber vulnerabilities at no risk to himself or others. He entered, in

---

[38] *See* U.S. Const. amend. V, cl. 4, *supra,* p. 7, n. 35.

[39] *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment; shall be by Jury[...]").

[40] *See* U.S. Const. amend. VI, cl. 2 ("In all criminal prosecutions, the accused shall enjoy the right to [...] an impartial jury of the State and district wherein the crime shall have been committed[...]").

[41] *Cf.* the Ex Post Facto Clause ("No Bill of Attainder or ex post facto Law shall be passed."), U.S. Const. art. I, § 9, cl. 3.

[42] *See* U.S. Const. amend. V, cl. 4, *supra,* p. 7, n. 35.

[43] *See* U.S. Const. amend. V, cl. 4, *supra,* p. 7, n. 35.

[44] *See* U.S. Const. art. III, § 2, cl. 3, *supra,* n. 39.

[45] *See* U.S. Const. amend. VI, cl. 2, *supra,* n. 40.

good faith, into a binding proffer agreement with the government.
Even though this Court found no inconsistencies between Defendant's
statements before and during the trial, the government repeatedly
introduced prejudicial proffer material without notice, thus
benefitting to Defendant's detriment by breaking the written promise
of the United States.  The sentence is unjust and must be vacated
under the Self-incrimination Clause.[46]

   7.   The District Court failed to enter the interests-of-justice
findings required by the Speedy Trial Act "by the time" it denied
Defendant's motion to dismiss.  Two hundred and forty-five days passed
between Defendant's arrest and the indictment in this case.  This
Court twice made no speedy-trial findings as required by law, despite
clear guidance from the Supreme Court.  This docket never should have
gone to trial.  The only remedy is vacatur and dismissal, under the
Speedy Trial Act[47] and the Speedy and Public Trial Clause.[48]

   8.   Defendant was convicted only due to the ineffective
assistance of counsel.  Trial counsel's negligence broke the
constitutional bar.  He failed to, *inter alia*, investigate the facts
of the case, prepare Defendant to testify or be cross-examined, timely
object to the unlawful use of proffer information, renew a suppression
motion or use competent evidence at his disposal to merit an explicit
jury instruction on defense of another.  None of these inactions could
have benefited Defendant or may be said to have been strategic trade-

---

[46] *See* U.S. Const. amend. V, cl. 3 ("No person shall be […] compelled in any criminal case to be a witness against himself").
[47] *See* 18 U.S.C. §§ 3161 *et seq.*
[48] *See* U.S. Const. amend. VI, cl. 1 ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial").

offs.  Under the Counsel Clause,[49] Defendant had a right not merely to counsel, but to the effective assistance of counsel, which he never received.

---

[49] *See* U.S. Const. amend. VI, cl. 7 ("In all criminal prosecutions, the accused shall [...] have the Assistance of Counsel for his defence.").

**II.   TABLE OF CONTENTS**

Amended Motion To Vacate and Set Aside Sentence (§ 2255)..............1

I. Introduction.....................................................1

II. Table of contents.............................................11

III. Tables of authorities and other references and citations......13

    A. Constitutional provisions....................................13

    B. Case decisions...............................................14

    C. Statutes.....................................................18

    D. Rules........................................................20

    E. Pattern jury instructions....................................23

    F. Treatises....................................................23

    G. Instant references & citations..............................23

    H. Entries on other dockets.....................................30

    I. Governmental citations.......................................32

    J. Reference citations..........................................33

    K. Media reports................................................39

IV. The controversy remains live..................................46

V. The Motion was timely..........................................46

VI. This Amended Motion is timely and otherwise proper............47

VII. Further amendment is possible................................48

VIII. Defendant reserves his right to reply and requests a reply
deadline..........................................................49

IX. Relevant facts...............................................49

  A. Justina Pelletier and the "troubled teen" industry...........49

  B. The search warrant..........................................78

  C. Boston Children's Hospital, Harvard, the government, the courts, *et al*...........................................................80

  D. United States v. Aaron Swartz, 11-cr-10260-NMG (D. Mass.)....108

  E. Judicial disclosure and public trust........................120

  F. Manipulation of judges' case assignments....................123

  G. Suppression................................................147

  H. Defense counsel............................................150

  I. The proffer................................................169

X. This case cannot be construed as having achieved due process...172

XI. Defendant's right to an impartial appellate panel was violated..............................................................176

XII. The denial of defendant's requested jury instruction as to his defense of another violated due process.........................180

XIII. Under the defense-of-another theory, Defendant is *actually innocent*........................................................203

XIV. Assistant United States Attorney Mark Kosto misrepresented the Court's instructions to the jury, violating due process and Defendant's right to trial by jury...............................203

XV. The government prejudicially violated the proffer agreement...209

XVI. The District Court failed to enter the interests-of-justice findings required by the Speedy Trial Act "by the time" it denied Defendant's motion to dismiss....................................215

XVII. Defendant was convicted only due to the ineffective assistance of counsel.......................................................218

Defendant Requests an Evidentiary Hearing...........................227

Request for Oral Argument...........................................227

This Motion Is Verified.............................................229

Certificate of Service..............................................230

### III.   TABLES OF AUTHORITIES AND OTHER REFERENCES AND CITATIONS

#### A.   CONSTITUTIONAL PROVISIONS

Counsel Clause..............*see, infra,* U.S. Const. amend. VI, cl. 7.

Due Process Clause...........*see, infra,* U.S. Const. amend. V, cl. 4.

Emoluments Clause..........*see, infra* U.S. Const. art. I, § 9, cl. 8.

Ex Post Facto Clause.......*see, infra,* U.S. Const. art. I, § 9, cl. 3.

Fourth Amendment.....................................................
    ....*see, infra,* U.S. Const. amend. IV; U.S. Const. amend. IV, cl. 2.

Free Speech and Press Clause. .*see, infra,* U.S. Const. amend. I, cl. 3.

Impartial Jury and District Clause...................................
    ...........................*see, infra,* U.S. Const. amend. VI, cl. 2.

Jury-and-venue Clause....*see, infra,* U.S. Const. art. III, § 2, cl. 3.

Self-incrimination Clause.....*see, infra,* U.S. Const. amend. V, cl. 3.

Speedy and Public Trial Clause.......................................
    ...........................*see, infra*, U.S. Const. amend. VI, cl. 1.

Warrants Clause..............*see, infra,* U.S. Const. amend. IV, cl. 2.

U.S. Const. amend. I, cl. 3.......................79 n. 107; ████████

U.S. Const. amend. IV...............................................194

U.S. Const. amend. IV, cl. 2.......................7 n. 33; 148 n. 362

U.S. Const. amend. V, cl. 3.......................9 n. 46; 215 n. 505

U.S. Const. amend. V, cl. 4..................................7 n. 35;

   7 nn. 37-38; 8 nn. 42-43; 111 n. 227; 148 n. 362; 161 n. 421; 163 ¶¶

   337-338; 173 n. 469; 178 n. 471; 199 nn. 493-494

U.S. Const. amend. VI, cl. 1...........9 n. 48; 215 n. 506; 218 n. 507

U.S. Const. amend. VI, cl. 2.........................................

   ...............................8 nn. 40 & 45; 191 nn. 478 & 481

U.S. Const. amend. VI, cl. 7.........................................

   ...........10 n. 49; ████████; 166 n. 444; 218 n. 509; 220 n. 515

U.S. Const. art. I, § 9, cl. 3.....................8 n. 41; 189 n. 475

U.S. Const. art. I, § 9, cl. 8.............................7 n. 34

U.S. Const. art. III, § 2, cl. 3....................................

   ...............................8 nn. 39 & 44; 191 nn. 477 & 480

B. Case decisions

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986)...........178; 178

*Allen v. United States*, 157 U.S. 675, 681 (1895)...........184 n. 472

*American Textile Mfrs. Institute v. The Limited*, 190 F.3d 729, 742

   (6th Cir. 1999)................................................175

*Berger v. United States*, 295 U.S. 78, 84 (1935)...................205

*Betterman v. Montana*, 136 S. Ct. 1609, 1616 (2016).................215

*Bittner v. United States*, 143 S. Ct. 713, 724 (2023)..............199

*Boston Children's Hospital v. Nadal-Ginard*, 93-cv-12539 (D. Mass. Nov.

   12, 1993)..................124 ¶¶ 201-202; 127 ¶ 214; 128 ¶¶ 216-219

*Cabi, et al. v. Boston Children's Hospital*, 15-cv-12306 (D. Mass. June

    11, 2015)..................124 ¶¶ 201–202; 127 ¶ 214; 128 ¶¶ 216–219

*Casiano-Jiménez v. United States*, 817 F. 3d 816, 819 n. 3 (1st Cir.

    2016)..........................................................46

*Clay v. United States*, 537 U.S. 522, 527 (2003).....................46

*Commissioner v. Acker*, 361 U.S. 87, 91 (1959)......................199

*Commonwealth v. Barnacle*, 134 Mass. 215, 215 (1883)...............197

*Commonwealth v. Henriquez*, 56 Mass. App. Ct. 775 (2002).....193 n. 485

*Commonwealth v. Lopez,* No. 14-P-490 (Mass. App. Ct. Aug. 20, 2015)....

    .........................................................193 n. 485

*Commonwealth v. Michelle Carter*, 474 Mass. 624 (2016).............181

*Commonwealth v. Traylor*, 86 Mass. App. Ct. 84 (2014).......193 n. 485

*Connally v. Georgia*, 273 U.S. 510 (1927).........................174

*Darville v. Children's Hospital Corporation*, 11-cv-10599 (D. Mass.

    Apr. 8, 2011)..............124 ¶¶ 201–202; 127 ¶ 214; 128 ¶¶ 216–219

*DataTerm Inc. v. MicroStrategy Inc.*, 2018 U.S. Dist. LEXIS 94321, 11-

    cv-11970-FDS (Lead) (D. Mass. June 5, 2018)...............123 n. 291

*Davidson v. Cao*, 00-cv-11046 (D. Mass. May 30, 2000).................

    .........................124 ¶¶ 201–202; 127 ¶ 214; 128 ¶¶ 216–219

*DeGrandis v. Children's Hospital Boston*, 14-cv-10461 (D. Mass. Feb.

    25, 2014)..................124 ¶¶ 201–202; 127 ¶ 214; 128 ¶¶ 216–219

*Dugas v. Coplan*, 428 F.3d 317, 327-28 (1st Cir. 2005)..............225

*EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582, n. 10

    (1st Cir. 2001).......................................111 n. 227

*Felder v. Ponder*, 12-cv-11192 (D. Mass. July 10, 2012)...............

    .........................124 ¶¶ 201–202; 127 ¶ 214; 128 ¶¶ 216–219

*Ferrara v. United States*, 456 F.3d 278, 280 (2006)..................214

*Giaimo v. Detrano (In re Detrano)*, 222 B.R. 685, 688–89 (Bankr.

  E.D.N.Y. 1998)............................................126 n. 303

*Gottesfeld v. United States*, 143 S. Ct. 85 (Oct. 3, 2022)...........47

*Honda Motor Co. v. Oberg*, 512 U.S. 415, 434 (1994)................204

*In re Balderas*, 328 B.R. 707 (Bankr. W.D. Tex. 2005)........126 n. 302

*In re Byrd,* 269 F.3d 585, 594 (6th Cir. 2001) (Boggs, Suhrheinrich,

  Batchelder, JJ., dissenting on other grounds).............125 n. 300

*In re Justina Pelletier*, No. 13CP0034BO (June 17, 2014)............182

*In re Murchison*, 349 U.S. 133, 136 (1955).........173; 192 n. 484; 178

*Jordan v. De George*, 341 U.S. 223, 230 (1951).....................199

*Karas v. Hood Inc.*, 2011 U.S. Dist. LEXIS 48349, 11-cv-40016-FDS (D.

  Mass. May 5, 2011).......................................123 n. 294

*Kastigar v. United States*, 406 U.S. 441 (1972)....................214

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988)...

  ........................................................177

*McClesky v. Kemp*, 481 U.S. 279, 311 (1987)........................204

*Petruzzi's IGA Supermarkets v. Darling-Delware Co.,* 998 F.2d 1224,

  1233 (3d Cir. 1993)......................................126 n. 301

*Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)..........175

*Robinson v. Children's Hospital of Boston*, 14-cv-10263 (D. Mass. Feb.

  4, 2014)..................124 ¶¶ 201-202; 127 ¶ 214; 128 ¶¶ 216-219

*Smith Jr. v. McDonald*, 458 Mass. 540, 547-50 (2010)..........181; 190

*Strickland v. Washington*, 466 U.S. 668 (1984).......220; 224; 225; 226

*Students for Fair Admissions, Inc. v. Presidents and Fellows of*

  *Harvard College*, 980 F.3d 157 (1st Cir. 2020).............146 ¶ 268

*Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993)....................205

*Thompson v. Clark*, 142 S. Ct. 1332, 1336 (2022)....................194

*Timberland Design, Inc. v. FDIC*, 745 F. Supp. 784, 790 (D. Mass. 1990)

   ......................................................123 n. 292

*Tumey v. Ohio*, 273 U.S. 510 (1972)............................172-174

*United Nuclear Corp. v. Cannon*, 564 F. Supp. 581, 591-92 (D.R.I. 1983)

   (Selya, D.J.)........................................123 n. 292

*United States v. AMR Corp.*, 140 F. Supp. 2D 1141, 1182 (D. Kan. 2001)

   ......................................................125 n. 299

*United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007).........205; 206

*United States v. Bello*, 194 F.3d 18, 26-27 (1st Cir. 1999). .195 n. 490

*United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996)..........184

*United States v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir. 1978)......

   ......................................................119 n. 269

*United States v. Chantal*, 902 F.2d 1018 (1st Cir. 1990)..............

   ..........................................119 n. 269; 173; 175

*United States v. Ciavarella,* 716 F.3d 705 (3d Cir. 2013)......60 n. 87

*United States v. Conahan*, 2009 U.S. Dist. LEXIS 126148, No. 3:09-cr-28

   (M.D. Pa. July 30, 2009)...................................60 n. 87

*United States v. Cox*, 342 F.2d 167, 170-71 (5th Cir. 1965). .106 n. 205

*United States v. Drew*, 2009 U.S. Dist. LEXIS 85780, 2:08-0582-GW (C.D.

   Cal. Aug. 28, 2009) at *48, § IV(B)(2)...................111 n. 227

*United States v. Gottesfeld*, 18 F.4th 1 (1st Cir. 2021)..............

   ........174; 191 & n. 476; 192 & nn. 483-484; 197 & n. 492; 214; 217

*United States v. Harriss*, 347 U.S. 612, 617 (1954)................198

*United States v. Huete-Sandoval*, 668 F.3d 1, 3 (1st Cir. 2011).....217

*United States v. Jefferson*, 302 F. Supp. 2d 1295, 1300 n. 5 (M.D. Ala. 2004)....................................................125 n. 296

*United States v. Joyner*, 191 F.3d 47, 54 (1st Cir. 1999)......205; 206

*United States v. Lanier*, 520 U.S. 259, 266 (1997)..................199

*United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994)........206

*United States v. Ouimette,* 614 F. Supp. 107, 109 (D.R.I. 1985)........ ....................................................123 n. 293

*United States v. Phillips*, 225 F.3d 1198 (11th Cir. 2000).........179

*United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)......176

*United States v. Swartz*, 945 F. Supp. 2d 216, 218 (D. Mass. 2013)..... ....................................................119 n. 268

*United States v. Torres-Otero*, 232 F.3d 24, 31 (1st Cir. 2000).....179

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)....204

*United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999).............206

*Unwired Planet, LLC v. Apple Inc.*, 2017 U.S. Dist. LEXIS 20928, 13-cv- 04134-VC at *6-7 (N.D. Cal. Feb. 14, 2017)................125 n. 298

*VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1325 (Fed. Cir. 2014)..... ....................................................125 n. 297

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972)........172-174; 179

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................220; 225

*Williams v. Taylor*, 529 U.S. 362, 396 (2000)......................225

*Zedner v. United States*, 547 U.S. 489, 507 (2006).................217

C. Statutes

18 U.S.C. § 1030..........79 ¶ 56; 108 ¶ 152; 118 ¶ 175(H); 119 ¶ 178

18 U.S.C. § 1030(a)(2)(C)....................................111 n. 227

18 U.S.C. § 1030(c)(2)(A)....................................111 n. 227

18 U.S.C. § 1030(e)................................171 ¶ 385; 214 n. 504

18 U.S.C. §§ 2340 *et seq*.............................................

. 56 n. 76; 59 nn. 85-86; 66 n. 98; 78 n. 103; 161 n. 420; 183; 187;

*see, also, infra*, Convention Against Torture (CAT), Treaty Doc. 100-

20.

18 U.S.C. § 3006A.........................151 n. 383; 221 n. 516

18 U.S.C. §§ 3161 *et seq*.......................9 n. 47; 215; 217; 218

18 U.S.C. § 3161(b)................................................215; 218

18 U.S.C. § 3161(h)....................................................218

18 U.S.C. § 3161(h)(7)(A)...........................216; 217; 218

18 U.S.C. § 3162(b)....................................................218

28 U.S.C. § 46....................................................7 n. 36

28 U.S.C. § 144.......................79 ¶ 55; 120 n. 274; 161 n. 422

28 U.S.C. § 455.............79 ¶ 55; 120 n. 274; 161 n. 422; 173; 177

28 U.S.C. § 455(a)................................................

.........79 n. 110; 88 n. 149; 89 n. 151; 119 n. 269; 172; 175; 177

28 U.S.C. § 455(b)....................79 n. 110; 173; 175; 177 n. 470

28 U.S.C. § 455(b)(1)..............................79 n. 110; 172

28 U.S.C. § 455(b)(4)..............................79 n. 110; 172

28 U.S.C. § 455(b)(5)..................................79 n. 110

28 U.S.C. § 455(b)(5)(iii)........................79 n. 110; 172

28 U.S.C. § 455(b)(5)(iv).........................79 n. 110; 172

28 U.S.C. § 455(c)....................................120 n. 274

28 U.S.C. § 455(e)....................79 n. 110; 120 n. 274; 175

28 U.S.C. § 1291................................................7 n. 36

28 U.S.C. § 1746......................................................229

28 U.S.C. § 2242..........................................47; 49; 229

28 U.S.C. § 2255...............................................1; 179

28 U.S.C. § 2255(a)..............................................218

28 U.S.C. § 2255(f)...............................................47

42 U.S.C. § 1983..........................................65; 193 n. 486

Computer Fraud and Abuse Act (C.F.A.A.). *see, supra,* 18 U.S.C. § 1030.

Convention Against Torture (CAT)......................................

.............................*see, supra,* 18 U.S.C. §§ 2340 *et seq.*

Criminal Justice Act (C.J.A.)...........*see, supra,* 18 U.S.C. § 3006A.

M.G.L. ch. 119..........................................193 n. 487

M.G.L. ch. 210, § 5C....................................193 n. 487

M.G.L. ch. 265, § 13J(b)................................193 n. 485

Speedy Trial Act (S.T.A.)........*see, supra,* 18 U.S.C. §§ 3161 *et seq.*

United Nations Convention Against Torture (CAT)......................

.............................*see, supra,* 18 U.S.C. §§ 2340 *et seq.*

D. RULES

1 A.B.A. Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d
    ed. 1980)....................................................225

A.B.A. C.J.S...................................................223

A.B.A. C.J.S. 4-4.1(a).........................................223

A.B.A. C.J.S. 4-4.1(b).........................................223

A.B.A. C.J.S. 4-4.1(c).........................................223

A.B.A. C.J.S. 4-4.1(d).........................................224

A.B.A. C.J.S. 4-4.1(e).........................................224

A.B.A. C.J.S. 4-4.6(a).........................................224

A.B.A. Standards for Criminal Justice (2d ed. 1980)...............226

American Bar Association's Criminal Justice Standards (4th ed. 2017) .
.........................................*see, supra,* A.B.A. C.J.S.

Fed. R. Civ. P. 15(a)(1).......................................47; 48

Fed. R. Crim. P. 41........................................133 n. 316

Fed. R. Evid. 902(1)(6)........................................197

General Order 13-02, Plan for Implementing the Criminal Justice Act of
    1964, as Amended 18 U.S.C. § 3006A.......................151 n. 383

General Order 21-11, Plan for Implementing the Criminal Justice Act of
    1964, as Amended 18 U.S.C. § 3006A, at 2, § I(A).........221 n. 516

Guide to Judiciary Policy, Vol. 7A, Appx. 2A at § XI(A)(1). .221 n. 516

L.R. 1.1....................................................31 n. 51

L.R. 7.1....................................................49 n. 54

L.R. 7.1(b)(3)..............................................49 n. 54

L.R. 7.1(d)...................................................227

L.R. 40.1(g)...........................................130 ¶ 223

L.R. 83.1.2(a).........................................31 nn. 50-52

L.R. 83.2.1(c)..............................................196

L.R. 83.2.1(c)(1)...........................................196

L.R. 83.6.1................................................221

L.R. 112.1.................................................49 n. 54

Massachusetts Rules of Professional Conduct (Mass. R. Prof. C.)....221

Mass. R. Prof. C. 1.0(g)...................................222

Mass. R. Prof. C. 1.0(t)..............................165 n. 438

Mass. R. Prof. C. 1.1.....................................222

Mass. R. Prof. C. 1.1, Comment 5..........................223

Mass. R. Prof. C. 1.2(a)..................................223

Mass. R. Prof. C. 1.3.................................168 ¶ 369; 221

Mass. R. Prof. C. 1.3, Comment 1....................................221

Mass. R. Prof. C. 1.3, Comment 3....................................221

Mass. R. Prof. C. 1.3, Comment 4....................................221

Mass. R. Prof. C. 1.4(a)(1).........................................222

Mass. R. Prof. C. 1.4(a)(2).........................................222

Mass. R. Prof. C. 1.4(b)............................................222

Mass. R. Prof. C. 1.4, Comment 2....................................222

Mass. R. Prof. C. 1.16, Comment 9...................................222

Mass. R. Prof. C. 3.3(e)(2).........................165 ¶ 353 & n. 439

Rules for United States Magistrate Judges in the United States

    District Court for the District of Massachusetts Rule 6(a)(1) (Jan.

    8, 2002)........................................................123 n. 295

Rules for United States Magistrate Judges in the United States

    District Court for the District of Massachusetts Rule 8 (Jan. 8,

    2002)...........................................................123 n. 295

Rules for United States Magistrate Judges in the United States

    District Court for the District of Massachusetts Rule 15(a) (Sept.

    7, 2011)........................................................133 n. 315

Rules for United States Magistrate Judges in the United States

    District Court for the District of Massachusetts Rule 15(b) (Sept.

    7, 2011)........................................................133 n. 315

Rules for United States Magistrate Judges in the United States

    District Court for the District of Massachusetts Rule 15(d)(1)

    (Sept. 7, 2011).................................................133 n. 316

Rules Governing Section-2255 Proceedings 5(d)......................49

Rules Governing Section-2255 Proceedings 7.........................227

Rules Governing Section-2255 Proceedings 7(c).......................49

Rules Governing Section-2255 Proceedings 8(a).....................227

Rules Governing Section-2255 Proceedings 8(c).....................227

Rules Governing Section-2255 Proceedings 12.................49 n. 54

United States Court of Appeals for the First Circuit, Rulebook[*sic*]...

  ...............................................5 n. 28; 136 n. 325

United States District Court for the District of Massachusetts, Public

  Notice Update to Magistrate Judge Rules (May 3, 2022).....135 n. 324

E. Pattern Jury Instructions

First Circuit Pattern Crim. Jury Instr. § 5.04 (July 21, 2003)........

  ....................................184 n. 472; 194 n. 488; 198-203

F. Treatises

3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal

  Practice & Procedure § 555 (3d ed. 2007).........................205

G. Instant references & citations

Accompanying Verification (Feb. 1, 2024), E.C.F. no. unknown..........

  ...............................................229 n. 1; 230 n. 1

Affidavit of Jeffrey S. Kane, Ph.D. (Aug. 24, 2021), E.C.F. no. 442...

  .................................................129 nn. 310-311

Amended Motion for Extension (Feb. 20, 2018), E.C.F. no. 109.........

  ....................................................152 n. 387

*Anonymous #OpJustina Press Release Video*, Det. Hrg., Exh. 2, Trial,

  Exh. 121..............................................78 n. 103

Bandler, *EXCLUSIVE: Jailed Hacktivist Who Fought To Save Girl's Life*

  *Blocked By Biased Judge From Attending His Father's Funeral*,

DailyWire (Apr. 9, 2017), E.C.F. no. 90-1 at 25 (entered Oct. 23,

   2017)....................................................120 n. 276

Charge Conf. Tr., July 30, 2018, E.C.F. no. 328.......................

   ....................................163 n. 425; 189; 208 n. 500; 211

Clerk's Notes, Initial Appearance (Apr. 6, 2016), E.C.F. no. 13.......

   .....................................................80 n. 116

Clerk's Notes, Status Conf. (Nov. 28, 2017), E.C.F. no. 97. .152 n. 384

Clerk's Notes, Withdrawal Hearing (Nov. 28, 2016), E.C.F. no. 46......

   .....................................................151 n. 377

Clerk's Notes, Withdrawal Hearing (Oct. 27, 2017), E.C.F. no. 92......

   .....................................................151 n. 381

Clerk's Notes, Withdrawal Hearing (Mar. 9, 2018), E.C.F. no. 123......

   ...........................................153 n. 393; 155 n. 402

Clerk's Notes, Withdrawal Hearing (July 6, 2018), E.C.F. no. 231......

   ...........................................164 n. 428; 164 n. 435

Complaint Aff. (Feb. 16, 2016), E.C.F. no. 3-2.........86 nn. 142-143

Criminal Complaint (Feb. 16, 2016), E.C.F. no. 3....3 n. 11; 86 n. 142

Decl. Of Martin S. Gottesfeld (Aug. 6, 2021), *presumably* E.C.F. no.

   441-1.................................................135 n. 322

Decls. re Data and Preliminary Statistical Findings (Jan. 2022),

   E.C.F. nos. 457-5 *et seq*.......................136 nn. 327 & 330-334

Det. Hrg. Tr., Apr. 27, 2016, E.C.F. no. 19..........................

   ...........6 n. 32; 86 nn. 141-142; 87 nn. 144-146; 108 nn. 211-214

Det. Order (July 27, 2016), E.C.F. no. 25....................88 n. 147

Disq. Aff. at 19, ¶ 45 (Dec. 27, 2018), E.C.F. no. 346......113 n. 238

Docket Report.................162 n. 423; 153 n. 395; 154 n. 399; 215

Docket Report, 1:16-mc-91064-ADB, E.C.F. no. 164-3.................216

Draft Disqualification Motion, *presumably circa* E.C.F. no. 214-1 and

   E.C.F. no. 241-1.........................................164 ¶ 344

Emergency Motion to Withdraw (July 12, 2018), E.C.F. no. 241..........

   .....................................................165 ¶¶ 353-354

Emergency Motions for Disclosure and Disqualification, E.C.F. nos.

   340, 344-47.....................................5 n. 23; 121 n. 281

Government's PowerPoint Presentation, Trial Exh. D.....213; 171 n. 468

Government's Proposed Jury Instructions at 22 (July 9, 2018), E.C.F.

   no. 238.........................................................210

Grim, *Why I Knocked Boston Children's Hospital Off The Internet: A*

   *Statement From Martin Gottesfeld*, The Huffington Post (Sept. 18,

   2016), Trial Exh. 35............................................184

Final P.S.R. (Jan. 2, 2019), E.C.F. no. unknown........106 n. 204; 214

Form JS 45 (Feb. 16, 2016), E.C.F. no. 3-1.................133 n. 316

Form JS 45 (Oct. 19, 2016), E.C.F. no. 28-1................133 n. 316

Higgins, *Re:* Mandated Reporter complaint*: Emotional & Medical Child*

   *Abuse of Justina Pelletier, inpatient adolescent psychiatry unit,*

   *Boston Children's Hospital.: Children's Hospital Boston—Bader 5*

   *Unit,* Dec. 21, 2013, E.C.F. no. 127-2 ..........66 n. 98; 161 ¶ 329

Hrg. Tr., May 3, 2018, at 18:12, E.C.F. no. 434.............149 n. 368

Indictment (Oct. 19, 2016), E.C.F. no. 28.........................215

Judgment in a Criminal Case (Jan. 11, 2019), E.C.F. no. 389.........46

Jury Notes, E.C.F. no. 301-1 (entered Aug. 1, 2018)......201; 202; 207

Letter re Gillespie (Mar. 2, 2018), E.C.F. no. 121 (entered Mar. 5,

   2018).............................................152 nn. 390-391

Letter re Gillespie (Mar. 18, 2018), E.C.F. no. 140 (entered Mar. 27, 2018)..........................153 n. 396; 154 ¶ 310; 155 ¶¶ 313–314

Letter re Retained Counsel (Nov. 22, 2016), E.C.F. no. 44...151 n. 376

Memorandum and Order re Defense of Another, Suppression and the Speedy Trial Act (June 19, 2018), E.C.F. no. 209........................... ..............150 n. 373; 183; 184 n. 473; 187; 195 n. 491; 216; 217

Memorandum in Support of Expedited Release Pending Appeal at 4 (Aug. 6, 2021), E.C.F. no. 441 at 6 (entered Aug. 13, 2021).....135 n. 322

Motion, *pro se*, to Withdraw and Appoint New Counsel (Oct. 23, 2017), E.C.F. no. 90...........................................148 n. 363

Motion for Bail Pending Appeal (Aug. 6, 2021), E.C.F. no. 441......173

Motion for Extension (Feb. 13, 2018), E.C.F. no. 106........152 n. 385

Motion for Extension (Mar. 16, 2018), E.C.F. no. 124........153 n. 394

Motion for Extension of Time to Respond and to Obtain Unredacted Pleadings (Oct. 23, 2023), E.C.F. no. 460........................227

Motion for Judgment of Acquittal (July 26, 2018), E.C.F. no. 283...203

Motion for Leave to Appear *Pro Hac Vice* by Tor Ekeland (Apr. 1, 2016), E.C.F. no. 9...........................................150 n. 375

Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another (Feb. 28, 2018), E.C.F. no. 116.... .................................................180; 195 n. 490

Motion in Limine to Preclude Defense Questioning, Argument, or Evidence Inconsistent with the Defendant's December 17, 2015 Proffer Statement (June 29, 2018), E.C.F. no. 216........................210

Motion to Dismiss under the Speedy Trial Act (May 3, 2018), E.C.F. no. 164...................................................215; 217

Motion To Vacate and Set Aside Sentence (§ 2255) (Oct. 2, 2023),

   E.C.F. no. 457-8.........................................47; 227

Motion to Withdraw (Mar. 1, 2019), E.C.F. no. 119..........152 n. 389

Motion to Withdraw (Mar. 20, 2018), E.C.F. no. 130.........155 n. 405

Motion to Withdraw (June 28, 2018), E.C.F. no. 214.....163 nn. 426-427

Notice of Appearance by Jane Peachy (June 26, 2017), E.C.F. no. 72....

   ......................................................151 n. 378

Notice of Appearance by Seth Kosto (Nov. 6, 2017), E.C.F. no. 96......

   ......................................................102 n. 180

Notice of Case Assignment (Feb. 17, 2017), E.C.F. no. 5.....133 n. 317

Notice of Hearing (Mar. 19, 2018), E.C.F. no. 126..........154 n. 400

Notice of Intent to Reply in Support of Section-2255 Motion (Feb. 1,

   2024), E.C.F. no. unknown..................................49; 228

Notice of Reassignment (Feb. 29, 2016), E.C.F. no 6.........133 n. 318

Notice of Reassignment (Oct. 25, 2016), E.C.F. no. 34........88 n. 150

Notice of Reassignment (Nov. 14, 2016), E.C.F. no. 41........89 n. 152

Notice of Withdrawal of Appearance by Adam Bookbinder (Nov. 29, 2017),

   E.C.F. no. 99.........................................102 n. 179

Notice Requesting Courtesy Copy (Apr. 23, 2018), E.C.F. no. 149.......

   ......................................................160 n. 415

Opposition to Motion for Extension (Feb. 20, 2018), E.C.F. no. 108....

   ......................................................152 n. 386

Opposition to Motion in Limine to Preclude Defendant's "Torture

   Defense" Based on Necessity and Defense of Another (June 4, 2018),

   E.C.F. no. 198...................180; 181; 182; 189; 190; 195 n. 491

Opposition to Motion to Dismiss (May 4, 2018), E.C.F. no. 167......216

Opposition to Motion to Vacate and Set Aside Sentence (§ 2255) (Jan. 12, 2024), E.C.F. no. 465....................................47; 228

Opposition to Supplemental Suppression Motion at 6 (May 18, 2018), E.C.F. no. 179...........................149 n. 369; 149 nn. 371-372

Order Appointing Mr. David Grimaldi (Mar. 22, 2018), E.C.F. no. 136. . . ....................................................156 n. 411

Order Appointing Mr. Raymond Gillespie (Nov. 6, 2017), E.C.F. no. 93. . ....................................................151 n. 382

Order Denying Bail Pending Appeal (Nov. 10, 2021), E.C.F. no. 449. .173

Order Denying Motion to Dismiss (June 14, 2018), E.C.F. no. 205....... ....................................................216; 217

Order Granting Extension (Mar. 19, 2018), E.C.F. no. 125....153 n. 398

Order Granting Extension (Oct. 24, 2023), E.C.F. no. 461............47

Order Granting Extension (Dec. 8, 2023), E.C.F. no. 463.......47; 228

Order Granting in Part, Denying in Part, Motion for Extension (Feb. 21, 2018), E.C.F. no. 111.................................152 n. 388

Order Granting Motion to Withdraw (Mar. 22, 2018), E.C.F. no. 137..... ....................................................156 n. 412

Order of Recusal (Saris, C.J.) (Oct. 25, 2016), E.C.F. no. 33......... ..................................88 n. 149; 115 n. 246; 120 n. 273

Order of Recusal (Saylor, J.) (Nov. 14, 2016), E.C.F. no. 40......... ...........................................89 n. 151; 120 n. 273

Order for Service re Section-2255 Motion (Oct. 3, 2023), E.C.F. no. 458....................................................................47

Orders Denying Emergency Motion for Disclosure and Motions for Disqualification, E.C.F. nos. 342, 350-52........5 n. 23; 121 n. 282

Pollack, *Re: Children's Hospital Boston—Bader 5 Unit,* Dec. 21, 2013,

  E.C.F. no. 127-1.........65 n. 97; 161 ¶ 329; 193 n. 486; 219 n. 512

Proffer Agreement (Dec. 17, 2015), E.C.F. no. 216-1...................

  ..............................................170 n. 463; 209; 210

Second Motion for Extension of Time to Respond (Dec. 7, 2023), E.C.F.

  no. 462..............................................................228

Second Supplemental Suppression Motion (May 4, 2018), E.C.F. no. 166. .

  ...................................86 n. 140; 148 nn. 366-367; 219

Sentencing Tr., Jan. 10, 2019, E.C.F. no. 399........................

  ...........................................60 n. 89; 209 n. 503; 214

Supplemental Suppression Motion (Mar. 20, 2018), E.C.F. no. 128.......

  ..............................................148 n. 364; 155 n. 404

The Boston Foundation 100th Anniversary Gala Dinner, Dec. 2, 2015,

  E.C.F. no. 128-4 at 3-4...........84 n. 134; 147 n. 361; 149 n. 370

The Boston Foundation 2014 IRS Form 990, E.C.F. no. 166-3 at 15-16....

  ..............................................83 n. 131; 147 n. 361

Tr., June 27, 2017, at 4:14, E.C.F. no. 417.................151 n. 379

Tr., Mar. 9, 2018, at 18:12, E.C.F. no. 432.................153 n. 392

Tr., Mar. 19, 2018, E.C.F. no. 433.............154 n. 401; 155 n. 403

Tr., Mar. 22, 2018, E.C.F. no. 419.....................155 nn. 406-410

Tr., Apr. 4, 2018, at 9:6, E.C.F. no. 420...................156 n. 413

Tr., Apr. 19, 2018, at 7, E.C.F. no. 427...................160 n. 414

Tr., May 3, 2018, at 26:25, E.C.F. no. 434.................161 n. 416

Tr., July 6, 2018, *presumably* E.C.F. no. 435 (mislabeled July 9, 2018)

  ........................................164 n. 429; 164 nn. 432-434

Tr., July 17, 2018, E.C.F. no. 436.............119 n. 269; 103 n. 189

Trial Tr., July 19, 2018, E.C.F. nos. 322–23....103 n. 184; 103 n. 189

Trial Tr., July 23, 2018, E.C.F. nos. 324–25..........................

.....................................103 nn. 185–188, 103 nn. 190–199

Trial Tr., July 25, 2018, E.C.F. no. 327.............................

.........................................105 nn. 201–202; 150 ¶ 284

Trial Tr., July 27, 2018, at 71:21, E.C.F. no. 313.................213

Trial Tr., July 31, 2018, E.C.F. no. 329.......201; 204; 207; 208; 213

Trial Tr., Aug. 1, 2018, E.C.F. nos. 330-31. .121 nn. 278–279; 201; 209

United States District Court, Press Release, Apr. 16, 2014, E.C.F. no.

128-6..............................81 n. 122; 130 n. 313; 147 n. 361

Verdict Form (Aug. 1, 2018), E.C.F. no. 301.............86 n. 139; 202

H. Entries on other dockets

Appellant's Brief (July 31, 2020), *United States v. Gottesfeld*, Nos.

18-1669, 19-1042, 19-1043, 19-1107 (1st Cir.)..........174; 189; 216

Appellant's Supplemental Petition for Rehearing at 9, ¶ 11 (Nov. 19,

2021), *United States v. Gottesfeld*, No. 18-1669 (1st Cir.) (entered

Nov. 29, 2021).........................................120 n. 271

Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-

RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq*..........

.......165 nn. 436-437; 166 nn. 446-447; 167 nn. 451-453; 168 n. 457

Docket Report, *United States v. Gottesfeld*, No. 19-1042 (1st Cir.)....

....................................................102 n. 183

Draft P.S.R. page, sealed exhibit to Mandamus Petition, *In re*

*Gottesfeld*, No. 19-1011 (1st Cir.).......................106 n. 203

Errata Sheet, *United States v. Gottesfeld*, No. 18-1669 (1st Cir. Dec.

9, 2021)..............................................120 n. 272

General Order[50,51] 13-02, Plan for Implementing the Criminal Justice Act

    of 1964, as Amended 18 U.S.C. § 3006A......................151 n. 383

General Order[52] 21-11, Plan for Implementing the Criminal Justice Act

    of 1964, as Amended 18 U.S.C. § 3006A, at 2, § I(A).......221 n. 516

Petition for a Writ of Certiorari at 23 (Mar. 30, 2022), *United States*

    *v. Gottesfeld,* 21-1313.........................................175

Tr., July 16, 2018, *United States v. Gottesfeld*, 18-mc-91297-RGS (D.

    Mass.), E.C.F. no. 10...165 nn. 440–443; 166 nn. 445–461; 168 n. 457

*United States v. Gottesfeld*, No. 18-1669 (1st Cir. Nov. 5, 2021) at

    32:10................................................119 n. 270

*United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 1

    (Motion to Seal).........................................108 n. 215

*United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 2-1

    (Indictment).............................................108 n. 215

*United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 53

    (Superseding Indictment) (Sept. 12, 2012).................114 n. 241

*United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 113

    (The Massachusetts Institute of Technology's Motion to Intervene and

    Partially Oppose Motion to Modify Protective Order) at 1 (Mar. 29,

    2013)....................................................118 n. 267

*United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), Notice of Case

    Assignment (July 15, 2011)...............................113 n. 235

---

[50] "Effective upon the adoption of these local rules, the clerk shall establish and maintain one general order docket for each calendar year." L.R. 83.1.2(a).

[51] "These rules shall be known as Local Rules of the United States District Court for the District of Massachusetts and cited as 'L.R., D. Mass.' or 'L.R.'" L.R. 1.1.

[52] *See,* L.R. 83.1.2(a), *supra,* n. 50.

Warrant, No. 14-mj-2233-MBB (D. Mass.)................................

.............78 n. 104; 79 nn. 108-109; 92 n. 161; 133 nn. 316 & 319

Warrant Application, No. 14-mj-2233-MBB (D. Mass.)....................

...........................................86 n. 140; 133 n. 319

Warrant Return, No. 14-mj-2233-MBB (D. Mass.)...............78 n. 105

I. GOVERNMENTAL CITATIONS

Convention Against Torture (CAT), Treaty Doc. 100-20..................

. .56 n. 76; 59 nn. 85-86; 66 n. 98; 78 n. 103; 161 ¶ 329; 183; 187;

*see, also, supra,* 18 U.S.C. §§ 2340 *et seq.*

Declaration of Independence ¶¶ 20-21.........................191 n. 479

Garcia, *The U.N. Convention Against Torture: Overview of U.S.*

*Implementation Policy Concerning the Removal of Aliens*,

Congressional Research Service (Jan. 21, 2009)...................187

Gorton, Nathaniel M., *Financial Disclosure Report for Calendar Year*

*2012*.....................................................99 n. 172

Gorton, Nathaniel M., *Financial Disclosure Report for Calendar Year*

*2013*.....................................................89 n. 153

H.R. 1918—Aaron's Law Act of 2015.........................118 n. 265

H.R. 2454—Aaron's Law Act of 2013.........................118 n. 265

H. R. Rep. No. 93-1453, p. 5 (1974).............................177

Judicial Externship-Honorable Nathaniel M. Gorton, U.S. District Court

(snapshot June 4, 2023)....................................97 n. 168

Mass.gov, *Guide on the disclosure of confidential information: Court*

*information—Probate & Family Court*.......................193 n. 487

PACER..............................................80 ¶ 57 & n. 112

S.1030—Aaron's Law Act of 2015............................118 n. 265

S.1196—Aaron's Law Act of 2013...............................118 n. 265

S. Rep. No. 93-0419, p. 5 (1973)...................................177

S. Rep. No. 93-1021, p. 1 (1974)...................................215

United Nations Convention Against Torture (CAT)......................

...*see, supra,* Convention Against Torture (CAT), Treaty Doc. 100-20.

U.S. Bureau of Prisons, Inmate Locator, Search for 12982-104........46

U.S. House of Representatives Committee on Education and Labor,

Hearing on *Cases of Child Neglect and Abuse at Private Residential

Treatment Facilities* (Oct. 10, 2007)...................59 nn. 84-85

U.S. House of Representatives Committee on Education and Labor,

Hearing on *Child Abuse and Deceptive Marketing by Residential

Programs for Teens* (Apr. 24, 2008)...............56 n. 76; 59 n. 86

U.S. Senate Committee on the Judiciary, Hearing on *Oversight of the

U.S. Justice Department* at 12 (Mar. 6, 2013)..............117 n. 261

United States Attorney's Manual § 3-2.170...................120 n. 275

United States Attorney's Manual § 3-2.220...................120 n. 275

United States Court of Appeals for the First Circuit, *Sandra L. Lynch*

.................................................106 nn. 207-208

J. REFERENCE CITATIONS

Abelson, *et al.*, *Report to the President: MIT and the Prosecution of

Aaron Swartz* (July 26, 2013).......................................

. .109 nn. 219-220; 110 nn. 223-224; 111 nn. 228-234; 113 nn. 239-240

Alston, *et al.*, *The genetics and pathology of mitochondrial disease*,

Journal of Pathology (Jan. 2017)...........................52 n. 68

American Library Association, *James Madison Award—2013 Winner(s)*......

.................................................116 n. 252

British Society for Cell Biology, *Mitochondrion—much more than an energy converter*..........................................50 n. 58

Boston Children's Hospital, "calendar year 2015" donors list. 90 n. 154

Boston Children's Hospital, *About Us*........................80 n. 114

Boston Children's Hospital, *Zoom Frequently Asked Questions*. .80 n. 113

Brigham and Women's Hospital Directory, Marc Alan Pfeffer, MD, PhD....
............................................82 n. 124; 147 n. 361

Brigham and Women's Hospital, *About*. .82 n. 123; 130 n. 313; 147 n. 361

Brigham and Women's Hospital, *Adult Congenital Heart Disease Program*. .
.................................83 n. 127; 130 n. 313; 147 n. 361

Brigham and Women's Hospital, *Cardiovascular Genetic Diseases*.........
............................................83 n. 128; 147 n. 361

Brigham and Women's Hospital, *Pediatric Subspecialty Services*.........
............................................83 n. 126; 147 n. 361

Children's Hospital Corporation 2014 Form 990..............101 n. 176

Children's Hospital of Philadelphia, *Mitochondrial Disease*....50 n. 56

Choate, Hall & Stewart, LLP, *Adam J. Bookbinder*......................
.......................................81 nn. 117–118; 116 n. 256

Creative Commons, *We're Turning 20!  What's Happened Since 2001?* (May 24, 2021)..............................................109 n. 216

*Curriculum Vitae*, Honorable Marianne B. Bowler, U.S. Magistrate Judge, Exh. C. .83 n. 129–131; 85 n. 135; 86 n. 137; 130 n. 313; 147 n. 361

Dana-Farber / Harvard Cancer Center, *Home — DF/HCC*..........130 n. 312

Decl. re Data and Tables (Feb. 1, 2024), Exh. E......................
.......................................137 nn. 329–334; 138 n. 336

Decl. re Data and Tables, Attachm. 1, Attributed First Circuit Panel
   Decisions Per Year and By Selected Judges............136 nn. 328–329

Decl. re Data and Tables, Attachm. 2, First Circuit "HHS" & Similar
   Decisions Per Year and By Judges Lynch & Torruella........137 n. 333

Decl. re Data and Tables, Attachm. 3, First Circuit "HHS" & Similar
   Decisions Postdating May 8, 1995.........................137 n. 333

Decl. re Data and Tables, Attachm. 4, First Circuit
   "Massachusetts"–"HHS" & Similar Decisions Postdating May 8, 1995....
   ....................................................137 n. 329

Decl. re Data and Tables, Attachm. 5, Reviewed First Circuit "DCF"-
   type Decisions Postdating May 8, 1995....................137 n. 334

Decl. re Data and Tables, Attachm. 7, Filtered First Circuit "DCF"-
   type Decisions in Mass. Cases............................137 n. 330

Decl. re Data and Tables, Attachm. 10, First Circuit "Massachusetts"
   "Developmental Services"-type Decisions Postdating May 8, 1995......
   ....................................................137 n. 331

Decl. re Data and Tables, Attachm. 12, Filtered First Circuit "Harvard
   College"-type Decisions Postdating May 8, 1995...........137 n. 332

Decl. re First Circuit Case Assignments (Feb. 1, 2024), Exh. E........
   ....................................138 nn. 335–342; 139 nn. 344–360

Dermatol, *The role of mitochondrial function and cellular
   bioenergetics in ageing*[sic] *and disease* (Feb. 9, 2015).....52 n. 66

Eisner Camp, *Meet the Eisner and Crane Lake Advisory Board*. .102 n. 182

Encyclopedia of Reproduction (2d ed. 2018)....................51 n. 65

Foley Hoag LLP, *75 Years of Foley Hoag LLP* (June 15, 2018). .107 n. 210

Gramlich, *Biden has appointed more federal judges than any president since JFK at this point in his tenure*, The Pew Research Center (Aug. 9, 2022)................................................121 n. 284

Greater Boston Legal Services, *2008 Annual Report*............81 n. 120

Harvard Catalyst Profile, Marc Alan Pfeffer, M.D., Ph.D.............. ..............................................82 n. 125; 147 n. 361

Heuer, *The effects of nuclear DNA mutations on mitochondrial function*, Journal of the American Association of Nurse Practitioners (Jan. 1, 2023)....................................................52 n. 67

Internet Hall of Fame, *2013 Inductee Aaron Swartz, Internet Hall of Fame Innovator, Posthumous Recipient: Aaron Swartz was a computer programming prodigy and activist who played an instrumental role in the campaign for a free and open Internet and used technology to fight social, corporate and political injustices*..........116 n. 253

Jones, *Supreme Court Trust, Job Approval at Historical Lows*, Gallup (Sept. 29, 2022).........................................122 n. 289

JSTOR, *JSTOR Evidence in United States vs. Aaron Swartz*.....112 n. 234

Justina's Note, Exh. A................69 n. 102; 161 ¶ 329; 219 n. 510

Keker, Van Nest & Peters, *Aaron Swartz was no criminal* (Nov. 18, 2014) ....................................................113 n. 238

Krebs, *Five Facts About the Troubled Teen Industry: Some information to help you better understand the "troubled teen" industry that, despite having allegations of abuse levied against it for decades, continues to operate largely unregulated.*, American Bar Association Practice Points (Oct. 22, 2021).........................53 nn. 71–75

Lawyers Diary and Manual, *Biographies of Massachusetts Judges: Federal Court Judges sitting in Massachusetts*, Exh. B................................................................83 n. 129; 96 n. 166; 107 n. 209; 147 n. 361

Leadership Directories, Inc., *Federal-State Court Directory* 69 (2017 ed.)...........................................................124 ¶ 202

Lessig, *Remembering Aaron Swartz* (Jan. 12, 2013)...........109 n. 216

LexisNexis®.............................................................................123 ¶ 198 & n. 292; 124 ¶ 201; 129 ¶ 221; 130 ¶ 224; 131 ¶ 227

Massachusetts General Hospital, *About*...................................................85 n. 136; 130 n. 313; 147 n. 361

Merriam-Webster.com Dictionary, *bandwidth* (Sept. 19, 2023). .105 n. 200

Merriam-Webster.com Dictionary, *botnet* (Sept. 18, 2023).....170 n. 465

Merriam-Webster.com Dictionary, *endosymbiosis*................50 n. 60

Merriam-Webster.com Dictionary, *eukaryote* (July 15, 2023).....51 n. 61

Merriam-Webster.com Dictionary, *mitochondrial DNA* (Sept. 2, 2023).........................................................51 nn. 63-64

Merriam-Webster.com Dictionary, *organelle* (Aug. 7, 2023)......50 n. 57

Merriam-Webster.com Dictionary, *prokaryote* (July 15, 2023)....50 n. 59

Merriam-Webster.com Dictionary, *throughput* (Sept. 11, 2023). 105 n. 200

Moseneke, *All Rise: A Judicial Memoir*, Pan Macmilan (2021).........176

Nature, *The origin of mitochondria and chloroplasts* (2014)....51 n. 62

New England Baptist Hospital, *About*.............86 n. 138; 147 n. 361

Peters, *Re:* United States v. Aaron Swartz, *United States District Court, District of Massachusetts Crim No. 11-CR-10260 NMG* (Jan. 28, 2013).........................................................113 n. 237; 116 n. 256

Petition to *Remove United States District Attorney*[sic] *Carmen Ortiz*

  *from office for overreach in the case of Aaron Swartz*.....115 n. 245

Prep Review by MIT, Ivy League and Oxbridge Educated Insiders,

  *Buckingham Brown and Nichols School*........................96 n. 167

RECAP................................................110 ¶ 154 & n. 220

ScienceDirect.com, *gametogenesis*.............................51 n. 65

Seafood Industry Research Fund, *Slade Gorton & Co., Inc*......89 n. 153

Seafood Nutrition Partnership, *About Us*.....................91 n. 157

Seafood Nutrition Partnership, *Annual Report 2015*....................

  ...............................91 nn. 156 & 158–160; 92 nn. 162–165

SimilarWeb, *Top Websites Ranking: Most Visited Websites In The World*. .

  .....................................................109 n. 217

Slade Gorton & Co., Inc., *Executive Team* (snapshot Apr. 9, 2018)......

  ....................................................100 n. 173

Slade Gorton & Co., Inc., *Our Story*........................102 n. 177

TechTarget, *edge device*....................................170 n. 466

The Boston Foundation's IRS Forms 990............84 n. 133; 147 n. 361

The Boston Foundation, *Massachusetts United for Puerto*

  *Rico/Massachusetts Unido por Puerto Rico*.......84 n. 132; 147 n. 361

The Cleveland Clinic, *Mitochondrial diseases*.............52 nn. 69–70

*The Future of Seafood: Nourishing the World*, Speaker Biographies......

  ....................................................102 n. 178

The Giving Common: An Initiative of the Boston Foundation, *Wayside*

  *Youth & Family Support Network* (snapshot June 1, 2015)..............

  .............................................84 n. 132; 147 n. 361

The Home for Little Wanderers, *2014 Annual Report*..........100 n. 174

The Home for Little Wanderers, *Annual Report 2003*.......98 nn. 169-170

The Home for Little Wanderers, *Annual Report 2004*............98 n. 169

The Home for Little Wanderers, *The Home for Little Wanderers Awarded
    $50,000: Preschool Outreach Program receives award from Boston
    Children's Hospital* (Sept. 2, 2015; snapshot Feb. 27, 2018).........
    ....................................................101 n. 175

The Now, *What is Reddit?*...................................109 n. 217

Tor Ekeland, P.C., *Technology and Business Lawyers* (snapshot July 23,
    2014)...................................................79 n. 111

Tsisin, *The Troubled Teen Industry's Troubling Lack of Oversight*, The
    Regulatory Review (June 27, 2023)..........................56 n. 77

Tsukayama, *Celebrating the Life of Aaron Swartz: Nov. 12 and Nov. 13,*
    The Electronic Frontiers Foundation (E.F.F.) (Nov. 11, 2022)........
    ....................................................116 n. 255

Wikipedia, *Arbitrary code execution*........................170 n. 464

Zhang, *et al.*, *Red blood cell extrudes nucleus and mitochondria
    against oxidative stress* (July 2011)......................50 n. 58

K. Media reports

ABC News, *Advocates Fight for Justina Pelletier, Teen Held by State in
    Psych Ward* (Feb. 10, 2014)................................49 n. 55

Azevedo, *Reddit might once again be flirting with an IPO*, Tech Crunch
    (Nov. 27, 2023).........................................109 n. 217

Bandler, *EXCLUSIVE: Jailed Hacktivist Who Fought To Save Girl's Life
    Blocked By Biased Judge From Attending His Father's Funeral*,
    DailyWire (Apr. 9, 2017)...........................................

*see, supra,* Bandler, EXCLUSIVE: Jailed Hacktivist Who Fought To Save
Girl's Life Blocked By Biased Judge From Attending His Father's
Funeral, DailyWire (Apr. 9, 2017), E.C.F. no. 90-1 at 25 (entered
Oct. 23, 2017).

Blue, *MIT website hacked over Aaron Swartz a second time: This morning
MIT's website was hacked and defaced, with its nameservers changed.
The site credited hacker FBI informant Sabu (LulzSec); the site
autoplayed The Star Spangled Banner and stated "R.I.P Aaron Swartz."*
ZDNet (Jan. 22, 2013)......................................115 n. 247

Brito, *Aaron Swartz: The Punishment Did Not Fit the Crime—As long as
prosecutors have the option to put first-time computer trespassers
behind bars for decades, we will continue to see such clear
injustices.*, Reason (Jan. 31, 2013).......................111 n. 225

Brodkin, *Anonymous defaces MIT website with memorial for Aaron Swartz:
MIT site temporarily calls Swartz prosecution "miscarriage of
justice."* ArsTechnica (Jan. 14, 2013).....................115 n. 247

BuzzFeed News, *Prosecutor's Husband Defends Push To Jail Internet
Activist: Tom Dolan blasts Aaron Swartz's family for pointing a
finger at his wife, U.S. Attorney Carmen Ortiz.  Dolan, an IBM
executive, offers the first defense from the prosecution side as
Swartz's defenders demand Ortiz's firing.  UPDATE: Dolan has deleted
his Twitter account.* (Jan. 15, 2013)......................115 n. 251

CBS News/A.P., *"Turn yourself in," U.S. marshal warns escaped R.I.
inmate* (Jan. 3, 2017).........................................196

CBS News, *MIT Says Gunman Hoax Was Retaliation For Suicide Of Aaron
Swartz* (Feb. 27, 2013)....................................115 n. 249

Conaboy, *Children's Hospital takes a new name—sort of*, Boston.com (May

    16, 2012)......................................88 n. 148; 147 n. 361

Cullen, *On humanity, a big failure in Aaron Swartz case*, The Boston

    Globe (Jan. 15, 2013)..............................114 nn. 242–243

Daily Motion, *Alan Dershowitz extends offer to aid Justina Pelletier*

    *on Huckabee Show March 29 2014*.......67 n. 99; 161 ¶ 329; 219 n. 511

Dobnik, *Reddit co-founder commits suicide in New York as trial looms*,

    The Associated Press (Jan. 22, 2013).....................112 n. 234

Dobnik, *Reddit co-founder dies in N.Y. weeks before trial*, The

    Associated Press (Jan. 13, 2013).........................114 n. 244

Fortin, *Ted Williams Tunnel briefly closed for organ transplant*, NBC

    Boston (July 13, 2023)...................................192 n. 482

Fox61, *Sister Says Justina Pelletier's Health 'Worst Ever': As a West*

    *Hartford family fights for their daughter's return from*

    *Massachusetts state custody, they now fear her medical condition is*

    *deteriorating.  Justi…* (Mar. 22, 2014)......................61 n. 92

Glenn Beck, *Lou Pelletier talks to Glenn about the contempt of court*

    *charges and what comes next for his family* (Feb. 19, 2014). .62 n. 96

Gottesfeld, M., *In Biden's Nomination of Marty Walsh, Aaron Swartz*

    *Prosecutor Gets Her Final Comeuppance: Carmen Ortiz, a one-time*

    *rising star, went from "Bostonian of the Year" to the political*

    *wilderness.* (Feb. 15, 2021)..............................118 n. 264

Grant, *BCH: Philanthropy Supporters*, Failure to Listen (May 5, 2014). .

    .....................................................90 n. 155

Green, Mazor, *Corrupt justice: what happens when judges' bias taints a*

    *case?*, The Guardian (Oct. 18, 2015)......................122 n. 288

Greenfield, *Aaron Swartz's Prosecutor Just Got More Evil: The notoriously harsh prosecutor who insisted on jail time for Aaron Swartz may have withheld evidence, according to a letter filed by Swartz's legal team, making the villain of an emotional trial and even more emotional suicide sound perhaps more villainous than before.*, The Atlantic (Mar. 14, 2013).....................116 n. 256

Grim, *Why I Knocked Boston Children's Hospital Off The Internet: A Statement From Martin Gottesfeld*, The Huffington Post (Sept. 18, 2016)............................................................. . *see, supra,* Grim, Why I Knocked Boston Children's Hospital Off The Internet: A Statement From Martin Gottesfeld, The Huffington Post (Sept. 18, 2016), Trial Exh. 35

Grimaldi, *et al.,* *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest,* The Wall Street Journal (Sept. 28, 2021)..............................................121 n. 283

Hagan, *Slade Gorton to join Canadian seafood company*, The Gloucester Daily Times (Mar. 20, 2023)...............................102 n. 177

James, *Mom of Sick Connecticut Teen 'Collapses' in Court After Judge Sends Kid to Foster Care*: *Justina Pelletier's parents are upset, say decision crossed "so many lines."* ABC News (Feb. 25, 2014).......... ...................................................60 nn. 88 & 90

Klimas, *Father So Heartbroken About Daughter Held at Hospital Against His Will He Just Defied a Judge's Order to Talk to Us: 'I Want to Have All My Guns Blazing': "If we don't do something, she is going to die."* TheBlaze (Feb. 17, 2014).................61 n. 91; 62 n. 93

Klimas, *Judge Rules to Put Justina Pelletier in Foster Care, Father Says*, TheBlaze (Feb. 24, 2014)..............................62 n. 93

Knappenberger, *et al., The Internet's Own Boy: The Story of Aaron Swartz*...........................................................
109 nn. 216-218; 110 nn. 220, 222 & 224-226; 111 nn. 229-232; 112 n. 234; 113 nn. 236-237 & 239-240; 116 n. 254

Kovacs, *Prosecutors in Aaron Swartz Case Received Threats, Had Their Accounts Hacked: Prosecutors want to protect the identities of those involved in the investigation*, Softpedia (Apr. 4, 2013).............
...................................................115 nn. 248-249

Kushner, *The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison*, Rolling Stone (June 29, 2017)....6  n. 31

Malkin, *#FreeMartyG: Exposing America's Secret Prisons* (Jan. 25, 2022)
.........................................................6 n. 31

Lee, *The inside story of Aaron Swartz's campaign to liberate court filings: And how his allies are trying to finish the job by tearing down a big paywall.*, ArsTechnica (Feb. 8, 2013)...........110 n. 220

Lennard, *New Yorker launches tool by Aaron Swartz to protect leaks: Strongbox, co-created by the persecuted late technologist, is an open-source drop box for leaked documents*, Salon (May 18, 2013).....
......................................................110 n. 221

Leopold, *How Aaron Swartz helped build the Internet*, C.N.N. (Jan. 15, 2013)...................................................109 n. 218

Liberty Counsel, *Justina Pelletier to Remain Ward of the State* (Mar. 25, 2014)...........................................68 nn. 100-101

Marans, Grim, *This Federal Prosecutor Is Building A Career Indicting The Good Guys: But is U.S. Attorney Carmen Ortiz the one gone wrong?* HuffPost (July 5, 2016).....................................195 n. 489

Martin, *Carmen Ortiz: Triumphs, Controversies, And The Lingering Impact Of Aaron Swartz*, W.G.B.H. News (Dec. 22, 2016).....117 n. 257

McCullagh, *Plug-in opens up federal courts, with your help: When you pay to download a court document, the next person won't have to, thanks to a Firefox browser plug-in that's a collaborative project of Princeton University and the Internet Archive.*, CNET (Aug. 14, 2009)...................................................110 n. 220

MontanaPBS, *Who's Watching the Kids?* (Mar. 3, 2010).......57 nn. 78-83

Murphy, *US attorney's husband stirs Twitter storm on Swartz case*, The Boston Globe (Jan. 16, 2013).............................115 n. 251

NBC News, *Anonymous hijacks federal website to protest activist Aaron Swartz's death* (Jan. 26, 2013)............................115 n. 246

Newman, *Critics Slam Prosecution of Man Who Tried to Save Girl from Gov't*, The New American (Apr. 13, 2017).....................6 n. 31

N.P.R., *At A Young Age, Aaron Swartz Did A Lifetime Of Work* (Jan. 13, 2013)...................................................109 n. 217

Pearce, *Aaron Swartz's suicide continues to ripple through Congress*, The Los Angeles Times (Feb. 5, 2013).....................118 n. 263

Personhood USA, *Justina Pelletier denied same freedoms awarded to Boston Marathon Bombing Suspect, says Personhood USA* (Apr. 18, 2014) .........................................................68 n. 100

Phillips, *Carmen Ortiz and the Kennedy School?  It wasn't meant to be.*, The Boston Globe (June 15, 2017).....................106 n. 206

Richer, Tucker, *Massachusetts U.S. Attorney Rachael Rollins formally resigns in wake of ethics probes*, A.P. (May 19, 2023).....195 n. 489

Rogers, *Rep. Issa Slams Prosecutors For How They Handled The Aaron Swartz Case*, Business Insider (Feb. 7, 2013)..............117 n. 262

Simons, *What Happened to Justina Pelletier and Where Is She Now?*, Newsweek (Dec. 13, 2022)...................................50 n. 56

Slashdot, *White House Responds To Petition To Fire Aaron Swartz's Prosecutor* (Jan. 8, 2015)................................117 n. 260

Smith, G., *MIT Did Not 'Call In The Feds' To Pursue Aaron Swartz, Report Finds*, HuffPost (July 30, 2013)....................112 n. 234

Smith, E., *Speaking up for Swartz*, The Boston Herald (Jan. 26, 2013). . .......................................................115 n. 250

Stening, *Federal judges' financial conflicts add to mistrust of the judicial system*, Northeastern Global News (Jan. 11, 2022)........... .................................................121 nn. 285-287

Swidey, *Teen caught in medical, custody dispute leaves Children's Hospital*, The Boston Globe (Jan. 18, 2014).......61 n. 92; 99 n. 171

Swidey, Wen, *A medical collision with a child in the middle*, The Boston Globe (Dec. 15, 2013)................................61 n. 91

Swidey, Wen, *Frustration on all fronts in struggle over child's future*, The Boston Globe (Dec. 16, 2013).....61 n. 91; 62 n. 95; 182

The Boston Globe, *Mayor Walsh is drawn into federal labor probe* (Apr. 24, 2016)..............................................195 n. 489

The New York Times, *Staci Eisenberg, Seth Kosto* (Sept. 10, 2006)...... .......................................................102 n. 181

The New York Times, *WEDDINGS/CELEBRATIONS; Joyce Chen, David D'Addio*

  (Aug. 10, 2003)...........................................81 n. 119

Wen, Swidey, *State to retain custody of teen in medical case*, The

  Boston Globe (Dec. 20, 2013).............................99 n. 171

Winters, *Here are the odds you'll win the $439 million Powerball*

  *jackpot*, CNBC (Jan. 14, 2023)..........................139 n. 343

Xu, *Children's Hospital Comes Under Official Scrutiny*, The Harvard

  Crimson (Sept. 24, 2003).................................80 n. 115

## IV.   The controversy remains live.

Defendant was sentenced to 121 months' imprisonment and three years' supervised release. *See* Judgment in a Criminal Case (Jan. 11, 2019), E.C.F. no. 389.  He is still serving that sentence. *See, e.g.,* U.S. Bureau of Prisons, Inmate Locator, Search for 12982-104 (carceral release date Nov. 15, 2023), *available at* https://www.bop.gov/inmateloc/ (last accessed Sept. 27, 2023).  The controversy remains live. *See, e.g., Casiano-Jiménez v. United States*, 817 F. 3d 816, 819 n. 3 (1st Cir. 2016) (where habeas petitioner remained under supervised release, the government conceded the habeas case was not moot).

## V.   The Motion was timely.

The instant conviction became final on Oct. 3, 2022. *See Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a

certiorari petition expires."); *Gottesfeld v. United States,* 143 S.
Ct. 85 (Oct. 3, 2022) (certiorari denied).

Defendant thus had *at least* a year from Oct. 3, 2022, to file his
section-2255 motion.  *See* 28 U.S.C. § 2255(f) ("A 1-year period of
limitation shall apply to a motion under this section.  The limitation
period shall run from the latest of—(1) the date on which the judgment
of conviction becomes final; (2) the date on which the impediment to
making a motion created by governmental action in violation of the
Constitution or laws of the United States is removed, if the movant
was prevented from making a motion by such governmental action; […]").

Defendant timely filed his Motion within that time.  *See* Motion
To Vacate and Set Aside Sentence (§ 2255) (Oct. 2, 2023), E.C.F. no.
457-8.[53]

## VI.   THIS AMENDED MOTION IS TIMELY AND OTHERWISE PROPER.

Defendant has the statutory right to amend or supplement his section-
2255 motion "as provided in the rules of procedure applicable to civil
actions."  28 U.S.C. § 2242.  *Id est*, "A party may amend its pleading
once as a matter of course no later than: (A) 21 days after serving
it, or (B) if the pleading is one to which a responsive pleading is
required, 21 days after service of a responsive pleading[…]."  Fed. R.
Civ. P. 15(a)(1).

The Court required the government to file a responsive pleading.
Orders, E.C.F. nos. 458, 461, 463.  And the government indeed served a
responsive pleading on January 12, 2024.  *See* Opposition to Motion to
Vacate and Set Aside Sentence (§ 2255), E.C.F. no. 465.

---

[53] The government has not contested, and thus seems to concede, the timeliness of Defendant's Motion.

This amendment is thus timely and otherwise proper.

### VII.  FURTHER AMENDMENT IS POSSIBLE.

This amended pleading is tendered pursuant to Fed. R. Civ. P. 15(a)(1) (one amendment as of right).  "The court," however, "should freely give leave" for further amendment "when justice so requires."  *Id.*

Defendant hereby notifies the government and the Court that he shall seek such leave accordingly.

**VIII. Defendant reserves his right to reply and requests a reply deadline.**

Defendant reserves his right to reply to the government's response to the earlier section-2255 motion or any response to this amended pleading. *See* Rules Governing Section-2255 Proceedings 5(d) ("The moving party may submit a reply to the respondent's answer or other pleading within a time fixed by the judge."),[54] 7(c) ("The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness."); 28 U.S.C. § 2242 (Defendant "may, under oath, deny any of the facts set forth in the return or allege any other material facts."). *See, also,* Notice of Intent to Reply in Support of Section-2255 Motion (Feb. 1, 2024), E.C.F. no. unknown.

Accordingly, Defendant requests that the Court fix a time for Defendant's reply.

**IX.   Relevant facts**

A. Justina Pelletier and the "troubled teen" industry

1.   Defendant intervened against the abuse and torture of Ms. Justina Pelletier (hereinafter "Justina"), which began when Justina was 13 and continued until she was 16.

2.   Before the charged conduct, Defendant learned that Justina had contracted influenza in February 2013.[55]

---

[54] *But, cf.,* L.R. 7.1(b)(3) ("All other papers not filed as indicated in subsections (b)(1) and (2), whether in the form of a reply brief or otherwise, may be submitted only with leave of court."). *Cf., also,* L.R. 112.1 ("Unless otherwise specified in these local rules or by order of the court, motion practice in criminal cases shall be subject to L.R.7.1."). Defendant is unsure if or to what extent the L.R. apply to his Motion. *Cf.* Rules Governing Section-2255 Proceedings 12 ("The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules.").

[55] *See, e.g.,* ABC News, *Advocates Fight for Justina Pelletier, Teen Held by State in Psych Ward* (Feb. 10, 2014) ("One day Justina Pelletier was a seemingly healthy teenager performing jumps and spirals at a skating show and six

    3.    Before the charged conduct, Defendant learned that Justina also had and has mitochondrial disease.[56]

    4.    Mitochondria are discrete parts (organelles[57]) inside nearly all plant and animal cells.[58]

    5.    Relevant to the severe disease Justina suffers, mitochondria evolved, according to prevailing scientific theory, when one or more earlier, simpler, independent, single-celled life forms (prokaryotes[59]) entered mutually beneficial relationships living inside (endosymbiosis[60]) larger, more complex single-celled life forms

---

weeks later, on Feb. 10, 2013, she was in the emergency room at Children's Hospital in Boston after a severe bout with the flu, refusing to eat and barely able to walk."), *available at* https://abcnews.go.com/Health/advocates-fight-teen-justin-pelletier-held-state-pysch/story?id=22312907 (last accessed Sept. 27, 2023).

[56] "Mitochondrial disease, or mitochondrial disorder, refers to a group of disorders that affect the mitochondria." Children's Hospital of Philadelphia, *Mitochondrial Disease*, *available at* https://www.chop.edu/conditions-diseases/mitochondrial-disease (last accessed Sept. 5, 2023).  *See, also,* Simons, *What Happened to Justina Pelletier and Where Is She Now?*, Newsweek (Dec. 13, 2022) ("A geneticist, Dr. Richard Boles, explained in the documentary that Justina's DNA sequence shows that she does have a complex form of mitochondrial disease."), *available at* https://www.newsweek.com/battle-justina-pelletier-what-happened-where-now-peacock-documentary-1766611 (last accessed Sept. 27, 2023).

[57] *See, e.g.,* Merriam-Webster.com Dictionary, *organelle* (Aug. 7, 2023) ("a specialized cellular part (such as a mitochondrion, chloroplast, or nucleus) that has a specific function and is considered analogous to an organ"), *available at* https://www.merriam-webster.com/dictionary/organelle (last accessed Sept. 6, 2023).

[58] "Mitochondria are large organelles found in the cytoplasm of all plant and animal cells."  British Society for Cell Biology, *Mitochondrion—much more than an energy converter*, *available at* https://bscb.org/learning-resources/softcell-e-learning/mitochondrion-much-more-than-an-energy-converter/ (last accessed Sept. 5, 2023).  But, *cf., e.g.,* Zhang, *et al.*, *Red blood cell extrudes nucleus and mitochondria against oxidative stress* (July 2011) ("Mammal red blood cells (erythrocytes) contain neither nucle[i] nor mitochondria."), *available at* https://pubmed.ncbi.nlm.nih.gov/21698761/ (last accessed Sept. 5, 2023).

[59] *See, e.g.,* Merriam-Webster.com Dictionary, *prokaryote* (July 15, 2023) ("any of the typically unicellular microorganisms that lack a distinct nucleus and membrane-bound organelles and that are classified as a kingdom (Prokaryotae synonym Monera) or into two domains (Bacteria and Archaea)"), *available at* https://www.merriam-webster.com/dictionary/prokaryote (last accessed Sept. 6, 2023).

[60] *See, e.g.,* Merriam-Webster.com Dictionary, *endosymbiosis* ("symbiosis in which a symbiont dwells within the body of its symbiotic partner"), *available at* https://www.merriam-webster.com/dictionary/endosymbiosis (last accessed Sept. 5, 2023).

(eukaryotes[61]).  All current plants and animals arose from these pairings and still rely on mitochondria.[62]

6.   Mitochondria thus maintain their own deoxyribonucleic acid ("D.N.A.") distinct from the human genome.[63]

7.   Mitochondrial D.N.A. is passed largely if not entirely from biological mother to child,[64] i.e. without recombination through gametogenesis[65] and fertilization.

8.   "The classic role of mitochondria is oxidative phosphorylation, which generates [adenosine triphosphate (ATP)] by utilizing the energy released during the oxidation of the food we eat. ATP is used in turn as the primary energy source for most biochemical and physiological processes, such as growth, movement and homeostasis. We turn over approximately our own body weight in ATP each day, and almost all of this is generated by mitochondria, primarily within [the] muscle[s], brain, liver, heart and gastrointestinal tract.  The pre-eminent[*sic*] role of eating is to provide the fuel for mitochondria, and the pre-eminent role of breathing is to provide the oxygen and to remove the carbon dioxide [required and] produced during

---

[61] *See, e.g.,* Merriam-Webster.com Dictionary, *eukaryote* (July 15, 2023) ("any of a domain (Eukarya) or a higher taxonomic group (Eukaryota) above the kingdom that includes organisms composed of one or more cells containing visibly evident nuclei and organelles"), *available at* https://www.merriam-webster.com/dictionary/eukaryote (last accessed Sept. 5, 2023).

[62] *See, e.g.,* Nature, *The origin of mitochondria and chloroplasts* (2014), *available at* https://www.nature.com/scitable/content/the-origin-of-mitochondria-and-chloroplasts-14747702/ (last accessed Sept. 5, 2023).

[63] *See, e.g.,* Merriam-Webster.com Dictionary, *mitochondrial DNA* (Sept. 2, 2023) ("an extranuclear double-stranded DNA found exclusively in mitochondria that in most eukaryotes is a circular molecule and is maternally inherited"), *available at* https://www.merriam-webster.com/dictionary/mitochondrial%20DNA (last accessed Sept. 5, 2023).

[64] *Id.*

[65] "Gametogenesis is the process by which sperm and eggs are produced from the germ cells in the testes and ovaries, respectively."  ScienceDirect.com, *gametogenesis* (citing Encyclopedia of Reproduction (2d ed. 2018)), *available at* https://www.sciencedirect.com/topics/biochemistry-genetics-and-molecular-biology/gametogenesis (last accessed Sept. 6, 2023).

oxidative phosphorylation by mitochondria.  Similarly, a major role of the cardiovascular system is to deliver the substrates (glucose, fatty acids, oxygen) and remove the products (carbon dioxide) of mitochondrial activity."[66]

9.    Though the human and mitochondrial genomes are distinct, humans have genes to ensure compatibility with mitochondria and vice versa.[67]

10.   Except for the approximate mass of the A.T.P. humans turn over daily, Defendant knew the facts, *supra,* p. 50, ¶¶ 4-9, from his ninth-grade biology class.

11.   Before the charged conduct, Defendant learned that mitochondrial disease, in the singular, is an umbrella term for various, specific incompatibilities or other problems between a host organism and its mitochondria.[68]

12.   Before the charged conduct, Defendant learned that mitochondrial diseases are often inherited.[69]

13.   Before the charged conduct, Defendant learned that mitochondrial diseases are often progressive, degenerative and fatal:

---

[66] Dermatol, *The role of mitochondrial function and cellular bioenergetics in ageing*[sic] *and disease* (Feb. 9, 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4321783/ (last accessed Sept. 6, 2023).

[67] "The multiple functions of mitochondria, including adenosine triphosphate synthesis, are controlled by the coordination of both the mitochondrial DNA (mtDNA) and the nuclear DNA (nDNA) genomes."  Heuer, *The effects of nuclear DNA mutations on mitochondrial function*, Journal of the American Association of Nurse Practitioners (Jan. 1, 2023), *abstract available at* https://pubmed.ncbi.nlm.nih.gov/36602472/ (last accessed Sept. 27, 2023).

[68] "The umbrella term 'mitochondrial disease' refers to a clinically heterogeneous group of primary mitochondrial disorders in which the tissues and organs that are most often affected are those with the highest energy demands." Alston, *et al.*, *The genetics and pathology of mitochondrial disease*, Journal of Pathology (Jan. 2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5215404/ (last accessed Sept. 27, 2023).

[69] "Mitochondrial diseases are genetic.  You can inherit these conditions from your biological family in an autosomal dominant or autosomal recessive pattern.  This means that you can get a changed (mutated) gene that causes this condition from one or both of your biological parents respectfully.  Some cases can occur randomly (de novo) without any history of the condition in your biological family."  The Cleveland Clinic, *Mitochondrial diseases*, *available at* https://my.clevelandclinic.org/health/diseases/15612-mitochondrial-diseases (last accessed Sept. 27, 2023).

"There isn't a cure, but treatment can prevent life-threatening complications."[70]

14.   Defendant first learned of Justina ca. November 2013.

15.   At that point Defendant was already advocating for institutionalized youth, specifically in the "troubled teen" industry.

16.   "The 'troubled teen' industry is a network of private youth programs, therapeutic boarding schools, residential treatment centers, religious academies, wilderness programs, and drug rehabilitation centers and it dates back at least 50 years.  The facilities are operated by private companies, nonprofits, or faith-based groups and they promise to help youth with problems related to behavior, addiction, and eating disorders, and in some cases sexual orientation and gender identity.  Despite numerous allegations of serious abuse that date back decades, they continue to operate in a largely unregulated way."[71]

17.   "Youth can end up in the 'troubled teen' industry in a variety of different ways.  They can be privately placed by their parents or families; state and local governments can pay these programs to take youths from their foster care and juvenile justice systems; school districts can place youth through their individualized education programs; refugee resettlement agencies can place youth; or they can be placed by mental health providers."[72]

---

[70] *Id.*

[71] *See* Krebs, *Five Facts About the Troubled Teen Industry: Some information to help you better understand the "troubled teen" industry that, despite having allegations of abuse levied against it for decades, continues to operate largely unregulated.*, American Bar Association Practice Points (Oct. 22, 2021), *available at* https://www.americanbar.org/groups/litigation/committees/childrens-rights/practice/2021/5-facts-about-the-troubled-teen-industry/ (last accessed Oct. 2, 2023).

[72] *Id.* at ¶ 1.

18.   "In 2008 the U.S. Government Accountability Office (GAO) published the report 'Residential Programs: Selected Cases of Death, Abuse, and Deceptive Marketing.'  The report 'identified thousands of allegations of abuse, some of which resulted in death, at residential programs across the country and in American-owned and American operated facilities abroad.'  Despite these findings more than a decade ago, there is no federal regulation or oversight of these programs, nor are there consistent regulations among states. Furthermore, many states completely exempt religious boarding schools from licensing requirement[s] and from oversight from education and child welfare authorities.  States and facilities do not even keep track of the number of placements []or length of stay."[73]

19.   "It is estimated that between 120,000-200,000 young people reside in some type of group home, residential treatment center, boot camp, or correctional facility.  While the exact number of private placements [is] unknown, estimates are that more than 50,000 of those youth were placed privately by their parents."[74]

20.   "The 'troubled teen' industry is a big business.  It receives 'an estimated $23 billion dollars of annual public funds to purportedly treat the behavioral and psychological needs of vulnerable youth.'  Many residential facilities operate as for-profit organizations.  One such for-profit facility, Sequel, has an annual revenue that 'regularly tops $200 million; as of 2017, 90% of their[*sic*] revenue came from Medicaid, Medicare, and approximately 500

---

[73] *Id.* at ¶ 2.
[74] *Id.* at ¶ 3.

additional federal, state, and local programs.  Programs pay Sequel as much as $800 per day for each child at a facility.'"[75]

21.  Prior to the charged conduct, Defendant watched and credited sworn Congressional testimony about the "troubled teen" industry, *e.g.*, testimony such as the following by the U.S. Government Accountability Office (G.A.O.):

> One [wilderness program] group became lost and spent several additional hours hiking when the reported heat index outside was 120 degrees.  A 14-year-old boy, weighing 250 pounds, had problems breathing, but was encouraged by the staff to continue.  When he returned to the camp, he collapsed against a tree and fell to the ground.  Staff believed that he was faking it until he vomited, became unresponsive and ultimately died.
> A 17-year-old male jumped off of a building in a suicide attempt and severely broke his left arm, with the bone exposed.  Despite this severe wound, the boy was punched, slammed against walls and rolled in the dirt.  He was beaten so severely that he forgot who he was and he became unconscious.  These beatings continued for two weeks before he was finally given medical treatment.  A 16-year-old boy having trouble breathing and walking was tortured and humiliated for days.  One staff member told the boy that he deserved an Academy Award for faking it.  He died later that day.  An autopsy report for this boy showed 71 contusions and abrasions from head to toe.  Another 16-year-old boy with asthma was placed in a face-down restraint by three staff members before he died.  Another boy was restrained more than 250 times, including two times for more than 12 hours each.  A 12-year-old boy, weighing 87 pounds, was placed in a face-down restraint with a staff member lying on top of him until he died.
> And a staffer referred to as the drill instructor trained his pit bull to bite people in the crotch on command.  A 17-year-old boy experienced this painful abuse.[…]
> Boys at one boot camp were required to stand with bags over their head[s] and a hangman's noose

---

[75] *Id.* at ¶ 4.

around their neck[s].  The rope on this noose was
tightened to simulate a hanging.  The individual
responsible for this told officers that this was
an appropriate form of discipline.
Another boy was forced to lie face-down on a red
ant hill and was not allowed to brush the ants
off of his face or his body.  In a separate
incident, this boy was required to lie on his
stomach for 10 hours.  He was only allowed to get
up to vomit, and then he was required to clean up
his vomit before he got down on the ground again.
And finally, the poster board [(*see, infra,*
video, n. 76)] shows [a] picture of a horse in
Canada.  This horse was starved, as you can see
by the protruding rib cage.  Neglect also
resulted in the problems with the hoof that you
see on the picture.[…]
This horse belonged to the owner of one of our
case-study programs.  This owner was convicted in
Canada for cruelty to 39 horses and seven Golden
Retrievers.
Although he received a lifetime ban from taking
care of animals in Canada, he was allowed to take
care of teenagers here in the United States, and
the results should not be surprising.  He and his
wife were cited in Utah for, among many things,
use of profane language to humiliate youth,
improper seclusion, and rat infestation.[76]

22.    Before the charged conduct, Defendant learned that "troubled

teen" industry staffers market methods such as those quoted directly

above as "behavior modification" therapies.[77]

23.    Before the charged conduct, Defendant watched and credited

video of then-19-term U.S. Representative Mr. George Miller's

describing the "troubled teen" industry: "God, it's like almost every

---

[76] *See* U.S. House of Representatives Committee on Education and Labor, Hearing on *Child Abuse and Deceptive Marketing by Residential Programs for Teens* at 14:58 (Apr. 24, 2008), *available at* https://youtu.be/fRWEh-qIiUM?si=GcXr0M_kcXYn9Vll&t=898 (last accessed Oct. 2, 2023).  *See, also,* Convention Against Torture, Treaty Doc. 100-20; 18 U.S.C. §§ 2340 *et seq.*

[77] *See, e.g.,* Tsisin, *The Troubled Teen Industry's Troubling Lack of Oversight*, The Regulatory Review (June 27, 2023) ("[Residential treatment facilities] advertise care, promise behavior modification, and seek to 'fix' whatever parents may deem wrong with their teenage kids.  But RTFs too often *punish* mental health and behavior, instead of *treating* it.  Actual, evidence-based treatment, such as cognitive behavior therapy or trauma-informed care, is frequently supplanted by cruel, archaic methods of physical, emotional, and sexual abuse.") (emphasis in original), *available at* https://www.theregreview.org/2023/06/27/tsisin-the-troubled-teen-industrys-troubling-lack-of-oversight/ (last accessed Oct. 19, 2023).

abusive thing you think could happen to a child has happened in one of these settings somewhere at one time or another."[78]

24.   Before the charged conduct Defendant watched and credited video of Representative Miller's stating, regarding the industry: "I've been chasing these people for 25 years, and not much has changed, tragically, and a lot of children, a lot of children, have been chewed up in the system, permanently scared, permanently damaged, and in some tragic cases, killed."[79]

25.   Before the charged conduct Defendant watched and credited video of Representative Miller's stating, regarding the industry, that, unsuccessfully: "I've asked the Treasury Department to take a look at them.  I've asked the State Department to take a look at them. I asked the Justice Department to take a look at them[…]"[80]

26.   As a proud American, before the charged conduct, Defendant watched and credited Representative Miller's legal opinion, as a U.S. legislator and attorney:

> The idea that these are private institutions; private institutions don't get to violate the law: you don't get to abuse children.  You don't get to intimidate and psychologically abuse children; you don't get to do it on the school ground.  You don't get to do it in your private home.  And you don't get to do it on a ranch in Montana or anywhere else.[81]

27.   Before the charged conduct Defendant watched and credited video of Representative Miller's stating: "You worry that this industry is kind of, you know, infiltrating the political system at

---

[78] *See* MontanaPBS, *Who's Watching the Kids?* at 0:02 (Mar. 3, 2010), *available at* https://watch.montanapbs.org/video/montanapbs-presents-whos-watching-the-kids/ (last accessed Oct. 2, 2023).
[79] *Id.* at 36:46.
[80] *Id.* at 50:43.
[81] *Id.* at 51:01.

the highest levels to keep action from being taken to protect the kids."[82]

28.   Before the charged conduct, Defendant watched and credited video of Representative Miller's stating: "I've turned so many corners on this, I've been to so many investigations, I've been to so many review panels, so many blue-ribbon commissions, and the children just continue to get chewed up, and lost, and, and harmed."[83]

29.   Before the charged conduct, Defendant watched and credited video of Representative Miller's opening statements to multiple hearings on the industry, wherein he stated, *e.g.*,

> It is estimated that hundreds of private residential treatment programs operate nationwide.  The programs are governed for the most part by a weak patchwork of state regulations.  In many states, these programs operate without regulation, licensing or accreditation of any kind, despite often exorbitant prices of tuition.
> Parents often send their children to these programs when they feel they have exhausted their alternatives.  Their children may be abusing drugs or alcohol, attempting to run away or physically harm themselves, or otherwise acting out.  They send their children to these programs because [of] the promises [that] staff members will be able to help children straighten out their lives.
> In far too many cases, however, the very people entrusted with the safety, the health and the welfare of these children are the ones who violate the trust in some of the more horrific ways imaginable.  We are aware of stories where program staff members have forced children to remain in seclusion for days at a time, to remain in so-called stress positions for hours at a time, to undergo extreme physical exertion without sufficient food or water.
> And, today, we will hear evidence of even more horrifying stories of the children denied access

---

[82] *Id.* at 51:42.
[83] *Id.* at 56:56.

to bathrooms, forced to defecate on themselves,
of children forced to eat dirt or their own
vomit, of children paired with older children,
their so-called buddies, whose job it essentially
was [] to abuse them.  There is only one word for
this behavior, and that is *inhumane*.
*This nightmare has remained an open secret for
years.  Sporadic news accounts of specific
incidents have built a record that should never
have been ignored, but shamefully it was and the
federal government has completely failed to grasp
the urgency of this situation.*
*In 2003, I urged then Attorney General John
Ashcroft to begin an immediate investigation into
reports of child abuse at private residential
treatment programs.  The attorney general
refused, as did his successor, Alberto Gonzales.
I also then wrote Secretary of State Colin Powell
asking him to investigate the treatment of
children in facilities located overseas but
serving American children and operated by [] U.S.
companies.  Secretary Powell's response was
insufficient.*[84]

30.   Before the charged conduct Defendant watched and credited
video of Representative Miller's legal opinion, as a legislator and
attorney, stating, regarding the industry: "These allegations range
from neglect to torture, a word I do not use lightly."[85]

31.   Before the charged conduct Defendant watched and credited
video of G.A.O. Managing Director of Forensic Audits and Special
Investigations Mr. Gregory Kutz's confirmation that the industry
tortures youth on American soil, *e.g.*: "[W]e, as a country, judge
other countries harshly for their human rights violations.  Yet, at
the same time, we found torture and abuse of youth across the United
States."[86]

---

[84] U.S. House of Representatives Committee on Education and Labor, Hearing on *Cases of Child Neglect and Abuse at Private Residential Treatment Facilities* at 1:29 (Oct. 10, 2007) (emphasis added), *available at* https://www.c-span.org/video/?201427-1/child-abuse-private-facilities (last accessed Oct. 2, 2023).
[85] *Id.* at 1:08.  *See, also,* Convention Against Torture, Treaty Doc. 100-20; 18 U.S.C. §§ 2340 *et seq.*
[86] *See* U.S. House of Representatives Committee on Education and Labor, Hearing on *Child Abuse and Deceptive Marketing by Residential Programs for Teens, supra,* p. 56, n. 76, at 20:56.  *See, also,* Convention Against Torture,

32.   Before the charged conduct Defendant learned that over many years two state judges in Pennsylvania, Michael Conahan and Mark Ciavarella, had sold over 5,000 teens into the industry's custody in exchange for millions of dollars in kickbacks.[87]

33.   Defendant, circa November 2013, preliminarily researched Justina's case and published some of the information he found to social media.  Defendant was at that time already fully focused on another child's case, and he hoped that the matter would soon be resolved without his intervention, given the level of public scrutiny the case was receiving.[88],[89]

---

Treaty Doc. 100-20; 18 U.S.C. §§ 2340 *et seq.*

[87] *See, e.g., United States v. Conahan,* 2009 U.S. Dist. LEXIS 126148, No. 3:09-cr-28 (M.D. Pa. July 30, 2009) (Kosik, J.) (rejecting Rule 11(c)(1)(C) pleas as too lenient) ("Defendant Ciavarella [...] has resorted to public statements of remorse, more for his personal circumstances, yet continues to deny what he terms 'quid pro quo' his receipt of money as a finder's fee, notwithstanding the Government's abundance of evidence of his routine deprivation of children's constitutional rights by commitments to private juvenile facilities he helped to create in return for a 'finder's fee' in direct conflict of interest with his judicial roles.  Such denials are self[-]serving and abundantly contradicted by the evidence the Government proffers as offense conduct. [...] We paraphrase what has been written about judges, that, above all things, integrity is their lot and proper virtue, the landmark, and that removes it, corrupts the fountain.  In this case, the fountain from which the public drinks is confidence in the judicial system—a fountain which may be corrupted for a time well after this case.  We cannot accept the binding plea agreements' stipulation and terms as to the sentence imposed") (citations omitted), *available at* https://graphics8.nytimes.com/packages/pdf/national/20090801_judges_memorandum.pdf (last accessed Oct. 20, 2023); *United States v. Ciavarella,* 716 F.3d 705 (3d Cir. 2013).

[88] *Cf., e.g.,* James, *Mom of Sick Connecticut Teen ''Collapses' in Court After Judge Sends Kid to Foster Care*: *Justina Pelletier's parents are upset, say decision crossed "so many lines."* ABC News (Feb. 25, 2014) ("'We feel deeply saddened for Justina and her family today,' said Cristy Balcells, executive director of MitoAction.  'This is an injustice to the rare disease patient community and to the dedicated and valiant physicians who do the right thing in caring for these patients.  Mitochondrial disease is a very complicated illness with complex multi-system problems to treat so we are gravely concerned that Justina's medical needs are not being attended to, and we are concerned that her health will continue to decline without proper medical care.'  The Pelletiers reached out to MitoAction for help last year, said Balcells, and they have been speaking on their behalf and providing support.  *'We would have expected this to have been wrapped up in December,' she told ABCNews.com.*  'We are truly dismayed that this continues to be prolonged.  Justina has lost a year of her life living in an institution without people who care for her—no friends and family, nothing that a typical 15-year-old would have.  It's been drawn out because of a political battle and it's not good for the child.'") (emphasis added), *available at* https://web.archive.org/web/20230206160507/https://abcnews.go.com/Health/sick-connecticut-teen-justina-pelletier-foster-care/story?id=22668251 (last accessed Oct. 19, 2023).

[89] Defendant later apologized for not sooner rendering aid to Justina: "My only regret and the one thing I'm sorry is[,] I didn't get to help Justina sooner.  I wish I could have done something sooner."  *See* Sentencing Tr., Jan. 10, 2019, at 55:4, E.C.F. no. 399.

34.    Defendant noticed Justina's case in the news again circa February 2014 and was greatly concerned, given the nature of mitochondrial disease, that the matter had not been resolved.[90]

35.    Defendant thoroughly researched the case.

36.    At that point, at the latest, Defendant learned that Justina's older sister Jessica Pelletier had also been diagnosed with and successfully treated for mitochondrial disease.[91]

37.    Defendant read and credited media reports that Boston Children's Hospital remained in charge of Justina's care, but that Justina herself had been moved to the Wayside Youth and Family Support Network in Framingham, Massachusetts.[92]

---

[90] *See, e.g.,* James, *supra,* p. 60, n. 88.

[91] *See, e.g.,* Swidey, Wen, *A medical collision with a child in the middle*, The Boston Globe (Dec. 15, 2013) ("Linda [Pelletier] explained that Korson, the chief of metabolism at Tufts, had diagnosed Justina with mitochondrial disease, the same disorder that another of her four daughters, 24-year-old Jessica, had been diagnosed with several years earlier."), *available at* https://web.archive.org/web/20131215210153/https://www.bostonglobe.com/metro/2013/12/15/justina/vnwzbbNdiodSD7WDTh6xZI/story.html (last accessed Oct. 18, 2023); Swidey, Wen, *Frustration on all fronts in struggle over child's future* (Dec. 16, 2013) ("Internal state records show that Korson had explained that the disorder sometimes runs in families and that he had also been treating Justina's older sister for it."), *available at* https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-conclusion-still-uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html (last accessed Oct. 18, 2023); Klimas, *Father So Heartbroken About Daughter Held at Hospital Against His Will He Just Defied a Judge's Order to Talk to Us: 'I Want to Have All My Guns Blazing': "If we don't do something, she is going to die."* TheBlaze (Feb. 17, 2014) ("Jessica, 25, is the second-oldest of the Pelletiers' daughters and has mitochondrial disease herself.  The disease can manifest itself in various ways, but at its root, results from a defect in the mitochondria, an organelle inside cells that produces energy.  Jessica's diagnosis was established medically through analysis of the cells of her muscle tissue."), *available at* https://www.theblaze.com/news/2014/02/17/ready-jon-father-so-heartbroken-about-daughter-held-at-hospital-against-his-will-he-just-defied-a-judges-order-to-talk-to-us-i-want-to-have-all-my-guns-blazing#tbl-em-lnw58f9c4g7j1gd9i9p (last accessed Oct. 18, 2023).

[92] *See, e.g.,* Swidey, *Teen caught in medical, custody dispute leaves Children's Hospital*, The Boston Globe (Jan. 18, 2014) (Justina "'is no longer at Boston Children's,' hospital spokesman Rob Graham confirmed in an e-mail Friday, 'but at the request of DCF the hospital is continuing to follow the patient for outpatient care on a temporary basis until new providers can be located.'  At a closed-door hearing last week, Juvenile Judge Joseph Johnston and his court-appointed investigator set in motion a plan to have Justina discharged from Children's and moved to a transitional facility, with Tufts Medical Center doctors expected to assume primary oversight of her medical care, according to three sources briefed on the case.  However, two of those sources said Friday that state officials are rethinking the idea that Tufts would take a leadership role in treating Justina…"), *available at* https://web.archive.org/web/20140221175856/http://www.bostonglobe.com:80/metro/2014/01/18/teen-caught-medical-and-custody-dispute-leaves-boston-children-hospital-after-months/UHgFNo1dzWJCmUNXv6AX7K/story.html (last accessed Nov. 13, 2023); Fox61, *Sister Says Justina Pelletier's Health 'Worst Ever': As a West Hartford family fights for their daughter's return from Massachusetts state custody, they now fear her medical*

38.   At that point, at the latest, Defendant credited reports that Boston Children's Hospital, its psychiatry staffers and Wayside were continuing to subject Justina to "behavioral modification,"[93] the same tactics touted by the "troubled teen" industry.[94]

39.   At that point, at the latest, Defendant read and credited media reports that Lou and Linda Pelletier had pleaded with the F.B.I., to no avail, to vindicate their and Justina's civil rights.[95]

40.   At that point, at the latest, Defendant learned that Lou Pelletier had publicly named Harvard for its role in Justina's case, *e.g.*: "[W]e are fighting the two-headed monster, the ultimate David against Goliath, State of Massachusetts and DCF, Harvard and Boston Children's Hospital."[96]

41.   Upon research, Defendant concluded that the criticism of the Pelletiers prevailing in some circles was unfounded.  Defendant would

---

*condition is deteriorating.  Justi…* (Mar. 22, 2014) ("'They're saying one thing and not following through.  I just don't think it's fair anymore at this point to keep prolonging it,' Jennifer Pelletier told Fox CT on Saturday.  The judge recently ordered Tufts Medical Center to handle all future medical care, but the Pelletiers say that so far, Justina hasn't been seen by any Tufts physicians. […]  Justina is currently living at the Wayside Youth and Family Support Network in Framingham, Mass."), *available at* https://www.fox61.com/article/news/local/outreach/awareness-months/sister-says-justina-pelletiers-health-worst-ever/520-809290b4-a324-4eaf-bc0a-fe73a8218a22 (last accessed Oct. 18, 2023).

[93] *See, e.g.,* Klimas, *supra,* p. 61, n. 91 ("Jessica Pelletier demonstrated how [Justina] would fold a flap in cards and write messages in small handwriting underneath.  Lou Pelletier said if Justina got caught doing this 'she would get tortured,' which he said the hospital called 'behavioral modification.'"); Klimas, *Judge Rules to Put Justina Pelletier in Foster Care, Father Says* (Feb. 24, 2014) ("Lou Pelletier said that he believes BCH doctors could still be 'pushing behavioral modification,' which he considers 'inhumane criminal behavior' on the part of the physicians."), *available at* https://www.theblaze.com/news/2014/02/24/report-judge-rules-to-put-justina-pelletier-in-foster-care (last accessed Dec. 2, 2023).

[94] *See, supra,* p. 56, ¶ 22 (citation omitted).

[95] *See, e.g.,* Swidey, Wen, *Frustration on all fronts in struggle over child's future, supra,* p. 61, n. 91 (The Pelletiers "took their complaints to every authority they could think of: the district attorney, the attorney general, the governor's office, even the FBI.  They alleged that [Boston] Children's [Hospital] was using its considerable muscle to box them out at every turn.  When the parents received an e-mail from the person the judge had appointed as an independent investigator to advise him in the case, they were outraged to see her list an affiliation with [Boston] Children's [Hospital] in the e-mail.")

[96] *See* Glenn Beck, *Lou Pelletier talks to Glenn about the contempt of court charges and what comes next for his family* (Feb. 19, 2014), *available at* https://www.glennbeck.com/2014/02/19/lou-pelletier-talks-to-glenn-about-the-contempt-of-court-charges-and-what-comes-next-for-his-family/ (last accessed Dec. 2, 2023).

have considered it strange, indeed, for a loving and concerned family to navigate such a course unemotionally and without obvious signs of acute urgency.

42.   During Defendant's research he read and credited a Dec. 21, 2013, open letter to the commissioner of the Massachusetts Department of Public Health by former Assistant United States Attorney Mr. Barry Pollack regarding Boston Children's Hospital's Bader 5 psychiatric ward:

> We write to demand a formal investigation of the Bader 5 Unit at Children's Hospital Boston and, unless and until the Commonwealth can confirm the safety of children there, the closure of Bader 5. I am a former federal prosecutor, the longest-tenured member of the Board of Directors of the Massachusetts Society for the Prevention of Cruelty to Children, and counsel for the mother and child in the attached Complaint against Children's Hospital Boston and several of its providers.
> Based on publicized reports by several families, there has been a pattern of abuse of children by one or more healthcare providers at the Bader 5 inpatient unit of Children's Hospital.  In the case of my clients, the Bader 5 providers' analysis, treatment and approach were dead wrong, leading to a medically unnecessary confinement of a 14-year[-]old girl for approximately 6 weeks, followed by the return of the girl to the person who was the source of an overdose, rather than to the girl's mother and legal custodian.  The problem became apparent when the mother disagreed with Bader 5 healthcare providers and wanted her daughter returned to her home country of Switzerland for treatment.  As reported in the growing number of cases in which allegations are becoming public, Bader 5 healthcare providers, including Gary Gosselin and Colleen Ryan, along with an in-house counsel named Ellen Rothstein, appear to favor hasty accusations of medical child abuse or the like against parents who challenge them.  Based on allegations by multiple families, Gosselin and/or Ryan have even taken harsh stances to avoid second opinions that parents wish to seek from other facilities.  In

my view, one of Gosselin's[,] Ryan's, and
Rothstein's biggest weaknesses appears to be an
unwillingness to consider the possibility that
they have made mistakes, which is a major
deficiency in professionalism.  A former
Children's Hospital nurse and whistleblower,
Katie Higgins, has publicly reported these sorts
of problems at Bader 5.  As a result of, among
other things, arrogance, professional mediocrity,
and/or a rush to judgment, Bader 5 appears
virtually synonymous with abuse for many
children.  While Gosselin, Ryan, and Rothstein
may deflect blame for malpractice and abuse onto
parents, Bader 5 emerges as a serious risk of
abuse.  My clients' case involved the failure of
Bader 5 providers to protect a 14[-]year-old
girl, as set forth in the accompanying Complaint.
I understand that other cases in which children
have been confined in Bader 5 involve(d)
controversial diagnoses concerning mitochondrial
disorder (such as in the high profile Pelletier
case and a less publicized Hilliard case), PANDAS
(such as in the Wray case), and Lyme disease.
Medical debate offers benefits.  Without it, the
majority practice could still involve the use of
bloodletting, ice pick lobotomies, and leeches
(which I only recently learned the FDA approved
as a medical device in 2004, but for very limited
purposes).  Rather than respect a medical debate,
however, Bader 5 healthcare providers have
stifled it by attacking parents and deterring
alternate opinions.  Bader 5 providers have shut
out qualified professionals who are more familiar
with the patient.  They have threatened parents
and, worse yet, followed through on those threats
through an odd relationship that they have
established with DCF.  Not much needs to be said
about the view of DCF these days, but suffice to
say it lacks adequate medical resources and
reliability in general, but has the power to make
life very difficult for parents and families,
particularly when aligned with a name like
"Children's Hospital."
An anti-parent approach at Bader 5 fails to
respect the time-honored importance of the
parental relationship, at the expense of children
and families.  As the United States Court of
Appeals for the First Circuit wrote, in a
successful appeal by my client Claudia Felder in
a case in which Children's Hospital initially
held her daughter in Bader 5 for about 6 weeks to
her detriment: "We have stressed that 'under the

Constitution, parents have a fundamental interest
in their relationships with their children,' "
and the Supreme Court has emphasized that '[t]he
liberty interest … of parents in the care,
custody, and control of their children … is
perhaps the oldest of the fundamental liberty
interests recognized by this Court.[']"  Earlier
this year, another federal appellate court found
that an institutional report of parents for
"medical child abuse" constituted retaliation
that gave rise to a cause of action under the
Americans with Disabilities Act.  Furthermore,
Children's Hospital's concerted efforts with DCF
has resulted in Bader 5 operating under color of
state law, within the meaning of federal civil
rights laws, 42 U.S.C. § 1983.  DCF records
obtained through FOIA requests indicate that
Rothstein, a Children's Hospital lawyer,
incredibly offered to have the legal department
for Children's Hospital perform legal work for
DCF in one matter.
With this backdrop, you might ask why federal
claims are insufficient and why help is needed
from the Department of Public Health to shut down
Bader 5 or take other sufficient measures.  The
answer is simple.  Federal claims would not
include a right to shut down Bader 5, yet that
consequence is important to the health and
recovery of any children who have been trapped
there against their will and in circumstances in
which much less intrusive care would have been
more appropriate.  Children in Bader 5 can be
blocked from the outside world and even at times
daylight.  For those children, like all
victimized children, an important step in
recovery can be an acknowledgement of wrongdoing
by an institution that has failed them.  Bader 5
has clearly failed and hurt many of its patients
and their families.[97]

43.   During Defendant's research he read and credited a Jan. 10,

2014, open letter by former Boston Children's Hospital psychiatric

nurse Kathleen Higgins, regarding Boston Children's Hospital's Bader 5

psychiatric ward:

---

[97] Pollack, *Re: Children's Hospital Boston—Bader 5 Unit,* Dec. 21, 2013, E.C.F. no. 127-1, *also available at* https://drive.google.com/file/d/1o8GCiAdMATWIA13nUDO5hnMCyDete6RU/view (last accessed Sept. 7, 2023).

On February 15, 2013 the pronouncement that
shattered Justina's life was rendered by a total
stranger who sentenced her to undergoing the
stress of radical changes in her basic medical
care, before being moved to a more secure area of
B[oston Children's Hospital] where contact with
her family would be more severely limited and
more strictly monitored.

As advocate for the family, I informed Department
of Mental Health licensing director[] Liz Kinkead
of the breach of law regarding Justina's
commitment to a locked psychiatric unit and was
told that DMH was deferring to the ["]medical
expertise of Boston Children's Hospital."
Justina has no history of "serious mental
illness," nor did she exhibit behaviors that
indicated she was at risk for harming herself or
others.  Justina continues to be held against her
will on this locked psychiatric unit, licensed by
the Commonwealth of Massachusetts Department of
Mental Health, on the authority granted to
attending psychiatrist[] Dr. Colleen Ryan[]
presumably to prevent harm that would be caused
to Justina by the medical care her parents would
choose to pursue from board certified, licensed
metabolic/genetics specialist[] Dr. Mark Korson
of Tufts University Medical Center, who had been
treating Justina successfully for over a year.
Justina was forced to accept her imprisonment to
relinquish her basic human rights because it was
deemed "unsafe" for her to have access to the
medical care she expected to receive at B[oston
Children's Hospital].

From the perspective of the teen whose life has
been derailed, she is the ward of a state devoid
of compassion and conscience, prohibited from
contact with every facet of her life that holds
meaning for her.  I am submitting this
information, which has been made public, in the
form of a complaint against Judge Joseph
Johnston, Dr. Colleen Ryan and the Massachusetts
Department of Children and Families for the
emotional and medical abuse Justina Pelletier has
suffered for nearly a year.  It would be far more
accurate to call the "treatment" forced on
Justina by its more proper term, "torture."[98]

---

[98] Higgins, *Re:* Mandated Reporter complaint: *Emotional & Medical Child Abuse of Justina Pelletier, inpatient adolescent psychiatry unit, Boston Children's Hospital.: Children's Hospital Boston—Bader 5 Unit,* Dec. 21, 2013 (emphases removed), E.C.F. no. 127-2, *also available at* https://drive.google.com/file/d/1_A95yGUytFJ8zloRQd3LNJYmwASyo67q/view (last accessed Sept. 24, 2023).  *See, also,* Convention Against Torture, Treaty Doc. 100-20; 18 U.S.C. §§ 2340 *et seq.*

44.   On March 29, 2014, Defendant watched and credited Harvard Law School professor emeritus Mr. Alan Dershowitz's legal opinions regarding Justina's case, as told to former Arizona Governor Michael *Mike* Huckabee:

> It's of great, great concern to me.
> I know Children's Hospital very well.  Both of my children were treated there.  It's a wonderful hospital.  My wife, who has a Ph.D. in neuropsychology, worked there for many years.
> And yet neither my wife nor I can understand this case.  *The law of Massachusetts is clear*.  When you have a conflict in medical opinion, and here you have Tufts Medical School, which is one of the greatest medical schools in the country, [and] Children's Hospital, part of the Harvard teaching hospital system, you allow those conflicts of medical care to be resolved by the parents.  *The state doesn't come in and tell you [that] you have to accept the medical opinion of one hospital over the other.*
> Again, just as the lawyer in you has said, when you hear about a case like this, you scratch your head and you say, something else must be going on; there must be something we don't know.  *But if what we've heard is true, this is a horrible abuse of human rights, of civil liberties*.  And I'd like to help out, too.  I'm a member of the Massachusetts bar, and if there is anything I can do to restore the parental rights here.
> Look, I don't know who's right.  It may be that Children's Hospital is right, and Tufts is wrong.  It may be that she is getting better care.  I don't know the answer to that, medically.
> *I do know that under our legal system, when there's a conflict of medical opinion, the parents get to resolve that for a fifteen year old, not the state.[…]  And the gag order is clearly, the gag order is clearly unconstitutional.  You can't stop parents from bringing a petition about their grievances to the governor, to the president, to you or me, and to the American public.  That's clearly unconstitutional.*[99]

---

[99] *See, e.g.,* Daily Motion, *Alan Dershowitz extends offer to aid Justina Pelletier on Huckabee Show March 29 2014* at 0:33 (emphasis added), *available at* https://www.dailymotion.com/video/x1l13qw (last accessed Sept. 6, 2023).

45.   Before the charged conduct, Defendant read and credited media reports that Boston Children's Hospital *et al.* had denied Justina the rights and rites of Communion, Confession and Mass.[100]

46.   Before the charged conduct, Defendant read and credited media reports that Boston Children's Hospital *et al.* had denied Justina the right to a free, public education.[101]

---

[100] *See, e.g.,* Personhood USA, *Justina Pelletier denied same freedoms awarded to Boston Marathon Bombing Suspect, says Personhood USA* (Apr. 18, 2014) ("According to court documents, Justina Pelletier has expressed the desire to attend mass, but during her 14 months in DCF custody, has been prevented from exercising her religious liberties.  The Pelletier family, who are Catholic, are concerned that Justina has not been allowed to see a priest or attend mass on Christmas Eve, Christmas, or Easter."), *available at* https://www.prnewswire.com/news-releases/justina-pelletier-denied-same-freedoms-awarded-to-boston-marathon-bombing-suspect-says-personhood-usa-255807201.html (last accessed Dec. 2, 2023); Liberty Counsel, *Justina Pelletier to Remain Ward of the State* (Mar. 25, 2014) ("For 14 months DCF has refused to [...] allow Justina access to a clergy or communion"), *available at* https://i906.lc.org/newsroom/details/032514-justina-pelletier-to-remain-ward-of-the-state (last accessed Dec. 2, 2023).
[101] *Id.* ("For 14 months DCF has refused to provide [...] Justina [...] any meaningful education").

47.   During Defendant's research, days before the alleged distributed denial-of-service (DDoS), Defendant read and credited a note Justina handwrote and smuggled out of Boston Children's Hospital, past her censors: "[T]hey don't care that I'm sick[…]  [T]hey do not let me sleep vary[*sic*] much[.]  Hury[*sic*]! […] They hurt me all the time[,] push me all the time and more."[102]



---

[102] *See* Justina's Note, Exh. A.

48.   At the detention hearing and trial, the government admitted and attributed to Defendant an *Anonymous #OpJustina Press Release Video* uploaded to YouTube Mar. 23, 2014, that stated:

We are Anonymous



We are Legion
We do not forgive
We do not forget



```
                  Expect us
               United as one,
               divided by zero
                  Anonymous
     Greetings fellow citizens, we are Anonymous.
```



It has come to our attention that a fifteen-year-old girl by the name of Justina Pelletier has been held against her will by the state of Massachusetts for over one year.  Justina has a condition known as mitochondrial disease; however, the Boston Children's Hospital believes that it all is merely in her head and as a result she has been detained *in addition to being tortured physically and mentally by this corrupted system* for nothing more than being sick.



Justina is only allowed to speak to her family for twenty minutes a day and be visited for one hour a week.

Anonymous and the American People will not tolerate this abuse of our children and will retaliate using whatever means *necessary in order to protect our fellow citizens* from this abusive and manipulative behavior.  We will punish all those held accountable and will not relent until Justina is free.

To Judge Joseph F. Johnston, you seem to believe that you can just abduct children away from their parents with impunity because you are a judge? Wrong.

Anonymous is here to remind you who is in charge of this country, and, as a result, we feel that you should be exposed from behind your veil of secrecy and deceit.

To the American People, in this message you will find a website link.  Anonymous implores you to use this information to your maximum potential *in order to save Justina's life.*  Call his home and demand answers.  Mail letters to his home telling him that you will not stand for *this attack upon the innocent*.  Stand up for a child in her darkest hour.

Alice W. Newton was the so-called doctor who felt it was necessary to have Justina incarcerated inside the psychiatric ward of Boston Children's Hospital.  Where is your compassion, doctor?  Why is it that you feel that you need to abduct over four hundred children a year away from their

families?  Did you not make an oath to help and
protect the sick?  For your crimes against
children, we see it in the best interest to
punish you for your lack of empathy and obvious
lack of respect for your fellow humans.
Dear Americans, we also call upon you to use the
information provided to your fullest to make her
see that you as a People will not take this clear
abuse of power.
To the Boston Children's Hospital, why do you
employ people that clearly do not put patients
first?  We demand that you terminate Alice W.
Newton from her employment or you, too, shall
feel the full wrath of Anonymous.
Test us and you shall fail.
This will be your first and final warning.
Failure to comply with our demands will result in
retaliation in the likes which you have never
seen.



Free Justina and return her home to her family.
The voice of the People shall be heard.
We are Anonymous.
We are legion.
We do not forgive.
We do not forget.
Expect us.
Operation Justina engaged.

```
#OpJustina
Fight for those who have no voice.
```











Dear Citizen,
Every so often,
we are faced
with a choice

*to fight for what is right*
or to allow ourselves
and those around
us to be controlled
by the greed of others.



*We are fighting for free speech.*

*We are fighting for the truth.*



We are Anonymous.
Join us.[103]

49.   After the Court polled the jury as to its verdict, Juror Six very clearly told Defendant from the jury box, "I'm sorry."

B. THE SEARCH WARRANT

50.   On October 1, 2014, F.B.I. special agents Michael Tunick and Chris Hughes, along with 10 or so other federal agents and a representative of the Somerville Police Department executed a search warrant on Defendant's residence.[104]

51.   Pursuant to the warrant, the government seized Defendant's laptop, mobile phone and several other computing devices.[105]

---

[103] *See Anonymous #OpJustina Press Release Video* (emphasis added), Det. Hrg., Exh. 2, Trial, Exh. 121, *also available at* https://www.youtube.com/watch?v=CbnJyK_54Jo (last accessed Oct. 20, 2023).  *See, also,* Convention Against Torture, Treaty Doc. 100-20; 18 U.S.C. §§ 2340 *et seq.*

[104] *See, e.g.,* Warrant, No. 14-mj-2233-MBB (D. Mass.)

[105] *See* Warrant Return, *id.*

52.   During the execution of the warrant, Tunick and Hughes conceded that the *Anonymous #OpJustina Press Release Video*[106] was "protected speech."[107]

53.   The search warrant was issued by The Hon. Magistrate Judge Marianne B. Bowler.[108]

54.   Bowler hand-dated the issued warrant "September 29, 2014."[109]

55.   Defendant had never heard of Bowler and had no reason to believe Bowler had failed to disclose information relevant to the federal recusal statutes 28 U.S.C. §§ 144, 455.[110]

56.   The same day as the search, Defendant retained counsel, Mr. Tor Ekeland, of Tor Ekeland, P.C, a Brooklyn firm that stated it specializes in criminal defense of Computer Fraud and Abuse Act (C.F.A.A.) charges (18 U.S.C. § 1030).[111]

---

[106] *See, supra,* p. 70, ¶ 48 (citation omitted).

[107] *See* the Free Speech and Press Clause, U.S. Const. amend. I, cl. 3 ("Congress shall make no law … abridging the freedom of speech…").

[108] Warrant, *id.*

[109] *Id.*

[110] *See, e.g.,* 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."), (b) ("He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; […] (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding; (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: […] (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; (iv) Is to the judge's knowledge likely to be a material witness in the proceeding."), (e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).  Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.").

[111] "Tor Ekeland, P.C. is a New York City law firm representing clients at the cutting edge of technology and business law.  The Firm handles a range of litigation and transactions involving computer law, Internet law, intellectual property, and business. […]  We litigate civil and criminal matters in Federal[*sic*] and New York State courts and are currently handling three prominent federal criminal Computer Fraud and Abuse Act (CFAA) cases."  Tor Ekeland, P.C., *Technology and Business Lawyers* (snapshot July 23, 2014), *available at* https://web.archive.org/web/20140723020250/https://www.torekeland.com/ (last accessed Sept. 27, 2023).

57.   The application for the warrant was sealed and Defendant and counsel tried but were unable to obtain it from PACER[112] to scrutinize it.

58.   Defendant did not receive the warrant application until discovery.

C. BOSTON CHILDREN'S HOSPITAL, HARVARD, THE GOVERNMENT, THE COURTS, *ET AL.*

59.   Boston Children's Hospital is an organ of Harvard University such that, *e.g.*, the hospital's staffers' email addresses that Defendant is accused of disrupting end in "harvard.edu."[113]

60.   Boston Children's Hospital in fact advertises on its website that it "is the primary pediatric teaching hospital for Harvard Medical School."[114]

61.   In turn Harvard Medical School refers to, *inter alia*, Boston Children's Hospital and Brigham and Women's Hospital as "our hospitals."[115]

62.   Two assistant United States attorneys first appeared in this case: Mr. Adam J. Bookbinder and Mr. David D'Addio.[116]

---

[112] PACER, or Public Access to Court Electronic Records, is the U.S. courts' docketing system.

[113] *See, e.g.,* Boston Children's Hospital, *Zoom Frequently Asked Questions* ("Enter your BCH email address (firstname.lastname@childrens.harvard.edu)"), *available at* https://dme.childrenshospital.org/wp-content/uploads/2019/06/2319_Zoom_FAQ.pdf (last accessed Sept. 27, 2023).

[114] *See, e.g.,* Boston Children's Hospital, *About Us, available at* https://www.childrenshospital.org/about-us (last accessed Oct. 2, 2023).

[115] *See, e.g.,* Xu, *Children's Hospital Comes Under Official Scrutiny*, The Harvard Crimson (Sept. 24, 2003) (quoting Don Gibbons, Harvard Medical School associate dean for public affairs), *available at* https://www.thecrimson.com/article/2003/9/24/childrens-hospital-comes-under-official-scrutiny/ (last accessed Jan. 27, 2024).

[116] *See, e.g.,* Clerk's Notes, Initial Appearance (Apr. 6, 2016) ("Attorneys present: Bookbinder, D'Addio, […]"), E.C.F. no. 13.

63.   Defendant later learned that Bookbinder graduated from Harvard Law School.[117]

64.   Defendant later learned that Bookbinder was "'Cybersecurity, Privacy and Technology,' speaker, Harvard Law School Spring Reunion Program, April 2018,"[118] i.e. Bookbinder spoke at Harvard Law School about cybercrime three months before the trial of this case. Defendant knows not what prior engagements Bookbinder had at Harvard.

65.   Defendant later learned former Assistant United States Attorney David D'Addio's father is a medical doctor[119] and D'Addio contributed to Greater Boston Legal Services, which lists Boston Children's Hospital as a "Legal Community Donor" and Harvard Law School as a "Community Partner."[120,121]

66.   Defendant later learned that Magistrate Bowler at all relevant times "live[d] in Brookline with husband, Marc A. Pfeffer, M.D., Ph.D., who is the Dzau Professor of Medicine at the Harvard Medical School and a senior cardiologist at the Brigham and Women's Hospital in Boston."[122]

---

[117] *See, e.g.,* Choate, Hall & Stewart, LLP, *Adam J. Bookbinder* at Education & Credentials, *available at* https://www.choate.com/attorneys/adam-j-bookbinder.html (last accessed Sept. 27, 2023).

[118] *See, e.g., id.* at Publications and Presentations ("'Cybersecurity, Privacy and Technology,' speaker, Harvard Law School Spring Reunion Program, April 2018.").

[119] *See, e.g.,* The New York Times, *WEDDINGS/CELEBRATIONS; Joyce Chen, David D'Addio* (Aug. 10, 2003) ("His father is a clinical perfusionist, responsible for the operation of heart-lung machines"), *available at* https://web.archive.org/web/20150310085150/https://www.nytimes.com/2003/08/10/style/weddings-celebrations-joyce-chen-david-d-addio.html (last accessed Oct. 2, 2023).

[120] *See* Greater Boston Legal Services, *2008 Annual Report* at 9, 14–15, 20, *available at* http://www.gbls.org/sites/default/files/2008_Annual_Report.pdf (last accessed Oct. 2, 2023).

[121] Internal rather than E.C.F. or P.D.F. page nos. are used throughout this Motion, except where a page no. directly follows an E.C.F. reference, *e.g.*, "Exh. A at 2, E.C.F. no. 1 at 4" would indicate that the second page of Exhibit A is located at the fourth page of E.C.F. no. 1. Where practical, Defendant has targeted hyperlinks to particular P.D.F. pages.

[122] *See, e.g.,* United States District Court, Press Release, Apr. 16, 2014, E.C.F. no. 128-6 at 2, *also available at* https://www.mad.uscourts.gov/general/pdf/a2014/041614%20Press%20Release%20-%20Magistrate%20Judge%20Bowler%20Reappointment.pdf (last accessed Sept. 27, 2023).

67.   Brigham and Women's Hospital bills itself as a "major teaching hospital of Harvard Medical School."[123]

68.   Defendant later learned that Dr. Pfeffer is "author of over 450 peer-reviewed publications" and "has received research funding from the American Heart Association and National Institutes of Health."[124]

69.   Defendant later learned that Harvard lists Pfeffer's involvement in 731 "selected publications," including dozens in 2013–2014,[125] when Justina was held at Boston Children's Hospital and Wayside:



This graph shows the total number of publications by year. To see the data as text, click here.

70.   Defendant later learned that Pfeffer's Brigham and Women's cardiology department advertises its close working ties to Boston Children's Hospital, *e.g.*,

> Because Brigham and Women's Hospital is a member of Mass General Brigham, *an integrated health care system*, we offer patients a continuum of coordinated and high-quality care.  For newborns requiring subspecialty care, *we are fortunate to have immediate access to the expertise of subspecialists in every area of pediatrics at two of Boston's preeminent children's hospitals,*

[123] *See* Brigham and Women's Hospital, *About*, *available at* https://www.brighamandwomens.org/about-bwh (last accessed Oct. 1, 2023).

[124] *See, e.g.*, Brigham and Women's Hospital Directory, Marc Alan Pfeffer, MD, PhD, *available at* https://physiciandirectory.brighamandwomens.org/details/1225/marc-pfeffer-cardiovascular_medicine-boston (last accessed Sept. 29, 2023);

[125] *See, e.g.*, Harvard Catalyst Profile, Marc Alan Pfeffer, M.D., Ph.D. at Bibliographic, Timeline, *available at* https://connects.catalyst.harvard.edu/Profiles/display/Person/40985 (last accessed Sept. 29, 2023).

> *Boston Children's Hospital* and Mass General for
> Children.[126]

71.   Brigham and Women's Hospital further advertises,

> In collaboration with Boston Children's Hospital
> and the Boston Adult Congenital Heart (BACH)
> Program, our board-certified cardiovascular
> experts provide evaluation and diagnosis, with
> the aid of the latest in advanced imaging
> technologies, for patients aged 16 years and
> older who have congenital heart disease and
> related illnesses.[127]

72.   The Brigham and Women's Hospital cardiology department further advertises, "We work closely with physicians at Boston Children's Hospital."[128]

73.   Defendant later learned that from 1967-1969 Magistrate Bowler herself had been a "Research Asst., Harvard Medical School, Biochemistry Dept."[129]

74.   Defendant later learned that Magistrate Bowler was director emerita of The Boston Foundation 1995-2005.[130]

75.   On its 2014 IRS Form 990, The Boston Foundation reported grants of $182,950 to Boston Children's Hospital.[131]

---

[126] *See,* Brigham and Women's Hospital, *Pediatric Subspecialty Services* (emphasis added), *available at* https://www.brighamandwomens.org/pediatrics/nicu/pediatric-subspecialty-services (last accessed Sept. 27, 2023).

[127] *See* Brigham and Women's Hospital, *Adult Congenital Heart Disease Program*, *available at* https://www.brighamandwomens.org/heart-and-vascular-center/programs/congenital-heart-failure-and-adult-congenital-heart-disease-program (last accessed Sept. 27, 2023).

[128] *See* Brigham and Women's Hospital, *Cardiovascular Genetic Diseases* at Multidisciplinary Care, *available at* https://www.brighamandwomens.org/heart-and-vascular-center/diseases-and-conditions/cardiovascular-genetic-diseases (last accessed Oct. 2, 2023).

[129] *See, e.g.,* Lawyers Diary and Manual, *Biographies of Massachusetts Judges: Federal Court Judges sitting in Massachusetts* at 1, Bowler, Other Positions, Exh. B; *see also Curriculum Vitae*, Honorable Marianne B. Bowler, U.S. Magistrate Judge at 4, Exh. C.

[130] *See, e.g., Curriculum Vitae, supra,* p. 83, n. 129, at 6.

[131] *See, e.g., id.* at 6; The Boston Foundation 2014 IRS Form 990 at 94–95 (showing grants of $167,450, $5,000, $500 and $10,000 to Boston Children's Hospital), E.C.F. no. 166-3 at 15–16;

| | | | | | | |
|---|---|---|---|---|---|---|
| Childrens Hospital Corporation<br>401 Park Drive<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 5,000. | 0. | | Health Care |
| Childrens Hospital Corporation<br>401 Park Drive<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 111,000. | 0. | | Operating Support |
| Childrens Hospital Corporation<br>1 Autumn Street<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 2,200. | 0. | | Annual Fund |
| Childrens Hospital Corporation<br>1 Autumn Street<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 500. | 0. | | Health Care |
| Childrens Hospital Corporation<br>1 Autumn Street<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 30,600. | 0. | | Operating Support |
| Childrens Hospital Corporation<br>1295 Boylston Street<br>Boston, MA 02215 | 04-2774441 | 501 (c) (3) | 53,735. | 0. | | Operating Support |

Schedule I (Form 990)

76.   The Boston Foundation also raises money for and grants money to the Wayside Youth and Family Support Network.[132]

77.   From 2001-05, The Boston Foundation reported grants totaling $297,501 to Boston Children's Hospital.[133]

78.   As late as December 2015, more than a year after Her Honor issued the search warrant in this case, Magistrate Bowler attended fundraising galas for The Boston Foundation.[134]

---

[132] *See, e.g,* The Giving Common: An Initiative of the Boston Foundation, *Wayside Youth & Family Support Network* (snapshot June 1, 2015), *available at* https://web.archive.org/web/20150601094350/https://www.givingcommon.org/profile/1082424/wayside-youth-and-family-support-network/ (last accessed Sept. 27, 2023); The Boston Foundation, *Massachusetts United for Puerto Rico/Massachusetts Unido por Puerto Rico* at Relocation Grantees ("Wayside Youth & Family Support Network"), *available at* https://www.tbf.org/donors/forms/massachusetts-united-for-puerto-rico (last accessed Sept. 27, 2023).
[133] Total calculated from The Boston Foundation's IRS Forms 990, *available here* https://projects.propublica.org/nonprofits/organizations/42104021 (last accessed Sept. 30, 2023).
[134] *See, e.g.,* The Boston Foundation 100th Anniversary Gala Dinner, Dec. 2, 2015 ("Emeritus Members [...] The Honorable Marianne B. Bowler"), E.C.F. no. 128-4 at 3–4.



**BOARD OF DIRECTORS**

Current Members

Michael Keating, *Chair*
Paul A. La Camera, *Vice Chair*
Rosalin Acosta
Zamawa Arenas
Sandra Edgerley
Michael Eisenson
Grace Fey

Emeritus Members

Dwight L. Allison, Jr.
Carol F. Anderson
Joan T. Bok
The Honorable Marianne B. Bowler
Richard M. Burnes, Jr.
Louis Casagrande
Gerald Chertavian
Catherine D'Amato

79.  Defendant later learned that Magistrate Bowler, from 1999 onward, was a member of the Visiting Committee on Neuroscience at Massachusetts General Hospital.[135]

80.  Massachusetts General Hospital is "is not only the original teaching hospital of Harvard Medical School, but also its largest, and nearly all our staff physicians serve as faculty."[136]

---

[135] *See Curriculum Vitae*, Honorable Marianne B. Bowler, U.S. Magistrate Judge, *supra*, p. 83, n. 129, at 6.
[136] *See* Massachusetts General Hospital, *About, available at* https://www.massgeneral.org/about (last accessed Oct. 1, 2023).

81.   Defendant later learned that Magistrate Bowler is chairwoman emerita of New England Baptist Hospital 1990-1996 and remained a "Member of the Corporation" there from 1983 onward.[137]

82.   Defendant later learned that New England Baptist Hospital advertises that it conducts teaching programs "in collaboration with Harvard Medical School."[138]

83.   The government alleged and ultimately failed to prove that Defendant's actions caused "the potential modification or impairment of the medical examination, diagnosis, treatment, or care of [one] or more individuals."[139]

84.   Defendant later learned that, nonetheless, the government's search warrant application expressly alleged that Defendant had broadly disrupted communications at all the Harvard hospitals, including Brigham and Women's,[140] where Bowler's husband Dr. Pfeffer worked at the time.

85.   Early into Defendant's detention hearing, Bowler requested a copy of the criminal complaint from her clerk.[141]  The complaint was also entered into evidence at the detention hearing.[142]

---

[137] *See Curriculum Vitae*, Honorable Marianne B. Bowler, U.S. Magistrate Judge, *supra,* p. 83, n. 129, at 4.

[138] *See, e.g.,* New England Baptist Hospital, *About*, *available at* https://www.nebh.org/who-we-are/ (last accessed Sept. 27, 2023).

[139] *See, e.g.,* Verdict Form (no conviction for "the potential modification or impairment of the medical examination, diagnosis, treatment, or care of 1 or more individuals") (Aug. 1, 2018), E.C.F. no. 301.

[140] *See, e.g.,* Second Supplemental Suppression Motion at 2 ("Paragraph eight (8) of the affidavit states: 'The incoming traffic [from the DDOS attack] resulted in significant disruptions to the BCH website *and additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate.'*") (alterations and emphasis in Motion) (quoting Search Warrant Application, No. 14-mj-2233-MBB), E.C.F. no. 166.

[141] Det. Hrg. Tr., Apr. 27, 2016, at 7:3, E.C.F. no. 19.

[142] *Id.* at 2, Exhibits, A1 ("Complaint/Affidavit").

86.   The complaint affidavit expressly alleged that Defendant "also disrupted the Hospital's day-to-day operations *as well as the research* being done at the Hospital."[143]

87.   At the Defendant's detention hearing, Bookbinder beseeched Bowler that, because of Defendant's actions:

> [...], *you know*, that these doctors and there are many of them at *the Harvard hospitals* that are outside the hospital physically, could not access patient records of their patients in the hospital, that they couldn't place orders with pharmacies for medications, they couldn't communicate through the hospital portal with their patients.[144]

88.   Bookbinder further beseeched Bowler:

> [I]t was tremendously disruptive [] and that doesn't even include the fundraising that was disrupt[ed].  So not only was it operationally disruptive, it was expensive and *tremendously* concerning for *everyone* at the hospital because they were worried that patient records could be stolen, damaged, [or] altered and that could be *catastrophic* so this was a significant, *very significant*, disruption for the hospital.[145]

89.   At the conclusion of the detention hearing, a U.S. probation officer surnamed Brown and Magistrate Bowler had the following exchange:

> MS. BROWN: Obviously he [Defendant] doesn't need a probation officer as well.
> THE COURT: Yes, he will soon enough.  He will soon enough.[146]

90.   There were only two conceivable reasons Defendant would need a U.S. probation officer: 1) Magistrate Bowler planned to release him on pretrial probation or 2) Magistrate Bowler had already adjudged

---

[143] Complaint Aff. at ¶ 13 (Feb. 16, 2016), E.C.F. no. 3-2 at 3.
[144] Det. Hrg. Tr., *supra*, p. 86, n. 141, at 55 (emphasis added).
[145] *Id.* at 56:4–56:14 (emphasis added).
[146] *Id.* at 62:19.

Defendant guilty and expected him to need a U.S. probation officer
upon release from prison.

91.   Magistrate Bowler never released Defendant on pretrial
probation.

92.   At the time Bowler issued the detention order, the parties
had expressly and exclusively referenced Boston Children's Hospital as
"Boston Children's Hospital" or "BCH."  In the order, however, Bowler
began referring *sua sponte* to Boston Children's Hospital simply as
"Children's."[147]

93.   "Children's" is the moniker for Boston Children's Hospital
most preferred and generally used by the Harvard Medical School
community and internally by the Harvard hospitals, *e.g.*, "One
reporter" at boston.com "remembers when the hospital made a push,
[circa 2004], to have 'Children's' come first in print, an effort to
give the hospital more national appeal."[148]

94.   Upon indictment, the case was assigned to the Honorable
Patti B. Saris.  Within a week, Judge Saris filed an order: "I recuse
myself.  In 2013, the United States Sentencing Commission's website
was attacked by a group calling itself Anonymous.  As Chair of that
Commission, I conclude that my impartiality might reasonably be
questioned."[149]

95.   The case was reassigned to the Honorable F. Dennis Saylor
IV.[150]

---

[147] *See* Det. Order (July 27, 2016), at 10 ("Boston Children's Hospital (hereinafter 'Children's')"), E.C.F. no. 25.
[148] *See* Conaboy, *Children's Hospital takes a new name—sort of*, Boston.com (May 16, 2012), *available at*
https://www.boston.com/uncategorized/noprimarytagmatch/2012/05/16/childrens-hospital-takes-a-new-name-sort-of/ (last accessed Oct. 2, 2023).
[149] Order of Recusal (Saris, C.J.) (citing 28 U.S.C. § 455(a)) (Oct. 25, 2016), E.C.F. no. 33.
[150] Notice of Reassignment (Oct. 25, 2016), E.C.F. no. 34.

96.   Judge Saylor then entered an electronic order: "I hereby recuse myself from presiding in this matter.  One of the prosecutors in this action formerly served as my law clerk, and I have maintained a personal relationship with him; accordingly, my impartiality might reasonably be questioned."[151]

97.   The case was then assigned to the Honorable Nathaniel M. Gorton.[152]

98.   Defendant later learned that Judge Gorton was at all relevant times a clerk, secretary, director and shareholder of His Honor's for-profit family business Slade Gorton & Co., Inc.[153]

---

[151] Order of Recusal (Saylor, J.) (citing 28 U.S.C. § 455(a)) (Nov. 14, 2016), E.C.F. no. 40.

[152] Notice of Reassignment (Nov. 14, 2016), E.C.F. no. 41.

[153] "Slade Gorton & Co., Inc. manufactures and markets fresh and frozen seafood products.  It offers finfish, shellfish, and gluten free food products for food service and retail markets.  The company was founded in 1928 and is based in Boston, Massachusetts.  Slade Gorton & Co., Inc. operates as a subsidiary of SG Seafood Holdings, Inc." Seafood Industry Research Fund, *Slade Gorton & Co., Inc.*, *available at* https://sirfonline.org/donor/slade-gorton-co-inc/ (last accessed Sept. 28, 2023).  *See also* Gorton, Nathaniel M., *Financial Disclosure Report for Calendar Year 2013* at 1, § I(1), *available at* https://storage.courtlistener.com/us/federal/judicial/financial-disclosures/1251/nathaniel-m-gorton-disclosure.2013.pdf (last accessed Sept. 28, 2023).

99.   Defendant later learned that Slade Gorton & Co., Inc. donates to Boston Children's Hospital and is listed as a donor on the same Boston Children's Hospital website that Defendant is accused of disabling during a fundraiser.[154]

| $1,000 to $2,499 | | |
| --- | --- | --- |
| Aew Capital Management, LP | GTECH | Plumbers' Supply Company |
| Affinity Services Corporation | Guardum Pharmaceuticals, LLC | Pricewaterhouse Cooper Charitable Foundation |
| Alliance Data P-Card Program | The Gutierrez Company | Queen Consulting Group |
| AmazonSmile | HC Studio, Inc. | Reebok Human Rights Foundation |
| Ambry Genetics | HDF Painting, Inc. | Safe Kids Worldwide |
| Anna Ober Co., LLC | Head Games Salon for Hair & Body | Salon 1803 |
| Aria Salon & Spa | Hobbs Brook Management, LLC | Salon Astante |
| Associazione Amici, Inc. | Holyoke Credit Union Employees | Salon Forza, Inc. |
| Atlantic Plywood Corporation | Injury Free Coalition for Kids | Salon Mimoza Greenwich |
| Austin Liquor Company, Inc. | Iron Horse Contractors, Inc. | Shaolin Institute, Inc. |
| Avanti Salon | J n R Gutters, Inc. | Sigma-Tau Pharmaceuticals |
| B & L Pool Service | J Pepper Frazier, Co., Inc. | Slade Gorton & Co., Inc. |
| | Jaco Environmental, Inc. | |

100.   During the Justina Pelletier controversy, Boston Children's Hospital removed the names of donors from its website, apparently to protect those donors from economic and reputational harms due to their associations with Boston Children's Hospital.[155]

---

[154] *See, e.g.,* Boston Children's Hospital, "calendar year 2015" donors list at 28 ("Slade Gorton & Co., Inc."), *available at* http://giving.childrenshospital.org/assets/pdfs/2016_donorlist.pdf (last accessed Sept. 28, 2023).

[155] *See, e.g.,* Grant, *BCH: Philanthropy Supporters*, Failure to Listen (May 5, 2014) ("You can run, but you cannot hide.  Recently the Boston Children's Hospital web page listing their corporate donors suddenly became unavailable"), *available at* https://web.archive.org/web/20140626044827/http://failuretolisten.com/2014/05/05/bch-philantropy-supporters/ (last accessed Oct. 22, 2023).

101. Defendant later learned that Slade Gorton & Co., Inc. and Brigham and Woman's Hospital are each "National Partners" in the Seafood Nutrition Partnership.[156]



| | | | |
|---|---|---|---|
| AGR Partners | Global Aquaculture Alliance | Nuts Over Fish | Seabreeze Seafoods |
| Alaska Bering Sea Crabbers | Global Organization for EPA and DHA (GOED) | Ocean Beauty Seafoods | Seafood Exchange of Florida |
| Alaska Seafood Marketing Institute (ASMI) | Global Seas | Odyssey Enterprises | SeaShare |
| American Cancer Society | Gorton's | OmegaQuant | Seattle Fish Company |
| American Seafoods | Handy | Orca Bay Seafoods | SIRE |
| Associated Wholesale Grocers (AWG) | Harbor Seafood | Pacific Andes | Slade Gorton |
| Beacon Fisheries | Harvest Select | Phillips Lytle | Soy Aquaculture Alliance |
| Brigham and Women's Hospital | Healthy Weight Commitment Foundation | PNW (Project for Nutrition & Wellness) | SPE Certified |
| Bumble Bee Seafoods | High Liner Foods | PNW Seafood 101 (NOAA Fisheries PNW) | Stavis Seafoods |
| | | | Tampa Maid Foods |

102. Defendant later learned that the Seafood Nutrition Partnership is an industry trade group marketing to the public "the health and nutritional benefits of seafood."[157]

103. Defendant later learned that the Seafood Nutrition Partnership's founding board included "Dr. Allan Walker, Professor of Pediatrics, Chief, Harvard Medical School; Conrad Taff Professor of Nutrition, Harvard Medical School; Professor of Nutrition, Harvard School of Public Health."[158]

104. Defendant later learned that at the time of the charged conduct, i.e. April 2014, the Seafood Nutrition Partnership entered "into a partnership with Brigham and Women's Hospital and Roxbury

---

[156] *See, e.g.,* Seafood Nutrition Partnership, *Annual Report 2015* at 9, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=11 (last accessed Sept. 28, 2023).

[157] *See, e.g.,* Seafood Nutrition Partnership, *About Us, available at* https://www.seafoodnutrition.org/about-us/ (last accessed Sept. 28, 2023).

[158] *See, e.g., Annual Report 2015, supra,* p. 91, n. 156, at 1, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=3 (last accessed Sept. 28, 2023).

Tenants of Harvard to develop the Eating Heart Healthy nutrition intervention program."[159]



105.  Defendant later learned, "As a Clinton Global Initiative (CGI) Commitment to Action, [the Seafood Nutrition Partnership], Brigham and Women's Hospital, and Roxbury Tenants of Harvard formally pledge[d] to pilot four Eating Heart Healthy programs" in September 2014,[160] i.e. the same month the Court issued the search warrant for Defendant's home.[161]



106.  Defendant later learned:

> The Eating Heart Healthy pilot program, successfully completed in Boston in 2014, was conceived as a partnership among Seafood Nutrition Partnership (SNP); Brigham and Women's Hospital, *the teaching hospital of Harvard Medical School*; Roxbury Tenants of Harvard (RTH), a nonprofit affordable-housing community for low-income families from diverse ethnic and racial backgrounds; and the Hyatt Regency Boston.[162]

---

[159] *Id.* at 4, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=6 (last accessed Sept. 28, 2023).

[160] *Id.* at 5, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=6 (last accessed Sept. 28, 2023).

[161] *See* Warrant, *supra*, p. 78, n. 104.

[162] *Annual Report 2015*, *supra,* p. 91, n. 156, at 17 (emphasis added), *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=19 (last accessed Sept. 28, 2023).

107.  Defendant later learned that the Seafood Nutrition Partnership touts, "Researchers at Harvard found that eating twice weekly servings of seafood which is rich in heart healthy omega-3s reduces the risk of dying from [cardiovascular disease] by 36 [percent]."[163]

### Eating Heart Healthy: Description and Local Partners

In the United States, more women than men die from Cardiovascular Disease (CVD) each year; nearly half of all African-American women and one-third of Caucasian-American women are currently living with CVD. Low-income populations are also far more likely to be at risk for CVD and obesity, and it is more difficult for low-income families to change behavior due to stricter limitations of time and budget.

The prevalence of CVD in the U.S. is due in large part to a lack of awareness and education regarding what contributes to a heart-healthy diet. Researchers at Harvard found that eating twice weekly servings of seafood which is rich in heart healthy omega-3s reduces the risk of dying from CVD by 36%. Unfortunately, a staggering 80-90% of Americans do not consume enough seafood to meet the recommendation.

To help address this deficiency, SNP in 2014, while growing its national partner network developed a dietary behavioral change program called

Eating Heart Healthy (EHH)—encompassing intervention, education and food distribution—alongside doctors and nurses at Brigham and Women's Hospital in Boston. The program was conceived as part of the Clinton Global Initiative (CGI) Commitment to Action.

EHH pilot programs were launched within Boston's Roxbury Tenants of Harvard community. Through these initial month-long programs, SNP was able to track successful health and behavior outcomes for participants. Just as important, it also was able—simply through word-of-mouth—to engage new community partners such as the YMCA of Greater Boston, and build a waiting list of low-income adult women who want to participate in future interventions. Today SNP is continuing its strong partnership with Roxbury Tenants of Harvard, while also strengthening its emerging partnership with the YMCA of Greater Boston.

---

[163] *Annual Report 2015, supra,* p. 91, n. 156, at 16, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=18 (last accessed Sept. 28, 2023).

108.  The Seafood Nutrition Partnership's "Eating Heart Healthy" industry research[164] specifically invokes the perceived medical renown of Pfeffer's cardiology department at Brigham and Women's Hospital.



National Partners

| | | | |
|---|---|---|---|
| AGR Partners | Global Aquaculture Alliance | Nuts Over Fish | Seabreeze Seafoods |
| Alaska Bering Sea Crabbers | Global Organization for EPA and DHA (GOED) | Ocean Beauty Seafoods | Seafood Exchange of Florida |
| Alaska Seafood Marketing Institute (ASMI) | Global Seas | Odyssey Enterprises | SeaShare |
| American Cancer Society | Gorton's | OmegaQuant | Seattle Fish Company |
| American Seafoods | Handy | Orca Bay Seafoods | SIRE |
| Associated Wholesale Grocers (AWG) | Harbor Seafood | Pacific Andes | Slade Gorton |
| Beacon Fisheries | Harvest Select | Phillips Lytle | Soy Aquaculture Alliance |
| Brigham and Women's Hospital | Healthy Weight Commitment Foundation | PNW (Project for Nutrition & Wellness) | SPE Certified |
| Bumble Bee Seafoods | High Liner Foods | PNW Seafood 101 (NOAA Fisheries PNW) | Stavis Seafoods |
| Captain D's | Hyatt Regency Boston | Preferred Freezer Services | Tampa Maid Foods |
| Censea | Icicle Seafoods | President's Challenge | Together Counts |
| Chicken of the Sea | Indiana Soybean Alliance | ProFish | Trident Seafoods |
| Clear Springs Foods | Ipswich Shellfish Company | Provant | Tsunami |
| Colavita | King & Prince Seafood | Publix | UniSea |
| Darden | Long John Silver's | Red Lobster | USDA ChooseMyPlate.gov |
| Diversified Communications | Marine Harvest | Rich Products Corporation | Wiley's |
| DSM | Marine Stewardship Council (MSC) | Roxbury Tenants of Harvard | |
| Eastern Fish Company | Mazzetta Company | Royal DSM | |
| F.W. Bryce | Morey's | Sam's Club | |
| FoodDay | National Fisheries Institute | Sea Port Products | |
| Fortune Fish & Gourmet | National Institutes of Health – The HeartTruth | | |
| Genuine Alaska Pollock Product (GAPP) | NOAA FishWatch | | |
| Glacier Fish Company | NutriSavings | | |

9 | SEAFOOD NUTRITION PARTNERSHIP | 2015 ANNUAL REPORT | WWW.SEAFOOD NUTRITION.ORG                                TABLE OF CONTENTS

---

[164] *See, supra*, p. 91, ¶¶ 104–107 (citations omitted).

109.  Defendant later learned that Slade Gorton & Co., Inc. gave the Seafood Nutrition Partnership at least $10,000 in direct funding, with further financial "Individual Support" by "Mr[*sic*] & Mrs. Gorton."[165]

## Thank You to Our Donors

### CHAIRMAN'S CAMPAIGN CIRCLE

**Visionary Partners $500,000+**
DSM
Gorton's
High Liner Foods
Mazzetta Company, LLC
Trident Seafoods

**Anchor Partners $250,000 to $499,999**
American Seafoods Group
Bumble Bee
National Fisheries Institute

**Tailwind Partners $100,000 to $249,999**
CenSea
Eastern Fish Company
Fortune Fish & Gourmet
Glacier Fish Company

**Eating Heart Healthy Donors & Partners**
54 North
American Heart Association
Massachusetts
Boston Scientific
Brigham and Women's Hospital
Colavita
Hyatt Regency Boston
McCormick Spices
OmegaQuant
Roxbury Tenants of Harvard
Stavis Seafoods
Vela Foundation
Wiley's Finest

**Annual Donors – Change Leader $25,000+**
Morey's

**Annual Donors – Mobilizers $10,000+**
Clear Springs Foods
Handy
Harvest Select
Icicle Seafoods
Indiana Soybean Alliance
Ocean Beauty Seafoods
Sire Foundation
Slade Gorton
Soy Aquaculture Alliance
Stavis Seafoods
Tampa Maid
UniSea

**Annual Donors – Supporters $1,000+**
Alaska Bering Sea Crabbers
Beacon Fisheries

**In-Kind Supporters**
54 North
American Cancer Society
Colavita
Diversified Communications
Hyatt Regency Boston
McCormick Spices
OmegaQuant
Tsunami
Wiley's Finest

**Individual Support**
Dr. & Mrs. Brenna
Mr. & Mrs. Cornish
Mr. Enlow
Mr. Figueroa
Mr & Mrs. Gorton
Mr. Hart
Mr. Kaelin

---

[165] *Id.* at 18, *available at* https://www.seafoodnutrition.org/wp-content/uploads/2018/04/snp-2015annualrpt_web1.pdf#page=20 (last accessed Sept. 28, 2023).

110.  Defendant later learned that Judge Gorton is "Former Chair, Board of Trustees, Buckingham Browne & Nichols School, Cambridge, MA."[166]

111.  Defendant later learned, "Buckingham Browne and Nichols School is a Harvard University feeder based on Top 30 Harvard University Feeder Schools."[167]



by MIT Ivy League and Oxbridge Educated Insiders

Trusted by over tens of thousands online subscribers

---

[166] *See, e.g., Biographies of Massachusetts Judges: Federal Court Judges sitting in Massachusetts, supra,* p. 83, n. 129, at 3, Nathaniel M. Gorton, Civic Activities.
[167] Prep Review by MIT, Ivy League and Oxbridge Educated Insiders, *Buckingham Brown and Nichols School, available at* https://www.prepreview.com/school/Buckingham_Browne_and_Nichols_School.html (last accessed Sept. 28, 2023).

112.  Defendant later learned that Judge Gorton advertises internships directly on Harvard Law School's website.[168]

The Honorable Nathaniel M. Gorton
U.S. District Court
John Joseph Moakley U.S. Courthouse
One Courthouse Way – Suite 3110
Boston, MA 02210

and emailed to: patricia_verrier@mad.uscourts.gov

NO CALLS TO CHAMBERS, PLEASE.

**Harvard Law School** provides unparalleled opportunities to study law with extraordinary colleagues in a rigorous, vibrant, and collaborative environment.

---

[168] *See* Judicial Externship–Honorable Nathaniel M. Gorton, U.S. District Court (snapshot June 4, 2023), *available at* https://web.archive.org/web/20230604073327/https://hls.harvard.edu/announcements/judicial-externship-honorable-nathaniel-m-gorton-u-s-district-court/ (last accessed Sept. 28, 2023).

113.  Defendant later learned that Judge Gorton and his brother Michael Gorton Sr. had been board members of the New England Home for Little Wanderers, at least from 2003-2004.[169]



114.  Defendant later learned that in 2003, while Judge Gorton and His Honor's brother were New England Home for Little Wanderers board members, the New England Home for Little Wanderers "added [Boston] Children's Hospital to its roster of hospital partners" in its "Safe-at-Home" program, meant to divert "children from psychiatric inpatient stay by working intensively with families in their homes."[170]

---

[169] *See, e.g.,* The Home for Little Wanderers, *Annual Report 2003* at 6, *available at* https://web.archive.org/web/20071108003523/http://www.thehome.org/site/DocServer?docID=186 (last accessed Sept. 29, 2023); *Annual Report 2004* at 6, *available at* https://web.archive.org/web/20071108003539/http://www.thehome.org/site/DocServer?docID=185 (last accessed Sept. 29, 2023).
[170] *See, e.g., Annual Report 2003, supra*, p. 98, n. 169, at 2.

115.  Justina was a juvenile psychiatric inpatient whom Boston Children's Hospital sought to divert to an outpatient placement.[171]

116.  Defendant later learned that Judge Gorton remained a "Member of the Corporation" of the New England Home for Little Wanderers through at least 2012.[172]

---

[171] "Children's officials have indicated that, once a patient is medically stable, they move for discharge, but cannot do so if the legal custodian—in this case, the state—does not identify a safe location for the patient to go.  The state, meanwhile, has apparently struggled since the summer to find a suitable residential center or foster home for Justina."  Wen, Swidey, *State to retain custody of teen in medical case*, The Boston Globe (Dec. 20, 2013), *available at* https://web.archive.org/web/20131221023531/https://www.bostonglobe.com/metro/2013/12/20/judge-orders-new-look-case-teen-caught-medical-controversy/Fl8coCG6wAUeaNOQEYv20N/story.html (last accessed Sept. 29, 2023).  *See, also,* Swidey, *supra*, p. 61, n. 92 ("Children's officials, while declining to discuss specifics about Justina's case, have repeatedly stressed that the hospital does not keep patients in its care against the direction of the custodial guardian, which, for Justina, has been the child-welfare agency.  'In all cases, transfer to a less restrictive setting occurs as soon as an appropriate placement setting becomes available,' the hospital said in a statement.")

[172] *See, e.g.* Gorton, Nathaniel M., *Financial Disclosure Report for Calendar Year 2012* at 1, § I(2), *available at* https://storage.courtlistener.com/us/federal/judicial/financial-disclosures/1251/nathaniel-m-gorton-disclosure.2012.pdf (last accessed Sept. 29, 2023).

117.  Defendant later learned that Slade Gorton & Co., Inc. at all relevant times advertised its support for the New England Home for Little Wanderers on its website, next to links to "Email: sales@sladegorton.com" and "DOWNLOAD OUR CATALOG."[173]



118.  Defendant later learned that the Boston Foundation raises money for the New England Home for Little Wanderers.[174]

---

[173] *See* Slade Gorton & Co., Inc., *Executive Team* (snapshot Apr. 9, 2018), *available at* https://web.archive.org/web/20180409013922/http://www.sladegorton.com:80/about-us/our-team/executive-team (last accessed Oct. 1, 2020).
[174] *See, e.g.,* The Home for Little Wanderers, *2014 Annual Report* at 12, *available at* https://issuu.com/thehome/docs/the_home_for_little_wanderers/17 (last accessed Oct. 2, 2023).

119.  Defendant later learned that in 2008, while Judge Gorton remained a "member of the corporation" of the New England Home for Little Wanderers, Boston Children's Hospital gave the New England Home for Little Wanderers a $50,000 grant.[175]

## THE HOME FOR LITTLE WANDERERS AWARDED $50,000
*Wednesday, September 2, 2015*

Preschool Outreach Program receives award from Boston Children's Hospital



120.  Defendant later learned that in 2014–2015, Boston Children's Hospital gave the New England Home for Little Wanderers a further $50,000.[176]

| (35) The Home for Little Wanderers 10 Guest Street Boston, MA  02135 | 04-2104764 | 501(c)(3) | 50,000 |
|---|---|---|---|

---

[175] *See, e.g.*, The Home for Little Wanderers, *The Home for Little Wanderers Awarded $50,000: Preschool Outreach Program receives award from Boston Children's Hospital* (Sept. 2, 2015; snapshot Feb. 27, 2018), *available at* https://web.archive.org/web/20180227052314/https://thehome.org/site/News2?page=NewsArticle&amp;id=9815 (last accessed Sept. 28, 2023).
[176] *See, e.g.,* Children's Hospital Corporation 2014 Form 990 Schedule I at Part II, § a(35), *available at* https://projects.propublica.org/nonprofits/organizations/42774441/201602289349300235/IRS990ScheduleI (last accessed Sept. 29, 2023).

121.  Defendant later learned that Judge Gorton's niece, the C.E.O. of Slade Gorton & Co.,[177] Inc., went to Harvard.[178]

122.  Bookbinder withdrew from the case before trial,[179] and Assistant United States Attorney Mr. Seth Kosto entered an appearance.[180]  Alongside D'Addio, Kosto represented the government through trial.

123.  Defendant later learned that Kosto was at all relevant times married to Ms. Staci Eisenberg, who "completed a residency at the Harvard combined internal medicine-pediatrics program in Boston."[181]

124.  Defendant later learned that Eisenberg:

> has the privilege of teaching and working with
> residents [as] an Assistant Program Director for
> the Harvard Medicine-Pediatric Residency Program
> at Brigham and Women's Hospital and Boston
> Children's Hospital, as well as the Assistant
> Program Director for Wellness for the Brigham and
> Women's Hospital Internal Medicine Residency.[182]

125.  The U.S. Court of Appeals lists Boston Children's Hospital and Wayside each as an "Interested Party" to this case.[183]

---

[177] *See, e.g.,* Slade Gorton & Co., Inc., *Our Story* at 2006 ("Kim Gorton takes over as CEO"), *available at* https://www.sladegorton.com/about-us/our-story/ (last accessed Oct. 2, 2023); Hagan, *Slade Gorton to join Canadian seafood company*, The Gloucester Daily Times (Mar. 20, 2023) ("Slade Gorton, billing itself as 'America's Original Seafood Family,' will continue to be led by fifth-generation family members CEO Kim Gorton and her brother Mike Gorton Jr."), *available at* https://www.gloucestertimes.com/news/business/slade-gorton-to-join-canadian-seafood-company/article_0c4fab78-c4ef-11ed-b56b-8f6e593d02c2.html (last accessed Oct. 2, 2023).

[178] *See, e.g., The Future of Seafood: Nourishing the World*, Speaker Biographies at 8 (Kim Gorton "left her position to obtain an MBA from Harvard Business School."), *available at* https://www.mos.org/sites/dev-elvis.mos.org/files/docs/offerings/events/The-Future-of-Seafood_Speakers.pdf (last accessed Oct. 2, 2023).

[179] *See* Notice of Withdrawal of Appearance by Adam Bookbinder (Nov. 29, 2017), E.C.F. no. 99.

[180] *See* Notice of Appearance by Seth Kosto (Nov. 6, 2017), E.C.F. no. 96.

[181] *See, e.g.,* The New York Times, *Staci Eisenberg, Seth Kosto* (Sept. 10, 2006), *available at* https://www.nytimes.com/2006/09/10/fashion/weddings/10eisenberg.html (last accessed Sept. 29, 2023), snapshot (July 12, 2022) *available at* https://web.archive.org/web/20220712054430/https://www.nytimes.com/2006/09/10/fashion/weddings/10eisenberg.html (last accessed Sept. 29, 2023).

[182] *See, e.g.,* Eisner Camp, *Meet the Eisner and Crane Lake Advisory Board* at Staci Eisenberg Kosto, *available at* https://eisnercamp.org/about-us/lay-leadership/ (last accessed Sept. 29, 2023).

[183] *See, e.g.,* Docket Report, *United States v. Gottesfeld*, No. 19-1042 (1st Cir.)

-----------------------------

CHILDREN'S HOSPITAL BOSTON
Interested Party

WAYSIDE YOUTH AND FAMILY SUPPORT NETWORK
Interested Party

---

UNITED STATES

Appellee

v.

MARTIN GOTTESFELD

Defendant - Appellant

---

126.  During *voir dire*, Juror 13 answered that she was "an accountant."[184]

127.  The government's first witness was Mr. Patrick Keaton.[185]

128.  Mr. Keaton had worked at Wayside since 2015.[186]

129.  Mr. Keaton testified that directly before his employment at Wayside, i.e. up through 2015, "I worked as an IT consultant for a company by the name of KDSA Consulting, and we provided computer support for companies."[187]

130.  Before Keaton's direct examination concluded, the Court informed the parties that Juror 13 "said that she worked at Home for Little Wanderers four years ago."[188,189]

131.  Upon *voir dire*, Juror 13 told the Court that she worked for the New England Home for Little Wanderers "from 2006 to 2014."[190]

---

[184] Trial Tr., July 19, 2018, at 197:24, E.C.F. nos. 322–23.

[185] Trial Tr., July 23, 2018, at 42:6, E.C.F. nos. 324–25.

[186] *Id.* at 42:24.

[187] *Id.* at 43:4.

[188] *Id.* at 84:18.

[189] Neither Juror 13 nor Juror 14, *infra,* p. 104, ¶ 135, were alternates.  *See* Tr., July 17, 2018, at 37:6 ("THE COURT: […]  The alternates will be the last two jurors seated in the jury box […] and it doesn't matter which seat […]  I do it that way because then all 14 jurors are equals during the course of the trial.  They don't know whether they are alternates or not"), E.C.F. no. 436; Trial Tr., July 19, 2018, at 199:13 (identifying the potential alternates as jurors eight and nine), E.C.F. nos. 322–23.

[190] Trial Tr., July 23, 2018, *supra,* n. 185, at 95:17.

132.  Juror 13 reported that K.D.S.A., Keaton's former employer, was also the "IT consultant" for the Home for Little Wanderers.[191]

133.  Juror 13 reported that "Home for Little Wanderers also doing, you know, teenagers—you know, disadvantaged teenagers work. […] I just wanted you, you know, to know so it won't make a mistrial."[192]

134.  The Court denied Defendant's motion to excuse Juror 13 for cause.[193]

135.  At that same time the Court informed the parties that Juror 13 had come forward,[194] the Court also told the parties that Juror 14 "told my Deputy that he went to Wayside 14 years ago as a patient, notwithstanding the fact that of course I asked that question as clearly as I could during [e]mpanelment."[195]

136.  Upon *voir dire*, Juror 14 told the Court his experience at Wayside was "positive.  I mean, they're there to help."[196]

137.  The Court initially denied Defendant's motion to excuse Juror 14 for cause,[197] but said it "would consider the matter further."[198]

138.  Juror 14 then fell asleep in the jury box and audibly snored, after which the Court reconsidered and excused him.[199]

---

[191] *Id.* at 95:20–96:4.
[192] *Id.* at 97:1–97:19.
[193] *Id.* at 99:4 ("I would ask to excuse [Juror 13] for cause"), 99:21("THE COURT: […] I'm not going to excuse her for cause.").
[194] *See, supra,* p. 103, ¶ 130 (citation omitted).
[195] *Id.* at 84:11.
[196] *Id.* at 93:2.
[197] *Id.* at 94:18.
[198] *Id.* at 103:9.
[199] *Id.* at 159:19.

139.   Though the government failed to convince the jury that Defendant had potentially impacted the care of a single patient, government witness Steven Harper testified:

> So, Children's Hospital is a Harvard teaching hospital, as is Mass. General, Brigham, Beth Israel, Joslin, several others.  Because of that, Harvard is the upstream internet service provider.  So, Children's doesn't buy its internet connectivity from Comcast or AT&T or any of those guys; they actually buy it from Harvard, and then Harvard has all their connections upstream.
>
> The same is true for all of the medical institutions in Longwood, *they're a part of Harvard*, and I believe there's seven of them that are part of the Longwood Medical Area. [...]
> So, it wasn't just Children's that was down in this attack; it was Children's, it was Joslin, it was Dana-Farber, *Mass. General, Brigham and Women's, Beth Israel, and Harvard Medical School*. [...]
>
> To put it into perspective, that was 2.8 times larger than the amount of bandwidth[200] that Harvard had.  Harvard had 10 gigabits worth of bandwidth and were getting 28 gigabits worth of traffic.[201]

140.   And government witness Mr. Daniel Nigrin M.D., of Boston Children's Hospital, testified: "[A]ll of our faculty are faculty at Harvard Medical School."[202]

---

[200] The proper technical term is not bandwidth, but throughput.  Primarily—and properly—bandwidth refers to a range of frequencies.  *See, e.g.,* Merriam-Webster.com Dictionary, *bandwidth* (Sept. 19, 2023), *available at* https://www.merriam-webster.com/dictionary/bandwidth (last accessed Sept. 29, 2023).  The term, however, has fallen into common use as a synonym for throughput.  *Id.*  Throughput unambiguously refers to "the amount of something (such as material, data, etc.) that passes through something (such as a machine or system)."  Merriam-Webster.com Dictionary, *throughput* (Sept. 11, 2023), *available at* https://www.merriam-webster.com/dictionary/throughput (last accessed Sept. 29, 2023).

[201] Trial Tr., July 25, 2018, at 195:19–199:9 (emphasis added), E.C.F. no. 327.

[202] *Id.* at 52:5.

141.  The draft presentencing report ("P.S.R.") for this case sought restitution directly from Defendant to Brigham and Women's Hospital and other Harvard hospitals.[203]

142.  Only after Defendant filed the relevant page of the draft P.S.R. with the United States Court of Appeals, did a new version of the P.S.R. omit without explanation financial restitution to Brigham and Women's Hospital and the other Harvard hospitals besides Boston Children's Hospital.[204]

143.  United States Attorney Carmen Ortiz, who chose to indict Defendant,[205] sought a Harvard teaching position when she departed the U.S. attorney's office.[206]

144.  After a First Circuit panel of Judges Howard, Lynch and Kayatta affirmed Defendant's conviction and rehearing was denied, Defendant learned that Judge Lynch "served as an Assistant Attorney General for the Commonwealth of Massachusetts from 1973 to 1974."[207]

145.  After Defendant's conviction was affirmed and rehearing denied, Defendant learned that Judge Lynch "then joined the Massachusetts Department of Education as General Counsel from 1974 to 1978."[208]

---

[203] *See* Draft P.S.R. page (restitution sought for, *inter alia*, Brigham and Women's Hospital and Beth Israel Deaconess Medical Center), sealed exhibit to Mandamus Petition, *In re Gottesfeld*, No. 19-1011 (1st Cir.).

[204] *See* Final P.S.R. at 33, ¶ 156 (no restitution to Brigham and Women's Hospital or Beth Israel Deaconess Medical Center) (Jan. 2, 2019), E.C.F. no. unknown.

[205] *See, e.g., United States v. Cox*, 342 F.2d 167, 170–71 (5th Cir. 1965) (prosecutorial discretion ultimately rests with the United States Attorneys and U.S. Attorney General).

[206] *See, e.g.,* Phillips, *Carmen Ortiz and the Kennedy School?  It wasn't meant to be.*, The Boston Globe (June 15, 2017), *available at* https://www.bostonglobe.com/metro/2017/06/15/carmen-ortiz-and-kennedy-school-wasn-meant/PwTwgNiWcqtGnSnHiFkZkL/story.html (last accessed Sept. 28, 2023).

[207] United States Court of Appeals for the First Circuit, *Sandra L. Lynch*, *available at* https://www.ca1.uscourts.gov/sandra-l-lynch (last accessed Sept. 30, 2023).

[208] *Id.*

146.  After Defendant's conviction was affirmed and rehearing denied, Defendant learned that directly before taking the bench Judge Lynch spent 14 years at Foley, Hoag & Elliot in Boston.[209]

147.  After Defendant's conviction was affirmed and rehearing denied, Defendant learned that Foley, Hoag & Elliot was at all relevant times a Harvard stable, *e.g.*, according to early partner Bob Birnbaum:



Mr. Foley, ah, felt that you should build a law
firm on merit.  He hired, um, without regard to
religion, politics, or, or, whatever.  But the
fact is, I, I think probably merit was, at the
time, translated into hiring Harvard Law School
graduates, and, and high-ranking graduates, too.
I think it was the year after I came here, the
firm hired five Harvard Law Review editors.  I, I
am not, was not, a Harvard Law Review editor, but
the year after I came, they hired five.  Well,
there's not another law firm in the United States
*today* that could do that.[210]

148.  At Defendant's detention hearing his counsel asked F.B.I.

Special Agent Mr. Jeffrey Williams: "to the best of your knowledge,

---

[209] *See, e.g., Biographies of Massachusetts Judges, supra,* p. 83, n. 129, at 4–5, Exh. B.

[210] *See* Foley Hoag LLP, *75 Years of Foley Hoag LLP* at 22:48 (June 15, 2018) (emphasis is the speaker's), *available at* https://youtu.be/29BNArEDdhY?si=JtGibjL2e7QSgLAM&t=1368 (last accessed Sept. 28, 2023); *see also* Harr, *A Civil Action*, Random House (1995).

you, you testified that the FBI never investigated Wayside Youth for any alleged abuse of Justina Pelletier, correct?"[211]

149. Williams answered: "That's right."[212]

| | |
|---|---|
| 22 | Q    And to the best of your knowledge, you, you testified |
| 23 | that the FBI never investigated Wayside Youth for any |
| 24 | alleged abuse of Justina Pelletier, correct? |
| 25 | A    That's right. |

150. At Defendant's detention hearing defense counsel asked Williams: "And as far as you're aware, the FBI never investigated Boston Children's Hospital for any alleged abuse of Justina Pelletier, correct?"[213]

151. Williams answered: "Yes."[214]

| | | 53 |
|---|---|---|
| 1 | Q    And as far as you're aware, the FBI never | |
| 2 | investigated Boston Children's Hospital for any alleged | |
| 3 | abuse of Justina Pelletier, correct? | |
| 4 | A    Yes. | |

D. United States v. Aaron Swartz, 11-cr-10260-NMG (D. Mass.)

152. In July 2011, then-United States Attorney Ms. Carmen M. Ortiz indicted Mr. Aaron Swartz under the C.F.A.A., 18 U.S.C. § 1030.[215]

153. Swartz was widely credited as a technological visionary and prodigy; at the time of his arrest he was credited as an "early

---

[211] See Det. Hrg. Tr., Apr. 27, 2016, at 52:22, E.C.F. no. 19.
[212] Id. at 52:25.
[213] Id. at 53:1.
[214] Id. at 53:4.
[215] See, e.g., United States v. Swartz, 11-cr-10260-NMG (D. Mass.), E.C.F. nos. 1 (Motion to Seal ("CARMEN M. ORTIZ")), 2-1 (Indictment (three counts under "18 U.S.C. § 1030(a)")).

architect[]" of the Creative Commons,[216] co-founder of Reddit[217] and co-designer of the R.D.F. Site Summary (R.S.S.) protocol version 1.0:[218]

> Aaron Swartz was a 26-year-old computer programmer and an Internet celebrity—a former child prodigy who as a young teenager had worked alongside the leaders of the World Wide Web to create some of its basic technology for sharing information; an entrepreneur whose startup company became a key piece in a major news and entertainment service; an activist who co-founded an advocacy organization with more than a million members that organized petition drives for civil liberties and against censorship; and a Fellow at Harvard University's Safra Research Lab on Institutional Corruption.[219]

---

[216] "Today, over 2 billion works are licensed under the various [Creative Commons] licenses." Creative Commons, *We're Turning 20!  What's Happened Since 2001?* (May 24, 2021) (emphasis removed), *available at* https://creativecommons.org/2021/05/24/were-turning-20-whats-happened-since-2001/ (last accessed Dec. 3, 2023).  Swartz "was one of the early architects of Creative Commons.  As a teenager, he helped design the code layer to our licenses, and helped build the movement that has carried us so far."  Lessig, *Remembering Aaron Swartz* (Jan. 12, 2013), *available at* https://web.archive.org/web/20151204034753/http://creativecommons.org/weblog/entry/36298 (last accessed Dec. 3, 2023).  *See, also,* Knappenberger, *et al., The Internet's Own Boy: The Story of Aaron Swartz* at 13:36, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=816s (last accessed Dec. 5, 2023)

[217] "By the time [Swartz] was 20, he helped build the foundation of Reddit."  N.P.R., *At A Young Age, Aaron Swartz Did A Lifetime Of Work* (Jan. 13, 2013), *available at* https://www.npr.org/2013/01/13/169264447/at-a-young-age-aaron-swartz-did-a-lifetime-of-work (last accessed Dec. 3, 2023).  "Reddit is a website where users can view and share links or text posts for others to see.  These posts range from pictures and videos to news and discussion threads.  With hundreds of millions of users, Reddit has become one of the most popular websites globally and has provided a platform for up-to-date news and trends."  The Now, *What is Reddit?, available at* https://edu.gcfglobal.org/en/thenow/what-is-reddit/1/ (last accessed Dec. 3, 2023).  "The San Francisco-based company, co-founded by Steve Huffman, Aaron Swartz and Alexis Ohanian in 2005, is considering going public as early as the first quarter, sources told Bloomberg."  Azevedo, *Reddit might once again be flirting with an IPO*, Tech Crunch (Nov. 27, 2023), *available at* https://techcrunch.com/2023/11/27/reddit-might-once-again-be-flirting-with-an-ipo/ (last accessed Dec. 3, 2023).  As of November 2023, Reddit is the 18th-most-visited website in the world.  SimilarWeb, *Top Websites Ranking: Most Visited Websites In The World, available at* https://www.similarweb.com/top-websites/ (last accessed Dec. 3, 2023).  *See, also,* Knappenberger, *et al., supra*, n. 216, at 17:23, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=1043s.

[218] "Swartz was a prodigy. By the time he was 14, he had co-written the specification for RSS—originally Rich Site Summary, now Really Simple Syndication—a Web-publishing technology for delivering syndicated content from frequently updated sites, such as blogs or news websites.  RSS allows Web consumers to receive the latest stories on a feed without having to constantly revisit their favorite pages.  If you subscribe to a podcast—or receive automatic updates from CNN.com—you have Swartz to thank."  Leopold, *How Aaron Swartz helped build the Internet*, C.N.N. (Jan. 15, 2013), *available at* https://www.cnn.com/2013/01/15/tech/web/aaron-swartz-internet/index.html (last accessed Dec. 3, 2023).  *See, also,* Knappenberger, *et al., supra*, n. 216, at 7:42, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=462s.

[219] *See* Abelson, *et al., Report to the President: MIT and the Prosecution of Aaron Swartz* at 11 (July 26, 2013)*, available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=11 (last accessed Dec. 3, 2023).

154.  Swartz also helped seed RECAP[220] and worked on an anonymous drop-box for journalists.[221]

155.  The charges against Swartz arose from his apparent efforts to give taxpayers gratis access to government-funded academic research.[222]

156.  At the time of the charged conduct, M.I.T. freely allowed visitors to use its network.[223]

157.  At the time of the charged conduct, M.I.T. had an unlimited site license for JSTOR, the third-party portal housing the government-funded research in question.[224]

---

[220] "If you want to use the Internet to peek at documents filed in federal court cases, it's usually possible.  It's just relatively expensive.  The U.S. Congress allows the federal courts to charge a fee—currently set at 8 cents a page—to search for and download documents.  The database, called PACER, is strict about charging and even levies fees for searches that result in no matches.  Which is why a pair of Princeton University graduate students, with some help from Harvard University's Berkman Center, have developed a Firefox browser plug-in called RECAP (PACER spelled backward).  It's designed to make more court documents available to the public at no cost.  The way it works is simple: when you log in to the federal court system and pay with a credit card to download a document, the RECAP plug-in automatically and transparently forwards a copy to the Internet Archive, where it becomes available for free to the next person who wants to read it.  It's a collaborative effort, with others benefiting from your purchases, while you benefit from theirs."  McCullagh, *Plug-in opens up federal courts, with your help: When you pay to download a court document, the next person won't have to, thanks to a Firefox browser plug-in that's a collaborative project of Princeton University and the Internet Archive.*, CNET (Aug. 14, 2009), *available at* https://www.cnet.com/tech/tech-industry/plug-in-opens-up-federal-courts-with-your-help/ (last visited Dec. 3, 2023).  Swartz "scraped documents from PACER, the federal judiciary's paywalled website for public access to court records. […] Swartz got 2.7 million documents before the courts detected his downloads and blocked access."  Lee, *The inside story of Aaron Swartz's campaign to liberate court filings: And how his allies are trying to finish the job by tearing down a big paywall.*, ArsTechnica (Feb. 8, 2013).  "The FBI opened an investigation, but apparently concluded that no laws were violated, and thus no charges were filed."  Abelson, *et al., supra*, p. 109, n. 219, at 32, *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=32.  *See, also,* Knappenberger, *et al., supra*, p. 109, n. 216, at 29:04, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=1744s.

[221] *See, e.g.,* Lennard, *New Yorker launches tool by Aaron Swartz to protect leaks: Strongbox, co-created by the persecuted late technologist, is an open-source drop box for federal documents*, Salon (May 18, 2013), *available at* https://www.salon.com/2013/05/18/new_yorker_launches_tool_by_aaron_swartz_to_protect_leaks/ (last accessed Dec. 3, 2023).

[222] *See, e.g.,* Knappenberger, *et al., supra*, p. 109, n. 216, at 37:18, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2238s; *id.* at 58:08, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=3488s.

[223] *See, e.g.,* Abelson, *et al., supra*, p. 109, n. 219, at 18 ("guests may register to use the MIT network by supplying a name and an email address as contact information") (internal citations omitted), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=18 (last accessed Dec. 3, 2023).

[224] "Before" the events in controversy, "any computer on the MIT network could access JSTOR by simply going to http://www.jstor.org.  Visitors to MIT could establish a guest account on the MIT network and access JSTOR by connecting their computer to the MIT network, as Swartz did."  Abelson, *et al., supra*, p. 109, n. 219, at 116, *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=116 (last accessed Dec. 4,

158.  Swartz registered a laptop on the M.I.T. network and set it in an unlocked closet[225] downloading P.D.F.s from JSTOR.[226,227]

159.  JSTOR noticed the automated downloads and contacted M.I.T.[228]

160.  M.I.T. eventually found the laptop.[229]

161.  M.I.T. installed a camera to record the laptop.[230]

---

2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 39:59, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2399s.

[225] *See, e.g.,* Brito, *Aaron Swartz: The Punishment Did Not Fit the Crime—As long as prosecutors have the option to put first-time computer trespassers behind bars for decades, we will continue to see such clear injustices.*, Reason (Jan. 31, 2013) (Swartz "went into an unlocked maintenance closet in a building on MIT's campus and hooked up a laptop that he'd programmed to automatically download millions of academic articles from the JSTOR archive.  In no sense was he stealing.  As a fellow at Harvard, Swartz had legal access to the articles.  And because he was copying the articles—not taking them—JSTOR continued to have them."), *available at* https://reason.com/2013/01/31/aaron-swartz-the-punishment-did-not-fit/ (last accessed Dec. 4, 2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 41:41, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2501s

[226] *See, e.g.,* Knappenberger, *et al., supra,* p. 109, n. 216, at 39:59, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2399s.

[227] The bulk manner in which Swartz's laptop downloaded the articles has been said to have violated JSTOR's Terms of Service (T.O.S.).  Such violations, however, have been ruled non-criminal.  *See United States v. Drew*, 2009 U.S. Dist. LEXIS 85780, 2:08-0582-GW (C.D. Cal. Aug. 28, 2009) at *48, § IV(B)(2) ("The pivotal issue herein is whether basing a CFAA misdemeanor violation as per 18 U.S.C. §§ 1030(a)(2)(C) and 1030(c)(2)(A) upon the conscious violation of a website's terms of service runs afoul of the void-for-vagueness doctrine.  This Court concludes that it does primarily because of the absence of minimal guidelines to govern law enforcement, but also because of actual notice deficiencies."), *available at* https://storage.courtlistener.com/recap/gov.uscourts.cacd.415703.162.0.pdf#page=25 (last accessed Dec. 4, 2023).  *See, also, EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582, n. 10 (1st Cir. 2001) ("Congress did not define the phrase 'without authorization,' perhaps assuming that the words speak for themselves.  The meaning, however, has proven to be elusive."); the Due Process Clause, U.S. Const. amend. V, cl. 4 ("No person shall be […] deprived of life, liberty, or property, without due process of law").

[228] *See, e.g.,* Abelson, *et al., supra,* p. 109, n. 219, at 16–17 ("JSTOR engineers noticed an extremely large number of requests for downloads originating from MIT.  […]  In response, JSTOR engineers temporarily blocked further downloads directed to the MIT Internet Protocol (IP) address issuing the requests.  But the downloading continued from a different IP address.  […]  The next day, Sunday, September 26, 2010, JSTOR shut off access for the entire range of addresses (Class C network) containing the two addresses.  It sent an email to the MIT Libraries notifying them of this fact.  […]  JSTOR sought MIT's assistance to prevent the incident's recurrence.") (internal citations omitted), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=16 (last accessed Dec. 4, 2023).

[229] *See, e.g., id.* at 20 ("At approximately 3:00 a.m. on January 4, 2011, IS&T [(Information Services & Technology)] staff sent an email to its network engineers requesting that they trace the exact location in Building 16 of the computer using the IP address.  An IS&T network engineer began to search when he arrived for work in the morning, going to Building 16 and checking the basement closet containing the building's network switches.  Around 8:00 a.m., he entered the closet and saw a cable connected to a network switch and leading to a cardboard box on the floor.  He lifted the box and saw a laptop computer.") (footnote omitted), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=20 (last accessed Dec. 4, 2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 41:54, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2514s.

162.  The camera recorded Swartz tending the laptop,[231] and M.I.T. police promptly arrested him.[232,233]

163.  M.I.T. and JSTOR declined to press charges against Swartz.[234]

164.  Carmen Ortiz, the District of Massachusetts U.S. Attorney, nonetheless sought the indictment.

---

[230] *See, e.g.,* Abelson, *et al., supra,* p. 109, n. 219, at 22 ("The law enforcement group decided to leave the laptop and hard drive in place to see if the person who had set it up would return.  Because it was not feasible to continuously post MIT Police officers in the basement corridor for an indefinite period of time, and doing so would reveal the surveillance of the closet, the decision was made to install a video camera in the closet that could be monitored from elsewhere within MIT.  [Information Services & Technology] installed the camera at the request of the MIT Police."), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=22 (last accessed Dec. 4, 2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 42:00, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2520s.

[231] *See, e.g.,* Abelson, *et al., supra,* p. 109, n. 219, at 22 ("Half an hour later, an individual was seen on the video camera entering the basement closet.  He changed the hard drive attached to the laptop, and put the old one into a backpack.  Some of the law enforcement officers went to the closet to try to apprehend him, but he had left before they could arrive.  No one recognized the person in the video.  Still photos showing the suspect were taken from the video and provided to the MIT Police."), *available at available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=22 (last accessed Dec. 4, 2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 42:51, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2571s.

[232] *See, e.g.,* Abelson, *et al., supra,* p. 109, n. 219, at 24, *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=24 (last accessed Dec. 4, 2023).  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 43:34, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2614s.

[233] "After Aaron Swartz's arrest, Harvard suspended his fellowship and banned him from the Harvard campus, pending the outcome of an investigation into whether he had also used Harvard's computers or network for similar activities."  Abelson, *et al., supra,* p. 109, n. 219, at 31, *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=31 (last accessed Dec. 3, 2023).

[234] "Elliot Peters, Swartz's California-based defense attorney and a former federal prosecutor in Manhattan, told The Associated Press on Sunday that the case 'was horribly overblown' because Swartz had 'the right' to download from JSTOR, a subscription service used by MIT that offers digitized copies of articles from more than 1,000 academic journals.  Peters said even the company took the stand that the computer crimes section of the U.S. attorney's office in Boston had overreached in seeking prison time for Swartz and insisting—two days before his suicide—that he plead guilty to all 13 felony counts.  Peters said JSTOR's attorney, Mary Jo White—the former top federal prosecutor in Manhattan—had called Stephen Heymann, the lead Boston prosecutor in the case.  'She asked that they not pursue the case,' Peters said."  Dobnik, *Reddit co-founder commits suicide in New York as trial looms*, The Associated Press (Jan. 22, 2013), *available at* https://www.gazettenet.com/Archives/2013/01/swartx-hg-011413 (last accessed Dec. 3, 2023).  "We told the United States Attorney's Office that we had no further interest in the matter and did not want to press charges."  JSTOR, *JSTOR Evidence in United States vs. Aaron Swartz*, *available at* https://docs.jstor.org/ (last accessed Dec. 4, 2023).  "Officials at the Massachusetts Institute of Technology did not target the late Internet activist Aaron Swartz, but they failed to show leadership in a case that has raised questions about open access to online information and computer abuse laws, according to the findings of an internal investigation released Tuesday.  The 180-page report found that MIT officials did not 'call in the feds' to pursue charges against Swartz, and did not know prior to Swartz's arrest that he was the one responsible for downloading journal articles from the school's network.  The findings sought to rebut criticism that the university told prosecutors Swartz should go to prison."  Smith, G., *MIT Did Not 'Call In The Feds' To Pursue Aaron Swartz,*

165. *United States v. Swartz* was assigned to the Honorable Nathaniel M. Gorton.[235]

166. Assistant United States Attorney Mr. Stephen Heymann, then the head of the federal Internet and Computer Crimes Unit for Massachusetts,[236] pressured Swartz to plead guilty.[237]

167. As part of Heymann's pressure campaign, Heymann expressly invoked Judge Gorton's perceived pro-government, anti-defendant stance as a particularized coercive measure.[238]

168. Swartz resisted Heymann's overtures.[239]

---

*Report Finds*, HuffPost (July 30, 2013) (citing Abelson, *et al.*, *supra*, p. 109, n. 219), *available at* https://www.huffpost.com/entry/mit-aaron-swartz_n_3676185 (last accessed Dec. 3, 2023). "MIT never requested that a criminal prosecution be brought against Aaron Swartz." Abelson, *et al.*, *supra*, p. 109, n. 219, at 13, ¶ 2, *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=13 (last accessed Dec. 4, 2023). *See, also,* Knappenberger, *et al.*, *supra*, p. 109, n. 216, at 1:04:07, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=3847s.

[235] *See United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), Notice of Case Assignment ("Judge Nathaniel M. Gorton assigned to case.") (July 15, 2011).

[236] *See* Knappenberger, *et al.*, *supra*, p. 109, n. 216, at 45:14, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2714s.

[237] *See, e.g.,* Peters, *Re:* United States v. Aaron Swartz, *United States District Court, District of Massachusetts Crim No. 11-CR-10260 NMG* (Jan. 28, 2013) ("Heymann appears to have abused his discretion when he attempted to coerce Mr. Swartz into foregoing his right to a trial by pleading guilty. Specifically, AUSA Heymann offered Mr. Swartz four to six months in prison for a guilty plea, while threatening to seek over seven years in prison if Mr. Swartz chose to go to trial."), *available at* https://big.assets.huffingtonpost.com/HeymannOPRletter.pdf (last accessed Dec. 3, 2023). *See, also,* Knappenberger, *et al.*, *supra*, p. 109, n. 216, at 49:32, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=2972s.

[238] *See, e.g.,* Keker, Van Nest & Peters, *Aaron Swartz was no criminal* (Nov. 18, 2014) ("I was one of Aaron's lawyers in his criminal case, in 2012 and early 2013. [… Heymann] insisted that Aaron plead to a felony and serve prison time. And of course, what he said, as prosecutors often do, is that if we go to trial, it won't be so easy, and if we lose, well, this is a tough judge, and the prosecution is going to recommend a very difficult sentence. Aaron may end up having a term of years."), *available at* https://www.keker.com/news/news-items/aaron-swartz-was-no-criminal-dan-purcell (last accessed Dec. 4, 2023); Disq. Aff. at 19, ¶ 45 ("Timothy Watkins, Esq., who at the time was one of the senior federal criminal defense attorneys in Boston, truthfully told me that once The Honorable Nathaniel M. Gorton had been assigned to the case of *U.S. v. Aaron Swartz*, the United States Attorney's Office told [Swartz] through his attorneys that the government could effectively set his sentence as high as [it] liked since The Honorable Judge Gorton would not deviate from the recommendation of the prosecutors.") (Dec. 27, 2018), E.C.F. no. 346.

[239] *See, e.g.,* Abelson, *et al.*, *supra*, p. 109, n. 219, at 67–68, § III.C.3 ("On August 9, 2012, MIT's outside counsel had a 45-minute telephone conversation with [Heymann]. [… Heymann] said that the straw that broke the camel's back was that when he indicted the case, and allowed Swartz to come to the courthouse as opposed to being arrested, Swartz used the time to post a 'wild Internet campaign' in an effort to drum up support. This was a 'foolish' move that moved the case 'from a human one-on-one level to an institutional level.' [Heymann] said that on the institutional level cases are harder to manage both internally and externally.") & n. 40 ("The only Internet campaign occurring during this period that has been identified by the Review Panel is the statement and petition

169.  Heymann then compared Swartz to a rapist, who had "systematically revictimized" MIT by refusing to plead guilty.[240]

170.  The government increased the number of counts against Swartz from four to 13.[241]

171.  Swartz's attorneys notified Heymann that the pressure from the case had rendered Swartz suicidal.[242]

172.  Heymann responded to Swartz's attorneys: "Fine, we'll lock him up."[243]

173.  Swartz hanged himself on January 11, 2013.[244]

174.  The public was and is outraged over the circumstances of Swartz's suicide:

---

drive conducted by Demand Progress.  The statement was co-drafted by the Director of Demand Progress and Quinn Norton.  We do not know what the lead prosecutor meant by 'institutionalizing' a prosecution, and we do not comment on the implications of doing so based upon a public lobbying effort undertaken by or on behalf of a criminal defendant.") (internal citations omitted), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=67.  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 52:56, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=3176s; *id.* at 1:06:14, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=3974s.

[240] *See, e.g.,* Abelson, *et al., supra,* p. 109, n. 219, at 67, § III(C)(3) ("MIT's counsel noted that no one at the Institute was looking forward to the time, disruption and stress involved in testifying at hearings and trial.  [Heymann]'s response was that it disturbed him whenever a defendant 'systematically revictimized' the victim, and that was what Swartz was doing by dragging MIT through hearings and a trial.  He analogized attacking MIT's conduct in the case to attacking a rape victim based on sleeping with other men."), *available at* https://swartz-report.mit.edu/docs/report-to-the-president.pdf#page=67.  *See, also,* Knappenberger, *et al., supra,* p. 109, n. 216, at 53:01, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg&t=3181s.

[241] *See United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 53 (Superseding Indictment) (Sept. 12, 2012), *available at* https://storage.courtlistener.com/recap/gov.uscourts.mad.137971/gov.uscourts.mad.137971.53.0.pdf (last accessed Dec. 5, 2023).

[242] *See, e.g.,* Cullen, *On humanity, a big failure in Aaron Swartz case*, The Boston Globe (Jan. 15, 2013) ("'The thing that galls me is that I told Heymann the kid was a suicide risk,' [Swartz's lawyer] told me. 'His reaction was a standard reaction in that office, not unique to [Heymann]. He said, "Fine, we'll lock him up."'"), *available at* https://www.bostonglobe.com/metro/2013/01/15/humanity-deficit/bj8oThPDwzgxBSHQt3tyKI/story.html (last accessed Dec. 3, 2023).

[243] *Id.*

[244] *See, e.g.,* Dobnik, *Reddit co-founder dies in N.Y. weeks before trial*, The Associated Press (Jan. 13, 2013), *available at* https://www.usatoday.com/story/tech/2013/01/13/swartz-reddit-new-york-trial/1830037/ (last accessed Dec. 3, 2023).

A)   A WhiteHouse.gov petition to fire Ortiz for *Swartz* garnered over 61,000 signatures.[245]

B)   Activists identifying themselves as *Anonymous* trashed the United States Sentencing Commission's website.[246]

C)   M.I.T.[247] and Massachusetts United States Attorney's Office were hacked.[248]

D)   Prosecutors, M.I.T. and others associated with the case received death threats.[249]

E)   Protesters picketed the John J. Moakley U.S. Courthouse in Boston.[250]

F)   After Ortiz's husband tried to defend Ortiz publicly, the public ran him off Twitter.[251]

---

[245] *See* Petition to *Remove United States District Attorney*[sic] *Carmen Ortiz from office for overreach in the case of Aaron Swartz.*, *snapshot available at* https://web.archive.org/web/20141229091821/https://petitions.whitehouse.gov/petition/remove-united-states-district-attorney-carmen-ortiz-office-overreach-case-aaron-swartz/RQNrG1Ck (last accessed Dec. 3, 2023).

[246] *See, e.g.,* NBC News, *Anonymous hijacks federal website to protest activist Aaron Swartz's death* (Jan. 26, 2013), *available at* https://www.nbcnews.com/tech/tech-news/anonymous-hijacks-federal-website-protest-activist-aaron-swartzs-death-flna1c8125283 (last accessed Dec. 3, 2023).  *See, also, supra*, p. 88, ¶ 94 (quoting Order of Recusal (Saris, C.J.), *supra*, p. 88, n. 149 (citations omitted)).

[247] *See, e.g.,* Brodkin, *Anonymous defaces MIT website with memorial for Aaron Swartz: MIT site temporarily calls Swartz prosecution "miscarriage of justice."* ArsTechnica (Jan. 14, 2013), *available at* https://arstechnica.com/information-technology/2013/01/anonymous-defaces-mit-website-with-memorial-for-aaron-swartz/ (last accessed Dec. 3, 2023); Blue, *MIT website hacked over Aaron Swartz a second time: This morning MIT's website was hacked and defaced, with its nameservers changed.  The site credited hacker FBI informant Sabu (LulzSec); the site autoplayed The Star Spangled Banner and stated "R.I.P Aaron Swartz."* ZDNet (Jan. 22, 2013), *available at* https://www.zdnet.com/article/mit-website-hacked-over-aaron-swartz-a-second-time/ (last accessed Dec. 3, 2023).

[248] *See, e.g.,* Kovacs, *Prosecutors in Aaron Swartz Case Received Threats, Had Their Accounts Hacked: Prosecutors want to protect the identities of those involved in the investigation*, Softpedia (Apr. 4, 2013), *available at* https://news.softpedia.com/news/Prosecutors-in-Aaron-Swartz-Case-Received-Threats-Had-Their-Accounts-Hacked-342851.shtml (last accessed Dec. 3, 2023).

[249] *See, e.g., id.*; CBS News, *MIT Says Gunman Hoax Was Retaliation For Suicide Of Aaron Swartz* (Feb. 27, 2013), *available at* https://www.cbsnews.com/boston/news/mit-hoax-caller-said-gunman-was-retaliating-for-suicide-of-aaron-swartz/ (last accessed Dec. 3, 2023).

[250] *See, e.g.,* Smith, E., *Speaking up for Swartz*, The Boston Herald (Jan. 26, 2013), *available at* https://www.bostonherald.com/2013/01/26/speaking-up-for-swartz/ (last accessed Dec. 3, 2023).

[251] *See, e.g.,* Murphy, *US attorney's husband stirs Twitter storm on Swartz case*, The Boston Globe (Jan. 16, 2013), *available at* https://www.bostonglobe.com/metro/2013/01/16/attorney-husband-causes-backlash-twitter-with-posts-hacker-suicide/3Vm20xBaXXtYk6KgolSUxO/story.html (last accessed Dec. 3, 2023); BuzzFeed News, *Prosecutor's Husband Defends Push To Jail Internet Activist: Tom Dolan blasts Aaron Swartz's family for pointing a*

G)    The American Library Association posthumously honored Swartz with its James Madison Award.[252]

H)    The Internet Society posthumously inducted Swartz into its Hall of Fame.[253]

I)    Mr. Zachary Braff executive-produced a documentary film *The Internet's Own Boy: The Story of Aaron Swartz.*[254]

J)    Aaron Swartz Day continues to be celebrated worldwide as a time for civically minded technologists to volunteer their time and talents.[255]

175.    As a result of the aforementioned the following, *e.g.*, happened.

A)    Heymann was ultimately replaced as head of the federal Internet and Computer Crimes Unit for Massachusetts.[256]

---

finger at his wife, U.S. Attorney Carmen Ortiz. Dolan, an IBM executive, offers the first defense from the prosecution side as Swartz's defenders demand Ortiz's firing. UPDATE: Dolan has deleted his Twitter account.* (Jan. 15, 2013), *available at* https://www.buzzfeednews.com/article/buzzfeednews/prosecutors-husband-defends-push-to-jail-internet (last accessed Dec. 3, 2023).

[252] *See* American Library Association, *James Madison Award—2013 Winner(s), available at* https://www.ala.org/awardsgrants/awards/193/winners/2013 (last accessed Dec. 4, 2023).

[253] *See* Internet Hall of Fame, *2013 Inductee Aaron Swartz, Internet Hall of Fame Innovator, Posthumous Recipient: Aaron Swartz was a computer programming prodigy and activist who played an instrumental role in the campaign for a free and open Internet and used technology to fight social, corporate and political injustices., available at* https://www.internethalloffame.org/inductee/aaron-swartz/ (last accessed Dec. 4, 2023).

[254] *See* Knappenberger, *et al., supra,* p. 109, n. 216, *available at* https://www.youtube.com/watch?v=3Q6Fzbgs_Lg.

[255] "Those interested in working on projects in Aaron's honor can also contribute to the annual hackathon, which this year includes several projects: SecureDrop, Bad Apple, the Disability Technology Project (Sat. only), and EFF's own Atlas of Surveillance. In addition to the hackathon in San Francisco, there will also be concurrent hackathons in Ecuador, Argentina, and Brazil." Tsukayama, *Celebrating the Life of Aaron Swartz: Nov. 12 and Nov. 13,* The Electronic Frontiers Foundation (E.F.F.) (Nov. 11, 2022), *available at* https://www.eff.org/deeplinks/2022/11/celebrating-life-aaron-swartz-nov-12-and-nov-13 (last accessed Dec. 3, 2023).

[256] *Cf., e.g.,* Greenfield, *Aaron Swartz's Prosecutor Just Got More Evil: The notoriously harsh prosecutor who insisted on jail time for Aaron Swartz may have withheld evidence, according to a letter filed by Swartz's legal team, making the villain of an emotional trial and even more emotional suicide sound perhaps more villainous than before.,* The Atlantic (Mar. 14, 2013) (citing, Peters, *supra,* p. 113, n. 237), *available at* https://www.theatlantic.com/technology/archive/2013/03/aaron-swartz-prosecutor-withheld-evidence/317410/ (last accessed Dec. 3, 2023). By the time this case was opened, Bookbinder had become the unit head. *See, e.g., Adam J. Bookbinder, supra,* p. 81, n. 117 ("He was chief of the U.S. Attorney's Office's Cybercrime Unit, where he supervised a unit responsible for the investigation and prosecution of computer and intellectual property crime, including computer intrusions, data breaches, network attacks, theft of trade secrets, copyright and trademark

B)   Ortiz told the media that her office had not known that Swartz was suicidal,[257] despite Swartz's attorneys timely notification[258] and Heymann's response: "Fine, we'll lock him up."[259]

C)   The White House issued a statement:

> Aaron Swartz's death was a tragic, unthinkable loss for his family and friends.  Our sympathy continues to go out to those who were closest to him, and to the many others whose lives he touched.  We also reaffirm our belief that a spirit of openness is what makes the Internet such a powerful engine for economic growth, technological innovation, and new ideas. […] As to the specific personnel-related requests raised in your petitions, our response must be limited.  Consistent with the terms we laid out when we began We the People, we will not address agency personnel matters in a petition response, because we do not believe this is the appropriate forum in which to do so.[260]

D)   The Honorable U.S. Senator Mr. John Cornyn questioned Then-U.S. Attorney General Mr. Eric Holder about *United States v. Swartz* and prosecutorial misconduct and other abuses.[261]

E)   The Honorable U.S. Representative Mr. Darrell Issa spoke at Swartz's memorial service and opened an investigation into Ortiz.[262]

---

infringement, and online fraud.").

[257] *See, e.g.,* Martin, *Carmen Ortiz: Triumphs, Controversies, And The Lingering Impact Of Aaron Swartz*, W.G.B.H. News (Dec. 22, 2016) ("'It's an incredible tragedy that this young man took his life,' Ortiz said, noting that her office didn't know Swartz was in such a vulnerable place at the time."), *available at* https://www.wgbh.org/news/local/2016-12-22/carmen-ortiz-triumphs-controversies-and-the-lingering-impact-of-aaron-swartz (last accessed Dec. 3, 2023).

[258] *See, supra,* p. 114, ¶ 171 (citations omitted).

[259] *See, supra,* p. 114, ¶ 172 (citations omitted).

[260] *See* Slashdot, *White House Responds To Petition To Fire Aaron Swartz's Prosecutor* (Jan. 8, 2015), *available at* https://slashdot.org/story/15/01/08/0234236/white-house-responds-to-petition-to-fire-aaron-swartzs-prosecutor (last accessed Dec. 3, 2023).

[261] *See* U.S. Senate Committee on the Judiciary, Hearing on *Oversight of the U.S. Justice Department* at 12 (Mar. 6, 2013), *available at* https://www.govinfo.gov/content/pkg/CHRG-113shrg26145/pdf/CHRG-113shrg26145.pdf#page=16 (last accessed Dec. 3, 2023), *video available at* https://www.youtube.com/watch?v=CAdCU7u0kUI (last accessed Dec. 3, 2023).

[262] *See, e.g.,* Rogers, *Rep. Issa Slams Prosecutors For How They Handled The Aaron Swartz Case*, Business Insider (Feb. 7, 2013), *available at* https://www.businessinsider.com/darrell-issa-slams-carmen-ortiz-2013-2 (last accessed Dec. 4, 2023), *video available at* https://www.youtube.com/watch?v=kYsK1iCS0vE ("Ultimately, trusting the government is inconsistent with our founding words: 'We the People.'  Aaron understood that.") (last accessed Dec.

F)   The Honorable U.S. Representative Mr. Alan Grayson memorialized Swartz.[263]

G)   Ortiz went from a rising political star to the political wilderness.[264]

H)   Legislation known as "Aaron's Law" was repeatedly introduced to reform the C.F.A.A, 18 U.S.C. § 1030.[265]

176.  Specifically citing the public outrage[266] and continued fear of reputational and other harms, M.I.T. moved the Court to redact documents from *United States v. Swartz* before dissemination.[267]

177.  In granting M.I.T.'s motion, Judge Gorton found, *inter alia*:

> At approximately the same time Congress and the media began to scrutinize Mr. Swartz's prosecution, employees of the government, MIT and JSTOR were subjected to a variety of threats and harassing incidents by individuals purportedly retaliating in the name of Mr. Swartz.  Both the government and MIT suffered intrusions into their respective computer networks, resulting in outages to MIT's email system and a compromise of

---

4, 2023).

[263] *See, e.g.,* Pearce, *Aaron Swartz's suicide continues to ripple through Congress*, The Los Angeles Times (Feb. 5, 2013) ("Rep. Alan Grayson (D-Fla.) recalled Swartz's work as an intern.  'Aaron wanted to rock the boat, not just for the sake of boat-rocking, but for the sake of improving the lives of ordinary people,' he said."), *available at* https://www.latimes.com/nation/la-xpm-2013-feb-05-la-na-nn-aaron-swartz-washington-memorial-20130205-story.html (last accessed Dec. 4, 2023), *video available at* https://www.youtube.com/watch?v=nC0Y2qkw7ug (last accessed Dec. 4, 2023).

[264] *See, e.g.,* Gottesfeld, M., *In Biden's Nomination of Marty Walsh, Aaron Swartz Prosecutor Gets Her Final Comeuppance: Carmen Ortiz, a one-time rising star, went from "Bostonian of the Year" to the political wilderness.* (Feb. 15, 2021), *available at* https://theintercept.com/2021/02/15/marty-walsh-aaron-swartz-carmen-ortiz/ (last accessed Dec. 3, 2023).

[265] *See* H.R. 2454—Aaron's Law Act of 2013, *available at* https://www.congress.gov/bill/113th-congress/house-bill/2454 (last accessed Dec. 4, 2023); S.1196—Aaron's Law Act of 2013, *available at* https://www.congress.gov/bill/113th-congress/senate-bill/1196 (last accessed Dec. 4, 2023); H.R. 1918—Aaron's Law Act of 2015, *available at* https://www.congress.gov/bill/114th-congress/house-bill/1918 (last accessed Dec. 4, 2023); S.1030—Aaron's Law Act of 2015, *available at* https://www.congress.gov/bill/114th-congress/senate-bill/1030 (last accessed Dec. 4, 2023).

[266] *See, supra,* p. 114, ¶ 174 (citations omitted).

[267] *See United States v. Swartz*, 11-cr-10260-NMG (D. Mass.), E.C.F. no. 113 (The Massachusetts Institute of Technology's Motion to Intervene and Partially Oppose Motion to Modify Protective Order) at 1 (requesting "to redact the documents to protect the privacy and safety of members of the MIT community") (Mar. 29, 2013), *available at* https://storage.courtlistener.com/recap/gov.uscourts.mad.137971/gov.uscourts.mad.137971.113.0.pdf (last accessed Dec. 5, 2023).

the website of the United States Sentencing
Commission.  Employees of the United States
Attorney's Office and MIT who were in some way
associated with Mr. Swartz's case received
threatening communications.
Most troubling, in February, 2013 an unidentified
individual called MIT and reported that a gunman
in armor was on campus seeking to harm the
President of MIT in retaliation for its
involvement in the events surrounding Mr.
Swartz's death.  Although the report turned out
to be a hoax, more than 30 Cambridge and MIT
police officers responded to the call and MIT's
campus was locked down for several hours while
law enforcement searched for evidence of a
gunman.[268]

178.  The case at bar is the first and only C.F.A.A. activism case

brought by the U.S. Attorney for Massachusetts since *United States v.*

*Swartz*.

179.  Prior to the trial of this case, Judge Gorton barred, *sua*

*sponte*, any individual from attending the trial wearing, in the

Court's words: "a shirt showing Mr. Swartz in all his glory."[269]

180.  In its opinion affirming Defendant's conviction, the United

States Court of Appeals for the First Circuit incorrectly wrote that

Swartz was "another hacker," who had "committed suicide after being

convicted and sentenced" by the Court.[270]

---

[268] *United States v. Swartz*, 945 F. Supp. 2d 216, 218 (D. Mass. 2013).
[269] *See* Tr., July 17, 2018, at 46:18, E.C.F. no. 436.  *See, also, United States v. Chantal*, 902 F.2d 1018, 1022 (1st Cir. 1990) ("We recognize that the newly amended recusal provision, 28 U.S.C. § 455(a) now *permits* disqualification of judges even if alleged prejudice is a result of *judicially* acquired information in contradistinction to the prior law that *required* a judge to hear a case unless he had developed preconceptions by means of extrajudicial sources.") (quoting *United States v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir. 1978) (emphasis in original)).
[270] *See United States v. Gottesfeld*, No. 18-1669 (1st Cir. Nov. 5, 2021) at 32:10 ("In his motions to disqualify the trial judge below, Gottesfeld alleged that[...] the trial judge was 'emotionally compromised' from having presided over the trial of another hacker who committed suicide after being convicted and sentenced on charges similar to those brought against Gottesfeld").

181.  Only upon Defendant's protestation[271] did the First Circuit correct its opinion.[272]

### E. Judicial disclosure and public trust

182.  Except for Judge Saris's and Judge Saylor's recusal orders,[273] at no point has any judge or prosecutor involved with this case disclosed any information under, respectively, the recusal statutes[274] or executive guidelines.[275]

183.  Months before the Court denied suppression without any disclosure by Magistrate Bowler, Defendant put before the Court some of Her Honor's connections to this case *ex curia*.[276]

184.  Months before trial, Defendant put before the Court some of Judge Gorton's *ex curia* connections to this case.[277]

---

[271] *See* Appellant's Supplemental Petition for Rehearing at 9, ¶ 11 ("Mr. Swartz did not 'commit[] suicide after being convicted.'  The Panel Op[inion] should be changed out of respect for the (unconvicted dead.'"") (Nov. 19, 2021) (first alteration in original) (internal citations omitted), *United States v. Gottesfeld*, No. 18-1669 (1st Cir.) (entered Nov. 29, 2021).

[272] *See* Errata Sheet, *United States v. Gottesfeld*, No. 18-1669 (1st Cir. Dec. 9, 2021) ("The opinion of this Court issued on November 5, 2021 is amended as follows: On page 32, line 10, replace 'convicted and sentenced' with 'indicted'").

[273] *See, supra*, p. 88, ¶¶ 94–96 (quoting Order of Recusal (Saris, C.J.) (Oct. 25, 2016), E.C.F. no. 33; Order of Recusal (Saylor, J.) (Nov. 14, 2016), E.C.F. no. 40) (other citation omitted).

[274] *See* 28 U.S.C. §§ 144, 455, including § 455(c) ("A judge should inform himself about his personal and fiduciary and financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."), (e) (duty to disclose and obtain waiver).

[275] *See* United States Attorney Manual §§ 3-2.220 ("The same circumstances which require that a United States Attorney recuse himself/herself apply to an Assistant United States Attorney. [...]") (internal citation omitted), 3-2.170 ("When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact [the] General Counsel's Office, [Executive Office for United States Attorneys].  [...]").

[276] *See, e.g.,* Bandler, *EXCLUSIVE: Jailed Hacktivist Who Fought To Save Girl's Life Blocked By Biased Judge From Attending His Father's Funeral*, DailyWire (Apr. 9, 2017), E.C.F. no. 90-1 at 25 (entered Oct. 23, 2017).

[277] *See, e.g.,* Letter re Gillespie at 3–4 (Mar. 2, 2018) (Defendant wrote: "I [...] need to bring to The Court's attention another matter of which I had informed Mr. Gillespie.  The Home For Little Wanderers, a tax-exempt organization which offers adoption services[,] at one point listed The Honorable Judge Nathaniel Gorton as a member of its board of advisors and it also accepted a $50,000 donation from [...] Boston Children's Hospital, in Semptember, 2015—a mere 5 months before my arrest.  In the case of Justina Pelletier[,] the issue of possible adoption to a new family after she was taken from her parents' custody was highly controversial, as it often is in cases of similarly situated children."), E.C.F. no. 121 (entered Mar. 5, 2018).

185.  At trial, Defendant expressly moved for Judge Gorton's disqualification after a juror, *sua sponte*, alluded to Swartz.[278]

186.  Judge Gorton almost immediately denied the motion without findings.[279]

187.  In 2018, Defendant, citing, *inter alia*, Slade Gorton & Co., Inc., the Seafood Nutrition Partnership and Home for Little Wanderers,[280] moved for relevant disclosure by the Court, and, again for recusal.[281]

188.  The Court denied the motion, stating: "the presiding judge's recusal has long since been considered and rejected."[282]

189.  Three years later journalists uncovered that 131 U.S. judges had failed to 1) disclose that they or their families owned equity in the parties to 650 cases and 2) disqualify themselves.[283]

190.  Those 131 judges comprise roughly one sixth of the federal judiciary.[284]

191.  "What is at stake here is a lot," said Northeastern University Distinguished Professor of Law Ms. Martha Davis.[285]  "We have a judiciary for various reasons already losing the trust of the

---

[278] *See* Trial Tr., Aug. 1, 2018, at 19:14, E.C.F. nos. 330–31; *supra*, p. 108, § IX(D) (citations omitted).

[279] *See* Trial Tr., Aug. 1, 2018, *supra*, at 19:23 ("I'm not going to do that; okay?").

[280] *See supra*, p. 80, § IX(C) (citations omitted).

[281] *See* Emergency Motions for Disclosure and Disqualification, E.C.F. nos. 340, 344–47.

[282] *See* Orders Denying Emergency Motion for Disclosure and Motions for Disqualification, E.C.F. nos. 342, 350–52.

[283] *See* Grimaldi, *et al.*, *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, The Wall Street Journal (Sept. 28, 2021), *available at* https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421 (last accessed June 18, 2023).

[284] *See, e.g.,* Gramlich, *Biden has appointed more federal judges than any president since JFK at this point in his tenure*, The Pew Research Center (Aug. 9, 2022) ("As of Aug. 8, [2022,] there are 790 active federal judges serving in the 91 district courts and 13 appeals courts governed by Article III of the U.S. Constitution, as well as the Supreme Court"), *available at* https://www.pewresearch.org/short-reads/2022/08/09/biden-has-appointed-more-federal-judges-than-any-president-since-jfk-at-this-point-in-his-tenure/ (accessed June 18, 2023).

[285] *See* Stening, *Federal judges' financial conflicts add to mistrust of the judicial system*, Northeastern Global News (Jan. 11, 2022), *available at* https://news.northeastern.edu/2022/01/11/federal-judges-financial-conflicts/ (last accessed Oct. 1, 2023).

American people, and the evidence that federal judges are hearing cases that they have a direct financial interest in only makes things worse."

192.  Such violations, said Davis, "compound the lack of trust that the federal judiciary seems to be breeding."[286]

193.  "There is a check where, in theory, litigants who discover this sort of conflict can move to have the judge recused," Davis stated, "but the problem is recusal is often in the hands of a judge, and it's difficult from a litigator's perspective to decide when to raise the issue when a judge isn't approaching it in a serious way."[287]

194.  Various media outlets have documented what is already well known in the legal community: attorneys fear retaliation for bringing recusal motions.[288]

195.  "Forty-seven percent of U.S. adults," meanwhile, "say they have 'a great deal' or 'a fair amount' of trust in the judicial branch of the federal government that is headed by the Supreme Court.  This represents a 20-percentage-point drop from two years ago, including seven points since last year, and is now the lowest in Gallup's trend by six points."[289]

---

[286] *Id.*

[287] *Id.*

[288] *See, e.g.,* Green, Mazor, *Corrupt justice: what happens when judges' bias taints a case?*, The Guardian (Oct. 18, 2015) ("But court critics say that one reason judicial violations are common is because they frequently go unpunished.  When litigants ask a judge to back away because of a conflict, they risk being told no, then face possible retaliation, so many don't bother."), *available at* https://www.theguardian.com/us-news/2015/oct/18/judge-bias-corrupts-court-cases (last accessed Oct. 1, 2023).

[289] *See* Jones, *Supreme Court Trust, Job Approval at Historical Lows*, Gallup (Sept. 29, 2022), *available at* https://news.gallup.com/poll/402044/supreme-court-trust-job-approval-historical-lows.aspx (last accessed Oct. 1, 2023).

F. MANIPULATION OF JUDGES' CASE ASSIGNMENTS

196. Upon learning some of Magistrate Bowler's connections to Boston Children's Hospital and Harvard Medical School,[290] Defendant became curious as to how this case was assigned to Magistrate Bowler.

197. The U.S. courts publish that, with some exceptions, cases are assigned randomly to judges, and this Court has noted: "Every court considering attempts to manipulate the random assignment[s] of judges has considered [them] to constitute a disruption of the orderly administration of justice."[291]

198. A review ca. Aug. 6, 2021, of this Court's orders in the U.S. Bureau of Prisons (B.O.P.)'s LexisNexis® database[292] found the first reference to random judicial assignment in early 1985: "On remand[ January 26, 1985], the case was randomly assigned[…]"[293]

199. Said review also found the first reference to "The District Court's Program for Random Assignment of Civil Cases to Magistrate Judges" on May 5, 2011.[294]

200. Prior cases were also purportedly designated randomly to magistrate judges.[295]

---

[290] *See, supra*, p. 80, § IX(C) (citations omitted).

[291] *See DataTerm Inc. v. MicroStrategy Inc.*, 2018 U.S. Dist. LEXIS 94321, 11-cv-11970-FDS (Lead) (D. Mass. June 5, 2018) (internal quotation marks and citations omitted) (collecting cases).

[292] "Lexis is an essential tool of a modern, efficient law office.  As such, it saves lawyers' time by increasing the efficacy of legal research."  *Timberland Design, Inc. v. FDIC*, 745 F. Supp. 784, 790 (D. Mass. 1990) (Woodlock, J.) (quoting *United Nuclear Corp. v. Cannon*, 564 F. Supp. 581, 591–92 (D.R.I. 1983) (Selya, D.J.)).

[293] *See United States v. Ouimette*, 614 F. Supp. 107, 109 (D.R.I. 1985).

[294] *See Karas v. Hood Inc.*, 2011 U.S. Dist. LEXIS 48349, 11-cv-40016-FDS (D. Mass. May 5, 2011) at *1–2.

[295] *See, e.g.*, Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts Rule 6(a)(1) ("Except as set forth in Rule 8 of these Rules, the Clerk or deputy clerk must assign cases referred in the Eastern Division to the magistrate judges sitting in Boston by lot in such a manner that each magistrate judge is assigned as nearly as possible the same number of cases, except that when a magistrate judge has already ruled on a matter in a particular case, a subsequent referral in that case must be assigned to the same magistrate judge.") (effective Jan. 8, 2002), *available at* https://www.mad.uscourts.gov/general/pdf/LC/MJRules2011.pdf#page=15 (last accessed Sept. 30, 2023).

201. Nonetheless, said review of this Court's orders in the B.O.P.'s LexisNexis® database found seven (7) civil decisions involving Boston Children's Hospital in cases that should have been designated randomly.

| Case | Case no. | Date | Assigned Magistrate Judge |
|---|---|---|---|
| *Boston Children's Hospital v. Nadal-Ginard* | 93-cv-12539 | Nov. 12, 1993 | Karol |
| *Davidson v. Cao* | 00-cv-11046 | May 30, 2000 | Bowler |
| *Darville v. Children's Hospital Corporation* | 11-cv-10599 | Apr. 8, 2011 | Bowler |
| *Felder v. Ponder* | 12-cv-11192 | July 10, 2012 | Sorokin |
| *Robinson v. Children's Hospital of Boston* | 14-cv-10263 | Feb. 4, 2014 | Sorokin |
| *DeGrandis v. Children's Hospital Boston* | 14-cv-10461 | Feb. 25, 2014 | Sorokin |
| *Cabi, et al. v. Boston Children's Hospital* | 15-cv-12306 | June 11, 2015 | Bowler |

202. Said review, cross-referenced with this Court's website and Leadership Directories, Inc., *Federal-State Court Directory* 69 (2017 ed.) found the following numbers of magistrate judges available for designation at the times of those seven (7) cases.

| Case | No. of Magistrates | Magistrates |
|---|---|---|
| *Boston Children's Hospital v. Nadal-Ginard* | 5 | Alexander, Bowler, Cohen, Collings and Karol* |
| *Davidson v. Cao* | 4 | Alexander, Bowler*, Cohen and Collings |
| *Darville v. Children's Hospital Corporation* | 5 | Boal, Bowler*, Collings, Dein and Sorokin |
| *Felder v. Ponder* | 5 | Boal, Bowler, Collings, Dein and Sorokin* |
| *Robinson v. Children's Hospital of Boston* | 6 | Boal, Bowler, Collings, Dein, Hennessy and Sorokin* |
| *DeGrandis v. Children's Hospital Boston* | 6 | Boal, Bowler, Collings, Dein, Hennessy and Sorokin* |
| *Cabi, et al. v. Boston Children's Hospital* | 6 | Boal, Bowler*, Cabell, Dein, Hennessy and Kelley |

203.  Combinatorics is the "branch of mathematics founded on the formula[e] for permutations and combinations."[296]

204.  Combinatorics is employed in, *e.g.*, chess, poker, blackjack, genetics and computer science; it is relevant to verifying the randomness of purportedly random processes, *e.g.*, dealing cards fairly and designating magistrate judges to civil cases.

205.  Chess, poker, blackjack and computer science also employ game theory to understand behavior in zero-sum games and other adversarial scenarios, *e.g.*, I.B.M.'s *Deep Blue* used game theory to defeat human chess grand master Gary Kasparov in 1996.

206.  "[A] number of results in game theory [] have become important in economics and other fields."[297]

207.  "[G]ame-theoretic models have longstanding and widespread acceptance in economics and other disciplines."[298]

208.  "Analysis that tracks economic theories known as 'game theory' is used in the airline industry to predict actions by competitors and gauge competitors' reactions."[299]

209.  Lawyers also use game theory, *e.g.*, "the broad definitions used in the study of 'game theory' and in legal courses on the subject[] certainly apply" to death-penalty litigation.[300]

---

[296] *See United States v. Jefferson*, 302 F. Supp. 2d 1295, 1300 n. 5 (M.D. Ala. 2004).

[297] *See VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1325 (Fed. Cir. 2014).

[298] *See Unwired Planet, LLC v. Apple Inc.*, 2017 U.S. Dist. LEXIS 20928, 13-cv-04134-VC at *6–7 (N.D. Cal. Feb. 14, 2017).

[299] *See United States v. AMR Corp.*, 140 F. Supp. 2d 1141, 1182 (D. Kan. 2001).

[300] *See In re Byrd*, 269 F.3d 585, 594 (6th Cir. 2001) (Boggs, Suhrheinrich, Batchelder, JJ., dissenting on other grounds).

210.  Judges also use game theory, *e.g.*, "Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great."[301]

211.  A U.S. court applied game theory to attorneys-fees requests.[302]

212.  Another U.S. court noted, "Yes, this is sort of an exercise in non-quantitative game theory, but that is exactly what sophisticated commercial and bankruptcy lawyers do all day long."[303]

213.  Defendant has sufficient relevant experience in combinatorics and game theory to provide meaningful insights into magistrate judge designations in Boston Children's Hospital cases:

1.  At age five Defendant wrote his first computer program.

2.  At 12 Defendant sold his first computer program.

3.  At 15 Defendant was admitted on scholarship to both Phillips Academy Andover and Phillips Exeter Academy, and he matriculated to Exeter.

4.  Exeter integrates combinatorics into its standard mathematics curriculum starting in precalculus, which Defendant completed in an accelerated program for only the best math students.

---

[301] *See Petruzzi's IGA Supermarkets v. Darling-Delware Co.,* 998 F.2d 1224, 1233 (3d Cir. 1993) (internal citations omitted).

[302] *See In re Balderas*, 328 B.R. 707 (Bankr. W.D. Tex. 2005).

[303] *See Giaimo v. Detrano (In re Detrano)*, 222 B.R. 685, 688–89 (Bankr. E.D.N.Y. 1998).

5.   In 11th grade Defendant scored the highest possible mark on the college-level advanced placement (A.P.) computer-science A/B exam and won Exeter's highest computer-science prize, in large part for his work on game theory (A.I.) and combinatorics.



214.   Defendant calculated there were 21,600 possible combinations of magistrate designations for the six (6) post-1993 Boston Children's Hospital cases, *supra*, p. 124, ¶ 201, i.e. those excluding *Nadal-Ginard*.   The odds of Magistrates Bowler's and Sorokin's splitting them all, as they in fact did, were 1:1,350, or 0.074 percent.   This is less likely than flipping a coin exactly ten (10) times and getting only heads.[304]

215.   Massachusetts is a small district in the smallest federal circuit; its volume of cases is insufficient to explain one anomaly like the Bowler-Sorokin-BCH nexus.   The number of cases is too few to expect, reasonably, such an unlikely correlation; or, put another way, one would have to flip a coin many, many times to expect to see heads

---

[304] The odds of flipping a coin exactly ten times and getting only heads are 1:1024.

on ten (10) consecutive flips, and the number of coin flips in this district is too few.

216.  Though one may reasonably question whether the Bowler-Sorokin-BCH nexus started after *Nadal-Ginard*, even including that case, the odds of Judges Bowler's and Sorokin's splitting all or all but one of the seven Boston Children's Hospital cases as they did[305] remain unlikely: 2:675 or 0.2963 percent.  That's roughly three out of 1,000 or less likely than flipping a coin eight times and getting only heads (0.390625 percent).

217.  Excluding *Nadal-Ginard*, the odds of Magistrate Bowler's and any one other magistrate's splitting all the latest six Boston Children's Hospital cases, as happened,[306] were 1:180 or 0.556 percent. Those odds are 25 percent less likely than flipping a coin seven times and receiving all heads.[307]

218.  And the odds are still miniscule of Magistrate Bowler's and any other individual magistrate's splitting all or all but one of the seven Boston Children's Hospital cases,[308] i.e. those including *Nadal-Ginard*.  Specifically, they are 1,159:54,000 or 2.1462962 percent, or about 21.5 out of 1,000.  In contrast, the likelihood of flipping a coin five times and receiving all heads is 3.125 percent at odds of 1:32.

219.  Defendant sought the help of Mr. Jeffrey S. Kane, Ph.D., to confirm or refute Defendant's mathematics.[309]

---

[305] *See, supra*, p. 124, ¶ 201.
[306] *Id.*
[307] The odds of flipping a coin exactly seven times and receiving only heads are 1:128.
[308] *See, supra*, p. 124, ¶ 201.
[309] *See,* calculations, *supra*, p. 127, ¶¶ 214–218 (citations omitted).

220. Dr. Kane averred that, *inter alia*:

I am an Industrial/Organizational Psychologist
(Ph.D., The University of Michigan, M.A.,
University of Minnesota) with extensive education
and experience in the use of statistical methods
and the design of research and evaluation
projects. My education in statistics and
quantitative methods includes three 3 years of
full-time graduate studies in statistics,
research design, and psychometrics at both the
University of Minnesota and the University of
Michigan. I have served for 23 years as a
university professor, encompassing the rank of
full professor of Industrial/Organizational
Psychology at the California School of
Professional Psychology in Los Angeles, and the
rank of associate professor of Management at the
University of Massachusetts, the University of
North Carolina at Greensboro, the University of
Minnesota, Texas A&M University, and the Chinese
University of Hong Kong. I have held high level
research positions in county, state, and federal
government, and have consulted extensively with
private sector organizations for over 40 years.[310]

221. Kane calculated many of the relevant likelihoods as lower,
i.e. more unlikely, than Defendant's calculations and verified
Defendant's other calculations.[311]

222. Other cases involving Boston Children's Hospital may have
been excluded from the B.O.P.'s LexisNexis® database. Bluntly, many
cases are so obviously weak or insignificant that rigging the
magistrate-designation or district-judge-assignment processes for them
would be counterproductive. Manipulating the system for doomed or
otherwise inconsequential cases would raise the likelihood of
detection without concrete benefit and could create appellate issues
prolonging otherwise trivial Boston Children's Hospital cases. The
cases that appear in LexisNexis®, in contrast, either 1) required

---

[310] *See* Affidavit of Jeffrey S. Kane, Ph.D. (Aug. 24, 2021), E.C.F. no. 442.
[311] *Id.*

orders of sufficient significance to appear in LexisNexis® or 2) were cited in support of another decision and are thus part of the district's operational case law.

223. One must also ignore, for purposes of statistical analysis, cases designated directly under L.R. 40.1(g) (related civil cases are assigned to the same judge), *e.g.*, *The Children's Hospital Corporation v. Cakir*, 15-cv-13281 (D. Mass.).

224. Also of note, LexisNexis® had four cases involving the Dana-Farber Cancer Institute, a Harvard Medical School organ.[312]  Two cases had magistrates designated, and one of them was designated to Bowler.

| Case | Case no. | Magistrate |
|---|---|---|
| *Mehic v. Dana-Farber Cancer Institute* | 15-cv-12934 | Bowler |
| *Dana-Farber Cancer Institute, Inc. v. Ono Pharmaceutical Co.* | 15-cv-13443 | Cabell |

225.  The case split for Boston Children's Hospital and Dana-Farber cases was thus as follows.

| Magistrate | No. of cases | Magistrate | No. of cases |
|---|---|---|---|
| Bowler | 4 | Cohen | 0 |
| Sorokin | 3 | Boal | 0 |
| Karol | 1 | Dein | 0 |
| Cabell | 1 | Hennessy | 0 |
| Collings | 0 | Kelley | 0 |
| Alexander | 0 | | |

226.  Cases involving Harvard Medical School organs Brigham and Women's Hospital and Massachusetts General Hospital/Partners Healthcare, over which Magistrate Bowler could never preside given her immediately obvious connections to each,[313] provide a control

---

[312] *See, e.g.,* Dana-Farber / Harvard Cancer Center, *Home — DF/HCC* ("DF/HCC Is a Research Consortium that provides shared resources and a collaborative environment for over 1,100 cancer researchers at 7 Harvard institutions."), *available at* http://dfhcc.harvard.edu/ (last accessed Dec. 1, 2023).
[313] *See, e.g., supra*, p. 81, ¶¶ 66–67, 71, 79–80 (citations omitted).

experiment.  Magistrate Bowler's connections to Boston Children's Hospital and Dana-Farber cases are significant but inconspicuous, so Her Honor could have been designated to them without much said about disqualification.  It would have been unavoidably scandalous, however, for Magistrate Bowler to have entered significant rulings on Brigham and Women's Hospital or Massachusetts General Hospital cases, thus rendering no benefit to manipulating those case designations.

227.  Defendant's review of LexisNexis®[314] found 42 Massachusetts General Hospital and Brigham and Women's Hospital cases designated as follows.

| Magistrate | No. of cases | Magistrate | No. of cases |
|---|---|---|---|
| Collings | 5 | Cabell | 1 |
| Boal | 5 | Karol | 0 |
| Dein | 4 | Alexander | 0 |
| Sorokin | 4 | Cohen | 0 |
| Kelley | 4 | Hennessy | 0 |
| Bowler | 3 | | |

| Case | Case no. | Magistrate |
|---|---|---|
| Pressman v. Brigham Medical Grp. | 92-cv-10463 | Collings |
| Perkins v. Brigham & Women's Hospital | 93-cv-11701 | None |
| Heinrich, et al. v. Sweet, et al. | 97-cv-12134 | None |
| Choi v. Massachusetts General, et al. | 99-cv-10687 | None |
| Joseph, et al. v. Sweet, et al. | 00-cv-11026 | None |
| Massachusetts Eye & Ear v. Novartis Opthalmics | 01-cv-10747 | None |
| Porter v. Tap Pharmaceutical, et al. | 01-cv-10861 | None |
| Palomar Med. Techs v. Altus Med., Inc. | 02-cv-10258 | None |
| Alexander v. Brigham & Women's Physician's Organization, Inc. | 04-cv-10738 | None |
| United States v. Partners Healthcare System, Inc. | 05-cv-11576 | None |
| Moore v. Brigham & Women's Hospital | 05-cv-40123 | None |
| Jones v. Brigham and Women's Hospital | 07-cv-11481 | Collings |
| Bradley v. Sugarbaker | 07-cv-12319 | Sorokin |
| Sagun Tuli v. Brigham & Women's Hospital | 07-cv-12338 | Bowler |
| Maher v. Mass. Gen. Hosp. Long Term Disability Plan | 08-cv-10460 | None |

---

[314] *See, supra*, p. 123, ¶ 198.

| Case | Case no. | Magistrate |
|---|---|---|
| *Rubin v. The General Hospital* | 09-cv-10040 | Collings |
| *Palomar Medical Technologies, Inc. v. TRIA Beauty, Inc.* | 09-cv-11081 | None |
| *Meredy v. Massachusetts General Hospital* | 09-cv-11381 | None |
| *Hamilton v. Partners Healthcare* | 09-cv-11461 | None |
| *Greene v. Ablon* | 09-cv-10937 | None |
| *Reardon v. Massachusetts General Hospital Corporation* | 09-cv-11900 | None |
| *Phillips v. Medtronic, Inc.* | 10-cv-10305 | Bowler |
| *Shervin v. Partners Healthcare System, Inc.* | 10-cv-10601 | Sorokin |
| *Li v. Huffman* | 11-cv-11557 | Collings |
| *Kinghorn v. The General Hospital Corporation* | 11-cv-12078 | Dein |
| *Culton v. Brigham & Women's Hospital, Inc.* | 12-cv-10440 | Bowler |
| *Fertik v. Stevenson* | 12-cv-10795 | Kelley |
| *Goldstein v. Faulkner Hospital* | 12-cv-11974 | Boal |
| *Brigham and Women's Hospital, Inc. v. Perrigo Company* | 13-cv-11640 | Sorokin |
| *Toussaint v. Brigham and Women's Hospital, Inc.* | 13-cv-12083 | Collings |
| *Partners Healthcare System, Inc. v. Fisher Scientific Company LLC* | 14-cv-10382 | Sorokin |
| *Chacon v. Brigham and Women's Hospital* | 14-cv-13235 | Dein |
| *Rafi v. Brigham and Women's Hospital* | 14-cv-14017 | Boal |
| *Anversa v. Partners Healthcare System, Inc.* | 14-cv-14424 | Kelley |
| *Vertus v. General Hospital Corporation, The* | 15-cv-10888 | Dein |
| *Sams v. Massachusetts General Hospital* | 15-cv-11057 | Boal |
| *Wollman v. Massachusetts General Hospital, Inc.* | 15-cv-11890 | Dein |
| *Rosbeck v. Corin Group PLC* | 15-cv-12954 | Boal |
| *Rafi v. Morton* | 18-cv-10482 | Boal |
| *General Hospital Corp. v. Esoterix Genetic Labs, LLC.* | 18-cv-11360 | Cabell |
| *Ventura v. Massachusetts General Hospital* | 18-cv-12159 | Kelley |
| *Kane v. Mass. Gen. Hospital* | 20-cv-11266 | Kelley |

228. The split of Brigham and Women's Hospital and Massachusetts General Hospital/Partners Healthcare System cases much closer resembles what one expects from a random designation process, given the dates of the cases and the various magistrates' times on the bench.

229. The case at bar, however, as a criminal case, was not designated randomly.

230.  Defendant learned that this Court used a monthly rotation of emergency magistrates to hear, among other matters, search-warrant applications.[315]

231.  Once an emergency magistrate hears a search warrant application any future criminal cases arising therefrom are manually assigned to the same magistrate.[316]

232.  This system allowed the government to magistrate shop criminal cases to the particular magistrate it prefers for each case; indeed, it seems designed to allow the government to do so.

233.  Though this criminal case was first designated to Magistrate Hennessy,[317] it was redesignated to Bowler.[318]

234.  In this case, the government had submitted *ex parte* a search-warrant application to Magistrate Bowler, which remained under seal and unreviewable by Defendant and his counsel at Defendant's initial appearance and detention hearing.[319]  Defendant was thus unable

---

[315] *See* Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts Rule 15(a) ("One of the magistrate judges is designated as the emergency magistrate judge at Boston for each month of the calendar year."), (b) ("All new original matters within the territorial jurisdiction of the magistrate judges involving the filing of criminal complaints, issuance of warrants of arrest and search warrants, seizure warrants[…] must be filed with the magistrate judge then designated as the emergency magistrate judge.") (Sept. 7, 2011), *available at* https://www.mad.uscourts.gov/general/pdf/LC/MJRules2011.pdf (last accessed Oct. 1, 2023).

[316] "If, on a previous occasion, an emergency magistrate judge has received a criminal complaint or has issued a search warrant under the provisions of Fed. R. Crim. P. 41, in connection with an ongoing investigation, subsequent applications for warrants or arrest, search warrants, or other matters within the original jurisdiction of a magistrate judge, must be made to the magistrate judge who had conducted previous proceedings in the case, unless the new application or matter is not directly related to the previous investigation.  If, as a result of that continuing investigation, an indictment is returned, or an information is filed, the attorney for the government must, before the return of the indictment or the filing of the information, record the docket or case number(s) of those prior proceedings before the magistrate judge on the required Form JS 45."  Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts Rule 15(d)(1) (Sept. 7, 2011).  *See, also,* Form JS 45 ("Search Warrant Case Number 14-2234-MBB") (Feb. 16, 2016), E.C.F. no. 3-1; Form JS 45 (same) (Oct. 19, 2016), E.C.F. no. 28-1.

[317] *See, e.g.,* Notice of Case Assignment ("Magistrate Judge David H. Hennessy assigned") (Feb. 17, 2016), E.C.F. no. 5.

[318] *See, e.g.,* Notice of Reassignment ("Magistrate Judge Marianne B. Bowler added") (Feb. 29, 2016), E.C.F. no 6.

[319] *See,* Application and Warrant, No. 14-mj-2233-MBB (D. Mass.)

to rebut any of the warrant application's assertions pleaded to Magistrate Bowler and relevant to detention.

235.  In such cases where the government is in no hurry to execute a search or make an arrest, such as this case, it can, and indeed does, simply wait for the magistrate it prefers to become the emergency magistrate, thereby securing that magistrate for all future related matters without risking a random designation to any other magistrate.

236.  The average wait for the government to get its preferred magistrate as emergency magistrate was short.

| No. of magistrates | Average wait for a particular emergency magistrate | Maximum wait for a particular emergency magistrate |
|---|---|---|
| 2 | 8 days | 31 days |
| 3 | 21 days | 62 days |
| 4 | 35 days | 92 days |
| 5 | 49 days | 103 days |
| 6 | 64 days | 133 days |
| 7 | 79 days | 164 days |

237.  For this case, six magistrates were active in Boston when the government secured Bowler's permanent designation.  The average expected wait for Magistrate Bowler was thus 64 days.

238.  At all relevant times Magistrate Bowler's ties to Boston Children's Hospital, Harvard Medical School and the other Harvard hospitals[320] were available to the government in places the government was all but certain to notice them, *e.g.*, Her Honor's ties were publicly available and expressly delineated in this Court's press releases.[321]

239.  After the filing of an earlier version[322] of the relevant calculations,[323] the Court changed its emergency magistrate rotation from monthly to daily.[324]  This drastically reduced the government's

---

[320] *See, supra*, p. 81, ¶¶ 66–82 (citations omitted).

[321] *See, supra,* p. 81 ¶ 66 (citations omitted).

[322] *See* Memorandum in Support of Expedited Release Pending Appeal at 4 ("The AUSAs […] judge-shopped for [Magistrate Judge] Bowler in a system already rigged to put Her Honor on Harvard-hospital cases.") (citing Decl. Of Martin S. Gottesfeld, *presumably* E.C.F. no. 441-1) (Aug. 6, 2021), E.C.F. no. 441 at 6 (entered Aug. 13, 2021).

[323] *See, supra*, p. 132, ¶¶ 229–237 (citations omitted).

[324] *See* United States District Court for the District of Massachusetts, *Public Notice Update to Magistrate Judge Rules* at 5 (May 3, 2022), *available at* https://www.mad.uscourts.gov/general/pdf/announce/MJ%20Rule%20Changes%20052022.pdf#page=5 (last accessed Oct. 1, 2023).

average wait time for its preferred emergency magistrate in the vast majority of cases.

240. For appeals, First Circuit Rules dictate, "In accordance with long-standing practice, cases are assigned to panels on a random basis."[325]

241. But, after Defendant's conviction was affirmed and rehearing denied, Defendant learned that Judge Lynch was assigned a disproportionate number of appellate cases involving Harvard, the Massachusetts Department of Children and Families (hereafter the "D.C.F."), state and federal health and human services departments and other related entities, and that Judge Lynch wrote a disproportionate number of the orders and precedential opinions arising therefrom.[326]

242. After Defendant's conviction was affirmed and rehearing denied, Defendant hand copied dozens of pages of comprehensive data from the prison's LexisNexis computer and completed an initial set of calculations, by hand, in solitary confinement, regarding Judge Lynch's case assignments.[327]

243. Defendant found that in no year was Judge Lynch credited with more than half of the First Circuit's Decisions,[328] but that, *inter alia*, Judge Lynch had been assigned to

---

[325] *See* United States Court of Appeals for the First Circuit, Rulebook[*sic*] at 124, § D (also listing the exceptions to random assignments) ("No other non-random assignments of cases shall be made except for special cause and with the concurrence of the duty judge."), *available at* https://www.ca1.uscourts.gov/sites/ca1/files/rulebook.pdf#page=125 (last accessed Dec. 1, 2023).

[326] *See, generally,* Decls., Exhs. D–E.

[327] *See, generally,* Decls. re Data and Preliminary Statistical Findings (Jan. 2022), E.C.F. nos. 457-5 *et seq.*

[328] *See* Decl. re Data and Tables, Exh. E, Attachm. 1, Attributed First Circuit Panel Decisions Per Year and By Selected Judges.

1)    the First Circuit's last 10 published decisions most important to Massachusetts Health and Human Services (H.H.S.);[329]

2)    the First Circuit last nine published decisions most important to the Massachusetts Department of Children and Families (D.C.F.);[330]

3)    this millennium's five published decisions most important to the Massachusetts Department of Developmental Services;[331]

4)    seven of the First Circuit's nine most discretionary published decisions during her tenure listing Harvard University, its presidents and fellows, its medical school, or its cancer research center as litigants or interested parties;[332]

5)    50 of the First Circuit's 91 decisions most obviously implicating either Massachusetts or federal H.H.S. during Judge Lynch's time on the Court;[333] and

6)    43 of the First Circuit's 91 decisions most obviously implicating state social-services agencies.[334]

244.  Defendant has now calculated that "the apparent likelihood of Judge Sandra Lynch's assignments to all the First Circuit's last 10 published decisions most important to Massachusetts Health and Human

---

[329] *Id.*; Decl. re Data and Tables at 11, ¶ 56 (citing First Circuit "Massachusetts"–"HHS" & Similar Decisions Postdating May 8, 1995, Attachm. 4) (other citations omitted), Exh. E.

[330] *See* Decls, *supra*, n. 327; Decl. re Data and Tables at 11, ¶ 57–60 (citing Filtered First Circuit "DCF"-type Decisions in Mass. Cases, Attachm. 7) (other citations omitted), Exh. E.

[331] *See* Decls, *supra*, n. 327; Decl. re Data and Tables at 14, ¶ 63–67 (citing First Circuit "Massachusetts" "Developmental Services"-type Decisions Postdating May 8, 1995, Attachm. 10) (other citations omitted), Exh. E.

[332] *See* Decls, *supra*, n. 327; Decl. re Data and Tables at 15, ¶ 68–71 (citing Filtered First Circuit "Harvard College"-type Decisions Postdating May 8, 1995, Attachm. 12) (other citations omitted), Exh. E.

[333] *See* Decls, *supra*, n. 327; Decl. re Data and Tables at 9, ¶ 46–55 (citing First Circuit "HHS" & Similar Decisions Per Year and By Judges Lynch & Torruella, Attachm. 2; First Circuit "HHS" & Similar Decisions Postdating May 8, 1995, Attachm. 3), Exh. E.

[334] *See* Decls, *supra*, n. 327; Decl. re Data and Tables at 10, ¶ 57–58 (citing Reviewed First Circuit "DCF"-type Decisions Postdating May 8, 1995, Attachm. 5), Exh. E.

Services (H.H.S.)—as had happened since 2004—was 0.0097931940472 percent, or less than one in 10,211."[335]

245.  Defendant has further written and provided the source code for a trustworthy computer program capable of running and analyzing a billion simulations of random assignments for particular First Circuit judges and cases.[336]

246.  The program simulated the assignments of the 10 aforesaid Massachusetts H.H.S. cases and "yielded an even lower empirical probability of Judge Lynch's assignment to every case in the set: 0.0084074 percent."[337]

247.  Defendant has further calculated, "Judge Lynch's apparent likelihood of assignment to all the last nine published decisions most important to the Massachusetts Department of Children and Families (D.C.F.), as had happened since 2000, was 0.0103845579818 percent, or less than one in 9,629."[338]

248.  And, "A billion computer simulations of the random assignments of the cases directly above yielded a roughly equivalent empirical probability of Judge Lynch's assignment to every case in the set: 0.0104164 percent."[339]

249.  Defendant has further calculated, "Judge Lynch's apparent likelihood of assignment to all of this millennium's five published decisions most important to the Massachusetts Department of

---

[335] Decl. re First Circuit Case Assignments at 3, ¶ 6 (citation omitted), Exh. D.
[336] *Id.* at ¶ 5 (citation omitted); Decl. re Data and Tables at 16, ¶¶ 72–119 (citations omitted), Exh. E.
[337] Decl. re First Circuit Case Assignments at ¶ 7 (citation omitted), Exh. D.
[338] *Id.* at 4, ¶ 8 (citation omitted).
[339] *Id.* at ¶ 9 (citation omitted).

Developmental Services, as also had happened, was 1.946524478155 percent, or less than one in 51."[340]

250.  Once again, a billion computer simulations "yielded a roughly equivalent empirical probability of Judge Lynch's assignment to every case in the set: 2.0339953 percent."[341]

251.  Defendant has further calculated that Judge Lynch's combined apparent likelihood of assignment to all the cases from the three aforesaid sets, as had happened, "was 0.0000000829183 percent, or less than one out of 1.2 billion."[342]  In contrast, the odds of a single ticket winning the Powerball jackpot are 1 in 292,201,338, or more than four times higher.[343]

252.  Further, "A billion computer simulations of the random assignments of the cases directly above failed to produce a single result in which Judge Lynch was assigned to all of the cases in those three sets."[344]

253.  Defendant further asserts: "In my opinion, to believe that Judge Lynch's assignments to Massachusetts H.H.S., D.C.F. and D.D.S. cases were random is absurd."[345]

254.  Further, computer simulations of Judge Lynch's assignments to seven of the aforesaid nine Harvard cases "yielded empirical odds of 2,974,133:125,000,000, or 2.3793064 percent."[346]

---

[340] *Id.* at 5, ¶ 10 (citation omitted).
[341] *Id.* at 5, ¶ 11 (citation omitted).
[342] *Id.* at 6, ¶ 12 (citation omitted).
[343] *See, e.g.,* Winters, *Here are the odds you'll win the $439 million Powerball jackpot*, CNBC (Jan. 14, 2023), *available at* https://www.cnbc.com/2023/01/14/powerball-odds-of-winning-jackpot.html (last accessed June 21, 2023).
[344] *See* Decl. re First Circuit Case Assignments at 6, ¶ 13 (citation omitted).
[345] *Id.* at ¶ 14.
[346] *Id.* at ¶ 15 (citation omitted).

255. Even less likely, computer simulations of Judge Lynch's assignments to at least 50 of the First Circuit's 91 relevant state and federal H.H.S. cases yielded an empirical likelihood of 0.1168057 percent.[347]

256. Defendant has concluded: "In my opinion, to believe that Judge Lynch's assignments to those 50 state and federal H.H.S. cases were random is absurd."[348]

257. Also unlikely, computer simulations of Judge Lynch's assignments to at least 43 of the First Circuit's 91 relevant state social-services cases yielded an empirical likelihood of 9.1320891 percent.[349]

258. Defendant concluded: "In every instance tested, Judge Lynch's actual case assignments lie entirely outside or just barely within the empirical bell curve, as indicated in the marked-up charts directly below, wherein a red circle or X indicates Judge Lynch's actual number of assignments."[350]

---

[347] *Id.* at 9, ¶¶ 17–18 (citation omitted).
[348] *Id.* at ¶ 19.
[349] *Id.* at ¶¶ 20–21 (citation omitted).
[350] *Id.* at ¶ 22.







First Circuit "Massachusetts" "Developmental Services"-type Decisions Freq. Distr.

(One Billion Simulations)



First Circuit "Massachusetts" "DCF" and "Developmental Services"-type Decisions Freq. Distr.

(One Billion Simulations)



First Circuit "Harvard"-type Case Assignments Freq. Distr.

(One Billion Simulations)



First Circuit "HHS"-type Case Assignments Expected Freq. Distr.

(One Billion Simulations)



First Circuit "DCF"-type Case Assignments Expected Freq. Distr.

(One Billion Simulations)

259.  After Defendant's conviction was affirmed and rehearing denied, Defendant found, "Judge Lynch's assignments to social-services-related cases also exhibit an apparent skew towards Massachusetts D.C.F.: Her Honor sat for 43 of 91 social-services-related cases from throughout the circuit, but, differentiated, Her Honor's results are 17 for 45 outside Massachusetts (37.8%) and 26 for 46 inside Massachusetts (56.50%)."[351]

260.  After Defendant's conviction was affirmed and rehearing denied, Defendant found that Judge Lynch had been assigned to "five out of every seven [Massachusetts social-services-related cases] from 2012 onwards (15 of 21)."[352]

261.  After Defendant's conviction was affirmed and rehearing denied, Defendant found that Judge Lynch had been assigned to "10 of the last 13 published decisions in Massachusetts criminal or habeas cases most obviously implicating child protection."[353]

262.  After Defendant's conviction was affirmed and rehearing denied, Defendant found that Judge Lynch had been assigned to "seven of the Court's nine most discretionary published decisions during her tenure listing Harvard University, its presidents and fellows, its medical school, or its cancer research center as litigants or interested parties."[354]

263.  Absent her more-frequent-than-expected assignments, Judge Lynch could not have played the outsize role that Her Honor did in

---

[351] *Id.* at 14, ¶ 24 (citations omitted).
[352] *Id.* at ¶ 25 (citation omitted).
[353] *Id.* at 15, ¶ 26 (citation omitted).
[354] *Id.* at ¶ 12.

writing the precedents followed by this Court in the aforesaid types of cases.

264.  The U.S. Court of Appeals typically assigns a panel of three judges to make a published decision; usually, but not always, the panel elects a single member to write the decision and receive attribution.  Other times the decision is published *per curiam*, i.e. attributed to the court instead of to a single judge.  Thus, on average, U.S. appellate judges are attributed for writing under a third of their decisions.

265.  After Defendant's conviction was affirmed and rehearing denied, Defendant found that Judge Lynch "wrote three quarters (six of eight) of the decisions attributed to a single judge in the nine above cases paramount to Massachusetts DCF."[355]

266.  After Defendant's conviction was affirmed and rehearing denied, Defendant found that, of Her Honor's "26 above-mentioned Massachusetts social-service-related decisions, Judge Lynch wrote 14 of the 25 attributed to a single judge (56%)."[356]

267.  After Defendant's conviction was affirmed and rehearing denied, Defendant found, "Of the millennium's five published decisions most important to the Massachusetts Department of Developmental Services, Judge Lynch wrote three of the four attributed to a single judge (75%)."[357]

268.  After Defendant's conviction was affirmed and rehearing denied, Defendant found, "Of [Her Honor]'s seven above-mentioned

---

[355] *Id.* at ¶ 29 (citation omitted).
[356] *Id.* at ¶ 30 (citations omitted).
[357] *Id.* at ¶ 31 (citation omitted).

Harvard decisions, Judge Lynch wrote two of the four, i.e. half, of those attributed to a single judge, including the recent *Students for Fair Admissions* decision" recently overturned by the Supreme Court.[358]

269.   After Defendant's conviction was affirmed and rehearing denied, Defendant found, "of Judge Lynch's 50 Massachusetts and federal HHS decisions referenced above, [Her Honor] wrote 19 of the 31 attributed to a single judge (61.3%)."[359]

270.   After Defendant's conviction was affirmed and rehearing denied, Defendant noted, "Given Judge Lynch's apparent interest in these cases, as demonstrated by her prolific decision-writing, and the miniscule likelihood of such frequent assignments, many of Judge Lynch's H.H.S., Harvard, and social-services-related decisions are far more likely the result of human intent than random selection."[360]

G. SUPPRESSION

271.   Absent disclosure by Magistrate Bowler, Defendant was unaware of her ties to Boston Children's Hospital and the charged conduct[361] during his representation by Tor Ekeland PC.

272.   Defendant first broached disqualification and suppression to the Boston Federal Defender's Office.

273.   Attorney Ms. Jane Peachy forthrightly told Defendant that "Bowler should have recused."

274.   Attorney Peachy nonetheless declined to further investigate the matter, move for Bowler's disqualification or address the neutral

---

[358] *Id.* at 16, ¶ 32 (citation omitted).
[359] *Id.* at ¶ 33 (citation omitted).
[360] *Id.* at ¶ 34.
[361] *See, supra*, p. 81, ¶¶ 66–93 (citations omitted).

magistrate requirement.[362]  This led Defendant to seek and receive new counsel, expressly citing Magistrate Bowler's ties to Boston Children's Hospital.[363]

275.  Replacement counsel Mr. Raymond Gillespie first briefed the neutral magistrate requirement.[364]

276.  Attorney Gillespie then withdrew from the case.[365]

277.  Replacement counsel Mr. David Grimaldi then further briefed the neutral magistrate requirement.[366]

278.  Defendant had noticed that Magistrate Bowler dated the warrant "September 29, 2014," but that "the warrant papers clearly suggested that the application was granted on September 29, 2014[,] but only applied[-]for on September 30, 2014."[367]

279.  At a subsequent public hearing, the following became clear:

1.  Magistrate Bowler issued the warrant and dated it "September 29, 2014."

2.  The application for the warrant that Magistrate Bowler approved and returned to the government was dated "09/30/2014."

3.  At some point thereafter, Magistrate Bowler drew a line through the date on the warrant application, wrote

---

[362] A neutral warrant-issuing authority is a requirement under the Due Process Clause.  *See* U.S. Const. amend. V, cl. 4 ("No person shall be [...] deprived of life, liberty, or property, without due process of law").  *See, also,* the Warrants Clause, U.S. Const. amend. IV, cl. 2 ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").
[363] *See* Motion, *pro se,* to Withdraw and Appoint New Counsel (citing Bowler's ties to Boston Children's Hospital, Brigham and Women's Hospital and Harvard Medical School) (Oct. 23, 2017), E.C.F. no. 90.
[364] *See* Supplemental Suppression Motion (Mar. 20, 2018), E.C.F. no. 128.
[365] *See, infra,* p. 153, ¶ 304 (citation omitted).
[366] *See* Second Supplemental Suppression Motion (May 4, 2018), E.C.F. no. 166.
[367] *Id.* at 19 (quoting Warrant, Warrant Application).

"9/29/2014" in its place and entered only the modified

document on the warrant docket.

4.   Neither the government nor the defense had ever seen the

version of the document that Bowler modified.

5.   In reviewing the warrant application for propriety before

issuing the warrant, Magistrate Bowler, *at best for the

government*, overlooked the date discrepancy.[368]

280.  In arguing against suppression, the government expressly

stated: "Magistrate Judge Bowler Had No Relationship with The Boston

Foundation When She Issued the Warrant."[369]  In reality, she was at that

time and for over a year thereafter attending fundraising galas for

the Boston Foundation.[370]

281.  In arguing against suppression, the government expressly

asserted: "The fact that Judge Bowler's husband is employed by a

medical school and a hospital that were not the target of attack bring

investigation similarly provides no grounds for recusal."[371]

282.  In arguing against suppression, the government expressly

asserted: "[T]he relationship between [Harvard Medical School] and

area hospitals (including Children's Hospital and [Brigham and Women's

Hospital]) relates to training medical students and residents. [...]

[Harvard Medical School], Children's Hospital, and [Brigham and

Women's Hospital] are parts of distinct, independent entities with

their own leadership and organizational structures."[372]

---

[368] *See* Hrg. Tr., May 3, 2018, at 18:12, E.C.F. no. 434.
[369] *See* Opposition to Supplemental Suppression Motion at 6 (May 18, 2017), E.C.F. no. 179.
[370] *See, supra*, p. 84, ¶ 78 (citations omitted).
[371] *See* Opposition, *supra*, p. 160, n. 369, at 3.
[372] *Id.* at 9, n. 2.

283.  The Court credited the government's statements and denied the suppression motion, *e.g.*, the Court ruled "The government convincingly demonstrates that HMS is not an affiliate of area hospitals in the sense that there is a business relationship with the hallmarks of legal control, but rather that the affiliation relates to the training of medical students and residents."[373]

284.  The government, however, was preparing to present directly contradictory testimony against Defendant once the suppression motion was denied, such as, *supra*, p. 105, ¶¶ 139-140 (regarding the Harvard hospitals, "they're a part of Harvard," share Harvard's Internet connection and they were all allegedly "down" due to the charged conduct; regarding Boston Children's Hospital, "all our faculty are faculty at Harvard Medical School") (quoting Trial Tr., July 25, 2018, at 52:5, 195:19-199:9, E.C.F. no. 327).

285.  In light of the trial testimony, there is no reason to believe that Boston Children's Hospital would survive without Harvard, and every reason to believe it would not.

### H. DEFENSE COUNSEL

286.  The same day the F.B.I. executed the search warrant[374] Defendant retained Attorney Mr. Tor Ekeland for representation, if necessary, through trial.[375]

---

[373] *See* Memorandum and Order re Defense of Another, Suppression and the Speedy Trial Act at 27 (June 19, 2018), E.C.F. no. 209.

[374] *See, supra*, p. 78, § IX(B).

[375] *See, e.g.,* Motion for Leave to Appear *Pro Hac Vice* by Tor Ekeland (Apr. 1, 2016), E.C.F. no. 9.  *See, also, supra,* p. 79, ¶ 56 (describing Tor Ekeland, P.C.) (citations omitted).

287.  But, after nine months in custody, unemployed, Defendant could no longer afford retained counsel,[376] and the Court appointed Federal Public Defender Mr. Timothy Watkins.[377]

288.  Seven months later Federal Public Defender Ms. Jane Peachy filed an appearance[378] and Watkins informed the Court:

> Between the time that we were before Judge Bowler and here today, I've been offered a spot at the—a temporary spot at the Sentencing Commission for one year, a detail there from the Federal Defender Office, which I'm going to accept, and that begins in August, which is one of the reasons Ms. Peachy is here, and she'll be taking over the case from me.[379]

289.  The Federal Defender's Office disclosed to Defendant two potential conflicts of interest and both Peachy and Watkins refused to file to disqualify Magistrate Bowler and suppress on the basis of a deficient search warrant issued by a non-neutral magistrate; Defendant moved, *pro se*, and with counsel's permission, for replacement counsel.[380]

290.  The Court granted Defendant's motion.[381]

291.  Ten days later the Court appointed Attorney Mr. Raymond Gillespie.[382,383]

---

[376] *See, e.g.,* Letter re Retained Counsel (Nov. 22, 2016), E.C.F. no. 44.

[377] *See* Clerk's Notes, Withdrawal Hearing (Nov. 28, 2016) ("Counsel to withdraw and file a written motion to that effect.  FPD Watkins is appointed."), E.C.F. no. 46.

[378] *See* Notice of Appearance by Jane Peachy (June 26, 2017), E.C.F. no. 72.

[379] *See* Tr., June 27, 2017, at 4:14, E.C.F. no. 417.

[380] *See, supra,* p. 147, ¶¶ 272–274 (citations omitted).

[381] *See* Clerk's Notes, Withdrawal Hearing (Oct. 27, 2017), E.C.F. no. 92.

[382] *See* Order Appointing Mr. Raymond Gillespie (Nov. 6, 2017), E.C.F. no. 93.

[383] Defendant knows not whether Gillespie was the C.J.A. duty attorney for any of the relevant days between Oct. 27 and Nov. 6, 2017.  *Cf.* General Order 13-02, Plan for Implementing the Criminal Justice Act of 1964, as Amended 18 U.S.C. § 3006A, at 7, § V(A) ("In all cases, appointment of counsel shall be made as promptly as practicable under the circumstances.  The District Court shall implement such procedures as may be necessary or appropriate to ensure timely appointment."), (B) ("In general, appointments will be made using a duty day system."), *available at* https://web.archive.org/web/20170504043832/http://www.mad.uscourts.gov/caseinfo/pdf/general/111413%20GO13-02%20MAD%20CJA%20Plan.pdf (last accessed Dec. 6, 2023).

292. After Gillespie's first conference, the Court ordered that Defendant file his supplemental suppression motion by Feb. 15, 2018.[384]

293. Defendant was surprised that, on Feb. 13, 2018, Gillespie filed for an extension through Mar. 12, 2018.[385]

294. The government partially opposed the extension.[386]

295. Gillespie amended his motion, to seek an extension through Mar. 6, 2018.[387]

296. The Court granted an extension through Mar. 1, 2018.[388]

297. Defendant was again surprised when Gillespie failed to timely prepare the motion.  Instead, with Defendant's consent, Gillespie moved to withdraw.[389]

298. Defendant truthfully wrote to the Court: "As [Y]our [H]onor is aware, Mr. Gillespie has had months to prepare and file a supplemental motion to suppress.  Yet, he waited until the very last minute.  When he was granted an extension until yesterday, March 1st, 2018, he again procrastinated."[390]

299. Defendant truthfully wrote to the Court:

> It was at that point that I insisted that Mr.
> Gillespie move to withdraw and it seemed that we
> had a clear understanding that in his motion to
> resign as defense counsel he would cite his
> inability to meet the March 1st deadline which
> the Court had set.  Yet there is no mention of
> this in his motion.  However, I do have audio
> clips and emails which clearly document this
> course of events.[391]

---

[384] *See* Clerk's Notes, Status Conf. (Nov. 28, 2017), E.C.F. no. 97.

[385] *See* Motion for Extension, E.C.F. no. 106.

[386] *See* Opposition to Motion for Extension (Feb. 20, 2018), E.C.F. no. 108.

[387] *See* Amended Motion for Extension (Feb. 20, 2018), E.C.F. no. 109.

[388] *See* Order Granting in Part, Denying in Part, Motion for Extension (Feb. 21, 2018), E.C.F. no. 111.

[389] *See* Motion to Withdraw (Mar. 1, 2019), E.C.F. no. 119.

[390] *See* Letter re Gillespie at 1 (Mar. 2, 2018), E.C.F. no. 121 (entered Mar. 5, 2018).

[391] *Id.* at 2.

300.  The Court conducted a colloquy *ex parte*, at which Defendant reiterated that: "███████████████████████████████" because "████████████████████████." [392]

301.  The Court denied the motion to withdraw and reset the suppression motion deadline to Mar. 16, 2018. [393]

302.  Gillespie failed to file the suppression motion and sought an extension until Mar. 17, 2018. [394]

303.  Gillespie then failed to file the suppression motion on Mar. 17, 2018. [395]

304.  Circa this time, Defendant learned that Gillespie 1) did not carry malpractice insurance, 2) was ████████████████████████████ ████████████████████████ and 3) was ████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████. Gillespie never disclosed this ████████████████████ to Defendant, who discovered it on his own and raised it with the Court. [396]

305.  Defendant also raised concerns as to ████████████████ ████████████████████████████████████ [397]

306.  On Mar. 19, 2018, the Court ordered:

> Counsel shall file defendant's supplemental motion to suppress on or before 2:00 P.M. on Monday, March 19, 2018, in default of which Attorney Gillsepie[*sic*] shall appear before the Court in Courtroom #4 at 4:00 P.M., Monday, March 19, 2018 to explain his actions. [398]

---

[392] *See* Tr., Mar. 9, 2018, at 18:12, E.C.F. no. 432.
[393] *See* Clerk's Notes, Withdrawal Hearing (Mar. 9, 2018), E.C.F. no. 123.
[394] *See* Motion for Extension (Mar. 16, 2018), E.C.F. no. 124.
[395] *See, e.g.,* Docket Report.
[396] *See* Letter re Gillespie (Mar. 18, 2018), E.C.F. no. 140 (entered Mar. 27, 2018).
[397] *See, supra,* p. 151, n. 383.
[398] *See* Order Granting Extension (Mar. 19, 2018), E.C.F. no. 125.

307.  Gillespie again failed to file the suppression motion.[399]

308.  The Court scheduled a hearing to show cause and did not afford Defendant the opportunity to attend.[400]

309.  Gillespie attended the hearing telephonically.[401]

310.  The Court inquired upon Gillespie and Gillespie responded as follows:

> THE COURT:  Yes.  Good afternoon, Mr. Gillespie. We are here with respect to Mr. Gillespie's motion filed late Friday, actually, it was Friday night, for a brief continuance to file his motion —supplemental motion to suppress, and that motion asked for leave to file that motion on Saturday. Of course no one was here, nor did we know about the motion until this morning.  But there is still no motion on the docket, Mr. Gillespie. Why?
> MR. GILLESPIE:  I haven't finished it yet, Your Honor.  I'm almost done with it, but it's not quite ready to file yet.  But it will be filed today, if Your Honor will allow that.
> THE COURT:  Well, I will allow it, but you also have other deadlines facing you.  In fact, tomorrow, the 20th, the Defendant's amended motion to dismiss is due, and I expect that to be filed tomorrow.
> MR. GILLESPIE:  That will be filed tomorrow, Your Honor.  That is already 90 percent prepared.
> THE COURT: Okay.  What is the reason why you chose to file the motion for an extension at 10:00 on Friday night to file something on Saturday, and then it's not filed on Monday?  I'm not sure I understand why.
> MR. GILLESPIE:  Well, I thought I would have the full day to work with it on Saturday.  But, as it turns out, because of the death of a family friend, I couldn't do that.
> THE COURT:  Okay.  We are, as you know, under tight time constraints in this case, Mr. Gillespie, and I don't know if you are aware, but I have received what was entitled a courtesy copy of a letter that has been sent from your client, Mr. Gottesfeld, to the Court—the Court has not

---

[399] *See, e.g.,* Docket Report.
[400] *See* Notice of Hearing (Mar. 19, 2018), E.C.F. no. 126.
[401] *See* Tr., Mar. 19, 2018, at 2:14, E.C.F. no. 433.

> received the official copy—complaining about your
> representation yet again, and I think that it is
> actually inappropriate to have your client filing
> matters without you're doing it, as his counsel,
> because you are appointed counsel; and,
> therefore, he's not to be filing things ex parte
> or pro se.[402]
> So I think you should try to get a copy of that
> letter or at least consult with your client about
> it because it is something that certainly should—
> you should be aware of, and there may be other
> actions forthcoming after it; okay?
> I take it you aren't aware of that letter?
> MR. GILLESPIE:  I'm not aware of that letter,
> Your Honor.
> THE COURT:  Okay.  Well, I think you should make
> an effort to get it as soon as you can because it
> does make allegations in it that I'm sure you
> will want to respond to.[403]

311. Gillespie then filed a supplemental suppression motion the
next day.[404]

312. Upon review of the filed motion, Defendant noticed
qualitative issues.

313. Gillespie inquired upon Defendant as to the content of
Defendant's Letter re Gillespie (Mar. 18, 2018), E.C.F. no. 140
(entered Mar. 27, 2018).

314. Upon learning of the content of Defendant's Letter,
Gillespie again moved to withdraw.[405]

315. The Court conducted a colloquy *ex parte*, at which Gillespie
confirmed, "███████████████████████████████████████

███████████████████████████████████████"[406]

---

[402] This directive conflicted with the Court's previous directive: "Defendant will be allowed to file some filings pro se." Clerk's Notes, Withdrawal Hearing (Mar. 9, 2018), E.C.F. no. 123.

[403] *See,* Tr., Mar. 19, 2018, *supra,* p. 154, n. 401, at 2:16.

[404] *See* Supplemental Suppression Motion, E.C.F. no. 128 (filed Mar. 20, 2018).

[405] *See* Motion to Withdraw (Mar. 20, 2018), E.C.F. no. 130.

[406] *See* Tr., Mar. 22, 2018, at 7:20, E.C.F. no. 419.

316.  Gillespie further confirmed: "████████████████████

████████████████████████"[407]

317.  Defendant voiced concern that, due to Gillespie's ████████

████████████████████████[408] in terms of

representing Defendant, i.e. ████████████████████████

████████████████████████████████

████████████████[409]

318.  The Court advised Defendant that ████████████████

████████████████████████████████████

████████████████[410]

319.  The Court appointed Attorney Mr. David Grimaldi[411] and

granted Gillespie's Motion to Withdraw.[412]

320.  At Grimaldi's first status conference, he informed the Court

and the government: "I have a trial scheduled for July 23rd.  That's a

co-Defendant case, it's a complicated matter.  I can imagine it being

moved.  It's a first-degree murder case in State Court, but I can

imagine it being moved."[413]

321.  At Grimaldi's second status conference, the following

exchange occurred:

> MR. GRIMALDI:  But one complicating factor here
> is that—and I mentioned this at our previous
> hearing two weeks ago, but I've since had a court
> date on it, is that the other trial that is
> scheduled in Suffolk Superior Court, the first
> degree murder case, is a week prior to this

---

[407] *Id.* at 8:1.
[408] *Id.* at 10:25.
[409] *Id.* at 11:6.
[410] *Id.* at 12:18.  *See, also, supra,* p. 153, ¶ 305 (citation omitted).
[411] Order Appointing Mr. David Grimaldi (Mar. 22, 2018), E.C.F. no. 136.
[412] Order Granting Motion to Withdraw (Mar. 22, 2018), E.C.F. no. 137.
[413] *See* Tr., Apr. 4, 2018, at 9:6, E.C.F. no. 420.

scheduled trial in July. Last week—I think it was
last week.  It was after our last status
conference—I had a hearing before Judge Jeffrey
Locke in Suffolk Superior Court.  He said this
case is going on the expected date.  I won't
bring that court into this [C]ourt.  But I'll
just say it's a three co-defendant case, all
charged with first degree murder.  One of the
defendants previously had a motion to dismiss
allowed for lack of probable cause.  The judge
later reversed herself on a reconsideration
motion filed by the Commonwealth.  But they are
expecting a directed verdict in the case; in any
case, a not guilty verdict.  So everyone's eyes
are sort of on this case, and they're intent on
trying it.  I'm also successor counsel in that
case.  And it's scheduled the week before, and
I've had it much longer than this case, Your
Honor.
THE COURT:  You mean it's scheduled July 16?
MR. GRIMALDI:  Yes, it is scheduled—yes, I
believe so, yes. It's scheduled July 16.  And, of
course, all three gentlemen are in custody on the
first degree murder charges.  All that being the
case, and given Judge Locke's reaction to the
matter when I told him about this case, my
expectation is that case will go.  Do things
happen? Yes, they do.  I'll just tell you my
client is alleged to be the shooter in that case.
I don't see a deal forthcoming.  The other
gentlemen are sort of accomplices, aiding and
abetting, if you will, as alleged.  So I don't
see a deal coming for my client.  I expect to go
forward on the case.
THE COURT:  How long a case?
MR. GRIMALDI:  Two to three weeks, I would say.
So given that and given my newness to this case,
in all candor, I told you two weeks ago, and I
really mean it, I will not be dilatory, but I
just cannot be two places at once and prepare a
first degree murder trial at the same time as
preparing this one and do all that has to be done
in this case as well as that case in the time
frame allotted, assuming both cases were going to
go as scheduled.
So what I would like to see happen, perhaps, and
maybe this is premature, maybe it's not, is to
move this case—the trial date—to sometime as soon
as possible for everybody, the [C]ourt, the
prosecution, and myself, thereafter.  I mentioned
last week that I have a week that I'm taking in
August.  I think it's the 5th to the 12th.  And

then I'm available.  So from late August onward,
I can be in this [C]ourt in this session trying
this case.  But it's just a trial and that one
week away out of the country that are in the way.
THE COURT:  So your vacation week was August 5?
MR. GRIMALDI:  Yes. I leave—
THE COURT:  That Monday?
MR. GRIMALDI:  I leave on Sunday, August 5, and
arrive in Boston home on August 12.
THE COURT:  Yeah.  No chance of that murder trial
being moved forward if I were to talk to Judge
Locke?
MR. GRIMALDI:  Well—
THE COURT:  I know Judge Locke.
MR. GRIMALDI:  Yes.  I hadn't thought of that
before you just mentioned it.
THE COURT:  There are three defendants?
MR. GRIMALDI:  Three defendants.
THE COURT:  It's a two-week case?
MR. GRIMALDI:  At least.  Two to three, I would
say, from selection to verdict.
And I think that all three cases will be tried,
you know, but maybe a defendant will plea, but I
don't see that right now.  Certainly not my
client, the way I currently see the case.  You
know, I mean, of course, I'm preparing that case
as if it was going on July 16.  Depending on how
much—you know, we were to move it forward, if it
was a week I don't think that would be much of a
to-do.  If it was much beyond that, I'd have to
really think about it.
THE COURT:  All right.  Let me hear from the
government.
MR. KOSTO:  Your Honor, from the government's
perspective, we would propose, at least for the
next several weeks, behaving as if what sometimes
happens could happen.  Understanding that Mr.
Grimaldi can't be in two places at once and that
if we come into early June and those dates still
seem firm, it's going to be difficult for him to
try the case then, but what we are focused on,
Your Honor, is getting the case teed up and
briefed for the trial that will happen and
understanding the scope of that trial.
From the government's perspective, Mr. Grimaldi's
filing of the motion to dismiss tomorrow would
create a window of approximately two weeks for
the government to reply to the motion to dismiss
and for Mr. Grimaldi to oppose the motion to
suppress—excuse me, for Mr. Grimaldi to
supplement the motion to suppress.  That would

tee up those two motions to be argued and
decided.
What we would propose is for Mr. Grimaldi to have
some additional time to oppose the motion in
limine and for the parties to submit any replies
that remain so that this case can be argued the
week after Memorial Day weekend or early June at
the latest.  So that in the event we have a July
23 trial, we are preparing for the trial that we
all contemplate.
If we get to that argument status date in early
June and Judge Locke is locked in, we'll have an
issue to address.  But experience suggests that
we may not have an issue to address, without any
disrespect intended to Mr. Grimaldi's assessment.
One could promptly put it at 99 percent likely
that he will have a trial on July 16 in Superior
Court, but from the government's perspective we
should behave as if he may not so that we can
take full advantage of that window.
THE COURT:  The court agrees with that.  I do
want to move this matter forward and at least get
all of the motions out of the way in the, perhaps
now unlikely, event that we're able to go to
trial either on July—well, if we pushed it back
from July 23rd to the 30th, that runs into the
problem of Mr. Grimaldi's prior planned vacation,
and I don't want—I remember being in your seat,
and it's a long time ago, but I still do
remember, and those vacations that are long
planned are to be treasured, and I'm disinclined
to tread on that.  And we've decided before that
this is probably going to be more than one week,
but less than two weeks to resolve.  Is that
right?  Is that what we decided last time?
MR. KOSTO:  Yes, Your Honor, at least for the
government to put in its case.
MR. GRIMALDI:  I think that might turn, of
course, on the court's ruling—
THE COURT:  Yes.
MR. GRIMALDI:  —on the motion in limine.
THE COURT:  I understand.  If the tort[ure]
defense is still with us, then we may be longer.
So it's either July 16—I mean, July 23 or it's
not to happen because you're going away and
coming back and then I'm going away.  And then I
have a major criminal trial that has been
postponed a couple of times that is to start on,
I believe it's September 10 and it's due to go
three weeks or close to three weeks.  So we're
talking October if we're not in on July 23.

> I do agree with government's counsel, however,
> that we will get this matter teed up as though it
> were going to go July 23, whether it does or it
> doesn't.
> I think I will approach Judge Locke and see what
> his feeling is about it.  We do have a mutually
> respectful relationship between federal and state
> courts here and trial schedules, and I, of
> course, will let counsel know if I find anything,
> either plus or negative, on that.  But in the
> meantime, we will go forward as though we were
> going to start the case on July 23, understanding
> that it is perhaps unlikely now that we will get
> there.[414]

322.  Four days later the Court electronically requested that
Grimaldi "submit a courtesy copy" of an electronically filed motion
"to the Clerk's Office."[415]

323.  Grimaldi mentioned to Defendant that Grimaldi would be
heading to the courthouse to provide the requested courtesy copy.

324.  Defendant found it odd that the Court would request a
courtesy copy of an electronically filed document that the Court could
simply print itself, and stated such to Grimaldi.

325.  Defendant promptly called Grimaldi after Grimaldi's trip to
the courthouse and asked Grimaldi what had happened when he dropped
off the courtesy copy.

326.  Grimaldi told Defendant that he had simply dropped the
document at the Clerk's office and had no other relevant interactions
while at the courthouse.

327.  Ten days after the request for the courtesy copies, the
Court informed the parties:

> I have had a conversation with Superior Court
> Judge Jeffrey Locke, and I have been informed

---

[414] Tr., Apr. 19, 2018, at 7, E.C.F. no. 427.
[415] *See* Notice Requesting Courtesy Copy (Apr. 23, 2018), E.C.F. no. 149.

> that that case that involves defense counsel, Mr.
> Grimaldi, is not going to go forward in July.
> This case is going to go forward on July 23rd,
> you know, if it's not resolved between now and
> then.[416]

328. After the hearing, Defendant learned that Grimaldi was quite surprised by the development in his pending state court case.

329. Defendant, on multiple occasions, emphasized to each of Attorneys Ekeland, Watkins, Peachy, Gillespie and Grimaldi that, in the days before the charged conduct, Defendant had credited, *e.g.*, Mr. Dershowitz's legal opinion of the illegality of the force exerted to confine Justina in Boston Children Hospital's Bader 5 psychiatric ward and the Wayside Youth and Family Support Network,[417] that Defendant had read Justina's handwritten note,[418] that he had also read the open letters by Pollack and Higgins,[419] and that his imperative depended not on who had custody of Justina, but that she was made to suffer unconscionably, in violation of U.S. law and duly ratified human-rights accords, specifically the Convention Against Torture, Treaty Doc. 100-20.[420]

330. Defendant vigorously kept counsel updated as to potential disqualification grounds, but, with Defendant incarcerated and unable to conduct his own meaningful investigation, counsel never undertook their own investigations of the presiding district judge's interests relevant to the Due Process Clause[421] and recusal statutes.[422]

---

[416] *See* Tr., May 3, 2018, at 26:25, E.C.F. no. 434.
[417] *See, supra*, p. 67, ¶ 44 (citation omitted).
[418] *See, supra*, p. 69, ¶ 47 (citation omitted).
[419] *See, supra*, p. 63, ¶¶ 42–43 (citations omitted).
[420] *See, also,* 18 U.S.C. §§ 2340 *et seq.*
[421] *See* U.S. Const. amend. V, cl. 4 (No person shall "be deprived of life, liberty, or property, without due process of law").
[422] *See* 28 U.S.C. §§ 144, 455.

331.  Defendant learned for the first time at trial that the government had obtained from his laptop much of his Internet browsing history from the times in controversy, showing most of the media reports and documents he had reviewed prior to the charged conduct. None of Defendant's attorneys had told Defendant that this trove of exculpatory information was in discovery.  In fact, none of Defendant's attorneys ever reviewed the raw discovery with Defendant at all.[423]

332.  None of Defendant's attorneys ever prepared Defendant to testify or be cross-examined.

333.  None of Defendant's attorneys ever attempted to interview any of the government's trial witnesses.

334.  None of Defendant's attorneys ever attempted to find a single potential defense trial witness other than Defendant.[424]

335.  None of Defendant's attorneys ever retained a private investigator for any purpose whatsoever, *e.g.*, to substantiate Defendant's claims of defense of another, follow-up on or challenge the damage assessments, or produce evidence that non-coconspiratorial actors contributed significantly to the DDoS traffic.

---

[423] Defendant was in custody from before the first discovery was turned over until long after the trial.  *See, generally,* Docket Report.  The logs at the relevant detention facilities presumably reflect occasions on which Defendant's attorneys visited him with laptops, as, in Defendant's understanding, institution staff inspect and document each piece of technological equipment allowed into attorney visit rooms.  None of those relevant logs should reflect an external hard drive ever being brought to visit Defendant.  And, given the volume of instant discovery and contemporary computer storage capacities, external hard drives would have been utterly necessary for counsel to have reviewed the discovery with Defendant.

[424] Gillespie did attempt to recruit an expert witness for a suppression hearing, but, once the Court declined to hold a suppression hearing, no defense counsel ever reached out to a potential *trial* witness.

336.  Defendant timely asserted to Grimaldi that the government's attempt to add, *post facto*, a physical-presence element to defense of another was unlawful.  *See, infra*, p. 180, § XII (arguing due process notification and lenity required a defense-of-another instruction) (citations omitted); p. 203, § XIII (arguing actual innocence and that the sentence is a miscarriage of justice).

337.  Grimaldi never timely raised the aforesaid violation of the Due Process Clause, U.S. Const. amend. V, cl. 4.[425]

338.  Grimaldi never raised the related violations of the Due Process Clause that were obvious upon Defendant's aforesaid assertion. *See, infra*, p. 180, § XII (arguing due process notification and lenity required a defense-of-another instruction) (citations omitted).

339.  In the months before trial Defendant pleaded with his counsel to file a disqualification motion based on some of the information, *supra*, p. 89, ¶¶ 98-121.

340.  Counsel refused to file any such motion or take any action to investigate the potential facts of such motion.

341.  Defendant published a draft motion illustrative of what he would have liked filed.

342.  Defense counsel consequently moved to withdraw.[426]

343.  Counsel's motion noted: "Mr. Gottesfeld indicates he does not assent to counsel's withdrawal."[427]

---

[425] Instead, Grimaldi waited for the charge conference to investigate and present Defendant's legal theory. *See, infra*, p. 189 (quoting Charge Conf. Tr., July 30, 2018, at 18–19, E.C.F. no. 328).  By then, however, all opportunity to present an express affirmative defense of defense of another was lost.
[426] *See* Motion to Withdraw (June 28, 2018), E.C.F. no. 214.
[427] *Id.*

344.  Defendant believes that a copy of the draft disqualification motion was filed *ex parte* and under seal as an exhibit to the Motion to Withdraw (June 28, 2018), E.C.F. no. 214.

345.  The Court heard the withdrawal motion on July 6, 2018.[428]

346.  At that hearing defense counsel told the Court, regarding the disqualification issue, ███████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████[429],[430]

347.  Defendant truthfully told the Court:

███████████████████████████████████████████████████[431] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████[432]

348.  The court asked Defendant: ████████████████████████ ██████████████[433]

349.  Defendant truthfully answered: ██████████████████████ ████████████████████████████████████████████[434]

350.  The Court denied counsel's motion to withdraw.[435]

---

[428] *See, e.g.,* Clerk's Notes, Withdrawal Hearing (July 6, 2018), E.C.F. no. 231

[429] Tr., July 6, 2018, at 7:19, *presumably* E.C.F. no. 435 (mislabeled July 9, 2018).

[430] ██████████████████████████

[431] █████████████████████████████████████████████████████ █████████████████

[432] Tr., July 6, 2018, *supra,* p. 164, n. 429, at 13:10.

[433] *Id.* at 13:17.

[434] *Id.* at 13:19. ████████████████████████████████████ ███████████

[435] *See* Clerk's Notes, Withdrawal Hearing (July 6, 2018) ("Court denies 214 Motion to Withdraw as Attorney as to Martin Gottesfeld"), E.C.F. no. 231.

351.  Defendant and defense counsel had no further direct communication until the next hearing in this Court.[436]  Their indirect communications centered around the disqualification issue and did not relate to Defendant's potential testimony in this case.[437]

352.  In the interim, a reporter for *The Intercept* inquired upon defense counsel as to why no disqualification motion had been filed.

353.  Defense counsel, without Defendant's knowledge or consent, filed an Emergency Motion to Withdraw (July 12, 2018) (citing Mass. R. Prof. C. 3.3(e)(2)[438]),[439] E.C.F. no. 241.

354.  Defendant believes that another copy of the draft disqualification motion was filed under seal and *ex parte* as an exhibit to the Emergency Motion to Withdraw (July 12, 2018), E.C.F. no. 241.

355.  The motion was heard by the Honorable Richard G. Stearns on Monday, July 16, 2024.[440]

356.  At that hearing, days before this case went to trial, Defense counsel told this Court: "I no longer wish for [Defendant's] success in this case.  I no longer wish for it.  I can no longer represent him, consistent with my duties under the Rules of

---

[436] *See, e.g.,* Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*

[437] *Id.*

[438] "These Rules shall be known and cited as the Massachusetts Rules of Professional Conduct (Mass. R. Prof. C.)." Mass. R. Prof. C. 1.0(t).

[439] "If, in the course of representing a defendant prior to trial, the lawyer discovers this intention and is unable to persuade the client not to testify falsely, the lawyer shall seek to withdraw from the representation, requesting any required permission.  Disclosure of privileged or prejudicial information shall be made only to the extent necessary to effect the withdrawal.  If disclosure of privileged or prejudicial information is necessary, the lawyer shall make an application to withdraw ex parte to a judge other than the judge who will preside at the trial and shall seek to be heard in camera and have the record of the proceeding, except for an order granting leave to withdraw, impounded.  If the lawyer is unable to obtain the required permission to withdraw, the lawyer may not prevent the client from testifying."  Mass. R. Prof. C. 3.3(e)(2).

[440] *See, e.g.,* Tr., July 16, 2018, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.

Professional Conduct.  I'm asking the Court for leave to withdraw because I have an actual conflict of interest."[441]

357.  Defendant truthfully told the Court: "I would like to let the Court know that there has been no direct contact of any kind between myself and Mr. Grimaldi since the end of the last hearing on July 6, and any indirect contact that we have had has not had anything to do with any potential testimony of mine."[442]

358.  Defendant truthfully told the Court: "Now, as I said, there's been no direct contact, no lawyer visit, no legal mail, no phone call, no nothing, between July 6 and today when I saw Mr. Grimaldi."[443]

359.  Defendant truthfully told the Court: "*I don't want to delay [the trial].  I don't want new counsel.  I don't want to waive my right to counsel.*[444]  *I want Mr. Grimaldi to do his job.*"[445]

360.  Defendant truthfully told the Court: "Now, I have a declaration, six copies, seven copies, sufficient, marked Defendant's Exhibit A, going over these facts[,] that there has been no direct communication and that the indirect communication is not centered around testimony and that we have *never actually substantially briefed or prepared my testimony for this case in any way.*"[446]

---

[441] *Id.* at 8:3.

[442] *Id.* at 9:9.

[443] *Id.* at 9:22.

[444] *See* the Counsel Clause, U.S. Const. amend. VI, cl. 7 ("In all criminal prosecutions, the accused shall [...] have the Assistance of Counsel for his defence.").

[445] Tr., July 16, 2018, at 10:5 (emphasis added), *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.

[446] *Id.* at 10:22 (emphasis added); Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*

361.  Defendant truthfully told the Court: "I would like to offer that declaration, and I'm offering to swear to it here today.  My wife, who is here, I believe has copies of the indirect communications between myself and Attorney Grimaldi, again centering around filings, not around testimony."[447]

362.  The Court inquired upon Defendant: "Do I correctly understand that you are saying you are comfortable going forward with Mr. Grimaldi on Thursday?"[448]

363.  Defendant truthfully answered the Court: "*I want him to do his job*, [Y]our Honor, but I have no—*I don't want to represent myself, and I don't want a delay*, and I think that a future counsel may be worse.  So, yes, *I'm not exactly comfortable*, but I recognize it as the least bad of my options, as my preferred option."[449]

364.  The Court asked Defendant: "All right, if there is anything you want me to read, in fairness to you, since I have read what Mr. Grimaldi filed, I will read it before ruling?"[450]

365.  Defendant truthfully answered the Court: "I have copies for the government, for the clerk."[451]

366.  Upon its receipt of Defendant's declaration that, *inter alia*, Attorney Grimaldi had never worked with Defendant to prepare his

---

[447] Tr., July 16, 2018, at 11:7, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10; Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*
[448] Tr., July 16, 2018, at 11:25, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.
[449] *Id.* at 12:2 (emphasis added).
[450] *Id.* at 12:10.
[451] *Id.* at 12:13; Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*

testimony, the Court stated: "I obviously want to have the opportunity to read this before I decide."[452]

367.  The Court further stated: "First, I'm going to take an hour to read this.  I will say now that I am likely to deny the motion to withdraw."[453]

368.  Grimaldi then told the Court: "I can see in the present circumstances no way in which I can and would represent Mr. Gottesfeld at this forthcoming trial."[454]

369.  Grimaldi further pleaded:

> Rule 1.3 states, 'The lawyer should represent a client zealously.'  I cannot abide by these rules.  I cannot represent Mr. Gottesfeld in light of what's happened in the last days and weeks.  I cannot represent Mr. Gottesfeld zealously.  There is a significant risk that the representation of Mr. Gottesfeld will be materially limited by a personal interest of me[sic].[455]

370.  Grimaldi further told the Court: "Mr. Gottesfeld does not have my full and undivided loyalty based on events of the last days and weeks.  I'm in a very difficult position here."[456]

371.  Grimaldi further told the Court: "Several times now Mr. Gottesfeld has indicated that he has not heard from me since the last hearing date before Judge Gorton on July 6 until today.[457]  That's true.

---

[452] Tr., July 16, 2018, at 12:19, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10; Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*
[453] Tr., July 16, 2018, at 14:1, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10; Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*
[454] Tr., July 16, 2018, at 14:8, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.
[455] *Id.* at 14:25 (oral citations omitted).
[456] *Id.* at 15:19.
[457] *See, e.g., supra,* p. 154, ¶¶ 357–361 (citing Tr., July 16, 2018, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.; Decl. of Martin Gottesfeld, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), *presumably circa* E.C.F. nos. 8, 8-1 *et seq.*)).

I have not spoken to him or seen him.  I do not wish to speak to him or see him.  I do not wish to."[458],[459]

372.  The Court asked Defendant: "And you still want to go forward with Mr. Grimaldi as your lawyer?"[460]

373.  Defendant truthfully answered: "I wouldn't put—wouldn't use the word 'want,' but I would rather do that than any of my alternatives.  I think it is the least undesirable of the alternatives that are before me at the moment."[461]

374.  At trial, when the government solicited testimony that contradicted its opposition to the suppression motion,[462] Defendant said to Grimaldi: "I think they just gave us suppression."

375.  Grimaldi never renewed the suppression motion.

### I. THE PROFFER

376.  Before the criminal complaint was filed the government invited Defendant and counsel to the United States attorney's office for a "reverse proffer."

377.  At the reverse proffer the government made clear it was interested to receive substantial assistance from Defendant in the prosecution of other individuals.

378.  Before the criminal complaint was filed, the government and Boston Children's Hospital each also expressed a desire to understand the technical details of how Boston Children's Hospital was taken off

---

[458] Tr., July 16, 2018, at 18:21, *United States v. Gottesfeld*, 18-mc-91297-RGS (D. Mass.), E.C.F. no. 10.
[459] This was not a case of criminal conduct, a violation of any court rule or Defendant wishing his counsel to violate any ethical requirement.  In the Court's summation, Defendant's dilemma arose from "offense that your lawyer takes." *Id.* at 19:23.
[460] *Id.* at 20:22.
[461] *Id.* at 20:24.
[462] *See, supra*, p. 147, § VIII(G) Suppression (citations omitted).

the Internet and the extent to which Boston Children's Hospital's systems had been penetrated.

379.  Defendant agreed to share technical information under a proffer agreement, but not to implicate anyone else.

380.  Defendant and his legal team met at the United States attorney's office, under a proffer agreement,[463] with the government and several Boston Children's Hospital staffers.

381.  Under the proffer agreement, Defendant divulged, *inter alia*, that, from Somerville, he wrote a custom payload based on a published remote arbitrary-code-execution vulnerability[464] colloquially called "the moon worm," and used it to establish a "botnet"[465] of approximately 40,000 edge devices[466] that were Linksys routers.[467]  The government did not seem to know these details or to be on an investigative track likely to uncover them.

382.  Under the proffer agreement, Defendant divulged that he used a virtual private server (V.P.S.) to enroll and send and receive traffic to and from the "botnet."  The government did not seem to know

---

[463] *See* Proffer Agreement (Dec. 17, 2015), E.C.F. no. 216-1.

[464] "In computer security, arbitrary code execution (ACE) is an attacker's ability to run any commands or code of the attacker's choice on a target machine or in a target process.  An arbitrary code execution vulnerability is a security flaw in software or hardware allowing arbitrary code execution.  A program that is designed to exploit such a vulnerability is called an arbitrary code execution exploit.  The ability to trigger arbitrary code execution over a network (especially via a wide-area network such as the Internet) is often referred to as remote code execution (RCE)."  Wikipedia, *Arbitrary code execution* (emphases removed) (footnotes omitted), *available at* https://en.wikipedia.org/wiki/Arbitrary_code_execution (last accessed Sept. 30, 2023).

[465] *See* Merriam-Webster.com Dictionary, *botnet* (Sept. 18, 2023) ("a network of computers that have been linked together by malware : a network of bots"), *available at* https://www.merriam-webster.com/dictionary/botnet (last accessed Sept. 30, 2023).

[466] "An edge device is any piece of hardware that controls data flow at the boundary between two networks."  TechTarget, *edge device, available at* https://www.techtarget.com/searchnetworking/definition/edge-device (last accessed Sept. 30, 2023).  The term is most frequently used, as it is *supra*, for devices that separate one or more private networks from the Internet.

[467] Linksys is a common brand of home Internet router in the United States.

this detail or be on an investigative track likely to render admissible evidence of it beyond speculation.

383.  Under the proffer agreement, Defendant divulged that he had seen overt indications that, without communicating with Defendant, others beyond his sphere of control were probing the Boston Children's Hospital network.  The government seemed to have observed some of the same indications.

384.  Under the proffer agreement, Defendant white boarded detailed network diagrams of the Boston Children's Hospital DDoS traffic of which he personally knew, indicating the presence of his computer in Somerville, virtual private networks (V.P.N.s), The Onion Router (TOR), the nodes in the "botnet" and the Longwood Medical Area, home to Boston Children's Hospital and other Harvard hospitals.  The government did not seem to know these details or to be on an investigative track likely to render admissible evidence of them.

385.  At no point during the proffer did the parties address the relevant statutory definitions of data or information, *cf.* 18 U.S.C. § 1030(e) (no definition of data or information), and at no point did Defendant concede that the traffic sent conformed to those definitions.  The discussion was essentially technical and not lawyerly.

386.  The government then used the protected proffered information in highly prejudicial fashion in its cross-examination of Defendant and closing arguments, including in a demonstrative that had never been entered into evidence.[468]

---

[468] *See, infra,* p. 209, § XV (the government, *inter alia,* used in its closing argument a PowerPoint presentation showing 40,000 devices attacking Boston Children's Hospital) (citing Government's PowerPoint Presentation,

###### X.   THIS CASE CANNOT BE CONSTRUED AS HAVING ACHIEVED DUE PROCESS.

At every juncture of this case, including this one, Defendant "is entitled to a neutral and detached judge in the first instance." *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972).  This constitutional guarantee applied throughout the case and applies to this motion:

> *Every* procedure which would offer a *possible* temptation to the average man as a judge to forget the burden of proof required to convict the defendant, *or which might* lead him not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.

*Tumey v. Ohio*, 273 U.S. 510, 532 (1972) (emphasis added).  Not even where review is *de novo* "may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication."  *Ward* at 61.

Bracing *Ward, Tumey,* etc., a judge must recuse when his "impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  A judge's or her spouse's "financial interest in the subject matter" also begets recusal.  *See* 28 U.S.C. § 455(b)(4).  The same is true of other interests of the judge, her spouse or anyone within three degrees of relationship to either of them "that could be substantially affected by the outcome of the proceeding," *id.*; § 455(b)(5)(iii).  A judge aware 1) that such a person is a likely material witness or 2) of disputed evidentiary facts must, too, recuse.  § 455(b)(5)(iv), (b)(1).

---

Trial Exh. D) (other citations omitted).

Though overall Congress intended § 455 "to foster public confidence in the judicial system," *United States v. Chantal*, 902 F.2d 1018, 1022 (1st Cir. 1990), it specifically grounded § 455(b) in the Constitution:

> [A] fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual bias in the trial of cases.  But our system of laws has always endeavored to prevent even the probability of unfairness.  To this end[] no man is permitted to try cases where he has an interest in the outcome.  That interest cannot be defined with precision.  *Circumstances and relationships must be considered*.  This Court has said, however, that every procedure which would offer a possible temptation to the average man as a judge not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.  Such a stringent system may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way justice must satisfy the appearance of justice.

*In re Murchison*, 349 U.S. 133, 136 (1955) (alteration and emphasis added) (internal quotation marks, ellipsis and citations omitted).

*See, also,* the Due Process Clause.[469]  The particulars of these points have already been briefed in this case; Defendant hereby incorporates by reference those arguments from his Motion for Bail Pending Appeal (Aug. 6, 2021), E.C.F. no. 441.  That motion was filed nearly three months before the First Circuit affirmed the conviction and was denied as moot five days after it.  *See* Order Denying Bail Pending Appeal (Nov. 10, 2021), E.C.F. no. 449.  The unreached merits are now

---

[469] U.S. Const. amend. V, cl. 4 (No person shall "be deprived of life, liberty, or property, without due process of law").

relevant to this Motion and must be decided as they apply to the conviction and sentence as well as to this proceeding.

The apparent unfairness of Defendant's appeal, decided as it was by a panel that cannot reasonably be said to have been drawn randomly, compounds the issue. *See, infra,* Defendant's right to an impartial appellate panel was violated. (citations omitted).

Taken in the whole, there is far more to doubt about this case than there was in *Ward* (mayor, acting as judge, fined petitioner $100 that went into the city's coffers)*, Tumey* (mayor, acting as judge, fined petitioner $100 that went into state and city coffers) or *Connally v. Georgia*, 273 U.S. 510 (1927) (judge was paid five dollars per warrant issued but unpaid for warrant applications he denied). Those judgments were vacated and so, too, must be this one.

From a factual perspective, moreover, a finding of waiver or forfeiture of these claims is unfair and inaccurate. Defendant put before the Court Judge Gorton's and Magistrate Bowler's disqualifications before, during and after trial. *See, e.g., supra,* pp. 120, ¶¶ 183-188 (citations omitted); 163, ¶¶ 341-346 (citations omitted). Defendant then raised disqualification on appeal. *See* Appellant's Brief at 60 (July 31, 2020), *United States v. Gottesfeld*, Nos. 18-1669, 19-1042, 19-1043, 19-1107 (1st Cir.). But the First Circuit never addressed Judge Gorton's for-profit family business and its ties to Boston Children's Hospital and Brigham and Women's Hospital. *Cf. United States v. Gottesfeld*, 18 F.4th 1, 17 (2021) (mentioning only non-profit entities in discussing disqualification). Defendant then petitioned the Supreme Court on the matter. *See*

Petition for a Writ of Certiorari at 23 (Mar. 30, 2022), *United States v. Gottesfeld,* 21-1313.

Defendant at every juncture kept the courts updated on his discoveries, even though the duty to enter them on the record was never his. "[J]udges have an ethical duty to 'disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification.'" *American Textile Mfrs. Institute v. The Limited*, 190 F.3d 729, 742 (6th Cir. 1999) (quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995) (sentence vacated in habeas case after trial judge failed to disclose relevant disqualification information)). "'[B]oth litigants and counsel should be able to rely upon judges to comply with their own Canon of Ethics.'" *Id.* (quoting *Porter* at 1489). Where a judge "possibly did not consider" a "matter sufficiently relevant to merit disclosure[…] his nondisclosure did not vest in [a litigant] a duty to investigate" the judge. *Id.*

Nor may it be said that Defendant is untimely to raise the aggregate issue now before the Court: that this case's unique history, including events that Defendant discovered *after appeal*, despite lack of disclosure and *without any other adequate vehicle to address,* yield far more than the sum of their parts when it comes to assessing whether due process was served in this case.

And, as a matter of law, waiver is foreclosed. *See Chantal*, 902 F.2d at 1023 ("The waiver of § 455(b) grounds is forbidden, and it is allowed for § 455(a) only with a statement on the record of the basis for disqualification.") (citing 28 U.S.C. § 455(e)) (other citations

omitted).  *Cf., supra,* p. 120 ¶ 182 (no relevant on-the-record
judicial disclosures at bar) (citations omitted).  *See, also, Chantal*
at 1021 ("disqualification of judges" cannot "be so casually waived,
except as expressly authorized by statute").  Indeed, "§ 455(a) is
automatic, mandatory and self-executing."  *Id.* (citation omitted).
"It did away with the 'duty to sit' doctrine."  *Id.* (citation
omitted).  "It attacks the appearance of bias, not just bias in fact."
*Id.* (citation omitted).

### XI.   DEFENDANT'S RIGHT TO AN IMPARTIAL APPELLATE PANEL WAS VIOLATED.

The importance of random judicial assignments cannot be lost on this
Court or any member of the bar.  Cases are randomly assigned to avoid
judge shopping and appearances of impropriety.  "Courts are
essentially passive instruments of government.  They do not, or should
not, sally forth each day looking for wrongs to right.  They wait for
cases to come to them."  *United States v. Sineneng-Smith*, 140 S. Ct.
1575, 1579 (2020) (internal quotation marks and citations omitted)
(alteration marks omitted); *see also* Moseneke, *All Rise: A Judicial
Memoir*, Pan Macmilan (2021) ("The judicial function is passive.
Judges don't look for cases; but rather cases look for judges.").

It is axiomatically reasonable to question the impartiality of
judges who seek or accept disproportionately frequent case assignments
involving particular private parties or government agencies—especially
parties and agencies dear to them from prior public service or private
practice.  *See, supra,* p. 106, ¶¶ 144-270 (Judge Lynch's assignments
to cases like this one involving Harvard or social-services agencies
are too frequent to be random and she previously worked at Foley Hoag

and for the state education department) (citations omitted).  This is especially so when, as here, the court's published rules lead the public to believe its assignments are random.  *Id.* (Judge Lynch wrote far more than her share of the resultant orders and opinions).

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).[470]  A statutory violation such as a judge's seeking or accepting too-frequent case assignments involving parties dear to her, then writing a disproportionate number of the resulting precedential decisions, requires vacatur *even without a showing of prejudice*.  Cf*., e.g., Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). Moreover, the intent of the statute and *Liljeberg* remedy is "to promote public confidence in the judiciary."  *Id.* at 859-60 (citing S. Rep. No. 93-0419, p. 5 (1973); H. R. Rep. No. 93-1453, p. 5 (1974)).

As the Supreme Court pragmatically noted, "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges."  *Id.* at 864-65 (citation omitted).  "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible."  *Id.* at 865 (citing S. Rep. No 93-0419, p. 5; H. R. Rep. No. 93-1453, p. 5).

Where the "violation is neither insubstantial nor excusable," providing relief "will not produce injustice in other cases."  *Id.* at 868.  To the contrary, "willingness to enforce § 455 may prevent a

---

[470] Judicial disclosure by Judge Lynch is also appropriate in case of violation of 28 U.S.C. § 455(b).

substantial injustice in some future case by encouraging a judge or litigant to more closely examine possible grounds for disqualification and to promptly disclose them when discovered." *Id.* at 868. "It is therefore appropriate to vacate the judgment unless it can be said that [the losing party] did not make a timely request for relief, or that it would be otherwise unfair to deprive the prevailing party of its judgment." *Id.* "If we focus on fairness to the particular litigants" in this case, "there is a greater risk of unfairness in upholding the judgment" than there is in "allowing a new judge"—or panel—"to take a fresh look at the issues." *Id.* (footnote omitted).

Moreover, "this concern has constitutional dimensions." *Id.* at 865 n. 12 (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) ("We conclude that Justice Embry's participation in this case violated appellant's due process rights")); *see, also,* the Due Process Clause.[471] "More than 30 years ago Justice Black, speaking for the Court, reached a similar conclusion and recognized that under the Due Process Clause no judge 'can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome.'" *Aetna Life Ins. Co., supra,* at 822 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "He went on to acknowledge that what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.'" *Id.* "Nonetheless, a reasonable formulation of the issue is whether the 'situation is one "which would offer a possible temptation to the average … judge to … lead him not

---

[471] U.S. Const. amend. V, cl. 4 (No person shall "be deprived of life, liberty, or property, without due process of law").

to hold the balance nice, clear and true."'"  *Id.* (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972)).

Respectfully, any temptation that would lead a judge to seek or accept too-frequent case assignments involving particular parties then write a disproportionate number of the resulting precedents is, axiomatically, one which not only "would offer," but did offer, "a possible temptation [...] not to hold the balance nice, clear and true."

Defendant is entitled to a fresh appellate panel without deference to the First Circuit's prior disposition.  The judgment and sentence must be vacated, at the least, to allow a fresh direct appeal, as is otherwise done to allow an out-of-time appeal.  *Cf. United States v. Torres-Otero*, 232 F.3d 24, 31 (1st Cir. 2000) ("The Eleventh Circuit found that Congress wrote § 2255 in such a way as to permit district courts to authorize vacatur of sentence and summary reimposition of those sentences, and noted the intrinsic soundness of the approach taken by the district court" to give a defendant access to the right to an appeal he was wrongly denied) (citing *United States v. Phillips*, 225 F.3d 1198 (11th Cir. 2000)).

Like the previously discussed claim, this claim cannot be said to have been waived or forfeited.  *See, supra,* p. 174 (citations omitted).  Moreover, as a practical matter, the trial court is the proper venue for this claim in the first instance because 1) the appellate courts do not conduct evidentiary hearings, 2) no procedure exists for consideration of a second petition for rehearing to address a matter that, despite a litigant's due diligence, went undiscovered until after the denial of the first, timely petition for rehearing and

3) the district court is able to provide a remedy as detailed in the preceding paragraph.

### XII. THE DENIAL OF DEFENDANT'S REQUESTED JURY INSTRUCTION AS TO HIS DEFENSE OF ANOTHER VIOLATED DUE PROCESS.

The government moved *in limine* to preclude Defendant's use of a defense-of-another theory. *See* Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another (Feb. 28, 2018), E.C.F. no. 116. The government pleaded, as a matter of first impression in this circuit, that Defendant could not legally act in the defense of another while outside the physical presence of the individual being defended. *Id.* at 2. It also argued that Defendant could not show "(2) that [Justina] was subjected to the use of unlawful force; (3) that he reasonably anticipated his cyber attacks would address the supposed harm to her; and (4) that he had no legal alternative but to attack B[oston Children's Hospital] in violation of the law." *Id.*

Defendant timely opposed. *See* Opposition to Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another ("Opp.") (June 4, 2018), E.C.F. no. 198.

Defendant pleaded that the government's physical-presence requirement was without precedential support: "The government's insistence that the law requires actual presence to defend another is not based on binding precedent, antiquated, and poses serious societal dangers." *Id.* at 21. Defendant also timely raised that the government's anachronistic theory creates paradoxes, i.e. perpetrators may illegally inflict harm remotely but, under the government's

theory, good Samaritans are barred to intervene remotely to stop them. *Id.* at 20-21, 21 n. 4 (citing *Commonwealth v. Michelle Carter*, 474 Mass. 624 (2016) (Mass. state defendant convicted of manslaughter for remotely encouraging a suicide by S.M.S. ("text messages"))) ("By the government's logic, a concerned adult who took away Michelle Carter's phone or interfered with her phone service would be guilty of criminal offenses rather than credited with saving the victim's life, merely because he was not in the presence of the victim."); *see, also, Commonwealth v. Carter*, 474 Mass. at 633 ("We have never required in the return of an indictment for involuntary manslaughter that a defendant commit a physical act in perpetrating a victim's death."); *id.* at n. 14 ("Physical acts are certainly one means by which the Commonwealth can show the commission prong of involuntary manslaughter.  However, the defendant does not point to—and our research has not uncovered—any case in which physical acts have been made a prerequisite of involuntary manslaughter.") (internal citation omitted).  Under the government's theory, Defendant pleaded, "a modern person suffering abuse who could be aided by a concerned person through a laptop computer should nonetheless be forced to suffer that abuse because the person willing to render aid is not personally present."  Opp*., supra,* at 20.

Defendant also timely argued, "the government's apparent suggestion that it would be impossible for a state probate judge to issue an unlawful order requires no serious rebuttal."  *Id.* at 27.  "A state court order concerning custody of a child may indeed turn out to be unlawful."  *Id.* (citing, as *e.g., Smith Jr. v. McDonald*, 458 Mass.

540, 547-50 (2010) (probate judge exceeded her statutory authority in "unlawful order" regarding custody)).  Indeed, within weeks of the DDoS—but too late to spare Justina the use of her legs—the custody order in question was, in fact, revoked.  *See In re Justina Pelletier*, No. 13CP0034BO (June 17, 2014).

"Further, several aspects of the custody battle over J[ustina] led many to believe that the state court proceedings themselves were compromised."  Opp. at 28, E.C.F. no. 198 (citing Swidey, Wen, *Frustration on all fronts in struggle over child's future*, The Boston Globe (Dec. 13, 2013) ("One of the key pieces of evidence presented to Juvenile Court Judge Joseph Johnston had been an affidavit filed by a state social worker, following her interviews with all the major parties.  The affidavit showed considerable deference to Children's. It quoted liberally from hospital records and interviews with staff members there, including accusations that [Justina's] parents were obstructing her care.  It said the Children's doctors 'do not know where the parents picked up the current diagnosis and they are hard to disprove.'  It included negative comments from [Justina's] Connecticut pediatrician about how Linda and Lou had 'fired' multiple doctors and 'encouraged' the diagnosis of multiple medical problems.  However, the affidavit failed to mention that the social worker had interviewed Korson, and that Korson had explained the origins of the working diagnosis of mitochondrial disease that he had given [Justina]. Internal state records show that Korson had explained that the disorder sometimes runs in families and that he had also been treating [Justina's] older sister for it.") (alterations applied to restore

original article's text, *available at*

https://www.bostonglobe.com/metro/2013/12/16/month-medical-ordeal-

conclusion-still-uncertain/Y7qvYTGsq8QklkxUZvuUgP/story.html)).  "The

government's opinion as to whether B[oston Children's Hospital]'s and

Wayside's treatment of J[ustina] was 'unlawful force' has absolutely

no bearing on whether a reasonable juror, on the facts presented, will

determine that J[ustina] was subjected to unlawful force."  *Id.* at 29.

As to the third and fourth prongs of the government's argument,

Defendant timely pleaded, *inter alia*:

> [T]he government offers no case law or other
> authority to support [its] argument that a
> defendant may engage in only a certain type of
> reaction (such as direct physical force) to the
> widely-reported torture and abuse of a teenager.
> In fact, it would be commonsensical that a
> reaction short of direct physical force–such as a
> DDOS disruption that failed to harm a single
> person, which is the case here–might be
> prefer[able] to [a] reasonable juror [rather]
> than direct physical force that actually causes
> some physical harm.  Indeed, the government['s]
> position seems to invite exaggerated reactions
> rather than discourage them.

*Id.* at 27.  *See, also,* Convention Against Torture (CAT), Treaty Doc.

100-20; 18 U.S.C. §§ 2340 *et seq.*  The Court endorsed the government's

theory: "Defendant's proffered evidence does not, however, show that

it was objectively reasonable to believe that (1) Ms. Pelletier had

been subjected to unlawful force, (2) there were no viable legal

alternatives or (3) that defendant's actions would cause the desired

outcome."  Memorandum and Order re Defense of Another, Suppression and

the Speedy Trial Act at 5 (citations omitted) (June 19, 2018), E.C.F.

no. 209.[472]  The Court construed that the "alleged force being used against Ms. Pelletier was exerted pursuant to an order of a Massachusetts Juvenile Court judge to the DCF."  *Id.* at 8.  "The *de minimis* possibility that a court order, at some uncertain future point, could be reversed by an appellate court, does not mean that someone acting in accordance with that court order while it is in effect is somehow acting unlawfully."  *Id.* at 8-9 (citing, *e.g.*, *United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) (holding that district court was not obliged to give proposed self-defense instruction and making clear that general availability of affirmative defenses "must accommodate a citizen's duty to accede to lawful government power")) (other citations omitted).[473]

At trial the government admitted and attributed a published statement to Defendant.  *See* Grim, *Why I Knocked Boston Children's Hospital Off The Internet: A Statement From Martin Gottesfeld*, The Huffington Post (Sept. 18, 2016), Trial Exh. 35, *available at* https://www.huffpost.com/entry/why-i-knocked-boston-childrens-hospital-off-the-internet-a-statement-from-martin-gottesfeld_n_57df4995e4b08cb140966cd3 (last accessed Sept. 26, 2023). The statement asserted that Defendant had acted in "The defense of an innocent, learning disabled, 15-year-old girl."  *Id.*  It stated that Boston Children's Hospital "made misleading statements on an

---

[472] Defendant does not concede that the relevant pattern instruction applies a reasonableness standard resolvable by the trier of law.  Indeed, the history of self-defense and defense-of-another strongly reflects the opposite.  *See, e.g., Allen v. United States*, 157 U.S. 675, 681 (1895) ("the instruction was erroneous in withdrawing from the jury the question of self-defence[*sic*]").

[473] The Court cited Second, Fifth and Ninth circuit precedents on this point, but not any First Circuit or Supreme Court precedent, the application of which a person of ordinary intelligence could have foreseen at the time of the charged conduct.

affidavit, went to court, and had Justina's parents stripped of

custody." *Id.*

> They stopped her painkillers, leaving her in
> agony.  They stopped her heart medication,
> leaving her tachycardic.  They said she was a
> danger to herself[] and locked her in a psych
> ward.  They said her family was part of the
> problem, so they limited, monitored, and censored
> her contact with them.
> Justina resorted to sneaking notes, hidden in
> origami, to tell her family what she wasn't
> allowed to say around eavesdroppers.  Hospital
> staff pushed her to do things she was physically
> incapable of, due to the physical condition they
> refused to acknowledge she has.  They laughed at
> her as she struggled futilely.  They left her on
> a toilet for hours when she couldn't void her
> bowels.  They left her secluded in a bare room,
> or alone in the hallway, sometimes for days when
> she couldn't wheel herself elsewhere.
> When they did move her, they ripped her toe
> nails, dragging her feet on the floor.  They
> bruised her.  Her legs swelled, her gums receded,
> and her hair fell out.  This went on for 11
> months at B[oston Children's Hospital].
> Her parents went to the media, and a gag order
> was issued specifically prohibiting them from
> speaking to journalists.  When she finally left
> the hospital (in large part thanks to the
> negative publicity[),] she still wasn't allowed
> home and her ordeal wasn't over.  B[oston
> Children's Hospital] was still in charge and her
> suffering continued, though the most culpable had
> successfully manipulated the spotlight onto
> others.
> At her new treatment center, aptly named
> "Wayside," Justina was verbally assaulted while
> nude in the shower.  She continued to be denied
> her medications and treated according to the
> B[oston Children's Hospital] plan.
> Her father broke the gag order, publicly stating
> her life was in danger.  The story made big news,
> but there was no indication when Justina would be
> returned to her family and receive the long
> delayed treatment she desperately needed.  A
> former B[oston Children's Hospital] nurse called
> what Justina was enduring its proper term:
> torture.  According to international humanitarian
> law, she was right.

I had heard many, too many, such horror stories
of institutionalized children who were killed or
took their own lives in the so-called "troubled
teen industry."  I never imagined a renowned
hospital would be capable of such brutality and
no amount of other good work could justify
torturing Justina.  She wasn't alone either.
B[oston Children's Hospital] calls what it did to
her a "parentectomy," and there had been others
over at least the past 20 years.
I knew that B[oston Children's Hospital]'s big
donation day was coming up, and that most donors
give online.  I felt that to have sufficient
influence to save Justina from grievous bodily
harm and possible death, as well as dissuade
B[oston Children's Hospital] from continuing its
well established pattern of such harmful
"parentectomies," I'd have to hit B[oston
Children's Hospital] where they appear to care
the most, the pocket book and reputation.  All
other efforts to protect Justina weren't
succeeding and time was of the essence.  Almost
unbelievably, they kept their donation page on
the same public network as the rest of their
stuff.  Rookie mistake.  To take it down, I'd
have to knock the whole hospital off the
Internet.
I also knew from my career experience as a
biotech professional that no patients should be
harmed if Boston Children's was knocked offline.
There's no such thing as an outage-proof network,
so hospitals have to be able to function without
the Internet.  It's required by federal law, and
for accreditation.  The only effects would be
financial and on B[oston Children's Hospital]'s
reputation.
The network was strong, well[-]funded, but
especially vulnerable to a specific attack.
Apparently B[oston Children's Hospital] was
unwilling to architect around the problem.  I see
such laziness often in my work, and it leaves our
nation vulnerable.
I had spent my career building cyber-defenses.
For the first time, I was on the offensive.  I
coded around the clock for two weeks to perfect
the attack.  Small test runs were made.  B[oston
Children's Hospital] bragged to the media that
[it] w[as] withstanding the onslaught and hadn't
been taken down.  They had no idea what was to
come.
I finished the code just in time.  It ran.
B[oston Children's Hospital]'s donation page went

> down.  As [it was] down, I was nervous.  I left
> it running for a few hours.
> Then, with some donation time still left, I
> issued the command to stop the attacks—the point
> had been made.  Justina wasn't defenseless.
> Under the banner of Anonymous, she and other
> institutionalized children could and would be
> protected.  There have been no such egregious
> parentectomies published at B[oston Children's
> Hospital] since.
> In 2016, Justina's family announced they were
> suing Boston Children's.  The civil claim reads
> like a medical horror novel.
> Under U.S.-ratified human rights conventions,
> there can be no justification for torture, not
> even war, the threat of war, or the preservation
> of human life.  Freedom from torture is a non-
> derogable human right, and the U.S. is obligated
> to investigate, prosecute, and punish all acts of
> torture, no matter who perpetrated them.

*Id.  See, also,* Convention Against Torture, Treaty Doc. 100-20; 18

U.S.C. §§ 2340 *et seq.*  This statement put before the jury the

government's assertion that Defendant feared for Justina's life and

felt she was being tortured, as well as the questions of whether "(1)

Ms. Pelletier had been subjected to unlawful force, (2) there were no

viable legal alternatives" and (3) the "defendant's actions would

cause the desired outcome."  *Cf.* Memorandum and Order re Defense of

Another, Suppression and the Speedy Trial Act, *supra,* at 5.

Torture is, of course, unlawful force in the United States, as

are lesser acts of "cruel, inhuman, degrading treatment or

punishment."  *See, e.g.,* Garcia, *The U.N. Convention Against Torture:*

*Overview of U.S. Implementation Policy Concerning the Removal of*

*Aliens*, Congressional Research Service (Jan. 21, 2009) at 1-2,

*available at* https://apps.dtic.mil/sti/pdfs/ADA494854.pdf#page=5 (last

accessed Sept. 28, 2023).

> Perhaps the most notable international agreement prohibiting the use of torture is the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention or CAT), which obligates parties to prohibit the use of torture and to require the punishment or extradition of torturers found within their territorial jurisdiction.  Since opening for signature in December 1984, over 140 states, *including the United States*, have become parties to the Convention.  CAT defines torture as "any act by which severe pain or suffering, whether physical *or mental*, is intentionally inflicted on a person … by or at the instigation of or *with the consent or acquiescence of* a public official or other person acting in an official capacity."  […] CAT Article 16 further obligates signatory parties to take action to prevent "other acts of cruel, inhuman, or degrading [treatment or] punishment which do not amount to acts of torture…"

*Id.* (emphasis and alterations added) (internal citations omitted).  A finding that Justina could not reasonably have been tortured *because* she was in state custody directly invalidates the treaty, which makes state involvement, if only by acquiescence, one of torture's essential elements, *id.* (citation omitted).[474]  Moreover, the acts against Justina need not have risen to torture—though Defendant asserts that they did—in order to have been unlawful in the United States through its accession to the Convention, *id.* ("other acts of cruel, inhuman, or degrading [treatment or] punishment" also unlawful).

Defendant then raised at the charge conference, regarding the physical-presence requirement:

---

[474] The government's argument, that the state custody order authorized the violence and depravity with which Boston Children's Hospital mistreated Justina, stretches the truth of the situation.  To be sure, custody is meaningful authority, but it is not *carte blanche* to treat the minor in one's care arbitrarily or abusively, let alone with violence and neglect.   Thus, Defendant's strongest theory is that when he intervened in Boston Children's Hospital's and Wayside's treatment of Justina, he intervened to stop purely private entities, Boston Children's Hospital and Wayside, from grievous and wholly unwarranted violence against a fellow citizen, Justina.  *See* further discussion, *infra*, pp. 192–194 (citations omitted).

> [I]t's unfair to actually hold Mr. Gottesfeld to
> that burden when it's not clear in the First
> Circuit here that that is actually the law of the
> land.  And I think that the Government drew upon
> cases, again, from different District Courts and
> from out-of-state from 50 or so years ago, and
> then the Court made its Order.
> But it is far from evident that, in the First
> Circuit here in this jurisdiction, there's
> actually any presence requirement.  And it's—in a
> sense, *it is a due process violation to hold him
> to account in that regard*.  I also think that to
> hold him account—sort of, it's not the same as
> the Constitutional provision exactly, but it's
> like an ex-post-facto application of other law
> against him when it's not at all clear that, in
> this Circuit, there is in fact a presence
> requirement.

Charge Conf. Tr., July 30, 2018, at 18-19 (emphasis added), E.C.F. no.

328.  *See, also,* the Ex Post Facto Clause.[475]  In response the Court

said it would instruct the jury that Defendant's "[g]ood motive alone

is not a defense to the crimes charged."  Charge Conf. Tr., *supra*, at

20:2-20:11.

   Defendant timely appealed.  *See* Appellant's Brief at 57 (July 31,

2020), *United States v. Gottesfeld*, Nos. 18-1669, 19-1042, 19-1043,

19-1107 (1st Cir.).  "Given the remarkable changes in technology, it

is foreseeable that someone outside the presence of a victim should be

able to act in justification and in their defense without physically

being in the presence of the victim."  *Id.* at 58.  "For instance, a

computer-literate person could use a laptop to aid a victim by

preventing identity theft, preventing an abuser's dissemination of

child pornography, or stopping financial crimes."  *Id.* (citing Opp.,

---

[475] U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed.").

*supra*, at 21).  "Gottesfeld should not be forced to satisfy the presence requirement based on nonbinding, antiquated decisions." *Id.* "Second, Gottesfeld acted to prevent imminent harm." *Id.* at 59.  "In opposition to the Government's attempt to preclude the affirmative defense, Gottesfeld cited numerous statements demonstrating 'imminent harm.'" *Id.* (quoting Opp*., supra,* at 21-25).

> His statement in the Huffington Post concerning
> B[oston Children's Hospital]'s and Wayside's
> gross mistreatment and abuse of Ms. Pelletier
> corresponds with many local and national media
> reports and interviews by Justina's father where
> he details the suffering and pain his daughter
> was forced to endure.

*Id.* (citing Opp., *supra*, at 22-23).  "The harm against Ms. Pelletier was beyond 'imminent,' it was already occurring, and it was significant—the ongoing alleged kidnapping, abuse, and torture of a teenage girl was imminent harm." *Id.* (citing Opp., *supra*, at 24-26).

"Finally, Gottesfeld established that the force against Justina was 'unlawful.'  A state court order concerning the custody of a child may ultimately be deemed unlawful." *Id.* (citing *Smith Jr., supra*). "Indeed, after a 16-month custody battle, Justina was finally (and rightfully) returned to the custody of her parents." *Id.* (citation omitted).  "The unlawful nature of the order to remove Justina from her parents' care, DCF's handling of Ms. Pelletier's medical care, and the ensuing custody battle were the ultimate acts of overreach." *Id.* (citing Opp., *supra*, at 28-29).

The First Circuit affirmed the denial of the jury instruction largely on public-policy grounds: "To rule otherwise would be to empower every citizen with the ability to simultaneously incite and

immunize criminal conduct by another even as a judicial tribunal is
available to hear the claims of harm." *United States v. Gottesfeld*,
18 F.4th 1, 16 n. 8 (2021).[476]

This ruling disregarded that the question of the imminence of
harm is a *factual* issue, within the province of the jury, pursuant to
the Jury-and-venue Clause[477] and Impartial Jury and District Clause;[478]
no resort to judicial or other public authority is viable when the
harm is moments away.  And, so strongly did the Founders insist on
local jury trials, that the right thereto is the only one repeatedly
and expressly enumerated in the Declaration of Independence,[479] the
Constitution[480] and the Bill of Rights.[481]

The First Circuit also created a new requirement to support a
Defendant's reasonable belief and echoed this Court's ruling as to the
legality of the force exerted against Justina's person:

> [Defendant] marshals no case to support a finding
> that he reasonably believed that she faced the
> threat of immediate unlawful force.  To the
> contrary, he knew that her custody was authorized
> by a court order.  Furthermore, even if he
> thought that some individual or group of
> individuals were using or threatening to use
> unlawful force, that would have provided no
> justification for Gottesfeld to take hostage
> thousands of other persons' internet connections.

---

[476] This holding was made without citation to existing First Circuit or Supreme Court precedent, the application of which a person of ordinary intelligence could have understood at the time of the charged conduct.

[477] *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury").

[478] *See* U.S. Const. amend. VI, cl. 2 ("In all criminal prosecutions, the accused shall enjoy the right to […] an impartial jury of the State and district wherein the crime shall have been committed[…]").

[479] *See* Declaration of Independence ¶¶ 20 (blaming the monarch for "depriving us in many cases, of the benefits of Trial by Jury"), 21 (blaming the monarch for "transporting us" to hostile courts "beyond Seas to be tried for pretended offences").

[480] *See* U.S. Const. art. III, § 2, cl. 3, *supra*, n. 477.

[481] *See* U.S. Const. amend. VI, cl. 2, *supra*, n. 478.

*United States v. Gottesfeld, supra,* 18 F.4th at 16.[482,483]  The First Circuit thus put the cart before the horse.  If an already existing precedent is required to plead defense of another in a novel cybercrime prosecution, then the creation of said precedent is a chicken-before-the-egg dilemma.[484]  More important, Defendant and the public had never been notified of any such pleading requirement; the First Circuit first announced it when disposing of the appeal, after voluminous litigation and six years after the charged conduct.

In any event, the court order regarding custody of Justina is not apposite to the unlawfulness of the force exerted against her, *e.g.*, ripping her toenails, sexually assaulting her and otherwise torturing her.  If it were, then, for example, a bystander would be legally powerless to stop the murder of a child so long as the murderer had legal custody of the victim.  Indeed, court dockets across America are sadly replete with instances of custodians' unlawful force against

---

[482] These days, when significant disruptions to travel and commerce are routinely accommodated in the health interest of a single individual, it is hard if not impossible to reconcile a holding that thousands of internet connections take precedence over defending a person from torture or other unlawful force.  *See, e.g.*, Fortin, *Ted Williams Tunnel briefly closed for organ transplant*, NBC Boston (July 13, 2023) ("The Ted Williams Tunnel heading into South Boston was briefly shut down at 8:15 a.m. Thursday for an organ transplant, according to MassDOT.   The Ted Williams—which carries Interstate 90 between South Boston and East Boston—is one of the major detours being used for the Sumner Tunnel closure.  It carries traffic [in] both directions[] and is an important link to Logan Airport."), *available at* https://www.nbcboston.com/news/local/ted-williams-tunnel-to-briefly-close-for-medical-emergency-massdot-says/3088327/ (last accessed Sept. 26, 2023).   This is especially true where, as here, there is no evidence that any of the relevant internet users were aware of or inconvenienced by the DDoS, unlike, *e.g.*, the tunnel closure, *supra*.

[483] This holding was made without citation to existing First Circuit or Supreme Court precedent, the application of which Defendant could have reasonably foreseen at the time of the charged conduct.

[484] This is to say nothing of the stunningly unfair double standard of simultaneously allowing government civil defendants with neither liberty nor direct financial interests to invoke qualified immunity whenever no existing precedent clearly proscribes their unlawful, violent conduct against non-government actors and, concurrently, requiring non-government criminal defendants, at risk of life, liberty and property, to provide an existing precedent to invoke non-violent affirmative defenses.  "[T]o perform its high function in the best way justice must satisfy the appearance of justice."  *In re Murchison*, 349 U.S. 133, 136 (1955) (internal quotations marks and citation omitted).

children in their care.[485]   The legal assignment of custody is not *carte blanche* to abuse children, and, axiomatically, a defendant may invoke defense of another if he acted in defense of a child against that child's custodian.

But that is not to imply Boston Children's Hospital or Wayside ever had custody of Justina *de jure*.[486]   Neither Boston Children's Hospital nor Wayside were parties to the custody proceeding any more than they are instant parties.   Instead, the state sought and was awarded custody of Justina.   The First Circuit's opinion effectively holds affirmative defenses inapplicable when a court-ordered custodian acquiesces to a third party's child abuse or torture.

And, even assuming, *arguendo*, that the since-revoked custody order—which remained unavailable to Defendant and the public to review despite even the highest levels of diligence[487]—reached the horrible abuses perpetrated on Justina, it could not bar the defense-of-another theory.   For instance, someone incarcerated pursuant to official

---

[485] This fact needs no citation.  Nevertheless, *see, e.g., Commonwealth v. Lopez*, No. 14-P-490 (Mass. App. Ct. Aug. 20, 2015) ("The defendant was alleged to have steered police astray in their effort to determine the identity of the man who raped and impregnated the defendant's twelve[-]year[-]old daughter (to whom we refer by the pseudonym Kendra).  The defendant was also charged with beating her other daughter, Rae, with a belt.") (internal citations omitted) (convictions affirmed); *Commonwealth v. Traylor*, 86 Mass. App. Ct. 84 (2014) ("The defendant was charged under G. L. c. 265, § 13J(b), on two indictments for assault and battery upon a child by having care and custody of said child and committing an assault and battery, or wantonly or recklessly permitting or allowing another to commit an assault and battery resulting in substantial bodily injury to the child, and on five indictments for assault and battery upon a child by having care and custody of said child and committing an assault and battery, or wantonly or recklessly permitting or allowing another to commit an assault and battery resulting in bodily injury to the child.") (internal citations omitted) (affirmed); *Commonwealth v. Henriquez*, 56 Mass. App. Ct. 775 (2002) (defendant "pleaded guilty to sex crimes against his seven[-]year[-]old daughter") (remanded for resentencing).

[486] That, indeed, would have been a novel ruling.  Certainly, however, Boston Children's Hospital and Wayside had *de facto* custody of Justina, through the deference the state afforded them.  *See, supra,* p. 63, ¶ 42 (quoting Pollack, *supra*, p. 65, n. 97 ("Children's Hospital's concerted efforts with DCF has resulted in Bader 5 operating under color of state law, within the meaning of federal civil rights laws, 42 U.S.C. § 1983.")).

[487] *See, e.g.,* Mass.gov, *Guide on the disclosure of confidential information: Court information—Probate & Family Court* ("Case types that are confidential and not open to public inspection include adoptions and child welfare.") (citing M.G.L. chs. 210 § 5C, 119), *available at* https://www.mass.gov/info-details/guide-on-the-disclosure-of-confidential-information-court-information-probate-family-court (last accessed Sept. 28, 2023).

process is nevertheless considered unlawfully incarcerated *nunc pro tunc* upon his exoneration. *See, e.g., Thompson v. Clark*, 142 S. Ct. 1332, 1336 (2022) ("[P]olice officers arrested Thompson for resisting their entry into the apartment. Thompson was taken to a local hospital and then to jail. While Thompson was in custody, one of the police officers prepared and filed a criminal complaint charging Thompson with obstructing governmental administration and resisting arrest. Thompson remained in custody for two days. A judge then released him on his own recognizance. Before trial, the prosecution moved to dismiss the charges, and the trial judge in turn dismissed the case. The prosecutor did not explain why she sought to dismiss the charges, nor did the trial judge explain why he dismissed the case.[…] Thompson asserted that the officers maliciously prosecuted him and subjected him to an *unlawful, illegal and excessive detention* in violation of his Fourth Amendment rights.") (internal quotation marks and citation omitted) (emphasis added) (reversing dismissal of civil rights claim).[488] Even were the legality of the state's custody of Justina germane to the defense-of-another theory, the reasonableness of Defendant's view that the custody order was unlawful, separate from his view that the force exerted on Justina by third parties was unlawful, was properly subject to the jury's determination.

The government thus far has disdained the relevant media reportage of the violence Justina suffered as meaningless and

---

[488] Tellingly, the self-defense and defense-of-another pattern instruction, *infra*, is indiscriminate between criminal force or lesser-unlawful force.

unimportant.[489]  Defendant's contemporaneous, reasonable belief of impending, unlawful and dangerous direct force against Justina resulted, *inter alia*, from said journalism.[490]  And the Court has construed the reportage in the light most favorable to the prosecution.[491]  Meanwhile, however, the government and this Court

---

[489] The government's position is thus in tension with its own uses of the media as a meaningful and important public information channel, to which, *e.g.*, the Massachusetts U.S. attorney's office routinely and illegally leaks derogatory information in pursuit of its political goals and litigation.  *See, e.g.*, Richer, Tucker, *Massachusett U.S. Attorney Rachael Rollins formally resigns in wake of ethics probes*, A.P. (May 19, 2023) ("Massachusetts U.S. Attorney Rachael Rollins formally resigned Friday after wide-ranging investigations by two federal watchdog agencies found she sought to use her position to influence a local election and lied to investigators. […] The most stunning allegation in the inspector general's report—and another by the Office of Special Counsel—was that Rollins leaked information to the media last year in the hopes of sabotaging the campaign of her successor as Suffolk County district attorney, Kevin Hayden.  Investigators said Rollins tried to meddle in the district attorney race by providing information to the media that suggested Hayden was possibly under federal investigation.  After Hayden beat the [] candidate Rollins was supporting in the primary—Ricardo Arroyo—she leaked to The Boston Herald a memo detailing her office's recusal from any possible investigation into Hayden, investigators found.  She initially denied being the federal source in the Herald story when asked under oath about it by investigators, but later admitted to being the leaker, the inspector general's report said.  The inspector general's office referred the allegation to the Justice Department for possible prosecution for false statements, but officials declined prosecution, according to the report.  The special counsel also found multiple violations of the Hatch Act, a law that limits political activity by government workers.  Special Counsel Henry Kerner described them in a letter to Biden as among the 'most egregious' transgressions his agency has ever investigated."), *available at* https://apnews.com/article/rachael-rollins-massachusetts-us-attorney-resigns-42f9111ea4aedbcc6a1ba9f6313cfe6e (last accessed Oct. 18, 2023); Marans, Grim, *This Federal Prosecutor Is Building A Career Indicting The Good Guys: But is U.S. Attorney Carmen Ortiz the one gone wrong?* HuffPost (July 5, 2016) ("[U.S. Attorney Carmen] Ortiz's office is suspected of leaking a staggering amount of private information to the [Boston] Globe, even including details of wiretaps of [Marty] Walsh, the mayor.  'The wiretap is the most concerning,' said [former state A.G. Martha] Coakley.  'It is highly guarded.  It is under court order.  The only people who would have access to that should not be in the position of leaking it.'") (citing The Boston Globe, *Mayor Walsh is drawn into federal labor probe* (Apr. 24, 2016)), *available at* https://www.huffpost.com/entry/carmen-ortiz-us-attorney-marty-walsh-prosecution_n_577a7ddce4b09b4c43c0e29a (last accessed Oct. 18, 2023).

[490] *See, e.g., supra,* Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another at 12 ("Although Patient A's father was quoted in the media in February 2014 as saying Patient A's life was at risk, this is hardly competent evidence that BCH was causing her serious bodily harm") (citing *United States v. Bello*, 194 F.3d 18, 26–27 (1st Cir. 1999) (fight in prison recreation yard, followed by 18-plus-hour cooling-off period, could not satisfy immediate-danger element)).

[491] *Contrast, e.g.,* Opposition to Motion in Limine to Preclude Defendant's "Torture Defense" Based on Necessity and Defense of Another, *supra*, at 5 ("[I]n the months and weeks before the alleged offenses, many news outlets reported mistreatment and/or abuse of J[ustina] and her family") (citations omitted) *with* Memorandum and Order re Defense of Another, Suppression and the Speedy Trial Act, *supra*, at 3 ("In early 2014, the media began reporting on a teenager, Justina Pelletier ('Ms. Pelletier') who had been placed in the custody of the Massachusetts Department of Children and Families ('DCF') because of concerns that her parents were interfering with her treatment for a psycho-somatic disorder by instead insisting on treatment for mitochondrial disease.  Ms. Pelletier was reportedly treated at B[oston Children's Hospital] before being transferred to Wayside.").

expressly recognize and regularly utilize the media expressly to warn

the public of unlawful dangers, *e.g.*,

> From the time of arrest, issuance of an arrest
> warrant, or the filing of a complaint,
> information, or indictment in any criminal matter
> until the commencement of trial or disposition
> without trial, a lawyer associated with the
> prosecution or defense shall not release or
> authorize the release of any extrajudicial
> statement, which a reasonable person would expect
> to be disseminated by means of public
> communication, relating to that matter and
> concerning:
> (1) The prior criminal record (including arrests,
> indictments, or other charges of crime), or the
> character or reputation of the accused,

except, if, *inter alia*, "the accused has not been apprehended, a

lawyer associated with the prosecution may release any information

necessary to aid in his apprehension or to *warn the public of any*

*dangers the accused may present.*"   L.R. 83.2.1(c), (c)(1) (emphasis

added).   *See, e.g.,*

> Former Army reservist James Morales, 35, escaped
> from the Wyatt Detention Facility on New Year's
> Eve by climbing a basketball hoop to reach a
> rooftop, cutting through a fence and climbing
> through razor wire, according to authorities.
> Police believe Morales fled to Attleboro,
> Massachusetts, and stole a car that was found
> Sunday.
> At a news conference Tuesday, U.S. Marshal Jamie
> Hainsworth […] asked for the public's help and
> said people should notify authorities if they
> come across him.
> *"We know that he's a dangerous individual,"*
> *Hainsworth said.  "He may be armed."*

CBS News/A.P., *"Turn yourself in," U.S. marshal warns escaped R.I.*

*inmate* (Jan. 3, 2017) (emphasis added), *available at*

https://www.cbsnews.com/news/james-morales-escaped-wyatt-detention-

facility-jamie-hainsworth-warns/ (last accessed Sept. 28, 2023).  But,

under the government's theories and the courts' holdings in this case, a citizen informed of the deadly risk of an escaped felon through the media instead of through direct, firsthand experience, could not plead an affirmative defense for any acute action taken to protect himself or his family, if, *e.g.*, the escaped felon he recognized from media reports suddenly reached for an unknown object in his waistband.  This is notwithstanding the fact that media reports are self-authenticating evidence under Fed. R. Evid. 902(1)(6).

Similarly, the possibilities of later judicial sanction against unlawful force through discretionary executive prosecution or civil litigation have never barred and cannot now bar self-defense and defense of another.[492]  Presumably every case subject to this affirmative defense is one in which "a judicial tribunal is available to hear the claims of harm," *United States v. Gottesfeld,* 18 F.4ᵗʰ at 16 n. 8.  America, however, has never been a place where the possibility of such later official acts neuters the right of citizens to defend themselves and their fellow citizens from acutely imminent or continuing unlawful harm.  *See, e.g., Commonwealth v. Barnacle*, 134 Mass. 215, 215 (1883) ("It is well settled that, if a man is attacked, he has the right to defend himself.  If the attack is of such character that, and made under such circumstances, as to create a reasonable apprehension of great bodily harm, and he acts under such apprehension, and in the reasonable belief that no other means will *effectively* prevent the harm, he has the right to kill the assailant.") (emphasis added).

---

[492] The First Circuit's mention of the availability of judicial tribunals may have been regarding the affirmative defenses of necessity and justification, and not duress, self-defense and defense of another.

As for the other considerations in whether to allow presentation of defense of another, the long-published pattern instruction is and was devoid of public-policy, physical-presence, firsthand-knowledge and judicial-availability and -preclusion considerations:

> Use of force is justified when a person reasonably believes that it is necessary for the defense of oneself *or another* against the immediate use of unlawful force.  However, a person must use no more force than appears reasonably necessary in the circumstances.  The government has the burden of proving that [defendant] did not act in self-defense.

First Circuit Pattern Crim. Jury Instr. § 5.04 (July 21, 2003) (emphasis added) (alterations marks in original), *available at* https://www.mad.uscourts.gov/resources/pattern2003/ (last accessed Sept. 24, 2023).  Respectfully, could a layperson of ordinary intelligence have found a relevant foreclosing precedent applicable to defense of another, then the government, this Court or the First Circuit would have found it.  But no such precedent has ever been cited at any level of this case.

The Court may, of course, change its pattern instruction to include such considerations in the future.  Respectfully, however, it may not do so in hindsight to reach the conduct charged here.

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.  The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

*United States v. Harriss*, 347 U.S. 612, 617 (1954) (citations omitted).  The same must be said where, as here, the Court published a

relevant dispositive jury instruction with discrete elements of a complete common-law defense prior to a disputed act, then amended those elements, *post facto*, without having provided timely, fair notice to Defendant, so as to ensure his conviction. "This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law." *Jordan v. De George*, 341 U.S. 223, 230 (1951) (citations omitted). *See* the Due Process Clause.[493]

Defendant has the right to rely on the jury instruction as a person of "ordinary intelligence" would have understood it at the time of the charged conduct. "Under the rule of lenity," moreover, "this Court has long held, statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals." *Bittner v. United States*, 143 S. Ct. 713, 724 (2023) (quoting *Commissioner v. Acker*, 361 U.S. 87, 91 (1959)). "[A]s a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (internal quotation marks and citations omitted). If this nation is to remain one of laws, not men, then the Due Process Clause[494] requires the sentence's vacatur.

---

[493] U.S. Const. amend. V, cl. 4 (No person shall "be deprived of life, liberty, or property, without due process of law").

[494] *See* U.S. Const. amend. V, cl. 4, *supra*, p. 199 n. 493.

Notably, the instruction, as written, does not require that the force contemplated *actually be* immediate or unlawful.  Its scienter is that Defendant "reasonably believe[d]" they were immediate and unlawful.  And the reasonableness of Defendant's belief, *e.g.*, which media reports of imminent risk of life are credible and which are not, is the jury's purview, not the government's or the Court's.

Further, the refusal to provide the instruction materially affected the jury's verdict.  Shortly into deliberations, the jury foreperson sent a note: "What happens if we remain at an impasse and neither side anticipates being moved?"



Jury Notes at 1, E.C.F. no. 301-1 (entered Aug. 1, 2018); Trial Tr., July 31, 2018, at 93:25, E.C.F. no. 329.  Deliberations continued for another day before the foreperson came forward again:

> THE COURT:  Good afternoon, Counsel.
> We've had another inquiry from the forewoman
> after the last session that we answered the
> jury's question.  The forewoman subsequently came
> out to the Marshal and asked if she could speak
> to my Deputy.  My Deputy came up, and the
> forewoman told her that one of the jurors is
> requesting to be excused.
> My Deputy said, "Can you tell me why?"  And
> the forewoman said, "She felt she couldn't follow
> the instructions."

Trial Tr., Aug. 1, 2018, at 5-6, E.C.F. nos. 330-31.  The juror in question was number six.  *Id.* at 9:13.  Upon *voir dire*, Juror Six reported: "I'm very sympathetic to Mr. Gottesfeld, and I was actually crying in the ladies room, and I came out, and then I—and I almost

feel like I'm going along to get along, and that's not right." *Id.* at 11-12.

The government conceded: "I think she's said to the Court that *she feels she cannot comply with the Court's instructions* and that there are considerations of things not in the record of this case that are influencing her decisions. […] She has stated that she cannot decide this case based on the evidence and the rulings of the Court *and the instructions on the law*." *Id.* at 12:16 (emphasis added).

Only after the Court's repeated admonishment to follow instructions, which itself followed the government's misrepresentation of the Court's instructions that "you must convict" and its emphatically repeated directive that Defendant's "good motive" was not a defense to the crimes charged,[495] the jury returned a partial verdict form. *See* Jury Notes*, supra*, at 5 ("The jury requests that the [C]ourt consider a verdict including only one of the subparagraphs for each charge."); Verdict Form (Aug. 1, 2018), E.C.F. no. 301.

Clearly, had Juror Six been told she could acquit Defendant based on defense of another, she would have followed that instruction. She personally told Defendant, "I'm sorry," after the verdict was announced. *See, supra*, p. 78, ¶ 49.

Moreover, the wholesale preclusion of the affirmative defense barred Defendant's testimony and other evidence from further strengthening his defense-of-another argument. With the dearth of the evidence presented on the defense-of-another theory under the government's sweeping control of the presented facts and testimony

---

[495] *See infra*, p. 203, § XIV (citations omitted).

pursuant to the Court's Memorandum and Order re Defense of Another and Suppression, *supra*, and the government's instruction to the jury that it "must convict,"[496] it is remarkable, indeed, that the jury deadlocked for days.

The consideration of the defense-of-another theory, moreover, would likely have precluded the need for any deliberations at all. The pattern instruction, as written at the time of the charged conduct, *supra*, places the burden on the government to disprove defense of another beyond a reasonable doubt.  This burden the government simply cannot meet.  Defendant's Motion for Judgment of Acquittal (July 26, 2018), E.C.F. no. 283, would have been materially different, and, in such form, would have been granted.

**XIII. UNDER THE DEFENSE-OF-ANOTHER THEORY, DEFENDANT IS *ACTUALLY INNOCENT*.**
Expressly stated, under the defense-of-another instruction as published and understood by citizens of "ordinary intelligence" at the time of the charged conduct,[497] Defendant is *actually innocent*.  The sentence is a miscarriage of justice and must be vacated.

**XIV.  ASSISTANT UNITED STATES ATTORNEY MARK KOSTO MISREPRESENTED THE COURT'S INSTRUCTIONS TO THE JURY, VIOLATING DUE PROCESS AND DEFENDANT'S RIGHT TO TRIAL BY JURY.**
In closing argument, Assistant United States Attorney Mark Kosto misrepresented the Court's instructions to the jury and directed the jury, "[I]f you find unanimously that the Government has proven each of the elements of the count beyond a reasonable doubt, *you must*

---

[496] *Id.*
[497] *See, supra*, p. 180, § XII (citations omitted).

*convict* on that count."  Trial Tr., July 31, 2018, *supra*, at 9:13

(emphasis added).

Of course, no jury is so obliged.  "The criminal cases do

establish—as does our practice today—that a jury's arbitrary decision

to acquit a defendant charged with a crime is completely

unreviewable."  *Honda Motor Co. v. Oberg*, 512 U.S. 415, 434 (1994).

Nor was curative instruction possible or prudent, given that

Defendant, abidingly, never once at trial alluded to nullification.

> Any arguably salutary functions served by
> *inexplicable* jury acquittals would be lost if
> that prerogative were frequently exercised;
> indeed, calling attention to that power could
> encourage the substitution of individual
> standards for openly developed community rules.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)

(emphasis in original) (citations omitted).[498]  But Defendant's proper

conduct neither waived nor negated his right to have the jury render

the verdict.  "Individual jurors bring to their deliberations

qualities of human nature and varieties of human experience, the range

of which is unknown and perhaps unknowable."  *McClesky v. Kemp*, 481

U.S. 279, 311 (1987) (internal quotation marks and citation omitted).

To rule otherwise is to allow the government to tell jurors they "must

convict," then not only encourage, but require, criminal defendants to

respond by bringing nullification before juries.

> Discretion in the criminal justice system offers
> substantial benefits to the criminal defendant.
> Not only can a jury decline to impose the death
> sentence, it can decline to convict or choose to
> convict of a lesser offense.  Whereas decisions
> against a defendant's interest may be reversed by

---

[498] A finding that curative instruction was required would incorporate well into Defendant's I.A.C. claim, *infra,* p. 218, § XVII.

> the trial judge or on appeal, these discretionary
> exercises of leniency are final and unreviewable.

*Id.*  Neither a prosecutor nor a judge may tell a jury that it "must convict."  "Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence."  *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) (citations omitted).  "Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly" structural, "the jury guarantee being a basic protection whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function."  *Id.* at 281 (internal quotation and alterations marks and citations omitted).  "The right to trial by jury reflects, we have said, a profound judgment about the way in which law should be enforced and justice administered."  *Id.* (citation omitted).  "The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'"  *Id.*

Where, as here, "it is clear that the prosecutor's statements were incorrect[,…] the misstatements constituted prosecutorial misconduct."  *United States v. Azubike*, 504 F.3d 30, 38 (1st Cir. 2007) (citing *Berger v. United States*, 295 U.S. 78, 84 (1935); *United States v. Joyner*, 191 F.3d 47, 54 (1st Cir. 1999); 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice & Procedure § 555 (3d ed. 2007) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.")).

Although distinct, a misstatement of fact plainly pales in comparison to a directive "you must convict."

"We have recognized that prejudicial statements made during closing argument 'militate in favor of reversal' because they are 'the last words spoken to the jury by the trial attorneys.'" *Azubike, supra,* at 39 (quoting *United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994)). "Finally, this was a close case and the prosecutor's misstatements went to the heart of [Defendant]'s defense." *Id.* at 40.

"The government argues that the prejudice of a prosecutorial misstatement does not survive a jury instruction to consider the evidence or that the prosecutor's statements are not evidence." *Id.* at 41. "In most of the cases in which a standard corrective instruction was held sufficient to dissipate all prejudice, there was 'overwhelming evidence of [the defendant's] guilt, which "eliminate[d] any lingering doubt that the remarks could have unfairly prejudiced the jury's deliberations."'" *Id.* at 41 (quoting *Joyner*, 191 F.3d at 54) (collecting cases)). "In other cases, the misstatements were peripheral to the defense." *Id.* (citations omitted).

But, "Other cases hold that where the evidence was close, and the misstatement goes to a central issue in the case, an instruction to consider the evidence may well be insufficient." *Id.* "In *United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999), 'the prosecutor misstated a defense witness' testimony on a critical point and did so while purporting to quote the witness' testimony.'" *Id.* at 41–42 (citing *Watson* at 698). "The district court instructed the jury that 'counsel's questions, statements, and arguments are not evidence.'"

*Id.* at 42 (quoting *Watson* at 699).  "The District of Columbia Circuit vacated the conviction, reasoning that 'the case was close' and the misstated 'testimony concerned a central issue in the case.'"  *Id.* (quoting *Watson* at 700-01).  "The court concluded that 'the [jury] instructions given could neither undo the error nor mitigate its prejudicial effects under these egregious circumstances.'"  *Id.* (quoting *Watson* at 702).

This too was a close case, in the only objective sense.  After a short trial the jury split for days, sent a note declaring an "impasse" and ultimately returned a partial verdict form.  *See*, *supra*, p. 180, § XII (quoting Jury Notes, *supra*).  In this circumstance Kosto's "you must convict" jury directive cannot be construed as nonprejudicial.

Moreover, jurors are laypersons who heard the following in sequence.  First, from Kosto:

> Judge Gorton is going to instruct you in a bit about the elements of the charges in this case. Elements are a bit like a to-do list for your deliberations.  You can't get to a verdict without considering each of them.  Taking the two charges, or counts as they're called, one at a time, if you find unanimously that the Government has proven each of the elements of that count beyond a reasonable doubt, you must convict on that count.

Trial Tr., July 31, 2018, *supra*, at 9:8.[499]  Kosto then five more times told the jurors, "I expect Judge Gorton to tell you[…]," or similar. *Id.* at 15:20, 16:2, 19:22, 21:20, 21:4.  Kosto's seventh and final mention followed: "I expect Judge Gorton will tell you what the law is

---

[499] Kosto was, of course, also wrong that a juror must in every case consider each element of a charge.  The government's failure to prove a single element is dispositive and would render moot all remaining elements without serial consideration.

here: Good motive alone is not a defense to the crimes charged.  Let me say that again.  Good motive alone is not a defense to the crimes charged."  *Id.* at 28:8.

The jurors later heard from Assistant United States Attorney David D'Addio: "The judge will instruct you[…]"  *Id.* at 51:13.

Judge Gorton then instructed the jurors.  Because the instant charge conference concluded before the government's closing arguments,[500] Judge Gorton's instructions substantially echoed the government's closing arguments as to deliberations.  *See* Trial Tr., July 31, 2018, *supra,* at 56:10.[501]  This included mandatory language similar, to a layperson, to Kosto's "you must convict" directive and at no point cognizably contradicted that directive: "It is my duty to instruct you on the law that you *must* follow and apply."  *Id.* at 56:11 (emphasis added).  "[I]t is your sworn duty to follow the law, as I am about to define it for you."  *Id.* at 56:22.  "[A]ll of my instructions about the law you *must* apply."  *Id.* at 57:21.  "You *must* follow all the rules as I explain them."  *Id.* at 58:22.

Given this sequence, it is reasonable to assume Kosto's "you must convict" directive affected deliberations.  Jurors easily may have assumed, and likely did assume, with all or nearly all the government's closing assertions about deliberations echoed in the jury charge, that Kosto's "you must convict" directive was accurate and similarly mandatory.

---

[500] *See,* Charge Conf. Tr., *supra*, at 1 ("July 30, 2018 2:03 P.M.").

[501] With all the relevant motions decided and the precise instructions laid out to the parties, the government correspondingly conformed its closing argument.  But should any doubt remain, direct and cross-examination of the relevant attorneys would confirm this happened.

The doubts are particularly acute for Juror Six, who expressly stated her difficulties following the charge as she understood it, and who, almost certainly, would have taken an opportunity to acquit and encourage other jurors likewise. *See, supra,* p. 180, § XII (quoting Trial Tr., Aug. 1, 2018, *supra*, at 11-12 ("I'm very sympathetic to Mr. Gottesfeld, and I was actually crying in the ladies room, and I came out, and then I—and I almost feel like I'm going along to get along, and that's not right.")) (other citations omitted).

## XV. THE GOVERNMENT PREJUDICIALLY VIOLATED THE PROFFER AGREEMENT.

Prior to charging this case, the government and Boston Children's Hospital expressed significant interest in the technical details of the charged conduct.[502]  Defendant agreed to share technical information with both the government and Boston Children's Hospital under a proffer agreement, without implicating anyone else in the charged conduct.  *See, supra,* p. 170, ¶¶ 379-380 (citing Proffer Agreement (Dec. 17, 2015), E.C.F. no. 216-1).[503]

The government, regarding the proffer, expressly provided:

> No statements made or other information provided by Gottesfeld will be used by the United States Attorney directly against him, *except to rebut any evidence offered, or factual assertions made, by or on behalf of Gottesfeld at any stage of a criminal or civil proceeding (including but not limited to detention hearing, trial or sentencing) which is inconsistent with, or contrary to statements made during the proffer,* or in a prosecution of Gottesfeld based on false statements made or false information provided by him.

---

[502] *See, supra,* p. 169 ¶ 378.

[503] No one else was ever charged and the relevant statute of limitations has now expired.  Defendant received no credit at sentencing for assisting the government or acceptance of responsibility.  *See, e.g.,* Sentencing Tr., Jan. 10, 2019, E.C.F. no. 399.

*See* Motion in Limine to Preclude Defense Questioning, Argument, or Evidence Inconsistent with the Defendant's December 17, 2015 Proffer Statement at 1 (quoting Proffer Agreement, *supra*, ¶ 1 (emphasis in Motion)) (June 29, 2018), E.C.F. no. 216.  Later, the government expressly led Defendant and this Court to believe: "If counsel does contradict Gottesfeld's proffer statements during trial, whether directly or by insinuation, the government *will move to admit* the *relevant*, contradictory portions of Gottesfeld's December 2015 proffer."  *Id.* at 6 (emphasis added).

At the proffer the government and Boston Children's Hospital learned for the first and only time, from Defendant, that the source of *some* of the Internet traffic in controversy was an approximately 40,000-node "botnet" that Defendant had built using a custom payload based on an in-the-wild remote arbitrary-code-execution vulnerability colloquially called "the moon worm."  *See, supra*, p. 170, ¶¶ 381–383 (citations omitted).  The government did not seem to be on a parallel investigative track to construct these details.  *Id.*  Under the proffer agreement Defendant white boarded detailed diagrams of the DDoS traffic about which he personally knew.  *See, supra*, p. 171, ¶ 384.

No doubt with an eye on the proffered information, the government proposed the Court instruct the jury on impeachment by prior inconsistent statement.  *See* Government's Proposed Jury Instructions at 22 (July 9, 2018), E.C.F. no. 238.  At the charge conference, however, the Court decided: "I'm not going to give that [instruction] because I don't think there was any reference to prior inconsistent

statements during the course of the trial." Charge Conf. Tr., *supra*, at 8:23.

The government never moved to admit any of the proffer statements, never identified a single thing Defendant or his counsel said or implied that contradicted any of Defendant's proffer statements, never asserted any parallel construction of any of the information Defendant proffered and never objected to or sought reconsideration of this Court's denial of the government's request to instruct the jury as to impeachment by prior inconsistent statement.

Instead, without warning, for the first time, in front of the jury, and after the government had rested, Assistant United States Attorney D'Addio introduced information from the proffer while cross-examining Defendant:

> Q:  Let's start with the Boston Children's
> Hospital.  The botnet that you controlled to
> carry out that attack, was approximately 40,000
> nodes?
> A:  Yes.
> Q:  And you built that botnet yourself, you
> created it?
> A:  Yes.
> Q:  You created it using some type of malware
> that you put on the nodes; is that correct?
> A:  It depends on how you define malware.  There
> was software put on the nodes, yes.
> Q:  Okay.  And what was that software designed to
> do?
> A:  That software was designed to allow the node
> to accept a command to initiate a distributed
> denial or service, or I guess each node would be
> issuing its own denial of service, and then
> collectively there would be a distributed denial
> of service.
> Q:  And you got the software onto those nodes
> from your Somerville apartment, correct?
> A:  Not directly.
> Q:  You put the software—
> A:  I was physically located in my Somerville
> apartment at the time the software was loaded

onto those nodes, but the software did not come
directly from the Somerville apartment.
Q:  So you caused the software to be loaded onto
those nodes; correct?
A:  That's correct.
Q:  Okay.  And was that some variant of the so-
called moon worm?
A:  Yes, it was, as I recall.  Yes.
Q:  And did you customize that moon worm in some
way?
A:  I did more than customize it; I largely
rewrote it.
Q:  And then you caused that software to be put
onto those nodes?
A:  Correct.
Q:  Are those nodes that you owned?
A:  No, they were not.
Q:  Did you seek permission to have that software
loaded onto those nodes?
A:  No, I did not.
Q:  This botnet, you created it specifically for
the DDoS attack on Children's Hospital; right?
A:  Yes, with that in mind.  Yes.
Q:  And you controlled it through a virtual
private server?
A:  Correct.
Q:  And you communicated with the virtual private
server from a computer you were using?
A:  Correct.
Q:  And you initiated the attack from a computer
you were using?
A:  Correct.
Q:  You initiated the attack by issuing a command
from a computer you were using?
A:  That's correct.
Q:  And did that command go to a so-called
command-and-control server?
A:  Not in the traditional sense, but yes, in
some sense of that, yes.
Q:  Okay.  So you issued a command to a command—
you issued a command to a command-and-control
server that controlled the bots; is that correct?
A:  That then issued—that then relayed that
command to the bots, yes.
Q:  And the bots are what directed the
information or the data at the BCH network that
flooded it; correct?
A:  They directed the white noise, yes.
Q:  White noise.  *White noise or* packets of
information; right?
A:  That's correct, yes.
Q:  The randomized information?

> A:  I'm not sure if it was randomized or just may
> have happened to have been in the buffer.  I
> don't recall off the top of my head.
> Q:  Okay.  Those nodes, what were they
> physically?  What type of devices?
> A:  As far as I know, they were [Linksys]
> routers.

Trial Tr., July 27, 2018, at 71:21 (emphasis added), E.C.F. no. 313.

In closing argument, the government then, without notice of any kind,

employed a demonstrative never admitted into evidence that largely

copied Defendant's proffered white-board diagrams.  Defendant timely

objected: "I would ask that the Government give the Court a copy to

mark for identification of the demonstrative that Mr. Kosto used

during his closing argument because there is no record of it.  Again,

I had never seen it before, and I think the First Circuit ought to

review it."  Trial Tr., July 31, 2018, *supra*, at 92:18-93:14.  The

Court then newly marked the demonstrative "Exhibit D."  *Id*.  That

demonstrative illustrated 40,000 computers attacking Boston Children's

Hospital.  *See* Government's PowerPoint Presentation, Trial Exh. D.

Both the line of testimony and demonstrative derived from the

proffer were highly prejudicial.  The government made repeated

references to the testimony in its closing arguments while featuring

the demonstrative, *e.g.*

> The Defendant told you he did this.  He built a
> botnet of 40,000 nodes, those nodes links as
> routers that he took over that he controlled from
> this computer.  He sent commands from his
> computer to a second computer, that second
> command-and-control server, which then sent
> commands on to those 40,000 robot computers.
> This caused—the Defendant caused these nodes to
> attack Children's by transmitting information
> that bombarded the Hospital's network.

Trial Tr., July 31, 2018, *supra*, at 15:1.

> You listened to this evidence.  He took the
> stand, and he said, I issued a command to a
> command-and-control server that caused 40,000
> nodes of a botnet that he created himself and
> that that botnet sent packets of information.

*Id.* at 48:9.[504]  The breach of the proffer agreement further adversely affected Defendant at sentencing.  *See, e.g.,* Sentencing Tr., Jan. 10, 2019, at 13-14 (objection to use of proffered testimony at sentencing) (citing Final P.S.R.), E.C.F. no. 399.

The First Circuit then applied the proffer-derived testimony in its denial of Defendant's appeal: "even if [Defendant] thought that some individual or group of individuals were using or threatening to use unlawful force, that would have provided no justification for Gottesfeld to take hostage thousands of other persons' internet connections."  *United States v. Gottesfeld,* 18 F.4th at 16.

In this circuit,

> [i]t is axiomatic that the government must turn
> square corners when it undertakes a criminal
> prosecution.  This axiom applies regardless of
> whether the target of the prosecution is alleged
> to have engaged in the daintiest of white-collar
> crimes or the most heinous of underworld
> activities.  It follows that courts must be
> scrupulous in holding the government to this high
> standard as to sympathetic and unsympathetic
> defendants alike.

*Ferrara v. United States*, 456 F.3d 278, 280 (2006) (Selya, J.). Defendant requests a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), and, ultimately, the vacatur of the sentence

---

[504] In fact, Defendant never said at trial or the proffer that the botnet sent traffic that qualifies under the relevant statute as information or data, and the statute defines neither. *See* 18 U.S.C. § 1030(e) (no definitions of data or information).  This question of whether the traffic sent to Boston Children's Hospital met the statute's implied definitions in no way implicated Defendant's proffered statements. *See, supra*, p. 171, ¶ 385 (statutory definitions went undiscussed at the proffer).

because the government's breach of the proffer agreement violated the Self-incrimination Clause.[505]

### XVI. The District Court failed to enter the interests-of-justice findings required by the Speedy Trial Act "by the time" it denied Defendant's motion to dismiss.

"Congress passed the Speedy Trial Act […] 'to give effect to the sixth amendment right.'" *Betterman v. Montana*, 136 S. Ct. 1609, 1616 (2016) (quoting S. Rep. No. 93-1021, p. 1 (1974)) (citation omitted). *See* the Speedy and Public Trial Clause.[506]

Under the Speedy Trial Act ("S.T.A."), 18 U.S.C. §§ 3161 *et seq.*, "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b).

Defendant was arrested Feb. 17, 2016. *See* Docket Report. The indictment was not filed until 245 later. *See* Indictment (Oct. 19, 2016), E.C.F. no. 28. Defendant timely moved to dismiss the indictment for violation of the S.T.A. *See* Motion to Dismiss under the Speedy Trial Act (May 3, 2018), E.C.F. no. 164.

At issue is an S.T.A. provision by which courts may "exclude" from the speedy-trial clock:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if

---

[505] *See* U.S. Const. amend. V, cl. 3 (No person "shall be compelled in any criminal case to be a witness against himself").

[506] U.S. Const. amend. VI, cl. 1 ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[…]").

> the judge granted such continuance on the basis
> of his findings that the ends of justice served
> by taking such action outweigh the best interest
> of the public and the defendant in a speedy
> trial. *No such period of delay resulting from a*
> *continuance granted by the court in accordance*
> *with this paragraph shall be excludable under*
> *this subsection unless the court sets forth, in*
> *the record of the case, either orally or in*
> *writing, its reasons for finding that the ends of*
> *justice served by the granting of such*
> *continuance outweigh the best interests of the*
> *public and the defendant in a speedy trial.*

18 U.S.C. § 3161(h)(7)(A) (emphases added).

In controversy are six interests-of-justice exclusions entered outside the criminal case, on the Court's miscellaneous business docket (M.B.D.).  *Id.* at 12 (citing, at E.C.F. no. 164-3, Docket Report, 1:16-mc-91064-ADB).  The government argued the M.B.D. exclusions were valid.  *See* Opposition to Motion to Dismiss (May 4, 2018), E.C.F. no. 167.

The Court found that the M.B.D. exclusions "were proper."  Order Denying Motion to Dismiss at 2 (June 14, 2018), E.C.F. no. 205. Having done so, the Court neither entered nor promised new findings; instead, the Court relied on the previous M.B.D. orders to support the exclusions.  *Id.*  Five days later the Court entered a memorandum, where it found, *sua sponte,* "the orders excluding time were appropriate under the ends-of-justice provision of the Speedy Trial Act."  Memorandum and Order re Defense of Another, Suppression and the Speedy Trial Act at 24 (June 19, 2018), E.C.F. no. 209.

Defendant timely appealed.  *See* Appellant's Brief, *supra,* at 18.

The First Circuit found "the trial judge's order denying Gottesfeld's motion to dismiss sufficiently set forth the reasons

supporting the challenged ends-of-justice determinations." *United States v. Gottesfeld*, 18 F.4th at 8.  "Having so concluded, we need not address Gottesfeld's separate argument that the judge who granted the challenged continuances on the miscellaneous business docket failed to adequately set forth such findings." *Id.* n. 3.

But the findings the First Circuit cited, supporting the exclusions, were not actually set forth or alluded to in the order that denied the motion to dismiss. *See* Order Denying Motion to Dismiss (June 14, 2018), E.C.F. no. 205.  They were set forth five days later in the Memorandum that followed. *See* Memorandum and Order re Defense of Another, Suppression and the Speedy Trial Act at 24 (June 19, 2018), E.C.F. no. 209.

The Supreme Court, in contrast, holds "at the very least the Act implies that those findings must be put on the record *by the time* a district court rules on a defendant's motion to dismiss." *Zedner v. United States*, 547 U.S. 489, 507 (2006) (emphasis added); *accord United States v. Huete-Sandoval*, 668 F.3d 1, 3 (1st Cir. 2011) ("Such findings must, at the very least, be entered into the record by the time a district court rules on a defendant's motion to dismiss").

Because the subsequent entrance of the findings on the criminal docket occurred after the Court denied Defendant's Motion to Dismiss under the Speedy Trial Act, *supra*, they cannot support the denial of the motion.  And because the M.B.D. plainly is not "the record of the case," 18 U.S.C. § 3161(h)(7)(A), no findings supporting the challenged exclusions were entered in the instant record by the time the Court denied the motion.  This violates the S.T.A., which states:

> No such period of delay resulting from a
> continuance granted by the court in accordance
> with this paragraph shall be excludable under
> this subsection unless the court sets forth, in
> the record of the case, either orally or in
> writing, its reasons for finding that the ends of
> justice served by the granting of such
> continuance outweigh the best interests of the
> public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).  Absent those exclusions far more than the

maximum 30 days passed between Defendant's arrest and the filing of

the Indictment, and only one remedy exists:

> If, in the case of any individual against whom a
> complaint is filed charging such individual with
> an offense, no indictment or information is filed
> within the time limit required by section 3161(b)
> as extended by section 3161(h) of this chapter,
> such charge against that individual contained in
> such complaint shall be dismissed or otherwise
> dropped.

18 U.S.C. § 3162(b).  Because Defendant timely moved to dismiss under

the S.T.A. and the Court denied the motion when no findings were

entered in the criminal case to exclude Feb. 18–Oct. 19, 2016, "the

sentence was imposed in violation of the Constitution or laws of the

United States," as contemplated by 28 U.S.C. § 2255(a), 18 U.S.C. §§

3161 *et seq.* and the Speedy and Public Trial Clause.[507]  It must be

vacated.

## XVII. Defendant was convicted only due to the ineffective assistance of counsel.

Given all that trial counsel failed to do,[508] Defendant was only

convicted due to the ineffective assistance of counsel, in violation

of the Counsel Clause.[509].  Competent evidence was available to present,

---

[507] *See* U.S. Const. amend. VI, cl. 1, *supra*, p. 215 n. 506.
[508] *See, supra*, p. 147, ¶¶ 272–375 (examples of actions not taken) (citations omitted).
[509] *See* U.S. Const. amend. VI, cl. 7 ("In all criminal prosecutions, the accused shall [...] have the Assistance of Counsel for his defence.").

about which Defendant had already notified and in many cases provided counsel, *e.g.*, Justina's handwritten note,[510] Dershowitz's expert legal opinion as to the unlawfulness of Justina's torment[511] and Pollack's letter,[512] but counsel never presented them and there was no strategic gain to be had by his silence.  The limitations of the conduct authorized by the relevant child custody order as to child abuse and torture[513] were readily apparent to persons with legal training but went unargued, again, with nothing to gain for Defendant.  Objections were to be had, outside the presence of the jury, and curative instructions sought, for evidence that was impermissibly prejudicial, unlawfully obtained or both.[514]  Those objections inexplicably went unraised.  The Second Supplemental Suppression Motion, *supra*, should have been renewed considering the evidence that Defendant provided counsel regarding the breadth and depth of Magistrate Bowler's nexus to the events in controversy and the testimony solicited by the government at trial, but counsel inexplicably and unjustifiably failed to renew it. *See, supra*, p. 169, ¶¶ 374-375 (citations omitted).

Defense counsel made no significant investigation into the details of this case.  *See, e.g., supra*, p. 162, ¶¶ 331, 335 (citation omitted).  They relied on the incarcerated Defendant to bring them information instead of vice versa.  *See, e.g., supra*, p. 161, ¶¶ 329-330 (citations omitted).

---

[510] *See, supra,* p. 69 ¶ 47 (quoting Justina's Note, Exh. A).
[511] *See, supra,* 67 ¶ 44 (quoting Daily Motion, *Alan Dershowitz extends offer to aid Justina Pelletier on Huckabee Show March 29 2014* at 0:33).
[512] *See, supra,* 63 ¶ 42 (quoting Pollack, *Re: Children's Hospital Boston—Bader 5 Unit,* Dec. 21, 2013, E.C.F. no. 127-1).
[513] *See, supra*, p. 180, § XII (citations omitted).
[514] *See, e.g., supra*, p. 147, § IX(G) Suppression (citations omitted), p. 209, § XV The government prejudicially violated the proffer agreement. (citations omitted).

Defendant took the stand without knowing the questions his own counsel would ask or the questions likely upon cross-examination. *See, supra*, p. 166, ¶ 360 (citation omitted).

Though the list is not exhaustive, any of the aforementioned items stood to change the outcome of the case substantially.

Defendant never waived his right to the effective assistance of counsel and good excuses are not to be found for counsels' actions and inactions.  The sentence must be vacated and set aside under the Counsel Clause.[515]

"We established the legal principles that govern claims of ineffective assistance of counsel." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Id.* (citing *Strickland* at 687).

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland* at 688). "We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland* at 688) (alteration in *Wiggins*).

---

[515] *See* U.S. Const. amend. VI, cl. 7, *supra,* p. 218 n. 509.

In this Court, the primary prevailing professional norms are the Massachusetts Rules of Professional Conduct (Mass. R. Prof. C.).[516]  *See* L.R. 83.6.1 (adopting, with two irrelevant exceptions, the Mass. R. Prof. C.).  Among these rules is, "A lawyer shall act with reasonable diligence and promptness in representing a client."  Mass. R. Prof. C. 1.3.  "The lawyer should represent a client zealously within the bounds of the law."  *Id.*  Moreover, "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."  Mass. R. Prof. C. 1.3, Comment 1.  "A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf."  *Id.*

> Perhaps no professional shortcoming is more widely resented than procrastination.  A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed.  Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. […]

Mass. R. Prof. C. 1.3, Comment 3.  "Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client."  Mass. R. Prof. C. 1.3, Comment 4.  A lawyer's obligations continue despite discharge:

---

[516] *See, also,* Guide to Judiciary Policy, Vol. 7A, Appx. 2A at § XI(A)(1) ("CJA panel members must provide high quality representation consistent with the best practices of the legal profession and commensurate with those services rendered when counsel is privately retained.") (citation omitted).  *Cf.* General Order 21-11 Plan for Implementing the Criminal Justice Act of 1964, as Amended 18 U.S.C. § 3006A, at 2, § I(A) ("any lawyer appointed pursuant to this plan must provide high-quality representation consistent with the best practices of the legal profession and commensurate with those services rendered when counsel is privately retained.")

"Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."  Mass. R. Prof. C. 1.16, Comment 9.

A lawyer shall: "promptly inform the client of any decision or circumstance with respect to which the client's informed consent is required."  Mass. R. Prof. C. 1.4(a)(1) (citing Mass. R. Prof. C. 1.0(g) ("'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.")).  Also, a lawyer shall "reasonably consult with the client about the means by which the client's objectives are to be accomplished."  Mass. R. Prof. C. 1.4(a)(2).  "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  Mass. R. Prof. C. 1.4(b).

> If these Rules require that a particular decision
> about the representation be made by the client,
> paragraph (a)(1) requires that the lawyer
> promptly consult with and secure the client's
> consent prior to taking action unless prior
> discussions with the client have resolved what
> action the client wants the lawyer to take.

Mass. R. Prof. C. 1.4, Comment 2.  "A lawyer shall provide competent representation to a client."  Mass. R. Prof. C. 1.1.  "Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  *Id.*

> Competent handling of a particular matter
> includes inquiry into and analysis of the factual
> and legal elements of the problem, and use of
> methods and procedures meeting the standards of
> competent practitioners.  It also includes
> adequate preparation.  The required attention and

> preparation are determined in part by what is at
> stake; major litigation and complex transactions
> ordinarily require more extensive treatment than
> matters of lesser complexity and consequence.
> […]

Mass. R. Prof. C. 1.1, Comment 5.  "A lawyer shall seek the lawful
objectives of his or her client through reasonably available means
permitted by law and these Rules."  Mass. R. Prof. C. 1.2(a).

Another applicable set of prevailing professional norms are the
American Bar Association's Criminal Justice Standards (4th ed. 2017)
("A.B.A. C.J.S.").  "Defense counsel has a duty to investigate in all
cases, and to determine whether there is a sufficient factual basis
for criminal charges."  A.B.A. C.J.S. 4-4.1(a).

> The duty to investigate is not terminated by
> factors such as the apparent force of the
> prosecution's evidence, a client's alleged
> admissions to others of facts suggesting guilt, a
> client's expressed desire to plead guilty or that
> there should be no investigation, or statements
> to defense counsel supporting guilt.

A.B.A. C.J.S. 4-4.1(b).

> Defense counsel's investigative efforts should
> commence promptly and should explore appropriate
> avenues that reasonably might lead to information
> relevant to the merits of the matter,
> consequences of the criminal proceedings, and
> potential dispositions and penalties.  Although
> investigation will vary depending on the
> circumstances, it should always be shaped by what
> is in the client's best interests, after
> consultation with the client.  Defense counsel's
> investigation of the merits of the criminal
> charges should include efforts to secure relevant
> information in the possession of the prosecution,
> law enforcement authorities, and others, as well
> as independent investigation.  […]

A.B.A. C.J.S. 4-4.1(c).

> Defense counsel should determine whether the
> client's interests would be served by engaging

> fact investigators, forensic, accounting or other experts, or other professional witnesses such as sentencing specialists or social workers, and if so, consider, in consultation with the client, whether to engage them.  Counsel should regularly re-evaluate the need for such services throughout the representation.

A.B.A. C.J.S. 4-4.1(d).

> If the client lacks sufficient resources to pay for necessary investigation, counsel should seek resources from the court, the government, or donors.  Application to the court should be made *ex parte* if appropriate to protect the client's confidentiality.  Publicly funded defense offices should advocate for resources sufficient to fund such investigative expert services on a regular basis.  *If adequate investigative funding is not provided, counsel may advise the court that the lack of resources for investigation may render legal representation ineffective.*

A.B.A. C.J.S. 4-4.1(e) (emphasis added).[517]

> Defense counsel should prepare in advance for court proceedings.  Adequate preparation depends on the nature of the proceeding and the time available, and will often include: reviewing available documents; considering what issues are likely to arise and the client's position regarding those issues; how best to present the issues and what solutions might be offered; relevant legal research and factual investigation; and contacting other persons who might be of assistance in addressing the anticipated issues.  *If defense counsel has not had adequate time to prepare and is unsure of the relevant facts or law, counsel should communicate to the court the limits of the defense counsel's knowledge or preparation.*

A.B.A. C.J.S. 4-4.6(a) (emphasis added).[518]

    "In this case, as in *Strickland*, petitioner's claim stems from

counsel's decision to limit the scope of their investigation."

---

[517] Because inadequate funding for an investigation may render representation ineffective, the failure to investigate axiomatically may also render representation ineffective.

[518] Though Grimaldi admitted his lack of preparation as of July 16, 2018, to Judge Stearns, *supra*, p. 165 ¶¶ 353–355, 360, 371 (citations omitted), Grimaldi nowhere on the record advised Judge Gorton that Defendant was about to testify without any meaningful preparation for direct or cross examination.

*Wiggins*, 539 U.S. at 521 (citing *Strickland,* 466 U.S. at 673).  "Here, as in *Strickland*, counsel attempt to justify their limited investigation as reflecting a tactical judgment […] and to pursue an alternative strategy instead."  *Id.*

> In rejecting the respondent's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:
> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Id.* at 521–22 (quoting *Strickland* at 690–91 (alteration in *Wiggins*)). *See, also, Dugas v. Coplan*, 428 F.3d 317, 327–28 (1st Cir. 2005) (quoting same).  In finding an "ineffectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on [Petitioner's] voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins* at 522 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 A.B.A. Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980))) (first alteration added) (second alteration in *Wiggins*).

"In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same 'clearly established' precedent of *Strickland* we apply today." *Id.* (citing *Strickland* at 690-91 (establishing that "thorough investigation[s]" are "virtually unchallengeable" and underscoring that "counsel has a duty to make reasonable investigations"), 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like… are guides to determining what is reasonable)).

As with counsels' other failures herein described, the unjustified failure to investigate the facts and law of this case alone warrant vacatur.

**DEFENDANT REQUESTS AN EVIDENTIARY HEARING.**

Defendant requests an evidentiary hearing to resolve disputed factual matters. *See* Rules Governing Section-2255 Proceedings 8(a) ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.") (c) ("If an evidentiary hearing is warranted, the judge must […] conduct the hearing as soon as practicable after giving the attorneys adequate time to investigate and prepare.").

**REQUEST FOR ORAL ARGUMENT**

Defendant "wishes to be heard" and asserts that oral argument will "assist the [C]ourt." *Cf.* L.R. 7.1(d).

As the government noted after the original Motion To Vacate and Set Aside Sentence (§ 2255), E.C.F. no. 457-8: "Across 128 pages, the Motion alleges [eight] grounds in support of the relief it requests, including a claim that Gottesfeld received ineffective assistance of counsel." *See* Motion for Extension of Time to Respond and to Obtain Unredacted Pleadings (Oct. 23, 2023), E.C.F. no. 460.  The government then sought and received a further extension, citing, *inter alia*:

> Gottesfeld's claims cover diverse matters
> spanning from the investigation of his offense,
> his arrest and detention pre-trial, the conduct
> of his trial, and his appeal.  The claims require
> a close review of the extensive pre-trial record,
> the trial transcripts, and the appellate
> briefing, argument, and record […]

*See* Second Motion for Extension of Time to Respond (Dec. 7, 2023),
E.C.F. no. 462; Order Granting Extension (Dec. 8, 2023), E.C.F. no.
463.  In all, the government spent 102 days preparing its initial
Opposition to Motion to Vacate and Set Aside Sentence (§ 2255), E.C.F.
no. 465, which spans 18 pages.

This Amended Motion now exceeds 225 pages, incorporating
technical matters, including source code and statistical analyses.
Defendant has further timely notified the Court of his intent to reply
to any subsequent opposition.  *See* Notice of Intent to Reply in
Support of Section-2255 Motion (Feb. 1, 2024), E.C.F. no. unknown.
Such reply would also likely be necessarily substantial.

Respectfully, the Court can not spare the time to research these
matters adequately absent oral argument.

For all these reasons, Defendant requests oral argument.

**THIS MOTION IS VERIFIED.**

I hereby verify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *See* 28 U.S.C. §§ 1746, 2242.  Executed Thursday, February 1, 2024,


by:   */s/* Martin Gottesfeld, *pro se*,[1]
      28 Albion St., Apt. 1,
      Somerville, MA 02143,
      (617) 702-6156,
      mgottesfeld@gmail.com.

---

[1] For holographic execution, *see* Accompanying Verification (Feb. 1, 2024), E.C.F. no. unknown.

## CERTIFICATE OF SERVICE

I, Martin Gottesfeld, certify that on this date I hand delivered a
copy of the foregoing filing(s) on compact disc (C.D.) to the United
States attorney's office at Moakley U.S. courthouse,


by: */s/* Martin Gottesfeld, *pro se*,[1]          Thursday, February 1, 2024.

---

[1] For holographic execution, *see* Accompanying Verification (Feb. 1, 2024), E.C.F. no. unknown.